IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | |
|---|---|
| ADAM FRIED, ADMINISTRATOR, et al., | ) ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-00139 |
| | ) Judge Patricia A. Gaughan |
| CITY OF STRONGSVILLE, et al., | ) ) |
| Defendants. | ) |

- - -

THE DEPOSITION OF OFFICER WILLIAM JASON MILLER

THURSDAY, AUGUST 23, 2018

- - -

The deposition of OFFICER WILLIAM JASON MILLER, a Defendant herein, called for examination by the Plaintiffs, under the Federal Rules of Civil Procedure, taken before me, Kristine M. Esber, a Notary Public in and for the State of Ohio, pursuant to agreement of counsel, at the Strongsville Police Department, 18688 Royalton Road,  Strongsville, Ohio, commencing at 10:19 a.m., the day and date above set forth.

- - -

HOFFMASTER & BARBERIC, INC.
THE GRAY'S BLOCK, SUITE 440
1360 WEST NINTH STREET
CLEVELAND, OH  44113
(216) 621-2550
FAX (216) 621-3377
1-888-595-1970

Page 2

```
 1   APPEARANCES:
 2   On behalf of the Plaintiffs Amanda Pauley, Individually
     and as parent and next friend of Devon Connard, Yasmyn
 3   Evans, and Roy Evans, Jr.:
 4       JOSEPH F. SCOTT, ESQ.
         Scott & Winters Law Firm, LLC
 5       The Caxton Building
         812 Huron Road, Suite 490
 6       Cleveland, Ohio  44115
         440-498-9100
 7       email: jscott@ohiowagelawyers.com
 8   On behalf of the Plaintiff Adam Fried, Administrator of
     the Estate of Roy Evans, Jr., Deceased:
 9
         MARCUS SIDOTI, ESQ.
10       Jordan & Sidoti, LLP
         The Terminal Tower
11       50 Public Square, Suite 1900
         Cleveland, Ohio  44113
12       (216) 357-3350
         email: marcus@jordansidoti.com
13
14   On behalf of the Defendants City of Strongsville,
     Jason Miller, Sergeant Shamus Kelley, and James Kobak:
15
         TODD M. RASKIN, ESQ.
16       Mazanec, Raskin & Ryder Co., LP.
         100 Franklin's Row
17       34305 Solon Road
         Cleveland, Ohio  44139
18       (440) 248-7906
         email: traskin@mrrlaw.com
19
20   On behalf of the Fraternal Order of Police Lodge #15:
21       ROBERT M. PHILLIPS, ESQ.
         Faulkner, Hoffman & Phillips, LLC
22       20445 Emerald Parkway Drive, Suite 210
         Cleveland, Ohio  44135
23       (216) 781-3600
         email: Phillips@fhplaw.com
24
25                        - - -
```

Page 3

```
 1                       INDEX
 2                                  PAGES
 3   CROSS-EXAMINATION BY
 4       MR. SCOTT                   4, 181
 5       MR. SIDOTI                  116, 184
 6
 7                 - - -
 8
 9   PLAINTIFFS' EXHIBITS MARKED
10       9                  7
         10                 9
11       11                 16
         12                 (41), 45
12       13                 46
         14                 103
13       15                 189
14
15                 - - -
16
17   OBJECTIONS BY
18       MR. RASKIN     11, 15, 16, 17(2), 19, 42, 54,
                        57, 58, 70, 86, 104, 113, 117,
19                      129, 144, 149, 180, 188
20
21                 - - -
22
23
24
25
```

Page 4

```
 1           OFFICER WILLIAM JASON MILLER
 2   a Defendant herein, called for examination by the
 3   Plaintiffs, under the Rules, having been first duly
 4   sworn, as hereinafter certified, deposed and said as
 5   follows:
 6                      - - -
 7           MR. SCOTT:          Please let the
 8       record reflect that we're here for the
 9       deposition of Strongsville Police Officer
10       William Jason Miller being taken in the
11       matter of Adam Fried, Administrator, et
12       al., versus City of Strongsville, et al.
13       This case is pending in the United States
14       District Court for the Northern District
15       of Ohio, Case Number 1:18-CV-139 before
16       the Honorable Patricia A. Gaughan.
17                      - - -
18           CROSS-EXAMINATION
19   BY MR. SCOTT:
20   Q.   Officer Miller, my name is Joseph Scott.  And I
21   together with Attorney Marcus Sidoti have the privilege
22   of representing the Plaintiffs in this civil action
23   that we have filed concerning the events of March 7th,
24   2017.
25           And we've asked you here today to ask you a
```

Page 5

```
 1   number of questions relative to that complaint.  You
 2   understand that, correct?
 3   A.   Yes.
 4   Q.   Okay.  And, Officer Miller, I know you've had
 5   your deposition taken before, but if I could, again, I
 6   would just ask you as we go through this today, if I
 7   ask you anything that's not clear or you don't
 8   understand, please tell me and I'll try and rephrase my
 9   question.  Otherwise I'm going to assume that you're
10   trying to answer my question to the best your ability;
11   is that fair?
12   A.   Yes.
13   Q.   If at any time you want to take a break, please
14   let me know and we'll do so.  I only ask that you
15   answer the question that's in front of you before we
16   break.  Okay?
17   A.   Yes.
18   Q.   And, as always, please try and give a verbal
19   response as opposed to a nod of the head or uh-huh or
20   huh-uh as we won't have a clear understanding of what
21   that means when they transcribe this record.  Okay?
22   A.   Yes.
23   Q.   All right.  Would you please state your full
24   name for the record?
25   A.   William Jason Miller.
```

Page 6

1    Q.    Okay.  And, Officer Miller, you are employed
2    with the City of Strongsville Police Department,
3    correct?
4    **A.    Yes.**
5    Q.    Okay.  And what is your current position with
6    the Strongsville Police Department?
7    **A.    I am a canine officer on night shift.**
8    Q.    And how long have you been employed with the
9    City of Strongsville Police Department?
10   **A.    Since August of 2001.**
11   Q.    August of 2000?
12   **A.    2001.**
13   Q.    Okay.  2001.  Have you spent your entire law
14   enforcement career here in the City of Strongsville?
15   **A.    Yes.**
16   Q.    You didn't have any prior service with any other
17   community or police department, correct?
18   **A.    No.**
19   Q.    Officer Miller, did you have the chance to do
20   anything in preparation for today's deposition?
21       I don't want to know about things you discussed
22   with your attorney, but did you have a chance to look
23   at documents or meet with other officers or review
24   materials?
25   **A.    Yes.**

Page 7

1    Q.    Can you please tell me what you did to prepare
2    for today's deposition?
3    **A.    I read my statement to BCI.**
4    Q.    Okay.
5    **A.    And listened to the audio of that statement to**
6    **BCI.**
7    Q.    Okay.
8    **A.    And watched the cruiser dash cams that were**
9    **involved in the incident.**
10   Q.    Okay.  Did you have a chance to speak with any
11   of the other officers that were involved in the pursuit
12   that we're here to talk about today?
13   **A.    Regarding this topic?**
14   Q.    Yes, sir.
15   **A.    No.**
16   Q.    Okay.  I appreciate that you work with these
17   same officers every day and you may have interaction
18   about other business.  So you didn't talk about this
19   case?
20   **A.    No.**
21   Q.    Okay.  Let me, since you mentioned it, I will
22   hand you what I will mark as Plaintiffs' Exhibit 9.
23            (Thereupon, Plaintiffs' Exhibit 9 to
24            the deposition of OFFICER WILLIAM JASON
25            MILLER was marked for identification.)

Page 8

1    BY MR. SCOTT:
2    Q.    And please take a few moments to look that over.
3            MR. RASKIN:        Do you want
4            him to read the entire document, Joe?
5            MR. SCOTT:        No.  I'm not
6            going to ask him about the document right
7            now.  I just want him to be comfortable
8            that he had a chance to look at it and
9            knows what it is.
10   **A.    I know what it is.**
11   Q.    Okay.  Officer Miller, is this the statement
12   that you were just referencing that you reviewed prior
13   to today's deposition?
14   **A.    It appears so.**
15   Q.    Okay.  And Plaintiffs' Exhibit 9 is a statement
16   that was taken during an interview between yourself and
17   Special Agent Charles Moran with the Bureau of Criminal
18   Investigation, correct?
19   **A.    Yes.**
20   Q.    That interview occurred on or about March 14th
21   of 2017; is that correct?
22   **A.    Yes.**
23   Q.    Okay.  And I know that -- or I don't believe
24   this statement was made under oath, but is the
25   statement to the best of your knowledge truthful and

Page 9

1    accurate?
2    **A.    Yes.**
3    Q.    Is there anything in this statement that you
4    would change as you sit here today?
5            MR. RASKIN:        Make sure you
6            read the entire statement if you are being
7            asked that question.
8            (Thereupon, Plaintiffs' Exhibit 10 to
9            the deposition of OFFICER WILLIAM JASON
10           MILLER was marked for identification.)
11           MR. RASKIN:        Take your time.
12           (Thereupon, there was a discussion
13           off the record.)
14   BY MR. SCOTT:
15   Q.    Okay.  Officer Miller, you've had an opportunity
16   to look over the statement that you gave to BCI back on
17   March 14 of 2017.  Again, is there anything in that
18   statement that you would change as you sit here today?
19   **A.    No.**
20   Q.    Okay.  Thank you.  Let me hand you what's been
21   marked as Plaintiffs' Exhibit Number 10.
22           MR. PHILLIPS:        Do you have
23           enough, Joe?
24           MR. SCOTT:        It's okay.  We
25           all have that.

Page 10

1       MR. PHILLIPS:          Okay.
2       MR. SCOTT:             It's discovery
3   requests.
4       MR. PHILLIPS:          Thank you.
5       MR. SCOTT:             You're
6   welcome.
7   BY MR. SCOTT:
8   Q.    Officer Miller, I'll represent to you that these
9   were discovery responses that were provided to me
10  through your counsel for interrogatories that were
11  directed to you in this case.  Do you see that?
12  A.    Yes.
13  Q.    Okay.  And I think these were answered on or
14  about June 12th of 2018.  Do you see that?
15      MR. RASKIN:            Can I direct
16  him?
17      MR. SCOTT:             Oh, please,
18  please.  Yes.  Thank you.
19  A.    Yes.
20  Q.    And, again, Officer, I would ask as you sit here
21  today is there anything in there that you would change
22  or supplement as you sit here today?
23      MR. RASKIN:            Just read your
24  answers on the bottom of page 5.
25      While Officer Miller is reading

Page 11

1       Plaintiffs' Exhibit 10 let me just
2       interpose an objection to the extent that
3       your question seeks to have him comment
4       upon the objections that were asserted by
5       counsel.
6       MR. SCOTT:             Oh, no, I
7       appreciate that.  That wasn't my intent.
8       MR. RASKIN:            Okay.  So he
9       can ignore the objections --
10      MR. SCOTT:             Absolutely.
11      MR. RASKIN:            -- that we
12      made.
13          So wherever you see an objection to a
14      question or an interrogatory, don't bother
15      with that.  We're taking a legal position.
16      MR. SCOTT:             Absolutely.
17      Correct.
18  A.    No.
19  Q.    Okay.  Officer Miller, I wanted to ask you about
20  two of the interrogatories in particular, if I may.
21  The first one concerned the prior litigation involving
22  a Lawrence McKissic.  It was reflected in interrogatory
23  Number 11.  And I believe this was one of four, the
24  Lawrence McKissic was one of four use of deadly force
25  incidents that you've been involved in during your time

Page 12

1   here in Strongsville, correct?
2   A.    Yes.
3   Q.    And correct me if I'm wrong, at the time of the
4   Lawrence McKissic incident were you operating as part
5   of a multi-jurisdictional task force or possibly as a
6   deputized federal agent?
7   A.    Yes.
8   Q.    Both?
9   A.    Yes.
10  Q.    All right.  Fair enough.  And you had indicated
11  that your understanding was that the case was dismissed
12  on summary judgment in your answer.  Do you understand
13  that the case was actually settled?
14  A.    Well, at the time I didn't know the difference.
15  Q.    And I appreciate that.
16  A.    And to my knowledge at the time it was
17  dismissed.
18  Q.    Okay.
19  A.    Or I was removed from the case and so I was
20  dismissed, so to speak.
21  Q.    Okay.
22  A.    And so that's where I assumed that that was
23  applicable.
24  Q.    Did you ever hear of the Westfall Act?
25  A.    No.

Page 13

1   Q.    Did anybody ever mention that to you?
2       Okay.  That's fine.  We don't need to get in to
3   it.  And I appreciate your understanding was the case
4   was resolved somehow, that you were dropped from the
5   case.  But do you understand now that the case in fact
6   was settled?
7   A.    If you say it was.  I don't know the answer to
8   that.
9       MR. RASKIN:            He asked for
10      your understanding, not what you think he
11      means.  Just answer his question.
12  A.    Ask it again, please.
13  Q.    Do you understand now that the case was settled?
14  A.    No.
15  Q.    Okay.  And after the resolution of the McKissic
16  case was there any further review within the
17  Strongsville Police Department concerning your
18  involvement in that incident?
19  A.    No.
20  Q.    Okay.  Were you ever subject to any sort of
21  review by the Strongsville Police Department concerning
22  your involvement in the Lawrence McKissic incident?
23  A.    Yes.
24  Q.    What do you recall about that?
25  A.    I believe the Chief of Police at the time Chief

Page 14

1    **Goss reviewed the incident and the application of**
2    **force.**
3    Q.    Did you ever meet with Chief Goss regarding the
4    incident and your particular use of force?
5    **A.    Yes.**
6    Q.    Okay.  Individually?
7    **A.    Yes.**
8    Q.    Okay.  And this was a use of deadly force,
9    correct?
10   **A.    Yes.**
11   Q.    And Mr. McKissic as it turned out was an unarmed
12   suspect; is that fair?
13   **A.    No.**
14   Q.    What is your understanding?
15   **A.    He used his vehicle as a weapon.**
16   Q.    Okay.  He didn't have a gun; he used his vehicle
17   as a weapon?
18   **A.    Yes.**
19   Q.    Okay.  And then let me ask you about the other
20   interrogatory on that page, interrogatory Number 13.
21   And I'd asked you about your knowledge of the early
22   warning system for the City of Strongsville.  Do you
23   see that?
24   **A.    Yes.**
25   Q.    Okay.  And you had indicated at that time that

Page 15

1    you haven't received any training and you really didn't
2    have any knowledge of the early warning system; am I
3    correct?
4    **A.    That's correct.**
5    Q.    Is that still true today?
6              MR. RASKIN:          Objection.
7          You may answer that question, however
8          you may not disclose any information you
9          received as a result of your consultations
10         with counsel.  Subject to that
11         instruction, you can answer.
12   **A.    Ask the question again, please.**
13   Q.    Yes.  Let me ask it this way: since answering
14   these interrogatories on June 12th of 2018 have you
15   received any training as regards the City of
16   Strongsville Police Department's early warning system?
17   **A.    No.**
18   Q.    Okay.  And I take it inasmuch as you were not
19   aware, at least as of June 12th, 2018, of the City of
20   Strongsville's early warning system, I take it you were
21   not aware of any enhanced early warning system policy
22   during the tenure of Chief James Kobak; is that fair?
23   **A.    It's fair.**
24             MR. SCOTT:          Okay.  Let me
25         mark this as Plaintiffs' Exhibit 11, if I

Page 16

1    may.
2              (Thereupon, Plaintiffs' Exhibit 11 to
3          the deposition of OFFICER WILLIAM JASON
4          MILLER was marked for identification.)
5    BY MR. SCOTT:
6    Q.    Officer Miller, I'm going to hand you what has
7    been marked as Plaintiffs' Exhibit 11.  Take a moment
8    to look that over.
9          And, Officer Miller, let me begin by asking you
10   have you ever seen Plaintiffs' Exhibit 11 before?
11             MR. RASKIN:          Objection.
12         Same instructions, you can answer his
13         questions so long as you don't reveal
14         discussions you had or information you
15         received from consultation with counsel.
16         Subject to that instruction, you can
17         answer the question.
18   **A.    I've never seen this form before today.**
19   Q.    Okay.  Now, we received this late yesterday, and
20   my understanding is that this is a summary of
21   administrative proceedings involving yourself during
22   your time here at the City of Strongsville Police
23   Department.
24         Let me ask you, and this appears to be in
25   reverse chronological order with the first entry being

Page 17

1    the most recent and the last entry being the oldest.
2    As you look through these do you remember any of these
3    administrative proceedings?
4              MR. RASKIN:          Objection.
5          That mischaracterizes the document.
6          You can answer the question if you
7          know.
8    **A.    I can't answer to any of this, what it**
9    **represents or what it means to the police department**
10   **because I've never seen it before and I didn't know it**
11   **existed.**
12   Q.    Okay.  Let me just ask you about a couple of the
13   entries, if I may.  In the one column, we go 11 columns
14   over, there's a column captioned pursuit.  Do you see
15   that?
16   **A.    Yes.**
17   Q.    And then as we go down there's a number of
18   document files and check boxes that I assume indicate a
19   pursuit that maybe you were involved with.  Do you
20   know?
21             MR. RASKIN:          Objection,
22         foundation.
23         You can answer.
24   **A.    I don't know what qualifies a check mark and**
25   **what does not for any of those columns, or what my**

Page 18

1  involvement would have been for any of them or for any
2  of the subject matter.
3  Q.   As I look through the pursuit column I see
4  approximately 27 checked boxes.  Let me ask you, do you
5  recall being involved in 27 pursuits during your time
6  here?
7  A.   I don't keep track of how many pursuits I've
8  been involved with outside of report writing.
9  Q.   Okay.
10 A.   So I couldn't answer that.
11 Q.   Do you think you've been involved in 27
12 pursuits?
13 A.   I would like for you to specify, do you mean as
14 a primary responder, or I responded to the scene after
15 a pursuit?
16      I can't answer this because I don't know what
17 the qualifications of involvement are.
18 Q.   Okay.
19 A.   I could have responded to a scene after a
20 pursuit.  I get calls out for the dog after a pursuit,
21 a crash.  I don't know how they compile this
22 information or what constitutes a check mark.
23 Q.   Okay.  Let's go through it a couple of different
24 ways.  First of all, using possibly the broadest
25 definition, so a pursuit whether you were primary

Page 19

1  responder, support, or arrived on scene following
2  determination of a pursuit.  Does the number 27 comport
3  with your recollection as to how many pursuits you may
4  have been involved in?
5  A.   I just can't answer that definitively.  I really
6  don't keep track of how many pursuits I've been
7  involved with.
8  Q.   I guess I'm just trying to find range.  Does
9  that number sound high or low?
10      MR. RASKIN:          Objection,
11      asked and answered.
12      You can answer it again if you can.
13 A.   If I knew specifically what their criteria was
14 to say that I was involved versus what I was not
15 involved with, at what level of involvement, I could
16 answer that.
17 Q.   Okay.  Let's try it another way.  Pursuits where
18 you were the primary responding officer, would 27 sound
19 high to you in terms of the number of pursuits that
20 you've been involved in during your time with
21 Strongsville?
22 A.   Yes.
23 Q.   Okay.  So you think it's been fewer than 27
24 where you've been the primary officer?
25 A.   Yes.

Page 20

1  Q.   What would be a range that fits better with your
2  recollection?
3  A.   I don't think it would be fair to say.  I just
4  don't keep the stats.  I don't keep record of it.
5  Q.   But you think it's fewer than 27?
6  A.   Yes.
7  Q.   Okay.  Do you know of those how many would have
8  been high speed pursuits?
9  A.   I can't give you an exact number.
10 Q.   Okay.  Do you think the majority of the pursuits
11 where you've been involved in where you've been the
12 primary responding officer would have been high speed
13 pursuits?
14 A.   Yes.
15 Q.   Do you know how many of those pursuits where
16 you've been the primary responding officer have
17 terminated with the driver voluntarily stopping at some
18 point?
19 A.   I do not.
20 Q.   Do you know how many of those pursuits where
21 you've been the primary responding officer terminated
22 involuntarily with either a vehicle crash or through
23 other means?
24 A.   No, I don't know how many.
25 Q.   Okay.  Would you believe that to be the majority

Page 21

1  of the pursuits?
2  A.   Which?
3  Q.   That the vehicle -- the pursuit terminated
4  involuntarily with either the vehicle crashing or
5  otherwise being forced to stop.
6  A.   No.  I don't feel that that's accurate.
7  Q.   Okay.  What would you say is more accurate?
8  A.   If we're breaking this down in to ways that the
9  individual pursuits were stopped, I would think more
10 were called off because of the speed or the environment
11 we were in, in combination with them pulling over,
12 being compliant, rather than -- I think those would
13 outweigh any of the crashes that took place.
14 Q.   Okay.  Do you have -- the pursuit that we're
15 here to talk about today did not end voluntarily.  Can
16 we agree on that?
17 A.   That's correct.
18 Q.   Okay.  How many other pursuits do you recall
19 being involved in as a primary responder or a support
20 vehicle where the pursuit did not end voluntarily?
21 A.   Define voluntarily.  Do you mean by way of our
22 direct causality, or the driver miscalculated and
23 crashed.
24 Q.   Well, including situations where the driver
25 miscalculated and crashed or some other use of force,

Page 22

1   whether it be stop strips, rolling roadblock.
2   A.    That's not some other use of force. Either they
3   crashed because they made a mistake and miscalculated
4   their ability to drive, or we specifically did
5   something. So I can't throw those two together.
6   Q.    Take them one at a time. Pursuits where the
7   driver miscalculated and crashed, how many of those do
8   you recall?
9   A.    I recall individuals, but I can't give you a
10  specific number.
11  Q.    Okay. More than one?
12  A.    Yes.
13  Q.    Okay. More than five?
14  A.    I would have to read the individual reports
15  because there were some where they crashed after the
16  pursuit was called off.
17  Q.    Okay.
18  A.    And without reading a report, I can't separate
19  the details right now off of memory.
20  Q.    Were you involved in one such pursuit within a
21  few weeks of the March 7th, 2017 event?
22  A.    Prior, just prior to it. Yes.
23  Q.    Yes. With Officer Vlna, was that the other
24  officer involved, or was it somebody else?
25  A.    Wow, the pursuit I'm particularly thinking of

Page 23

1   included the majority of night shift. So to say who
2   was involved primary or secondary, I can't. I would
3   imagine the majority of the shift was involved at some
4   point.
5   Q.    Okay. What do you recall about that pursuit,
6   the one that occurred just a couple weeks prior to
7   March 7th, 2017?
8   A.    We had been having a rash of car thefts in a
9   particular zone in Strongsville. And I was posted at
10  the top of the hill on Pearl Road near Boston and I was
11  running traffic in that area.
12       A vehicle came off of Admiralty north of my
13  position and proceeded towards me. There was no other
14  traffic on the road. My radar just blew up, meaning
15  the car looked like it was driving very, very fast.
16  The speed limit through there is only 35. And I don't
17  recall the speed as we sit here today, however I recall
18  being astonished that it was very high. I want to say
19  over 60.
20       I turned in after it as it went by and the
21  vehicle almost immediately did a U-turn at the top of
22  the hill just into Medina County. Did a U-turn into
23  the BP that's there, gas station, then proceeded
24  northbound the way it came.
25  Q.    Okay.

Page 24

1   A.    I gave out the information that I was in pursuit
2   of the vehicle. I don't remember a lot of specifics.
3   I know it was a maroon four door, two black male
4   occupants northbound.
5        And I was operating the same Ford Crown Vic
6   which had a hard time keeping up. And I put the
7   information out to radio and everybody else that was
8   listening that I was in pursuit. And that's when
9   everybody else started to converge on the pursuit.
10  Q.    Okay. That pursuit ultimately ended with the
11  suspect vehicle wrecking?
12  A.    Well, I was not present for how the vehicle came
13  to a stop. We lost view on 71 northbound near West
14  65th. We lost contact with the vehicle. In fact, we
15  found out later the vehicle got off at West 65th and we
16  continued northbound.
17       I don't remember who the other officer was. I
18  believe it was Officer Glover who was immediately with
19  me. And after we had overshot the exit that the
20  vehicle took, it was -- I want to say it was pretty icy
21  and slippery.
22       When we responded back because OSP, Ohio State
23  Highway Patrol called to say they found the vehicle and
24  what street it was on. It was just off the ramp. We
25  went back to that, and that as you exit the ramp at

Page 25

1   West 65th and you go across the street, so to speak,
2   it's a dip, it's a downhill descent and it was very
3   icy. When we arrived it was very slippery.
4        We don't know if that car crashed by itself or
5   if they bailed and the car rolled to a stop. So to
6   answer your question I don't know exactly how it ended.
7   It did leave the roadway at some point. Whether it was
8   occupied at the time or not, we don't know. And it did
9   come in contact with a tree lawn and maybe a tree and a
10  fence.
11  Q.    Okay. Do you have a recollection of how many
12  motor vehicle accidents you've been involved in while
13  performing your duties as a Strongsville Police
14  Officer?
15  A.    No.
16  Q.    Okay. Again, if we look at Plaintiffs' Exhibit
17  11, there is a column designated as cruiser MVA. Do
18  you see that?
19  A.    Yes.
20  Q.    And we look down and see one, two, three, four,
21  five, six instances where the box in that column has
22  been checked. Would that comport with your
23  recollection of the number of motor vehicle accidents
24  that you've been involved in?
25  A.    I don't know the standards by which they call it

Page 26

1   a cruiser MVA.  If you're telling me that this means
2   they reported to the state, I don't know.  I really
3   don't know.
4   Q.   Well, do you recall being involved in six motor
5   vehicle accidents during your time as a Strongsville
6   Police Officer?
7   A.   No.
8   Q.   Do you think, do you recall fewer or more than
9   six motor vehicle accidents?
10   A.   Well, I guess I'm trying to separate my recall
11   from -- I've hit several deer.  I don't know the
12   application of the cruiser MVA.  It could be from deer
13   accidents, from pursuits.  I don't know.  So to be able
14   to say have I wrecked or caused damage on six cruisers,
15   it's possible.
16   Q.   Okay.
17   A.   However I don't know the action.
18   Q.   Do you think you've caused damage on more than
19   six cruisers?
20   A.   No.
21   Q.   Okay.  I want to turn back to Plaintiffs'
22   Exhibit 10 for just a second and I want to ask you
23   about interrogatory Number 12, if I may.  And in
24   interrogatory 12 I had asked about any suspensions that
25   you might have experienced during your time with

Page 27

1   Strongsville.  Do you see that?
2   A.   Yes.
3   Q.   And you did mention one day's suspension back in
4   2010; is that correct?
5   A.   Yes.
6   Q.   Okay.  Did you have another suspension in 2015?
7   And here, let me -- to be fair let me show you
8   what was previously marked as Plaintiffs' Exhibit 8
9   during Chief Kobak's deposition, and I'll show you what
10   I'm looking at.  Look at the whole thing if you like,
11   but I'm specifically looking at the information in
12   section B.
13           MR. RASKIN:         Section B you
14         said.
15           MR. SCOTT:         Yes.  You'll
16         see it.  It's about halfway right down
17         there.  (Indicating).
18           MR. RASKIN:         Read back the
19         question, please.
20           MR. SCOTT:         I can ask a
21         different question.
22   BY MR. SCOTT:
23   Q.   Officer Miller, what I'm trying to ask you is do
24   you recall a disciplinary suspension on or about July
25   5th I think it is of 2015?

Page 28

1   A.   Not specifically, no.
2   Q.   Okay.  And would it be your testimony that that
3   record is inaccurate, that you did not have such a
4   suspension, or you just simply don't remember one way
5   or the other?
6   A.   Well, I suppose if you could provide a document
7   that described this incident or described what happened
8   as a matter of that, I can't say one way or another.  I
9   can't remember ever being disciplined and suspended in
10   2015.
11   Q.   Okay.  This was a record that was provided in
12   response to a public records request by the City of
13   Strongsville back on September 1 of 2015.  So that's
14   where I got the information was from the city, but you
15   don't have any recollection of that particular
16   suspension?
17   A.   I'm sure it's accurate, but I don't know.  I
18   can't recall.
19           MR. RASKIN:         Don't guess.
20         Just answer his question.
21   BY MR. SCOTT:
22   Q.   All right.  Officer Miller, during your time
23   here at the City of Strongsville have you received
24   regular, and by regular I mean scheduled, periodic
25   performance evaluations?

Page 29

1   A.   Yes.
2   Q.   Okay.  And has the process for completing the
3   performance evaluations changed at all throughout your
4   career?
5   A.   Yes.
6   Q.   Okay.  What has changed; what's different?
7   A.   Generally we use a bubble system that describes
8   characteristics of the expected -- of what's expected
9   of the police officer.  And that's changed based on
10   stats and the way we sign off on it.  It's now
11   electronic versus handwritten, things like that.
12   Q.   When did it become electronic to your knowledge?
13   A.   Maybe a year ago.
14   Q.   Okay.  So is the form, the performance
15   evaluation form then completed online with some
16   software or something, some electronic version?
17   A.   It's done on a computer in the sergeant's
18   office.
19   Q.   Okay.  And it's done in the sergeant's office?
20   A.   Yes.
21   Q.   Okay.  My understanding is that one of the
22   sergeants for whatever shift you're primarily working
23   will be the individual who completes the performance
24   evaluation; is that right?
25   A.   Completes it, or does the review with the

Page 30

1  officer?
2  Q.  Well, why don't you tell me how it works.
3  A.  My understanding is the three sergeants that are
4  in charge of the officer have a discussion on the
5  evaluation and how it should be filled out per officer.
6  And then one of those sergeants does the review of that
7  evaluation with the officer individually.
8  Q.  Okay.  So is it your understanding that the
9  performance evaluation reflects the collective opinion
10  of the three shift sergeants?
11  A.  No.
12  Q.  What is your understanding?
13  A.  It's not always done -- I'm not present when
14  those are filled out.  Sometimes they are filled out
15  without the other sergeants present, because the
16  sergeant who has to get that task completed has to get
17  the job done and they have to be turned in by a
18  deadline.
19  Q.  Okay.
20  A.  So there are times when the sergeants have not
21  all been available to complete that.
22  Q.  Okay.  Is it your understanding that ideally all
23  three sergeants will meet to confer about each officer
24  under their supervision when completing a performance
25  evaluation?

Page 31

1  A.  It would be ideal.
2  Q.  But you're saying that that may not always be
3  possible due to time constraints and whatever demands
4  the sergeants are responding to when the performance
5  evaluation is being completed, correct?
6  A.  That's correct.
7  Q.  All right.  Are you given some sort of
8  notification?
9      It's my understanding these are quarterly
10  evaluations; is that correct?
11  A.  Yes.
12  Q.  Okay.  Are you given some sort of notification
13  when these are going to occur, or are you just called
14  in after the fact and say we have your quarterly
15  evaluation and we'd like to go through it with you?
16  A.  That's correct, the latter.
17  Q.  So you're notified after the evaluation has been
18  completed that one of the sergeants wants to have a
19  meeting with you to discuss the evaluation?
20  A.  That's correct.
21  Q.  Okay.  And it's not necessarily the same
22  sergeant each time, correct?
23  A.  That's correct.
24  Q.  Okay.  But it will be one of the three from the
25  shift.  And you primarily work third shift; is that

Page 32

1  correct?
2  A.  Yes.
3  Q.  And what are the hours of that?
4  A.  2200 to 0700.
5  Q.  Okay.  We marked several of the performance
6  evaluations at Chief Kobak's deposition.  Let me just
7  hand them to you.  They were previously marked as
8  Plaintiffs' Exhibit 5, 6 and 7.  If you could just take
9  a minute and familiarize yourself with those, please.
10      MR. RASKIN:      Okay.  Thank
11  you.
12  BY MR. SCOTT:
13  Q.  Officer Miller, you had a chance to look at
14  Plaintiffs' Exhibits 5, 6 and 7, correct?
15  A.  Yes.
16  Q.  And these appear to be quarterly evaluations for
17  yourself.  Plaintiffs' Exhibit 5 is for the period of
18  1-1-2014 to 4-30-2014, correct?
19  A.  Yes.
20  Q.  And then Plaintiffs' Exhibit 6 would be for the
21  period of 5-1-2014 to 8-31-2014, correct?
22  A.  Yes.
23  Q.  And Plaintiffs' Exhibit 7 is for the period of
24  1-1-2015 to 4-30-2015, correct?
25  A.  Yes.

Page 33

1  Q.  And the form that these are printed on, this is
2  a preprinted form.  Is the online or computer-based
3  form similar to the information that's contained in
4  Plaintiffs' Exhibits 5, 6 and 7?
5      In terms of the structure of the form.  Not the
6  part that's been handwritten, but just how the form is
7  structured.
8  A.  Without seeing one, I can't say that any of the
9  criteria 1 through 9 on the cover page is still the
10  same or worded the same as page 2.
11  Q.  Okay.
12  A.  They seem similar, but I can't say that they're
13  the same.
14  Q.  All right.  Now, you would have met with one of
15  the shift sergeants when each of these evaluation forms
16  was completed, correct?
17  A.  That's correct.
18  Q.  And on the second page of each of those
19  evaluation forms is a space for a performance
20  improvement plan.  Do you see that?
21  A.  Yes.
22  Q.  Okay.  And on the three exhibits that you have
23  Plaintiffs' Exhibits 5, 6 and 7, the performance
24  improvement plan section is blank, correct?
25  A.  Yes.

Page 34

1    Q.    Were you ever given -- for the time reflected by
2    these evaluations were you ever given a written
3    performance improvement plan?
4    A.    Never.
5    Q.    Okay.  Have you ever been given a written
6    performance plan during your career here with the City
7    of Strongsville Police Department?
8    A.    No.
9    Q.    Other than meeting with the shift sergeant for
10   each of the evaluations reflected in Plaintiffs'
11   Exhibits 5, 6 and 7, did you meet with anyone else in
12   the chain of command regarding your particular
13   evaluations for each of those periods?
14   A.    No.
15   Q.    My understanding from talking to former Chief
16   Kobak is the structure of the department is such that
17   beneath the chief are two deputy chiefs.  Am I correct
18   about that, if you know?
19   A.    It depends.  There were times when during
20   transitions it's not always like that, but essentially
21   yes.
22   Q.    Well, I appreciate that.  So there might have
23   been subtle differences when transitioning from one
24   chief to another you mean?
25   A.    Yes.

Page 35

1    Q.    Certainly under Chief Kobak my understanding is
2    there were two deputy chiefs.  Does that comport --
3    A.    Yes.
4    Q.    And beneath the two deputy chiefs would have
5    been two lieutenants?
6    A.    There could have been a third.
7    Q.    Okay.  Do you know if the individuals who held
8    the position of deputy chief under Chief Kobak, if
9    those were the two same individuals throughout his time
10   as Chief of Police for the City of Strongsville?
11   A.    No.
12   Q.    You don't know, or they weren't?
13   A.    I don't recall when they were promoted or --
14   Q.    I think one of those individuals was
15   Chief Fender.  Is that your recollection?
16   A.    Yes.
17   Q.    Okay.  Did you ever meet with either
18   Chief Fender or the individual who held the other post
19   as deputy chief under Chief Kobak, did you ever meet
20   with any of those deputy chiefs concerning your
21   evaluation, the evaluation of your performance as a
22   City of Strongsville Police Officer?
23   A.    For these particular three that we're talking
24   about?
25   Q.    Yes, sir.

Page 36

1    A.    No.
2    Q.    For any other evaluation that you may have
3    received as a City of Strongsville Police Officer?
4    A.    No.
5    Q.    What about the lieutenants, did you ever meet
6    with any City of Strongsville Police lieutenant during
7    Chief Kobak's tenure to discuss your performance as a
8    City of Strongsville Police Officer?
9    A.    For these particular three?
10   Q.    Yes.
11   A.    No.
12   Q.    Okay.  Did you ever meet with any City of
13   Strongsville Police Lieutenant again during Chief
14   Kobak's tenure concerning any other performance
15   evaluation that you may have received other than those
16   contained in Plaintiffs' Exhibits 5, 6 and 7?
17   A.    It's possible.
18   Q.    All right.  Do you have a specific recollection
19   of doing that, or are you just guessing that that may
20   have happened?
21   A.    I'm not guessing.  I know that I sat down with
22   who at one time was Sergeant O'Deens who was then
23   promoted to lieutenant and had the evaluations
24   completed.  I don't recall if that was during the end
25   of Kobak's career or the beginning of Fender's tenure

Page 37

1    as Chief.
2    Q.    Okay.
3    A.    There was a time while he was a lieutenant he
4    was still assigned to the night shift.  And I don't
5    recall specifically if he was lieutenant at the time,
6    but I did sit down with him.
7    Q.    Okay.
8    A.    On occasion.
9    Q.    Is Lieutenant O'Deens still a lieutenant with
10   the City of Strongsville Police Department?
11   A.    Yes.
12   Q.    Okay.  And I want to understand this.  Was this
13   something that you recall only happening once in your
14   career here where you met with a lieutenant concerning
15   your performance evaluation?
16   A.    In my career?
17   Q.    Here, yes.
18   A.    No.
19   Q.    Okay.  There's been other occasions where you
20   meet with a lieutenant here at City of Strongsville to
21   discuss a performance evaluation?
22   A.    Yes.
23   Q.    How many other times do you think you've met
24   with a lieutenant?
25   A.    During my career, early in my career Charles

Page 38

1    Goss was chief and Lieutenant Fender, currently Chief,
2    was the lieutenant of night shift.  And he filled out
3    several of these during the time he was assigned to
4    night shift as a lieutenant.
5    Q.    Okay.  So early on in your career when
6    Lieutenant Fender, then Lieutenant Fender was assigned
7    to night shift, he took on the responsibility on some
8    occasions to complete the performance evaluation as
9    opposed to the night shift sergeant?
10   A.    To complete it, or review it with the officer?
11   Q.    Okay.  You tell me which.
12   A.    I don't know who completed them.
13   Q.    Okay.
14   A.    I know that I sat down for review on multiple
15   occasions with the lieutenant because he was the only
16   OIC that night or that week that he was doing the
17   reviews.
18   Q.    Okay.  During the time of Chief Kobak's tenure
19   am I correct it was not the regular practice for the
20   night shift lieutenant to meet with night shift
21   officers to review the performance evaluations?
22   A.    I don't recall the transition.  I don't remember
23   specifically when.  It may have been on paper that's
24   what they expected to do, but I don't recall
25   specifically.

Page 39

1    Q.    Well, what you've told me about is one instance
2    possibly close to the end of Chief Kobak's tenure or
3    possibly the beginning of Chief Fender's tenure, one
4    incident where you meet with Lieutenant O'Deens to
5    discuss your performance evaluation.
6    A.    Yes.
7    Q.    And that's the only incident where you recall
8    meeting with a lieutenant during or near the time of
9    Chief Kobak's tenure as Chief of Police; is that fair?
10   A.    We filled out four of these a year since I've
11   been here and I can't recall specifically.
12   Q.    Okay.  And all I'm asking is what you remember
13   as you sit here.  You remember the one incident,
14   correct?
15   A.    And I was clear that I'm not sure if he was
16   still a sergeant at that time.  He could have been a
17   lieutenant at the time.
18   Q.    Oh, no, I understand that.
19   A.    Okay.
20   Q.    I understand.  And I understand you have never
21   received a written performance improvement plan during
22   your time here as a City of Strongsville Police
23   Officer, correct?
24   A.    That's correct.
25   Q.    Have you ever received any sort of letter of

Page 40

1    reinstruction or anything like that?
2    A.    Not that I'm familiar with.
3    Q.    Okay.  Have you ever been sent to any sort of
4    retraining because of your involvement in any
5    particular incident?
6    A.    No.
7          MR. RASKIN:        He's done with
8          these.  You can focus on his questions.
9    BY MR. SCOTT:
10   Q.    I understand that there may be times when there
11   is roll call training or other types of in-service
12   training that all the officers may attend together.  I
13   want to ask you about other types of training.  For
14   instance, have you received any training outside of the
15   academy on performing a rolling roadblock?
16   A.    No.
17   Q.    Have you ever practiced performing a rolling
18   roadblock with other officers here?
19   A.    No.
20   Q.    What about felony call out stops as a traffic
21   stop tactic, have you ever practiced performing a
22   felony call out stop with other officers here?
23   A.    No.
24   Q.    I want to ask you --
25          MR. SCOTT:        Let's go ahead

Page 41

1    and mark this.
2          (Thereupon, Plaintiffs' Exhibit 12 to
3          the deposition of OFFICER WILLIAM JASON
4          MILLER was marked for identification.)
5    BY MR. SCOTT:
6    Q.    Officer Miller, let me hand you what I've marked
7    as Plaintiffs' Exhibit 12.
8          MR. PHILLIPS:        Thank you,
9          Joseph.
10         MR. SCOTT:        You're welcome.
11         MR. RASKIN:        Thank you.
12   Q.    Please take a minute to look that over.
13         Officer Miller, you've had a chance to look at
14   Plaintiffs' Exhibit 12.  Are you familiar with that
15   document?
16   A.    Yes.
17   Q.    Okay.  This purports to be City of
18   Strongsville's policy regarding motorist stops; is this
19   correct?
20   A.    That's correct.
21   Q.    Are you aware of any other written policies
22   maintained by the City of Strongsville Police
23   Department other than this policy that discusses or
24   gives direction on how to perform a motor vehicle stop?
25   A.    No.

1    Q.    Okay.  The second page of Plaintiffs' Exhibit
2    12, section B is captioned high risk stops.
3    A.    I see that.
4    Q.    Okay.  Again, are you aware of any other written
5    policy maintained by the City of Strongsville governing
6    how Strongsville Police Officers perform high risk
7    stops?
8    A.    No.
9    Q.    Okay.  What is your understanding of what
10   qualifies as a high risk stop?
11   A.    **Essentially a high risk stop are those stops**
12   **that are not for just common traffic violations.  They**
13   **include when it's a shoplifting, you know, there's a**
14   **misdemeanor warrant involved, those types of things.**
15   **It's a rolling domestic.**
16   Q.    Okay.  The policy indicates that, if I'm reading
17   this correctly, special procedures shall be utilized
18   when stopping and approaching suspected or confirmed
19   felony violators or other high risk stops, correct?
20   A.    **For traffic stops, yes.**
21        MR. RASKIN:        Excuse me,
22        Joe.  I'm going to object to the use of
23        this exhibit as being marked because it's
24        highlighted.  I think you may have given
25        us your copy.

1        MR. SCOTT:        Let me switch
2        that.  I'll give you that and we'll remark
3        that.
4        MR. RASKIN:        Thank you.
5    BY MR. SCOTT:
6    Q.    Go ahead.
7        MR. RASKIN:        You want to
8        read back the question or withdraw it and
9        ask it again?  Sorry to interrupt you.
10        MR. SCOTT:        No, no.  It's
11        quite all right.
12   Q.    Officer Miller, if I'm reading this correctly
13   underneath the caption high risk stops, it indicates
14   special procedures shall be utilized when stopping and
15   approaching suspected or confirmed felony violators or
16   other high risk stops, correct?
17   A.    **Traffic stops, correct.**
18   Q.    Okay.  So if you're trying to stop -- you
19   believe that if you're trying to stop a vehicle for
20   something other than a traffic stop, this policy would
21   not apply?
22   A.    **You used the word trying.  This is referencing**
23   **the actions of the officer when the vehicle has come to**
24   **a stop.  It's a traffic stop.  This isn't the process**
25   **by which.**

1        **This is implying that they're compliant and pull**
2    **over knowing what we're dealing with as the occupants.**
3    Q.    Let me make sure.  Let's look at section 2 under
4    B, high risk stop.  It states the officer will keep the
5    suspect vehicle in view and request sufficient
6    assistance to make the stop.  So you understand that to
7    be a voluntary stop by the driver of the vehicle?
8    A.    **That's the -- this is speaking of when the plan**
9    **-- the planned initiating of a stop is to take place.**
10   **It's not describing -- it's describing what the officer**
11   **should be thinking of and doing prior to initiating**
12   **this stop, allowing other officers to get close and get**
13   **in place in case it turns into something worse and they**
14   **do not comply and they do not stop.**
15   Q.    So your understanding is that this policy
16   wouldn't have any application under circumstance where
17   the driver of the suspect vehicle does not voluntarily
18   come to a stop?
19   A.    **That's correct.**
20   Q.    All right.  What written policies exist within
21   the City of Strongsville for stopping a vehicle where
22   the driver of the suspect vehicle does not voluntarily
23   stop?
24   A.    **We have a pursuit policy.  And during that**
25   **pursuit if that person voluntarily stops and that**

1    **person stops and is compliant, then we would revert**
2    **back to the high risk stops.**
3    Q.    Okay.  What written policy exists for a
4    situation where the driver of the suspect vehicle does
5    not voluntarily stop?
6    A.    **That would be our pursuit policy.**
7    Q.    Okay.  Did you want to take a break?
8        MR. RASKIN:        Excuse me,
9        Joe.
10        Do you need to, or do you still have
11        some time?
12        THE WITNESS:        We started 10
13        after 10:00?
14        MR. RASKIN:        Yeah.
15        THE WITNESS:        We're good.
16        Go to the top of the hour.
17        MR. RASKIN:        Joe, just to
18        give you a heads up, about 30 minutes.
19        MR. SCOTT:        I was trying
20        to watch that myself.
21        MR. RASKIN:        Thank you.
22        Madam reporter, would you remark
23        this?
24        (Thereupon, Plaintiffs' Exhibit 12 to
25        the deposition of OFFICER WILLIAM JASON

Page 46

1          MILLER was remarked for identification.)
2    BY MR. SCOTT:
3    Q.    While I'm getting this ready to mark, Officer,
4    looking back at Plaintiffs' Exhibit 12, section B and
5    specifically looking at the section B 6, paragraphs A
6    and B, I want to ask you the tactics, if you will, that
7    are described in Plaintiffs' Exhibit 12, section B 6, A
8    and B.  Does that basically define the procedures for
9    performing a felony call out stop?
10   A.    Yes.
11         MR. SCOTT:          Mark this as
12   13, please.
13         (Thereupon, Plaintiffs' Exhibit 13 to
14         the deposition of OFFICER WILLIAM JASON
15         MILLER was marked for identification.)
16   Q.    Officer Miller, handing you what we've marked as
17   Plaintiffs' Exhibit 13.
18         MR. RASKIN:          Hang on a
19   second.
20   Q.    Take a minute and look at that.
21         MR. RASKIN:          Go ahead, Joe.
22   Q.    Officer, what I've handed you as Plaintiffs'
23   Exhibit 13 is an -- I think it's captioned motor
24   vehicle pursuits; is that correct?
25   A.    Yes.

Page 47

1    Q.    Are there any other written policies by the City
2    of Strongsville concerning motor vehicle pursuits other
3    than what's contained in Plaintiffs' Exhibit 13?
4    A.    No.
5    Q.    Okay.  Can I have it back, please?  Thank you.
6          I wanted to back up for a second.  On
7    Plaintiffs' Exhibits 5, 6 and 7, these were the
8    performance evaluations that we looked at before.  Do
9    you recall the meetings that you would have had with
10   the shift sergeant following each of these particular
11   performance evaluations?
12   A.    Only one of them.
13   Q.    Which one do you recall?
14   A.    The one dated 1-1-15 to 4-30-15.
15   Q.    What do you recall about that?
16   A.    This particular evaluation was reviewed with me
17   by Tom O'Deens.
18   Q.    Okay.
19   A.    And, again, I don't remember if he was a
20   sergeant or lieutenant at the time.
21   Q.    Okay.  Anything else you recall about that
22   meeting?
23   A.    Yes.
24   Q.    And please tell me.
25   A.    Some of the handwritten notes I remember having

Page 48

1    discussion about.
2    Q.    Okay.  Which ones in particular?
3    A.    The time sheets and the reports.
4    Q.    And what do you recall discussing with Officer
5    O'Deens?
6    A.    At the time Officer Glover and I were wearing
7    two hats, so to speak.  I was assigned to patrol and I
8    was also handling most of or all of the narcotics
9    interdiction work that the bureau did not do.  Glover
10   and I maintained all of the narcotics investigations.
11         And so at the time I was -- I had many reports
12   sitting on my desk that were based on waiting for
13   certain subjects of those reports to decide whether or
14   not they wanted to work or were currently working with
15   us.  And so those reports were sitting on our desk for
16   quite a long time waiting for the outcome of the
17   opportunities to perform based on what the prosecutor
18   wanted to see happen.
19         And so there was a time when there were time
20   sheets built up because we didn't -- it was very rare
21   that we could incur overtime while doing the vice work
22   or the narcotics work as well as doing patrol work.  So
23   we had to keep individual time sheets separate from
24   what is normal to patrol where they just clock in.
25         And sometimes with normal patrol work and

Page 49

1    narcotics work a lot of stuff blended together.  And it
2    was difficult to keep on top of all the paperwork.
3    From the patrol side it was they had an expectation of
4    certain reports to be done on time.  And our hours were
5    -- we often incurred extra hours that normally would
6    have been overtime, but we had to keep track of those.
7          So there was difficulty in understanding how
8    those extra hours translated to hours that we had to
9    take off from the patrol side, and there was quite a
10   bit of difficulty going back and forth at that time.
11   Q.    Okay.  So I think what you're telling me is you
12   felt that the rating was undeserved, given what was
13   being asked of you at the time and the time constraints
14   that you were operating under.
15   A.    Well, not necessarily.  What I'm saying is that
16   we were bogged down and this whole process was new to
17   both patrol and the bureau having two guys that were
18   assigned to patrol full time but while also handling
19   almost full time narcotics.  And so there was a time
20   when it was a learning curve for all of us to figure
21   out exactly how to get this more efficient.
22   Q.    Okay.  Any other written notes that you recall
23   discussing with Officer O'Deens at that time?
24   A.    Yes.
25   Q.    Please tell me about those.

Page 50

1   A.    Giving the dispatchers a hard time.
2   Q.    Okay.  What was that about?
3   A.    Specifically at that time we were doing quite a
4   bit of narcotics work and at the time it was pretty
5   dangerous.  And there were times when we had
6   dispatchers who weren't familiar with that type of
7   work.  And we would have difficulty in getting the
8   information that we needed as soon as possible rather
9   than when they got around to it.  We needed to make
10  sure they understood the priority when we were on the
11  road.
12        And there were times when we had disagreements
13  on, or personal conflict on how important it was.  In
14  fact, I think that evolved -- that was part of -- even
15  possibly that discussion evolved into when we were
16  doing our narcotics work, we would have a separate
17  dispatcher assigned to us to handle the workload.
18  Q.    Were those disagreements something that occurred
19  on more than one occasion?
20  A.    Yes.
21  Q.    Okay.  Was there anything else that you
22  understood formed the basis for the notes that you're
23  referencing other than your disagreements with
24  dispatchers?
25  A.    For line 3?

Page 51

1   Q.    Yes, sir.
2   A.    No.
3   Q.    Anything else, any other notes, and we're
4   looking at, what, Exhibit 7?
5   A.    Yes.
6   Q.    Anything else that you recall discussing with
7   Officer O'Deens relative to Plaintiffs' Exhibit 7?
8   A.    Yes.
9   Q.    Please tell me.
10  A.    The part where it says mumbles on the radio.
11  Q.    Yes.
12  A.    I'm rather soft spoken, and at the time I was
13  fresh out of doing a lot of undercover work and it took
14  me quite a long time to get used to bringing the mic
15  back to my mouth, because when you're undercover out in
16  the world, you don't bring the mic to your mouth,
17  you'll give yourself away.
18  Q.    Okay.
19  A.    And it was quite difficult breaking that habit
20  of never bringing the radio to your mouth when you
21  speak.  And so that was one of the things we had a
22  discussion about.
23  Q.    Anything else?
24  A.    Not sure line 4.
25  Q.    Any other notes on Plaintiffs' Exhibit 7 that we

Page 52

1   haven't discussed that you recall discussing with
2   Officer O'Deens?
3   A.    Yes.
4   Q.    Please tell me.
5   A.    Line 6 where it says incomplete paperwork, that
6   was basically rehashing the reports sitting on my desk
7   for quite a long time waiting on informants and court
8   paperwork, and it just takes a long time.
9   Q.    Okay.
10  A.    As well as the written warnings.
11  Q.    Any other notes?
12  A.    Yes, written warnings.
13  Q.    That's 7?
14  A.    Yes.
15  Q.    Please tell me about that.
16  A.    That's under 6 on 7, is that what you mean?
17  Q.    Well, you tell me what you recall discussing
18  with Officer O'Deens regarding --
19  A.    Where it says owner, there was a time when we
20  went to a new type of written warnings rather than a
21  tiny little piece of paper.  And I understood that it
22  was okay to circle owner as part of filling it out.  So
23  I would circle owner, much like we do with our parking
24  violations.  Rather than putting all of the address and
25  owner's information, we would circle owner.

Page 53

1         And so for a while I had been turning in written
2   warnings for stopping somebody and writing a warning.
3   I would fill out vehicle information and circle owner,
4   rather than filling it all out.  And that's part of
5   that discussion.
6   Q.    Okay.  Any other notes on Plaintiffs' Exhibit 7
7   that you recall discussing with Officer O'Deens?
8   A.    No.
9   Q.    Okay.  And I take it from your earlier answer
10  you don't recall any discussions with whoever the
11  sergeant may have been relative to Plaintiffs' Exhibits
12  5 or 6.
13  A.    No.
14  Q.    Okay.  And I don't know if I asked you earlier.
15  Did you ever meet with Chief Kobak during his tenure as
16  Chief directly concerning your performance as a police
17  officer?
18        MR. RASKIN:          You did ask
19        that question.
20        MR. SCOTT:           Did I ask
21        that?
22        MR. RASKIN:          But you can
23        answer.
24  A.    No.
25  Q.    Thank you.

Page 54

1    Okay.  I want to go back to the BCI interview
2 statement that we marked earlier in the deposition.  Do
3 you still have that?
4 **A.    Yes.**
5 Q.    And, again, this was prepared from your meeting
6 with Special Agent Charles Moran of the Bureau of
7 Criminal Investigation approximately one week after the
8 events of March 7th, 2017, correct?
9 **A.    Yes.**
10 Q.    And on the last page of that exhibit there's a
11 notification with your name and signature there; is
12 that correct?
13 **A.    Yes.**
14 Q.    Dated 3-14-17.  Is it ten o'clock or 1000 hours?
15 **A.    Yes.**
16 Q.    So that was the time of the interview?
17 **A.    Yes.**
18 Q.    Okay.  Had you done anything to prepare for that
19 interview?
20         MR. RASKIN:        Objection.
21             You may answer that question,
22             however, since you were present with
23             counsel, you may not disclose any
24             information from your preparation with
25             counsel.

Page 55

1 **A.    Yes.**
2 Q.    What did you do to prepare for the interview
3 with Special Agent Moran?
4 **A.    I watched some of the cruiser in dash -- the**
5 **dash cam cruiser videos of the pursuit, but not all of**
6 **them.**
7 Q.    Okay.  Anything else?
8 **A.    I may have read Steving's report in our CAD**
9 **system.  He was the only one that typed a narrative.**
10 Q.    Okay.  Do you know why that was?
11 **A.    Why it was?**
12 Q.    Yeah.  That Officer Steving was the only one
13 that typed a narrative?
14 **A.    I do not know.**
15 Q.    Would it be typical that all the officers
16 involved in the incident would have typed a narrative?
17 **A.    Not always, no.**
18 Q.    Well, is it required in a use of force incident
19 that any officer using force type a narrative
20 concerning the force they used in that event?
21 **A.    I don't think it specifically says type a**
22 **narrative, but you're expected to give a statement as**
23 **part of the report.**
24 Q.    Okay.  Please tell me anything else you recall
25 doing to prepare for the March 14th, 2017 interview.

Page 56

1 **A.    I don't specifically recall as preparing.  I may**
2 **have heard Ms. Pauley's conversations on the phone.**
3 Q.    Okay.  Were those provided to you?
4     How did you obtain those?
5 **A.    Those were provided by a dispatcher to Officer**
6 **Glover.**
7 Q.    Okay.  And did Officer Glover then provide them
8 to you?
9 **A.    Yes.**
10 Q.    Do you know how those phone conversations were
11 obtained?
12 **A.    How they were actually put onto a piece of**
13 **media, or can you specify?**
14 Q.    No.  Let me ask it this way: is it your
15 understanding that those were phone calls that
16 Amanda Paully made to various individuals in the early
17 morning hours of March 7th, 2017 after she had returned
18 to the Strongsville Police station?
19 **A.    Did I know what they were?  Yes.**
20 Q.    And to your knowledge is there any -- did
21 anybody tell Ms. Pauley that her conversations were
22 being recorded?
23 **A.    I wasn't present for that.  No.**
24 Q.    Okay.  Were you aware of any signage here in the
25 Strongsville Police Department that cautions those

Page 57

1 using the phones here that their conversations may be
2 recorded?
3 **A.    There may be in the jail, but not that I'm**
4 **familiar with on station.**
5 Q.    Well, it's your understanding that she used a
6 phone here at the station, correct?
7 **A.    Yes.**
8 Q.    Did anybody ever tell you that they had
9 Ms. Pauley's permission to record her telephone
10 conversations?
11 **A.    No.**
12 Q.    I'm sorry, did you tell me would it have been
13 Officer Glover who provided you with a summary of those
14 phone conversations or the conversations themselves?
15         MR. RASKIN:        Objection.
16             That mischaracterizes the evidence.
17                 Why don't you answer the question
18                 again.
19 **A.    Ask the question again.**
20 Q.    Yeah.  Well, let me ask you again, did Officer
21 Glover provide you with the tape recordings themselves
22 of those phone conversations?
23 **A.    They weren't on tape.  It was an e-mail sent to**
24 **him with them digitally put onto an e-mail format.**
25 **Yes.**

Page 58

1    Q.    So you were able to hear the digital file of the
2    actual phone calls?
3    A.    I heard files.  I don't know how complete they
4    were.  I don't know how many phone calls there were.  I
5    heard calls.  I don't remember how many there were that
6    she actually made versus what we received.
7    Q.    In addition to hearing the audio files did
8    Officer Glover send you any sort of summary of those
9    phone calls?
10   A.    Yes.
11   Q.    Okay.  Were you provided with any other
12   information prior to your interview on March 14th,
13   2017?
14          MR. RASKIN:              Objection.
15          That mischaracterizes his testimony.  He
16          said he wasn't sure when he received that
17          in relation to his interview.
18   BY MR. SCOTT:
19   Q.    What I've been asking you about are things that
20   you were able to review prior to your interview.
21   A.    I think I started that by saying I wasn't sure
22   if I got those prior to or not.
23   Q.    Okay.
24   A.    What I said was I may have.
25   Q.    I see.  Well, let me ask you about information.

Page 59

1    We've talked about some of the video.  We talked about
2    possibly Officer Steving's incident report.  And I
3    understand that you may or may not have actually
4    received or heard the phone conversations involving
5    Amanda Pauley prior to your interview.
6          Is there anything else that you specifically
7    remember reviewing prior to your March 14th, 2017
8    interview?
9    A.    No.
10   Q.    Okay.  If we look at page 4 of that interview,
11   and I'm sorry, we marked that as Plaintiffs' Exhibit --
12   A.    9.
13   Q.    -- 9.  You were discussing with Special Agent
14   Moran what happened as you approached the van.
15          MR. RASKIN:              You want to
16          point him to a paragraph?
17   BY MR. SCOTT:
18   Q.    And I'm looking at the first full paragraph on
19   page 4.  And this is after the van has spun out.  And
20   you stopped your vehicle.  Okay?
21   A.    Yes.
22   Q.    First of all, did you radio or tell any of the
23   other officers involved in this pursuit prior to
24   exiting the vehicle that you intended to exit your
25   vehicle and rush the van?

Page 60

1    A.    No.
2    Q.    And I'm correct that Sergeant Kelley was in
3    charge of this pursuit, correct?
4    A.    Yes.
5    Q.    And that was always the case, Sergeant Kelley
6    was always in charge of the pursuit throughout the
7    entirety of the event, correct?
8    A.    Yes.
9    Q.    So you never communicated to him your intention
10   to exit your vehicle and rush the van, correct?
11   A.    No.
12   Q.    Do you recall how long it was between the time
13   you exited your vehicle and you actually reached the
14   driver's side door of the van?
15   A.    No.
16   Q.    Do you know if it was a matter of seconds?
17   A.    I don't recall.
18   Q.    You indicate during this time, and I'm reading
19   about the middle of the paragraph, first full
20   paragraph, you say, now I had a real good view of the
21   driver from all my lights and everything.  So you could
22   see clearly -- you could see Mr. Evans clearly inside
23   the van; is that correct?
24   A.    Yes.
25   Q.    And you could see Ms. Pauley inside the van at

Page 61

1    that time?
2    A.    I don't recall exactly when I saw her
3    specifically.  I saw him.  I don't remember how many
4    moments passed that I recognized her.
5    Q.    Well, you were aware that there was a front seat
6    passenger in the van before the van ever stopped,
7    correct?
8    A.    Yes.
9    Q.    Okay.  In your mind as you approached the van
10   had this pursuit terminated?
11   A.    No.
12   Q.    When did this pursuit terminate as you
13   understood?
14   A.    When we removed Mr. Evans from the vehicle.
15   Q.    So not until after Mr. Evans had been shot and
16   removed from the vehicle was this pursuit over as far
17   as you were concerned, correct?
18   A.    Correct.
19   Q.    You indicate as you're looking through the
20   driver's side window, is that correct, as you're
21   approaching the van?
22   A.    Not just that window.
23   Q.    Okay.  What parts of the van were you able to
24   see through and observe the driver?
25   A.    Well, I could only see the driver through the

Page 62

1  **driver's side window, but I was also looking through**
2  **the windows behind him.**
3  Q.  Okay.  Could you see anybody inside the van or
4  anything inside the van as you looked through the
5  windows behind the driver?
6  **A.  At what point?**
7  Q.  As you approached the van.
8  **A.  Not initially, no.**
9  Q.  Okay.  Subsequently as you got closer to the van
10  could you see anything inside the van through the other
11  windows, the windows behind the driver?
12  **A.  At this point I don't recall exactly when I saw**
13  **the children in the back moving around and recognized**
14  **that there was at least one person back there.**
15  Q.  Well, do you recall realizing that somebody was
16  in the back of the van before or after the first shot
17  was fired?
18  **A.  Yes.**
19  Q.  Which was it, before or after?
20  **A.  Before.**
21  Q.  So before the first shot was fired you were
22  aware there was a driver, there was a front seat
23  passenger, and there was at least one passenger in the
24  rear of the van?
25  **A.  I think what I testified was in fact I couldn't**

Page 63

1  **recall if it was just before or just after.  I want to**
2  **say it was as I engaged him, I saw the head of someone**
3  **moving around between the seat and the pillar where the**
4  **seat belt would attach to the wall.  I could see**
5  **someone moving around there, or it was through the**
6  **curve of the window at the lower portion of the rear**
7  **window where it meets the door.**
8  Q.  Okay.  And I just want to understand at what
9  point in time do you recall observing that, was that
10  before or after the first shot was fired?
11  **A.  I still can't say.  I really just -- I was not**
12  **100 percent sure when I gave the statement and I want**
13  **to say it was before, but I can't say specifically.**
14       MR. RASKIN:          He needs to
15       take a break.
16       MR. SCOTT:          Okay.  That's
17       fine.  Thank you.
18       (Thereupon, there was a recess.)
19  BY MR. SCOTT:
20  Q.  Officer Miller, we were going through your
21  interview with Special Agent Moran dated March 14th of
22  2017.  And I had been asking you about what you were
23  able to observe as you approached the van after it had
24  spun out.  You exited your cruiser and began
25  approaching the van.

Page 64

1       You indicated to me you could  see -- through
2  the driver's side door you could see Mr. Evans,
3  correct?
4  **A.  Yes.**
5  Q.  And you recall as you approached, got closer to
6  the van at some point you could see through the windows
7  behind the driver's side door into the back of the van;
8  is that correct?
9  **A.  Yes.**
10  Q.  And this is all prior to you opening the door on
11  the van, correct?
12  **A.  Yes.**
13  Q.  Okay.  And we can agree that ultimately you
14  opened the door on the van as opposed to Mr. Evans
15  opening it or someone else opening the door; is that
16  correct?
17  **A.  That's correct.**
18  Q.  Okay.  I want to ask you about the last full
19  paragraph on page 4.  It begins Officer Miller
20  continued, so when I stood up I initially started to
21  draw my gun and immediately saw the passenger female.
22       And I want to understand at what point in time
23  specifically you're referencing when you say so when I
24  stood up.  Do you mean when you stood up as you got out
25  of your cruiser, or at some other point?

Page 65

1  **A.  Yes.  It's not the first time I saw her.  I**
2  **guess what I should have said is I realized her in the**
3  **background.**
4  Q.  Okay.  And when you stood up, you're referring
5  to standing up as you got out of your car?
6  **A.  Correct.**
7  Q.  So approximately how far were you from the van
8  from where you were standing outside your car door?
9  **A.  I don't know the answer to that.**
10  Q.  Okay.  Do you have an estimate of how far away
11  you were?
12  **A.  No, I don't.**
13  Q.  Let me ask it this way: when the van spun out in
14  front of you I think you indicated in your statement
15  you tried to position your car so as to block the
16  driver's side door so nobody could bail from the
17  vehicle; is that fair?
18  **A.  That's correct.**
19  Q.  And you actually ended up making contact with
20  the side of the van behind the driver's door; is that
21  correct?
22  **A.  Yes.**
23  Q.  Okay.  When you exited your vehicle was your
24  vehicle still in physical contact with the van, still
25  touching the van?

Page 66

1    A.   I don't recall.
2    Q.   Okay.  Can we agree that whether it was actually
3    touching the van or not, the front end of your vehicle
4    would have been in very close proximity to the side of
5    the van?
6    A.   That's correct.
7    Q.   Within a foot or so; is that fair?
8    A.   Yes.
9    Q.   Okay.  So really the distance you would have
10   been from the driver's side door of the van from your
11   position as you were exiting your car would have been
12   whatever the length of your car is from the front to
13   the back of your driver's door; is that fair?
14   A.   Yes.
15   Q.   And when you stand up as you're getting up out
16   of your car you say I saw him plain as day.  So you
17   could clearly see inside the van at this point?
18   A.   I could see his left side plain as day from
19   about his elbow up is what I believe I said.
20   Q.   Okay.  And what you observed at that time was
21   that Mr. Evans had his left hand on the steering wheel,
22   correct?
23   A.   Correct.
24   Q.   And his right hand on the gear shift?
25   A.   That's correct.

Page 67

1    Q.   Okay.  And you believed that he was trying to
2    maneuver the gear shift in some manner; is that
3    correct?
4    A.   Yes.
5    Q.   Okay.  And you said this was just before and
6    just after he made contact with Sergeant Kelley; is
7    that correct?
8    A.   Just after and just before.
9    Q.   Okay.
10   A.   Well, that's not true.
11   Q.   Okay.
12   A.   Ask that question again, please.
13   Q.   Let me ask you this, and I'm just reading it
14   from the statement.  Let me read what's written here on
15   the exhibit.  I saw him plain as day with his left hand
16   on the steering wheel and his right hand trying to
17   jimmy or maneuver the -- work the gear selector just
18   before and just after he made contact with Sergeant
19   Kelley.  Do you see that?
20   A.   Which paragraph are we at?
21   Q.   I'm looking at the final paragraph on page 4.
22        MR. RASKIN:        Can I point it
23        to him?
24        MR. SCOTT:         Oh, please
25        please.  Yes.  Thank you.

Page 68

1    A.   Okay.  Ask the question again, please.
2    Q.   Well, first of all, did I read that correctly?
3    A.   Well, read it again because I don't remember
4    what you said.
5    Q.   Okay.  I saw him plain as day with his left hand
6    on the steering wheel and his right hand trying to
7    jimmy the or maneuver the -- work the gear selector
8    just before and just after he made contact with
9    Sergeant Kelley.
10   A.   Yes, you read that correctly.
11   Q.   Okay.  And is that what you recall?
12   A.   Yes.
13   Q.   Okay.  You had said before you thought something
14   was not correct.  Is what's written here as you recall
15   correct?
16   A.   That's specific to that moment, yes.
17   Q.   Okay.  And when you say just before and just
18   after he made contact with Sergeant Kelley, you're
19   talking about the last time that the van made contact
20   with Sergeant Kelley's vehicle; is that correct?
21   A.   No.
22   Q.   Okay.  So was there further contact between the
23   van and Sergeant Kelley's vehicle after this moment
24   that you're describing?
25   A.   At that moment he had just made contact, and it

Page 69

1    was clear by his actions trying to put it in reverse
2    and revving the engine that he was trying to put it in
3    reverse to do the same thing again.  So that is just
4    before and just after.
5    Q.   Okay.  So there was a subsequent contact between
6    the van and Sergeant Kelley's vehicle?
7    A.   Which time?
8    Q.   After this.
9    A.   After what?
10   Q.   After the moment you're describing in this final
11   paragraph on page 4.
12   A.   You're asking if there was another one?
13   Q.   Yes.
14   A.   No.
15   Q.   Okay.  Let me see if I understand what you're
16   trying to tell me.  After the van spins out --
17   A.   Yes.
18   Q.   -- am I correct that the van and Sergeant
19   Kelley's vehicle made contact twice?
20   A.   Yes.
21   Q.   Okay.  And the second -- has the second contact
22   occurred as you're standing there outside your vehicle
23   looking in and seeing Mr. Evans, the left hand on the
24   steering wheel and the right hand on the gear shift?
25   A.   Yes.

Page 70

1    Q.    Okay.  There was no further contact between the
2    van and Sergeant Kelley's vehicle after that point in
3    time, correct?
4          MR. RASKIN:          Objection as
5          to form.  After what point in time?
6          MR. SCOTT:          The point in
7          time that's described in this final
8          paragraph, the second contact.
9    BY MR. SCOTT:
10   Q.    You said both contacts had occurred as you're
11   standing there outside.
12   A.    What I said was just before and just after.  I
13   didn't say the second time.  I said worked the gear
14   selector just before and just after he made contact
15   with Sergeant Kelley.
16   Q.    Okay.  So let me go back again just so I
17   understand what you have to tell us.  Was there a
18   subsequent contact between the van and Officer Kelley's
19   vehicle after this moment?
20   A.    What I'm referencing in that statement is I was
21   expecting him to do that again and that would be the
22   part that I described as just before.  I expected him
23   trying to put it in reverse to repeat what he had just
24   done to hit Sergeant Kelley.
25   Q.    Okay.  And did the van ever hit Sergeant

Page 71

1    Kelley's vehicle again after this moment?
2    A.    For a third time after he spun out, no.
3    Q.    Okay.  So whatever contact there was between the
4    van and Officer Kelley's vehicle had completed as you
5    were standing there outside your vehicle exiting your
6    vehicle; is that fair?
7    A.    Yes.
8    Q.    So there was no further contact between the van
9    and Sergeant Kelley's vehicle as you approached the
10   van; is that fair?
11   A.    That's fair.
12   Q.    And you indicate in your statement following
13   that last paragraph on page 4 and the very, very
14   beginning of page 5, you indicate because you could see
15   both of Mr. Evans' hands you decided to just open the
16   door and pull him out.
17   A.    That's correct.
18   Q.    So immediately before you opened the door of the
19   van you could see both of Mr. Evans' hands; is that
20   correct?
21   A.    That's correct.
22   Q.    Okay.  You've seen the video, the dash cam
23   video, correct?
24   A.    Yes.
25   Q.    Do you know how much time passes between the

Page 72

1    time you opened the door and the time the first shot is
2    fired?
3    A.    Specifically, no.
4    Q.    No recollection at all?
5    A.    If you're asking me to give you a few seconds
6    versus minutes, it's a few seconds.
7    Q.    Okay.  Well, is it even a few seconds?
8    A.    I can't specify.  I don't know for sure.
9    Q.    Whatever appears on the video, that's what it
10   is, right?
11   A.    Yes.
12   Q.    Okay.  Prior to approaching the vehicle as the
13   van was spinning out you had observed that as a result
14   of hitting the stop strips one of the front tires on
15   the van had been deflated, correct?
16   A.    No, that's not correct.
17   Q.    Tell me what it is.
18   A.    The first thing I observed was the rear tire was
19   falling apart and then moments later observed the front
20   tire deflating.
21   Q.    And when you say falling apart, actually coming
22   apart and coming off the vehicle, correct?
23   A.    Yes.
24   Q.    So at the point in time when the van is stopped
25   and you're exiting your vehicle at least one of the

Page 73

1    rear tires is completely gone, correct?
2    A.    The van wasn't stopped.
3    Q.    I understand.  But one of the rear tires was
4    completely gone; is that correct
5    A.    At which point?
6          When he made the second contact after spinning
7    out, yes.
8    Q.    And at that same point in time at least one of
9    the front tires was deflated?
10   A.    It looked low and it was losing air, but I don't
11   know to what status it was.
12   Q.    Okay.  Do you know what condition the other two
13   tires on the van were in?
14   A.    Not until later, no.
15   Q.    Okay.  You indicate in the next paragraph that
16   you were afraid that the van was going to back up and
17   pin you between your car and the door because you were
18   essentially between your front bumper and the van.
19         MR. RASKIN:          Again, I'm
20         just going to point him to where you're
21         at.
22         MR. SCOTT:          Yes, please.
23         Thank you.
24         MR. RASKIN:          The top of
25         this part.

Page 74

1    BY MR. SCOTT:
2    Q.   Do you see that?
3    A.   Yes.
4    Q.   Okay.  Let me ask you, have you received
5    training on what to do if a vehicle starts moving when
6    you're at the side of the vehicle?
7    A.   Well, I'd have to know the context and the
8    specific situation to be able to say that.
9    Q.   Well, in a situation like this have you received
10   training on what to do?
11   A.   When I was with the feds doing the undercover
12   work on the drug task force there were multiple times
13   where we trained for dynamic vehicle extractions which
14   included a vehicle in traffic, the occupant or
15   occupants were targets of an investigation, and we were
16   going to perform a dynamic vehicle extraction which is
17   very similar to the situation we had at hand at the
18   moment that we're here for today.
19   Q.   And was that training sort of a practice
20   demonstration, if you will, or was it a classroom
21   training: what form?
22   A.   It was an actual physical we were out doing the
23   work.
24   Q.   So somebody was physically demonstrating what
25   would be acceptable tactics; is that correct?

Page 75

1    A.   Yes.
2    Q.   Were you ever trained to simply step back away
3    from a vehicle that might start moving as you
4    approached it?
5    A.   I don't recall specifically.
6    Q.   Okay.  That's something that may or may not have
7    happened, you don't recall as you sit here today?
8    A.   That's correct.
9    Q.   You indicate that when you opened the door
10   Mr. Evans was looking right at you; is that correct?
11   A.   No, that's not correct.
12   Q.   All right.  What is correct?
13        MR. RASKIN:          Again, do you
14        want him to read this paragraph; is that
15        what you're asking?
16   BY MR. SCOTT:
17   Q.   Let me ask you what you recall.  Do you recall
18   as you opened the door Mr. Evans was looking at you?
19   A.   He wasn't looking at me until I opened the door
20   and started to engage him, and he looked at me in
21   shock.
22   Q.   He looked at you in?
23   A.   In shock.  What I think I testified was that, or
24   my statement was that he was as surprised as I was that
25   the door opened.  But he did not look at me prior to

Page 76

1    that door coming open.
2    Q.   So when you opened the door you recall that
3    Mr. Evans had a surprised look on his face?
4    A.   Yes.
5    Q.   All right.  And you don't recall Mr. Evans
6    looking in your direction as you approached the
7    vehicle?
8    A.   He never did.  He was intently focused on
9    ramming Sergeant Kelley and moving him out of the way
10   so he could escape.  He never acknowledged my presence.
11   Q.   Well, do you know if during the second contact
12   between the van and Sergeant Kelley's vehicle if
13   Sergeant Kelley's vehicle moved into the path of the
14   van?
15   A.   I don't know the answer to that.  Or at the time
16   I didn't know the answer to that.
17   Q.   So you don't know if Mr. Evans drove at Sergeant
18   Kelley's vehicle, or if Sergeant Kelley's vehicle
19   pulled into Mr. Evans' path?
20   A.   Right now today?
21   Q.   At that time.
22   A.   No, I did not.
23   Q.   Do you know as you sit here today?
24   A.   I know as I sit here today Sergeant Kelley tried
25   to maintain the box and Mr. Evans backed up and rammed

Page 77

1    him.
2    Q.   Okay.  So do you understand as you sit here
3    today from looking at the vehicle that as Mr. Evans
4    began to pull forward again, Sergeant Kelley positioned
5    his vehicle into the path of the van?
6    A.   The path in terms that he didn't have time to
7    stop and couldn't help himself and made contact?  I
8    don't know what you're saying.
9    Q.   Well, from looking at the videos --
10   A.   Yes.  They made contact, so he had to.
11        MR. RASKIN:          This isn't a
12        conversation.  Let him ask his question.
13        Answer his question.
14   BY MR. SCOTT:
15   Q.   We watched the video and I suppose we can queue
16   it up at some point.  The van appears to be moving
17   straight forward.  The wheels aren't turned at the
18   point in time that Sergeant Kelley pulls his vehicle
19   further into the path of the van and then the van makes
20   contact with Sergeant Kelley's vehicle.  Have you seen
21   that?
22   A.   You're asking me to say that he wasn't already
23   partially in front of him.  I don't know where he was
24   in relationship as that second movement forward began.
25   I don't know if it was even necessary for him to pull

Page 78

1 forward. I don't know.
2 Q.   But what you see on the video is Officer
3 Kelley's vehicle moving forward into the path of the
4 van, correct?
5 A.   He may have already been into the path, so I
6 can't agree with you on that.
7 Q.   Well, it's moving further into the path of the
8 van.
9 A.   Yes.
10 Q.   Okay. When you opened the door could you see
11 Mr. Evans, either of his hands?
12 A.   Yes.
13 Q.   What could you see?
14 A.   Both of his hands.
15 Q.   As you opened the door?
16 A.   Yes.
17 Q.   And where were they?
18 A.   On the steering. His left hand was on the
19 steering wheel in about the 10:00 position and his
20 right hand was on the gear selector.
21 Q.   So when you opened the door Mr. Evans' hands
22 were still more or less in the same position that you
23 had observed them when you first got out of your car?
24 A.   Yes.
25 Q.   Okay. So whatever occurred that made you fear

Page 79

1 Mr. Evans might be reaching for a weapon occurred after
2 you opened the van door?
3 A.   That's correct.
4 Q.   What do you recall what happened next?
5      You had the door open. You see Mr. Evans' left
6 hand on the steering wheel, right hand on the gear
7 shift.
8 A.   What I do recall next? There was quite a bit
9 going on.
10 Q.   Okay. Please tell me what you can remember.
11 A.   When I opened the door my intent was to go hands
12 on because I could see his hands and he wasn't paying
13 attention to me at the moment. I was quite surprised
14 that the door opened. My intent was to go hands on and
15 just pull him out of the vehicle before he could back
16 up again.
17      And as I started to give commands he turned --
18 he recognized that the door was open. Somewhere in
19 that moment of when the door comes open he may have
20 turned to look at me prior to me giving commands or
21 during the commands. I don't know if it was because
22 the door came open and he felt the air exchange or
23 heard the sirens suddenly louder. I don't know why he
24 looked at me.
25      But it was clear I caught him off guard. At

Page 80

1 least my interpretation was I caught him off guard. I
2 started to give commands with the expectation I was
3 just going to put hands on and pull him out of the
4 vehicle.
5      As he did this and turned, he turned to his left
6 to acknowledge my presence and his right hand came off
7 the gear selector and went down below where I could no
8 longer see it.
9 Q.   When Mr. Evans' hand came off the gear selector
10 was he still seated upright in the front seat?
11 A.   Yes.
12 Q.   Could you see his left hand?
13 A.   It was still on the -- yes.
14 Q.   You think it was still on the steering wheel?
15 A.   I'm sure it was still on the steering wheel.
16 Q.   When you fired the first shot was Mr. Evans
17 turned towards you?
18 A.   His face and head were turned towards me, but
19 his body -- he did not blade, he did not square off if
20 that's what you mean.
21 Q.   Yes, that is what I mean. At any time did he
22 square off?
23 A.   No.
24 Q.   And I think you indicated in your statement, and
25 I'm looking at the middle of that first full paragraph

Page 81

1 that takes up most of the page on page 5, you indicated
2 I decided to shoot him because of my close proximity.
3 Do you see that?
4 A.   Yes.
5 Q.   All right. So you made the decision to fire
6 because you were positioned so close to Mr. Evans?
7 A.   Well, that's a very broad statement.
8 Q.   Tell me what would be more accurate.
9 A.   Well, what this statement has to do with is
10 everything that's going on at the moment. I didn't
11 have an opportunity to retreat because he was clearly
12 trying to still ram Sergeant Kelley and put his life in
13 danger. Had I retreated he still would have had the
14 opportunity to continue attacking Sergeant Kelley.
15      He would have -- at that moment that he dipped
16 and his put his hand down, had he come up with a
17 weapon, he could have clearly engaged me and then my
18 accuracy at that moment drops the farther I get away.
19      So with the passenger as a back drop, that
20 would have been a very terrible situation to try and
21 take a shot or engage somebody. Not to mention I had
22 Officer Plut and other officers that I was not aware
23 of. I knew there were other officers coming on foot,
24 but had anyone else engaged, it's quite possible -- at
25 that moment I was the only person who knew there was

Page 82

1    someone else behind him.  And had Sergeant Kelley
2    engaged him with a weapon, it's very possible those
3    children would have been hit.
4          So what I'm saying there in that moment is
5    because I was so close to him, I clearly was the only
6    one who had the opportunity to put this to an end by
7    shooting him.
8    Q.    What you indicated in your statement on March
9    14th, 2017 was simply I decided to shoot him because of
10   my close proximity, correct?
11   A.    If you look at just that statement by itself,
12   yes, that's what that reads.
13   Q.    Was there any reason why you could not have
14   remained in your cruiser and performed a felony call
15   out stop?
16   A.    Well, no felony call out stop, had he stopped
17   and had he pulled over and complied, takes place with
18   anyone inside their cruisers.  Everyone exits their
19   cruisers.  So it would have been foolish for me to stay
20   in my vehicle for any such event.
21   Q.    When you say everybody exits their cruisers, do
22   they stay by their cruisers?
23   A.    They do.
24   Q.    Was there any reason why you couldn't have
25   remained by your cruiser and called Mr. Evans out of

Page 83

1    this van?
2    A.    Yes.
3    Q.    Why?
4    A.    The sirens were extremely loud.  He was still in
5    a manner of attacking Sergeant Kelley.  He had no
6    intention of stopping.  This had not come to a stop.
7    At no point did he come to a point we could do or
8    perform a felony call out.
9    Q.    Well, you could have turned the sirens off if
10   that was a problem, right?
11   A.    Depending on which car you're in, the car --
12   some cars, the sirens turn off automatically when you
13   put the car in park.  And I wasn't prepared for that.
14   My car, for whatever reason, the sirens did not turn
15   off.
16   Q.    And the last order that was exchanged between
17   you and the other officers in the pursuit was that you
18   were going to perform a felony call out stop, right?
19   A.    No, that's not correct.
20   Q.    What was the last order exchanged between you
21   and the other officers?
22   A.    That we were going to try to perform a rolling
23   roadblock.
24   Q.    Okay.  There had been an agreement to do a
25   felony call out stop, correct?

Page 84

1    A.    If he had complied and come to a stop, correct.
2    Q.    In terms of approaching the vehicle, that was
3    the last order that was given, correct?
4    A.    No, that's not correct.
5    Q.    What was that last order?
6    A.    That we were going to try to do another rolling
7    roadblock.
8    Q.    Between the first and second shots what
9    happened?
10   A.    The actions of Mr. Evans remained the same.  He
11   still posed a threat to Sergeant Kelley.
12   Q.    How did he --
13   A.    And to the occupants.
14   Q.    -- pose a threat?
15   A.    I could hear the engine revving.  The engine was
16   still revving, and I expected after the first shot that
17   all of that would stop and it did not stop.
18   Q.    So because the engine was still revving,
19   anything else that Mr. Evans did that you thought was
20   threatening yourself or any other officers on scene?
21   A.    He was still trying to maintain -- his right
22   hand was still below where I couldn't see it.  So if he
23   still had the wherewithal to have his foot on the
24   accelerator, I expected that he still had the ability
25   to raise his hand with a weapon.

Page 85

1    Q.    Okay.  Well, do you know if he didn't raise his
2    hand because he'd been shot?
3    A.    No, I don't know that.
4    Q.    Did you consider that?
5    A.    I don't know that I had time to.
6    Q.    So the engine is still revving, you can't see
7    his right hand and you fire a second time; is that
8    correct?
9    A.    Yes.
10   Q.    And how far do you think Ms. Pauley was away
11   from Mr. Evans when you shot each time?
12   A.    Whatever the distance is between the passenger's
13   seat and the driver's seat.
14   Q.    What about the distance between Mr. Evans and
15   the children in the back of the van?
16   A.    Possibly closer.
17   Q.    Did any other officer on scene fire their
18   weapons?
19   A.    No.
20   Q.    Did you see the location of the children in the
21   back between the first and second shots?
22   A.    Well, we keep saying children.  I don't know
23   that I ever knew that they were children.  I knew that
24   there was a head there.  I knew there was at least one
25   person.  So to be specific and say children, plural, I

Page 86

1  don't know the ages and I didn't know there was more
2  than one person.
3     Q.   Okay.  Did you become aware of a person or
4  persons, the location of a person or persons in the
5  back seat between the first and second shots?
6          MR. RASKIN:          Objection.
7          There was no back seat.
8  BY MR. SCOTT:
9     Q.   Back area of the van between the first and
10  second shots.
11    A.   I think what my statement was I still can't
12  recall if I was aware of the children just prior to the
13  first shot or just after.  However I do remember a
14  child's voice crying somewhere in that moment.  And I
15  would have to refer to my statement on that one because
16  I don't recall specifically.
17    Q.   Okay.  Whatever is in your statement would be an
18  accurate depiction of certainly what you remembered
19  back on March 14th, right?
20    A.   Yes.
21    Q.   Okay.  What happened next as regards extracting
22  Mr. Evans from the van?
23    A.   Sometime about that moment after the second shot
24  his hand came in to view and he -- there was a lot
25  going on, you have to understand.  The passenger was

Page 87

1  extremely upset and animated.  She had reached out to
2  his shoulder and was pulling on his arm.  There was
3  lots of screaming, lots of crying.
4          I guess I would have to know -- if you asked me
5  a specific question, I could answer it.  But you're
6  asking me a very broad question on quite a bit of
7  information?
8     Q.   Let me ask you a specific question.  You said
9  Mr. Evans -- after the second shot Mr. Evans' right
10  hand came in to view.  Did I understand that correctly?
11    A.   I'd have to refer to my statement, but I recall
12  his right hand coming in to view, yes, after the second
13  shot.
14    Q.   And from your recollection did it come in
15  to view as a result of some voluntary movement by
16  Mr. Evans, or from you or possibly Officer Vlna pulling
17  on Mr. Evans?
18    A.   It had to have come in to view.  I don't know
19  why it came in to view.  It was prior to Officer Vlna
20  going to the car.
21    Q.   Okay.
22    A.   I think you're asking me to speculate why.  I
23  don't know why.  I don't know if he brought his hand in
24  to view or if the manner of the tugging on his arm
25  brought it in to view.  I don't know.

Page 88

1     Q.   And I don't want you to speculate.  I'm sorry.
2  I just want what you recall.  And if you don't recall
3  one way or the other, that's fine.  And I appreciate
4  that.
5     A.   I don't recall.
6     Q.   At any time after the second shots were fired,
7  and at any time after that did Mr. Evans say anything
8  to you?
9     A.   Never.
10    Q.   Did he say anything at all?
11    A.   Never.
12    Q.   Did he make any kind of sound, a groan or
13  anything like that that you recall?
14    A.   Those sirens were so loud, I just couldn't hear
15  anything if he did say anything.
16    Q.   Could you tell if Mr. Evans was still breathing
17  at that point in time?
18    A.   At which moment?
19    Q.   After the second shot as you're extracting him
20  from the --
21    A.   No, I did not know if he was breathing.  I had
22  no idea if that round incapacitated him or not.
23    Q.   Okay.  After Mr. Evans was taken out of the van
24  do you know if at any time you were able to detect
25  breathing by Mr. Evans?

Page 89

1     A.   My primary concern at that moment had to do with
2  stopping the bleeding.  And the chaos was so
3  overwhelming, all I could focus on was finding the
4  wound and stopping the bleeding and getting EMS support
5  and medical support from anyone else that was on the
6  scene that could help out.
7          I don't know.  I don't know if I at the moment
8  knew that he was breathing or didn't know.  I don't
9  recall one way or another at this moment.
10    Q.   Okay.  Do you recall any vital signs from
11  Mr. Evans as he was being removed from the van and as
12  medical treatment was being performed on him?
13    A.   No, I don't.
14    Q.   You indicate in your statement at one point as
15  you were performing medical treatment Mr. Evans vomited
16  some kind of fluid.  Do you remember that?
17    A.   Now that you bring that up, yes.
18    Q.   Okay.  Again, do you remember any other groans
19  or sounds that may have been coming from Mr. Evans at
20  this point?
21    A.   I don't recall.  I want to say that I recall
22  that he still had a pulse or was still in some function
23  alive until I asked for Plut to check the pulse and he
24  said he couldn't find a pulse.  Then it started to go
25  downhill from there.

Page 90

1    And I don't recall if that was just being
2  optimistic or everything that was going on the
3  moment from doing CPR and him moving around from people
4  maneuvering him. But at that moment prior to Plut
5  saying he didn't have a pulse and he wanted to start
6  CPR I want to say he still had a pulse or was still
7  functioning.
8  Q.  Okay. And do you know for what period of time
9  that was that you were trying to administer first aid
10 to Mr. Evans until Officer Plut said I can't find a
11 pulse?
12 A.  It seemed like forever. I don't know.
13 Q.  Okay. So it might have been a number of
14 minutes; is that fair?
15 A.  Whatever the video shows. I really don't know.
16 Q.  Okay. Did you continue administering first aid
17 to Mr. Evans until EMS got on scene?
18 A.  I don't think so.
19 Q.  Would somebody else have stepped in and relieved
20 you?
21 A.  Yes.
22 Q.  Okay. Do you know how long it was between the
23 time of the second shot and when EMS arrived on scene?
24 A.  No, I don't.
25 Q.  Okay. After EMS came were you close in

Page 91

1  proximity to Mr. Evans; were you still monitoring what
2  was going on with him when EMS arrived on scene?
3  A.  Once everything started to calm down and I was
4  removed from that immediate area I still can't remember
5  where I was, who I talked to, what I did at that
6  moment. I don't even remember getting back to the
7  police department.
8  Q.  Okay. Obviously at some point after the scene
9  was cleared you got back to the Strongsville Police
10 Department, correct?
11 A.  Yes.
12 Q.  Do you recall, did you or any of the other
13 officers involved in this incident use a cell phone or
14 call anybody?
15 A.  I remember multiple sergeants going back and
16 forth on their city phones. I assume city phones.
17 I don't know. But on phones talking to supervisors,
18 talking to other officers that were trying to
19 coordinate day shift coming in and things like that.
20 I remember conversations like that, but to say what
21 phones they used, who they talked to, I can only
22 speculate.
23 Q.  Does every officer have a city issued phone, or
24 do you just carry a personal phone?
25 A.  No.

Page 92

1  Q.  No, they --
2  A.  Not everybody has a city phone. Only
3  supervisors.
4  Q.  Okay. Do you carry a personal phone on duty?
5  A.  Not always.
6  Q.  Okay. As more times than not?
7  A.  Yes.
8  Q.  To your knowledge did the other officers, other
9  patrol officers carry personal cell phones while on
10 duty?
11 A.  I would say a majority of them do, but I don't
12 know how often.
13 Q.  I appreciate that. Did anybody ever ask to
14 inspect your personal cell phone as part of the
15 investigation into this incident?
16 A.  No.
17 Q.  To your knowledge did anybody ask to inspect the
18 personal cell phones of any other officers who were
19 involved in this incident?
20 A.  No.
21 Q.  It would be fair to say that during the time of
22 this pursuit and throughout its termination you didn't
23 know who was driving the van, correct?
24 A.  As to his identity?
25 Q.  Yes, sir

Page 93

1  A.  No, I didn't.
2  Q.  You didn't have any information about Roy Evans,
3  correct?
4  A.  No.
5  Q.  Never heard of Roy Evans?
6  A.  No.
7  Q.  To your knowledge none of the other officers
8  involved in the pursuit knew who was driving the van,
9  correct?
10 A.  Correct.
11 Q.  Okay. I want to talk about the pursuit itself a
12 little bit. And I understand, I believe I'm correct,
13 correct me if I'm wrong, you became aware that I think
14 it was Sergeant Kelley was involved in a pursuit and
15 you were here at the Strongsville Police Department; is
16 that right?
17 A.  Yes.
18 Q.  Okay. And my understanding is this all started
19 about two o'clock in the morning; is that right?
20 A.  Yes.
21 Q.  And you were performing some duty here at the
22 Strongsville Police Department?
23 A.  I don't necessarily know I was performing a
24 duty, but I was on station.
25 Q.  And did you become aware through radio traffic

Page 94

1   or something that Sergeant Kelley was requesting
2   assistance in a pursuit?
3   A.   Yes.
4   Q.   And you were available to join in that effort,
5   correct?
6   A.   Yes.
7   Q.   Okay.  So you joined in the pursuit.  Do you
8   remember where exactly you joined in the pursuit?
9   A.   At the Ohio Turnpike and Interstate 71
10  southbound.
11  Q.   Okay.  And so you were up by the Ohio Turnpike.
12  My understanding is this pursuit would have began when
13  Sergeant Kelley was initially northbound on 71.  Is
14  that your understanding as well?
15  A.   Yes.
16  Q.   Were you ever part of the northbound leg of the
17  pursuit?
18  A.   No.
19  Q.   Okay.  So you would have joined either as the
20  pursuit was turning or after it had turned southbound
21  on 71; is that fair?
22  A.   I guess I'd have to have your definition of
23  joined.
24  Q.   Well, when you consider to have joined the
25  pursuit, where were you?

Page 95

1   A.   When Mr. Evans turned south on Pearl, I was
2   north on Pearl to intersect.  And that's when I got out
3   of the vehicle and was actually taking an action
4   towards helping him, rather than just move into the
5   area.
6        So do you define that as partaking?  That's
7   where I got the spikes out by Valley Parkway expecting
8   him to continue southbound.
9   Q.   So let me ask about that then.  So as Sergeant
10  Kelley is pursuing the van northbound on 71, it exits
11  at Pearl Road, right?
12  A.   Yes.
13  Q.   And you are on Pearl Road north?
14  A.   Yes.
15  Q.   Okay.  And did you try and use stop strips or
16  something at that point in time?
17  A.   Based on his transmission that he had started
18  southbound on Pearl, I got out of the vehicle at Valley
19  Parkway and Pearl expecting that he would intersect my
20  position where I would deploy stop sticks.
21  Q.   All right.  And what happened next?
22  A.   About the time I got out of my cruiser and
23  started to run to my trunk.  Kelley transmitted that
24  he's getting back on 71 to go southbound.
25  Q.   Okay.  And what did you do?

Page 96

1   A.   I got back in the car and proceeded north to the
2   Turnpike on ramp which is accessed by Pearl Road.
3   Q.   Okay.  And so when you were actually physically
4   part of the pursuit, would it have been southbound on
5   71 south?
6   A.   Yes.
7   Q.   And do you know about what mile marker you would
8   have joined that pursuit?
9   A.   Whatever mile marker is the actual ramp to get
10  on 71 south from the Turnpike.
11  Q.   Okay.  And that's north of Route 82, correct?
12  A.   That's correct.
13  Q.   And do you know how many miles in total the
14  pursuit covered?
15  A.   No, I don't.
16  Q.   Do you know how long you were engaged in the
17  pursuit in terms of time?
18  A.   No.
19  Q.   Do you know at approximately what mile marker
20  the first rolling roadblock was attempted?
21  A.   I know the area, but I can't say to the specific
22  mile marker.
23  Q.   Do you know approximately where it was?
24  A.   Yes.
25  Q.   Where was that?

Page 97

1   A.   Just south of Drake and just north of Boston
2   Road.
3   Q.   Okay.  And do you know at approximately what
4   point the first rolling roadblock was called off?
5   A.   Yes.
6   Q.   Approximately where was that?
7   A.   Where or when?
8   Q.   Where?
9   A.   I don't recall where.  Same general area.  It
10  was called off almost immediately after he made contact
11  with me.
12  Q.   So that attempt only lasted a few moments?
13  A.   Maybe a mile.
14  Q.   Okay.  Now, in between the first attempted
15  rolling roadblock and the second the Ohio State Highway
16  Patrol deployed stop strips: is that right?
17  A.   Yes.
18  Q.   Do you know how far it was from where the first
19  rolling roadblock was called off until the Ohio State
20  Highway Patrol deployed stop strips?
21  A.   No, I do not.
22  Q.   Do you have a recollection in terms of time or
23  distance?
24  A.   I'd have to watch the video.
25  Q.   Okay.  What about between the time the van

Page 98

1    encounters the stop strips and the second rolling
2    roadblock is attempted, do you have a recollection in
3    terms of time or distance --
4    **A.    No.**
5    Q.    -- as to how long that was?
6    **A.    No.**
7    Q.    Do you have a recollection as to how long you
8    and the other officers were engaged in trying to
9    perform the second rolling roadblock before it was
10   called off?
11   **A.    The second rolling roadblock was never called**
12   **off. It actually never took place.**
13   Q.    So you were just setting up for it when the van
14   spun out?
15   **A.    Yes.**
16   Q.    Did you see at the time of the pursuit, and not
17   from what you may have seen from video, but at the time
18   of the pursuit were you able to see any contact between
19   the van and any other vehicle involved in the pursuit,
20   any other law enforcement vehicle?
21   **A.    Yes.**
22   Q.    What contact do you recall actually witnessing?
23   **A.    When Mr. Evans attempted to push me off the road**
24   **during the first rolling roadblock.**
25   Q.    I'm sorry. I meant other than your vehicle did

Page 99

1    you observe any physical contact between the van and
2    any other vehicle involved in the pursuit?
3    **A.    Throughout the entirety?**
4    Q.    Yes.
5    **A.    Yes.**
6    Q.    What do you recall seeing?
7    **A.    When we were attempting to maneuver into the --**
8    **for the second rolling roadblock, that's when Sergeant**
9    **Kelley maneuvered to the passenger side area of the van**
10   **while I was waiting for Officer Vlna to get up front**
11   **and Officer Plut to come to the rear. I started to**
12   **move in to the right side and that's when he went to**
13   **the left and made contact with Sergeant Kelley.**
14   Q.    And were you actually able to see that contact
15   between the two vehicles?
16   **A.    Yes.**
17   Q.    So you could see the driver's side of the van
18   and I assume the passenger's side of Sergeant Kelley's
19   vehicle from where you were?
20   **A.    Well, I could see the rear. I had a clear view**
21   **of the rear of Mr. Evans' van and the front and**
22   **passenger side -- well, the entire passenger side of**
23   **Sergeant Kelley's vehicle until they made contact.**
24   Q.    And was this after the van had encountered the
25   stop strips?

Page 100

1    **A.    Yes.**
2    Q.    Was this after the rear tire had started to come
3    apart on the back of the van?
4    **A.    Yes.**
5    Q.    And was this after the one front tire appeared
6    to deflate?
7    **A.    Yes.**
8    Q.    Have you received any specific training on
9    de-escalation?
10   **A.    Yes.**
11   Q.    What training have you received?
12   **A.    Throughout the years. I know there was one**
13   **class specifically that was in the interrogatories that**
14   **we mentioned. I would have to look at my training, but**
15   **de-escalation is in part of many classes to include**
16   **firearms and tactics and rules of engagement like Fast**
17   **at OSP.**
18   Q.    What is your understanding as to the purpose of
19   de-escalation training?
20   **A.    Well, I've recently had a de-escalation class**
21   **that I volunteered for in recent months, just last**
22   **month I think. So to be able to separate that two days**
23   **of information from information that I had received**
24   **over the years is going to be very difficult. So to be**
25   **able to say how it applied back then, I'm afraid I**

Page 101

1    **would mix the two.**
2    Q.    I don't necessarily want you to separate the
3    two. Why don't you tell me what you recall from this
4    recent training?
5    **A.    Essentially what it comes down to is the**
6    **subject's compliance versus non-compliance and the**
7    **response to situations that may include stand-off**
8    **situations, subjects that are off their medications,**
9    **subjects that are having problems with spouses, that**
10   **are more or less stress induced rather than just**
11   **non-compliance of civil obedience.**
12   Q.    Well, do you understand one of the purposes for
13   de-escalation training is to promote officer safety?
14   **A.    As well as the subject, yes.**
15   Q.    And do you understand one of the purposes of
16   de-escalation training is to reduce both the level and
17   the number of incidents, use of force incidents?
18   **A.    I know that there are times, as in the**
19   **curriculum there are times when de-escalation training**
20   **cannot take effect and are not applicable to that**
21   **situation where an officer has to take action as**
22   **opposed to creating time and distance. And**
23   **specifically that was covered most recently, time and**
24   **distance when an officer has an opportunity and isn't**
25   **immediately compelled to take action.**

1    Q.    I'm just asking in general if a goal of
2    de-escalation training is to reduce the number of
3    incidents of use of force?
4    A.    I would have to know the moment and the use of
5    force.
6    Q.    In general.
7    A.    Yes.
8    Q.    And is a goal of de-escalation training to avoid
9    placing officers in situations where they might
10   misperceive the need to use force or the level of force
11   necessary?
12   A.    They trained you to recognize when you have time
13   and distance and don't have to get necessarily involved
14   to use force, if that's what you mean.  But it's very
15   case specific.
16   Q.    Well, it teaches, does it not, de-escalation
17   training, the utilization of tactics that would help
18   avoid placing an officer in situations where force
19   might be necessary?
20   A.    But those tactics and that curriculum is based
21   upon a situation or scenario where the officer has time
22   and distance and isn't immediately compelled to act.
23   So to answer your question, it again depends.
24        The curriculum is based and built upon
25   information and that includes the information that

1    you're saying, but it also has to do with very specific
2    moments in time and very specific situations.
3              MR. RASKIN:         Joe, why don't
4         you let the reporter take a drink?
5              MR. SCOTT:          Off the
6         record.
7              (Thereupon, there was a recess.)
8              (Thereupon, Plaintiffs' Exhibit 14 to
9         the deposition of OFFICER WILLIAM JASON
10        MILLER was marked for identification.)
11   BY MR. SCOTT:
12   Q.    Officer, I want to hand you what I've marked as
13   Plaintiffs' Exhibit 14.  And I will tell you that this
14   is a still frame photo taken from one of the videos.
15             MR. PHILLIPS:        It was 14?
16             MR. SCOTT:           14, yes, sir.
17   Q.    And this photo appears to capture the moment.
18   It looks like your left hand is on the driver's side
19   door.  Do you see that?
20   A.    I can't say for sure that's what that is.
21   Q.    Okay.  That is you in sort of the middle of the
22   photo looking at your back?
23   A.    Yes.
24   Q.    Okay.  You appear to be drawing your weapon at
25   this point.

1    A.    I can't say for sure.  There's no time on this.
2    You'd have to show this exact moment in the video and
3    pause it so I could say yes or no, because there's so
4    much information right here that's left out.  I don't
5    know.
6         You're showing me a picture.  I can't see even
7    the time to say when this occurred, when this was
8    frozen.  All I know is that the door is open and --
9    Q.    Well, let me ask you this --
10             MR. RASKIN:          Let me enter
11        an objection to the alteration of the
12        photo, because I suspect the photo did not
13        include a characterization of either the
14        driver's head or driver's left arm.
15             MR. SCOTT:           Okay.  No.
16        That's been added from the photo.
17   BY MR. SCOTT:
18   Q.    Let me ask you this, Officer Miller: to the
19   right of the photo, does that depict the cruiser that
20   you were driving on March 7th of 2017?
21   A.    Yes.
22   Q.    And on the left side does that appear to be the
23   back of Sergeant Kelley's vehicle?
24   A.    Yes.
25   Q.    And there's an individual positioned immediately

1    behind Sergeant Kelley's vehicle.  Would that be
2    Officer Plut?
3    A.    I can't say for certain, but I would assume so.
4    Q.    Is that individual in the position that you
5    recall Officer Plut being in as you opened the door on
6    the van?
7    A.    I don't know where he was when I opened the
8    door.
9    Q.    Does that appear to be your position, what you
10   recall, as you opened the door on the van?
11   A.    Yes.
12   Q.    Okay.  And what we see in the driver's seat is
13   what appears to be the left arm of the driver.  Do you
14   recall seeing Mr. Evans' left arm in that position as
15   you opened the door?
16   A.    I can't say for sure that that particular white
17   mark on that is his left arm, but it was in that
18   general area, yes.
19   Q.    Okay.  So the white mark at least comports with
20   your recollection of where Mr. Evans' left arm would
21   have been as you opened the door, correct?
22   A.    Yes.
23   Q.    And we see what appears to be a head turned in
24   your direction.  Do you see that?
25   A.    I see what's marked as a head, yes.

Page 106

1  Q.   Okay.  Well, you told me before that Mr. Evans
2  looked right at you with a surprised look on his face
3  when you opened the door, correct?
4  A.   Yes, I did say that.
5  Q.   Okay.  And so does that indication as to where
6  the driver's head as being Mr. Evans' head comport with
7  your recollection of how Mr. Evans looked at you when
8  you opened the door to the van?
9  A.   No.  Quite actually the more I stare at it, that
10  might actually be Ms. Pauley's face because, as I
11  stated to BCI, she had turned and faced and was
12  animated, out of control, very upset facing us square
13  towards me as the back drop.  And that's about the area
14  where she was trying to communicate through screaming
15  and crying what was going on.  That's very possible
16  that's her face.
17  Q.   Okay.  So what is designated as the driver's
18  head in Plaintiffs' Exhibit 14 does not comport with
19  what you recall as being the position of Mr. Evans'
20  head as you opened the door to the driver's side door
21  of the van?
22  A.   No.
23  Q.   Okay.  So you remember his head being in a
24  different position?
25  A.   He was his -- for that to actually take place

Page 107

1  without knowing measurements, without knowing where
2  this was in the video, he -- when I pulled the trigger
3  the first time his back was up against the seat for the
4  most part.
5         For his head to be here in this picture to me,
6  he would have to be leaning forward with his back away
7  from the seat and away from me.  And I know when I
8  engaged him, my round was in a general direction away
9  from the passenger.  And what you're asking me to agree
10  here is that he would have been directly in front of
11  her and that's just not what happened.
12  Q.   Okay.  So you recall Mr. Evans' back being in
13  contact with the driver's seat; is that correct?
14  A.   His lower back and right.  He was like -- I'm
15  trying to put it in words for her.
16         MR. RASKIN:          You have to
17         put it in words because she can't
18         interpret what you mean if you move your
19         body or answer non-verbally.
20  A.   So essentially his right side would have been
21  still in partial contact with the seat leaning a little
22  bit towards Ms. Pauley with his face turned looking at
23  me (indicating).
24  Q.   Okay.  But his back was against the seat?
25  A.   Not 100 percent.

Page 108

1  Q.   Okay.
2  A.   But it was -- his right side of his back through
3  part of his lower shoulder was still up against the
4  seat.
5  Q.   Okay.
6         MR. RASKIN:          Excuse me.
7         Let the record reflect that the witness is
8         also attempting to demonstrate physically
9         with his right hand below the conference
10         table level.
11  BY MR. SCOTT:
12  Q.   Well, let me ask you, Officer, you indicated
13  that Mr. Evans was not blocking your view of Ms.
14  Pauley, correct?
15  A.   That's correct.
16  Q.   So Mr. Evans was not bent over in any way?
17  A.   Well, define bent over.
18  Q.   Well, --
19  A.   He wasn't bent forward.  He was bent -- he was
20  essentially bent slightly to his right in the seated
21  position, if facing the steering wheel was forward or
22  to his front.  To his right was Ms. Pauley and he was
23  leaning slightly to his right.
24         So define bent over.
25  Q.   Okay, I think you also indicated to me that

Page 109

1  when you opened the door initially you could see both
2  of Mr. Evans' hands?
3  A.   That's correct.
4  Q.   Left hand was on the steering wheel; right hand
5  on the gear shift?
6  A.   That's correct.
7  Q.   And you indicated that because you could see
8  both of Mr. Evans' hands your initial thought was to, I
9  think the phrase you used was go hands on and just
10  physically remove Mr. Evans from the van; is that fair?
11  A.   Yes.
12  Q.   But as you were opening the door to the van, you
13  were reaching for your weapon; is that right?
14  A.   No.
15  Q.   Okay.  What's wrong about that?
16  A.   Initially when I got out of the vehicle, out of
17  my vehicle I went for my gun and realized I didn't need
18  it at that moment because I did not have a clear path
19  of engagement to Mr. Evans from that moment.  The door
20  was closed.  There's glass in the way.  There's a
21  passenger behind him.  He had just assaulted Sergeant
22  Kelley for the second time.  I could not incapacitate
23  him with my weapon at that moment in time.
24  Q.   Okay.  So had you begun to draw your weapon and
25  then stopped, or were you reholstering your weapon?

1    A.    When I exited my vehicle I went for my gun
2    because he was clearly trying to assault Kelley for the
3    third time by backing up and ramming him again.  And
4    decided I just could not engage him at that moment with
5    my gun.
6    Q.    Okay.  So did you -- I'm trying to understand
7    what you're telling me relative to your actions towards
8    your gun.  Did you reholster your gun or --
9    A.    Yes.  I never took it out.  I never even
10   unlocked the safety.
11   Q.    Okay.  You took your hand off of your gun?
12   A.    Yes.
13   Q.    Okay.  Do you know if your hand was on your gun
14   when you opened the door to the van?
15   A.    It was not.
16   Q.    Okay.  Do you know if you were holding your gun
17   as you opened the door to the van?
18   A.    I was not holding it.
19   Q.    Okay.  Were you on any sort of administrative
20   leave or anything to that effect following this event?
21   A.    Yes.
22   Q.    Okay.  For how long were you on administrative
23   leave?
24   A.    About a month.
25   Q.    Okay.  And is that a standard protocol for an

1    officer involved in the use of deadly force incident to
2    be on administrative leave for that period of time?
3    A.    I can't say to what our standard protocol is
4    because it just hasn't happened.  It hasn't -- I know
5    what our policy says, and it references three days
6    minimum; however, it's really up to the discretion of
7    the Chief and how the investigation is going.  So I
8    can't answer to what is protocol.
9    Q.    Had it been your desire to return to active duty
10   sooner than a month?
11   A.    Yes and no.
12   Q.    Okay.  Can you please explain that?
13   A.    After something like this you have to understand
14   that sitting at home, not knowing what's going on, not
15   knowing what information is being developed, what is
16   happening is very hard to do.  17 years of going to
17   work every single day or every couple days and not
18   being a part of that team and not knowing what happened
19   or what's going to happen or how it's evolving.
20        So some time after a couple of weeks I started
21   making calls to find out what it would take to get me
22   back to at least doing something at the police
23   department.
24   Q.    Okay.  And was there any sort of retraining or
25   counseling any of kind that was given to you because of

1    your involvement in this incident?
2    A.    Counseling, could you explain what you mean by
3    counseling and what it refers to, in terms of my
4    actions here, or just general welfare?
5    Q.    Well, let me ask you both ways.  First of all,
6    any counseling as regards to your performance as a
7    police officer?
8    A.    For that moment in time?
9    Q.    Yes, sir.
10   A.    Yes.
11   Q.    Okay.  What did you receive?
12   A.    I initially had not turned on my mic pack until
13   later in the pursuit.  As part of walking through the
14   basics through everything that we're trained to do
15   through pursuit driving school, it occurred to me that
16   I had not turned on my mic pack because I was on
17   station.  And when you're on station you immediately
18   lose signal from the cruiser to your mic pack and it
19   vibrates every three seconds or so and it becomes very
20   annoying.  So it's normal to turn that mic pack off
21   while you're typing or doing something in station.
22        Nine times out of ten when you leave station you
23   remember.  But when something like this comes up
24   suddenly and you react suddenly, minor details
25   sometimes get overlooked, like turning on your mic

1    pack.  So I was counseled to try to remember to turn on
2    my mic pack sooner.
3    Q.    So of all the actions that you took during your
4    participation in this pursuit through its resolution
5    the one thing that you felt that the City of Strongsville was
6    critical of was your failure to turn on your mic pack?
7    A.    That's correct.
8    Q.    Had you received any other counseling relative
9    to your performance of duties as a police officer?
10   A.    No.
11   Q.    Did you receive some other form of counseling?
12   A.    Yes.
13   Q.    Just for your well-being?
14   A.    Yes.
15   Q.    Okay.  And there was nothing about that that
16   prevented you from returning to active duty, right?
17           MR. RASKIN:            Objection.
18        I need to -- we need to take a break.
19           MR. SCOTT:             Okay.
20        (Thereupon, there was a recess.)
21           MR. RASKIN:            So Mr. Scott
22        has begun to inquire of Officer Miller
23        with regard to counseling that he may have
24        had subsequent to the events which are the
25        subject matter of the Plaintiffs'

Page 114

1     complaint.  I have advised my client that
2     he has HIPAA privacy rights.
3         MR. SCOTT:         Yes.
4         MR. RASKIN:        And he does
5         not have to disclose any communications
6         that he may have had with respect to any
7         counseling that occurred.
8         MR. SCOTT:         Okay.
9  BY MR. SCOTT:
10  Q.   I think my question was simply, was there
11  anything about that that prevented you from returning
12  to active duty?
13  **A.   And I understand that.  I just didn't know where**
14  **you were going from there.**
15  Q.   I don't think I'm going anywhere after that.
16         MR. RASKIN:        If I had known
17         that, then we wouldn't have taken a break.
18         I apologize.  But I didn't know that, so I
19         just wanted to make sure he understood
20         that he had HIPAA policy rights.
21         MR. SCOTT:         Okay.
22         Absolutely.
23  **A.   So to answer your question, nothing came up that**
24  **prevented me from coming back to work.**
25  Q.   Okay.  And let me ask you, Officer Miller,

Page 115

1  following the incident with Lawrence McKissic that we
2  talked about earlier were you under administrative
3  leave while that incident was being investigated?
4  **A.   Yes.**
5  Q.   Was it for a similar period of time, or longer
6  or shorter?
7  **A.   It was shorter.**
8  Q.   Okay.  Do you remember how long?
9  **A.   I don't recall.  Maybe two weeks.  I don't**
10  **recall.  It was a different chief at the time.**
11  Q.   I think you said that was Chief Goss.
12  **A.   Goss, G-O-S-S.**
13  Q.   And, again, as regards to your performance as a
14  police officer, did you receive any counseling or
15  retraining as regards to your performance as a police
16  officer relative to the indent involving Lawrence
17  McKissic?
18  **A.   No.**
19         MR. SCOTT:         Officer
20         Miller, I believe those are all the
21         questions I have for you here today.  I
22         thank you for giving us the opportunity to
23         speak with you.
24                            - - -
25  ///

Page 116

1  BY MR. SIDOTI:
2  Q.   Officer Miller, my name is Marcus Sidoti.  And
3  Mr. Scott has already outlined the caption of the
4  litigation.
5         And as you may or may not be aware, in regards
6  to Plaintiffs, I personally represent Adam Fried as the
7  Administrator of the Estate of Roy Evans, Jr.
8         I'm going to do my best here not to be
9  redundant.  Mr. Scott covered a lot of similar areas so
10  I'm going to do my best, which may result in me jumping
11  around a little bit if you don't mind.
12         The same rules apply.  If you have any questions
13  or don't understand my question, just ask me to
14  rephrase or ask for time.  But the same caveat in
15  regards to if I have a pending question, if you'd like
16  to speak with counsel, that's fine.  Just please answer
17  that question before you take that break.  Is that
18  okay?
19  A.   Yes.
20  Q.   Okay.  Mr. Scott asked you a number of questions
21  regarding some policies, primarily that of the pursuit
22  policy in conjunction with the traffic stop policy.  Do
23  you recall that?
24  A.   Yes.
25  Q.   And those are two separate policies.  One, a

Page 117

1  policy adopted by the City of Strongsville for police
2  officers in effectuating traffic stops, and the other
3  when officers are in pursuit of an individual; is that
4  a fair statement?
5  A.   Yes.
6  Q.   Okay.  In regards to any motor vehicle stops,
7  and I believe Mr. Scott may have covered this, are
8  there any other policies that you understand aside from
9  the traffic stop and the pursuit policy that would be
10  pertinent here?
11         MR. RASKIN:        Objection,
12         asked and answered.
13         You can answer it again.
14  A.   No.
15  Q.   Okay.  Mr. Scott asked you some questions and
16  you indicated that, you know, it goes from a traffic
17  stop in regards to, you know, would the vehicle have
18  stopped and some of the policies should only be
19  implemented or utilized by the officers once that
20  vehicle stops.  Do you recall that line of questioning?
21  A.   Yes.
22  Q.   Okay.  So is it your understanding that the
23  traffic stop policy only comes in to play and is the
24  policy adopted by the City of Strongsville only if you
25  have a vehicle that's stopped on the roadway; is that

Page 118

1   your thought?
2   **A.   Define stopped.**
3   Q.   Ceased of any further movement.
4   **A.   Like a crash?**
5   Q.   Period.  A stop.  Something's immobile.  It's
6   not moving any longer.
7   **A.   Yes, that would then revert back to the motorist**
8   **stops.**
9   Q.   So the cessation of movement, does that change
10  if I asked you to identify it by that phrase?
11  **A.   Well, I want to understand your definition of**
12  **stop and weather it was compliant and they pulled over**
13  **and just stopped, or it was stopped by means of**
14  **anything unrelated to our involvement like an accident**
15  **or the car rolls over and is no longer in motion.**
16  Q.   Let me come back to that for a moment.  You
17  understand that there are certain specific protocols
18  once a motor vehicle, an attempted traffic stop
19  escalates in to a pursuit, correct?
20  **A.   Yes.**
21  Q.   There's specific policies that are addressed
22  once someone is not stopping for something as minor as
23  a stop sign violation, fair statement?
24  **A.   Yes.**
25  Q.   Okay.  Is it your testimony that then if that

Page 119

1   car stops from what was the pursuit, that your policy
2   would then revert back to an officer's obligations
3   underneath the traffic stop policy?
4   **A.   It would really depend on that moment in time.**
5   **And if you give me a specific scenario, I could help**
6   **you out and be more specific in my answer.**
7   Q.   But it's a possibility based on your
8   understanding that it could revert back and forth?
9   **A.   Yes.**
10  Q.   Okay.  Mr. Scott addressed a bit about the
11  McKissic matter.  Do you recall that case?
12  **A.   Yes.**
13  Q.   Okay.  We've already addressed the fact that I
14  believe you were employed as a Strongsville officer,
15  but at that time you were representing the regional
16  task force or whoever was involved with that drug
17  transaction Mr. McKissic was involved in; is that
18  correct?
19  **A.   Yes.**
20  Q.   So just to clarify, what were you outfitted in
21  at the time of that incident, if you recall?
22  **A.   Define what you mean.  My clothing?**
23  Q.   Yeah.
24  **A.   I was wearing jeans and a T-shirt, a vest, a**
25  **bulletproof vest, a badge.  I had a light-weight winter**

Page 120

1   **jacket on.**
2   Q.   Okay.  So fair enough that you weren't outfitted
3   in any Strongsville Police garb that you would have as
4   a patrolman here?
5   **A.   That's correct.**
6   Q.   What was your -- strike that.
7   Were you operating as part of the vice force at
8   that point?
9   You're undercover.  Are you a vice officer at
10  that point?
11  **A.   I was a task force officer assigned to the FBI.**
12  Q.   Okay.  How much involvement with that particular
13  case did you have prior to the incident that occurred
14  that led to the litigation with Mr. McKissic; was it a
15  -- and I'm just clarifying, were you involved in the
16  investigation for weeks; was it a scheduled buy just
17  that day, if you can recall?
18       MR. RASKIN:       You can
19       answer.
20  **A.   There was a lot of planning that went into that.**
21  **I don't recall if specifically that was several weeks**
22  **long.  I know that we had done one prior buy on that**
23  **subject.  So to answer your question it wasn't planned**
24  **and executed on the same day of the shooting.**
25  Q.   When you say we, were you personally involved

Page 121

1   with the prior buy with Mr. McKissic and whoever was
2   the confidential informant?
3   **A.   Yes.**
4   Q.   Okay.  Was that in the City of Strongsville?
5   **A.   No.**
6   Q.   Was that another buy in which you were working
7   under your capacity as one of the task officers?
8   **A.   Yes.**
9   Q.   And in that particular case, that was a
10  scheduled drug transaction between a confidential
11  informant and Mr. McKissic; is that correct?
12  **A.   No.**
13  Q.   Can you tell me what that --
14  **A.   It was Mr. McKissic was the driver of that**
15  **transaction.  At the time we had no idea until after**
16  **the shooting who the target was because we only knew**
17  **them by a street name.  So it was either the passenger**
18  **or the driver of the transaction.**
19  Q.   The prior buy that you were involved in, was
20  Mr. McKissic involved in that transaction as well?
21  **A.   I don't know the answer to that.**
22  Q.   Okay.  That particular case, the incident with
23  Mr. McKissic and the litigation back in 2011, 2012,
24  that happened at a Walmart; is that correct?
25  **A.   Yes.**

1  Q.    The portion of the stop that led to the shooting
2  involving Mr. McKissic, to clarify.
3  A.    Yes.
4  Q.    Okay.  Do you recall how many officers were on
5  scene at that time?
6  A.    No, I don't.
7  Q.    Do you recall in regards to your investigation
8  how many officers were involved in the prior buy?
9  A.    No.
10  Q.    Do you recall if it's more than five?
11  A.    When you say officers that were involved, I need
12  to know specifically if you're referring to the initial
13  task force responding officers who were part of the
14  buy, because there was a lot more to this that included
15  some of the Strongsville Police Department uniformed
16  division during that buy and arrest.
17  Q.    To the best of your knowledge when you fired the
18  first of nine shots against Mr. McKissic, how many
19  officers do you understand were on scene, if you
20  recall?
21  A.    Five.
22  Q.    Okay.  How many of them do you believe or recall
23  were Strongsville Police Officers?
24  A.    Myself and one other.  So two on scene.
25  Q.    Who was the other, if you recall?

1  A.    Detective Zurzin.
2  Q.    Walk me through what you recall in
3  Mr. McKissic's case how the drug transaction occurred
4  until the shooting.
5  A.    Those are details that I haven't thought about
6  or read about in quite a long time.  Without -- I can
7  generalize and give you a very general idea of what was
8  going on and what happened.
9  Q.    Please do.
10  A.    But to say that I'm going to be fact and stat
11  specific, I can't say that I would be very accurate.
12  Q.    Give me the generalized understanding of what
13  you recall.
14  A.    That particular day we were supposed to do a buy
15  bust in Strongsville.  The source was being controlled
16  by me.  And we were expecting to buy a sum of crack.
17  And the target agreed or sometimes met our snitch in
18  the Walmart parking lot or in the Strongsville area.
19  So it was comfortable to put him in that location again
20  for another buy.
21          The initial plan was for the Strongsville
22  uniformed division to make the arrest via a traffic
23  stop out on Pearl Road near 71 after the buy went down
24  and after the two left the area.  However, that was
25  immediately changed right immediately following the buy

1  by our lieutenant who was in charge of the task force
2  at the time representing Cleveland, Lieutenant
3  Connolley.
4          He was driving an F 250 pickup truck and had a
5  relatively high field of view.  As he drove past the
6  car that the two were in, he observed them holding a
7  large sum of narcotics and money and not paying
8  attention to their surroundings.
9          So he made the call at that moment and changed
10  it up to take them down right there in that parking
11  lot, which was not planned and we were not prepared
12  for.  And that's how it evolved into that moment where
13  he was shot.
14  Q.    Mr. McKissic was operating that vehicle.  Do you
15  recall who else was inside of the car at the time shots
16  were fired?
17  A.    I don't remember his name.
18  Q.    Do you recall identifying prior to firing your
19  weapon that there were other occupants in the vehicle?
20  A.    There were no other occupants.
21  Q.    At the time when you shot, Mr. McKissic was the
22  only occupant?
23  A.    Yes, because the passenger had been removed
24  already by Lieutenant Connolley.
25  Q.    And in this case when you shot, you weren't in a

1  vehicle; you were only on foot at that time, correct?
2  A.    Yes.
3  Q.    Okay.  And once the passenger was removed,
4  Mr. McKissic I'm assuming, was he trying to leave the
5  parking lot?
6  A.    After he had been shot?
7  Q.    Prior to.
8  A.    Yes, he was trying to leave.
9          Prior to the take down?
10          Explain at what --
11  Q.    Walk me through what you recall.  You indicated
12  that officers removed the passenger.  I'm assuming that
13  he would have got, for lack of better terms, a heads up
14  that something was going on possibly involving law
15  enforcement.  How was it that the passenger was
16  extracted prior to the gentleman trying to leave the
17  parking lot?
18  A.    At the moment the lieutenant changed it up, we
19  were -- as he was making -- as he was making the turn,
20  the vehicle was still in transit through the parking
21  lot aisles.  I assumed he was leaving or intended to
22  leave immediately following the sale, but we didn't
23  know that for sure.
24          He was driving down one of the aisles.  And when
25  he reached the end is when Lieutenant Connolley pulled

Page 126

1    in front of him to go the opposite direction as if we
2    were just another car looking for the spot. And that's
3    when he made the observation that now would be a good
4    time to take them down as opposed to using the road
5    units.
6          And at that moment, because he observed that
7    their focus was in their laps and that he observed a
8    large amount of what he believed to be cash and
9    narcotics at the time that they were trying to divvy
10   up, and thought that that would be a good time to try
11   and extract them.
12         At that moment we started a dynamic vehicle
13   extraction where my vehicle was going to be the
14   blocking vehicle to the front. His vehicle went to the
15   rear. And the parked cars essentially on the passenger
16   side of that vehicle would essentially block on the
17   right.
18   Q.   At that point or at some point you pulled your
19   vehicle in front of Mr. McKissic's vehicle?
20   A.   Not by purpose of the takedown, but as the way
21   it was unfolding, that's where my vehicle ended up as
22   part of the sudden changeup. I was already there. So
23   it wasn't -- it was both -- I stopped there in front of
24   him, but I also exited the vehicle because now where I
25   was put me in a position to block the vehicle.

Page 127

1    Q.   Did you exit your vehicle?
2    A.   Yes.
3    Q.   Okay. And as you indicated, your vehicle would
4    have been blocking him, not by plan, but as the change
5    in plan your vehicle was conveniently there for the
6    path of which Mr. McKissic would have been leaving the
7    parking lot?
8    A.   No, it actually was both. But the plan of that
9    type of takedown includes a blocking vehicle to the
10   front and a blocking vehicle to the rear, and one or
11   more persons are holding them at gunpoint while another
12   officer goes and does the extraction, which is what
13   Lieutenant Connolley did. He went to the passenger
14   side and extracted the passenger while I held the
15   driver, expecting Detective Zurzin to come around the
16   other side and grab the driver and then we'd be
17   complete.
18   Q.   And when you said you held the driver, what
19   position did you take?
20        Well, the vehicle was already there and you're
21   out of the vehicle at this point, correct?
22   A.   Yes.
23   Q.   Okay. And where did you stand in relation to
24   Mr. McKissic's vehicle?
25   A.   When I got out of my vehicle standing at

Page 128

1    my doorway I was already immediately in front of
2    Mr. McKissic's vehicle.
3    Q.   Was he his vehicle stopped at that time?
4    A.   Yes.
5    Q.   So would you have had the opportunity to move
6    out from directly in front of Mr. McKissic's vehicle?
7    A.   Could I just walk away?
8    Q.   Could you just walk somewhere except for
9    directly in front of a stopped vehicle at that
10   juncture?
11   A.   Yes, I could.
12   Q.   Okay. Did you remain directly in front of the
13   vehicle while the passenger was extracted?
14   A.   Yes.
15   Q.   At that point did you have your gun drawn, if
16   you recall?
17   A.   I don't recall.
18   Q.   At some point immediately before, during and
19   after the extraction of the passenger did you draw your
20   gun at some point?
21   A.   Yes.
22   Q.   Okay. And still remaining directly in front of
23   Mr. McKissic's vehicle?
24   A.   Yes.
25   Q.   And Mr. McKissic remained in the vehicle and at

Page 129

1    some point you discharge I believe nine rounds of your
2    firearm; is that correct?
3    A.   Yes.
4    Q.   Okay. Were you harmed in regards to your
5    involvement in that case?
6         MR. RASKIN:            Objection.
7    BY MR. SIDOTI:
8    Q.   Were you harmed?
9         Would you like me to rephrase?
10        MR. RASKIN:            I would,
11        because I don't know what that term means.
12   Q.   Did you sustain any physical injuries as a
13   result of your reaction with Mr. McKissic at that time,
14   Officer?
15   A.   Physical, no.
16   Q.   Okay. And did you remain on scene to do an
17   inventory of Mr. McKissic's vehicle after he was shot?
18   A.   No.
19   Q.   As you sit here today are you aware that
20   Mr. McKissic was not in possession of any firearms in
21   that vehicle?
22   A.   Yes.
23   Q.   So another officer or sergeant had already
24   extracted the passenger. Is there any other officers
25   near the driver's side door around the time when you

Page 130

1  discharged your firearm?
2  A.  No.
3  Q.  To the best of your recollection did any other
4  officers discharge their firearm in that incident?
5  A.  No.
6  Q.  Well, I'm going to move on to the incident
7  involving Mr. Evans.  I have several things of the
8  video queued up that we'll go over later.  I was going
9  to bring the projector, but I figured it would be
10  easier if we look at it on a laptop.  I don't know what
11  I have here, so we'll do that near the end, but a
12  couple questions first regarding the pursuit.
13      Mr. Scott asked you several questions regarding
14  some contact between vehicles, yourself, Sergeant
15  Kelley and the van being driven by Mr. Evans.  Do you
16  recall that?
17  A.  Yes.
18  Q.  Okay.  The first contact, if you recall, that
19  happened between yourself and Mr. Evans, was that prior
20  to or after the deployed strips had already made
21  contact with the van?
22  A.  Prior to.
23  Q.  Okay.  At the time of the first contact, and if
24  you want to reference the video, we can.  We'll go
25  there.  But do you recall the first contact in what

Page 131

1  I'll refer to as the one lane or the slow lane in a
2  multi-lane highway.  Do you recall that?
3  A.  Actually, the one lane is the inside lane.  It
4  goes one, two, three to the right.
5  Q.  Do you recall at the time of the first contact
6  between yourself and Mr. Evans that he would have been
7  operating the van in the slow lane, otherwise referred
8  to as the three lane.
9  A.  That's not true.
10  Q.  What lane of travel do you believe that he was
11  in the first time that his car and your car made
12  contact with one another, if you recall?
13  A.  Between the first and second lane.
14  Q.  Okay.  At some point prior to the deployment of
15  the stop sticks by the Ohio State Highway Patrol do you
16  operate your vehicle in the berm or what would be
17  outside of the lane of the three lane?
18  A.  Yes.
19  Q.  Okay.  You know, Officer, before I forget, will
20  you do me a favor?
21      You're wearing a duty belt as you're outfitted
22  currently, correct?
23  A.  Yes.
24  Q.  Would you stand up for a moment?
25  A.  (Indicating).

Page 132

1  Q.  I notice your gun's holstered on your right
2  side.  Are you right handed?
3  A.  Yes.
4  Q.  Okay.  Is that holster similar or perhaps the
5  same holster you would have had on your duty belt on
6  the date of the incident which is the litigation in
7  this case?
8  A.  It's not the same, but it's similar.
9      MR. RASKIN:          You can sit
10      down.
11  BY MR. SIDOTI:
12  Q.  Could you turn?  Okay.  You can sit down.
13  Thanks.
14      You've been an officer for a number of years.
15  You're familiar with the fact there's many different
16  holsters officers carry their issued firearm on or in I
17  should say, correct?
18  A.  Yes.
19  Q.  Okay.  So the particular holster you have on
20  now, it looks like as at if it has a single strap that
21  goes over what would be the hammer of the weapon that
22  you're carrying; is that a fair statement?
23  A.  If you're asking me if that's one level of
24  safety, yes.  There's one level of safety there.  It's
25  not a strap.

Page 133

1  Q.  So the one level of safety, it looks to be maybe
2  a three-quarter inch strap of material that goes from
3  the interior portion of the holster over the rear of
4  the gun and looks as if it buttons.  Can you tell me
5  the apparatus on how that locks there?
6  A.  With the exception of the button, that's
7  relatively right.
8  Q.  Okay.  So would it pop off similar to, you know,
9  a button, is it a clip; how would --
10  A.  It is a hinge.
11  Q.  It's a hinge.  Okay.  (Indicating).  Got you.
12      So let's talk about the holster that you had on
13  the night of the incident.  Do you recall that
14  particular holster?
15  A.  I believe it's the same.
16  Q.  Okay.  You believe it's identical?
17  A.  It's identical in construction, but not the same
18  holster that I have on today.
19  Q.  Would it be identical in regards to levels of
20  safety --
21  A.  Yes.
22  Q.  -- for removing the firearm from your belt?
23  A.  Yes.
24  Q.  Okay.
25      MR. RASKIN:          Let him get

Page 134

1      his question out before you answer it,
2      even though you think you know what it's
3      going to be.  Okay?
4   BY MR. SIDOTI:
5   Q.    So, for the record, what does it require of you
6   to make the firearm capable of being removed from the
7   holster by the first level of safety?
8   **A.    I cannot remove it like this (indicating).**
9   **There's another level of safety.**
10      MR. RASKIN:        All right.  So
11      that translates to nothing on the
12      transcript.  So you have to describe what
13      you just did in order to answer his
14      question.
15  **A.    I cannot remove the weapon with defeating the**
16  **first level of safety.**
17  Q.    Okay.  So in order to remove your weapon, it's
18  fair to state that you do several things with the
19  holster for safety reasons and the like, right?
20  **A.    Correct.  Yes.**
21  Q.    So it indicates as if you're using your thumb to
22  depress the interior side of the holster to have that,
23  as if it were a bridge, to come forward to the front of
24  your body to then access the butt of the gun; is that a
25  fair statement?

Page 135

1   **A.    Yes.**
2   Q.    That would be the first level of safety for that
3   holster, correct?
4   **A.    Yes.**
5   Q.    Okay.  I'm a bit familiar.  Is the second level
6   of safety, does it have some sort of safety mechanism
7   which the gun has to be pushed down and pulled forward?
8   **A.    No.**
9   Q.    Could you walk me through what would be after
10  the first level of safety to remove that firearm?
11  **A.    After the first level of safety there's a block**
12  **that keeps the weapon from falling out.  That is**
13  **defeated, the second level of safety is defeated by the**
14  **interior button that's hidden beneath the hood of the**
15  **level one safety.**
16  Q.    Okay.  And then assuming if you now hit that
17  button that looks like you're depressing with your
18  thumb on the interior again pushing that button
19  backward, would that allow you to remove the firearm?
20  **A.    Yes.**
21  Q.    Okay.  And it's your testimony that was perhaps
22  not the identical, but the same holster in regards to
23  the mechanism and levels of safety from the night of
24  the incident; is that fair?
25  **A.    Yes.**

Page 136

1   Q.    Okay.  Is there a policy that you're familiar
2   with at the time of the incident -- well, strike that.
3      Mr. Scott asked you questions at the time
4   when you were approaching the vehicle being driven by
5   Mr. Evans that your intent was to just pull him out of
6   the vehicle physically, correct?
7   **A.    Yes.**
8   Q.    Okay.  And that was your intent including up
9   until the time that you grabbed the door just prior to
10  opening; is that a fair statement?
11  **A.    I still intended when I opened the door to grab**
12  **him.**
13  Q.    Okay.  And grab him only, that was going to be
14  your means of removing him from the vehicle.  You were
15  only going to grab him and remove him out physically,
16  correct?
17  **A.    Yes.**
18  Q.    Okay.  Do you recall that prior to approaching
19  the vehicle and touching the door that you had
20  addressed your firearm to make it more accessible in
21  any way?
22  **A.    Not specifically, no.**
23  Q.    Okay.  Since you indicated that your plan was to
24  only physically remove Mr. Evans, there wouldn't be any
25  reason when you removed yourself from your vehicle

Page 137

1   prior to approaching his that you would have addressed
2   any of the safety levels with the firearm to make it
3   more accessible when you approached the van; is that a
4   fair statement?
5   **A.    When I got out of the vehicle I didn't have any**
6   **interaction with my weapon during the pursuit or when I**
7   **got out of the vehicle until that moment when I stood**
8   **up.**
9   Q.    And refresh me, when you say stood up, what do
10  you mean, when you got out of the vehicle?
11  **A.    Yes.**
12  Q.    Okay.  So when you got up did you address your
13  weapon in any way?
14  **A.    Yes.**
15  Q.    Okay.  How?
16  **A.    I reached down for it and then disengaged.**
17  Q.    Okay.  Why would you reach down for it?
18  **A.    I reached down for it because he had just rammed**
19  **Sergeant Kelley the second time and was obviously**
20  **preparing to do it again.  And at that moment the**
21  **totality of the circumstances indicated that I would**
22  **try to engage him, but with Ms. Pauley immediately**
23  **behind him and the vehicle being a closed door and**
24  **having the experience of glass taking effect and door**
25  **panels taking effect, it would be a terrible idea.**

Page 138

1    Q.    And I want to address this, what you keep
2  referring to as ramming of Sergeant Kelley's vehicle.
3  In your guestimation, or if you know or if you don't
4  know, how fast would you believe Mr. Evans' vehicle was
5  going prior to the last time he made contact with
6  Sergeant Kelley's vehicle before you fired your weapon?
7    **A.    I don't know.**
8    Q.    Have you ever testified in a traffic violation
9  matter in any municipal court or any mayor's court?
10   **A.    Yes.**
11   Q.    Okay.  Have you ever issued a ticket to anyone
12  -- well, strike that.
13        Have you ever testified as to what you believe
14  the speed of a vehicle to be, even without a radar or
15  any other device to indicate how fast that vehicle is
16  traveling?
17   **A.    I don't recall ever testifying to a**
18  **speed-related issue.**
19   Q.    Okay.  Mr. Scott went through the BCI report you
20  read that was issued as a result of a sit-down audio
21  taped interview that you had with Mr. Moran; is that
22  correct?
23   **A.    Yes.**
24   Q.    Okay.  And you indicated both in the report and,
25  if you recall, at the time of the interview that the

Page 139

1  lights from multiple cruisers were able to illuminate
2  things so you can see Mr. Evans as you refer to very
3  clearly.  Do you recall that?
4    **A.    Yes.**
5    Q.    Okay.  And you also indicated that even at the
6  time when you opened the door that you could see both
7  of his hands on the steering wheel and/or the right
8  hand being on the gear shift, correct?
9    **A.    Yes.**
10   Q.    Okay.  And that's a visual that you're
11  indicating that you saw his hands at those positions,
12  and you referred to them in your testimony as being on
13  the vehicle -- on the steering wheel and the shifter
14  after you opened the door, correct?
15   **A.    I would say as I opened the door.  I don't know**
16  **to what point the door was fully opened versus the**
17  **motion.**
18   Q.    And in the video, if you recall, there's another
19  officer that's almost directly next to you.  Do you
20  recall who that was?
21   **A.    I didn't at the time, but I know who it is now.**
22   Q.    And who is it?
23   **A.    Officer Plut.**
24   Q.    Okay.  Mr. Scott asked you some questions
25  regarding a, quote, unquote, felony call out.  Are you

Page 140

1  familiar with those call outs?
2    **A.    Yes.**
3    Q.    Okay.  What is a felony call out?
4    **A.    If you're talking about a felony stop is what I**
5  **assume you're talking about.**
6    Q.    Okay.
7        MR. RASKIN:        Wait a minute.
8        Is that what you're asking?
9        MR. SIDOTI:        I'm going to
10       clarify.
11       MR. RASKIN:        Thank you.
12  BY MR. SIDOTI:
13   Q.    Did you have the opportunity to review or listen
14  to any of the dispatch audio from the date of the
15  incident?
16   **A.    As a matter of watching the video, yes.**
17   Q.    Okay.  So you recall even in the beginning of
18  the pursuit all the way until the end of it there's
19  numerous calls back and forth on radio regarding the
20  strips and the pursuit and where officers are involved
21  and the like, correct?
22   **A.    Yes.**
23   Q.    Communications are being made by the officers
24  through dispatch or the radios that are on the audio
25  portion of the files, correct?

Page 141

1    **A.    Yes.**
2    Q.    Okay.  So at some point there's a conversation,
3  I believe between you and Sergeant Kelley, and correct
4  me if I'm wrong, that you're going to execute a felony
5  call out.  Do you recall that?
6    **A.    Yes.**
7    Q.    And I'm not going to talk about it verbatim.
8  It's on a tape.  We've all heard it.  And Sergeant
9  Kelley -- I believe it's you.  If you recall do you
10  make the request, hey, if they stop are we just calling
11  them out.
12   **A.    Yes.**
13   Q.    And Sergeant Kelley who's your immediate
14  supervisor, correct?
15   **A.    Yes.**
16   Q.    And he's in charge of this pursuit, correct?
17   **A.    Yes.**
18   Q.    He acquiesces that order?
19   **A.    I don't think he was reluctant.  He certainly**
20  **wasn't protesting it.  That's what that means, right?**
21   Q.    Right.
22   **A.    He wasn't reluctant.  It was a conversation**
23  **between the two of us.**
24   Q.    And he agreed, you indicated something along the
25  lines of, hey, we're just going to call them out.

Page 142

1    That's right, we're just calling them out?
2    A.    Well, that was two officers talking through per
3    policy trying to look forward through the pursuit if
4    they do stop, what we will do.  There were many things
5    that were talked about.
6    Q.    After that specific discussion -- well, let me
7    ask you this -- strike that.
8         Sergeant Kelley tells you to do something.  Did
9    he have to tell you that that's an order?
10   A.    Well, it depends.  If two guys are talking in a
11   room and he just happens to be the sergeant and I just
12   happen to be the patrolman, it's not necessarily
13   conferred or inferred by me as an order.
14        The conversation that you're talking about was
15   brought up by me and the two guys were having a
16   conversation for the benefit of the new guy, relatively
17   new guy who has zero experience in these types of
18   things.  And that's what that was about.
19   Q.    Okay.  But there's specifically a conversation
20   between yourself, Sergeant Kelley your supervisor
21   indicating that you're going to call the individuals
22   out of the van, correct?
23   A.    If it comes to a stop, yes.
24   Q.    That's not said on the dispatch or any of the
25   recordings, is it?

Page 143

1    A.    It's obviously implied and understood by all
2    those involved.
3    Q.    Obviously implied and understood?
4    A.    Yes.
5    Q.    Never verbalized, but obviously said and
6    understood?
7    A.    Yes.
8    Q.    Okay.  Your testimony a moment ago was that you
9    were having this discussion for I believe you indicated
10   the new guy.
11   A.    Yes.
12   Q.    Who's that?
13   A.    Plut.
14   Q.    How long had Plut been on the force to your
15   recollection at that time?
16   A.    Not very long.
17   Q.    How would Plut know what's going to be inferred
18   for something that's never verbalized?
19   A.    As an order, it wasn't inferred as an order.  It
20   was a tactic so he was aware of possible outcomes
21   should this vehicle come to a compliant stop.
22   Q.    So this is a soft order or not really an order?
23   A.    I wouldn't say it was an order at all.  I would
24   say it was an understanding, discussion of a probable
25   tactic that -- position we would take should he pull

Page 144

1    over or stop.
2    Q.    Well, since that particular probable tactic was
3    addressed specifically on radio for all officers to
4    hear, what other probable alternatives were ever
5    addressed verbally through radio up until you
6    discharged your firearm?
7    A.    The stop sticks, the attempt to do a rolling
8    roadblock that was cancelled.
9    Q.    At the time of the felony call out is it your
10   recollection that those discussions of the stop sticks
11   and the second roadblock came after the discussion of
12   the felony call out?
13   A.    Did the -- ask that again.
14   Q.    You indicated -- I asked you if there was any
15   subsequent discussions later, after the fact of the
16   felony call out order inference, whatever you want to
17   refer to it as.
18        MR. RASKIN:        Objection,
19   mischaracterizes that.  You know he didn't
20   testify to that.
21        MR. SIDOTI:        Strike that.
22   I'll rephrase it.
23        MR. RASKIN:        Thank you.
24   BY MR. SIDOTI:
25   Q.    The discussion on the radio regarding a felony

Page 145

1    call out between you and your immediate supervisor who
2    is in charge of the pursuit, was there any
3    communication after that discussion regarding any
4    potential alternative tactics but for a felony call
5    out?
6    A.    No.
7    Q.    I just want to make sure there's no audio were
8    missing.  You never said, hey, I'm going to get out of
9    the car?
10   A.    Well, if you're asking, like I testified
11   earlier, a felony call out does include getting out of
12   the car.  That's part of the training.  That's the
13   basic.  No one sits in their car for a felony call out.
14   Even if you determine at that moment in time you are
15   going to do a felony call out and it applied to that
16   situation, every officer would have been out of their
17   car at that moment.
18   Q.    Does a felony call out mean get out of the car
19   and rush up to the vehicle that you're pursuing?
20   A.    No.
21   Q.    Okay.  So it's not that you complied with the
22   discussion of the felony call out.  You do a felony
23   call out -- walk me through one that's not this
24   particular case.  What would you do in a felony call
25   out then?

Page 146

1    **A.    In an ideal situation the vehicle that you're**
2    **trying to stop is wanted for a felony pulls over, is**
3    **compliant and stops, whether it be by an accident, but**
4    **they're still remaining in the vehicle.  It could be**
5    **because they chose to pull over and stop or because**
6    **they hit a pole, or for whatever reason the vehicle**
7    **came to a stop and the occupants did not bail.**
8    **        The officers will take a position of safety to**
9    **the rear of the vehicle or where they all were to not**
10   **create a cross fire.  Then begin -- one person on the**
11   **scene would begin calling out and giving very specific**
12   **point-by-point commands to the occupants to comply.**
13   **        And so long as that compliance continued, you**
14   **would eventually walk them out under very direct**
15   **control over the loud speaker, bringing each person**
16   **back separately from each other, one at a time to a**
17   **standby officer who would take them into custody and**
18   **remove them from the immediate scene.  And then that**
19   **would continue until the vehicle was empty.**
20   Q.    Do you have the ability to communicate through
21   your loud speaker through your radio, or do you have to
22   be physically in the car?
23   **A.    You have to be physically in the car.  Well,**
24   **that's not --**
25            THE NOTARY:            Excuse me.  I

Page 147

1            need more paper.
2    **A.    To clarify, the microphone that operates the**
3    **loud speaker is in the vehicle and it has an expandable**
4    **cable.  Nobody sits in the vehicle and gives commands**
5    **while seated in the vehicle.  They're standing outside**
6    **the vehicle operating the mic that's attached within**
7    **the vehicle.**
8    Q.    Did you ever attempt to utilize yours prior to
9    exiting your vehicle?
10   **A.    No.**
11   Q.    You've indicated that the felony call out --
12   strike that.
13            There was no condition precedent in regards to
14   the felony call out.  There wasn't something that had
15   to occur prior to just calling them out of the vehicle
16   and not approaching it, was there?
17   **A.    Yes.  The vehicle had to come to a compliant**
18   **stop in a controlled environment.  This never occurred.**
19   Q.    But no one ever said that?
20   **A.    What do you mean?**
21   Q.    On the audio.  That's never said on the radio,
22   hey, we're going to do a felony call out, you're right,
23   we're not taking the car; well, only if the car stops
24   though.  That's never said.  There's nothing audio --
25   no one ever verbalized via radio that we're only doing

Page 148

1    a felony call out when the car stopped, do they?
2    **A.    Part of the plan if the car comes to a stop was**
3    **to do a felony call out.  Are you asking if someone**
4    **verbalized something different?**
5    Q.    Yes.
6    **A.    If the vehicle came to a stop?**
7    Q.    Did anybody --
8            MR. RASKIN:            Wait.
9            MR. SIDOTI:            I'm going to
10           correct it.  Let's just strike this.
11           MR. RASKIN:            Thank you.
12           MR. SIDOTI:            Let me
13           clarify.
14   BY MR. SIDOTI:
15   Q.    We've already agreed that through the pursuit
16   you're utilizing the radio to communicate with all the
17   officers involved, correct?
18   **A.    Yes.**
19   Q.    There's never any audio amongst the officers,
20   any one, that indicates that the vehicle has to be
21   stopped prior to the felony call out, is there?
22   **A.    That would not make sense.**
23   Q.    Okay.
24   **A.    No one does a felony call out on a vehicle**
25   **that's still in motion or still actively trying to**

Page 149

1    escape.
2    Q.    At the time when you exited your vehicle what
3    lane of travel was your car in after you struck the van
4    being driven by Mr. Evans?
5            MR. RASKIN:            Objection.
6            That mischaracterizes the evidence.
7            There's no testimony that he struck the
8            car.
9            MR. SIDOTI:            He testified
10           himself, Todd.
11   BY MR. SIDOTI:
12   Q.    Officer, did you strike the van with your
13   vehicle?
14           MR. RASKIN:            You can
15           testify.
16   **A.    My vehicle came in contact with his.**
17   Q.    I'm not going interchange words.  There was
18   contact?
19   **A.    Yes.**
20           MR. RASKIN:            It's
21           different.
22   Q.    You indicated that you attempted to make contact
23   with the vehicle on the driver's side door, but that
24   your car inadvertently made contact somewhere in the
25   middle of the van, correct?

1  **A.    That's not necessarily what I said.**
2  Q.    What did you say?
3  **A.    I intended on blocking the door so it couldn't**
4  **open.  And by trying to do that I rolled forward and**
5  **made contact.**
6  Q.    So when we say contact and strike, like your
7  intent was to use your vehicle to physically make
8  contact with the van?
9  **A.    No.**
10  Q.    Okay.
11  **A.    My intent was to block his ability to open it**
12  **far enough that he could escape.**
13  Q.    Got you.  What lane of travel at that time do
14  you believe your vehicle was in?
15  **A.    I don't recall.**
16  Q.    Mr. Scott asked you some questions regarding
17  some recorded phone calls unbeknownst to the callers
18  that you listened to at some point either prior to or
19  after you made your statement to BCI.  Do you recall
20  that?
21  **A.    Yes.**
22  Q.    And you've been at this department for how many
23  years again?
24  **A.    I'm in my eighteenth year.**
25  Q.    So are there phones within the vicinity that

1  aren't taped, if you know?
2          MR. RASKIN:          You mean the
3      facility?
4          MR. SIDOTI:          Yeah.  In the
5      police station, yes.
6  BY MR. SIDOTI:
7  Q.    Are there phones within the police station that
8  are not taped?
9  **A.    I don't know what phones are or aren't taped.  I**
10  **don't know what the policy is regarding what phones**
11  **shall be taped and which not.  I don't know.**
12  Q.    Have you had instances in the past in which
13  individual phone calls that are not in the jail -- so
14  for the sake of this line of questioning I want to
15  exclude everyone that's in jail or under a formal
16  arrest in the jail.  Okay?
17      Have you ever had the opportunity to utilize
18  individual's phone calls being taped that are making
19  calls from within the department?
20  **A.    That would -- no.  But only if you're also**
21  **including dispatch which was not part of jail.**
22  **Sometimes calls come into the dispatch and we use those**
23  **recordings.  But in terms of within the walls that we**
24  **sit, no.**
25  Q.    So excluding dispatch and excluding the jail,

1  have you ever in your tenure here ever been tendered
2  recorded phone calls from within the department?
3  **A.    No.**
4  Q.    So this is the first time?
5  **A.    Yes.**
6  Q.    This the first time that you knew that phones
7  were recorded here?
8  **A.    I knew that there were phones recorded at the**
9  **police department, but I don't know which phones are**
10  **and which are not.**
11  Q.    So if someone came in, you know, maybe someone
12  is a passenger for an OVI and the driver gets arrested
13  for operating a vehicle under the influence and the
14  passenger has to come in.  I'm sure that's happened
15  before.  Is that a fair statement?
16  **A.    Yeah.**
17  Q.    And they may want to call to get a ride.
18  **A.    Yes.**
19  Q.    Fair statement?
20      Okay.  What phone would you let them use?
21  **A.    I don't know.  I've never had that come up where**
22  **I had to have somebody use a phone within these walls.**
23  **We don't have pay phones.  I would imagine if we**
24  **borrowed a cell phone, we would do that.  But I've**
25  **never had someone within these walls to have the**

1  **opportunity to use a phone.**
2  Q.    Did you ever ask Officer Glover how he got those
3  tapes when he e-mailed them to you?
4  **A.    No.**
5  Q.    Did you ever have a discussion with him
6  regarding them?
7  **A.    Yes.**
8  Q.    What was that discussion?
9  **A.    I don't remember the specific details, but I**
10  **remember the approximate time.  I was still in relative**
11  **shock of what happened and how this whole thing went**
12  **down.  And I was directed specifically by Deputy Chief**
13  **Janowski that if I wanted to watch video or see any of**
14  **the evidence or read statements or be involved in any**
15  **way that I had to have someone close with me that knows**
16  **me present.**
17      And we set out to watch the videos as they were
18  **put on CD for us to watch in the bureau.  Sometime**
19  **around there it occurred to me that, and I think it was**
20  **just after reading -- we checked the CAD entry, C-A-D,**
21  **to see if anyone had typed any narratives yet.  And the**
22  **only entry in there was Steving's entry.**
23      And it occurred to me at that moment that he had
24  **let her use phones within the walls.  And I said, call**
25  **dispatch and see if those calls were made on a recorded**

Page 154

1  line. I didn't know what phones were used. I didn't
2  even know that she was brought back to the police
3  department until that moment and was allowed to use the
4  phone.
5  Q.  Did you know immediately when inquiring that the
6  phone calls made by Ms. Pauley and some other
7  individuals were in fact made on recorded lines?
8  A.  No, I did not know.
9  Q.  Do you know how it came to be that Officer
10  Glover was the one responsible to listen to those and
11  provide you with summaries?
12  A.  He has an association with one of the
13  dispatchers who handles that when calls come in. He
14  has prior experience of getting 9-1-1 calls or misuse
15  of 9-1-1, or getting phone calls as they come in. I
16  hadn't experienced that yet or had an opportunity or a
17  need to recover incoming phone calls.
18      So I simply asked him, hey, ask the dispatcher
19  if she can get those phone calls.
20  Q.  Do you recall who that dispatcher was?
21  A.  No, I don't.
22  Q.  Do you know how many dispatchers are here?
23  A.  Many.
24  Q.  And if you know or don't know, does one
25  particular dispatcher or maybe one or two of them work

Page 155

1  the night shift with you?
2  A.  Multiple dispatchers work at night the same time
3  I'm working, but it's a multi-jurisdiction dispatch
4  agency. So we may only have one assigned to our radio
5  traffic where there are five, six, seven dispatchers
6  assigned to other agencies within the same room at our
7  police department.
8  Q.  So I would be wrong in thinking that a
9  dispatcher would be this young lady that maybe sits on
10  the other side of this wall.
11  A.  That's correct.
12  Q.  It could be somebody else?
13  A.  Dispatch isn't even in this building. They're
14  in a separate building. They have an address down the
15  road.
16      MR. RASKIN:          That would be
17  the Chief's secretary.
18  BY MR. SIDOTI:
19  Q.  Do you know if prior to Mr. Evans' removal from
20  the van if he was wearing a seat belt?
21  A.  He was not.
22  Q.  If when you immediately opened the door you see
23  both of his hands and he's not wearing a seat belt, why
24  not just grab him and take him out of the van at that
25  point?

Page 156

1  A.  That sure was the plan.
2      MR. RASKIN:          Answer his
3  question.
4  A.  Why not --
5      MR. SIDOTI:          He did. It's
6  fine. I'll move on.
7      MR. RASKIN:          I think we're
8  going to take a break now. How much
9  longer do you have?
10      MR. SIDOTI:          Including the
11  video, less than 45 minutes.
12      (Thereupon, there was a recess.)
13  BY MR. SIDOTI:
14  Q.  Officer, Mr. Scott asked do you recall if you
15  listened to the audio tapes of Ms. Pauley and Devon
16  prior to your interview with BCI, if you remember.
17      MR. RASKIN:          That was asked
18  and answered.
19      You can answer it again.
20  A.  I still can't remember if it was prior to. I
21  don't remember how long it took to get them.
22  Q.  Okay. So at some point you did listen to them
23  though, correct?
24  A.  Yes.
25  Q.  Okay. And as you testified you indicated that

Page 157

1  you were aware of their existence the same day as the
2  incident, correct?
3  A.  No, I did not say that.
4  Q.  Clarify for me. When you indicated that you
5  were kind of assigned to be with another officer and
6  you gave some testimony that if you want to view the
7  tapes and you want to do things, who was giving you
8  that instruction, was that Janowski?
9  A.  Yes.
10  Q.  Okay. And when was that conversation had, if
11  you recall?
12  A.  It was either the following day -- I remember
13  daylight, we were in the bureau. It could have been
14  the same day but much later in the day after daylight.
15  So it was within I'd say 24, 48 hours of the event.
16  Q.  Okay. So within very close proximity of time
17  you had a conversation with -- and I want to have his
18  rank, he's the deputy chief?
19  A.  Yes.
20  Q.  Janowski, that indicated if you wanted to watch
21  anything or listen to anything, was that prior to your
22  statement to BCI?
23  A.  Yes.
24  Q.  Okay. And when was that statement; when did you
25  give that statement?

Page 158

1   A.   To BCI?
2   Q.   Yes.
3   A.   On March 14th.
4   Q.   Okay.  So you have a conversation within 24 to
5   48 hours with Deputy Chief Janowski.  Was he telling
6   you to come to me if you want to see the footage or
7   listen to the audio, or was he just telling you let me
8   know if you want to review it, if you recall?
9   A.   I don't remember specifically having to go
10  through him to gain access to any of the material.  The
11  material is already generally available to us as patrol
12  officers, because it uploads to a database that we have
13  access to.
14       The instruction, as I remember it, was
15  specifically, just take it easy, don't watch anything,
16  don't listen to anything, don't talk to anybody, don't
17  listen to guys BSing on station.  Just if you want to
18  sit down and watch it, do it in the bureau with another
19  guy like Glover.  I think Glover might have even been
20  there at the time and volunteered to be there with me
21  and for me when we initially watch anything or hear
22  anything.
23  Q.   I understand the video's of dash cams of several
24  officers and, in fact, several jurisdictions.  But what
25  relevance would it have to conversations made by

Page 159

1   Ms. Pauley or Devon out of the station; what --
2   A.   It had nothing to do with my statement.
3   Q.   When I asked you about the McKissic case I had
4   asked you if you sustained any physical injuries as a
5   result of your involvement.  I believe your response
6   was something along the lines of not physical.  Were
7   there other injuries that you sustained?
8   A.   Well, if you look at our policy and the way it
9   describes injuries, injuries aren't just physical.
10  They're psychological.  And for a long time I was very
11  set aside on how things like this occur and how we go
12  from having direct control of a situation, and then it
13  suddenly -- that control being taken away from us and
14  having to go through the situation that we did, the
15  depositions and the lawsuits and all that because of a
16  situation that was well planned out.  We had everything
17  lined up and because it was suddenly changed, we had to
18  go through something.
19       So I had a lot of doubt in what we were doing
20  and what -- how important our planning and all that
21  structure was.  And I had questions on whether or not I
22  wanted to be involved with that anymore.
23  Q.   So as a result of McKissic incident, as
24  Mr. Raskin has indicated, I'm not -- if you spoke with
25  any mental healthcare provider, I don't want that

Page 160

1   information.  So if you think I'm going there, don't
2   answer that portion of the question or don't respond in
3   such a manner.
4       But after the McKissic -- well, strike that.
5       Mr. Scott asked there have been four use of
6   deadly force matters that you've been involved in.
7   With the McKissic matter, was that the second one that
8   you discharged your firearm in, if you recall?
9   A.   Ask the question again.
10  Q.   Was the McKissic incident the second of the four
11  -- second of the three uses of deadly force in which
12  you personally discharged your firearm?
13  A.   Yes.
14  Q.   Okay.  That was the second?
15  A.   Yes.
16  Q.   And then Mr. Evans being the third?
17  A.   Right.
18  Q.   And the first of the four you did not discharge;
19  you were just involved perhaps collaterally?
20  A.   I did not fire, but I was directly in line of
21  everything that was going on at the moment.
22  Q.   Okay.  So after the McKissic matter you
23  indicated some issues with perhaps protocol and
24  strategizing and things.  Did you voice any of those
25  concerns to any supervisors in the department?

Page 161

1   A.   All those concerns came out by way of deposition
2   and the case itself.
3   Q.   That you --
4   A.   As far as it.  So you had some personal issues on the
5   things had nothing to do with my police department as
6   it were.  And I left the task force shortly after that,
7   so it really was a moot point.
8   Q.   Got it.  So you had some personal issues on the
9   way that that particular incident was ran, and then you
10  left that task force?
11  A.   Not necessarily that it was ran, but the way it
12  resulted, yes.
13  Q.   Okay.  Did ever seek any counseling after that?
14       MR. RASKIN:        You can answer
15            that question with a yes or a no.
16  A.   Yes.
17  Q.   Having issues with the way that that resulted,
18  which again resulted in you discharging nine rounds of
19  your firearm striking Mr. McKissic, do you recall how
20  long it was after that that you left that task force?
21  A.   No.
22  Q.   Did you have to ask permission to leave that
23  task force?
24  A.   No.
25  Q.   Does it just go up through your supervisors at

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 162

1  Strongsville to say I don't want to do that any longer?
2  A.  I didn't experience that opportunity. The
3  opportunity to leave the task force arose because
4  Strongsville through attrition was having manpower
5  issues and it became an opportunity to come back to the
6  road for that reason, rather than voicing a concern or
7  having any other identifying problems.
8  Q.  Is it fair to say that incident in and of itself
9  had some impact on you as an officer?
10  A.  Yes.
11  Q.  I mean, people go through traumatic incidences
12  that can have a reverberating effect for the rest of
13  their lives; fair statement?
14  A.  I think it depends on the specifics, but yes.
15  Q.  Okay.  If you had such an issue in the case in
16  which you had to discharge and shoot a man nine times
17  who you came to find out was unarmed, I mean, do you
18  think that compromised your judgment ability as you
19  continued on as a Strongsville Police Officer?
20  A.  No.
21  I think it improved it.
22  Q.  Well, let's just finalize between Mr. Evans and
23  Mr. McKissic.  I know we have two incidents, some five
24  to six years apart.  The dates are the dates, but fair
25  enough, somewhere outside of five to --

Page 163

1  A.  Yes.
2  Q.  Both individuals are operating vehicles,
3  correct?
4  A.  Yes.
5  Q.  Both individuals are unarmed with any weapons,
6  correct?
7  A.  Yes.
8  Q.  Both individuals, you have a visual on both of
9  them while they're operating the vehicles, correct?
10  A.  Yes.
11  Q.  Both of the individuals for a total of 11
12  bullets, you're the only officer that discharges your
13  firearm on both of those incidences, correct?
14  A.  Yes.
15  Q.  And in both of those cases you voluntarily place
16  yourself in close proximity to those vehicles.
17        MR. RASKIN:        Is that a
18  question?
19        MR. SIDOTI:        Yes, it is.
20        MR. RASKIN:        Then why don't
21  you ask it as a question?
22  BY MR. SIDOTI:
23  Q.  And in both of those cases you also placed
24  yourself voluntarily in close proximity to both the
25  vehicles of Mr. McKissic and Mr. Evans, correct?

Page 164

1  A.  No.
2        MR. SIDOTI:        Okay.  For the
3  remainder of my questions, Todd, it's
4  probably easier if I flip my computer on
5  to that side and you tell me where you'd
6  like me to sit.  It's probably easier if
7  I'm in the middle where you can sit next
8  to him, or you can stand.  What do you
9  prefer for the watching of the video?
10        MR. RASKIN:        Well, --
11        MR. SIDOTI:        You guys can
12  both come stand over my shoulder.
13        MR. RASKIN:        What's your
14  preference?
15        THE WITNESS:        Whatever's
16  easiest.  Let's just get it done.
17        MR. RASKIN:        Why don't we
18  stand?
19        (Thereupon, there was a discussion
20  off the record.)
21        MR. SIDOTI:        Let the record
22  reflect Mr. Raskin's jovial comment was
23  taken just as such.
24        MR. RASKIN:        Thank you.  I
25  appreciate that.

Page 165

1  BY MR. SIDOTI:
2  Q.  So I'm going to do this the easiest way possible
3  for continuity with the deposition testimony.  I'm
4  going refer to this as I have in other depositions as
5  the request for production of documents tendered by the
6  Plaintiffs responded to by the Defendants.
7      This is all the documents on a thumb drive.
8  This is RFP Number 6 which is designated as the video
9  dash cam that's been tendered.  That particular exhibit
10  of RFP Number 6 has five separate videos starting with
11  car 3 to car 9, cars 12 and 27 and the SPD of the final
12  two files aren't important.
13      So I'm going to click on car 9, which is the
14  second of the videos.  And there's nine pieces of video
15  clip.  I'm clicking on the first one.  This is a video
16  that is approximately 15 minutes in length.
17      I'm going to go to the beginning of this,
18  Officer Miller, and we'll just talk about a couple
19  things for the purposes of identification.
20      Here we have what I've stopped at 1 minute 53
21  seconds of the outline portion of the video.  It
22  indicates 3-7 of 2017.  The time looks to be 2:37 in
23  the morning and 57 seconds with a front I'm assuming is
24  going to be the camera indicating of Number 9.  Do you
25  see that, sir?

Page 166

1    **A.    Yes.**
2    Q.    Do you recall, are you familiar with this video;
3    have you viewed this in the past?
4    **A.    Yes.**
5    Q.    Okay.  And what do you understand this video to
6    be?
7         Do you know whose vehicle this is?
8    **A.    Yes.**
9    Q.    Okay.  Whose vehicle is this?
10   **A.    Plut's.**
11   Q.    This is Officer Plut that was involved in
12   the incident that we're discussing.  I can play a
13   portion of it, I don't have the audio on, starting from
14   the beginning.  This of course is a different officer's
15   vehicle, correct?
16        The same --
17   **A.    Still Officer Plut.**
18   Q.    Okay.  So let's --
19        MR. SIDOTI:         Off the record
20        for a second.
21        (Thereupon, there was a discussion
22        off the record.)
23   BY MR. SIDOTI:
24   Q.    All right.  So, Officer Miller, we've scrolled
25   through several minutes of the video.  If you'll

Page 167

1    indicate on the bottom here, I have it at 12 minutes.
2    Do you see that?
3    **A.    Yes.**
4    Q.    Okay.  Do you see what this video is depicting
5    at this still frame at 12 minutes?
6    **A.    Yes.**
7    Q.    What do you see there?
8    **A.    I see Mr. Evans' van up and to the right**
9    **slightly and Sergeant Kelley's SUV up and to the left**
10   **and they're nearly parallel.**
11   Q.    Okay.  And what lane of travel are they in
12   respectively at this time?
13   **A.    I don't know yet.**
14   Q.    I forwarded it and I'm stopping the video at
15   12:30.  Do you see another vehicle in the picture now?
16   **A.    Yes.**
17   Q.    Okay.  And whose vehicle is that on the right?
18   **A.    Mine.**
19   Q.    Okay.  And can you tell me now where the
20   vehicles in their respective lanes, where they're
21   operating?
22   **A.    Yes.**
23   Q.    Please tell me starting with Sergeant Kelley.
24   **A.    Sergeant Kelley is in the Number 2, the center**
25   **lane.  Mr. Evans is in the Number 3 lane and I am on**

Page 168

1    the berm.
2    Q.    Okay.  I'm playing the video starting at 3:28
3    here.  All right.  At 3:31 we've seen now the van is
4    spinning out of control.
5    **A.    3:31?**
6    Q.    Yes.
7    **A.    Yes.**
8    Q.    13:31, I apologize.  You saw the van go out of
9    view and I'm now stopping it here at 13:35.  Do you see
10   that?
11   **A.    Yes.**
12   Q.    Sergeant Kelley to the left.  The van as we view
13   the still image looking to be pointing somewhere around
14   8:30; fair statement?
15   **A.    The van pointing --**
16   Q.    (Indicating).
17   **A.    I don't know about 8:30.  Are you trying to say**
18   **the van has something to do with a clock?**
19        **So let's say 270 degrees.**
20   Q.    Okay.  And your vehicle is here on the right?
21   **A.    Yeah.**
22   Q.    So let's play it again from 13:27.  Okay.  I
23   just stopped it there at 13:36.  Do you see that?
24   **A.    Yes.**
25   Q.    Your vehicle just struck the door on the front

Page 169

1    driver's side of the vehicle being driven by Mr. Evans,
2    correct?
3    **A.    Yes.**
4    Q.    Okay.  So when we indicated in some questions
5    earlier when I asked about the contact, Mr. Evans' car
6    just spun out, you stated about 270 degrees.  And now
7    your vehicle just struck the driver's side near the
8    door, near the rear of the door on the driver's side,
9    correct?
10   **A.    I believe both vehicles struck each other.**
11   **Mr. Evans' vehicles was still rotating on its axis at**
12   **that moment that I'm also moving forward.  I don't**
13   **think it was in part that vehicle stopped rotating**
14   **because of my vehicle.**
15   Q.    Okay.  So now again I've stopped at 13:37 we
16   saw.  Now Sergeant Kelley's vehicle and Mr. Evans'
17   vehicle have just made contact with one another also,
18   correct?
19   **A.    Yes.**
20   Q.    Okay.  Now, your vehicle you see that at 13:37
21   it depicts that the driver's side door is opening.  Do
22   you see that?
23   **A.    Yes.**
24   Q.    Your vehicle is in park at this time?
25   **A.    I don't know the answer to that.**

Page 170

```
 1   Q.    Well, would you have left your car in drive when
 2   you exit the vehicle?
 3   A.    At that moment I can't say whether it was in
 4   park or still in drive.
 5   Q.    Okay.  Now I've stopped it at 13:40 which
 6   depicts now that you exited the vehicle, correct?
 7   A.    Yes.
 8   Q.    Is it fair to assume that your car's now in
 9   park?
10   A.    In fact I remember now, that's why I got back in
11   the car to put it in park.
12   Q.    So what would you approximate, Officer, is the
13   distance from the rear of Mr. Evans' van at this
14   juncture to the guard rail on the berm?
15   A.    I have no idea.
16   Q.    Could you just estimate?
17   A.    No.
18   Q.    Well, we know that your car is now in park and
19   you testified that you were driving in the berm when
20   Mr. Evans was operating the vehicle in the three lane,
21   correct?
22   A.    That car spun out and started left and continued
23   left.  And, actually, the beginning of the spin out
24   began at or on the berm on the far left.  So it's where
25   he came to a rest.  Right now the majority of the left
```

Page 171

```
 1   of my car, the driver's side indicating that I made a
 2   left turn towards the interior of the roadway.  So I'm
 3   not close to the berm, nor am I on the berm or the
 4   guard rail.
 5   Q.    So you're not able to say how far away the rear
 6   of his van is to the guardrail at that time?
 7   A.    No.
 8   Q.    Okay.  Starting at 13:39.  13:39 you're out --
 9   13:41 you're out of your vehicle here, correct?
10   A.    Well, let's use the time on the screen.
11   Q.    2:40:09, we'll use that now.  You're indicating
12   the time stamp designation next to the date of what is
13   indicating --
14        MR. RASKIN:        Can I stop you
15        for a minute?
16        MR. SIDOTI:        Sure
17        MR. RASKIN:        You're asking
18        a whole series of questions about a video
19        that you're playing on your laptop,
20        including specific references to time,
21        either the time stamp or the amount of
22        time that the video encompasses and
23        specific points on it.
24        I'm going to ask then that that video
25        be marked as an exhibit to this
```

Page 172

```
 1   deposition, because otherwise both your
 2   questions and Officer Miller's answers
 3   don't make any sense.
 4        MR. SIDOTI:        Understood.
 5   Which is why --
 6        MR. RASKIN:        So if you
 7   could just pull out the thumb drive.  If
 8   you've got more on the thumb drive than
 9   just that, you can send it to the
10   reporter.  I'm perfectly okay with that.
11   Let's just mark it as an exhibit so that
12   we'll have questions and answers and an
13   exhibit to refer to.
14        MR. SIDOTI:        Just for the
15   record, we've used this specific video
16   footage in prior depositions.  I do have a
17   separate thumb drive specifically of how
18   it was tendered by the Defendants in
19   regards to the response to the production
20   of documents.  So I do have this
21   particular piece of footage with the same
22   time stamps, both in regards to Windows
23   Media Player and to the designation of
24   time on top of the exhibit.
25        So that is separate.  It's been
```

Page 173

```
 1   referenced in other depositions.  If you
 2   want to also include it in this, then I'll
 3   do that.
 4        MR. RASKIN:        I just want it
 5   marked.
 6        MR. SCOTT:        I think you
 7   described it as --
 8        MR. SIDOTI:        It's been
 9   marked, but I'll mark it for this depo.
10        MR. SCOTT:        I thought
11   being described it as being produced in
12   response to production of documents Number
13   6 and the specific camera angle.
14        MR. SIDOTI:        Right.
15        MR. SCOTT:        Okay.
16   BY MR. SIDOTI:
17   Q.    So, now, Officer Miller, I'll use the reference
18   to the time stamp up top.  We're dealing with 2:39:40,
19   right?
20        Now we're at 2:40:03, counting, :04.  Why don't
21   you note you get out of the vehicle here.  Not really
22   an important time, but, you know, I stopped it at
23   2:40:09.  Do you see that?
24   A.    Yes.
25   Q.    Do you see yourself out of the vehicle?
```

Page 174

1  **A.  Yes.**
2  Q.  Your right hand, would you agree with me that
3  it's on your firearm?
4  **A.  I don't know the answer to that.**
5  Q.  I started here at 2:40:02.  Watch this clip of
6  the video, please.
7      Okay.  So now there's a period of time in which
8  your hand is on your firearm, correct?
9  **A.  Yes.**
10  Q.  Do you recall what you were doing at that time?
11  **A.  I was holding it.**
12  Q.  Okay.  Had you taken the first level of safety
13  off your holster at that time?
14  **A.  No.**
15  Q.  Okay.  But it's fair to say that when you get
16  out of the vehicle and for the portion now as you're
17  approaching the door of Mr. Evans that you've just been
18  addressing your firearm, correct?
19  **A.  Yes.**
20  Q.  Okay.  All right.  Now I stopped it at 2:40 and
21  12 seconds.  You'll indicate the door has been opened,
22  correct?
23  **A.  Yes.**
24  Q.  Okay.  And now 2:40 and 13 seconds.  Do you see
25  that?

Page 175

1  **A.  See what?**
2  Q.  Do you see that the door is now opened and your
3  gun -- or your arm is extended with the firearm in your
4  right hand, correct?
5  **A.  I can't see that, but I can only assume that.**
6  Q.  I'm going to play it through starting at 2:40
7  which is where -- so I'm going to let this play.
8  I stopped at 2:40:14.  Do you see that?
9  **A.  Yes.**
10  Q.  Would it assist you hearing the audio to be able
11  to testify that you have already fired the two shots;
12  will that assist you?
13  **A.  I believe so, yes.**
14  Q.  Okay.  2:40:15 we stopped the footage.  Now with
15  audio you can hear both shots have already been
16  discharged, correct?
17  **A.  Yes.**
18  Q.  You're the only officer that has fired at that
19  time, correct?
20  **A.  Yes.**
21  Q.  Okay.  As you just watched that portion of the
22  video, prior to you exiting the vehicle and up until
23  discharging your firearm were we just able to watch
24  that on I'll call this Exhibit Number --
25      MR. SIDOTI:           Where did you

Page 176

1  leave off, Joe?  I'll mark it as after
2  that.
3      MR. SCOTT:           I think I left
4  off at 14.
5  BY MR. SIDOTI:
6  Q.  I'm going to mark this particular portion of
7  footage as Plaintiffs' Exhibit 15.  You had the
8  opportunity to watch this clip of prior to exiting your
9  vehicle up until both shots have been discharged by
10  yourself, Officer Miller; is that correct?
11  **A.  How does she know what part of the footage**
12  **you're on?**
13  Q.  Well, I played the footage starting at --
14  **A.  You're referencing a frozen screen.**
15  Q.  Okay.  So we're playing it from 2:40 prior to
16  exiting the vehicle and you watched it until both shots
17  have been discharged and that was at the end of 2:40
18  and 15 seconds; is that a fair statement?
19  **A.  Yes.**
20  Q.  Okay.  This camera angle is perpendicular to
21  the driver's side window of the vehicle operated by
22  Mr. Evans, correct?
23  **A.  Yes.**
24  Q.  Okay.  Were you able to see his hands in the
25  video image for the portion that we just watched on the

Page 177

1  steering wheel operating the car?
2  **A.  No.**
3  Q.  Okay.  Could you see his hands on the steering
4  wheel immediately before and during while you're
5  opening the door of the van?
6  **A.  As by way of watching the video?**
7  Q.  Yes.
8  **A.  Not by watching the video, no.**
9  Q.  Okay.  Were you able to notice that Sergeant
10  Kelley, as Mr. Scott asked you previously, did since
11  drive his vehicle up to block the path of Mr. Evans?
12  **A.  I don't know that I knew that at the moment.**
13  Q.  So as you just watched this video and all the
14  times you've had the opportunity to watch the video and
15  in your recollection do you recall that Mr. Evans'
16  hands were on the wheel and/or on the gear shifter as
17  you were opening the door?
18  **A.  Yes.**
19      MR. SIDOTI:           You can have a
20  seat, Todd.  You guys can have a seat.
21      MR. RASKIN:           Oh, okay.
22      Just so I'm clear, Marcus, you're
23  going to mark that thumb drive?
24      MR. SIDOTI:           No.  I'll have
25  to mark another one, but I have this

1    specific piece of footage on its own
2    independent thumb drive.
3         MR. RASKIN:        When you say
4    this specific piece of footage are you
5    talking about Plut, the view from his
6    cruiser?
7         MR. SIDOTI:        The Defendants
8    tendered their response to production.
9    And in that it's been systematic, so
10   Mr. Scott and I have the same documents
11   and they're listed the same because they
12   were -- I don't have the ability to
13   change --
14        MR. RASKIN:        Right.  But
15   I'm saying are you going to tender the
16   entire video from when you first asked the
17   witness do you recognize the vehicle all
18   the way through to your last question
19   which was at 2:40:15, I believe, when the
20   question was were both shots fired or
21   words to that effect?
22        I just want to make sure that we're
23   clear.  Are you going to tender all of
24   that and mark it?
25        MR. SIDOTI:        From start to

1    finish.  For the entire 15 minutes I will
2    have an independent exhibit for that.
3         MR. RASKIN:        That's what I
4    want to make sure.
5         MR. SIDOTI:        All right.  So
6    I'm going to, when I do tender that, which
7    will be used in other depos, but we're
8    going to refer to it as Plaintiffs' 15.
9    And, again, for clarification in the
10   response by the defense through the
11   discovery process it's been referred to as
12   RFP Number 6, video 1 of car 9.
13        Just a few more questions.
14        MR. RASKIN:        Hang on.
15        THE WITNESS:        We're good.
16   BY MR. SIDOTI:
17   Q.   Officer Miller, are you aware as you sit here
18   today that your counsel has already taken the
19   deposition of Ms. Pauley in regards to this matter?
20   A.   Yes.
21   Q.   Okay.  As you sit here today do you understand
22   that her testimony was that at the time the shots were
23   fired that Mr. Evans' hands were both above his heart,
24   either on the steering wheel or on the gear shift at
25   the time you discharged both shots?

1         MR. RASKIN:        Objection.
2    That mischaracterizes her testimony.  Her
3    testimony was not consistent.
4         But you can answer what you
5    understand.
6    A.   No, I don't know what she testified to.
7    Q.   Okay.  So if you were to be informed that
8    Ms. Pauley's testimony was at the time you fired both
9    shots that Mr. Evans' hands were in fact above his
10   heart and not reaching down near the middle counsel,
11   that would be inconsistent with what you recall of the
12   events that transpired for this incident.
13   A.   I don't know what she perceived in what
14   chronological order.  I can't say what she said.
15   Q.   Okay.  But if Ms. Pauley were to say at the time
16   of the shooting on both shots that Mr. Evans' hands
17   were in fact above and not dropping down, that would be
18   inconsistent with what you recall occurred on that day?
19   A.   It would be inconsistent.
20   Q.   Also in regards to any verbal commands that you
21   gave, if Ms. Pauley's testimony was that you gave no
22   verbal commands prior to discharging your firearm, that
23   would be inconsistent with what you recall transpired
24   on that day as well, correct?
25   A.   The video from my cruiser will show that's

1    inconsistent.  Yes.
2    Q.   You believe the video indicates that there were
3    verbal commands given prior to your first shot?
4    A.   Absolutely.
5         MR. SIDOTI:        Officer, I
6    don't believe I have any further questions
7    at this time.  Thank you.
8         MR. SCOTT:        If I could
9    just ask a couple quick questions in
10   follow up.
11             - - -
12   BY MR. SCOTT:
13   Q.   Officer Miller, you'd agree with me that your
14   intent was to position your vehicle so as to block the
15   driver's door after the van spun out, correct?
16   A.   Yes.
17   Q.   And that was to prevent the driver of that
18   vehicle from bailing from the vehicle, correct?
19   A.   Yes.
20   Q.   And that would have been consistent with the
21   tactics involved in performing a felony call out,
22   correct?
23   A.   No.
24   Q.   Is part of a felony call out watching or
25   preventing the driver of the vehicle from bailing from

Page 182

1   the vehicle?
2   A.   No.
3   Q.   Okay.  Was that part of the discussion when you
4   were discussing a felony call out during the pursuit
5   words to the effect, if no one bails, we're going to do
6   a felony call out?
7   A.   **Are you asking if we had a discussion if no one**
8   **bails we're going to do a felony call out?**
9   Q.   Let me ask you this: the radio communications,
10  you've listened to them, reflect communications between
11  yourself and other officers to the effect that if no
12  one bails, we're going to do a felony call out,
13  correct?
14  A.   **Yes.**
15  Q.   Positioning your vehicle against the driver's
16  side door as you had intended would have been a means
17  of preventing the driver from bailing from the vehicle,
18  correct?
19  A.   **Yes.**
20  Q.   Okay.  Mr. Sidoti was asking questions regarding
21  the similarities between the events of the March 7,
22  2017 pursuit with the events involved in the Lawrence
23  McKissic incident, and had asked you if in both
24  instances you had voluntarily positioned yourself in a
25  position of danger, do you recall that, and you said,

Page 183

1   no, that's not correct, correct?
2   A.   **Do I recall saying that?  Yes, that's correct.**
3   Q.   Okay.  You would agree that in both instances
4   the tactics that you determined to employ in responding
5   to those situations resulted in you being placed in
6   close proximity to the cars in both instances?
7   A.   **Not necessarily, no.**
8   Q.   Well, you in fact were in close proximity to
9   both cars in both instances, correct?
10  A.   **Where I was in close proximity and the how I got**
11  **there were not necessarily my decision.**
12  Q.   Nobody ordered you in to close proximity of the
13  cars in either instances, did they?
14  A.   **In the first one, yes.**
15  Q.   Who ordered you in close proximity to
16  Mr. McKissic's vehicle?
17  A.   **It was by way of the lieutenant saying we're**
18  **going to take them down now and that's where my car**
19  **was.  At the moment of that takedown, that's where I**
20  **was.  I had no choice.  There was no time for**
21  **discussion.**
22  Q.   Did anyone order you in close proximity to
23  Mr. Evans' van on the March 7th, 2017 incident?
24  A.   **No.**
25       MR. SCOTT:        Thank you,

Page 184

1   Officer.  That's all I have.
2       MR. SIDOTI:         Two follow
3   ups.
4            - - -
5   BY MR. SIDOTI:
6   Q.   Officer, was there any other way that you were
7   communicating with the officers involved other than the
8   audio radio communications that we've received or you
9   reviewed?
10  A.   **No.**
11  Q.   Were you texting?
12  A.   **No.**
13  Q.   You're not FaceTiming?
14       Anything on the radio is the only way that you
15  were communicating amongst yourselves regarding this
16  incident?
17  A.   **Yes.**
18  Q.   Just Mr. Scott's last question with regards
19  McKissic, how you indicated I'm in close proximity on
20  the McKissic matter by the order that we're going to do
21  this now.  But I'm assuming had the superior officer
22  ordered you, Officer Miller, you get out and stand
23  directly in front of the car, that order was never
24  made, correct?
25  A.   **No.**

Page 185

1   Q.   That was a voluntary position that you chose to
2   take when you were getting out of the vehicle and
3   placing yourself in front of Mr. McKissic's car,
4   correct?
5   A.   **It was not voluntary, no.**
6   Q.   Let me ask you this: when you're trained, OPOTA
7   and the like, for executing traffic stops, there's
8   posts on vehicles, for instance the A post, correct?
9   A.   **Yes.**
10  Q.   You're familiar with that?
11  A.   **Yes.**
12  Q.   It's an A post which is near the back side of
13  the driver's door for safety so that officers won't get
14  shot or would have longer time to react in case
15  someone's going to produce a weapon, correct?
16  A.   **Are you asking me if that's how it was designed?**
17  Q.   Yeah.  Is that what your understanding is of
18  when officers are trained to take an A post during a
19  traffic stop?
20  A.   **This wasn't a traffic stop.**
21  Q.   I'm not asking you that.  I'm asking you
22  specifically in regards to a traffic stop, are you
23  familiar with the training to take an A post during the
24  execution of a traffic stop?
25  A.   **No.**

Page 186

1  Q.    What is an A post?
2  A.    **The rear of the vehicle where the window meets**
3  **the frame or the rear trunk area.**
4  Q.    Do you understand that to be consistent with
5  your training if you are effectuating just a traffic
6  stop?
7  A.    **No.**
8  Q.    Okay.  But you understand and would agree that
9  there's training in regards to positions you would take
10  with a vehicle when you're on foot for officer safety,
11  correct?
12  A.    **I think what you're asking me is --**
13        MR. RASKIN:        Hold on.  No,
14        no.  You're not to inquire what you think
15        he's asking.  If you understand his
16        question, answer it.  If you don't, ask
17        him to rephrase it.  It's not a
18        conversation.
19  A.    **I don't understand what you're saying.**
20  Q.    Do you understand that there is training for
21  officers specifically regarding traffic stops on
22  positions taken near the vehicle for officer safety?
23  A.    **Regarding the A post?**
24  Q.    Is there training for officers during the
25  effectuation of traffic stop?

Page 187

1  A.    **Yes.**
2  Q.    You're trained to do it so that you're safe.
3  A.    **Yes.**
4  Q.    And it's for circumstances so you have time to
5  react and to make sure someone's not going to produce a
6  gun and things like that, correct?
7  A.    **Yes.**
8  Q.    So there's training that you're provided that
9  you specifically had on a proper way to approach a
10  vehicle when you're on foot so that you're safe,
11  correct?
12  A.    **Yes.**
13  Q.    And one of those is not standing in front of a
14  vehicle, correct?
15  A.    **This wasn't --**
16  Q.    I'm not asking you, sir.  I mean, can we agree
17  that standing in front of a vehicle is not a safe place
18  for an officer based on training to stand to keep
19  himself safe?
20  A.    **It's not an ideal location.**
21  Q.    Then if you put yourself in that place
22  voluntarily -- strike that.
23        Officer, though, would you agree it's consistent
24  in both of these cases, both McKissic and Evans, you
25  without order on your own, and in fact not with the

Page 188

1  felony call out that was in the Evans case, put
2  yourself voluntarily in a position of placing yourself
3  in danger to then justify the use of deadly force?
4        MR. RASKIN:        Objection.
5        You have asked that question several
6        different ways.  And he has testified that
7        he did not voluntarily put himself in a
8        position of danger in the McKissic case.
9        So last time, Marcus, and then I'm
10        going to tell him don't answer anymore.
11        Go ahead.  You can answer him again.
12  A.    **Ask the question again, please.**
13  Q.    In both McKissic and Evans case you weren't
14  specifically ordered to take the positions that you
15  took when you were outside of your vehicle.  You took
16  those positions subject to the order of we're taking
17  the car down in McKissic now, but you placed yourself
18  into those positions that you justified that after you
19  placed yourself there justifying the use of deadly
20  force in both of those cases?
21  A.    **I disagree.**
22        MR. SIDOTI:        I have nothing
23        further.
24        MR. SCOTT:        Nothing else.
25        Thank you.

Page 189

1        MR. RASKIN:        No waiver.
2        (Thereupon, Plaintiffs' Exhibit 15 to
3        the deposition of OFFICER WILLIAM JASON
4        MILLER will be provided and marked for
5        identification.)
6        ---
7        (DEPOSITION CONCLUDED.)
8        ---
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 190

```
 1    I have read the foregoing transcript from Page 1
 2    through 189 and note the following corrections:
 3    PAGE    LINE            REQUESTED CHANGE
 4
 5
 6       .
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20    _____
                 OFFICER WILLIAM JASON MILLER
21        Subscribed and sworn to before me on the ____ day
22    of _____, 2018.
23
24    _____
                 Notary Public
25        My commission expires: _____.
```

Page 191

```
 1             CERTIFICATE
 2    State of Ohio,     ) SS:
 3    County of Cuyahoga. )
 4       I, Kristine M. Esber, a Notary Public within and
      for the State of Ohio, duly commissioned and qualified,
 5    do hereby certify that the within-named witness,
      OFFICER WILLIAM JASON MILLER, was by me first duly
 6    sworn to tell the truth, the whole truth and nothing
      but the truth in the cause aforesaid: that the
 7    testimony then given by him was reduced to stenotypy,
      and afterwards transcribed by me through the process of
 8    computer-aided transcription, and that the foregoing is
      a true and correct transcript of the testimony so given
 9    by him as aforesaid.
10       I do further certify that this deposition was
      taken at the time and place in the foregoing caption
11    specified.
12       I am not, nor is the court reporting firm with
      which I am affiliated, under a contract as defined in
13    Civil Rule 28(D).
14       I do further certify that I am not a relative,
      employee or attorney of either party, or otherwise
15    interested in the event of this action.
16
17       IN WITNESS WHEREOF, I have hereunto set my hand
      and affixed my seal of office at Cleveland, Ohio, on
18    this 29th day of August 2018.
19
20
21    _____
      Kristine M. Esber, Notary Public
22    in and for the State of Ohio.
      My Commission expires November 29, 2020.
23
24
25
```

**A**

**a.m** 1:20
**ability** 5:10 22:4
84:24 146:20
150:11 162:18
178:12
**able** 26:13 58:1
58:20 61:23
63:23 74:8
88:24 98:18
99:14 100:22
100:25 139:1
171:5 175:10
175:23 176:24
177:9
**Absolutely** 11:10
11:16 114:22
181:4
**academy** 40:15
**accelerator**
84:24
**acceptable** 74:25
**access** 134:24
158:10,13
**accessed** 96:2
**accessible**
136:20 137:3
**accident** 118:14
146:3
**accidents** 25:12
25:23 26:5,9
26:13
**accuracy** 81:18
**accurate** 9:1
21:6,7 28:17
81:8 86:18
123:11
**acknowledge**
80:6
**acknowledged**
76:10
**acquiesces**
141:18
**act** 12:24 102:22
**action** 4:22
26:17 95:3

101:21,25
191:15
**actions** 43:23
69:1 84:10
110:7 112:4
113:3
**active** 111:9
113:16 114:12
**actively** 148:25
**actual** 58:2
74:22 96:9
**Adam** 1:4 2:8
4:11 116:6
**added** 104:16
**addition** 58:7
**address** 52:24
137:12 138:1
155:14
**addressed**
118:21 119:10
119:13 136:20
137:1 144:3,5
**addressing**
174:18
**administer** 90:9
**administering**
90:16
**administrative**
16:21 17:3
110:19,22
111:2 115:2
**Administrator**
1:4 2:8 4:11
116:7
**Admiralty** 23:12
**adopted** 117:1
117:24
**advised** 114:1
**affiliated** 191:12
**affixed** 191:17
**aforesaid** 191:6
191:9
**afraid** 73:16
100:25
**agencies** 155:6
**agency** 155:4
**agent** 8:17 12:6

54:6 55:3
59:13 63:21
**ages** 86:1
**ago** 29:13 143:8
**agree** 21:16
64:13 66:2
78:6 107:9
174:2 181:13
183:3 186:8
187:16,23
**agreed** 123:17
141:24 148:15
**agreement** 1:17
83:24
**ahead** 40:25
43:6 46:21
188:11
**aid** 90:9,16
**air** 73:10 79:22
**aisles** 125:21,24
**al** 1:4,7 4:12,12
**alive** 89:23
**allow** 135:19
**allowed** 154:3
**allowing** 44:12
**alteration**
104:11
**alternative**
145:4
**alternatives**
144:4
**Amanda** 2:2
56:16 59:5
**amount** 126:8
171:21
**and/or** 139:7
177:16
**angle** 173:13
176:20
**animated** 87:1
106:12
**annoying** 112:20
**answer** 5:10,15
12:12 13:7,11
15:7,11 16:12
16:17 17:6,8
17:23 18:10,16

19:5,12,16
25:6 28:20
53:9,23 54:21
57:17 65:9
76:15,16 77:13
87:5 102:23
107:19 111:8
114:23 116:16
117:13 119:6
120:19,23
121:21 134:1
134:13 156:2
156:19 160:2
161:14 169:25
174:4 180:4
186:16 188:10
188:11
**answered** 10:13
19:11 117:12
156:18
**answering** 15:13
**answers** 10:24
172:2,12
**anybody** 13:1
56:21 57:8
62:3 91:14
92:13,17 148:7
158:16
**anymore** 159:22
188:10
**apart** 72:19,21
72:22 100:3
162:24
**apologize** 114:18
168:8
**apparatus** 133:5
**appear** 32:16
103:24 104:22
105:9
**APPEARANC...**
2:1
**appeared** 100:5
**appears** 8:14
16:24 72:9
77:16 103:17
105:13,23
**applicable** 12:23

101:20
**application** 14:1
26:12 44:16
**applied** 100:25
145:15
**apply** 43:21
116:12
**appreciate** 7:16
11:7 12:15
13:3 34:22
88:3 92:13
164:25
**approach** 187:9
**approached**
59:14 61:9
62:7 63:23
64:5 71:9 75:4
76:6 137:3
**approaching**
42:18 43:15
61:21 63:25
72:12 84:2
136:4,18 137:1
147:16 174:17
**approximate**
153:10 170:12
**approximately**
18:4 54:7 65:7
96:19,23 97:3
97:6 165:16
**area** 23:11 86:9
91:4 95:5
96:21 97:9
99:9 105:18
106:13 123:18
123:24 186:3
**areas** 116:9
**arm** 87:2,24
104:14 105:13
105:14,17,20
175:3
**arose** 162:3
**arrest** 122:16
123:22 151:16
**arrested** 152:12
**arrived** 19:1
25:3 90:23

91:2
**aside** 117:8
159:11
**asked** 4:25 9:7
13:9 14:21
19:11 26:24
49:13 53:14
87:4 89:23
116:20 117:12
117:15 118:10
130:13 136:3
139:24 144:14
150:16 154:18
156:14,17
159:3,4 160:5
169:5 177:10
178:16 182:23
188:5
**asking** 16:9
39:12 58:19
63:22 69:12
72:5 75:15
77:22 87:6,22
102:1 107:9
132:23 140:8
145:10 148:3
171:17 182:7
182:20 185:16
185:21,21
186:12,15
187:16
**assault** 110:2
**assaulted** 109:21
**asserted** 11:4
**assigned** 37:4
38:3,6 48:7
49:18 50:17
120:11 155:4,6
157:5
**assist** 175:10,12
**assistance** 44:6
94:2
**association**
154:12
**assume** 5:9
17:18 91:16
99:18 105:3

140:5 170:8
175:5
**assumed** 12:22
125:21
**assuming** 125:4
125:12 135:16
165:23 184:21
**astonished** 23:18
**attach** 63:4
**attached** 147:6
**attacking** 81:14
83:5
**attempt** 97:12
144:7 147:8
**attempted** 96:20
97:14 98:2,23
118:18 149:22
**attempting** 99:7
108:8
**attend** 40:12
**attention** 79:13
124:8
**attorney** 4:21
6:22 191:14
**attrition** 162:4
**audio** 7:5 58:7
138:20 140:14
140:24 145:7
147:21,24
148:19 156:15
158:7 166:13
175:10,15
184:8
**August** 1:11
6:10,11 191:18
**automatically**
83:12
**available** 30:21
94:4 158:11
**avoid** 102:8,18
**aware** 15:19,21
41:21 42:4
56:24 61:5
62:22 81:22
86:3,12 93:13
93:25 116:5
129:19 143:20

157:1 179:17
**axis** 169:11

―――――――――――
**B**
―――――――――――
**B** 27:12,13 42:2
44:4 46:4,5,6,7
46:8
**back** 9:16 24:22
24:25 26:21
27:3,18 28:13
43:8 45:2 46:4
47:5,6 49:10
51:15 54:1
62:13,14,16
64:7 66:13
70:16 73:16
75:2 79:15
81:19 85:15,21
86:5,7,9,19
91:6,9,15
95:24 96:1
100:3,25
103:22 104:23
106:13 107:3,6
107:12,14,24
108:2 111:22
114:24 118:7
118:16 119:2,8
121:23 140:19
146:16 154:2
162:5 170:10
185:12
**backed** 76:25
**background**
65:3
**backing** 110:3
**backward**
135:19
**badge** 119:25
**bail** 65:16 146:7
**bailed** 25:5
**bailing** 181:18
181:25 182:17
**bails** 182:5,8,12
**BARBERIC**
1:22
**based** 29:9 48:12

48:17 95:17
102:20,24
119:7 187:18
**basic** 145:13
**basically** 46:8
52:6
**basics** 112:14
**basis** 50:22
**BCI** 7:3,6 9:16
54:1 106:11
138:19 150:19
156:16 157:22
158:1
**began** 63:24
77:4,24 94:12
170:24
**beginning** 36:25
39:3 71:14
140:17 165:17
166:14 170:23
**begins** 64:19
**begun** 109:24
113:22
**behalf** 2:2,8,14
2:20
**believe** 8:23
11:23 13:25
20:25 24:18
43:19 66:19
93:12 115:20
117:7 119:14
122:22 129:1
131:10 133:15
133:16 138:4
138:13 141:3,9
143:9 150:14
159:5 169:10
175:13 178:19
181:2,6
**believed** 67:1
126:8
**belt** 63:4 131:21
132:5 133:22
155:20,23
**beneath** 34:17
35:4 135:14
**benefit** 142:16

**bent** 108:16,17
108:19,19,20
108:24
**berm** 131:16
168:1 170:14
170:19,24
171:3,3
**best** 5:10 8:25
116:8,10
122:17 130:3
**better** 20:1
125:13
**bit** 49:10 50:4
79:8 87:6
93:12 107:22
116:11 119:10
135:5
**black** 24:3
**blade** 80:19
**blank** 33:24
**bleeding** 89:2,4
**blended** 49:1
**blew** 23:14
**block** 1:22 65:15
126:16,25
135:11 150:11
177:11 181:14
**blocking** 108:13
126:14 127:4,9
127:10 150:3
**body** 80:19
107:19 134:24
**bogged** 49:16
**borrowed**
152:24
**Boston** 23:10
97:1
**bother** 11:14
**bottom** 10:24
167:1
**box** 25:21 76:25
**boxes** 17:18 18:4
**BP** 23:23
**break** 5:13,16
45:7 63:15
113:18 114:17
116:17 156:8

breaking 21:8
   51:19
breathing 88:16
   88:21,25 89:8
bridge 134:23
bring 51:16
   89:17 130:9
bringing 51:14
   51:20 146:15
broad 81:7 87:6
broadest 18:24
brought 87:23
   87:25 142:15
   154:2
BSing 158:17
bubble 29:7
building 2:5
   155:13,14
built 48:20
   102:24
bulletproof
   119:25
bullets 163:12
bumper 73:18
bureau 8:17
   48:9 49:17
   54:6 153:18
   157:13 158:18
business 7:1
bust 120:16
   123:15
butt 134:24
button 133:6,9
   135:14,17,18
buttons 133:4
buy 120:16,22
   121:1,6,19
   122:8,14,16
   123:14,16,20
   123:23,25

C

C-A-D 153:20
cable 147:4
CAD 55:8
   153:20
call 25:25 40:11

40:20,22 46:9
82:14,16 83:8
83:18,25 91:14
124:9 139:25
140:1,3 141:5
141:25 142:21
144:9,12,16
145:1,4,11,13
145:15,18,22
145:23,24
147:11,14,22
148:1,3,21,24
152:17 153:24
175:24 181:21
181:24 182:4,6
182:8,12 188:1
called 1:14 4:2
   21:10 22:16
   24:23 31:13
   82:25 97:4,10
   97:19 98:10,11
callers 150:17
calling 141:10
   142:1 146:11
   147:15
calls 18:20 56:15
   58:2,4,5,9
   111:21 140:19
   150:17 151:13
   151:18,19,22
   152:2 153:25
   154:6,13,14,15
   154:17,19
calm 91:3
cam 55:5 71:22
   165:9
camera 165:24
   173:13 176:20
cams 7:8 158:23
cancelled 144:8
canine 6:7
capable 134:6
capacity 121:7
caption 43:13
   116:3 191:10
captioned 17:14
   42:2 46:23

capture 103:17
car 23:8,15 25:4
   25:5 65:5,8,15
   66:11,12,16
   73:17 78:23
   83:11,11,13,14
   87:20 96:1
   118:15 119:1
   124:6,15 126:2
   131:11,11
   145:9,12,13,17
   145:18 146:22
   146:23 147:23
   147:23 148:1,2
   149:3,8,24
   165:11,11,13
   169:5 170:1,11
   170:18,22
   171:1 177:1
   179:12 183:18
   184:23 185:3
   188:17
car's 170:8
career 6:14 29:4
   34:6 36:25
   37:14,16,25,25
   38:5
carry 91:24 92:4
   92:9 132:16
carrying 132:22
cars 83:12
   126:15 165:11
   183:6,9,13
case 1:6 4:13,15
   7:19 10:11
   12:11,13,19
   13:3,5,5,13,16
   44:13 60:5
   102:15 119:11
   120:13 121:9
   121:22 123:3
   124:25 129:5
   132:7 145:24
   159:3 161:2
   162:15 185:14
   188:1,8,13
cases 163:15,23

187:24 188:20
cash 126:8
caught 79:25
   80:1
causality 21:22
cause 191:6
caused 26:14,18
cautions 56:25
caveat 116:14
Caxton 2:5
CD 153:18
Ceased 118:3
cell 91:13 92:9
   92:14,18
   152:24
center 167:24
certain 48:13
   49:4 105:3
   118:17
certainly 35:1
   86:18 141:19
CERTIFICATE
   191:1
certified 4:4
certify 191:5,10
   191:14
cessation 118:9
chain 34:12
chance 6:19,22
   7:10 8:8 32:13
   41:13
change 9:4,18
   10:21 118:9
   127:4 178:13
   190:3
changed 29:3,6
   29:9 123:25
   124:9 125:18
   159:17
changeup
   126:22
chaos 89:2
characteristics
   29:8
characterization
   104:13
charge 30:4 60:3

60:6 124:1
141:16 145:2
Charles 8:17
   37:25 54:6
check 17:18,24
   18:22 89:23
checked 18:4
   25:22 153:20
chief 13:25,25
   14:3 15:22
   27:9 32:6
   34:15,17,24
   35:1,8,8,10,15
   35:18,19,19
   36:7,13 37:1
   38:1,1,18 39:2
   39:3,9,9 53:15
   53:16 111:7
   115:10,11
   153:12 157:18
   158:5
Chief's 155:17
chiefs 34:17 35:2
   35:4,20
child's 86:14
children 62:13
   82:3 85:15,20
   85:22,23,25
   86:12
choice 183:20
chose 146:5
   185:1
chronological
   16:25 180:14
circle 52:22,23
   52:25 53:3
circumstance
   44:16
circumstances
   137:21 187:4
city 1:7 2:14
   4:12 6:2,9,14
   14:22 15:15,19
   16:22 28:12,14
   28:23 34:6
   35:10,22 36:3
   36:6,8,12

37:10,20 39:22
41:17,22 42:5
44:21 47:1
91:16,16,23
92:2 113:5
117:1,24 121:4
**civil** 1:15 4:22
101:11 191:13
**clarification**
179:9
**clarify** 119:20
122:2 140:10
147:2 148:13
157:4
**clarifying**
120:15
**class** 100:13,20
**classes** 100:15
**classroom** 74:20
**clear** 5:7,20
39:15 69:1
79:25 99:20
109:18 177:22
178:23
**cleared** 91:9
**clearly** 60:22,22
66:17 81:11,17
82:5 110:2
139:3
**Cleveland** 1:23
2:6,11,17,22
124:2 191:17
**click** 165:13
**clicking** 165:15
**client** 114:1
**clip** 133:9
165:15 174:5
176:8
**clock** 48:24
168:18
**close** 39:2 44:12
66:4 81:2,6
82:5,10 90:25
153:15 157:16
163:16,24
171:3 183:6,8
183:10,12,15

183:22 184:19
**closed** 109:20
137:23
**closer** 62:9 64:5
85:16
**clothing** 119:22
**collaterally**
160:19
**collective** 30:9
**column** 17:13,14
18:3 25:17,21
**columns** 17:13
17:25
**combination**
21:11
**come** 25:9 43:23
44:18 81:16
83:6,7 84:1
87:14,18 99:11
100:2 118:16
127:15 134:23
143:21 147:17
151:22 152:14
152:21 154:13
154:15 158:6
162:5 164:12
**comes** 79:19
101:5 112:23
117:23 142:23
148:2
**comfortable** 8:7
123:19
**coming** 72:21,22
76:1 81:23
87:12 89:19
91:19 114:24
**command** 34:12
**commands**
79:17,20,21
80:2 146:12
147:4 180:20
180:22 181:3
**commencing**
1:19
**comment** 11:3
164:22
**commission**

190:25 191:22
**commissioned**
191:4
**common** 42:12
**communicate**
106:14 146:20
148:16
**communicated**
60:9
**communicating**
184:7,15
**communication**
145:3
**communications**
114:5 140:23
182:9,10 184:8
**community** 6:17
**compelled**
101:25 102:22
**compile** 18:21
**complaint** 5:1
114:1
**complete** 30:21
38:8,10 58:3
127:17
**completed** 29:15
30:16 31:5,18
33:16 36:24
38:12 71:4
**completely** 73:1
73:4
**completes** 29:23
29:25
**completing** 29:2
30:24
**compliance**
101:6 146:13
**compliant** 21:12
44:1 45:1
118:12 143:21
146:3 147:17
**complied** 82:17
84:1 145:21
**comply** 44:14
146:12
**comport** 19:2
25:22 35:2

106:6,18
**comports** 105:19
**compromised**
162:18
**computer** 29:17
164:4
**computer-aided**
191:8
**computer-based**
33:2
**concern** 89:1
162:6
**concerned** 11:21
61:17
**concerning** 4:23
13:17,21 35:20
36:14 37:14
47:2 53:16
55:20
**concerns** 160:25
161:1
**CONCLUDED**
189:7
**condition** 73:12
147:13
**confer** 30:23
**conference**
108:9
**conferred**
142:13
**confidential**
121:2,10
**confirmed** 42:18
43:15
**conflict** 50:13
**conjunction**
116:22
**Connard** 2:2
**Connolley** 124:3
124:24 125:25
127:13
**consider** 85:4
94:24
**consistent** 180:3
181:20 186:4
187:23
**constitutes**

18:22
**constraints** 31:3
49:13
**construction**
133:17
**consultation**
16:15
**consultations**
15:9
**contact** 24:14
25:9 65:19,24
67:6,18 68:8
68:18,19,22,25
69:5,19,21
70:1,8,14,18
71:3,8 73:6
76:11 77:7,10
77:20 97:10
98:18,22 99:1
99:13,14,23
107:13,21
130:14,18,21
130:23,25
131:5,12 138:5
149:16,18,22
149:24 150:5,6
150:8 169:5,17
**contacts** 70:10
**contained** 33:3
36:16 47:3
**context** 74:7
**continue** 81:14
90:16 95:8
146:19
**continued** 24:16
64:20 146:13
162:19 170:22
**continuity** 165:3
**contract** 191:12
**control** 106:12
146:15 159:12
159:13 168:4
**controlled**
123:15 147:18
**conveniently**
127:5
**converge** 24:9

**conversation**
77:12 141:2,22
142:14,16,19
157:10,17
158:4 186:18
**conversations**
56:2,10,21
57:1,10,14,14
57:22 59:4
91:20 158:25
**coordinate**
91:19
**copy** 42:25
**correct** 5:2 6:3
6:17 8:18,21
11:17 12:1,3
14:9 15:3,4
21:17 27:4
31:5,6,10,16
31:20,22,23
32:1,14,18,21
32:24 33:16,17
33:24 34:17
38:19 39:14,23
39:24 41:19,20
42:19 43:16,17
44:19 46:24
54:8,12 57:6
60:2,3,7,10,23
61:7,17,18,20
64:3,8,11,16
64:17 65:6,18
65:21 66:6,22
66:23,25 67:3
67:7 68:14,15
68:20 69:18
70:3 71:17,20
71:21,23 72:15
72:16,22 73:1
73:4 74:25
75:8,10,11,12
78:4 79:3
82:10 83:19,25
84:1,3,4 85:8
91:10 92:23
93:3,9,10,12
93:13 94:5

96:11,12
105:21 106:3
107:13 108:14
108:15 109:3,6
113:7 118:19
119:18 120:5
121:11,24
125:1 127:21
129:2 131:22
132:17 134:20
135:3 136:6,16
138:22 139:8
139:14 140:21
140:25 141:3
141:14,16
142:22 148:10
148:17 149:25
155:11 156:23
157:2 163:3,6
163:9,13,25
166:15 169:2,9
169:18 170:6
170:21 171:9
174:8,18,22
175:4,16,19
176:10,22
180:24 181:15
181:18,22
182:13,18
183:1,1,2,9
184:24 185:4,8
185:15 186:11
187:6,11,14
191:8
**corrections**
190:2
**correctly** 42:17
43:12 68:2,10
87:10
**counsel** 1:18
10:10 11:5
15:10 16:15
54:23,25
116:16 179:18
180:10
**counseled** 113:1
**counseling**

111:25 112:2,3
112:6 113:8,11
113:23 114:7
115:14 161:13
**counting** 173:20
**County** 23:22
191:3
**couple** 17:12
18:23 23:6
111:17,20
130:12 165:18
181:9
**course** 166:14
**court** 1:1 4:14
52:7 138:9,9
191:12
**cover** 33:9
**covered** 96:14
101:23 116:9
117:7
**CPR** 90:3,6
**crack** 123:16
**crash** 18:21
20:22 118:4
**crashed** 21:23
21:25 22:3,7
22:15 25:4
**crashes** 21:13
**crashing** 21:4
**create** 146:10
**creating** 101:22
**Criminal** 8:17
54:7
**criteria** 19:13
33:9
**critical** 113:6
**cross** 146:10
**CROSS-EXA...**
3:3 4:18
**Crown** 24:5
**cruiser** 7:8 25:17
26:1,12 55:4,5
63:24 64:25
82:14,25 95:22
104:19 112:18
178:6 180:25
**cruisers** 26:14

26:19 82:18,19
82:21,22 139:1
**crying** 86:14
87:3 106:15
**current** 6:5
**currently** 38:1
48:14 131:22
**curriculum**
101:19 102:20
102:24
**curve** 49:20 63:6
**custody** 146:17
**Cuyahoga** 191:3

―――――――――

**D**
**damage** 26:14
26:18
**danger** 81:13
182:25 188:3,8
**dangerous** 50:5
**dash** 7:8 55:4,5
71:22 158:23
165:9
**database** 158:12
**date** 1:20 132:6
140:14 171:12
**dated** 47:14
54:14 63:21
**dates** 162:24,24
**day** 1:20 7:17
66:16,18 67:15
68:5 91:19
111:17 120:17
120:24 123:14
157:1,12,14,14
180:18,24
190:21 191:18
**day's** 27:3
**daylight** 157:13
157:14
**days** 100:22
111:5,17
**de-escalation**
100:9,15,19,20
101:13,16,19
102:2,8,16
**deadline** 30:18

**deadly** 11:24
14:8 111:1
160:6,11 188:3
188:19
**dealing** 44:2
173:18
**Deceased** 2:8
**decide** 48:13
**decided** 71:15
81:2 82:9
110:4
**decision** 81:5
183:11
**deer** 26:11,12
**defeated** 135:13
135:13
**defeating** 134:15
**Defendant** 1:14
4:2
**Defendants** 1:8
2:14 165:6
172:18 178:7
**defense** 179:10
**define** 21:21
46:8 95:6
108:17,24
118:2 119:22
**defined** 191:12
**definition** 18:25
94:22 118:11
**definitively** 19:5
**deflate** 100:6
**deflated** 72:15
73:9
**deflating** 72:20
**degrees** 168:19
169:6
**demands** 31:3
**demonstrate**
108:8
**demonstrating**
74:24
**demonstration**
74:20
**department** 1:18
6:2,6,9,17
13:17,21 16:23

17:9 34:7,16
37:10 41:23
56:25 91:7,10
93:15,22
111:23 122:15
150:22 151:19
152:2,9 154:3
155:7 160:25
161:5
**Department's**
15:16
**depend** 119:4
**Depending**
83:11
**depends** 34:19
102:23 142:10
162:14
**depict** 104:19
**depicting** 167:4
**depiction** 86:18
**depicts** 169:21
170:6
**deploy** 95:20
**deployed** 97:16
97:20 130:20
**deployment**
131:14
**depo** 173:9
**depos** 179:7
**deposed** 4:4
**deposition** 1:10
1:13 4:9 5:5
6:20 7:2,24
8:13 9:9 16:3
27:9 32:6 41:3
45:25 46:14
54:2 103:9
161:1 165:3
172:1 179:19
189:3,7 191:10
**depositions**
159:15 165:4
172:16 173:1
**depress** 134:22
**depressing**
135:17
**deputized** 12:6

**deputy** 34:17
35:2,4,8,19,20
153:12 157:18
158:5
**descent** 25:2
**describe** 134:12
**described** 28:7,7
46:7 70:7,22
173:7,11
**describes** 29:7
159:9
**describing** 44:10
44:10 68:24
69:10
**designated**
25:17 106:17
165:8
**designation**
171:12 172:23
**designed** 185:16
**desire** 111:9
**desk** 48:12,15
52:6
**details** 22:19
112:24 123:5
153:9
**detect** 88:24
**Detective** 123:1
127:15
**determination**
19:2
**determine**
145:14
**determined**
183:4
**developed**
111:15
**device** 138:15
**Devon** 2:2
156:15 159:1
**difference** 12:14
**differences**
34:23
**different** 18:23
27:21 29:6
106:24 115:10
132:15 148:4

149:21 166:14
188:6
**difficult** 49:2
51:19 100:24
**difficulty** 49:7
49:10 50:7
**digital** 58:1
**digitally** 57:24
**dip** 25:2
**dipped** 81:15
**direct** 10:15
21:22 146:14
159:12
**directed** 10:11
153:12
**direction** 41:24
76:6 105:24
107:8 126:1
**directly** 53:16
107:10 128:6,9
128:12,22
139:19 160:20
184:23
**disagree** 161:4
188:21
**disagreements**
50:12,18,23
**discharge** 129:1
130:4 160:18
162:16
**discharged**
130:1 144:6
160:8,12
175:16 176:9
176:17 179:25
**discharges**
163:12
**discharging**
161:18 175:23
180:22
**disciplinary**
27:24
**disciplined** 28:9
**disclose** 15:8
54:23 114:5
**discovery** 10:2,9
179:11

**discretion** 111:6
**discuss** 31:19
36:7 37:21
39:5
**discussed** 6:21
52:1
**discusses** 41:23
**discussing** 48:4
49:23 51:6
52:1,17 53:7
59:13 166:12
182:4
**discussion** 9:12
30:4 48:1
50:15 51:22
53:5 142:6
143:9,24
144:11,25
145:3,22 153:5
153:8 164:19
166:21 182:3,7
183:21
**discussions**
16:14 53:10
144:10,15
**disengaged**
137:16
**dismissed** 12:11
12:17,20
**dispatch** 140:14
140:24 142:24
151:21,22,25
153:25 155:3
155:13
**dispatcher** 50:17
56:5 154:18,20
154:25 155:9
**dispatchers** 50:1
50:6,24 154:13
154:22 155:2,5
**distance** 66:9
85:12,14 97:23
98:3 101:22,24
102:13,22
170:13
**District** 1:1,2
4:14,14

**division** 1:3
122:16 123:22
**divvy** 126:9
**document** 8:4,6
17:5,18 28:6
41:15
**documents** 6:23
165:5,7 172:20
173:12 178:10
**dog** 18:20
**doing** 36:19
38:16 44:11
48:21,22 50:3
50:16 51:13
55:25 74:11,22
90:3 111:22
112:21 147:25
159:19 174:10
**domestic** 42:15
**door** 24:3 60:14
63:7 64:2,7,10
64:14,15 65:8
65:16,20 66:10
66:13 71:16,18
72:1 73:17
75:9,18,19,25
76:1,2 78:10
78:15,21 79:2
79:5,11,14,18
79:19,22
103:19 104:8
105:5,8,10,15
105:21 106:3,8
106:20,20
109:1,12,19
110:14,17
129:25 136:9
136:11,19
137:23,24
139:6,14,15,16
149:23 150:3
155:22 168:25
169:8,8,21
174:17,21
175:2 177:5,17
181:15 182:16
185:13

**doorway** 128:1
**doubt** 159:19
**downhill** 25:2
89:25
**Drake** 97:1
**draw** 64:21
109:24 128:19
**drawing** 103:24
**drawn** 128:15
**drink** 103:4
**drive** 2:22 22:4
165:7 170:1,4
172:7,8,17
177:11,23
178:2
**driven** 130:15
136:4 149:4
169:1
**driver** 20:17
21:22,24 22:7
44:7,17,22
45:4 60:21
61:24,25 62:5
62:11,22
105:13 121:14
121:18 127:15
127:16,18
152:12 181:17
181:25 182:17
**driver's** 60:14
61:20 62:1
64:2,7 65:16
65:20 66:10,13
85:13 99:17
103:18 104:14
104:14 105:12
106:6,17,20
107:13 129:25
149:23 169:1,7
169:8,21 171:1
176:21 181:15
182:15 185:13
**driving** 23:15
92:23 93:8
104:20 112:15
124:4 125:24
170:19

**drop** 81:19
106:13
**dropped** 13:4
**dropping** 180:17
**drops** 81:18
**drove** 76:17
124:5
**drug** 74:12
119:16 121:10
123:3
**due** 31:3
**duly** 4:3 191:4,5
**duties** 25:13
113:9
**duty** 92:4,10
93:21,24 111:9
113:16 114:12
131:21 132:5
**dynamic** 74:13
74:16 126:12

**E**

**e-mail** 57:23,24
**e-mailed** 153:3
**earlier** 53:9,14
54:2 115:2
145:11 169:5
**early** 14:21 15:2
15:16,20,21
37:25 38:5
56:16
**easier** 130:10
164:4,6
**easiest** 164:16
165:2
**EASTERN** 1:3
**easy** 158:15
**effect** 101:20
110:20 137:24
137:25 162:12
178:21 182:5
182:11
**effectuating**
117:2 186:5
**effectuation**
186:25
**efficient** 49:21

**effort** 94:4
**eighteenth**
150:24
**either** 20:22 21:4
22:2 35:17
78:11 94:19
104:13 121:17
150:18 157:12
171:21 179:24
183:13 191:14
**elbow** 66:19
**electronic** 29:11
29:12,16
**email** 2:7,12,18
2:23
**Emerald** 2:22
**employ** 183:4
**employed** 6:1,8
119:14
**employee** 191:14
**empty** 146:19
**EMS** 89:4 90:17
90:23,25 91:2
**encompasses**
171:22
**encountered**
99:24
**encounters** 98:1
**ended** 24:10
25:6 65:19
126:21
**enforcement**
6:14 98:20
125:15
**engage** 75:20
81:21 110:4
137:22
**engaged** 63:2
81:17,24 82:2
96:16 98:8
107:8
**engagement**
100:16 109:19
**engine** 69:2
84:15,15,18
85:6
**enhanced** 15:21

**enter** 104:10
**entire** 6:13 8:4
9:6 99:22
178:16 179:1
**entirety** 60:7
99:3
**entries** 17:13
**entry** 16:25 17:1
153:20,22,22
**environment**
21:10 147:18
**Esber** 1:16 191:4
191:21
**escalates** 118:19
**escape** 76:10
149:1 150:12
**ESQ** 2:4,9,15,21
**essentially** 34:20
42:11 73:18
101:5 107:20
108:20 126:15
126:16
**Estate** 2:8 116:7
**estimate** 65:10
170:16
**et** 1:4,7 4:11,12
**evaluation** 29:15
29:24 30:5,7,9
30:25 31:5,15
31:17,19 33:15
33:19 35:21,21
36:2,15 37:15
37:21 38:8
39:5 47:16
**evaluations**
28:25 29:3
31:10 32:6,16
34:2,10,13
36:23 38:21
47:8,11
**Evans** 2:3,3,8
60:22 61:14,15
64:2,14 66:21
69:23 75:10,18
76:3,5,17,25
77:3 78:11
79:1 80:16

81:6 82:25
84:10,19 85:11
85:14 86:22
87:9,16,17
88:7,16,23,25
89:11,15,19
90:10,17 91:1
93:2,5 95:1
98:23 106:1,7
108:13,16
109:10,19
116:7 130:7,15
130:19 131:6
136:5,24 139:2
149:4 160:16
162:22 163:25
167:25 169:1
170:20 174:17
176:22 177:11
187:24 188:1
188:13
**Evans'** 71:15,19
76:19 78:21
79:5 80:9 87:9
99:21 105:14
105:20 106:6
106:19 107:12
109:2,8 138:4
155:19 167:8
169:5,11,16
170:13 177:15
179:23 180:9
180:16 183:23
**event** 22:21
55:20 60:7
82:20 110:20
157:15 191:15
**events** 4:23 54:8
113:24 180:12
182:21,22
**eventually**
146:14
**everybody** 24:7
24:9 82:21
92:2
**evidence** 57:16
149:6 153:14

evolved 50:14,15
  124:12
evolving 111:19
exact 20:9 104:2
exactly 25:6
  49:21 61:2
  62:12 94:8
examination
  1:14 4:2
exception 133:6
exchange 79:22
exchanged 83:16
  83:20
exclude 151:15
excluding
  151:25,25
Excuse 42:21
  45:8 108:6
  146:25
execute 141:4
executed 120:24
executing 185:7
execution
  185:24
exhibit 7:22,23
  8:15 9:8,21
  11:1 15:25
  16:2,7,10
  25:16 26:22
  27:8 32:8,17
  32:20,23 41:2
  41:7,14 42:1
  42:23 45:24
  46:4,7,13,17
  46:23 47:3
  51:4,7,25 53:6
  54:10 59:11
  67:15 103:8,13
  106:18 165:9
  171:25 172:11
  172:13,24
  175:24 176:7
  179:2 189:2
exhibits 3:9
  32:14 33:4,22
  33:23 34:11
  36:16 47:7

53:11
exist 44:20
existed 17:11
existence 157:1
exists 45:3
exit 24:19,25
  59:24 60:10
  127:1 170:2
exited 60:13
  63:24 65:23
  110:1 126:24
  149:2 170:6
exiting 59:24
  66:11 71:5
  72:25 147:9
  175:22 176:8
  176:16
exits 82:18,21
  95:10
expandable
  147:3
expectation 49:3
  80:2
expected 29:8,8
  38:24 55:22
  70:22 84:16,24
expecting 70:21
  95:7,19 123:16
  127:15
experience
  137:24 142:17
  154:14 162:2
experienced
  26:25 154:16
expires 190:25
  191:22
explain 111:12
  112:2 125:10
extended 175:3
extent 11:2
extra 49:5,8
extract 126:11
extracted 125:16
  127:14 128:13
  129:24
extracting 86:21
  88:19

extraction 74:16
  126:13 127:12
  128:19
extractions
  74:13
extremely 83:4
  87:1

_____

**F**

F 2:4 124:4
face 76:3 80:18
  106:2,10,16
  107:22
faced 106:11
FaceTiming
  184:13
facility 151:3
facing 106:12
  108:21
fact 13:5 24:14
  31:14 50:14
  62:25 119:13
  123:10 132:15
  144:15 154:7
  158:24 170:10
  180:9,17 183:8
  187:25
failure 113:6
fair 5:11 12:10
  14:12 15:22,23
  20:3 27:7 39:9
  65:17 66:7,13
  71:6,10,11
  90:14 92:21
  94:21 109:10
  117:4 118:23
  120:2 132:22
  134:18,25
  135:24 136:10
  137:4 152:15
  152:19 162:8
  162:13,24
  168:14 170:8
  174:15 176:18
falling 72:19,21
  135:12
familiar 40:2

41:14 50:6
  57:4 132:15
  135:5 136:1
  140:1 166:2
  185:10,23
familiarize 32:9
far 61:16 65:7
  65:10 85:10
  97:18 150:12
  161:4 170:24
  171:5
farther 81:18
fast 23:15
  100:16 138:4
  138:15
Faulkner 2:21
favor 131:20
FAX 1:24
FBI 120:11
fear 78:25
federal 1:15 12:6
feds 74:11
feel 21:6
felony 40:20,22
  42:19 43:15
  46:9 82:14,16
  83:8,18,25
  139:25 140:3,4
  141:4 144:9,12
  144:16,25
  145:4,11,13,15
  145:18,22,22
  145:24 146:2
  147:11,14,22
  148:1,3,21,24
  181:21,24
  182:4,6,8,12
  188:1
felt 49:12 79:22
female 64:21
fence 25:10
Fender 35:15,18
  38:1,6,6
Fender's 36:25
  39:3
fewer 19:23 20:5
  26:8

field 124:5
figure 49:20
figured 130:9
file 58:1
filed 4:23
files 17:18 58:3,7
  140:25 165:12
fill 53:3
filled 30:5,14,14
  38:2 39:10
filling 52:22 53:4
final 67:21 69:10
  70:7 165:11
finalize 162:22
find 19:8 89:24
  90:10 111:21
  162:17
finding 89:3
fine 13:2 63:17
  88:3 116:16
  156:6
finish 179:1
fire 81:5 85:7,17
  146:10 160:20
firearm 129:2
  130:1,4 132:16
  133:22 134:6
  135:10,19
  136:20 137:2
  144:6 160:8,12
  161:19 163:13
  174:3,8,18
  175:3,23
  180:22
firearms 100:16
  129:20
fired 62:17,21
  63:10 72:2
  80:16 88:6
  122:17 124:16
  138:6 175:11
  175:18 178:20
  179:23 180:8
firing 124:18
firm 2:4 191:12
first 4:3 11:21
  16:25 18:24

59:18,22 60:19
62:16,21 63:10
65:1 68:2 72:1
72:18 78:23
80:16,25 84:8
84:16 85:21
86:5,9,13 90:9
90:16 96:20
97:4,14,18
98:24 107:3
112:5 122:18
130:12,18,23
130:25 131:5
131:11,13
134:7,16 135:2
135:10,11
152:4,6 160:18
165:15 174:12
178:16 181:3
183:14 191:5
**fits** 20:1
**five** 22:13 25:21
122:10,21
155:5 162:23
162:25 165:10
**flip** 164:4
**fluid** 89:16
**focus** 40:8 89:3
126:7
**focused** 76:8
**follow** 181:10
184:2
**following** 19:1
47:10 71:12
110:20 115:1
123:25 125:22
157:12 190:2
**follows** 4:5
**foolish** 82:19
**foot** 66:7 81:23
84:23 125:1
186:10 187:10
**footage** 158:6
172:16,21
175:14 176:7
176:11,13
178:1,4

**force** 11:24 12:5
14:2,4,8 21:25
22:2 55:18,19
55:20 74:12
101:17 102:3,5
102:10,10,14
102:18 111:1
119:16 120:7
120:11 122:13
124:1 143:14
160:6,11 161:6
161:10,20,23
162:3 188:3,20
**forced** 21:5
**Ford** 24:5
**foregoing** 190:1
191:8,10
**forever** 90:12
**forget** 131:19
**form** 16:18
29:14,15 33:1
33:2,3,5,6 70:5
74:21 113:11
**formal** 151:15
161:4
**format** 57:24
**formed** 50:22
**former** 34:15
**forms** 33:15,19
**forth** 1:20 49:10
91:16 119:8
140:19
**forward** 77:4,17
77:24 78:1,3
107:6 108:19
108:21 134:23
135:7 142:3
150:4 169:12
**forwarded**
167:14
**found** 24:15,23
**foundation**
17:22
**four** 11:23,24
24:3 25:20
39:10 160:5,10
160:18

**frame** 103:14
167:5 186:3
**Franklin's** 2:16
**Fraternal** 2:20
**fresh** 51:13
**Fried** 1:4 2:8
4:11 116:6
**friend** 2:2
**front** 5:15 61:5
62:22 65:14
66:3,12 72:14
72:19 73:9,18
77:23 80:10
99:10,21 100:5
107:10 108:22
126:1,14,19,23
127:10 128:1,6
128:9,12,22
134:23 165:23
168:25 184:23
185:3 187:13
187:17
**frozen** 104:8
176:14
**full** 5:23 49:18
49:19 59:18
60:19 64:18
80:25
**fully** 139:16
**function** 89:22
**functioning** 90:7
**further** 13:16
68:22 70:1
71:8 77:19
78:7 118:3
181:6 188:23
191:10,14

——————
**G**
**G-O-S-S** 115:12
**gain** 158:10
**garb** 120:3
**gas** 23:23
**Gaughan** 1:6
4:16
**gear** 66:24 67:2
67:17 68:7

69:24 70:13
78:20 79:6
80:7,9 109:5
139:8 177:16
179:24
**general** 97:9
102:1,6 105:18
107:8 112:4
123:7
**generalize** 123:7
**generalized**
123:12
**generally** 29:7
158:11
**gentleman**
125:16
**getting** 46:3 50:7
66:15 89:4
91:6 95:24
145:11 154:14
154:15 185:2
**give** 5:18 20:9
22:9 43:2
45:18 51:17
55:22 72:5
79:17 80:2
119:5 123:7,12
157:25
**given** 31:7,12
34:1,2,5 42:24
49:12 84:3
111:25 181:3
191:7,8
**gives** 41:24
147:4
**giving** 50:1
79:20 115:22
146:11 157:7
**glass** 109:20
137:24
**Glover** 24:18
48:6,9 56:6,7
57:13,21 58:8
153:2 154:10
158:19,19
**go** 5:6 17:13,17
18:23 25:1

31:15 40:25
43:6 45:16
46:21 54:1
70:16 79:11,14
89:24 95:24
109:9 126:1
130:8,24 158:9
159:11,14,18
161:25 162:11
165:17 168:8
188:11
**goal** 102:1,8
**goes** 117:16
127:12 131:4
132:21 133:2
**going** 5:9 8:6
16:6 31:13
42:22 49:10
63:20 73:16,20
74:16 79:9
80:3 81:10
83:18,22 84:6
86:25 87:20
90:2 91:2,15
100:24 106:15
111:7,14,16,19
114:14,15
116:8,10 123:8
123:10 125:14
126:13 130:6,8
134:3 136:13
136:15 138:5
140:9 141:4,7
141:25 142:21
143:17 145:8
145:15 147:22
148:9 149:17
156:8 160:1,21
165:2,4,13,17
165:24 171:24
175:6,7 176:6
177:23 178:15
178:23 179:6,8
182:5,8,12
183:18 184:20
185:15 187:5
188:10

**good** 45:15
60:20 126:3,10
179:15
**Goss** 14:1,3 38:1
115:11,12
**governing** 42:5
**grab** 127:16
136:11,13,15
155:24
**grabbed** 136:9
**GRAY'S** 1:22
**groan** 88:12
**groans** 89:18
**guard** 79:25
80:1 170:14
171:4
**guardrail** 171:6
**guess** 19:8 26:10
28:19 65:2
87:4 94:22
**guessing** 36:19
36:21
**guestimation**
138:3
**gun** 14:16 64:21
109:17 110:1,5
110:8,8,11,13
110:16 128:15
128:20 133:4
134:24 135:7
175:3 187:6
**gun's** 132:1
**gunpoint** 127:11
**guy** 142:16,17
143:10 158:19
**guys** 49:17
142:10,15
158:17 164:11
177:20

**H**

**habit** 51:19
**halfway** 27:16
**hammer** 132:21
**hand** 7:22 9:20
16:6 32:7 41:6
66:21,24 67:15

67:16 68:5,6
69:23,24 74:17
78:18,20 79:6
79:6 80:6,9,12
81:16 84:22,25
85:2,7 86:24
87:10,12,23
103:12,18
108:9 109:4,4
110:11,13
139:8 174:2,8
175:4 191:17
**handed** 46:22
132:2
**handing** 46:16
**handle** 50:17
**handles** 154:13
**handling** 48:8
49:18
**hands** 71:15,19
78:11,14,21
79:11,12,14
80:3 109:2,8,9
139:7,11
155:23 176:24
177:3,16
179:23 180:9
180:16
**handwritten**
29:11 33:6
47:25
**Hang** 46:18
179:14
**happen** 48:18
111:19 142:12
**happened** 28:7
36:20 59:14
75:7 79:4 84:9
86:21 95:21
107:11 111:4
111:18 121:24
123:8 130:19
152:14 153:11
**happening** 37:13
111:16
**happens** 142:11
**hard** 24:6 50:1

111:16
**harmed** 129:4,8
**hats** 48:7
**head** 59:1 63:2
80:18 85:24
104:14 105:23
105:25 106:6,6
106:18,20,23
107:5
**heads** 45:18
125:13
**healthcare**
159:25
**hear** 12:24 58:1
84:15 88:14
144:4 158:21
175:15
**heard** 56:2 58:3
58:5 59:4
79:23 93:5
141:8
**hearing** 58:7
175:10
**heart** 179:23
180:10
**held** 35:7,18
127:14,18
**help** 77:7 89:6
102:17 119:5
**helping** 95:4
**hereinafter** 4:4
**hereunto** 191:17
**hey** 141:10,25
145:8 147:22
154:18
**hidden** 135:14
**high** 19:9,19
20:8,12 23:18
42:2,6,10,11
42:19 43:13,16
44:4 45:2
124:5
**highlighted**
42:24
**highway** 24:23
97:15,20 131:2
131:15

**hill** 23:10,22
**hinge** 133:10,11
**HIPAA** 114:2,20
**hit** 26:11 70:24
70:25 82:3
135:16 146:6
**hitting** 72:14
**Hoffman** 2:21
**HOFFMAST...**
1:22
**Hold** 186:13
**holding** 110:16
110:18 124:6
127:11 174:11
**holster** 132:4,5
132:19 133:3
133:12,14,18
134:7,19,22
135:3,22
174:13
**holstered** 132:1
**holsters** 132:16
**home** 111:14
**Honorable** 4:16
**hood** 135:14
**hour** 45:16
**hours** 32:3 49:4
49:5,8,8 54:14
56:17 157:15
158:5
**huh-uh** 5:20
**Huron** 2:5

**I**

**icy** 24:20 25:3
**idea** 88:22
121:15 123:7
137:25 170:15
**ideal** 31:1 146:1
187:20
**ideally** 30:22
**identical** 133:16
133:17,19
135:22
**identification**
7:25 9:10 16:4
41:4 46:1,15

103:10 165:19
189:5
**identify** 118:10
**identifying**
124:18 162:7
**identity** 92:24
**ignore** 11:9
**illuminate** 139:1
**image** 168:13
176:25
**imagine** 23:3
152:23
**immediate** 91:4
141:13 145:1
146:18
**immediately**
23:21 24:18
64:21 71:18
97:10 101:25
102:22 104:25
112:17 123:25
123:25 125:22
128:1,18
137:22 154:5
155:22 177:4
**immobile** 118:5
**impact** 162:9
**implemented**
117:19
**implied** 143:1,3
**implying** 44:1
**important** 50:13
159:20 165:12
173:22
**improved**
162:21
**improvement**
33:20,24 34:3
39:21
**in-service** 40:11
**inaccurate** 28:3
**inadvertently**
149:24
**inasmuch** 15:18
**incapacitate**
109:22
**incapacitated**

88:22
**inch** 133:2
**incidences**
  162:11 163:13
**incident** 7:9 12:4
  13:18,22 14:1
  14:4 28:7 39:4
  39:7,13 40:5
  55:16,18 59:2
  91:13 92:15,19
  111:1 112:1
  115:1,3 119:21
  120:13 121:22
  130:4,6 132:6
  133:13 135:24
  136:2 140:15
  157:2 159:23
  160:10 161:9
  162:8 166:12
  180:12 182:23
  183:23 184:16
**incidents** 11:25
  101:17,17
  102:3 162:23
**include** 42:13
  100:15 101:7
  104:13 145:11
  173:2
**included** 23:1
  74:14 122:14
**includes** 102:25
  127:9
**including** 21:24
  136:8 151:21
  156:10 171:20
**incoming** 154:17
**incomplete** 52:5
**inconsistent**
  180:11,18,19
  180:23 181:1
**incur** 48:21
**incurred** 49:5
**indent** 115:16
**independent**
  178:2 179:2
**INDEX** 3:1
**indicate** 17:18

60:18 61:19
71:12,14 73:15
75:9 89:14
138:15 167:1
174:21
**indicated** 12:10
  14:25 64:1
  65:14 80:24
  81:1 82:8
  108:12,25
  109:7 117:16
  125:11 127:3
  136:23 137:21
  138:24 139:5
  141:24 143:9
  144:14 147:11
  149:22 156:25
  157:4,20
  159:24 160:23
  169:4 184:19
**indicates** 42:16
  43:13 134:21
  148:20 165:22
  181:2
**indicating** 27:17
  107:23 131:25
  133:11 134:8
  139:11 142:21
  165:24 168:16
  171:1,11,13
**indication** 106:5
**individual** 21:9
  22:14 29:23
  35:18 48:23
  104:25 105:4
  117:3 151:13
**individual's**
  151:18
**individually** 2:2
  14:6 30:7
**individuals** 22:9
  35:7,9,14
  56:16 142:21
  154:7 163:2,5
  163:8,11
**induced** 101:10
**inference** 144:16

**inferred** 142:13
  143:17,19
**influence** 152:13
**informant** 121:2
  121:11
**informants** 52:7
**information**
  15:8 16:14
  18:22 24:1,7
  27:11 28:14
  33:3 50:8
  52:25 53:3
  54:24 58:12,25
  87:7 93:2
  100:23,23
  102:25,25
  104:4 111:15
  160:1
**informed** 180:7
**initial** 109:8
  122:12 123:21
**initially** 62:8
  64:20 94:13
  109:1,16
  112:12 158:21
**initiating** 44:9
  44:11
**injuries** 129:12
  159:4,7,9,9
**inquire** 113:22
  186:14
**inquiring** 154:5
**inside** 60:22,25
  62:3,4,10
  66:17 82:18
  124:15 131:3
**inspect** 92:14,17
**instance** 39:1
  40:14 185:8
**instances** 25:21
  151:12 182:24
  183:3,6,9,13
**instruction**
  15:11 16:16
  157:8 158:14
**instructions**
  16:12

**intended** 59:24
  125:21 136:11
  150:3 182:16
**intent** 11:7
  79:11,14 136:5
  136:8 150:7,11
  181:14
**intention** 60:9
  83:6
**intently** 76:8
**interaction** 7:17
  137:6
**interchange**
  149:17
**interdiction** 48:9
**interested**
  191:15
**interior** 133:3
  134:22 135:14
  135:18 171:2
**interpose** 11:2
**interpret** 107:18
**interpretation**
  80:1
**interrogatories**
  10:10 11:20
  15:14 100:13
**interrogatory**
  11:14,22 14:20
  14:20 26:23,24
**interrupt** 43:9
**intersect** 95:2,19
**Interstate** 94:9
**interview** 8:16
  8:20 54:1,16
  54:19 55:2,25
  58:12,17,20
  59:5,8,10
  63:21 138:21
  138:25 156:16
**inventory**
  129:17
**investigated**
  115:3
**investigation**
  8:18 54:7
  74:15 92:15

111:7 120:16
122:7
**investigations**
  48:10
**involuntarily**
  20:22 21:4
**involved** 7:9,11
  11:25 17:19
  18:5,8,11 19:4
  19:7,14,15,20
  20:11 21:19
  22:20,24 23:2
  23:3 25:12,24
  26:4 42:14
  55:16 59:23
  91:13 92:19
  93:8,14 98:19
  99:2 102:13
  111:1 119:16
  119:17 120:15
  120:25 121:19
  121:20 122:8
  122:11 140:20
  143:2 148:17
  153:14 159:22
  160:6,19
  166:11 181:21
  182:22 184:7
**involvement**
  13:18,22 18:1
  18:17 19:15
  40:4 112:1
  118:14 120:12
  129:5 159:5
**involving** 11:21
  16:21 59:4
  115:16 122:2
  125:14 130:7
**issue** 138:18
  162:15
**issued** 91:23
  132:16 138:11
  138:20
**issues** 160:23
  161:8,17 162:5

—————————————
**J**
—————————————

**jacket** 120:1
**jail** 57:3 151:13
  151:15,16,21
  151:25
**James** 2:14
  15:22
**Janowski** 153:13
  157:8,20 158:5
**Jason** 1:10,13
  2:14 4:1,10
  5:25 7:24 9:9
  16:3 41:3
  45:25 46:14
  103:9 189:3
  190:20 191:5
**jeans** 119:24
**jimmy** 67:17
  68:7
**job** 30:17
**Joe** 8:4 9:23
  42:22 45:9,17
  46:21 103:3
  176:1
**join** 94:4
**joined** 94:7,8,19
  94:23,24 96:8
**Jordan** 2:10
**Joseph** 2:4 4:20
  41:9
**jovial** 164:22
**Jr** 2:3,8 116:7
**jscott@ohiow...**
  2:7
**Judge** 1:6
**judgment** 12:12
  162:18
**July** 27:24
**jumping** 116:10
**juncture** 128:10
  170:14
**June** 10:14
  15:14,19
**jurisdictions**
  158:24
**justified** 188:18
**justify** 188:3
**justifying**

188:19

——————
**K**
**keep** 18:7 19:6
  20:4,4 44:4
  48:23 49:2,6
  85:22 138:1
  187:18
**keeping** 24:6
**keeps** 135:12
**Kelley** 2:14 60:2
  60:5 67:6,19
  68:9,18 70:15
  70:24 76:9,24
  77:4,18 81:12
  81:14 82:1
  83:5 84:11
  93:14 94:1,13
  95:10,23 99:9
  99:13 109:22
  110:2 130:15
  137:19 141:3,9
  141:13 142:8
  142:20 167:23
  167:24 168:12
  177:10
**Kelley's** 68:20
  68:23 69:6,19
  70:2,18 71:1,4
  71:9 76:12,13
  76:18,18 77:20
  78:3 99:18,23
  104:23 105:1
  138:2,6 167:9
  169:16
**kind** 88:12 89:16
  111:25 157:5
**knew** 19:13
  81:23,25 85:23
  85:23,24 89:8
  93:8 121:16
  152:6,8 177:12
**know** 5:4,14
  6:21 8:10,23
  12:14 13:7
  17:7,10,20,24
  18:16,21 20:7

20:15,20,24
  24:3 25:4,6,8
  25:25 26:2,3
  26:11,13,17
  28:17 34:18
  35:7,12 36:21
  38:12,14 42:13
  53:14 55:10,14
  56:10,19 58:3
  58:4 60:16
  65:9 71:25
  72:8 73:11,12
  74:7 76:11,15
  76:16,17,23,24
  77:8,23,25
  78:1 79:21,23
  85:1,3,5,22
  86:1,1 87:4,18
  87:23,23,25
  88:21,24 89:7
  89:7,8 90:8,12
  90:15,22 91:17
  92:12,23 93:23
  96:7,13,16,19
  96:21,23 97:3
  97:18 100:12
  101:18 102:4
  104:5,8 105:7
  107:7 110:13
  110:16 111:4
  114:13,18
  117:16,17
  120:22 121:21
  122:12 125:23
  129:11 130:10
  131:19 133:8
  134:2 138:3,4
  138:7 139:15
  139:21 143:17
  144:19 151:1,9
  151:10,11
  152:9,11,21
  154:1,2,5,8,9
  154:22,24,24
  155:19 158:8
  162:23 166:7
  167:13 168:17

169:25 170:18
  173:22 174:4
  176:11 177:12
  180:6,13
**knowing** 44:2
  107:1,1 111:14
  111:15,18
**knowledge** 8:25
  12:16 14:21
  15:2 29:12
  56:20 92:8,17
  93:7 122:17
**known** 114:16
**knows** 8:9
  153:15
**Kobak** 2:14
  15:22 34:16
  35:1,8,19
  53:15
**Kobak's** 27:9
  32:6 36:7,14
  36:25 38:18
  39:2,9
**Kristine** 1:16
  191:4,21

——————
**L**
**lack** 125:13
**lady** 155:9
**lane** 131:1,1,3,3
  131:7,8,10,13
  131:17,17
  149:3 150:13
  167:11,25,25
  170:20
**lanes** 167:20
**laps** 126:7
**laptop** 130:10
  171:19
**large** 124:7
  126:8
**lasted** 97:12
**late** 16:19
**law** 2:4 6:13
  98:20 125:14
**lawn** 25:9
**Lawrence** 11:22

11:24 12:4
  13:22 115:1,16
  182:22
**lawsuits** 159:15
**leaning** 107:6,21
  108:23
**learning** 49:20
**leave** 25:7
  110:20,23
  111:2 112:22
  115:3 125:4,8
  125:16,22
  161:22 162:3
  176:1
**leaving** 125:21
  127:6
**led** 120:14 122:1
**left** 66:18,21
  67:15 68:5
  69:23 78:18
  79:5 80:5,12
  99:13 103:18
  104:4,14,22
  105:13,14,17
  105:20 109:4
  123:24 161:6
  161:10,20
  167:9 168:12
  170:1,22,23,24
  170:25 171:2
  176:3
**leg** 94:16
**legal** 11:15
**length** 66:12
  165:16
**let's** 18:23 19:17
  40:25 44:3
  133:12 148:10
  162:22 164:16
  166:18 168:19
  168:22 171:10
  172:11
**letter** 39:25
**level** 19:15
  101:16 102:10
  108:10 132:23
  132:24 133:1

134:7,9,16
135:2,5,10,11
135:13,15
174:12
**levels** 133:19
135:23 137:2
**lieutenant** 36:6
36:13,23 37:3
37:5,9,9,14,20
37:24 38:1,2,4
38:6,6,15,20
39:4,8,17
47:20 124:1,2
124:24 125:18
125:25 127:13
183:17
**lieutenants** 35:5
36:5
**life** 81:12
**light-weight**
119:25
**lights** 60:21
139:1
**limit** 23:16
**line** 50:25 51:24
52:5 117:20
151:14 154:1
160:20 190:3
**lined** 159:17
**lines** 141:25
154:7 159:6
**listed** 178:11
**listen** 140:13
154:10 156:22
157:21 158:7
158:16,17
**listened** 7:5
150:18 156:15
182:10
**listening** 24:8
**litigation** 11:21
116:4 120:14
121:23 132:6
**little** 52:21 93:12
107:21 116:11
**lives** 162:13
**LLC** 2:4,21

**LLP** 2:10
**location** 85:20
86:4 123:19
187:20
**locks** 133:5
**Lodge** 2:20
**long** 6:8 16:13
48:16 51:14
52:7,8 60:12
90:22 96:16
98:5,7 110:22
115:8 120:22
123:6 143:14
143:16 146:13
156:21 159:10
161:20
**longer** 80:8
115:5 118:6,15
156:9 162:1
185:14
**look** 6:22 8:2,8
9:16 16:8 17:2
18:3 25:16,20
27:10 32:13
41:12,13 44:3
46:20 59:10
75:25 76:3
79:20 82:11
100:14 106:2
130:10 142:3
159:8
**looked** 23:15
47:8 62:4
73:10 75:20,22
79:24 106:2,7
**looking** 27:10,11
46:4,5 51:4
59:18 61:19
62:1 67:21
69:23 75:10,18
75:19 76:6
77:3,9 80:25
103:22 107:22
126:2 168:13
**looks** 103:18
132:20 133:1,4
135:17 165:22

**lose** 112:18
**losing** 73:10
**lost** 24:13,14
**lot** 24:2 49:1
51:13 86:24
116:9 120:20
122:14 123:18
124:11 125:5
125:17,21
127:7 159:19
**lots** 87:3,3
**loud** 83:4 88:14
146:15,21
147:3
**louder** 79:23
**low** 19:9 73:10
**lower** 63:6
107:14 108:3
**LP** 2:16

_____

**M**

**M** 1:16 2:15,21
191:4,21
**Madam** 45:22
**maintain** 76:25
84:21
**maintained**
41:22 42:5
48:10
**majority** 20:10
20:25 23:1,3
92:11 170:25
**making** 65:19
111:21 125:19
125:19 151:18
**male** 24:3
**man** 162:16
**maneuver** 67:2
67:17 68:7
99:7
**maneuvered**
99:9
**maneuvering**
90:4
**manner** 67:2
83:5 87:24
160:3

**manpower** 162:4
**March** 4:23 8:20
9:17 22:21
23:7 54:8
55:25 56:17
58:12 59:7
63:21 82:8
86:19 104:20
158:3 182:21
183:23
**Marcus** 2:9 4:21
116:2 177:22
188:9
**marcus@jord...**
2:12
**mark** 7:22 15:25
17:24 18:22
41:1 46:3,11
105:17,19
172:11 173:9
176:1,6 177:23
177:25 178:24
**marked** 3:9 7:25
9:10,21 16:4,7
27:8 32:5,7
41:4,6 42:23
46:15,16 54:2
59:11 103:10
103:12 105:25
171:25 173:5,9
189:4
**marker** 96:7,9
96:19,22
**maroon** 24:3
**material** 133:2
158:10,11
**materials** 6:24
**matter** 4:11 18:2
28:8 60:16
113:25 119:11
138:9 140:16
160:7,22
179:19 184:20
**matters** 160:6
**mayor's** 138:9
**Mazanec** 2:16
**McKissic** 11:22

11:24 12:4
13:15,22 14:11
115:1,17
119:11,17
120:14 121:1
121:11,14,20
121:23 122:2
122:18 124:14
124:21 125:4
127:6 128:25
129:13,20
159:3,23 160:4
160:7,10,22
161:19 162:23
163:25 182:23
184:19,20
187:24 188:8
188:13,17
**McKissic's**
123:3 126:19
127:24 128:2,6
128:23 129:17
183:16 185:3
**mean** 18:13
21:21 28:24
34:24 52:16
64:24 80:20,21
102:14 107:18
112:2 119:22
137:10 145:18
147:20 151:2
162:11,17
187:16
**meaning** 23:14
**means** 5:21
13:11 17:9
20:23 26:1
118:13 129:11
136:14 141:20
182:16
**meant** 98:25
**measurements**
107:1
**mechanism**
135:6,23
**media** 56:13
172:23

**medical** 89:5,12
  89:15
**medications**
  101:8
**Medina** 23:22
**meet** 6:23 14:3
  30:23 34:11
  35:17,19 36:5
  36:12 37:20
  38:20 39:4
  53:15
**meeting** 31:19
  34:9 39:8
  47:22 54:5
**meetings** 47:9
**meets** 63:7 186:2
**memory** 22:19
**mental** 159:25
**mention** 13:1
  27:3 81:21
**mentioned** 7:21
  100:14
**met** 33:14 37:14
  37:23 123:17
**mic** 51:14,16
  112:12,16,18
  112:20,25
  113:2,6 147:6
**microphone**
  147:2
**middle** 60:19
  80:25 103:21
  149:25 164:7
  180:10
**mile** 96:7,9,19
  96:22 97:13
**miles** 96:13
**Miller** 1:10,13
  2:14 4:1,10,20
  5:4,25 6:1,19
  7:25 8:11 9:10
  9:15 10:8,25
  11:19 16:4,6,9
  27:23 28:22
  32:13 41:4,6
  41:13 43:12
  46:1,15,16

63:20 64:19
  103:10 104:18
  113:22 114:25
  115:20 116:2
  165:18 166:24
  173:17 176:10
  179:17 181:13
  184:22 189:4
  190:20 191:5
**Miller's** 172:2
**mind** 61:9
  116:11
**Mine** 167:18
**minimum** 111:6
**minor** 112:24
  118:22
**minute** 32:9
  41:12 46:20
  140:7 165:20
  171:15
**minutes** 45:18
  72:6 90:14
  156:11 165:16
  166:25 167:1,5
  179:1
**miscalculated**
  21:22,25 22:3
  22:7
**mischaracteri...**
  17:5 57:16
  58:15 144:19
  149:6 180:2
**misdemeanor**
  42:14
**misperceive**
  102:10
**missing** 145:8
**mistake** 22:3
**misuse** 154:14
**mix** 101:1
**moment** 16:7
  68:16,23,25
  69:10 70:19
  71:1 74:18
  79:13,19 81:10
  81:15,18,25
  82:4 86:14,23

88:18 89:1,7,9
  90:3,4 91:6
  102:4 103:17
  104:2 109:18
  109:19,23
  110:4 112:8
  118:16 119:4
  124:9,12
  125:18 126:6
  126:12 131:24
  137:7,20 143:8
  145:14,17
  153:23 154:3
  160:21 169:12
  170:3 177:12
  183:19
**moments** 8:2
  61:4 72:19
  97:12 103:2
**money** 124:7
**monitoring** 91:1
**month** 100:22
  110:24 111:10
**months** 100:21
**moot** 161:7
**Moran** 8:17 54:6
  55:3 59:14
  63:21 138:21
**morning** 56:17
  93:19 165:23
**motion** 118:15
  139:17 148:25
**motor** 25:12,23
  26:4,9 41:24
  46:23 47:2
  117:6 118:18
**motorist** 41:18
  118:7
**mouth** 51:15,16
  51:20
**move** 95:4 99:12
  107:18 128:5
  130:6 156:6
**moved** 76:13
**movement** 77:24
  87:15 118:3,9
**moving** 62:13

63:3,5 74:5
  75:3 76:9
  77:16 78:3,7
  90:3 118:6
  169:12
**multi-jurisdict...**
  155:3
**multi-jurisdict...**
  12:5
**multi-lane** 131:2
**multiple** 38:14
  74:12 91:15
  139:1 155:2
**mumbles** 51:10
**municipal** 138:9
**MVA** 25:17 26:1
  26:12

**N**

**name** 4:20 5:24
  54:11 116:2
  121:17 124:17
**narcotics** 48:8
  48:10,22 49:1
  49:19 50:4,16
  124:7 126:9
**narrative** 55:9
  55:13,16,19,22
**narratives**
  153:21
**near** 23:10 24:13
  39:8 123:23
  129:25 130:11
  169:7,8 180:10
  185:12 186:22
**nearly** 167:10
**necessarily**
  31:21 49:15
  93:23 101:2
  102:13 142:12
  150:1 161:11
  183:7,11
**necessary** 77:25
  102:11,19
**need** 23:12 45:10
  102:10 109:17
  113:18,18

122:11 147:1
  154:17
**needed** 50:8,9
**needs** 63:14
**never** 16:18
  17:10 34:4
  39:20 51:20
  60:9 76:8,10
  88:9,11 93:5
  98:11,12 110:9
  110:9 143:5,18
  145:8 147:18
  147:21,24
  148:19 152:21
  152:25 184:23
**new** 49:16 52:20
  142:16,17
  143:10
**night** 6:7 23:1
  37:4 38:2,4,7,9
  38:16,20,20
  133:13 135:23
  155:1,2
**nine** 112:22
  122:18 129:1
  161:18 162:16
  165:14
**NINTH** 1:23
**nod** 5:19
**non-compliance**
  101:6,11
**non-verbally**
  107:19
**normal** 48:24,25
  112:20
**normally** 49:5
**north** 23:12 95:2
  95:13 96:1,11
  97:1
**northbound**
  23:24 24:4,13
  24:16 94:13,16
  95:10
**Northern** 1:2
  4:14
**Notary** 1:16
  146:25 190:24

191:4,21
**note** 173:21
190:2
**notes** 47:25
49:22 50:22
51:3,25 52:11
53:6
**notice** 132:1
177:9
**notification** 31:8
31:12 54:11
**notified** 31:17
**November**
191:22
**number** 4:15 5:1
9:21 11:23
14:20 17:17
19:2,9,19 20:9
22:10 25:23
26:23 90:13
101:17 102:2
116:20 132:14
165:8,10,24
167:24,25
173:12 175:24
179:12
**numerous**
140:19

——————
**O**
**o'clock** 54:14
93:19
**O'Deens** 36:22
37:9 39:4
47:17 48:5
49:23 51:7
52:2,18 53:7
**oath** 8:24
**obedience**
101:11
**object** 42:22
**objection** 11:2
11:13 15:6
16:11 17:4,21
19:10 54:20
57:15 58:14
70:4 86:6

104:11 113:17
117:11 129:6
144:18 149:5
180:1 188:4
**objections** 3:17
11:4,9
**obligations**
119:2
**observation**
126:3
**observe** 61:24
63:23 99:1
**observed** 66:20
72:13,18,19
78:23 124:6
126:6,7
**observing** 63:9
**obtain** 56:4
**obtained** 56:11
**obviously** 91:8
137:19 143:1,3
143:5
**occasion** 37:8
50:19
**occasions** 37:19
38:8,15
**occupant** 74:14
124:22
**occupants** 24:4
44:2 74:15
84:13 124:19
124:20 146:7
146:12
**occupied** 25:8
**occur** 31:13
147:15 159:11
**occurred** 8:20
23:6 50:18
69:22 70:10
78:25 79:1
104:7 112:15
114:7 120:13
123:3 147:18
153:19,23
180:18
**office** 29:18,19
191:17

**officer** 1:10,13
4:1,9,20 5:4
6:1,7,19 7:24
8:11 9:9,15
10:8,20,25
11:19 16:3,6,9
19:18,24 20:12
20:16,21 22:23
22:24 24:17,18
25:14 26:6
27:23 28:22
29:9 30:1,4,5,7
30:23 32:13
35:22 36:3,8
38:10 39:23
41:3,6,13
43:12,23 44:4
44:10 45:25
46:3,14,16,22
48:4,6 49:23
51:7 52:2,18
53:7,17 55:12
55:19 56:5,7
57:13,20 58:8
59:2 63:20
64:19 70:18
71:4 78:2
81:22 85:17
87:16,19 90:10
91:23 99:10,11
101:13,21,24
102:18,21
103:9,12
104:18 105:2,5
108:12 111:1
112:7 113:9,22
114:25 115:14
115:16,19
116:2 119:14
120:9,11
127:12 129:14
129:23 131:19
132:14 139:19
139:23 145:16
146:17 149:12
153:2 154:9
156:14 157:5

162:9,19
163:12 165:18
166:11,17,24
170:12 172:2
173:17 175:18
176:10 179:17
181:5,13 184:1
184:6,21,22
186:10,22
187:18,23
189:3 190:20
191:5
**officer's** 119:2
166:14
**officers** 6:23
7:11,17 38:21
40:12,18,22
42:6 44:12
55:15 59:23
81:22,23 83:17
83:21 84:20
91:13,18 92:8
92:9,18 93:7
98:8 102:9
117:2,3,19
121:7 122:4,8
122:11,13,19
122:23 125:12
129:24 130:4
132:16 140:20
140:23 142:2
144:3 146:8
148:17,19
158:12,24
182:11 184:7
185:13,18
186:21,24
**Oh** 1:23 10:17
11:6 39:18
67:24 177:21
**Ohio** 1:2,17,19
2:6,11,17,22
4:15 24:22
94:9,11 97:15
97:19 131:15
191:2,4,17,22
**OIC** 38:16

**okay** 5:4,16,21
6:1,5,13 7:4,7
7:10,16,21
8:11,15,23
9:15,20,24
10:1,13 11:8
11:19 12:18,21
13:2,15,20
14:6,8,16,19
14:25 15:18,24
16:19 17:12
18:9,18,23
19:17,23 20:7
20:10,25 21:7
21:14,18 22:11
22:13,17 23:5
23:25 24:10
25:11,16 26:16
26:21 27:6
28:2,11 29:2,6
29:14,19,21
30:8,19,22
31:12,21,24
32:5,10 33:11
33:22 34:5
35:7,17 36:12
37:2,7,12,19
38:5,11,13,18
39:12,19 40:3
41:17 42:1,4,9
42:16 43:18
45:3,7 47:5,18
47:21 48:2
49:11,22 50:2
50:21 51:18
52:9,22 53:6,9
53:14 54:1,18
55:7,10,24
56:3,7,24
58:11,23 59:10
59:20 61:9,23
62:3,9 63:8,16
64:13,18 65:4
65:10,23 66:2
66:9,20 67:1,5
67:9,11 68:1,5
68:11,13,17,22

69:5,15,21
70:1,16,25
71:3,22 72:7
72:12 73:12,15
74:4 75:6 77:2
78:10,25 79:10
83:24 85:1
86:3,17,21
87:21 88:23
89:10,18 90:8
90:13,16,22,25
91:8 92:4,6
93:11,18 94:7
94:11,19 95:15
95:25 96:3,11
97:3,14,25
103:21,24
104:15 105:12
105:19 106:1,5
106:17,23
107:12,24
108:1,5,25
109:15,24
110:6,11,13,16
110:19,22,25
111:12,24
112:11 113:15
113:19 114:8
114:21,25
115:8 116:18
116:20 117:6
117:15,22
118:25 119:10
119:13 120:2
120:12 121:4
121:22 122:4
122:22 125:3
127:3,23
128:12,22
129:4,16
130:18,23
131:14,19
132:4,12,19
133:8,11,16,24
134:3,17 135:5
135:16,21
136:1,8,13,18

136:23 137:12
137:15,17
138:11,19,24
139:5,10,24
140:3,6,17
141:2 142:19
143:8 145:21
148:23 150:10
151:16 152:20
156:22,25
157:10,16,24
158:4 160:14
160:22 161:13
162:15 164:2
166:5,9,11,18
167:4,11,17,19
168:2,20,22
169:4,15,20
170:5 171:8
172:10 173:15
174:7,12,15,20
174:24 175:14
175:21 176:15
176:20,24
177:3,9,21
179:21 180:7
180:15 182:3
182:20 183:3
186:8
**oldest** 17:1
**once** 37:13 91:3
117:19 118:18
118:22 125:3
**ones** 48:2
**online** 29:15
33:2
**open** 71:15 76:1
79:5,18,19,22
104:8 150:4,11
**opened** 64:14
71:18 72:1
75:9,18,19,25
76:2 78:10,15
78:21 79:2,11
79:14 105:5,7
105:10,15,21
106:3,8,20

109:1 110:14
110:17 136:11
139:6,14,15,16
155:22 174:21
175:2
**opening** 64:10
64:15,15
109:12 136:10
169:21 177:5
177:17
**operate** 131:16
**operated** 176:21
**operates** 147:2
**operating** 12:4
24:5 49:14
120:7 124:14
131:7 147:6
152:13 163:2,9
167:21 170:20
177:1
**opinion** 30:9
**OPOTA** 185:6
**opportunities**
48:17
**opportunity**
9:15 81:11,14
82:6 101:24
115:22 128:5
140:13 151:17
153:1 154:16
162:2,3,5
176:8 177:14
**opposed** 5:19
38:9 64:14
101:22 126:4
**opposite** 126:1
**optimistic** 90:2
**order** 2:20 16:25
83:16,20 84:3
84:5 134:13,17
141:18 142:9
142:13 143:19
143:19,22,22
143:23 144:16
180:14 183:22
184:20,23
187:25 188:16

**ordered** 183:12
183:15 184:22
188:14
**OSP** 24:22
100:17
**outcome** 48:16
**outcomes** 143:20
**outfitted** 119:20
120:2 131:21
**outline** 165:21
**outlined** 116:3
**outs** 140:1
**outside** 18:8
40:14 65:8
69:22 70:11
71:5 131:17
147:5 162:25
188:15
**outweigh** 21:13
**overlooked**
112:25
**overshot** 24:19
**overtime** 48:21
49:6
**overwhelming**
89:3
**OVI** 152:12
**owner** 52:19,22
52:23,25 53:3
**owner's** 52:25

---

**P**
**pack** 112:12,16
112:18,20
113:1,2,6
**page** 10:24
14:20 33:9,10
33:18 42:1
54:10 59:10,19
64:19 67:21
69:11 71:13,14
81:1,1 190:1,3
**PAGES** 3:2
**panels** 137:25
**paper** 38:23
52:21 147:1
**paperwork** 49:2

52:5,8
**paragraph** 59:16
59:18 60:19,20
64:19 67:20,21
69:11 70:8
71:13 73:15
75:14 80:25
**paragraphs** 46:5
**parallel** 167:10
**parent** 2:2
**park** 83:13
169:24 170:4,9
170:11,18
**parked** 126:15
**parking** 52:23
123:18 124:10
125:5,17,20
127:7
**Parkway** 2:22
95:7,19
**part** 12:4 33:6
50:14 51:10
52:22 53:4
55:23 70:22
73:25 92:14
94:16 96:4
100:15 107:4
108:3 111:18
112:13 120:7
122:13 126:22
145:12 148:2
151:21 169:13
176:11 181:24
182:3
**partaking** 95:6
**partial** 107:21
**partially** 77:23
**participation**
113:4
**particular** 11:20
14:4 23:9
28:15 34:12
35:23 36:9
40:5 47:10,16
48:2 105:16
120:12 121:9
121:22 123:14

132:19 133:14
144:2 145:24
154:25 161:9
165:9 172:21
176:6
**particularly**
22:25
**parts** 61:23
**party** 191:14
**passed** 61:4
**passenger** 61:6
62:23,23 64:21
81:19 86:25
99:9,22,22
107:9 109:21
121:17 124:23
125:3,12,15
126:15 127:13
127:14 128:13
128:19 129:24
152:12,14
**passenger's**
85:12 99:18
**passes** 71:25
**path** 76:13,19
77:5,6,19 78:3
78:5,7 109:18
127:6 177:11
**Patricia** 1:6 4:16
**patrol** 24:23
48:7,22,24,25
49:3,9,17,18
92:9 97:16,20
131:15 158:11
**patrolman** 120:4
142:12
**Pauley** 2:2 56:21
59:5 60:25
85:10 107:22
108:14,22
137:22 154:6
156:15 159:1
179:19 180:15
**Pauley's** 56:2
57:9 106:10
180:8,21
**Paully** 56:16

**pause** 104:3
**pay** 152:23
**paying** 79:12
124:7
**Pearl** 23:10 95:1
95:2,11,13,18
95:19 96:2
123:23
**pending** 4:13
116:15
**people** 90:3
162:11
**perceived**
180:13
**percent** 63:12
107:25
**perfectly** 172:10
**perform** 41:24
42:6 48:17
74:16 83:8,18
83:22 98:9
**performance**
28:25 29:3,14
29:23 30:9,24
31:4 32:5
33:19,23 34:3
34:6 35:21
36:7,14 37:15
37:21 38:8,21
39:5,21 47:8
47:11 53:16
112:6 113:9
115:13,15
**performed** 82:14
89:12
**performing**
25:13 40:15,17
40:21 46:9
89:15 93:21,23
181:21
**period** 32:17,21
32:23 90:8
111:2 115:5
118:5 174:7
**periodic** 28:24
**periods** 34:13
**permission** 57:9

161:22
**perpendicular**
176:20
**person** 44:25
45:1 62:14
81:25 85:25
86:2,3,4
146:10,15
**personal** 50:13
91:24 92:4,9
92:14,18 161:8
**personally** 116:6
120:25 160:12
**persons** 86:4,4
127:11
**pertinent** 117:10
**Phillips** 2:21,21
9:22 10:1,4
41:8 103:15
**Phillips@fhpl...**
2:23
**phone** 56:2,10
56:15 57:6,14
57:22 58:2,4,9
59:4 91:13,23
91:24 92:2,4
92:14 150:17
151:13,18
152:2,20,22,24
153:1 154:4,6
154:15,17,19
**phones** 57:1
91:16,16,17,21
92:9,18 150:25
151:7,9,10
152:6,8,9,23
153:24 154:1
**photo** 103:14,17
103:22 104:12
104:12,16,19
**phrase** 109:9
118:10
**physical** 65:24
74:22 99:1
129:12,15
159:4,6,9
**physically** 74:24

96:3 108:8
109:10 136:6
136:15,24
146:22,23
150:7
**pickup** 124:4
**picture** 104:6
107:5 167:15
**piece** 52:21
56:12 172:21
178:1,4
**pieces** 165:14
**pillar** 63:3
**pin** 73:17
**place** 21:13 44:9
44:13 82:17
98:12 106:25
163:15 187:17
187:21 191:10
**placed** 163:23
183:5 188:17
188:19
**placing** 102:9,18
185:3 188:2
**plain** 66:16,18
67:15 68:5
**Plaintiff** 2:8
**Plaintiffs** 1:5,15
2:2 4:3,22
116:6 165:6
**Plaintiffs'** 3:9
7:22,23 8:15
9:8,21 11:1
15:25 16:2,7
16:10 25:16
26:21 27:8
32:8,14,17,20
32:23 33:4,23
34:10 36:16
41:2,7,14 42:1
45:24 46:4,7
46:13,17,22
47:3,7 51:7,25
53:6,11 59:11
103:8,13
106:18 113:25
176:7 179:8

189:2
**plan** 33:20,24
34:3,6 39:21
44:8 123:21
127:4,5,8
136:23 148:2
156:1
**planned** 44:9
120:23 124:11
159:16
**planning** 120:20
159:20
**play** 117:23
166:12 168:22
175:6,7
**played** 176:13
**Player** 172:23
**playing** 168:2
171:19 176:15
**please** 4:7 5:8,13
5:18,23 7:1 8:2
10:17,18 13:12
15:12 27:19
32:9 41:12
46:12 47:5,24
49:25 51:9
52:4,15 55:24
67:12,24,25
68:1 73:22
79:10 111:12
116:16 123:9
167:23 174:6
188:12
**plural** 85:25
**Plut** 81:22 89:23
90:4,10 99:11
105:2,5 139:23
143:13,14,17
166:11,17
178:5
**Plut's** 166:10
**point** 20:18 23:4
25:7 59:16
62:6,12 63:9
64:6,22,25
66:17 67:22
70:2,5,6 72:24

73:5,8,20
77:16,18 83:7
83:7 88:17
89:14,20 91:8
95:16 97:4
103:25 120:8
120:10 126:18
126:18 127:21
128:15,18,20
129:1 131:14
139:16 141:2
150:18 155:25
156:22 161:7
**point-by-point**
146:12
**pointing** 168:13
168:15
**points** 171:23
**pole** 146:6
**police** 1:18 2:20
4:9 6:2,6,9,17
13:17,21,25
15:16 16:22
17:9 25:13
26:6 29:9 34:7
35:10,22 36:3
36:6,8,13
37:10 39:9,22
41:22 42:6
53:16 56:18,25
91:7,9 93:15
93:22 111:22
112:7 113:9
115:14,15
117:1 120:3
122:15,23
151:5,7 152:9
154:2 155:7
161:5 162:19
**policies** 41:21
44:20 47:1
116:21,25
117:8,18
118:21
**policy** 15:21
41:18,23 42:5
42:16 43:20

44:15,24 45:3
45:6 111:5
114:20 116:22
116:22 117:1,9
117:23,24
119:1,3 136:1
142:3 151:10
159:8
**pop** 133:8
**portion** 63:6
122:1 133:3
140:25 160:2
165:21 166:13
174:16 175:21
176:6,25
**pose** 84:14
**posed** 84:11
**position** 6:5
11:15 23:13
35:8 65:15
66:11 78:19,22
95:20 105:4,9
105:14 106:19
106:24 108:21
126:25 127:19
143:25 146:8
181:14 182:25
185:1 188:2,8
**positioned** 77:4
81:6 104:25
182:24
**Positioning**
182:15
**positions** 139:11
186:9,22
188:14,16,18
**possession**
129:20
**possibility** 119:7
**possible** 26:15
31:3 36:17
50:8 81:24
82:2 106:15
143:20 165:2
**possibly** 12:5
18:24 39:2,3
50:15 59:2

85:16 87:16
125:14
**post** 35:18 185:8
185:12,18,23
186:1,23
**posted** 23:9
**posts** 185:8
**potential** 145:4
**practice** 38:19
74:19
**practiced** 40:17
40:21
**precedent**
147:13
**prefer** 164:9
**preference**
164:14
**preparation**
6:20 54:24
**prepare** 7:1
54:18 55:2,25
**prepared** 54:5
83:13 124:11
**preparing** 56:1
137:20
**preprinted** 33:2
**presence** 76:10
80:6
**present** 24:12
30:13,15 54:22
56:23 153:16
**pretty** 24:20
50:4
**prevent** 181:17
**prevented**
113:16 114:11
114:24
**preventing**
181:25 182:17
**previously** 27:8
32:7 177:10
**primarily** 29:22
31:25 116:21
**primary** 18:14
18:25 19:18,24
20:12,16,21
21:19 23:2

89:1
**printed** 33:1
**prior** 6:16 8:12
11:21 22:22,22
23:6 44:11
58:12,20,22
59:5,7,23
64:10 72:12
75:25 79:20
86:12 87:19
90:4 120:13,22
121:1,19 122:8
124:18 125:7,9
125:16 130:19
130:22 131:14
136:9,18 137:1
138:5 147:8,15
148:21 150:18
154:14 155:19
156:16,20
157:21 172:16
175:22 176:8
176:15 180:22
181:3
**priority** 50:10
**privacy** 114:2
**privilege** 4:21
**probable** 143:24
144:2,4
**probably** 164:4
164:6
**problem** 83:10
**problems** 101:9
162:7
**Procedure** 1:15
**procedures**
42:17 43:14
46:8
**proceeded** 23:13
23:23 96:1
**proceedings**
16:21 17:3
**process** 29:2
43:24 49:16
179:11 191:7
**produce** 185:15
187:5

**produced**
173:11
**production**
165:5 172:19
173:12 178:8
**projector** 130:9
**promote** 101:13
**promoted** 35:13
36:23
**proper** 187:9
**prosecutor**
48:17
**protesting**
141:20
**protocol** 110:25
111:3,8 160:23
**protocols** 118:17
**provide** 28:6
56:7 57:21
154:11
**provided** 10:9
28:11 56:3,5
57:13 58:11
187:8 189:4
**provider** 159:25
**proximity** 66:4
81:2 82:10
91:1 157:16
163:16,24
183:6,8,10,12
183:15,22
184:19
**psychological**
159:10
**public** 1:16 2:11
28:12 190:24
191:4,21
**pull** 44:1 71:16
77:4,25 79:15
80:3 136:5
143:25 146:5
172:7
**pulled** 76:19
82:17 107:2
118:12 125:25
126:18 135:7
**pulling** 21:11

87:2,16
pulls 77:18
  146:2
pulse 89:22,23
  89:24 90:5,6
  90:11
purports 41:17
purpose 100:18
  126:20
purposes 101:12
  101:15 165:19
pursuant 1:17
pursuing 95:10
  145:19
pursuit 7:11
  17:14,19 18:3
  18:15,20,20,25
  19:2 21:3,14
  21:20 22:16,20
  22:25 23:5
  24:1,8,9,10
  44:24,25 45:6
  55:5 59:23
  60:3,6 61:10
  61:12,16 83:17
  92:22 93:8,11
  93:14 94:2,7,8
  94:12,17,20,25
  96:4,8,14,17
  98:16,18,19
  99:2 112:13,15
  113:4 116:21
  117:3,9 118:19
  119:1 130:12
  137:6 140:18
  140:20 141:16
  142:3 145:2
  148:15 182:4
  182:22
pursuits 18:5,7
  18:12 19:3,6
  19:17,19 20:8
  20:10,13,15,20
  21:1,9,18 22:6
  26:13 46:24
  47:2
push 98:23

pushed 135:7
pushing 135:18
put 24:6 56:12
  57:24 69:1,2
  70:23 80:3
  81:12,16 82:6
  83:13 107:15
  107:17 123:19
  126:25 153:18
  170:11 187:21
  188:1,7
putting 52:24

—— Q ——
qualifications
  18:17
qualified 191:4
qualifies 17:24
  42:10
quarterly 31:9
  31:14 32:16
question 5:9,10
  5:15 9:7 11:3
  11:14 13:11
  15:7,12 16:17
  17:6 25:6
  27:19,21 28:20
  43:8 53:19
  54:21 57:17,19
  67:12 68:1
  77:12,13 87:5
  87:6,8 102:23
  114:10,23
  116:13,15,17
  120:23 134:1
  134:14 156:3
  160:2,9 161:15
  163:18,21
  178:18,20
  184:18 186:16
questioning
  117:20 151:14
questions 5:1
  16:13 40:8
  115:21 116:12
  116:20 117:15

130:12,13
  136:3 139:24
  150:16 159:21
  164:3 169:4
  171:18 172:2
  172:12 179:13
  181:6,9 182:20
queue 77:15
queued 130:8
quick 181:9
quite 43:11
  48:16 49:9
  50:3 51:14,19
  52:7 79:8,13
  81:24 87:6
  106:9 123:6
quote 139:25

—— R ——
radar 23:14
  138:14
radio 24:7 51:10
  51:20 59:22
  93:25 140:19
  144:3,5,25
  146:21 147:21
  147:25 148:16
  155:4 182:9
  184:8,14
radios 140:24
rail 170:14 171:4
raise 84:25 85:1
ram 81:12
rammed 76:25
  137:18
ramming 76:9
  110:3 138:2
ramp 24:24,25
  96:2,9
ran 161:9,11
range 19:8 20:1
rank 157:18
rare 48:20
rash 23:8
Raskin 2:15,16
  3:18 8:3 9:5,11
  10:15,23 11:8

11:11 13:9
  15:6 16:11
  17:4,21 19:10
  27:13,18 28:19
  32:10 40:7
  41:11 42:21
  43:4,7 45:8,14
  45:17,21 46:18
  46:21 53:18,22
  54:20 57:15
  58:14 59:15
  63:14 67:22
  70:4 73:19,24
  75:13 77:11
  86:6 103:3
  104:10 107:16
  108:6 113:17
  113:21 114:4
  114:16 117:11
  120:18 129:6
  129:10 132:9
  133:25 134:10
  140:7,11
  144:18,23
  148:8,11 149:5
  149:14,20
  151:2 155:16
  156:2,7,17
  159:24 161:14
  163:17,20
  164:10,13,17
  164:24 171:14
  171:17 172:6
  173:4 177:21
  178:3,14 179:3
  179:14 180:1
  186:13 188:4
  189:1
Raskin's 164:22
rating 49:12
reach 137:17
reached 60:13
  87:1 125:25
  137:16,18
reaching 79:1
  109:13 180:10
react 112:24

185:14 187:5
reaction 129:13
read 7:3 8:4 9:6
  10:23 22:14
  27:18 43:8
  55:8 67:14
  68:2,3,10
  75:14 123:6
  138:20 153:14
  190:1
reading 10:25
  22:18 42:16
  43:12 60:18
  67:13 153:20
reads 82:12
ready 46:3
real 60:20
realized 65:2
  109:17
realizing 62:15
really 15:1 19:5
  26:2 63:11
  66:9 90:15
  111:6 119:4
  143:22 161:7
  173:21
rear 62:24 63:6
  72:18 73:1,3
  99:11,20,21
  100:2 126:15
  127:10 133:3
  146:9 169:8
  170:13 171:5
  186:2,3
reason 82:13,24
  83:14 136:25
  146:6 162:6
reasons 134:19
recall 13:24 18:5
  21:18 22:8,9
  23:5,17,17
  26:4,8,10
  27:24 28:18
  35:13 36:24
  37:5,13 38:22
  38:24 39:7,11
  47:9,13,15,21

48:4 49:22
51:6 52:1,17
53:7,10 55:24
56:1 60:12,17
61:2 62:12,15
63:1,9 64:5
66:1 68:11,14
75:5,7,17,17
76:2,5 79:4,8
86:12,16 87:11
88:2,2,5,13
89:9,10,21,21
90:1 91:12
97:9 98:22
99:6 101:3
105:5,10,14
106:19 107:12
115:9,10
116:23 117:20
119:11,21
120:17,21
122:4,7,10,20
122:22,25
123:2,13
124:15,18
125:11 128:16
128:17 130:16
130:18,25
131:2,5,12
133:13 136:18
138:17,25
139:3,18,20
140:17 141:5,9
150:15,19
154:20 156:14
157:11 158:8
160:8 161:19
166:2 174:10
177:15 180:11
180:18,23
182:25 183:2
**receive** 112:11
113:11 115:14
**received** 15:1,9
15:15 16:15,19
28:23 36:3,15
39:21,25 40:14

58:6,16 59:4
74:4,9 100:8
100:11,23
113:8 184:8
**recess** 63:18
103:7 113:20
156:12
**recognize** 102:12
178:17
**recognized** 61:4
62:13 79:18
**recollection** 19:3
20:2 25:11,23
28:15 35:15
36:18 72:4
87:14 97:22
98:2,7 105:20
106:7 130:3
143:15 144:10
177:15
**record** 4:8 5:21
5:24 9:13 20:4
28:3,11 57:9
103:6 108:7
134:5 164:20
164:21 166:19
166:22 172:15
**recorded** 56:22
57:2 150:17
152:2,7,8
153:25 154:7
**recordings** 57:21
142:25 151:23
**records** 28:12
**recover** 154:17
**reduce** 101:16
102:2
**reduced** 191:7
**redundant** 116:9
**refer** 86:15
87:11 131:1
139:2 144:17
165:4 172:13
179:8
**reference** 130:24
173:17
**referenced** 173:1

**references** 111:5
171:20
**referencing** 8:12
43:22 50:23
64:23 70:20
176:14
**referred** 131:7
139:12 179:11
**referring** 65:4
122:12 138:2
**refers** 112:3
**reflect** 4:8 108:7
164:22 182:10
**reflected** 11:22
34:1,10
**reflects** 30:9
**refresh** 137:9
**regard** 113:23
**regarding** 7:13
14:3 34:12
41:18 52:18
116:21 130:12
130:13 139:25
140:19 144:25
145:3 150:16
151:10 153:6
182:20 184:15
186:21,23
**regards** 15:15
86:21 112:6
115:13,15
116:5,15 117:6
117:17 122:7
129:4 133:19
135:22 147:13
172:19,22
179:19 180:20
184:18 185:22
186:9
**regional** 119:15
**regular** 28:24,24
38:19
**rehashing** 52:6
**reholster** 110:8
**reholstering**
109:25
**reinstruction**

40:1
**relation** 58:17
127:23
**relationship**
77:24
**relative** 5:1 51:7
53:11 110:7
113:8 115:16
153:10 191:14
**relatively** 124:5
133:7 142:16
**relevance** 158:25
**relieved** 90:19
**reluctant** 141:19
141:22
**remain** 128:12
129:16
**remainder** 164:3
**remained** 82:14
82:25 84:10
128:25
**remaining**
128:22 146:4
**remark** 43:2
45:22
**remarked** 46:1
**remember** 17:2
24:2,17 28:4,9
38:22 39:12,13
47:19,25 58:5
59:7 61:3 68:3
79:10 86:13
89:16,18 91:4
91:6,15,20
94:8 106:23
112:23 113:1
115:8 124:17
153:9,10
156:16,20,21
157:12 158:9
158:14 170:10
**remembered**
86:18
**removal** 155:19
**remove** 109:10
134:8,15,17
135:10,19

136:15,24
146:18
**removed** 12:19
61:14,16 89:11
91:4 124:23
125:3,12 134:6
136:25
**removing** 133:22
136:14
**repeat** 70:23
**rephrase** 5:8
116:14 129:9
144:22 186:17
**report** 18:8
22:18 55:8,23
59:2 138:19,24
**reported** 26:2
**reporter** 45:22
103:4 172:10
**reporting** 191:12
**reports** 22:14
48:3,11,13,15
49:4 52:6
**represent** 10:8
116:6
**representing**
4:22 119:15
124:2
**represents** 17:9
**request** 28:12
44:5 141:10
165:5
**REQUESTED**
190:3
**requesting** 94:1
**requests** 10:3
**require** 134:5
**required** 55:18
**resolution** 13:15
113:4
**resolved** 13:4
**respect** 114:6
**respective**
167:20
**respectively**
167:12
**respond** 160:2

**responded** 18:14
18:19 24:22
165:6
**responder** 18:14
19:1 21:19
**responding**
19:18 20:12,16
20:21 31:4
122:13 183:4
**response** 5:19
28:12 101:7
159:5 172:19
173:12 178:8
179:10
**responses** 10:9
**responsibility**
38:7
**responsible**
154:10
**rest** 162:12
170:25
**result** 15:9 72:13
87:15 116:10
129:13 138:20
159:5,23
**resulted** 161:12
161:17,18
183:5
**retraining** 40:4
111:24 115:15
**retreat** 81:11
**retreated** 81:13
**return** 111:9
**returned** 56:17
**returning**
113:16 114:11
**reveal** 16:13
**reverberating**
162:12
**reverse** 16:25
69:1,3 70:23
**revert** 45:1
118:7 119:2,8
**review** 6:23
13:16,21 29:25
30:6 38:10,14
38:21 58:20

140:13 158:8
**reviewed** 8:12
14:1 47:16
184:9
**reviewing** 59:7
**reviews** 38:17
**revving** 69:2
84:15,16,18
85:6
**RFP** 165:8,10
179:12
**ride** 152:17
**right** 5:23 8:6
12:10 22:19
27:16 28:22
29:24 31:7
33:14 36:18
43:11 44:20
66:24 67:16
68:6 69:24
72:10 75:10,12
76:5,20 78:20
79:6 80:6 81:5
83:10,18 84:21
85:7 86:19
87:9,12 93:16
93:19 95:11,21
97:16 99:12
104:4,19 106:2
107:14,20
108:2,9,20,22
108:23 109:4
109:13 113:16
123:25 124:10
126:17 131:4
132:1,2 133:7
134:10,19
139:7 141:20
141:21 142:1
147:22 160:17
166:24 167:8
167:17 168:3
168:20 170:25
173:14,19
174:2,20 175:4
178:14 179:5
**rights** 114:2,20

**risk** 42:2,6,10,11
42:19 43:13,16
44:4 45:2
**road** 1:19 2:5,17
23:10,14 50:11
95:11,13 96:2
97:2 98:23
123:23 126:4
155:15 162:6
**roadblock** 22:1
40:15,18 83:23
84:7 96:20
97:4,15,19
98:2,9,11,24
99:8 144:8,11
**roadway** 25:7
117:25 171:2
**ROBERT** 2:21
**roll** 40:11
**rolled** 25:5 150:4
**rolling** 22:1
40:15,17 42:15
83:22 84:6
96:20 97:4,15
97:19 98:1,9
98:11,24 99:8
144:7
**rolls** 118:15
**room** 142:11
155:6
**rotating** 169:11
169:13
**round** 88:22
107:8
**rounds** 129:1
161:18
**Route** 96:11
**Row** 2:16
**Roy** 2:3,8 93:2,5
116:7
**Royalton** 1:19
**Rule** 191:13
**rules** 1:15 4:3
100:16 116:12
**run** 95:23
**running** 23:11
**rush** 59:25 60:10

145:19
**Ryder** 2:16

**S**

**safe** 187:2,10,17
187:19
**safety** 101:13
110:10 132:24
132:24 133:1
133:20 134:7,9
134:16,19
135:2,6,6,10
135:11,13,15
135:23 137:2
146:8 174:12
185:13 186:10
186:22
**sake** 151:14
**sale** 125:22
**sat** 36:21 38:14
**saw** 61:2,3 62:12
63:2 64:21
65:1 66:16
67:15 68:5
139:11 168:8
169:16
**saying** 31:2
49:15 58:21
77:8 82:4
85:22 90:5
103:1 178:15
183:2,17
186:19
**says** 51:10 52:5
52:19 55:21
111:5
**scenario** 102:21
119:5
**scene** 18:14,19
19:1 84:20
85:17 89:6
90:17,23 91:2
91:8 122:5,19
122:24 129:16
146:11,18
**scheduled** 28:24
120:16 121:10

**school** 112:15
**Scott** 2:4,4 3:4
4:7,19,20 8:1,5
9:14,24 10:2,5
10:7,17 11:6
11:10,16 15:24
16:5 27:15,20
27:22 28:21
32:12 40:9,25
41:5,10 43:1,5
43:10 45:19
46:2,11 53:20
58:18 59:17
63:16,19 67:24
70:6,9 73:22
74:1 75:16
77:14 86:8
103:5,11,16
104:15,17
108:11 113:19
113:21 114:3,8
114:9,21
115:19 116:3,9
116:20 117:7
117:15 119:10
130:13 136:3
138:19 139:24
150:16 156:14
160:5 173:6,10
173:15 176:3
177:10 178:10
181:8,12
183:25 188:24
**Scott's** 184:18
**screaming** 87:3
106:14
**screen** 171:10
176:14
**scrolled** 166:24
**seal** 191:17
**seat** 61:5 62:22
63:3,4 80:10
85:13,13 86:5
86:7 105:12
107:3,7,13,21
107:24 108:4
155:20,23

177:20,20
**seated** 80:10
108:20 147:5
**second** 26:22
33:18 42:1
46:19 47:6
69:21,21 70:8
70:13 73:6
76:11 77:24
84:8 85:7,21
86:5,10,23
87:9,12 88:6
88:19 90:23
97:15 98:1,9
98:11 99:8
109:22 131:13
135:5,13
137:19 144:11
160:7,10,11,14
165:14 166:20
**secondary** 23:2
**seconds** 60:16
72:5,6,7
112:19 165:21
165:23 174:21
174:24 176:18
**secretary** 155:17
**section** 27:12,13
33:24 42:2
44:3 46:4,5,7
**see** 10:11,14
11:13 14:23
17:14 18:3
25:18,20 27:1
27:16 33:20
42:3 48:18
58:25 60:22,22
60:25 61:24,25
62:3,10 63:4
64:1,2,6 66:17
66:18 67:19
69:15 71:14,19
74:2 78:2,10
78:13 79:5,12
80:8,12 81:3
84:22 85:6,20
98:16,18 99:14

99:17,20
103:19 104:6
105:12,23,24
105:25 109:1,7
139:2,6 153:13
153:21,25
155:22 158:6
165:25 167:2,4
167:7,8,15
168:9,23
169:20,22
173:23,25
174:24 175:1,2
175:5,8 176:24
177:3
**seeing** 33:8
69:23 99:6
105:14
**seek** 161:13
**seeks** 11:3
**seen** 16:10,18
17:10 71:22
77:20 98:17
168:3
**selector** 67:17
68:7 70:14
78:20 80:7,9
**send** 58:8 172:9
**sense** 148:22
172:3
**sent** 40:3 57:23
**separate** 22:18
26:10 48:23
50:16 100:22
101:2 116:25
155:14 165:10
172:17,25
**separately**
146:16
**September**
28:13
**sergeant** 2:14
30:16 31:22
34:9 36:22
38:9 39:16
47:10,20 53:11
60:2,5 67:6,18

68:9,18,20,23
69:6,18 70:2
70:15,24,25
71:9 76:9,12
76:13,17,18,24
77:4,18,20
81:12,14 82:1
83:5 84:11
93:14 94:1,13
95:9 99:8,13
99:18,23
104:23 105:1
109:21 129:23
130:14 137:19
138:2,6 141:3
141:8,13 142:8
142:11,20
167:9,23,24
168:12 169:16
177:9
**sergeant's** 29:17
29:19
**sergeants** 29:22
30:3,6,10,15
30:20,23 31:4
31:18 33:15
91:15
**series** 171:18
**service** 6:16
**set** 1:20 153:17
159:11 191:17
**setting** 98:13
**settled** 12:13
13:6,13
**seven** 155:5
**Shamus** 2:14
**sheets** 48:3,20
48:23
**shift** 6:7 23:1,3
29:22 30:10
31:25,25 33:15
34:9 37:4 38:2
38:4,7,9,20,20
47:10 66:24
67:2 69:24
79:7 91:19
109:5 139:8

155:1 179:24
**shifter** 139:13
177:16
**shock** 75:21,23
153:11
**shoot** 81:2 82:9
162:16
**shooting** 82:7
120:24 121:16
122:1 123:4
180:16
**shoplifting**
42:13
**shorter** 115:6,7
**shortly** 161:6
**shot** 61:15 62:16
62:21 63:10
72:1 80:16
81:21 84:16
85:2,11 86:13
86:23 87:9,13
88:19 90:23
124:13,21,25
125:6 129:17
181:3 185:14
**shots** 84:8 85:21
86:5,10 88:6
122:18 124:15
175:11,15
176:9,16
178:20 179:22
179:25 180:9
180:16
**shoulder** 87:2
108:3 164:12
**show** 27:7,9
104:2 180:25
**showing** 104:6
**shows** 90:15
**side** 49:3,9 60:14
61:20 62:1
64:2,7 65:16
65:20 66:4,10
66:18 74:6
99:9,12,17,18
99:22,22
103:18 104:22

106:20 107:20
108:2 126:16
127:14,16
129:25 132:2
134:22 149:23
155:10 164:5
169:1,7,8,21
171:1 176:21
182:16 185:12
**Sidoti** 2:9,10 3:5
4:21 116:1,2
129:7 132:11
134:4 140:9,12
144:21,24
148:9,12,14
149:9,11 151:4
151:6 155:18
156:5,10,13
163:19,22
164:2,11,21
165:1 166:19
166:23 171:16
172:4,14 173:8
173:14,16
175:25 176:5
177:19,24
178:7,25 179:5
179:16 181:5
182:20 184:2,5
188:22
**sign** 29:10
118:23
**signage** 56:24
**signal** 112:18
**signature** 54:11
**signs** 89:10
**similar** 33:3,12
74:17 115:5
116:9 132:4,8
133:8
**similarities**
182:21
**simply** 28:4 75:2
82:9 114:10
154:18
**single** 111:17
132:20

**sir** 7:14 35:25
51:1 92:25
103:16 112:9
165:25 187:16
**sirens** 79:23 83:4
83:9,12,14
88:14
**sit** 9:4,18 10:20
10:22 23:17
37:6 39:13
75:7 76:23,24
77:2 129:19
132:9,12
151:24 158:18
161:4 164:6,7
179:17,21
**sit-down** 138:20
**sits** 145:13 147:4
155:9
**sitting** 48:12,15
52:6 111:14
**situation** 45:4
74:8,9,17
81:20 101:21
102:21 145:16
146:1 159:12
159:14,16
**situations** 21:24
101:7,8 102:9
102:18 103:2
183:5
**six** 25:21 26:4,9
26:14,19 155:5
162:24
**slightly** 108:20
108:23 167:9
**slippery** 24:21
25:3
**slow** 131:1,7
**snitch** 123:17
**soft** 51:12
143:22
**software** 29:16
**Solon** 2:17
**somebody** 22:24
53:2 62:15
74:24 81:21

90:19 152:22
155:12
**someone's**
185:15 187:5
**Something's**
118:5
**soon** 50:8
**sooner** 111:10
113:2
**sorry** 43:9 57:12
59:11 88:1
98:25
**sort** 13:20 31:7
31:12 39:25
40:3 58:8
74:19 103:21
110:19 111:24
135:6
**sound** 19:9,18
88:12
**sounds** 89:19
**source** 123:15
**south** 95:1 96:5
96:10 97:1
**southbound**
94:10,20 95:8
95:18,24 96:4
**space** 33:19
**SPD** 165:11
**speak** 7:10 12:20
25:1 48:7
51:21 115:23
116:16
**speaker** 146:15
146:21 147:3
**speaking** 44:8
**special** 8:17
42:17 43:14
54:6 55:3
59:13 63:21
**specific** 22:10
36:18 68:16
74:8 85:25
87:5,8 96:21
100:8 102:15
103:1,2 118:17
118:21 119:5,6

123:11 142:6
146:11 153:9
171:20,23
172:15 173:13
178:1,4
**specifically**
19:13 22:4
27:11 28:1
37:5 38:23,25
39:11 46:5
50:3 55:21
56:1 59:6 61:3
63:13 64:23
72:3 75:5
86:16 100:13
101:23 120:21
122:12 136:22
142:19 144:3
153:12 158:9
158:15 172:17
185:22 186:21
187:9 188:14
**specifics** 24:2
162:14
**specified** 191:11
**specify** 18:13
56:13 72:8
**speculate** 87:22
88:1 91:22
**speed** 20:8,12
21:10 23:16,17
138:14
**speed-related**
138:18
**spent** 6:13
**spikes** 95:7
**spin** 170:23
**spinning** 72:13
73:6 168:4
**spins** 69:16
**spoke** 159:24
**spoken** 51:12
**spot** 126:2
**spouses** 101:9
**spun** 59:19
63:24 65:13
71:2 98:14

169:6 170:22
181:15
**square** 2:11
80:19,22
106:12
**SS** 191:2
**stamp** 171:12,21
173:18
**stamps** 172:22
**stand** 66:15
127:23 131:24
164:8,12,18
184:22 187:18
**stand-off** 101:7
**standard** 110:25
111:3
**standards** 25:25
**standby** 146:17
**standing** 65:5,8
69:22 70:11
71:5 127:25
147:5 187:13
187:17
**stare** 106:9
**start** 75:3 90:5
178:25
**started** 24:9
45:12 58:21
64:20 75:20
79:17 80:2
89:24 91:3
93:18 95:17,23
99:11 100:2
111:20 126:12
170:22 174:5
**starting** 165:10
166:13 167:23
168:2 171:8
175:6 176:13
**starts** 74:5
**stat** 123:10
**state** 1:17 5:23
24:22 26:2
97:15,19
131:15 134:18
191:2,4,22
**stated** 106:11

169:6
**statement** 7:3,5
8:11,15,24,25
9:3,6,16,18
54:2 55:22
63:12 65:14
67:14 70:20
71:12 75:24
80:24 81:7,9
82:8,11 86:11
86:15,17 87:11
89:14 117:4
118:23 132:22
134:25 136:10
137:4 150:19
152:15,19
157:22,24,25
159:2 162:13
168:14 176:18
**statements**
153:14
**states** 1:1 4:13
44:4
**station** 23:23
56:18 57:4,6
93:24 112:17
112:17,21,22
151:5,7 158:17
159:1
**stats** 20:4 29:10
**status** 73:11
**stay** 82:19,22
**steering** 66:21
67:16 68:6
69:24 78:18,19
79:6 80:14,15
108:21 109:4
139:7,13 177:1
177:3 179:24
**stenotypy** 191:7
**step** 75:2
**stepped** 90:19
**Steving** 55:12
**Steving's** 55:8
59:2 153:22
**sticks** 95:20
131:15 144:7

144:10
**stood** 64:20,24
  64:24 65:4
  137:7,9
**stop** 21:5 22:1
  24:13 25:5
  40:21,22 41:24
  42:10,11 43:18
  43:19,20,24,24
  44:4,6,7,9,12
  44:14,18,23
  45:5 46:9
  72:14 77:7
  82:15,16 83:6
  83:18,25 84:1
  84:17,17 95:15
  95:20 97:16,20
  98:1 99:25
  116:22 117:9
  117:17,23
  118:5,12,18,23
  119:3 122:1
  123:23 131:15
  140:4 141:10
  142:4,23
  143:21 144:1,7
  144:10 146:2,5
  146:7 147:18
  148:2,6 171:14
  185:19,20,22
  185:24 186:6
  186:25
**stopped** 21:9
  59:20 61:6
  72:24 73:2
  82:16 109:25
  117:18,25
  118:2,13,13
  126:23 128:3,9
  148:1,21
  165:20 168:23
  169:13,15
  170:5 173:22
  174:20 175:8
  175:14
**stopping** 20:17
  42:18 43:14

44:21 53:2
  83:6 89:2,4
  118:22 167:14
  168:9
**stops** 40:20
  41:18 42:2,7
  42:11,19,20
  43:13,16,17
  44:25 45:1,2
  117:2,6,20
  118:8 119:1
  146:3 147:23
  185:7 186:21
**straight** 77:17
**strap** 132:20,25
  133:2
**strategizing**
  160:24
**street** 1:23 24:24
  25:1 121:17
**stress** 101:10
**strike** 120:6
  136:2 138:12
  142:7 144:21
  147:12 148:10
  149:12 150:6
  160:4 187:22
**striking** 161:19
**strips** 22:1 72:14
  95:15 97:16,20
  98:1 99:25
  130:20 140:20
**Strongsville** 1:7
  1:18,19 2:14
  4:9,12 6:2,6,9
  6:14 12:1
  13:17,21 14:22
  15:16 16:22
  19:21 23:9
  25:13 26:5
  27:1 28:13,23
  34:7 35:10,22
  36:3,6,8,13
  37:10,20 39:22
  41:22 42:5,6
  44:21 47:2
  56:18,25 91:9

93:15,22 113:5
  117:1,24
  119:14 120:3
  121:4 122:15
  122:23 123:15
  123:18,21
  162:1,4,19
**Strongsville's**
  15:20 41:18
**struck** 149:3,7
  168:25 169:7
  169:10
**structure** 33:5
  34:16 159:21
**structured** 33:7
**stuff** 49:1
**subject** 13:20
  15:10 16:16
  18:2 101:14
  113:25 120:23
  188:16
**subject's** 101:6
**subjects** 48:13
  101:8,9
**Subscribed**
  190:21
**subsequent** 69:5
  70:18 113:24
  144:15
**Subsequently**
  62:9
**subtle** 34:23
**sudden** 126:22
**suddenly** 79:23
  112:24,24
  159:13,17
**sufficient** 44:5
**Suite** 1:22 2:5,11
  2:22
**sum** 123:16
  124:7
**summaries**
  154:11
**summary** 12:12
  16:20 57:13
  58:8
**superior** 184:21

**supervision**
  30:24
**supervisor**
  141:14 142:20
  145:1
**supervisors**
  91:17 92:3
  160:25 161:25
**supplement**
  10:22
**support** 19:1
  21:19 89:4,5
**suppose** 28:6
  77:15
**supposed** 123:14
**sure** 9:5 28:17
  39:15 44:3
  50:10 51:24
  58:16,21 63:12
  72:8 80:15
  103:20 104:1
  105:16 114:19
  125:23 145:7
  152:14 156:1
  171:16 178:22
  179:4 187:5
**surprised** 75:24
  76:3 79:13
  106:2
**surroundings**
  124:8
**suspect** 14:12
  24:11 44:5,17
  44:22 45:4
  104:12
**suspected** 42:18
  43:15
**suspended** 28:9
**suspension** 27:3
  27:6,24 28:4
  28:16
**suspensions**
  26:24
**sustain** 129:12
**sustained** 159:4
  159:7
**SUV** 167:9

**switch** 43:1
**sworn** 4:4
  190:21 191:6
**system** 14:22
  15:2,16,20,21
  29:7 55:9
**systematic** 178:9

**T**

**T-shirt** 119:24
**table** 108:10
**tactic** 40:21
  143:20,25
  144:2
**tactics** 46:6
  74:25 100:16
  102:17,20
  145:4 181:21
  183:4
**take** 5:13 8:2
  9:11 15:18,20
  16:7 22:6 32:8
  41:12 44:9
  45:7 46:20
  49:9 53:9
  63:15 81:21
  101:20,21,25
  103:4 106:25
  111:21 113:18
  116:17 124:10
  125:9 126:4
  127:19 143:25
  146:8,17
  155:24 156:8
  158:15 183:18
  185:2,18,23
  186:9 188:14
**takedown**
  126:20 127:9
  183:19
**taken** 1:16 4:10
  5:5 8:16 88:23
  103:14 114:17
  159:13 164:23
  174:12 179:18
  186:22 191:10
**takes** 52:8 81:1

82:17
**talk** 7:12,18
  21:15 93:11
  133:12 141:7
  158:16 165:18
**talked** 59:1,1
  91:5,21 115:2
  142:5
**talking** 34:15
  35:23 68:19
  91:17,18 140:4
  140:5 142:2,10
  142:14 178:5
**tape** 57:21,23
  141:8
**taped** 138:21
  151:1,8,9,11
  151:18
**tapes** 153:3
  156:15 157:7
**target** 121:16
  123:17
**targets** 74:15
**task** 12:5 30:16
  74:12 119:16
  120:11 121:7
  122:13 124:1
  161:6,10,20,23
  162:3
**teaches** 102:16
**team** 111:18
**telephone** 57:9
**tell** 5:8 7:1 30:2
  38:11 47:24
  49:25 51:9
  52:4,15,17
  55:24 56:21
  57:8,12 59:22
  69:16 70:17
  72:17 79:10
  81:8 88:16
  101:3 103:13
  121:13 133:4
  142:9 164:5
  167:19,23
  188:10 191:6
**telling** 26:1

49:11 110:7
  158:5,7
**tells** 142:8
**ten** 54:14 112:22
**tender** 178:15,23
  179:6
**tendered** 152:1
  165:5,9 172:18
  178:8
**tenure** 15:22
  36:7,14,25
  38:18 39:2,3,9
  53:15 152:1
**term** 129:11
**Terminal** 2:10
**terminate** 61:12
**terminated**
  20:17,21 21:3
  61:10
**termination**
  92:22
**terms** 19:19 33:5
  77:6 84:2
  96:17 97:22
  98:3 112:3
  125:13 151:23
**terrible** 81:20
  137:25
**testified** 62:25
  75:23 138:8,13
  145:10 149:9
  156:25 170:19
  180:6 188:6
**testify** 144:20
  149:15 175:11
**testifying** 138:17
**testimony** 28:2
  58:15 118:25
  135:21 139:12
  143:8 149:7
  157:6 165:3
  179:22 180:2,3
  180:8,21 191:7
  191:8
**texting** 184:11
**thank** 9:20 10:4
  10:18 32:10

41:8,11 43:4
  45:21 47:5
  53:25 63:17
  67:25 73:23
  115:22 140:11
  144:23 148:11
  164:24 181:7
  183:25 188:25
**Thanks** 132:13
**thefts** 23:8
**thing** 27:10 69:3
  72:18 113:5
  153:11
**things** 6:21
  29:11 42:14
  51:21 58:19
  91:19 130:7
  134:18 139:2
  142:4,18 157:7
  159:11 160:24
  161:5 165:19
  187:6
**think** 10:13
  13:10 18:11
  19:23 20:3,5
  20:10 21:9,12
  26:8,18 27:25
  35:14 37:23
  42:24 46:23
  49:11 50:14
  55:21 58:21
  62:25 65:14
  75:23 80:14,24
  85:10 86:11
  87:22 90:18
  93:13 100:22
  108:25 109:9
  114:10,15
  115:11 134:2
  141:19 153:19
  156:7 158:19
  160:1 162:14
  162:18,21
  169:13 173:6
  176:3 186:12
  186:14
**thinking** 22:25

44:11 155:8
**third** 31:25 35:6
  71:2 110:3
  160:16
**thought** 68:13
  84:19 109:8
  118:1 123:5
  126:10 173:10
**threat** 84:11,14
**threatening**
  84:20
**three** 25:20 30:3
  30:10,23 31:24
  33:22 35:23
  36:9 111:5
  112:19 131:4,8
  131:17 160:11
  170:20
**three-quarter**
  133:2
**throw** 22:5
**thumb** 134:21
  135:18 165:7
  172:7,8,17
  177:23 178:2
**THURSDAY**
  1:11
**ticket** 138:11
**time** 5:13 9:11
  11:25 12:3,14
  12:16 13:25
  14:25 16:22
  18:5 19:20
  22:6 24:6 25:8
  26:5,25 28:22
  31:3,22 34:1
  35:9 36:22
  37:3,5 38:3,18
  39:8,16,17,22
  45:11 47:20
  48:3,6,11,16
  48:19,19,23
  49:4,10,13,13
  49:18,19,19,23
  50:1,3,4 51:12
  51:14 52:7,8
  52:19 54:16

60:12,18 61:1
  63:9 64:22
  65:1 66:20
  68:19 69:7
  70:3,5,7,13
  71:2,25 72:1,1
  72:24 73:8
  76:15,21 77:6
  77:18 80:21
  85:5,7,11 88:6
  88:7,17,24
  90:8,23 92:21
  95:16,22 96:17
  97:22,25 98:3
  98:16,17
  101:22,23
  102:12,21
  103:2 104:1,7
  107:3 109:22
  109:23 110:3
  111:2,20 112:8
  115:5,10
  116:14 119:4
  119:15,21
  121:15,18
  122:5 123:6
  124:2,15,21
  125:1 126:4,9
  126:10 128:3
  129:13,25
  130:23 131:5
  131:11 136:2,3
  136:9 137:19
  138:5,25 139:6
  139:21 143:15
  144:9 145:14
  146:16 149:2
  150:13 152:4,6
  153:10 155:2
  157:16 158:20
  159:10 165:22
  167:12 169:24
  171:6,10,12,20
  171:21,22
  172:22,24
  173:18,22
  174:7,10,13

175:19 179:22
179:25 180:8
180:15 181:7
183:20 185:14
187:4 188:9
191:10
**times** 30:20
34:19 37:23
40:10 50:5,12
74:12 92:6
101:18,19
112:22 162:16
177:14
**tiny** 52:21
**tire** 72:18,20
100:2,5
**tires** 72:14 73:1
73:3,9,13
**today** 4:25 5:6
7:12 9:4,18
10:21,22 15:5
16:18 21:15
23:17 74:18
75:7 76:20,23
76:24 77:3
115:21 129:19
133:18 179:18
179:21
**today's** 6:20 7:2
8:13
**Todd** 2:15
149:10 164:3
177:20
**told** 39:1 106:1
**Tom** 47:17
**top** 23:10,21
45:16 49:2
73:24 172:24
173:18
**topic** 7:13
**total** 96:13
163:11
**totality** 137:21
**touching** 65:25
66:3 136:19
**Tower** 2:10
**track** 18:7 19:6

49:6
**traffic** 23:11,14
40:20 42:12,20
43:17,20,24
74:14 93:25
116:22 117:2,9
117:16,23
118:18 119:3
123:22 138:8
155:5 185:7,19
185:20,22,24
186:5,21,25
**trained** 74:13
75:2 102:12
112:14 185:6
185:18 187:2
**training** 15:1,15
40:11,12,13,14
74:5,10,19,21
100:8,11,14,19
101:4,13,16,19
102:2,8,17
145:12 185:23
186:5,9,20,24
187:8,18
**transaction**
119:17 121:10
121:15,20
123:3
**transcribe** 5:21
**transcribed**
191:7
**transcript**
134:12 190:1
191:8
**transcription**
191:8
**transit** 125:20
**transition** 38:22
**transitioning**
34:23
**transitions**
34:20
**translated** 49:8
**translates**
134:11
**transmission**

95:17
**transmitted**
95:23
**transpired**
180:12,23
**traskin@mrrl...**
2:18
**traumatic**
162:11
**travel** 131:10
149:3 150:13
167:11
**traveling** 138:16
**treatment** 89:12
89:15
**tree** 25:9,9
**tried** 65:15
76:24
**trigger** 107:2
**truck** 124:4
**true** 15:5 67:10
131:9 191:8
**trunk** 95:23
186:3
**truth** 191:6,6,6
**truthful** 8:25
**try** 5:8,18 19:17
81:20 83:22
84:6 95:15
113:1 126:10
137:22
**trying** 5:10 19:8
26:10 27:23
43:18,19,22
45:19 67:1,16
68:6 69:1,2,16
70:23 81:12
84:21 90:9
91:18 98:8
106:14 107:15
110:2,6 125:4
125:8,16 126:9
142:3 146:2
148:25 150:4
168:17
**tugging** 87:24
**turn** 26:21 83:12

83:14 112:20
113:1,6 125:19
132:12 171:2
**turned** 14:11
23:20 30:17
77:17 79:17,20
80:5,5,17,18
83:9 94:20
95:1 105:23
106:11 107:22
112:12,16
**turning** 53:1
94:20 112:25
**Turnpike** 94:9
94:11 96:2,10
**turns** 44:13
**twice** 69:19
**two** 11:20 22:5
24:3 25:20
34:17 35:2,4,5
35:9 48:7
49:17 73:12
93:19 99:15
100:22 101:1,3
115:9 116:25
122:24 123:24
124:6 131:4
141:23 142:2
142:10,15
154:25 162:23
165:12 175:11
184:2
**type** 50:6 52:20
55:19,21 127:9
**typed** 55:9,13,16
153:21
**types** 40:11,13
42:14 142:17
**typical** 55:15
**typing** 112:21
_____
**U**
**U-turn** 23:21,22
**uh-huh** 5:19
**ultimately** 24:10
64:13
**unarmed** 14:11

162:17 163:5
**unbeknownst**
150:17
**undercover**
51:13,15 74:11
120:9
**underneath**
43:13 119:3
**understand** 5:2
5:8 12:12 13:5
13:13 37:12
39:18,20,20
40:10 44:6
59:3 63:8
64:22 69:15
70:17 73:3
77:2 86:25
87:10 93:12
101:12,15
110:6 111:13
114:13 116:13
117:8 118:11
118:17 122:19
158:23 166:5
179:21 180:5
186:4,8,15,19
186:20
**understanding**
5:20 12:11
13:3,10 14:14
16:20 29:21
30:3,8,12,22
31:9 34:15
35:1 42:9
44:15 49:7
56:15 57:5
93:18 94:12,14
100:18 117:22
119:8 123:12
143:24 185:17
**understood**
50:10,22 52:21
61:13 114:19
143:1,3,6
172:4
**undeserved**
49:12

**unfolding**
126:21
**uniformed**
122:15 123:22
**United** 1:1 4:13
**units** 126:5
**unlocked** 110:10
**unquote** 139:25
**unrelated**
118:14
**uploads** 158:12
**upright** 80:10
**ups** 184:3
**upset** 87:1
106:12
**use** 11:24 14:4,8
21:25 22:2
29:7 42:22
55:18 91:13
95:15 101:17
102:3,4,10,14
111:1 150:7
151:22 152:20
152:22 153:1
153:24 154:3
160:5 171:10
171:11 173:17
188:3,19
**uses** 160:11
**utilization**
102:17
**utilize** 147:8
151:17
**utilized** 42:17
43:14 117:19
**utilizing** 148:16

**V**

**v** 1:6
**Valley** 95:7,18
**van** 59:14,19,25
60:10,14,23,25
61:6,6,9,21,23
62:3,4,7,9,10
62:16,24 63:23
63:25 64:6,7
64:11,14 65:7

65:13,20,24,25
66:3,5,10,17
68:19,23 69:6
69:16,18 70:2
70:18,25 71:4
71:8,10,19
72:13,15,24
73:2,13,16,18
76:12,14 77:5
77:16,19,19
78:4,8 79:2
83:1 85:15
86:9,22 88:23
89:11 92:23
93:8 95:10
97:25 98:13,19
99:1,9,17,21
99:24 100:3
105:6,10 106:8
106:21 109:10
109:12 110:14
110:17 130:15
130:21 131:7
137:3 142:22
149:3,12,25
150:8 155:20
155:24 167:8
168:3,8,12,15
168:18 170:13
171:6 177:5
181:15 183:23
**various** 56:16
**vehicle** 14:15,16
20:22 21:3,4
21:20 23:12,21
24:2,11,12,14
24:15,20,23
25:12,23 26:5
26:9 41:24
43:19,23 44:5
44:7,17,21,22
45:4 46:24
47:2 53:3
59:20,24,25
60:10,13 61:14
61:16 65:17,23
65:24 66:3

68:20,23 69:6
69:19,22 70:2
70:19 71:1,4,5
71:6,9 72:12
72:22,25 74:5
74:6,13,14,16
75:3 76:7,12
76:13,18,18
77:3,5,18,20
78:3 79:15
80:4 82:20
84:2 95:3,18
98:19,20,25
99:2,19,23
104:23 105:1
109:16,17
110:1 117:6,17
117:20,25
118:18 124:14
124:19 125:1
125:20 126:12
126:13,14,14
126:16,19,19
126:21,24,25
127:1,3,5,9,10
127:20,21,24
127:25 128:2,3
128:6,9,13,23
128:25 129:17
129:21 131:16
136:4,6,14,19
136:25 137:5,7
137:10,23
138:2,4,6,14
138:15 139:13
143:21 145:19
146:1,4,6,9,19
147:3,4,5,6,7,9
147:15,17
148:6,20,24
149:2,13,16,23
150:7,14
152:13 166:7,9
166:15 167:15
167:17 168:20
168:25 169:1,7
169:13,14,16

169:17,20,24
170:2,6,20
171:9 173:21
173:25 174:16
175:22 176:9
176:16,21
177:11 178:17
181:14,18,18
181:25 182:1
182:15,17
183:16 185:2
186:2,10,22
187:10,14,17
188:15
**vehicles** 99:15
130:14 163:2,9
163:16,25
167:20 169:10
169:11 185:8
**verbal** 5:18
180:20,22
181:3
**verbalized** 143:5
143:18 147:25
148:4
**verbally** 144:5
**verbatim** 141:7
**version** 29:16
**versus** 4:12
19:14 29:11
58:6 72:6
101:6 139:16
**vest** 119:24,25
**vibrates** 112:19
**Vic** 24:5
**vice** 48:21 120:7
120:9
**vicinity** 150:25
**video** 59:1 71:22
71:23 72:9
77:15 78:2
90:15 97:24
98:17 104:2
107:2 130:8,24
139:18 140:16
153:13 156:11
164:9 165:8,14

165:15,21
166:2,5,25
167:4,14 168:2
171:18,22,24
172:15 174:6
175:22 176:25
177:6,8,13,14
178:16 179:12
180:25 181:2
**video's** 158:23
**videos** 55:5 77:9
103:14 153:17
165:10,14
**view** 24:13 44:5
60:20 86:24
87:10,12,15,18
87:19,24,25
99:20 108:13
124:5 157:6
168:9,12 178:5
**viewed** 166:3
**violation** 118:23
138:8
**violations** 42:12
52:24
**violators** 42:19
43:15
**visual** 139:10
163:8
**vital** 89:10
**Vlna** 22:23
87:16,19 99:10
**voice** 86:14
160:24
**voicing** 162:6
**voluntarily**
20:17 21:15,20
21:21 44:17,22
44:25 45:5
163:15,24
182:24 187:22
188:2,7
**voluntary** 44:7
87:15 185:1,5
**volunteered**
100:21 158:20
**vomited** 89:15

| W | | | | |
|---|---|---|---|---|
| **Wait** 140:7 148:8 | 52:12,20 53:2 | 45:15 51:3 | 126:14 127:13 | 191:5,17 |

**W**

**Wait** 140:7
148:8
**waiting** 48:12,16
52:7 99:10
**waiver** 189:1
**walk** 123:2
125:11 128:7,8
135:9 145:23
146:14
**walking** 112:13
**wall** 63:4 155:10
**walls** 151:23
152:22,25
153:24
**Walmart** 121:24
123:18
**want** 5:13 6:21
8:3,7 23:18
24:20 26:21,22
37:12 40:13,24
43:7 45:7 46:6
54:1 59:15
63:1,8,12
64:18,22 75:14
88:1,2 89:21
90:6 93:11
101:2 103:12
118:11 130:24
138:1 144:16
145:7 151:14
152:17 157:6,7
157:17 158:6,8
158:17 159:25
162:1 173:2,4
178:22 179:4
**wanted** 11:19
47:6 48:14,18
90:5 114:19
146:2 153:13
157:20 159:22
**wants** 31:18
**warning** 14:22
15:2,16,20,21
53:2
**warnings** 52:10

52:12,20 53:2
**warrant** 42:14
**wasn't** 11:7
56:23 58:16,21
73:2 75:19
77:22 79:12
83:13 108:19
120:23 126:23
141:20,22
143:19 147:14
185:20 187:15
**watch** 45:20
97:24 153:13
153:17,18
157:20 158:15
158:18,21
174:5 175:23
176:8 177:14
**watched** 7:8
55:4 77:15
175:21 176:16
176:25 177:13
**watching** 140:16
164:9 177:6,8
181:24
**way** 15:13 19:17
21:21 23:24
28:4,8 29:10
56:14 65:13
76:9 88:3 89:9
108:16 109:20
126:20 136:21
137:13 140:18
153:15 159:8
161:1,9,11,17
165:2 177:6
178:18 183:17
184:6,14 187:9
**ways** 18:24 21:8
112:5 188:6
**we'll** 5:14 43:2
130:8,11,24
165:18 171:11
172:12
**we're** 4:8 7:12
11:15 21:8,14
35:23 44:2

45:15 51:3
74:18 112:14
141:25 142:1
147:22,23,25
156:7 166:12
173:18,20
176:15 178:22
179:7,15 182:5
182:8,12
183:17 184:20
188:16
**we've** 4:25 46:16
59:1 119:13
141:8 148:15
166:24 168:3
172:15 184:8
**weapon** 14:15
14:17 79:1
81:17 82:2
84:25 103:24
109:13,23,24
109:25 124:19
132:21 134:15
134:17 135:12
137:6,13 138:6
185:15
**weapons** 85:18
163:5
**wearing** 48:6
119:24 131:21
155:20,23
**weather** 118:12
**week** 38:16 54:7
**weeks** 22:21
23:6 111:20
115:9 120:16
120:21
**welcome** 10:6
41:10
**welfare** 112:4
**well-being**
113:13
**went** 23:20
24:25 52:20
80:7 99:12
109:17 110:1
120:20 123:23

126:14 127:13
138:19 153:11
**weren't** 35:12
50:6 57:23
120:2 124:25
188:13
**West** 1:23 24:13
24:15 25:1
**Westfall** 12:24
**Whatever's**
164:15
**wheel** 66:21
67:16 68:6
69:24 78:19
79:6 80:14,15
108:21 109:4
139:7,13 177:1
177:4,16
179:24
**wheels** 77:17
**WHEREOF**
191:17
**wherewithal**
84:23
**white** 105:16,19
**William** 1:10,13
4:1,10 5:25
7:24 9:9 16:3
41:3 45:25
46:14 103:9
189:3 190:20
191:5
**window** 61:20
61:22 62:1
63:6,7 176:21
186:2
**windows** 62:2,5
62:11,11 64:6
172:22
**winter** 119:25
**Winters** 2:4
**withdraw** 43:8
**within-named**
191:5
**witness** 45:12,15
108:7 164:15
178:17 179:15

191:5,17
**witnessing** 98:22
**word** 43:22
**worded** 33:10
**words** 107:15,17
149:17 178:21
182:5
**work** 7:16 31:25
48:9,14,21,22
48:22,25 49:1
50:4,7,16
51:13 67:17
68:7 74:12,23
111:17 114:24
154:25 155:2
**worked** 70:13
**working** 29:22
48:14 121:6
155:3
**workload** 50:17
**works** 30:2
**world** 51:16
**worse** 44:13
**wouldn't** 44:16
114:17 136:24
143:23
**wound** 89:4
**Wow** 22:25
**wrecked** 26:14
**wrecking** 24:11
**writing** 18:8
53:2
**written** 34:2,5
39:21 41:21
42:4 44:20
45:3 47:1
49:22 52:10,12
52:20 53:1
67:14 68:14
**wrong** 12:3
93:13 109:15
141:4 155:8

| X |
|---|

| Y |
|---|
**Yasmyn** 2:2

**Yeah** 45:14
  55:12 57:20
  119:23 151:4
  152:16 168:21
  185:17
**year** 29:13 39:10
  150:24
**years** 100:12,24
  111:16 132:14
  150:23 162:24
**yesterday** 16:19
**young** 155:9

**Z**

**zero** 142:17
**zone** 23:9
**Zurzin** 123:1
  127:15

**0**

**04** 173:20
**0700** 32:4

**1**

**1** 28:13 33:9
  165:20 179:12
  190:1
**1-1-15** 47:14
**1-1-2014** 32:18
**1-1-2015** 32:24
**1-888-595-1970**
  1:25
**1:18-CV-00139**
  1:6
**1:18-CV-139**
  4:15
**10** 3:10 9:8,21
  11:1 26:22
  45:12
**10:00** 45:13
  78:19
**10:19** 1:19
**100** 2:16 63:12
  107:25
**1000** 54:14
**103** 3:12
**104** 3:18

**11** 3:11,18 11:23
  15:25 16:2,7
  16:10 17:13
  25:17 163:11
**113** 3:18
**116** 3:5
**117** 3:18
**12** 3:11 26:23,24
  41:2,7,14 42:2
  45:24 46:4,7
  165:11 167:1,5
  174:21
**12:30** 167:15
**129** 3:19
**12th** 10:14 15:14
  15:19
**13** 3:12 14:20
  46:12,13,17,23
  47:3 174:24
**13:27** 168:22
**13:31** 168:8
**13:35** 168:9
**13:36** 168:23
**13:37** 169:15,20
**13:39** 171:8,8
**13:40** 170:5
**13:41** 171:9
**1360** 1:23
**14** 3:12 9:17
  103:8,13,15,16
  106:18 176:4
**144** 3:19
**149** 3:19
**14th** 8:20 55:25
  58:12 59:7
  63:21 82:9
  86:19 158:3
**15** 2:20 3:13,18
  165:16 176:7
  176:18 179:1,8
  189:2
**16** 3:11,18
**17** 111:16
**17(2)** 3:18
**180** 3:19
**181** 3:4
**184** 3:5

**18688** 1:18
**188** 3:19
**189** 3:13 190:2
**19** 3:18
**1900** 2:11

**2**

**2** 33:10 44:3
  167:24
**2:37** 165:22
**2:39:40** 173:18
**2:40** 174:20,24
  175:6 176:15
  176:17
**2:40:02** 174:5
**2:40:03** 173:20
**2:40:09** 171:11
  173:23
**2:40:14** 175:8
**2:40:15** 175:14
  178:19
**2000** 6:11
**2001** 6:10,12,13
**2010** 27:4
**2011** 121:23
**2012** 121:23
**2015** 27:6,25
  28:10,13
**2017** 4:24 8:21
  9:17 22:21
  23:7 54:8
  55:25 56:17
  58:13 59:7
  63:22 82:9
  104:20 165:22
  182:22 183:23
**2018** 1:11 10:14
  15:14,19
  190:22 191:18
**2020** 191:22
**20445** 2:22
**210** 2:22
**216** 1:24,24 2:12
  2:23
**2200** 32:4
**23** 1:11
**24** 157:15 158:4

**248-7906** 2:18
**250** 124:4
**27** 18:4,5,11
  19:2,18,23
  20:5 165:11
**270** 168:19
  169:6
**28(D)** 191:13
**29** 191:22
**29th** 191:18

**3**

**3** 50:25 165:11
  167:25
**3-14-17** 54:14
**3-7** 165:22
**3:28** 168:2
**3:31** 168:3,5
**30** 45:18
**34305** 2:17
**35** 23:16
**357-3350** 2:12

**4**

**4** 3:4 51:24
  59:10,19 64:19
  67:21 69:11
  71:13
**4-30-15** 47:14
**4-30-2014** 32:18
**4-30-2015** 32:24
**41** 3:11
**42** 3:18
**440** 1:22 2:18
**440-498-9100**
  2:6
**44113** 1:23 2:11
**44115** 2:6
**44135** 2:22
**44139** 2:17
**45** 3:11 156:11
**46** 3:12
**48** 157:15 158:5
**490** 2:5

**5**

**5** 10:24 32:8,14

**32**:17 33:4,23
  34:11 36:16
  47:7 53:12
  71:14 81:1
**5-1-2014** 32:21
**50** 2:11
**53** 165:20
**54** 3:18
**57** 3:18 165:23
**58** 3:18
**5th** 27:25

**6**

**6** 32:8,14,20
  33:4,23 34:11
  36:16 46:5,7
  47:7 52:5,16
  53:12 165:8,10
  173:13 179:12
**60** 23:19
**621-2550** 1:24
**621-3377** 1:24
**65th** 24:14,15
  25:1

**7**

**7** 3:10 32:8,14
  32:23 33:4,23
  34:11 36:16
  47:7 51:4,7,25
  52:13,16 53:6
  182:21
**70** 3:18
**71** 24:13 94:9,13
  94:21 95:10,24
  96:5,10 123:23
**781-3600** 2:23
**7th** 4:23 22:21
  23:7 54:8
  56:17 104:20
  183:23

**8**

**8** 27:8
**8-31-2014** 32:21
**8:30** 168:14,17
**812** 2:5

**82** 96:11
**86** 3:18

---

**9**

**9** 3:10,10 7:22
7:23 8:15 33:9
59:12,13
165:11,13,24
179:12
**9-1-1** 154:14,15

Page 191

1                         CERTIFICATE

2    State of Ohio,        ) SS:

3    County of Cuyahoga.   )

4         I, Kristine M. Esber, a Notary Public within and
     for the State of Ohio, duly commissioned and qualified,
5    do hereby certify that the within-named witness,
     OFFICER WILLIAM JASON MILLER, was by me first duly
6    sworn to tell the truth, the whole truth and nothing
     but the truth in the cause aforesaid; that the
7    testimony then given by him was reduced to stenotypy,
     and afterwards transcribed by me through the process of
8    computer-aided transcription, and that the foregoing is
     a true and correct transcript of the testimony so given
9    by him as aforesaid.

10        I do further certify that this deposition was
     taken at the time and place in the foregoing caption
11   specified.

12        I am not, nor is the court reporting firm with
     which I am affiliated, under a contract as defined in
13   Civil Rule 28(D).

14        I do further certify that I am not a relative,
     employee or attorney of either party, or otherwise
15   interested in the event of this action.

16

17        IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Cleveland, Ohio, on
18   this 29th day of August 2018.

19

20                    _Kristine M Esber_

21   _____
     Kristine M. Esber, Notary Public
22   in and for the State of Ohio.
     My Commission expires November 29, 2020.

23

24

25

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 190

1   I have read the foregoing transcript from Page 1

2   through 189 and note the following corrections:

3   PAGE      LINE                    REQUESTED CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   _____

21   Subscribed and sworn to before me on the _18th_ day

22   of _SEPTEMBER_ , 2018.

23

24   _____
     Notary Public

25   My commission expires: _04-23-22_ .

MARGARET A. HINTZ
NOTARY PUBLIC - OHIO
MY COMMISSION EXPIRES 4-23-2022

OFFICER WILLIAM JASON MILLER

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**