IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
- - -

ADAM FRIED, Administrator,   )
et al.,   )
        Plaintiff,   )
  )
     v.   ) Case No. 1:18-CV-00139
  ) Judge Patricia A. Gaughan
CITY OF STRONGSVILLE,   )
et al.,   )
       Defendants.   )

- - -

THE DEPOSITION OF SERGEANT SHAMUS KELLEY
THURSDAY, JULY 19, 2018
- - -

     The deposition of SERGEANT SHAMUS KELLEY, a
Defendant herein, taken as if upon cross-examination by
the Plaintiffs, under the Federal Rules of Civil
Procedure, taken before me, Janet M. Hoffmaster,
Registered Professional Reporter and Notary Public in
and for the State of Ohio, pursuant to Notice, at
Strongsville Police Department, 18688 Royalton Road,
Strongsville, Ohio, commencing at 9:06 a.m., the day
and date above set forth.

                  - - -

HOFFMASTER & BARBERIC, INC.
THE GRAY'S BLOCK
1360 WEST 9TH STREET, SUITE 440
CLEVELAND, OHIO  44113
(216) 621-2550
FAX: (216) 621-3377
1-888-595-1970
email: hoffmastercourt@aol.com

Page 2

```
 1   APPEARANCES:
 2   On behalf of the Plaintiffs Amanda Pauley, Individually
     and as parent and next friend of Devon Connard, Yasmyn
 3   Evans, and Roy Evans, Jr.:
 4       JOSEPH F. SCOTT, ESQ.
         Scott & Winters Law Firm, LLC
 5       The Caxton Building
         812 E. Huron Road, Suite 490
 6       Cleveland, OH  44115
         (440) 498-9100
 7       email: jscott@ohiowagelawyeres.com
 8
     On behalf of the Plaintiff Adam Fried, Administrator of
 9   the Estate of Roy Evans, Jr., Deceased:
10       MARCUS SIDOTI, ESQ.
         Jordan & Sidoti, LLP
11       The Terminal Tower
         55 Public Square, Suite 1900
12       Cleveland, OH  44113
         (216) 357-3350
13       email: marcus@jordansidoti.com
14
     On behalf of Defendants City of Strongsville, Jason
15   Miller, Sergeant Shamus Kelley, and James Kobak:
16       STEVEN K. KELLEY, ESQ.
         TODD M. RASKIN, ESQ.
17       Mazanec, Raskin & Ryder, L.P.A.
         100 Franklin's Row
18       34305 Solon Road
         Cleveland, OH  44139
19       (440) 248-7906
         email: skelley@mrrlaw.com
20       email: traskin@mrrlaw.com
21           - - -
22   ALSO PRESENT:
         Officer William Miller
23       Amanda Pauley
         David Pauley
24           - - -
25
```

Page 3

```
 1               INDEX
 2                           PAGES
 3   CROSS-EXAMINATION BY
 4       MR. SCOTT                4, 220
 5       MR. SIDOTI              152
 6
             - - -
 7
 8   PLAINTIFF'S EXHIBITS MARKED
 9       1              23
         2              99
10       3              118
11
             - - -
12
13   OBJECTIONS BY
14       MR. KELLEY     7. 9. 11(2), 13, 14, 15, 16,
                        19, 20, 21(3), 22, 30, 33, 51,
15                      55, 70, 74, 82, 85, 95, 99,
                        113, 115, 120, 130, 145, 146,
16                      154, 165, 168, 178, 190, 194,
                        197, 209
17
18           - - -
19
20
21
22
23
24
25
```

Page 4

```
 1           SERGEANT SHAMUS KELLEY
 2   a Defendant herein, called for examination by the
 3   Plaintiffs, under the Rules, having been first duly
 4   sworn, as hereinafter certified, was deposed and said
 5   as follows:
 6               CROSS-EXAMINATION
 7       MR. SCOTT:           Please let the
 8   record reflect that we're here today for
 9   the discovery deposition of Sergeant
10   Shamus Kelley being taken in the matter of
11   Adam Fried, Administrator of the Estate of
12   Roy Dale Evans, et al. versus City of
13   Strongsville, et al, Case No. 1:18-CV-139
14   pending in the United States District
15   Court for the Northern District of Ohio
16   before the Honorable Judge Patricia A.
17   Gaughan.
18   BY MR. SCOTT:
19   Q.   Sergeant Kelley, my name is Joseph Scott and I
20   have the privilege of representing Amanda Kelley [sic]
21   and her three children in a civil litigation that's
22   been filed.
23       You're familiar with that complaint, correct,
24   sir?
25   A.   Yes.
```

Page 5

```
 1   Q.   And we've asked you here today to ask you a
 2   number of questions relative to the allegations that
 3   have been made in that complaint as well as the
 4   assertions that have been made in the answers filed on
 5   behalf of the defendants; you understand that, correct?
 6   A.   I understand.
 7   Q.   Okay.  Thank you, sir.
 8       The way we'll proceed this morning, obviously
 9   I'm going to ask you a number of questions and I would
10   ask that you please try and give me a verbal response
11   to my questions as opposed to a nod of the head or a
12   uh-huh or huh-uh because we won't know what that means
13   when we have it typed up, okay?
14   A.   Okay.
15   Q.   So we want to have a complete and accurate
16   record, all right?
17   A.   Yes.
18   Q.   If at any time I ask you anything that's not
19   clear, please tell me and I'll try and rephrase my
20   question, otherwise I'm going to assume that you're
21   trying to answer my questions to the best of your
22   ability; is that fair?
23   A.   That's fair.
24   Q.   If at any time, sir, you want to take a break
25   for any reason at all, please let me know and we'll do
```

Page 6

1  so. I only ask that you answer the question that's
2  pending before we break, okay?
3  **A.  Yes.**
4  Q.  All right.  Would you please state your full
5  name for the record?
6  **A.  My name is Shamus Kelley.  My first name is**
7  **spelled S-H-A-M-U-S, and last name, K-E-L-L-E-Y.**
8  Q.  And you are a sergeant with the Strongsville
9  Police Department; am I correct in that?
10  **A.  I am.**
11  Q.  And how long have you been a member of the
12  Strongsville Police Department?
13  **A.  I got hired on March 2nd, 2001, so I'm in my**
14  **18th year.**
15  Q.  And, sir, did you have any law enforcement
16  background prior to that?
17  **A.  I was a corrections officer downtown at the**
18  **Cuyahoga County Sheriff, that's all, for about seven**
19  **months before I got this job.**
20  Q.  Let me ask you, in preparing for today's
21  deposition were you able to review any documents, any
22  videos, any photographs, anything like that?
23  **A.  Yes.**
24  Q.  Can you tell me what materials you have
25  available to you that you were able to review prior to

Page 7

1  coming here today?
2  **A.  I reviewed the statement that I gave to Agent**
3  **Chuck Moran.**
4  Q.  Agent Chuck Moran with the Bureau of Criminal
5  Investigations?
6  **A.  That's correct, yeah.  It was a typed out**
7  **version of my statement.**
8  **I also listened to the verbal statement I gave**
9  **to Agent Moran on the early morning hours after the**
10  **incident occurred.  That's basically everything that I**
11  **prepared for today.**
12  Q.  Did you have a -- other than your counsel, I
13  mean, I don't want to know what you talked about with
14  your attorney, but did you have the opportunity to meet
15  with any other members of the Strongsville Police
16  Department or anyone else who was involved in the
17  incident of March 7, 2017?
18          MR. KELLEY:          Objection.
19          What time frame?
20          MR. SCOTT:          Prior to
21  coming here today.
22          MR. KELLEY:          You're saying
23  in preparation for deposition.
24          MR. SCOTT:          Yes, sir.
25          MR. KELLEY:          Okay.  Go

Page 8

1  ahead.
2  **A.  In preparation for the deposition, yes.**
3  Q.  And who did you have an opportunity to meet
4  with, other than your attorney?
5  **A.  I did speak with Jason Miller, yes.**
6  Q.  To review the events of March 7, 2017?
7  **A.  No.  We spoke of the policy that the**
8  **Strongsville Police has in regards to the pursuits.**
9  **Basically we talked about our pursuit policy.**
10  Q.  Okay.  And what about the pursuit policy?
11  **A.  Specifically there was a caveat in the pursuit**
12  **policy as it relates to specialty vehicles being**
13  **involved in a pursuit.**
14          **And there was a discussion that we had to**
15  **decipher whether a canine vehicle was a specialty**
16  **vehicle that was allowed in a pursuit or not.**
17          **So we spoke with our deputy chief and we got**
18  **clarification that Officer Miller's canine car is not**
19  **considered a specialty vehicle because it is pursuit**
20  **rated.**
21  Q.  Did you have a concern about the nature of
22  Officer Miller's vehicle on March 7, 2017 while this
23  pursuit was occurring?
24  **A.  No.**
25  Q.  So you looked at the videos; is that correct?

Page 9

1  **A.  I looked at -- I have seen videos in the last**
2  **year-and-a-half.**
3  Q.  I want to ask you a little bit about your law
4  enforcement training.
5          Where did you go to the academy?
6  **A.  I went to the Ohio State Highway Patrol Academy,**
7  **their basic police academy.**
8  Q.  What year did you complete that?
9  **A.  That was from March 5th, 2001 until June 22nd,**
10  **2001, so it was four months.**
11  Q.  And would you have then assumed duties as a
12  patrol officer here with the City of Strongsville after
13  completing the academy?
14  **A.  There is an in-house training protocol here,**
15  **but, yes, I would be considered a sworn officer after**
16  **that point.**
17  Q.  Other than the incident on March 7th, 2017 have
18  you been involved in any other use of deadly force
19  incidents?
20  **A.  No, I have not.**
21  Q.  Are you aware of any other use of deadly force
22  incidents involving other City of Strongsville Police
23  Officers other than the March 7, 2017 incident?
24          MR. KELLEY:          Objection.
25          You can answer.

Page 10

1  A.    Yes.
2  Q.    What use of deadly force incidents are you aware
3  of, other than March 7, 2017?
4  A.    Right.  There was an incident where a now
5  retired officer by the name of Lieutenant Mark
6  Stepanovich was in an officer involved shooting in a
7  house.  That incident, actually, there was another
8  officer, Officer Curtiss Fields was also involved in
9  that same incident.
10        I am aware of Officer Miller's officer involved
11 shooting that occurred in the Walmart parking lot
12 previously.
13        And off the top of my head with this question,
14 that's all can I remember.
15 Q.    Okay.  So you can remember two other use of
16 deadly force incidents involving Strongsville --
17 members of the Strongsville Police Department; is that
18 fair?
19 A.    That's fair.
20 Q.    If there is a use of deadly force incident
21 involving a Strongsville Police Officer, is that
22 information something that's disseminated through the
23 ranks that everybody is made aware of?
24 A.    Yes.
25 Q.    And what's the purpose of doing that?

Page 11

1        MR. KELLEY:        Objection.
2        Go ahead.
3  BY MR. SCOTT:
4  Q.    If you know.
5  A.    I don't know other than it's just information
6  sharing.
7  Q.    Is it shared for the purposes of discussing use
8  of force policy, tactics and training, that sort of
9  thing?
10        MR. KELLEY:        Objection.
11        Go ahead.
12 Q.    Do you know?
13 A.    I don't know.
14 Q.    Certainly nobody's ever conveyed that to you,
15 that the purpose in sharing that information was to
16 enhance everybody else's knowledge and training in the
17 use of force; is that fair?
18 A.    Can you say that again?  I kind of lost you
19 there.
20 Q.    I'm trying to understand why the information
21 would be disseminated and whether or not there's any
22 training purpose behind disseminating such information
23 that you've been made aware of.
24 A.    Quite frankly the information gets disseminated
25 because we are all so close working in the same, you

Page 12

1  know, agency, in the same field.
2        Afterwards obviously there's training issues
3  that come out of it, sometimes through the
4  administration, sometimes through the course of a civil
5  lawsuit.
6  Q.    How does it get disseminated?  Just people
7  talking?
8  A.    People, word-of-mouth, yes.
9  Q.    Phone calls, texting, emails, anything like
10 that?
11 A.    Yes, I'm sure.
12 Q.    Okay.  Do officers -- let me ask, you yourself,
13 do you carry a personal cell phone when you're on duty?
14 A.    I do.
15 Q.    To your knowledge do other members of the
16 Strongsville Police Department carry a personal cell
17 phone while they're on duty?
18 A.    I'm sure that they do, yes.
19 Q.    Are there any policies concerning the use of
20 personal cell phones while on duty?
21 A.    I don't know of any policies that we have on the
22 use of personal cell phones.
23        Specifically we have a policy that they do not
24 want us to use your personal cell phones to take
25 photographs or evidentiary photos with our personal

Page 13

1  phones.
2  Q.    Okay.
3  A.    That's the only one I'm aware of.
4  Q.    So other than evidence gathering, you're not
5  aware of any limitation on the use of personal cell
6  phones while on duty; is that fair?
7  A.    That's fair.
8  Q.    Are there any special protocols, administrative
9  procedures that officers are subject to if they are
10 involved in a use of deadly force incident?
11        MR. KELLEY:        Objection.
12        Go ahead.
13 A.    Which officers specifically are you mentioning?
14 Q.    Any officer involved in a use of deadly force
15 incident.  Let's just start with everybody who might be
16 on scene at the time the deadly force is used.
17 A.    There are protocols in place, yes.
18 Q.    What are they?
19 A.    From a supervisory standpoint, which is
20 applicable to me, obviously I have to let the person
21 that is my boss, for lack of a better term, know about
22 what happened.
23        Aside from the logistics at the scene,
24 immediately after a deadly force incident, that would
25 be the only one that comes to mind when it comes to

Page 14

1  administrative duties. Most of the duties are
2  logistics at the scene, if I'm answering your question
3  right.
4    Q.    How are use of deadly force incidents
5  investigated? Are they investigated internally? Are
6  they investigated in conjunction with outside agencies?
7  How are they investigated?
8         MR. KELLEY:        Objection.
9         Go ahead.
10 A.    Deadly force shootings you're speaking of.
11   Q.    Yes, sir.
12 A.    Our deadly force shootings and this one that
13 we're here for specifically was investigated by BCI and
14 I -- and also afterwards I have knowledge that there
15 was an internal investigation done by this agency.
16   Q.    When you say this agency?
17 A.    Strongsville Police Department.
18   Q.    That there was an additional internal
19 investigation done as well.
20 A.    Correct.
21   Q.    Okay. And is that sort of like an internal
22 affairs report, a typed report of some kind that you
23 became aware of?
24 A.    Yes.
25   Q.    Are officers involved in use of deadly force

Page 15

1  incidents placed on administrative leave or anything of
2  that nature while the investigation's going on?
3  A.    Yes.
4    Q.    And what is involved there?
5  A.    It's immediately three days. Three days is
6  immediately right after the incident.
7    Q.    And is that three days for everybody that was on
8  scene, or only the active shooters, or --
9  A.    It's definitely for the active shooter, and I
10 think it is a case-by-case basis for other people
11 involved.
12   Q.    And is there any sort of review when an officer
13 is brought back on active duty after such a three-day
14 leave period to discuss or review the incident?
15        MR. KELLEY:        Objection.
16        Go ahead.
17 A.    I don't know. I don't have that administrative
18 position.
19   Q.    Is there any formal determination as to the
20 appropriateness of the use of deadly force made by
21 Strongsville before an officer is brought back on duty
22 from administrative leave?
23 A.    I don't know that.
24   Q.    And that's not something you've ever been
25 involved in.

Page 16

1  A.    No.
2    Q.    Who would be involved with that?
3  A.    It would have to be our administration. We have
4  a chief, two deputy chiefs. We have a lieutenant that
5  is in charge of our patrol division. We have a
6  lieutenant that is in charge of our detective bureau.
7  It would be somewhere in those ranks.
8    Q.    Are you aware of whether or not the City of
9  Strongsville Police Department has what is referred to
10 as an early warning system?
11 A.    I am aware of it, yes.
12   Q.    What is your understanding of the early warning
13 system?
14 A.    It is a procedure that is set in play by our --
15 in our policies whereas if we see that there is an
16 officer for whatever reason, be it noticeable change or
17 decline in their personal life, their mental status,
18 anything like that, if they have deficiencies in their
19 work, it's something that we document.
20   Q.    What about involvement in such things as use of
21 deadly force incidents, does that get placed in the
22 early warning system?
23        MR. KELLEY:        Objection.
24        Go ahead.
25 A.    I don't know because that wouldn't be something

Page 17

1  that I would do as a sergeant.
2    Q.    Have you received any formal training on the
3  city's early warning system policy?
4  A.    Basic.
5    Q.    And what basic training?
6  A.    What it is and how I would access it into the
7  computer network to make an entry.
8    Q.    Have you made any entries into the computer
9  network regarding the early warning system?
10 A.    Yes.
11   Q.    What sorts of entries have you made?
12 A.    Incidents involving patrol officers that I
13 supervise, if they did something that was deficient, if
14 they did something that needed corrective measures, if
15 they were instructed that they had to improve their
16 performance.
17   Q.    When was the first time you recall ever making
18 such an entry?
19 A.    I have been a sergeant for I guess a
20 year-and-a-half, probably maybe eight months ago. I
21 don't know for certain, though.
22   Q.    Prior to the events of March 7, 2017 had you
23 ever made an entry into the early warning system
24 regarding any officer that you had supervision over?
25 A.    No.

Page 18

1   Q.   Prior to March 7, 2017 were you aware of any
2   other supervising officer, whether it be sergeant,
3   lieutenant, commander, deputy chief, whatever, making
4   an entry into the early warning system concerning any
5   other member of the Strongsville Police Department?
6   **A.   Specifically I don't know who.**
7   Q.   What about not specifically?  You're saying
8   nothing you had direct knowledge of?
9   **A.   Right.  Right.  I'm sure that it happened, but I**
10  **don't know -- prior to March 7, 2001 [sic] I had only**
11  **been a sergeant for approximately six weeks, so.**
12  Q.   2017?
13  **A.   I'm sorry.  My mistake, 2017, yes.**
14  Q.   Okay.  But you say that you're sure it's
15  happened.  What makes you sure that that would have
16  happened?
17  **A.   Well, we are a living, breathing organization**
18  **and there's going to be improvements that need to be**
19  **made, and mistakes are going to be made, of course it**
20  **happens.**
21  Q.   So you would assume that somebody was following
22  that policy.
23  **A.   Yes.**
24  Q.   Okay.  Have you ever received training on the
25  concept of unity of command?

Page 19

1   **A.   Yes.**
2   Q.   What does that mean to you?
3   **A.   Well, in an organization such as this it means**
4   **that we operate on a quasi-military organizational**
5   **structure so there's ranks.  And the person who has the**
6   **rank is the person who is the leader.**
7   Q.   And when the leader, the highest ranking officer
8   involved -- right?
9   **A.   Yes.**
10  Q.   -- issues a command, you expect that command to
11  be followed by all the other members of the unit that
12  are operating with you at that time; is that fair?
13  **A.   That's fair.**
14  Q.   No room for people to go off on their own and do
15  their own thing, correct?
16      MR. KELLEY:         Objection.
17  **A.   Police officers do have discretion.  In my**
18  **position as a sergeant I don't have the opportunity to**
19  **supervise everybody all the time.  And certainly not**
20  **every task that we perform in the police department**
21  **requires autocratic, you know, leadership.**
22  Q.   I understand that.
23  **A.   Officers do have discretion, but as a leader, as**
24  **a sergeant, as the highest ranking officer, yes, I**
25  **would expect people to --**

Page 20

1   Q.   Follow your commands.
2   **A.   Correct.**
3   Q.   And if they wanted to do something different,
4   they would check with you first; is that fair?
5   **A.   Not in every single case because officers do**
6   **have discretion, but, yes.**
7   Q.   Okay.
8   **A.   If it was feasible.**
9   Q.   Have you ever received any de-escalation
10  training?
11  **A.   Yes.**
12  Q.   What do you understand that to be?
13  **A.   The job of a police officer is very dynamic and**
14  **we deal with people that are in crisis quite often,**
15  **just about every day.**
16      **So some of the training that we receive**
17  **instructs us that when we deal with somebody, you know,**
18  **we should be cognizant that we shouldn't be escalating**
19  **a situation.  We should be taking measures to try and**
20  **end a situation so that nobody gets hurt.**
21  Q.   And things that would potentially escalate a
22  situation would be officers placing themselves in
23  danger needlessly?
24      MR. KELLEY:         Objection.
25  **A.   If an officer was placing themselves needlessly**

Page 21

1   in danger I would say yes.
2   Q.   That would be contrary to your de-escalation
3   training; is that fair?
4       MR. KELLEY:         Objection.
5       **Go ahead.**
6   **A.   Depending on the situation I would say yes.**
7   Q.   Well, can you imagine a situation where an
8   officer could needlessly place themselves in danger
9   that would not be contrary to your de-escalation
10  training?
11      MR. KELLEY:         Objection.
12      You can answer.
13  **A.   Police officers have to make decisions where**
14  **they have to protect public safety.  And if that need**
15  **arises then the officer does have discretion to make**
16  **those types of decisions, to put themselves in danger,**
17  **yes.**
18  Q.   I'm asking you if placing themselves in danger
19  needlessly is contrary to your de-escalation training.
20      MR. KELLEY:         Objection.
21      Go ahead.
22  **A.   I'm not sure if I quite understand the question.**
23  Q.   Well, de-escalation tactics are intended to
24  limit, if you will, the use of force necessary to
25  apprehend a suspect or end a situation that you might

1  be involved in; is that fair?
2  **A.   That's a very blanket statement, but, yes,**
3  **that's fair to say.**
4  Q.   Well, there may be an opportunity to resolve a
5  situation say with less than lethal force depending
6  upon the tactics that are used as opposed to charging
7  forward and escalating a confrontation; is that fair?
8         MR. KELLEY:        Objection.
9         You can answer.
10 **A.   Again, depending on the situation, that may or**
11 **may not be fair.**
12 Q.   But the concept in general is to look for
13 opportunities to limit the amount of force necessary in
14 an effort to resolve a situation as peacefully as
15 possible.
16 **A.   Yes.  I think we all want that, yeah.**
17 Q.   Okay.  The training that you went through on
18 de-escalation tactics, where did you receive that?
19 **A.   I know that we reviewed this, but off the top of**
20 **my head, I forget.  If there's a form I could look at,**
21 **where I had it done.**
22 Q.   You're saying you reviewed it as part of this
23 litigation?
24 **A.   I reviewed it.  I don't remember where I had it**
25 **at.  It was several years ago.**

1  Q.   Let me help you out here.
2         (Thereupon, Plaintiff's Exhibit 1 to
3         the deposition of SERGEANT SHAMUS KELLEY
4         was marked for identification.)
5  BY MR. SCOTT:
6  Q.   Sergeant Kelley, handing you what's been marked
7  as Plaintiff's Exhibit 1, I believe it's captioned
8  "Answer to Plaintiffs' First Set of Interrogatories
9  Directed to Defendant Shamus Kelley;" am I correct on
10 that?
11 **A.   That's correct.**
12 Q.   And I think attached to the back of that are
13 copies of training certificates and maybe even a
14 schedule of training?
15 **A.   Yes.**
16 Q.   Does that help you recall your de-escalation
17 training?
18 **A.   Yes, thank you.**
19 **It appears that my most recent training on this**
20 **crisis de-escalation topic was on March 1st and 2nd of**
21 **2016.**
22 Q.   So about a year before this incident.
23 **A.   Yes.**
24 Q.   And where did that training take place?
25 **A.   It was, it took place -- it was instructed by**

1  the North Coast Polytechnic Institute, and I believe it
2  was at a Strongsville Fire Station, if my memory serves
3  correct.
4  Q.   Were there a number of officers from the
5  Strongsville Police Department that went through the
6  same training at the same time?
7  **A.   Yes.**
8  Q.   Did everybody go through the same training at
9  the same time?
10 **A.   I assume, yes.**
11 Q.   Was that mandated for everybody as far as you
12 know, mandated training?
13 **A.   As far as I know it's mandated by the state that**
14 **every officer has to go through that.**
15 Q.   Did you keep any of the training materials from
16 that?
17 **A.   We are given a handout at that instructing**
18 **course.  I don't believe that I held onto it.**
19 Q.   So you don't think you have a copy of it as you
20 sit here today.
21 **A.   No.**
22 Q.   Do you keep copies of any training materials for
23 any training that you've received?
24 **A.   I keep copies of the certificates that we**
25 **receive upon completions.  I have some training**

1  **documents.  I don't have all of my training documents**
2  **saved.**
3  Q.   What sorts of training materials have you saved?
4  **A.   I still have four large binders that we received**
5  **in our basic police academy.  And I do have some -- I**
6  **don't know specifically, but I do have some other**
7  **training handouts that I received over the years.**
8  Q.   But in --
9  **A.   I have them in a file cabinet.**
10 Q.   In general you haven't made a point of keeping
11 all the training materials that you've received.
12 **A.   That's correct.  I don't have them all.**
13 Q.   May I have that back, please?
14 **A.   Sure.**
15 Q.   Thank you.
16 Do you ever review those training materials from
17 time to time?
18 **A.   I don't remember the last time that I reviewed**
19 **them.**
20 Q.   Would I be correct that your de-escalation
21 training would be potentially applicable in any
22 situation?
23 **A.   Yes.**
24 Q.   Have you received any training on dealing with
25 individuals in mental health crisis?

Page 26

```
 1   A.   Yes, I have.
 2   Q.   And what do you recall about that?
 3   A.   The training that I received was very basic, and
 4   what I recall being taught was that there are certain
 5   mannerisms that we should be cognizant of that may
 6   indicate that a person has mental health issues or may
 7   be in mental health crisis.
 8   Q.   Okay.  What sorts of mannerisms?
 9   A.   You're asking for specific things?
10   Q.   What do you recall about that?  You said there's
11   specific things that you're taught to look for.
12        I assume you carry that with you as you go out
13   in the field every day.
14   A.   Yes.  I would say things like facial
15   expressions, body language expressions that would
16   indicate that somebody's under duress or stress,
17   whether that be physical or mental stress.
18   Q.   And what specific facial expressions would you
19   be looking for?
20   A.   We were just taught to be cognizant of basically
21   anything that does not seem normal.
22   Q.   A blank look, a blank stare would be something
23   that didn't seem normal in some situations?
24   A.   Depending on the situation that could be an
25   indication, yes.
```

Page 27

```
 1   Q.   Would somebody who is engaging in behavior that
 2   doesn't seem logical, would that be a suggestion that
 3   they might be in a mental health crisis?
 4   A.   That could be, yes.
 5   Q.   And, again, is your mental health training
 6   something that would be applicable, potentially
 7   applicable in any situation?
 8   A.   Potentially, yes, sure.
 9   Q.   Do you know when the City of Strongsville early
10   warning system was originally adopted?
11   A.   I don't.
12   Q.   Do you know if it was adopted during the time
13   that you were on the force, that is, after you had
14   joined the force?
15   A.   I don't know.
16   Q.   Other than the March 7, 2017 pursuit have you
17   been involved in any other vehicle pursuits?
18   A.   Yes.
19   Q.   How many do you think you've been involved in?
20   A.   I have not kept track, but it's been at least
21   10.
22   Q.   And in terms of lengths of pursuits, duration of
23   pursuit, whether it be distance or time, how would
24   those have compared to the March 7, 2017 pursuit?
25   A.   March 17 [sic] pursuit was not the longest
```

Page 28

```
 1   pursuit that I was in.
 2   Q.   What was the longest pursuit that can you
 3   recall?
 4   A.   I don't recall the year, but I recall I was in a
 5   motor vehicle pursuit that started in Strongsville and
 6   ended in Lodi.
 7   Q.   Okay.
 8   A.   So actually now that I think about it, it was
 9   similar.  But that particular pursuit that I'm speaking
10   of in the past actually started in Cleveland, then it
11   stopped, and then it started again in Strongsville.
12   Q.   Okay.
13   A.   So maybe that's where my mind's going there.
14   Q.   Would you have joined it when it reached
15   Strongsville and then continued with it to Lodi?  That
16   pursuit that you're referring to, the prior pursuit?
17   A.   That's what occurred, yes.
18   Q.   Tell me a little bit about that.  What sort of
19   vehicle were you pursuing?
20   A.   The pursuit initiated somewhere in the West 80th
21   and Madison area in Cleveland where a -- it was a
22   stolen car and it -- it was reported to us that it had
23   attempted to run over a Cleveland Officer and they
24   pursued the car 71 south.
25        And then Strongsville joined in the pursuit.  It
```

Page 29

```
 1   pursued to Lodi and then eventually the car pulled over
 2   and stopped and the two occupants, they were actually
 3   juvenile occupants, they were called out on the
 4   megaphone and they were taken into custody.
 5   Q.   And the callout on the megaphone, is that
 6   referred to as a felony callout type stop?
 7   A.   Yes.
 8   Q.   Tell me about felony callout stops, what is the
 9   training for or the protocol, if you will, for
10   performing a felony callout stop?
11   A.   It's training that's initiated in the police
12   academy, so it's rather universal in that all police
13   officers are familiar with it.
14        It's a traffic stop situation, whether it stems
15   from a pursuit or just an individual who is, you know,
16   wanted for a felony.
17        The car is stopped, the police cars are behind
18   it, the person is called out on the megaphone and
19   placed into handcuffs.
20   Q.   And does the felony callout stop provide, say, a
21   higher level of officer protection as opposed to
22   rushing the vehicle?
23   A.   It is for the safety of everybody, yes.
24   Q.   So it enhances officer safety and suspect
25   safety.
```

Page 30

1  A.  Yes.
2  Q.  And safety of anybody else who might be in the
3  area.
4  A.  That's correct.
5  Q.  The idea being that the vehicle is now stopped,
6  you can sort of wait them out; is that the idea behind
7  it?
8  MR. KELLEY:  Objection.
9  Go ahead.
10  A.  The thought behind it and the tactics behind it
11  are to take the person into custody in a controlled
12  environment.
13  Q.  Do you remember anything about the -- referring
14  to this prior incident that ended in Lodi, you said
15  that some of the background information when it began
16  at West 80th and Madison was that the vehicle had
17  driven at a police officer.  I assume a Cleveland
18  Police Officer.
19  A.  Yes, that's what I recall.
20  Q.  So at some point your understanding was that
21  there was a Cleveland Police Officer outside of their
22  vehicle, or maybe even in their vehicle, that the
23  driver of the vehicle threatened with running them
24  over?
25  A.  I didn't have that information.

Page 31

1  Q.  You said that there was some sort of
2  communication that the vehicle had driven at other
3  police officers.
4  A.  That's correct, yeah, but I didn't -- we weren't
5  given any specifics on that.
6  Q.  Okay.  And do you remember anything about the
7  speed of that pursuit as you proceeded down from
8  Strongsville to Lodi?
9  A.  I'm trying to recall.  I remember that -- I
10  actually can't recall.  It was over 10 years ago.
11  I remember the felony callout because the
12  highway patrol was involved.
13  Q.  Okay.
14  A.  I don't actually recall the pursuit.
15  Q.  Was there ever any use of stop strips or
16  anything like that in the Lodi pursuit?
17  A.  No.
18  Q.  You're familiar obviously with Strongsville's
19  pursuit policy, correct?
20  A.  Correct.
21  Q.  And what factors do you consider in determining
22  whether or not to maintain a pursuit, a vehicle
23  pursuit?
24  A.  I'm aware of a number of factors that determine
25  that.  There are issues such as something as simple as

Page 32

1  the condition of the police vehicle that we're driving
2  all the way to the safety of the public.
3  Q.  So certainly officer safety is a consideration
4  in whether or not to maintain a vehicle pursuit; is
5  that fair?
6  A.  That's fair.
7  Q.  Safety of other motorists who might be using the
8  roadways, correct?  That's a consideration.
9  A.  Sure.
10  Q.  Weather conditions?
11  A.  Yes.
12  Q.  And the safety of the suspect vehicle and its
13  occupants might also be a consideration; is that fair?
14  A.  That's fair.
15  Q.  If at any time you feel that maintaining a
16  pursuit presents an unreasonable risk of injury to
17  either yourself or other officers you can terminate the
18  pursuit; is that fair?
19  A.  That is an option, yes.
20  Q.  And if you felt that, I mean, as supervisor
21  involved in a pursuit, if you ever felt that
22  maintaining the pursuit presented an unreasonable risk
23  of harm to yourself or other officers, you would
24  terminate the pursuit, wouldn't you?
25  A.  I did have that option, yes.

Page 33

1  Q.  And you would do that, correct?
2  A.  Depending on the situation, that could be a
3  decision I would make, sure.
4  Q.  Well, what additional factors would cause you
5  not to make the decision to terminate the pursuit if
6  you felt that continuing it presented an unreasonable
7  risk of harm to yourself or other officers?
8  MR. KELLEY:  Objection.
9  Go ahead.
10  A.  I don't know if I can answer that question
11  without specifics.
12  Q.  Well, and I guess I'm trying to find out the
13  specifics that would cause you to say, no, we have to
14  keep going even though I feel this is a danger to
15  myself and other officers.
16  A.  I would say that would be depicted by the
17  situation itself.
18  Q.  Well, so would that be the reason for wanting to
19  stop the vehicle?  Would that be one of the things that
20  you would consider?
21  A.  Say that again, please.
22  Q.  Yeah, would the reason for stopping, wanting to
23  stop the vehicle be part of your calculus in whether or
24  not to continue a pursuit that you felt presented an
25  unreasonable risk of harm to yourself and other

Page 34

1   officers?
2   A.    The idea to pursue a vehicle just to stop it,
3   that doesn't register with me.  I'm going to say no on
4   that.
5   Q.    That's not what I'm asking you.
6        You might be involved in a pursuit for any
7   number of reasons such as a traffic offense, right?
8   A.    That's correct.
9   Q.    Or maybe somebody is trying to get away from the
10  scene of a violent crime, that would be another reason
11  for wanting to stop somebody, correct?
12  A.    That's correct.
13  Q.    And you certainly would not equate those two
14  things, would you?  Saying that the need to apprehend
15  somebody running from a violent crime equates with
16  trying to stop somebody for a traffic stop, would you?
17  A.    Again, that's a pretty blanket statement and I'm
18  going to say that depending on the situation at the
19  time of the incident there would have to be
20  determinations made.
21  Q.    Well, isn't that one of the things that goes
22  into the calculus of whether or not to maintain a
23  pursuit is the nature of the offense for which you're
24  trying to stop the suspect vehicle?
25  A.    That is a caveat to it, yes.

Page 35

1   Q.    So it makes a difference whether you're trying
2   to stop a vehicle for a traffic stop, or you're trying
3   to stop a vehicle because there's a suspect in there
4   running from a violent crime, or there's a suspect in
5   there that you believe might be a danger to somebody
6   else; isn't there a difference?
7   A.    It's very subjective, but there can be a
8   difference, yes.
9   Q.    Let me ask you about March 6th of 2017.
10       You said that you'd been a sergeant for about
11  six weeks; is that correct?
12  A.    That's correct.
13  Q.    And I take it you became a sergeant by passing
14  an exam of some kind or something like that?
15  A.    That's correct.
16  Q.    And was there any sort of training that was
17  afforded to you after you became a sergeant to help you
18  with your supervisory duties?
19  A.    I had received some on-the-job training, and at
20  the time of this incident on March 17 [sic] I was in
21  the process of receiving on-the-job training as it
22  relates to administrative duties.
23  Q.    Okay.
24  A.    But there is no formal training period for new
25  sergeants.

Page 36

1   Q.    And since assuming your duties six weeks earlier
2   had you been involved in any other pursuits as the
3   sergeant in charge prior to March 6, 2017?
4   A.    Yes.
5   Q.    And what pursuits were you involved in prior as
6   sergeant?
7   A.    I recall one particular chase that was initiated
8   here in Strongsville and it ended when the vehicle
9   crashed into a front yard on West 65th and I-71 and the
10  suspects fled on foot.  I recall that pursuit.
11  Q.    Do you know about when that was in relation to
12  the March 7 pursuit?
13  A.    We're only talking six weeks, so it was
14  relatively close in there.  And I remember it was cold
15  and snowy out so I'm going to say probably very early
16  in 2017.
17  Q.    And how did that begin?  How were you involved
18  in that?  How did you become aware of that and then
19  subsequently become involved in that pursuit?
20  A.    That particular pursuit was initiated by Officer
21  Miller.  He had attempted to stop the vehicle and they
22  immediately took off at a high rate of speed and got on
23  71 north.
24  Q.    Okay.  And so I assume that there was some radio
25  communication that Officer Miller was involved in a

Page 37

1   high speed pursuit on 71 north; is that how you became
2   aware of it?
3   A.    No.  I became aware of it in town here.  It
4   initiated in town.
5   Q.    So you were there -- did you spot the vehicle,
6   did somebody else spot the vehicle?
7   A.    No.  Officer Miller spotted the vehicle, Officer
8   Miller attempted to stop the vehicle and the vehicle
9   fled at a high speed.  I was never involved directly in
10  the pursuit.
11       When the vehicle crashed in the area of West
12  65th and I-71 I drove there at regular speed to that
13  scene.
14  Q.    So would your role have been more of monitoring
15  it over the radio?
16  A.    That's correct.
17  Q.    You were never physically present in your own
18  vehicle following along.
19  A.    That's correct.
20  Q.    Were there any other officers other than Officer
21  Miller involved in that particular pursuit?
22  A.    Yes.
23  Q.    Who else was involved in that?
24  A.    I remember an officer, Officer Glover who's a
25  Strongsville officer, I remember.  I remember that that

Page 38

1  vehicle was road spiked by a state trooper somewhere in
2  the area of West 130th and 71.
3       Off the top of my head that's all I can recall.
4  Q.   So those two officers, Officer Miller and
5  Officer Glover are the only two that you recall being
6  involved?
7  A.   That's who I recall, yeah.
8  Q.   And, I'm sorry, I'm not familiar with the roads,
9  do you know approximately how long that pursuit lasted
10  from beginning to end?
11  A.   I don't recall.  I know that the vehicle was
12  traveling at a high rate of speed.  I don't know the
13  time, though.
14  Q.   Was it your understanding that Officer Miller
15  wanted to stop the vehicle for speed?  Was that the
16  reason for following and attempting to stop the
17  vehicle?
18  A.   I don't remember.  There was -- I don't remember
19  the reason.
20  Q.   And you said stop strips were deployed in that
21  case?
22  A.   I remember, yes.
23  Q.   Also by the Ohio State Highway Patrol?
24  A.   Correct.
25  Q.   And the vehicle subsequently crashed?

Page 39

1  A.   Not as an immediate result of being road spiked.
2  Q.   How far after it was spiked is it your
3  understanding that the vehicle crashed?
4  A.   I recall that it was road spiked in the area of
5  West 130th on 71 northbound.  The vehicle exited West
6  65th, made a left at the dead end, made an immediate
7  right on that side street and that's where it crashed.
8  In one of those front yards.
9  Q.   Was the suspect apprehended?
10  A.   Eventually, yes.
11  Q.   Adult?  Juvenile?  Do you know?
12  A.   I believe he was a young adult.
13  Q.   Do you know if there was any contact between the
14  suspect vehicle and the Strongsville vehicles in that
15  other pursuit?
16  A.   I don't recall.
17  Q.   May or may not --
18  A.   I don't recall that there was.
19  Q.   Was there any, to your knowledge, any follow-up
20  investigation of the pursuit and its ultimate outcome
21  made by the Strongsville Police Department?
22  A.   I'm sure that there was.
23  Q.   And do you know what that outcome was, the
24  result of that investigation?
25  A.   I don't recall.  It was nothing extraordinary.

Page 40

1  Q.   Would there be a file somewhere on that
2  investigation?
3  A.   I would assume.
4  Q.   How would it be labeled?  How would it be
5  stored?
6  A.   In an administrative case file, it's kind of
7  like a manila type folder.
8  Q.   You do it by number, by name, by date?
9  A.   All of the above, yeah.  There's a number
10  assigned to it, there's a date assigned to it.
11  Q.   So if I wanted to look at that I'd have to know
12  what date this pursuit occurred, or I'd have to know
13  the name of the suspect?  How would I access it?
14  A.   Any one of those ways, you know, the name, the
15  date.
16       MR. KELLEY:        Could we go off
17       the record for a second?
18       (Thereupon, there was a discussion
19       off the record.)
20  BY MR. SCOTT:
21  Q.   Do you know if the suspect in this earlier
22  pursuit was injured as a result of the crash?
23  A.   I remember him coming back to the city jail.  I
24  don't believe he was injured.
25  Q.   The fact that he came to the city jail would

Page 41

1  suggest to you that he didn't require medical
2  treatment; is that what you're telling me?
3  A.   Correct.
4  Q.   Again, turning your attention to March 6,
5  2017 --
6       MR. KELLEY:        March 7?
7       MR. SCOTT:         Well, March 6
8       because this event occurred in the early
9       morning hours, as I understand it, during
10       the shift that would have begun March 6th
11       and ended March 7th.
12  BY MR. SCOTT:
13  Q.   Is that correct?
14  A.   Correct.
15  Q.   So I understand you were working what you call
16  third shift?  Night shift?
17  A.   Correct, yes.
18  Q.   And my understanding is that third shift here
19  runs from about 22:00, if we're doing it in military
20  time, to 08:00 the next day; is that fair?
21  A.   Correct.
22  Q.   So 10:00 at night, eight o'clock in the morning
23  the next day; is that correct?
24  A.   That's correct, yeah.
25  Q.   And you would report to your shift sometime

Page 42

1   around ten o'clock or something like that.
2   A.   Ten o'clock is starting time, yes.
3   Q.   Would you have worked any other secondary
4   employment or anything like that earlier that day?
5   A.   I work very little secondary employment, so I
6   don't recall, but most likely no.
7   Q.   Anything special about that day that stands out
8   as you began your shift that evening?
9   A.   No.
10  Q.   How many other Strongsville Police Officers are
11  on duty during the third shift?
12  A.   Every day there has to be a minimum of five
13  patrol officers.  Sometimes we have as many as eight.
14  On this particular night I don't remember how many were
15  working.
16  Q.   As sergeant how many of those officers would you
17  have had supervisory authority over?
18  A.   Basically all of them.
19  Q.   And there's no other sergeant on duty at night
20  when you're on duty; is that correct?
21  A.   There sometimes is.
22  Q.   Was there another sergeant on duty this
23  particular night?
24  A.   Yes, there was.
25  Q.   Who was that?

Page 43

1   A.   His name is Ronald Nettles and he is also a
2   sergeant.  He has been a sergeant for approximately
3   four or five years now.
4   Q.   Would you and Sergeant Nettles or whoever the
5   sergeant might be that's on duty share supervisory
6   duties over any other patrol officers who might be on
7   duty at that time; is that how it works?
8   A.   That's how it works.
9   Q.   So you don't have your own platoon that's just
10  simply assigned to you.
11  A.   That's correct.  If I was working by myself, I
12  would solely supervise all of them.  In the event that
13  another sergeant is there, we share duties.
14  Q.   And what do you recall about that evening?  I
15  mean, you get to work, you go on duty, what do you
16  remember?
17  A.   Specifically I remember that -- that I remember
18  when I was at my desk my microphone pack was, the alarm
19  was going off, because when the microphone pack that is
20  attached to the dashboard camera is out of range of the
21  police car, it will give an alarm.
22         And I remember that I was at my desk doing desk
23  work and my alarm was going off, so I shut the
24  microphone pack off.  It's battery operated.
25         And then of course obviously we learn later that

Page 44

1   I obviously forgot to turn it back on because there's
2   no audio in my portion of the pursuit.
3         I remember going -- after doing some desk duties
4   I remember going out into my squad car, taking a lap
5   around the city and then going down to the interstate.
6   And that's just before this incident began.
7   Q.   And this incident began around what, two o'clock
8   in the morning?  2:30 in the morning?  Something like
9   that?
10  A.   I believe it was 2:30, 2:35 in the morning.
11  Q.   So you went down to do just sort of basic
12  traffic patrol?
13  A.   Yes.
14  Q.   And what do you recall?  What were the weather
15  conditions like that night?
16  A.   I recall that it was pretty mild with the
17  exception of some light rain.  That's pretty much it.
18  I do remember -- I remember, you know, like rain.
19  Q.   Kind of misting rain?
20  A.   Yeah, rain on the windshield.
21  Q.   And the specific area that you were patrolling,
22  were you patrolling traffic on 71, or were you
23  patrolling other road traffic and highway?  What cars
24  were you specifically monitoring?
25  A.   When I went down to the interstate?

Page 45

1   Q.   So were you parked on the interstate?
2   A.   I first took a lap around the city, then I went
3   down to the interstate and I parked in that middle area
4   that's called a crossover where you typically see --
5   Q.   Okay.  About what mile marker is that; do you
6   know?
7   A.   I believe it's 230.
8   Q.   And am I correct that the mile markers decrease
9   in value, if you will, they go down in number as you
10  head south; is that correct?
11  A.   Correct.
12  Q.   So as you're heading towards southern Ohio, the
13  numbers are going down.
14  A.   That's correct.
15  Q.   And were you facing then, were you watching
16  northbound traffic?
17  A.   I was.
18  Q.   And what were the overall traffic conditions
19  like on 71 that early morning as you were sitting
20  there?
21  A.   It was very light, as I recall.  Light traffic.
22  Q.   Is that typical?
23  A.   Typical.
24  Q.   And what did you see next?
25  A.   I was monitoring traffic and I saw traffic

Page 46

1   moving.
2       Are you referring to --
3   Q.   Well, let me ask you this, prior to becoming
4   alerted to the van that Roy Evans was driving, prior to
5   that did you make any traffic stops?
6   **A.   I don't recall making any traffic stops.**
7   Q.   So would the van that Mr. Evans was operating,
8   that was the first traffic stop you initiated that
9   evening as you sat there on 71 northbound?
10  **A.   That's what I remember, yes.**
11  Q.   Tell me about that, how did you become aware of
12  the van and what did you do?
13  **A.   I saw a pair of headlights approaching my**
14  **location from the south heading north on 71, and it was**
15  **in the high speed lane, the number 1 lane.  And I**
16  **remember seeing two tractor-trailers traveling in a**
17  **line in the middle lane.**
18      **And I could tell from a distance that the pair**
19  **of headlights that were in that number 1 high speed**
20  **lane were moving much faster than the tractor-trailers**
21  **because I saw the van -- or I saw the headlights, I**
22  **should say, I didn't know it was a van at the time.**
23  **But I saw the headlights passing those**
24  **tractor-trailers.**
25      **So when the van got into my proximity I**

Page 47

1   **activated my radar which shoots a radar beam.  And I**
2   **was able to ascertain that I got a radar lock on that**
3   **set of headlights as doing 80 miles an hour.**
4   Q.   Okay.
5   **A.   When the van got closer, it's a very dark, unlit**
6   **stretch of highway.  When the van passed me, I**
7   **recognized it as a Ford Econoline van because that's**
8   **what we had when I was a kid.**
9   Q.   You clocked it at 80 miles per hour.
10  **A.   That's correct.**
11  Q.   And what is the posted speed limit in the area
12  where you were monitoring?
13  **A.   60.**
14  Q.   At what point does -- I know the speed limit on
15  71 changes at some point to 70 or whatever.
16      Did you know how far up the road traffic is
17  going, say, at a greater speed, 70 miles an hour?  When
18  does it drop down to 60; if you know?
19  **A.   Coming north?**
20  Q.   Yes, sir.
21  **A.   It turns from 70 to 60 at the Medina/Cuyahoga**
22  **County line.**
23  Q.   Do you know about what mile marker that is?
24  **A.   It has to be around the 229 or 228.**
25  Q.   So maybe a mile or two before you saw the van.

Page 48

1   **A.   Probably closer to two or two-and-a-half I would**
2   **think.  I'm guesstimating.**
3   Q.   I appreciate that.  I think you told me that you
4   were close to 230, mile marker 230; is that fair?
5   **A.   Yeah, that's fair to say.  I don't know exactly.**
6   Q.   It is where it is, but you think it might be
7   around 228 or so.
8   **A.   Yeah.**
9   Q.   Okay.  And so you pull out to follow the van?
10  **A.   Correct.**
11  Q.   Stop the van?
12  **A.   Yes.**
13  Q.   And you saw the van go around two
14  tractor-trailer rigs, right?
15  **A.   Yes.**
16  Q.   Did the van appear to maintain its lane of
17  travel as it did that, as it passed those two
18  tractor-trailer rigs?
19  **A.   I saw -- when I pulled out I saw the van go from**
20  **the high speed lane and in one motion get off the exit**
21  **ramp.**
22  Q.   That's not a totally unfamiliar maneuver, is it,
23  if somebody becomes aware that possibly they've been
24  clocked going over the speed limit, that they might try
25  and exit the highway to not get a traffic ticket?

Page 49

1   **A.   I've seen that before, yes.**
2   Q.   And so this particular van, as soon as you
3   pulled out, it took the next available exit off the
4   highway; is that what you're telling me?
5   **A.   Yes.**
6   Q.   Okay.  And how far -- was that Pearl Road, or
7   what was the exit?
8   **A.   That's Royalton Road which is 82.**
9   Q.   Royalton Road.
10  **A.   Yeah.**
11  Q.   So it got off on Royalton Road?
12  **A.   Yes.**
13  Q.   And do you know approximately what mile marker
14  Royalton Road is?
15  **A.   I think that's exit 231, so that would be 231**
16  **mile marker.**
17  Q.   So within a mile of you initiating this pursuit
18  the van got off on Royalton Road.
19  **A.   Yes.**
20  Q.   And was there any other traffic on the exit ramp
21  as the van got off that you recall?
22  **A.   No, there was no other traffic.**
23  Q.   And I take it you were behind the van as it went
24  up the exit ramp?
25  **A.   I was quite a bit behind it.  I was still**

Page 50

1 accelerating up to speed trying to pursue it, and when
2 I say pursue, no lights and sirens, just basically you
3 got to floor the accelerator to catch up to a car like
4 that.
5 Q. Sure. You're going from zero to whatever
6 they're going.
7 A. Correct.
8 Q. And you try to close the gap.
9 A. Yes.
10 Q. Okay. Did you call out your speeds during that
11 particular part of the pursuit?
12 A. No. It actually wasn't a pursuit as we know by
13 definition. I don't want to get lost in translation.
14 When I saw pursuing, I was just pedal to the
15 metal trying to catch up to it.
16 Q. And then you were going to initiate a traffic
17 stop once you got close enough.
18 A. Correct.
19 Q. And I know that in prior statements there's been
20 discussion about speeds of maybe 90 all the way up to
21 100 miles per hour on the northbound portion of this
22 pursuit, and you understand what I mean by that,
23 correct?
24 A. Yes, yes.
25 Q. Was that the speed you were going?

Page 51

1 MR. KELLEY: Objection.
2 Go ahead.
3 A. I would have to say yes.
4 Q. Well, you're trying to catch up to the van.
5 A. Yes.
6 Q. So not only do you have to match the van's speed
7 but you have to close the gap between you and the van;
8 is that correct?
9 A. Yes.
10 Q. Okay. So you see the van go up the exit ramp at
11 North Royalton Road?
12 A. Correct.
13 Q. Which is also Route 82.
14 A. Correct.
15 Q. And is there any traffic between you and the van
16 at this point?
17 A. No.
18 Q. And what do you see the van do next?
19 A. Well, when I'm approximately at the bottom of
20 the ramp trying to catch up to the van, the van, I see,
21 gets to the top of the ramp, and the ramp kind of does
22 a little S, so it's not a straight shot. You still
23 have to cover some ground.
24 I see it go through the red light at the top of
25 the ramp and make a left.

Page 52

1 Q. And you're able to keep eyes on the van the
2 whole time.
3 A. When it got to the top of the ramp and went
4 through the red light and turned left, I lost sight of
5 it.
6 Q. Okay. When did you next see the van?
7 A. I got to the top of the ramp, I went through the
8 red light, I turned left and I saw nothing but empty
9 lanes of travel. There was zero traffic on Royalton
10 Road.
11 Q. Did you have your lights and sirens on at this
12 point?
13 A. I did at this point. I turned them on about
14 halfway up the ramp.
15 Q. So there's no -- would that be Royalton Road
16 then that you're turning left onto?
17 A. Yes.
18 Q. And there's no traffic in either -- no other
19 traffic in either direction on Royalton Road that you
20 see.
21 A. That's correct.
22 Q. And what happens next?
23 A. So I know that because everything is a straight,
24 flat shot, I would have been able to see the van ahead
25 of me. So I knew it didn't continue on State Route 82.

Page 53

1 Off to the right, when you make that left off
2 the top of the ramp there's an entrance ramp to get
3 back on 71 north. So I surmised that he got off the
4 interstate and got right back on the interstate.
5 Q. And you said to get back onto 71 north, do you
6 mean south, or was it to get back on this north?
7 A. North.
8 Q. Okay. Because you had been proceeding north
9 before.
10 A. Yes. So he got off at -- northbound, got off at
11 82 and then jumped right back on northbound, if that
12 makes sense.
13 Q. I see. Okay.
14 A. So I got to the top of the ramp to head back
15 down onto the interstate. And when I was at the top of
16 the ramp I saw the van at the bottom of the ramp
17 merging back into the lanes of 71.
18 Q. And as the van merged back into the lanes, it's
19 still going northbound on 71, correct?
20 A. Correct.
21 Q. As it merged back in was there any other traffic
22 on the road?
23 A. I don't recall. I can only have a visual image
24 of that van at the bottom of the ramp.
25 Q. Well, would it be fair to say that you don't

Page 54

1  recall any traffic having to get out of the way of the
2  van as it merged back onto 71 northbound?
3  **A.    Right.**
4  Q.    That's correct?
5  **A.    I didn't see any evasive actions.**
6  Q.    I take it then you follow the van down the ramp
7  back onto 71 northbound.
8  **A.    That's correct.**
9  Q.    Do you have a recollection as to maybe how close
10  you are to the van at this point?
11  **A.    Well, I was able to catch up to the van rather**
12  **quickly because the car I was driving was actually**
13  **brand new, the squad car I was driving was brand new,**
14  **so I caught up to it very quickly.**
15  **At this point we're doing about a hundred miles**
16  **an hour, and the van had no headlights on anymore.**
17  Q.    And are you still closing the distance between
18  yourself and the van when you're going a hundred miles
19  per hour?
20  **A.    No. I believe that I had gotten to the back of**
21  **the van rather quickly and we were traveling at that**
22  **speed together.**
23  Q.    And about how many car lengths would you have
24  been maintaining this -- it's a pursuit now, right?
25  **A.    It is a pursuit. I did call it at this point.**

Page 55

1  Q.    About how many car lengths would you have been
2  maintaining in this pursuit?
3  **A.    Initially I got in close because I wanted to**
4  **read the license plate, but then once I was able to get**
5  **the license plate, the Pennsylvania license plate, I**
6  **then backed off to probably two car lengths I'm**
7  **guessing.**
8  Q.    Would two car lengths be about 20 feet?
9  MR. KELLEY:            Objection.
10  MR. SCOTT:            I'm just
11  trying to understand what --
12  MR. KELLEY:            Yeah, we can
13  disagree over what a car length is.
14  MR. SCOTT:            Exactly.
15  **A.    Whatever the video shows.**
16  Q.    All right. Were you able to see inside the van
17  at all?
18  **A.    I was not able to see inside the van until we**
19  **got off the interstate for the first time -- well,**
20  **this would have been the second time.**
21  Q.    You're telling me that you were not able to see
22  inside the van until after the van had reentered 71
23  north from Royalton Road.
24  **A.    No, I'm getting ahead of myself.**
25  Q.    Let's just talk about this point in time, we're

Page 56

1  back on 71 north and you've gotten the license plate
2  and you were not able to see inside the van at that
3  point in time.
4  **A.    That's correct.**
5  Q.    Have any other cars joined you, any other
6  Strongsville Police cars joined you in the pursuit at
7  this point? We just reentered the pursuit -- we just
8  reentered 71 north.
9  **A.    No, I was by myself.**
10  Q.    But you had radioed that you were involved in a
11  pursuit.
12  **A.    Yes.**
13  Q.    And had you asked for assistance at that point?
14  **A.    I did.**
15  Q.    Okay. And as you followed the van continuing on
16  71 north, do you recall what lane of travel you were
17  in?
18  **A.    I don't recall. I have to watch the video**
19  **again.**
20  Q.    Were you and the van in the same lane of travel,
21  that is, were you directly behind it?
22  **A.    I remember taking a position where I was**
23  **actually kind of straddling a lane so that my lights**
24  **were shining into his side-view mirror.**
25  Q.    Okay.

Page 57

1  **A.    I don't remember what lane that was.**
2  Q.    Did the van appear to maintain its lane of
3  travel, whatever lane that may have been.
4  **A.    At this point I recall -- again, I'd have to**
5  **confer with the video, but I don't remember there being**
6  **a lot of traffic and I believe that he was relatively**
7  **in the same lane.**
8  Q.    The pursuit continues north on 71 to what point?
9  **A.    We pass the Ohio Turnpike exit and then the next**
10  **exit after that is the Pearl Road Middleburg Heights**
11  **exit, exited there.**
12  Q.    Is that about mile marker 234?
13  **A.    I am going to assume, yes.**
14  Q.    And the van exits on Pearl Road.
15  **A.    Yes.**
16  Q.    And you're still more or less directly behind
17  the van; is that fair?
18  **A.    Yes.**
19  Q.    Okay.
20  **A.    This is when I first see Mr. Evans.**
21  Q.    And is that going up the exit ramp?
22  **A.    It's a downward exit ramp that goes to Pearl**
23  **Road. And at the bottom of this ramp there's just a**
24  **stop sign.**
25  **And Mr. Evans was stopped checking left and**

Page 58

1  right, and it was at that point where I stayed in that
2  straddle position off to his left and I saw
3  Mr. Evans' side profile in his left side-view mirror.
4  Q.   Well, let me understand that.
5       Mr. Evans brought his van to complete stop at
6  the stop sign?
7  A.   He did.
8  Q.   And from your observation it appeared to you
9  that Mr. Evans was checking traffic in either direction
10  to see if he could cross onto Pearl Road?
11  A.   Yes.  I got the impression that he was checking
12  cross-traffic so that he could keep going.
13  Q.   And was there any cross-traffic?
14  A.   I believe that there was not.
15  Q.   So Mr. Evans would have brought the van to a
16  complete stop, checked for traffic, and then proceeded
17  through.
18  A.   He made a left turn, yes.
19  Q.   And made a left-hand turn.
20  A.   Yes.
21  Q.   So Pearl Road would be an east/west road?
22  A.   Pearl Road is north/south.
23  Q.   North/south.
24  A.   So he would have continued, he would have gone
25  south making a left turn.

Page 59

1  Q.   But he would have had to cross over two lanes of
2  traffic, northbound traffic.
3  A.   Correct.
4  Q.   And he was able to do that without -- he was
5  able to do that safely, right?
6  A.   He did it, yes.
7  Q.   Did you slow or stop at the stop sign?
8  A.   I was right behind Mr. Evans' van, so, yes, I
9  stopped.
10  Q.   So there was a moment in time when both vehicles
11  were stopped at the stop sign?
12  A.   Yeah, I remember being able to ascertain his
13  side profile through the left side-view mirror, but it
14  was not a -- it was him checking traffic to keep going.
15  It wasn't him stopping.
16  Q.   Does the fact that Mr. Evans stopped at the stop
17  sign and checked traffic hold any significance for you?
18  A.   At the time it didn't, other than
19  self-preservation, I guess.  He didn't want to get
20  struck by an oncoming car.
21  Q.   He proceeds southbound on North Royalton --
22  excuse me, proceeds southbound on Pearl, and then what
23  happens?
24  A.   When you make a left-hand turn at that
25  intersection you travel about a couple hundred feet,

Page 60

1  maybe 500 feet, and then there's an entrance ramp to
2  get on 71 south.  He took that ramp, that entrance
3  ramp.
4  Q.   Again, any other traffic on the entrance ramp to
5  71 southbound now?
6  A.   I don't recall, no.  I'm going to say no.
7  Q.   And you continued to maintain a couple car
8  lengths behind the van?
9  A.   Again, I'd have to look at the video, but, yeah.
10  Q.   So the pursuit now gets back onto 71 now
11  southbound at approximately mile marker 234.
12  A.   That's correct.
13  Q.   Is that right?
14  A.   That's correct.
15  Q.   And about how long has the pursuit been going on
16  at this point?
17  A.   I don't have an exact number.  Couple minutes.
18  Q.   And as the van and yourself merge back onto 71
19  southbound is there any traffic that you have to
20  maneuver around?
21  A.   I do recall that there was, like I recall seeing
22  a tractor, big truck of some kind.  I don't know if it
23  was a box truck or a tractor-trailer.  I recall going
24  around that.
25  Q.   And obviously the van went around it as well,

Page 61

1  correct?
2  A.   Correct.
3  Q.   And as the van and your cruiser passed the
4  tractor-trailer rig or truck, whatever it was, did that
5  vehicle, the truck, have to take any evasive action,
6  swerve or brake or otherwise to accommodate the van
7  passing it?
8  A.   I don't recall.  I'd have to look at the -- the
9  video would clearly show if that driver brakes.
10  Q.   I watched the video, it doesn't appear that the
11  truck takes any evasive action or has to take any
12  evasive action.
13  A.   Okay.
14  Q.   It appears that both your vehicle and the van
15  are able to pass it safely without interfering with its
16  travel.
17  A.   Understood.
18  Q.   Is that your recollection?
19  A.   Yeah, if that's what you saw, I believe you,
20  yes.
21  Q.   And I listened to the statement you gave to the
22  Bureau of Criminal Investigation, and you describe this
23  southbound leg of the pursuit, if I can use that
24  term --
25  A.   I understand.

Page 62

1    Q.    -- as being more controlled.
2          Do you remember using that phrase?
3    A.    I remember.
4    Q.    And I think you were referring to as this
5    pursuit turns southbound and continues southbound the
6    speeds are somewhere around 80, 85 miles per hour; is
7    that your recollection?
8    A.    I recollect -- that is correct, but also I
9    remember being down to in the 70s as well.
10   Q.    And you recall that the traffic conditions were
11   fairly light; is that correct?
12   A.    I do recall that there was traffic and I do
13   recall that it's safe to say that it was light, yes.
14   Q.    Given the conditions that existed as this
15   pursuit proceeded southbound at this particular moment,
16   and we can talk about that being entry onto 71
17   southbound at Pearl Road, you didn't feel that this
18   pursuit presented any sort of unreasonable risk to
19   yourself, did you?
20   A.    At that time, not to myself, no.
21   Q.    Did you believe that this pursuit presented any
22   sort of unreasonable risk to other motorists?
23   A.    Yes, I did believe that, yeah.
24   Q.    And what did you see that -- was it just the
25   speed of the pursuit?  What made you think it was

Page 63

1    unreasonable to other motorists?
2    A.    I believe that all vehicle pursuits are
3    inherently dangerous to the public safety.  I think the
4    supreme court agrees with that.
5    Q.    But, again, that's part of the calculus in
6    determining whether or not to maintain the pursuit,
7    correct?
8    A.    That's a fair statement, sure.
9    Q.    And if you really thought that it was life
10   threatening to other motorists wouldn't you terminate
11   the pursuit?
12   A.    Again, that's a pretty blanket question and
13   you're asking for a pretty subjective and a pretty --
14   pretty -- you're asking a very broad question asking
15   for a very specific answer.
16   Q.    Well, let's just talk about this pursuit.
17         I mean, did you ever think at this point when
18   we're southbound on 71, we've just gotten back on from
19   Pearl Road, did you think at that point in time that
20   this pursuit needs to terminate because it presents an
21   unreasonable risk of danger to other motorists on the
22   road?
23   A.    No, I didn't.  Clearly I didn't think that
24   because the pursuit continued.
25   Q.    You continued it.

Page 64

1          At that point did Mr. Evans appear to maintain
2    his lane of travel, whatever lane that may have been?
3    A.    Initially, yes, but then in the next couple
4    miles after that, no.
5    Q.    Okay.  At what point do other Strongsville
6    Police Officers join in the pursuit?
7    A.    Shortly after the south leg of the pursuit
8    began, all of the officers that were heading north to
9    come assist me, we then were coming at them, so to
10   speak.
11   Q.    Okay.  Did they turn around through some --
12   through the median or something, some cross-over point?
13   A.    Yes.
14   Q.    Do you know about where that was that they
15   joined in the southbound leg of the pursuit?
16   A.    I believe it was north of the Ohio Turnpike in
17   between the Pearl Road exit and Ohio Turnpike exit, but
18   it's approximate.
19   Q.    So somewhere around maybe mile marker 233, 232,
20   something like that?
21   A.    That's safe to say, yeah.
22   Q.    I want to ask you, do you recall how many
23   Strongsville Police Officers joined in the pursuit
24   initially?
25   A.    I don't know the exact names of the officers who

Page 65

1    initially joined the pursuit.  I knew that at one point
2    on the south leg I had discovered that there was --
3    there was either six including me, or six plus me.  I
4    can't remember.
5          The number six was in my head and I knew that
6    that was too many and I called a couple cars off.
7    Q.    The cars that remained, and I believe there were
8    four including yourself --
9    A.    Including myself, yes, right.  Right.
10   Q.    So let's just talk about the four that remained.
11         How were those cars positioned?  How were the
12   Strongsville Police cars positioned relative to the
13   van?
14   A.    I remember that I backed off a little bit
15   because there was Officer Plut, Officer Vlna, Officer
16   Miller, and I remember taking kind of a backseat to the
17   pursuit, and the video will show that.  I kind of back
18   off behind some police cars.
19         And that's how the pursuit continued in that
20   southbound leg because I did, you know, have a
21   cognitive -- I do remember having a cognitive thought
22   that, you know, I'm the supervisor, so I should back
23   off of this and oversee this.
24   Q.    Okay.  Let me just stop you there, if I may.
25         At this juncture, so there's, again, a total of

Page 66

1    four Strongsville Police Officers including yourself
2    involved in this, am I correct that at this point the
3    only offense that you're aware of for stopping the
4    vehicle would be traffic violations of speeding and
5    possibly fleeing?
6    **A.    Yes.**
7    Q.    Okay.  You didn't have any other reason for
8    stopping the vehicle, correct?
9    **A.    Well, the van, it was the initial probable cause**
10   **for the speed.**
11   Q.    Yes.
12   **A.    When the van had got off at 82 and got back on**
13   **82, or at -- got off at 82 and got back on at 82 he had**
14   **turned his lights off.  So I determined that, you know,**
15   **that was definitely a safety issue.**
16   Q.    Also be a traffic violation?
17   **A.    It's an equipment violation, yeah, so to speak,**
18   **yeah.**
19   Q.    So you back off so that you can take sort of
20   more of a supervisory role to monitor the pursuit,
21   correct?
22   **A.    That's correct.**
23   Q.    And you let the other three cruisers, do they go
24   in front of you more or less, further southbound than
25   you?

Page 67

1    **A.    I remember ascertaining that there was Officer**
2    **Plut, Officer Vlna, there was me there as the**
3    **supervisor, and I remember that I made a mental check**
4    **that Officer Miller was there, and he's obviously a**
5    **canine officer so he has, you know, a dog.  So I**
6    **remember ascertaining that was my little core team**
7    **there.**
8    Q.    So you're just trying to assess what sort assets
9    you have now at your disposal; is that what you're
10   telling me?
11   **A.    You now, my mind -- actually my mind was moving**
12   **quite a bit during this time, like thinking of**
13   **strategies and scenarios and how we were going to**
14   **handle this situation.**
15   **So it was about this time that I decided with**
16   **the headlights off and some light traffic that we were**
17   **going to try a boxing in maneuver.**
18   **So I don't remember exactly what the radio**
19   **traffic was but I basically gave the order to try and**
20   **surround this car and to slow it down.**
21   Q.    And this is, I think it's referred to in some of
22   the documents as a rolling roadblock.
23   **A.    Correct.  That's correct.**
24   Q.    Now, before we get to that, you drop back.
25   Am I correct that there was one Strongsville

Page 68

1    Police cruiser more or less to the side, driver's side
2    of the van, another more or less to the passenger side
3    of the van, and another behind the van?  Do I have that
4    correct?
5    Say immediately before you give this order to
6    attempt the rolling roadblock.
7    **A.    I mean, I recall that -- I recall all of us were**
8    **behind the van.  I don't recall exactly what lanes**
9    **everybody was in.  I'd have to watch the video again.**
10   Q.    Prior to initiating the rolling roadblock,
11   though, did any of the Strongsville cruisers position
12   themselves to be more or less at the side of the van?
13   **A.    Yes.  And I don't recall who was on the left**
14   **side, if that's what you're asking.**
15   Q.    You just recall that there was a --
16   **A.    That's the logistics behind it.  You surround it**
17   **so somebody --**
18   Q.    And for how long?  Did you know when this began,
19   what mile marker when it began that there were cruisers
20   on either side of the van?
21   **A.    It's in that couple mile stretch between Pearl**
22   **-- I don't recall exactly.**
23   Q.    Couple miles stretch between Pearl and when the
24   other officers joined in?
25   **A.    The other officers had joined in, and I don't**

Page 69

1    **recall if it was before -- we're traveling south on 71.**
2    **I don't recall if it was before 82 or just after 82**
3    **that we attempted our first boxing in.**
4    **I want to say it was before 82 heading south.**
5    Q.    And do you know what sort of distance you
6    covered as you and the other officers attempted this
7    first boxing in?  Is that something that went on for a
8    couple of miles, or less than a mile?  Do you know how
9    long that --
10   **A.    I would say definitely less because it ended**
11   **very quickly after I told everybody to back off.  We**
12   **started to jockey into position and Mr. Evans**
13   **sideswiped to the right and hit Officer Miller's car.**
14   Q.    Did you see the contact between the van and
15   Officer Miller's car?
16   **A.    I did, yeah.**
17   Q.    Did you see any other contact between Officer
18   Miller's car and the van, other than that initial
19   sideswiping that you're talking about?
20   MR. KELLEY:          At what point?
21   BY MR. SCOTT:
22   Q.    Within moments of the first contact.
23   **A.    I recall that Mr. Evans sideswiped Officer**
24   **Miller's car and then we backed off.  I don't recall**
25   **any other vehicle contact at this point.**

Page 70

1    Q.    And when this sideswiping went on, where were
2    you positioned relative to the van?
3    A.    I have a mental image in my head that I'm back
4    and offset to the left.
5    Q.    So you would not have had a clear line of sight
6    between the two vehicles as they headed southbound side
7    by side; is that fair?
8            MR. KELLEY:          Objection.
9            Go ahead.
10   A.    I saw the maneuver that Mr. Evans made, but as a
11   clear picture line of sight of the collision that
12   occurred, I did not see that.
13   Q.    So you couldn't see the actual contact between
14   the two cars.
15   A.    Not initially, no.
16   Q.    Well, at any point could you see the contact
17   between the two cars?
18   A.    I saw it very clearly in the video after the
19   fact.
20   Q.    I see.  So you're saying that after the fact you
21   watched the video.  All right.
22            And you could just see the movement of the van
23   as opposed to inside the van and see what Mr. Evans was
24   doing with the steering wheel; is that fair?
25   A.    At this point I did not see that, no.

Page 71

1    Q.    So you just saw the movement of the van itself
2    as opposed to any maneuver of the steering wheel that
3    Mr. Evans may have made; is that correct?
4    A.    That's correct.
5    Q.    Okay.  And you called off the rolling roadblock
6    at that point?
7    A.    Yes.
8    Q.    And do you know about what mile marker you
9    called off the rolling roadblock?
10   A.    I'm going to surmise 232 area.
11   Q.    Okay.
12   A.    I don't know exactly.
13   Q.    Okay.  I appreciate that.
14            What happens next?  You call off the rolling
15   roadblock, what do you recall?
16   A.    I recall us attempting to get road spikes set up
17   further down the interstate, making provisions for
18   that.
19   Q.    And that was contacting the Ohio State Highway
20   Patrol; is that correct?
21   A.    Yes.
22   Q.    How did you know that they were out there and
23   involved, were you all on the same radio channel?
24   A.    We're on different radio channels.  We can't
25   speak with them directly over the radio.

Page 72

1            It's just something that we always do, we call,
2    we have the dispatchers call and it gets orchestrated
3    that way.
4    Q.    So you were able to radio dispatch and say, see
5    if Ohio Highway Patrol is out there and if they can put
6    down stop strips, or something to that effect.
7    A.    Yes.
8    Q.    Would you have issued -- were you the one issuing
9    that directive, or was somebody else doing that?
10   A.    I believe that I said let's back off until we
11   get spike strips, and I think that in and of itself got
12   the ball rolling.  I don't remember the exact dialogue.
13   Q.    And to be clear, now, throughout this, from the
14   time you're 71 southbound until this pursuit is
15   terminated, you are the supervising officer in charge
16   of this pursuit; is that correct?
17   A.    That's correct.
18   Q.    So you tell everyone to back off and they back
19   off.
20   A.    That's correct.
21   Q.    And you find out, I assume it's relayed to you
22   through dispatch, that the Ohio State Highway Patrol is
23   available to deploy stop strips and try and deflate the
24   tires on this van.
25   A.    Correct.

Page 73

1    Q.    And so you tell everybody to back off so they
2    don't get caught up in the stop strips; is that
3    correct?
4    A.    Essentially, yes.
5    Q.    Well, is there something different about that
6    that you remember?
7    A.    Well, I also wanted to back off from Mr. Evans
8    because of, you know, when he struck the vehicle it
9    immediately escalated things.
10            Officer Miller, when the sideswiping occurred,
11   Officer Miller said over the radio that he got -- I
12   think he said he got rammed, was the words that Officer
13   Miller used.
14            So that in and of itself escalated everything in
15   my position, so I wanted to back away from that until
16   we got in better control of it.
17   Q.    And what you understand the, quote, unquote,
18   ramming to be was this side-to-side contact between the
19   van and Officer Miller's car; is that right?
20   A.    It was an intentional sideswiping, yes.
21   Q.    But it was side to side, not front of the car to
22   side of the car or something like that.
23   A.    I guess that's a fair interpretation.
24   Q.    Well, you used the term sideswipe.  Is that what
25   you meant, that one side of the vehicle touched the

Page 74

1  other side of the vehicle?
2  **A.    Fair to say, yes.**
3  Q.    Okay.  Let me ask you, in terms of the tactics
4  in performing a rolling roadblock, and I think this was
5  part of the discussion in some of the interviews with
6  the Bureau of Criminal Investigation, was that you
7  always leave the suspect vehicle an avenue for escape;
8  am I correct about that?
9  **A.    I'm only aware of, you know, the Fourth**
10  **Amendment issues that dictate we can't obstruct a road**
11  **completely.**
12  Q.    Is it part of your training when performing a
13  rolling roadblock to leave a suspect vehicle an avenue
14  where they can escape out of it?
15  **A.    I don't remember reading that in my policies.**
16  Q.    Do you stop and do you surround the vehicle on
17  all four sides, was that your intent?
18  **A.    The intent was to surround it in traffic and**
19  **force the vehicle to slow down by us slowing down.**
20  Q.    This vehicle, in fact, though, was able to get
21  out of the rolling roadblock; is that correct?
22             MR. KELLEY:                 Objection.
23  **A.    Are we -- we're speaking --**
24  Q.    Well, let's talk about the first time you
25  attempted it.

Page 75

1  **A.    First time we attempted it, nobody really got**
2  **into position at that point yet.**
3  Q.    Okay.  And how many times did you attempt the
4  rolling roadblock throughout this pursuit?
5  **A.    Twice.**
6  Q.    So this was the first time.
7  **A.    The first time ended before it started.**
8  Q.    So before all the vehicles are in place to
9  perform the rolling roadblock it's called off.
10  **A.    Correct.**
11  Q.    And after you call off the rolling roadblock, do
12  you remember what lane of travel the van was in?
13  **A.    I believe it was the slow lane.  There's three**
14  **lanes, fast lane, passing lane, middle lane, slow lane.**
15  **I believe it was the slow lane and I believe that**
16  **Officer Miller was kind of situated in the berm when he**
17  **got hit.**
18  Q.    So when Officer Miller's vehicle is positioning
19  itself, when Officer Miller is positioning the vehicle
20  as his part of the participation of this rolling
21  roadblock, you recall that his vehicle had to go onto
22  the berm somewhat?
23  **A.    I think so.**
24  Q.    And so as we're looking at the roadway
25  southbound, going left to right we have the passing

Page 76

1  lane, if you will, the middle lane, and then what you
2  refer to as the slow lane, and then a berm.
3  **A.    Correct.**
4  Q.    Is that correct?
5  **A.    Correct.**
6  Q.    Is there also a little bit of a berm next to the
7  passing lane?
8  **A.    Yes.**
9  Q.    And the van's more or less in the slow lane,
10  Officer Miller's more or less on the berm.  I take it
11  the other vehicle, whoever may have been operating it,
12  is more or less in the center lane?
13  **A.    On the left side of the van?**
14  Q.    Yes, sir.
15  **A.    If it even got to that point, yes, it would have**
16  **taken that position.**
17  Q.    And would you have been sort of more or less in
18  the center lane?  You said that your position may have
19  been somewhat to the driver's side of the van.
20  **A.    Relatively speaking, yes.**
21  Q.    After you call off the rolling roadblock, does
22  Mr. Evans remain in the slow lane for some period of
23  time?
24  **A.    I remember that things picked up after that.**
25  Q.    Okay.  Well, what do you mean by that?

Page 77

1  **A.    Well, at the point of that contact between**
2  **Mr. Evans and Officer Miller, it seemed that Mr. Evans**
3  **became more aggressive in his driving.**
4  Q.    How so?  I mean, what suggested to you that he
5  was more aggressive?
6  **A.    I believe that he sped up again, he started**
7  **going faster.  And I don't -- and I actually -- I don't**
8  **recall that he stayed in the slow lane.  I believe that**
9  **he -- I remember him getting more aggressive, changing**
10  **lanes out of that slow lane.**
11  Q.    Well, when he's changing lanes out of that slow
12  lane, is any Strongsville Police car next to him at the
13  side of him?
14  **A.    At this point, no, because we're still not road**
15  **spiked yet.**
16  Q.    So when he's changing lanes he doesn't appear to
17  be driving at any Strongsville Police car; is that
18  correct?
19  **A.    At this point he was -- we were all behind.**
20  Q.    And as he's changing lanes is there other
21  traffic on the road?
22  **A.    I recall light traffic.**
23  Q.    Okay.
24  **A.    I do.**
25  Q.    And is Mr. Evans able to maneuver around that

Page 78

1  light traffic without causing that traffic to swerve or
2  brake or take other evasive maneuvers?
3  **A.  I don't remember anything extraordinary.**
4  Q.   So it would be fair to say that throughout this
5  pursuit you never saw any other traffic, motorists,
6  ever have to take any evasive action to avoid
7  Mr. Evans.
8  **A.  I don't remember.  I'd have to look at the**
9  **video. I don't remember anything extraordinary.**
10  Q.   And as you sit here you don't recall any
11  traffic, other traffic having to take any evasive
12  maneuvers because of Mr. Evans' driving or maneuvers.
13  **A.  I don't remember that.**
14  Q.   Okay.
15         MR. KELLEY:        Can we take a
16         break right now?
17         MR. SCOTT:        Oh,
18         absolutely, please.  I'm sorry.  I don't
19         mean to make it a marathon.
20             (Thereupon, there was a brief
21         recess.)
22  BY MR. SCOTT:
23  Q.   Sergeant Kelley, we were talking about the now
24  March 7, 2017 pursuit as it's proceeding southbound on
25  71. And you've just called off the first attempt at a

Page 79

1  rolling roadblock and you indicated that the van had
2  maneuvered around some other traffic on the road; is
3  that correct?
4  **A.  Correct.**
5  Q.   And what else in your mind suggested that
6  Mr. Evans at this point was driving more aggressively?
7  I think you said that he sped up a little bit; is that
8  correct?
9  **A.  That's correct.**
10  Q.   What else?
11  **A.  I'm trying to picture the pursuit in my mind.**
12  **There are an increase in speed, there are lane**
13  **changes, and it was just more aggressive driving.**
14  Q.   And, again, I think you told me the lane
15  changes, though, did not result in any other motorist
16  having to take any sort of evasive maneuvers; is that
17  correct?
18  **A.  I don't recall that, that's correct.**
19  Q.   And I take it the lane changes did not cause
20  either yourself or the other Strongsville Police
21  Officers involved to take any sort of evasive
22  maneuvers?
23  **A.  We were behind him at the time, yes.**
24  Q.   The condition that you just described, Mr. Evans
25  has made several lane changes, he sped up a little, you

Page 80

1  and the other officers are behind him, is this the
2  condition of the pursuit, if you will, between that
3  point and when the van encounters the stop strips?
4  **A.  That's correct.**
5  Q.   And the segment that I just described, again,
6  with you and the other cruisers being behind the van
7  after you called off the rolling roadblock to where
8  Mr. Evans encounters the stop strips, do you have a
9  recollection as to how far that was in terms of
10  distance or time?
11  **A.  It's a short period of time, I know that.**
12  Q.   Do you think it may have gone on for a couple
13  miles?
14  **A.  From the time that we called off the roadblock**
15  **to the time he was road spiked; is that your question?**
16  Q.   Yes, sir.
17  **A.  It was more than a couple miles.**
18  Q.   Am I correct that road spikes were deployed
19  around mile marker 224, something like that?  Or do you
20  have a different recollection.
21  **A.  I recollect that it was further south in the**
22  **area -- mile marker 224 as I recollect is the**
23  **Brunswick 303 exit?**
24  Q.   Yes, sir.
25  **A.  And I believe that they deployed their road**

Page 81

1  **spikes at the Route -- somewhere in the area of the**
2  **Route 3 exit which would have been further south of**
3  **224.**
4  Q.   And I correct that the pursuit ultimately
5  terminates around mile marker 220, or was it further
6  south?
7  **A.  I don't know the exact mile marker.  I know that**
8  **we were just north of I-271, I remember that.  I don't**
9  **remember what mile marker that is.**
10  Q.   So in any event this condition that we just
11  described, again, with you and the other officers
12  behind Mr. Evans, Mr. Evans having made some lane
13  changes until the point in time that he's spiked is
14  several miles.
15  **A.  Several miles, yes.**
16  Q.   Okay.  Mr. Evans encounters the spike strips,
17  what happens next?
18  **A.  There was nothing immediate that happened.**
19  **Ultimately we slowed to about -- increasingly slowed**
20  **from down to 50, down to 40.  And I remember we were in**
21  **the vicinity of about 35 miles an hour.**
22  Q.   As you were slowing after the van has been
23  spiked, are you able to see any debris, rubber coming
24  off of the van?
25  **A.  Initially I didn't, but when I saw the video**

Page 82

1    later I saw his tires come off of the van.
2    Q.    At the time, though, did you assume or believe
3    that the van was slowing because it had the encountered
4    the spike strips?
5    A.    Yes.
6    Q.    And so you knew that the van had become
7    disabled; is that fair?
8    A.    That's not a fair statement, no.  I have a
9    different interpretation.
10   Q.    Okay.  What would be your interpretation?
11   A.    When we were down to about 35 miles an hour, I
12   did see Mr. Evans from kind of a back left-side view
13   looking kind of a side profile of him again.  And I
14   could see that he was not making any actions to stop.
15   In fact, I saw him struggling with the steering wheel
16   trying to continue.
17   Q.    Trying to maintain control of the van?
18   A.    Right.
19   Q.    Because now this van has three flat tires?
20   A.    I remember two, but it could be three.
21   Q.    Okay.  At least two, though.
22   A.    I remember seeing two flat tires, yes.
23   Q.    Both on the driver's side?
24             MR. KELLEY:        Objection.
25   ///

Page 83

1    BY MR. SCOTT:
2    Q.    Were those the two that you observed?
3    A.    The two I remember seeing were on the passenger
4    side.
5    Q.    Both on the passenger side?
6    A.    That's what I remember seeing.
7    Q.    So now are you somewhat to the right of the van?
8    A.    I would be on the driver's side of the van.
9    Q.    I'm just trying to see how you could see the
10   passenger side tires.
11   A.    Okay, I'm sorry.  I'm talking from a different
12   frame of reference.
13             After the chase I remember seeing two flat
14   tires.  I didn't see any flated [sic] or deflated tires
15   at all during the chase.
16   Q.    Okay.  But you're assumption was that the van
17   was slowing because the tires had been somewhat
18   deflated by the stop strips.
19   A.    And I had heard people say that it was a
20   successful spike strip.  I had heard people say that
21   the tires were shredding.  And I actually, now that
22   we're in this question, I recollect saying over the
23   radio that his tires are shot.  Not meaning shot with a
24   gun --
25   Q.    No, no, no.

Page 84

1    A.    -- but they were -- I remember saying that, now
2    that we're into this question.
3    Q.    Right.
4    A.    So I had to have seen the passenger side
5    probably rear tire shredded.  I had to have, because I
6    said it in the radio traffic.  I remember it.
7    Q.    And let me ask you, at this particular point in
8    time, first of all, as you observed the van after it's
9    been spiked and the passenger tire shredded, do you
10   recall any other traffic being on the road?
11   A.    At this point I remember that we had caused --
12   this pursuit, you know, had caused -- had become kind
13   of spectacular and whatever traffic was around us was
14   not by us.  It was behind us.  It had slowed.
15             We were by ourselves in this.  We had occupied
16   these lanes just ourselves.
17   Q.    And at that point did you believe that you
18   and/or the other Strongsville Officers were in a
19   position of an unreasonable risk of danger?
20   A.    I remember assessing the biggest risk that I
21   processed at that moment was the fact that he was not
22   able to control the van, even though he was still
23   trying to flee with that bouncing steering wheel.
24   Q.    So would you have thought the biggest risk of
25   danger would have been to the driver and other

Page 85

1    occupants, if there were any?
2    A.    Everybody involved, yes.
3    Q.    But not necessarily to yourself and the other
4    Strongsville Officers.
5             MR. KELLEY:        Objection.
6    A.    No, I don't agree with that statement.  I
7    believe that we were all, you know, the potential of
8    danger is all around.
9    Q.    Okay.  But you and the other officers were still
10   somewhat behind the van, correct?
11   A.    We were in pursuit of it, yes.
12   Q.    Well, you weren't next to it, right?
13   A.    Depending on which frame of the pursuit we are
14   speaking of right now, I was next to it at certain
15   points.
16   Q.    And we'll get to that, because you attempted
17   this rolling roadblock again, correct?
18   A.    Correct.
19   Q.    Yeah, but prior to that, after the van has been
20   spiked and you see the rubber coming off the passenger
21   side tire, you and the other Strongsville Police
22   Officers are in a position behind the van, correct?
23   A.    Relatively speaking, yes.
24   Q.    Okay.
25   A.    But I do remember getting up to a position where

Page 86

1   **I can see into the left side of the van and see him**
2   **struggling with the steering wheel.**
3   Q.   No, no, no, I understand that.
4   **A.   Yeah.**
5   Q.   So at least initially you're not next -- so if
6   he loses control before you move up alongside of him,
7   if he loses control, he's not going to immediately go
8   into you, correct?  You're not right next to him.
9   **A.   There were times where I was next to him.**
10  Q.   Well, I understand that you subsequently move up
11  next to him, I get that.
12       But when you first observed the tire coming off
13  the van or being deflated, you were not next to him,
14  were you?
15  **A.   No, I had to have been behind him yet.**
16  Q.   And the other officers were behind him as well,
17  correct?
18  **A.   For the most -- like I said, yes.  Relatively**
19  **speaking, yes.**
20  Q.   And having observed that now there's at least
21  one tire that has been deflated, shredded, whatever, I
22  think your wording was the tires are shot, correct?
23  **A.   Yes, that's what I said.**
24  Q.   Was there any doubt in your mind at that point
25  that this pursuit was going to terminate one way or the

Page 87

1   other?
2   **A.   Not at this point.**
3   Q.   Well, you didn't think that the van could
4   possibly continue on for any considerable distance
5   without tires, did you?
6   **A.   No, I believe that a vehicle could do that.**
7   Q.   So in your mind you thought that this, at that
8   point that this pursuit might go on for a number of
9   miles yet?
10  **A.   Sure, yes.**
11  Q.   What happened next?
12  **A.   It was about this time that I made the decision**
13  **to implement another rolling roadblock.  And I decided**
14  **to take a position on the left side passenger -- left**
15  **passenger side of the van because I had a sport utility**
16  **vehicle.  Mr. Evans was driving a large van and**
17  **everybody else had sedans.  So I said I was going take**
18  **a bigger position onto the left side.**
19  Q.   Okay, and if I could stop you, I just want to
20  make sure that we agree on the terminology.
21       You have said left passenger side.
22  **A.   I'm sorry.**
23  Q.   It's okay, and are you looking at the van or are
24  you looking through the van?
25  **A.   No.**

Page 88

1   Q.   And I appreciate that left is a relative term
2   and I just want to make sure.
3   **A.   No.**
4   Q.   Do you mean the driver's side?
5   **A.   Yes, I'm sorry.**
6   Q.   No, no.  It's quite all right.
7   **A.   My fault, I'm not trying to -- I'm not trying to**
8   **muddy the waters.**
9   Q.   No, no.  I know that.  I know that.
10  **A.   It was the left side driver's side, to clarify.**
11  Q.   Okay.  And you take a position on the driver's
12  side of the van.
13  **A.   Yes.**
14  Q.   And we're going to -- you instructed the other
15  officers to perform another rolling roadblock; is that
16  correct?
17  **A.   That's correct.**
18  Q.   And the way that that would be executed then is
19  that you -- there's four in total Strongsville Police
20  Officers involved, including yourself, correct?
21  **A.   Correct.**
22  Q.   And so each of the four cars is going to take a
23  position either in front, in back, or to the side of
24  the van; is that correct?
25  **A.   That's correct.**

Page 89

1   Q.   And you're going to completely box it in and
2   attempt to slow down and thereby force the van to slow
3   down.
4   **A.   That's correct.**
5   Q.   Okay.  And but immediately prior to that you
6   said that you had been able to see from your position
7   at the side of the van, you were able to see Mr. Evans
8   struggling with the steering wheel to maintain control
9   of the vehicle; is that fair?
10  **A.   That's correct.**
11  Q.   Did you have any concerns that positioning
12  yourself next to a van that was losing its tires where
13  you've seen the driver already struggling to maintain
14  control presented a danger for yourself or other
15  officers?
16  **A.   My wife wouldn't have liked it.**
17  Q.   Okay.  Because you know at that point that
18  Mr. Evans, whoever the driver is, obviously you don't
19  know who the driver is at that point, is struggling to
20  maintain control of the vehicle, right?
21  **A.   I did it to -- I did it to assess the situation.**
22  Q.   Well, but you ordered the rolling roadblock to
23  stop the van, correct?
24  **A.   After I saw Mr. Evans struggling with the**
25  **steering wheel, not --**

Page 90

1   Q.   Correct.
2   A.   Just so the events are in chronological order.
3   Q.   Yes, sir.
4        And when you ordered that second rolling
5   roadblock the speed of this pursuit has slowed,
6   correct?
7   A.   Correct.
8   Q.   You're going what, about 30 miles per hour; is
9   that fair?
10  A.   30 to 35, somewhere in there.
11  Q.   Okay.  And then what happens next?
12  A.   I had that cognitive thought to do the rolling
13  roadblock again because between Mr. Evans struggling
14  with the steering wheel and I remember just before the
15  rolling road -- the last rolling roadblock, I remember
16  seeing a car pass us, and it's in the video.
17       So I just made the decision to do the rolling
18  roadblock because other people were getting involved
19  again, motorists.
20       I remember telling Officer Vlna to get into the
21  front in the video and that we were going to do a,
22  implement another rolling roadblock.  I use the words,
23  you know, we're going to get this guy stopped.
24  Q.   Okay.
25  A.   It was starting to come into play.  Officer Vlna

Page 91

1   passed all of us and got in front.  I was on the
2   driver's side in the white SUV.
3        I remember Officer Plut was probably behind us
4   and Officer Miller had taken a position or was in the
5   process of taking a position on the passenger side.
6        I had started to move into the driver's side, I
7   started to move my car closer into his, and he --
8   Mr. Evans collided with me on the left.
9   Q.   Do you know if that was -- did you see inside
10  the van to see what Mr. Evans was doing immediately
11  before colliding with you?
12  A.   I could see inside the van at that point.  I was
13  alongside of him.
14  Q.   Okay.  Was Mr. Evans still struggling to
15  maintain control of his vehicle?
16  A.   Yes.
17  Q.   And that's how it appeared to you?
18  A.   Yes.
19  Q.   And let me, I forgot to ask you this earlier,
20  but, you know, again, throughout this pursuit, and I
21  think you said initially when you were northbound you
22  wanted to get close enough to see the plate and you saw
23  it was a Pennsylvania plate.
24       And I assume that you were able to do sort of a
25  radio check on the plate, try and find out who owns

Page 92

1   this vehicle, is there any wants or warrants for it?
2   A.   That's correct.
3   Q.   You know, what am I dealing with here; is that
4   correct?
5   A.   M-hm.  Yes, sorry.
6   Q.   No, no.  That's fine.
7        And you didn't know anything about Roy Evans at
8   this point, correct?
9   A.   No, I did not.
10  Q.   And throughout the entirety of this pursuit you
11  didn't know anything about Roy Evans; is that fair?
12  A.   I didn't know who he was, no.
13  Q.   You didn't know who was driving that van.
14  A.   Correct.
15  Q.   And the other thing I meant to ask you about is,
16  prior to commencing this second rolling roadblock were
17  you aware that there were other occupants, at least one
18  other occupant in the van other than the driver?
19  A.   Yes.
20  Q.   Okay.  And when did you first become aware that
21  there was another occupant in the van other than the
22  driver?
23  A.   It was before, obviously, that last rolling
24  roadblock.  And it was when I was going up alongside
25  the driver's side to try and see what was going on, I

Page 93

1   saw a person in the passenger seat and I saw a cellular
2   phone on.  And it was kind of being held in the
3   mannerism like a speaker phone.  But it was dark and I
4   did not know it was Miss Pauley.  I didn't know it was
5   a woman.
6   Q.   Right.
7   A.   I just saw a person.
8        It was somebody else in the pursuit who
9   identified the passenger as a female.  I just saw a
10  person holding a cell phone.
11  Q.   And whatever, male, female, there was somebody
12  who was somewhat illuminated by the light of the cell
13  phone, I think is what you're telling me.
14  A.   Yeah, I saw just a black silhouette and I just
15  distinctly saw that bright cell phone screen, you know,
16  in the darkness.
17  Q.   Did that hold any significance for you that
18  there was another person in the van or the fact that
19  that other person appeared to be using a cell phone?
20  A.   Yeah, I mean --
21  Q.   I mean, as you sit here today --
22  A.   It was a significant -- it was a significant
23  event that I remember it specifically, yes.
24  Q.   Okay.
25  A.   At the time I don't remember having a passing

Page 94

1  thought of who that person was talking to or if it was
2  a GPS, trying to get a GPS track on where they would be
3  going. I don't know what they were doing, I just saw
4  the illuminated cell phone.
5        It looked like she was holding it like a speaker
6  phone, because it looked like the person was holding it
7  out in front of them.
8  Q.   Getting back to this second rolling roadblock,
9  what happened as you and the other officers proceeded
10 to execute the rolling roadblock?
11 A.   So, again, we get back into that position,
12 Officer VIna was in the front, I'm on the driver's
13 side, and Mr. Evans hits me from the side. And then it
14 was -- it was -- and then backed off to the right. And
15 then --
16 Q.   Let me ask you, I'm sorry, I just want to make
17 sure I understand.
18       Who backed off to the right?
19 A.   Mr. Evans.
20 Q.   So he didn't stay in contact with your vehicle.
21 A.   Correct, yeah. My vehicle stayed relatively
22 moving forward in the same position. Mr. Evans' van
23 went left and hit me and backed off a little bit.
24       And then after that occurred, Mr. Evans turned
25 his wheel to the left and hit me much harder this time.

Page 95

1  And when I gave my statement to Agent Moran I didn't
2  actually remember this occurring until I saw the video,
3  but Mr. Evans pushes me off to the left side of the
4  interstate.
5  Q.   Now, prior to the first contact I think you said
6  that you saw Mr. Evans struggling with the steering
7  wheel as if to attempt to maintain control of the
8  vehicle; is that correct?
9  A.   That's correct.
10 Q.   And when you watch the video you can clearly
11 see the tires coming off of this van, correct?
12 A.   I did see that, yes.
13 Q.   And there's more than one tire coming off this
14 van; is that correct?
15 A.   I saw that afterwards, yes.
16 Q.   And even as the van swerves to the left and
17 spins out, again, the tires are coming off this van,
18 correct?
19       MR. KELLEY:         Objection.
20 A.   From a perspective of -- I don't have a
21 perspective of that as it's occurring.
22 Q.   No, having seen the video.
23 A.   Having seen the video, the back tire was
24 completely gone and I believe that the front -- the
25 back passenger tire was completely gone. And the

Page 96

1  passenger, the front passenger tire I believe was
2  completely deflated. I don't recall seeing that
3  shredded off.
4  Q.   And as the van -- did it appear as the van moved
5  left and then spun out that Mr. Evans was struggling to
6  maintain control of the van? Were you able to see him?
7  A.   When he struck me the second time, or when he
8  spun out?
9  Q.   When he struck you the second time.
10 A.   I interpreted that as an intentional act.
11 Q.   Well, were you able to see --
12 A.   I didn't see -- I only remember seeing that
13 steering wheel just bouncing so much. That's all I
14 remember seeing.
15 Q.   Okay. Having seen the video would you agree
16 with me that Mr. Evans was struggling to maintain the
17 vehicle as the tires came off the vehicle?
18 A.   At which point?
19 Q.   As he struck you again swerving left.
20 A.   No. That was intentional.
21 Q.   Did you in your statement to the Bureau of
22 Criminal Investigation indicate that you felt that
23 Mr. Evans ultimately lost control of his van because he
24 no longer had tires and was trying to accelerate out of
25 the rolling roadblock?

Page 97

1  A.   That's correct.
2  Q.   And it was almost as if he was on ice?
3  A.   That's correct.
4  Q.   And he had no control of his vehicle; is that
5  fair?
6  A.   After he struck me, yes, that's what I told
7  Agent Moran.
8  Q.   So the vehicle spins and what happens next?
9  A.   The vehicle spins and comes to a stop facing
10 east in the southbound lanes. And I had the thought in
11 my head that I was going to pull my squad car in front
12 of his van to end the pursuit, to stop any more forward
13 motion on his part, because at that time I interpreted
14 that this is way too dangerous of a situation. It
15 could not continue.
16       When I did that, just as I pulled up in front of
17 his van, Mr. Evans hit me. Immediately after doing
18 that he backed up. He put his van in reverse and he
19 backed up.
20       And, again, I moved forward more. I moved
21 forward again. And when I moved forward, I got hit
22 really hard.
23       And I have a mental image that I told Agent
24 Moran that all I saw was this Ford emblem coming at me.
25 And it was coming at me from the right front.

1    Q.    I've seen the video of the van backing and then
2    pulling forward.  Your vehicle pulls in front of the
3    van immediately before it's struck; is that correct?
4    **A.    Twice I pulled forward in front of the van,**
5    **twice I got struck.**
6    Q.    And the second time -- well, both times you're
7    pulling forward to block the van in?
8    **A.    Yeah, I partially blocked the van in.  I don't**
9    **completely -- I don't completely pull my car into the**
10   **van's path so that both of my passenger doors are**
11   **exposed to the front of his van.  I just pulled the**
12   **right front nose of my car in front of the van.**
13   Q.    And to be clear, and I think you just said it
14   correctly, that your car pulls into the van's path.
15   That's what you recall, right?
16   **A.    I blocked the van, yes.**
17   Q.    Now, prior to the van spinning out do you recall
18   issuing any commands for how you were going to handle
19   the stop once you got the van stopped?
20   **A.    I remember having a dialogue about this issue,**
21   **yes.**
22   Q.    What do you remember?
23   **A.    At some point in this pursuit Officer Miller**
24   **gets on the radio and he says, I don't know his exact**
25   **words, but it was an issue of, if this car stops, we're**

1    **just going to do a callout or a felony stop.  I don't**
2    **remember the exact words he used.  And I just clarified**
3    **that by saying, yes.**
4    Q.    Okay.  So the initial thought to do the felony
5    callout stop you think came from Officer Miller and you
6    as the supervising officer agreed that that was the
7    proper way to do it.
8    **A.    I clarified that if Mr. Evans stopped and gave**
9    **up chase that we would call him out on the felony stop**
10   **PA system.**
11   Q.    Am I correct that that is the last command that
12   you give prior to shots being fired?
13        MR. KELLEY:         Objection.
14        Go ahead.
15   **A.    I don't recall.  If the radio tapes dictate**
16   **that, then, yes.  I just don't remember.**
17        MR. SCOTT:         Let me mark
18   this as Plaintiff's Exhibit 2.
19        (Thereupon, Plaintiff's Exhibit 2 to
20        the deposition of SERGEANT SHAMUS KELLEY
21        was marked for identification.)
22   BY MR. SCOTT:
23   Q.    Okay, Sergeant Kelley, let me hand you this, and
24   I have one for your counsel as well.
25        Please take a minute to look this over.  I think

1    the particular part that I'm interested in is towards
2    the back.  What I'm specifically interested in is on
3    page 4, but please look at the entire document.
4        And you'll see where I have it highlighted.
5    **A.    Yes, I do.**
6    Q.    So first of all, Plaintiff's Exhibit 2 is
7    captioned "Strongsville PD Radio Traffic;" is that
8    correct?
9    **A.    That's correct.**
10   Q.    Are you familiar, have you seen printouts like
11   this before?
12   **A.    This is my first in this format, but I**
13   **understand what it is.**
14   Q.    Okay.  And this appears to be sort of a typed or
15   printed version of the radio communications relative to
16   this pursuit, correct?
17   **A.    That's correct.**
18   Q.    And if we look at, this is, to be clear, six
19   pages long, correct?
20   **A.    Six pages, yes.**
21   Q.    If we look at the page numbered 4 and we look at
22   the very first item, it's listed as item 11, at least
23   that's how it's labeled on this document.
24        It says, "76 confirming if no one bails, we're
25   just doing a felony callout, we're not charging up on

1    the car 17;" do you see that?
2    **A.    I see that.**
3    Q.    Did I read that correctly?
4    **A.    You did.**
5    Q.    And let me understand what some of these numbers
6    mean.
7        76 confirming, who's 76?
8    **A.    That is me.**
9    Q.    And so this is -- you're making this broadcast;
10   is that correct?
11   **A.    No.  This is not me.  This is Officer Miller.**
12   Q.    So is Officer Miller, is he saying to you --
13   **A.    He's calling my number and then saying,**
14   **"confirming if no one bails, we're just doing a felony**
15   **callout, we're not charging up on the car."**
16        And I don't know what 17 means.
17   Q.    Okay.  And then item 120, "That's correct.
18   We'll call him out;" did I read that correctly?
19   **A.    I'm sorry.  120?**
20   Q.    Yes.
21   **A.    That's correct, yeah.  My typing is marred up,**
22   **but whatever the radio traffic says, "That's correct.**
23   **We'll call him out," I'm not disputing that, yeah.**
24        MR. KELLEY:         And just so
25        it's clear on the record, the document

Page 102

1    that we're talking about was apparently a
2    document prepared by BCI.
3         And, correct me if I'm wrong, but I
4    mean there are these boxes that appear in
5    the words that kind of obscure the words.
6         MR. SCOTT:         Yeah.
7    **A.   It sounds -- it sounds correct as what I said.**
8    **I'm sure the radio traffic confirms it.**
9    Q.   Yeah, words to that effect, right?
10   When you say that's correct, you mean, that's
11   correct, we're going to do a felony callout.  And no
12   one --
13   **A.   Yeah, I mean, that's correct.  I'm confirming**
14   **Officer Miller's statement.**
15   Q.   And would your confirmation, there's not a time
16   stamp on this, but would your confirmation have been
17   fairly immediate to Officer Miller's communication?
18   **A.   I believe it was.  I believe it was immediate,**
19   **yes.**
20   Q.   It says, item 121, "Passing the 222.2 mile
21   marker;" do you see that?
22   **A.   I see it.**
23   Q.   Okay.  So at this point, I'm just trying to
24   figure out what's going on, at this point are you in
25   the process of performing the second rolling roadblock,

Page 103

1    or where is this, these communications occurring in
2    relation to the second rolling roadblock?
3    **A.   From a geographical standpoint I would be able**
4    **to identify it better if I watched the video.  Yeah,**
5    **it's just not time stamped, so I don't know.**
6    Q.   Do you know if this is before, after, during the
7    time that the van spun out?
8    **A.   This would definitely be before the van spun**
9    **out, much before actually.  I remember being in motion**
10   **in a pursuit when this conversation occurred.**
11   Q.   And but this would be after the spike strips,
12   correct?
13   **A.   I don't remember.**
14   Q.   I think I can help you with that one.
15   **A.   I'm sure there's a definitive answer, I just**
16   **don't remember.**
17   Q.   If we look back on page 3?
18   **A.   Okay.**
19   Q.   And if we look at item 107: do you see that?
20   **A.   I do see it.**
21   Q.   And somebody broadcasts, says, "Radio, did they
22   say they had positive."
23   **A.   Right.  So it would have been after the road**
24   **spikes.**
25   Q.   And then there's an affirmation, "They hit the

Page 104

1    spikes," correct?
2    **A.   That's correct.**
3    Q.   And then item 110, "All right.  We're southbound
4    coming up on route mile marker 222" something, correct?
5    **A.   That's correct.**
6    Q.   And then if you look at, there's item 114 and
7    then there's another item 11 and a box for a number.  I
8    assume it was supposed to be 115.
9    **A.   I see it.**
10   Q.   Do you know whose communication this is?  It
11   says, "All right 17 you got the driver."
12   **A.   I believe that this is me talking.**
13   Q.   Okay.
14   **A.   I don't know what 17 means.  I wouldn't have --**
15   **oh, 17 is Officer Plut; is that right?  Okay.**
16        **So 17 is the number for Officer Plut.**
17   Q.   And Officer Plut is the northern most car in
18   this pursuit; am I correct about that?
19   **A.   Yes, you're right.**
20   Q.   He's at the back.
21   **A.   At the back.**
22   Q.   North would be to the back, correct?
23   **A.   That's correct.**
24   Q.   "All right 17 you got the driver, when this
25   comes to an end and those tires turn to nothing, you've

Page 105

1    got the driver, I've got the passenger;" is that
2    correct?
3    **A.   Gosh, I just -- I don't remember saying that.  I**
4    **don't remember saying that.  I'm not saying that I**
5    **didn't say it, but I just don't remember that.**
6         **Maybe it's in a radio transmission that I can**
7    **say, yes, that was me.  I don't know.**
8    Q.   Well, I suppose at some point we can queue up
9    the conversation, if need be.
10   **A.   I don't know who that is.  I don't recall saying**
11   **that.**
12   Q.   Okay.
13   **A.   Not to say that I didn't say that, but I just**
14   **don't recall saying that.**
15        MR. KELLEY:         And let me
16        just say for the record, this is not a
17        Strongsville document and it's clearly got
18        some transcription problems with it.  I
19        mean, it's not indicating who's saying
20        what.  There's probably a better document
21        that would answer those questions, so
22        continuing on with this one I think is a
23        problem.
24        MR. SCOTT:         Yeah, well,
25        when we take a break I'll try and find a

Page 106

1    better document.
2  BY MR. SCOTT:
3    Q.    But let me ask you this, Sergeant, again, being
4  the officer in charge of this pursuit, wouldn't you
5  have been the one giving direction to what the
6  individual officer assignments were going to be as this
7  pursuit terminated?
8    A.    That's correct.  I just don't remember saying
9  this.
10   Q.    Okay.  And then we go back to page 4 and we're
11 doing the felony callout, right?
12   A.    Yeah, that's correct.
13   Q.    Again, when we go on page 4 and we see the fifth
14 item down, it says item 12 and then there's a box.
15         Do you see that?
16   A.    Yes.
17   Q.    And it begins with "All right."
18   A.    I'm reading this.
19   Q.    "His wheels are shot;" do you see that?
20   A.    Yes, that's definitely me.
21   Q.    And that's plural, more than one tire, correct?
22   A.    Yes, that's what I said, yes.
23   Q.    "I'm going to block his driver door so he can't
24 bail once he comes to a stop;" is that correct?
25   A.    That sounds like me, yes.

Page 107

1    Q.    And this is all part of doing a felony callout
2  stop; is that correct?
3    A.    This is not part of a felony stop.
4    Q.    Well --
5    A.    At this point I don't believe that -- in the
6  dialogue that I said this sentence, I was not of the
7  frame of mind that Mr. Evans was stopping at all.
8    Q.    Well, how long, do you know how long, and we
9  have the very first item on page 4 that says we're
10 doing a felony callout stop and then your confirmation,
11 and then two communications later you say you're going
12 to block his driver door, correct?
13   A.    That's correct, yeah.
14   Q.    And do you have any idea how much time elapsed
15 between those two things, between the time you confirm
16 the felony callout stop and the time you said you're
17 going to block his driver's door?
18   A.    I don't recall right at this minute.  Again,
19 there's probably a definitive answer, but I just don't
20 know what it is.
21   Q.    Do you know if this I'm going to block his
22 driver door communication is before, during, or after
23 the van spun out?
24   A.    Definitely before.
25   Q.    And what changed, if anything, between your

Page 108

1  confirmation of the felony callout stop and your
2  communication that you're going to block the driver's
3  door?
4    A.    I'm sorry, say that again.
5    Q.    What changed if anything significantly in the
6  pursuit in your mind between those two communications
7  when you confirm the felony callout stop and you said
8  that you were going to block the driver's door?
9    A.    Yeah.  This radio communication that I'm giving
10 out about the driver door and the passenger door, this
11 is in the event that they take off running out of the
12 doors.
13         A felony callout, obviously, to clarify, is a
14 controlled situation after -- or in the event that
15 Mr. Evans would have pulled over and stopped and given
16 up.
17   Q.    Well --
18   A.    This, me telling them about the -- me blocking
19 the driver door so that he can't bail, that means
20 so he can't run.  That's an indication that Mr. Evans
21 was not giving up.
22   Q.    Well, isn't part of, you said, if no one bails
23 we're going to do a felony callout stop.  Isn't the not
24 bailing part of containing the suspect in the vehicle
25 so that you can do a felony callout stop?

Page 109

1    A.    A broad question that -- again, another broad
2  question that you want me to interpret very
3  specifically.  A lot of this is contingent on the
4  situation as I know you know.
5    Q.    Let me ask you this, in between your callout of
6  -- or your confirmation that we're going to do a felony
7  callout stop, okay, no one's charging vehicle, in
8  between that and the time of shots fired, did you ever
9  broadcast a tactic other than felony callout stop?
10   A.    I called out the rolling roadblock.
11   Q.    The rolling roadblock was before or after the
12 felony callout stop?
13   A.    What I remember are two distinct conversations.
14 If Mr. Evans gave up and stopped, we would do a felony
15 stop.
16         The second conversation I had about them bailing
17 out is another dialogue because they're not giving up.
18   Q.    Well, how much time elapsed between those two
19 communications that you decided that Mr. Evans now is
20 not giving up?
21   A.    I'd have to look at the video.  I don't
22 remember.
23   Q.    Where were you when you heard the call of shots
24 fired?
25   A.    I believe I made that call.

1  Q.    You made the call of shots fired?
2  A.    Yeah, that's correct.
3  Q.    And where were you when you made that call?
4  A.    I was the -- the second hit occurred when I was
5  seated in the driver's seat. And I couldn't get radio
6  communication for some reason. So the shots fired call
7  came a little bit after the actual event occurred.
8  Q.    But you were still in your vehicle when you made
9  that call?
10 A.    I had to use -- I remember having to use the car
11 microphone because it's more powerful. For some
12 reason, I don't know why, there's a time in the video
13 where it looks like I'm paused inside the car. I'm
14 trying to establish radio communication and get an
15 ambulance. And I was having problems with radio
16 reception at that particular moment as Murphy's Law
17 would have it.
18       But I was, you know, I saw the event unfold. I
19 saw Officer Miller shoot Mr. Evans, if that's what
20 you're asking.
21 Q.    You were able to see Officer Miller open the
22 door of the van?
23 A.    I was able to see, yes. I specifically remember
24 seeing the van because the van was, as I later found
25 out, to be an old church bus and it had like a peace

1  dove on the driver door, and I remember specifically
2  seeing that.
3        If you can -- if I can paint the picture, I'm
4  seated in the driver's seat of my car. Mr. Evans' van
5  has collided with my right front. And I look out my
6  passenger window and I see the open door with the peace
7  dove, and I see Officer Miller on his feet.
8  Q.    I would take it that the open driver door would
9  have been in your line of sight between you and Officer
10 Miller.
11 A.    They were both in my line of -- I was able to
12 see both of them. I don't what the angle was, but I
13 saw the door open and I saw Officer Miller shoot.
14 Q.    Did you see Officer Miller draw his gun?
15 A.    I did not see him draw his gun.
16 Q.    Did you see him point his gun?
17 A.    Yeah, I saw -- I saw Officer Miller stand
18 upright from a little bit of a crouch forward position.
19 And then I saw -- I didn't see him draw his gun, but I
20 saw his gun pointed and firing.
21 Q.    And your vehicle would have been stopped at the
22 point in time that you're watching all this; is that
23 fair?
24 A.    Yes, it was stopped.
25 Q.    And the van was stopped at the point in time

1  that you're watching all this; is that fair?
2  A.    It was -- it all happened in the same second.
3  Q.    So let me ask you this, you don't have a
4  recollection of the van moving at that point in time,
5  do you?
6  A.    My recollection is that I told Agent Moran that
7  it all happened instantly, within the same instant.
8  Q.    Okay. So --
9  A.    Being hit, the door opening, seeing Officer
10 Miller fire, and I heard something inaudible that
11 Officer Miller was saying, but it was consistent with
12 the commands that we're trained to yell out.
13 Q.    Well, you don't know what he said, right?
14 A.    I don't know exactly what he said. It was
15 inaudible to me, but I heard the inflection in his
16 voice.
17 Q.    Okay. Were you able to see Mr. Evans inside his
18 van when Officer Miller drew his weapon?
19 A.    I was able to see, I told Agent Moran I was only
20 able to see the front windshield of the van. I could
21 not see through the front windshield.
22       And I don't know if it was because of glare or
23 something, but afterwards when I saw the video, my
24 video camera, I was able to see Miss Pauley in a
25 frantic state, but at the time it occurred all I saw

1  was the glare of that van windshield.
2  Q.    Let me ask you, I forgot about this, prior to
3  the van coming to a stop, do you recall communications
4  either by yourself or other officers that Mr. Evans
5  appeared to be reaching for something?
6  A.    At the time of the incident I didn't have any
7  knowledge of that. I didn't hear anything and I wasn't
8  at a vantage to see any of that.
9  Q.    Do you remember anybody saying that Mr. Evans
10 had lit a cigarette?
11 A.    I do recall that.
12 Q.    And at any time did you see Mr. Evans with a
13 cigarette as he was driving the van?
14 A.    Yeah, in rewinding, yeah, I do recall that, that
15 occurring.
16 Q.    Did it seem like normal behavior to you,
17 Mr. Evans lighting a cigarette after this, what, 20
18 minutes of pursuit?
19 A.    It did not seem like normal behavior, no.
20 Q.    But initially there was a concern that somebody,
21 whether it was yourself or some other officer, saw some
22 sort of reaching motion by Mr. Evans, right?
23       MR. KELLEY:          Objection.
24       Go ahead.
25 A.    I believe that that was a part of radio traffic.

Page 114

1  Q.   And then an indication that, oh, he's just
2  lighting a cigarette, correct?
3  A.   I don't have -- reaching a -- the radio traffic
4  says reaching around, male, white, bald very short
5  hair, reaching around, it's inaudible, lighting up a
6  cigarette.
7  Q.   Where is that?
8  A.   That's item number 127 on page 4.
9  Q.   Correct.  So your understanding, those two
10 things went together, the broadcast about reaching and
11 then lighting the cigarette; is that correct?
12 A.   That's what it shows here, yes, sir.  I don't
13 dispute it.
14 Q.   And that appears to be only a few communications
15 prior to shots fired, correct?
16 A.   That was just prior to me getting the second
17 rolling roadblock in place.  Item number 12 block --
18 oh, there's two of them.
19      Right after cigarette it says no recording.
20 Then it says, "72 are you still in this."  That is me
21 asking Officer Vlna.  He says, yes, sir I'm off to your
22 right corner.  And I said, all right, why don't you
23 come around here in front and we'll get this guy
24 stopped.
25 Q.   Okay.  And then the next communication is shots

Page 115

1  fired, correct?
2  A.   According to this, yes, sir.
3  Q.   All right.  Let me ask you this, do you recall
4  any communications in between "Why don't you come
5  around in front here" and "Shots fired"?
6  A.   No, I believe that's when the whole colliding
7  and spinning out occurred, yeah.  I don't recall any
8  other radio traffic during that time.
9  Q.   From your vantage point inside your vehicle
10 after it's come to a stop, you see Officer Miller open
11 the door, did you personally see anything that in your
12 mind at that moment -- well, could you see what
13 Mr. Evans' hands were doing?
14 A.   No, I didn't see anything inside the van.
15 Q.   Did you see any weapons on Mr. Evans at any
16 time?
17 A.   I did not see any weapons at any time.
18 Q.   From your vantage point could you see anything
19 that you personally observed that justified the use of
20 deadly force?
21      MR. KELLEY:            Objection.
22      Go ahead.
23 A.   I was hit by Mr. Evans, the door came open, I
24 heard yelling, and Officer Miller fired twice.
25 Q.   Okay.  Well, the hitting of your vehicle had

Page 116

1  stopped before the shots were fired, correct?
2  A.   I recall that it happened all in an instant.  I
3  don't know what BCI's investigation showed, you know,
4  frame by frame, but my interpretation of it is it all
5  happened at once.
6  Q.   Well, you can see, you've seen the video, right?
7  A.   I have, yeah.
8  Q.   And the last impact with your vehicle clearly
9  occurs prior to the shots being fired, correct?
10 A.   I just can't answer it without looking at it
11 again.  It just happened all at the same time for me.
12 Q.   I think we'll queue that up if you guys can just
13 give me a few minutes.
14      MR. SIDOTI:            I got it, if
15 you want it.
16      MR. SCOTT:            Do you have
17 it?  That would be great.
18      MR. SIDOTI:            Would you like
19 to go right before the shooting?
20      MR. SCOTT:            Yeah, yeah, if
21 we can do that and then we'll maybe
22 position this so that everybody can see
23 what we're looking at here.
24      MR. SIDOTI:            Marcus Sidoti
25 on behalf of Adam Fried, I'm going to

Page 117

1  queue up what's been identified and
2  tendered in defendants' response to
3  discovery, indicates five separate videos,
4  cars 3, 9, 12, 27, and then SPD 12 and 27.
5  This is video one of that of car 9 queued
6  up to 13 minutes and 30 seconds.
7      MR. SCOTT:            And, Sergeant
8  Kelley, let me know if you can see this or
9  if we need to reposition.
10      So we're playing this video on a
11 laptop, and go ahead and play that.
12      (Thereupon, the video was played.)
13 BY MR. SCOTT:
14 Q.   Sergeant Kelley, were able to see that video?
15 A.   Yes.
16 Q.   And that captures the last few moments, if you
17 will, of the pursuit prior to shots being fired and
18 then as shots are fired, correct?
19 A.   That's correct.
20 Q.   You'd agree with me that your vehicle is stopped
21 before shots are fired, correct?
22 A.   That's correct.
23 Q.   And the van also appears to be stopped before
24 shots are fired; is that correct?
25 A.   I watched it stop for a millisecond, second,

Page 118

1  yes.
2  Q.  And, again, from your vantage point inside your
3  police vehicle were you able to see anything that
4  justified the use of deadly force?
5  **A.  From my vantage point, you know, all I saw was a**
6  **glared windshield.**
7  Q.  Okay.  Thank you.
8  **A.  Aside from being collided with, I don't know**
9  **what occurred inside the van.**
10  Q.  And, again, the collision occurred before the
11  shots were fired, correct?
12  **A.  Very closely, yeah.**
13  Q.  Did you sustain any injuries in this pursuit?
14  **A.  No.**
15  Q.  Did you make any comp claims or anything like
16  that?
17  **A.  No.**
18  Q.  To your knowledge did any officer who was
19  involved in this pursuit sustain any physical injury?
20  **A.  I don't know.**
21  Q.  You're not aware of any.
22  **A.  I'm not aware of it.**
23  Q.  I want to take a few minutes and identify some
24  documents, if I may.
25       (Thereupon, Plaintiff's Exhibit 3 to

Page 119

1       the deposition of SERGEANT SHAMUS KELLEY
2       was marked for identification.)
3  BY MR. SCOTT:
4  Q.  Sergeant Kelley, I want to hand you a collection
5  of five color photographs and ask you to please just
6  take a minute and look at those.
7  **A.  Okay.**
8  Q.  I'll indicate to you that these photographs were
9  produced to us in discovery by your counsel and I
10  believe they are part of the investigative file for
11  this incident.
12  **A.  Okay.**
13  Q.  Sergeant Kelley, what I wanted to ask you, in
14  those five photographs that make up Plaintiff's Exhibit
15  3, is there some portion of the vehicle that you were
16  operating on March 7, 2017 captured in each of those
17  photos?
18  **A.  Yes.**
19  Q.  And it would be the white, obviously the white
20  vehicle, we see some of the police Strongsville marking
21  on the side of the car; is that correct?
22  **A.  That's correct.**
23  Q.  This is some sort of SUV, sport utility vehicle;
24  is that correct?
25  **A.  That's correct.**

Page 120

1  Q.  And do you see in any of those photographs the
2  area, you had mentioned that the van at some point in
3  time, did you say sideswiped initially, was that the
4  first contact between your vehicle and the van?
5  **A.  That's correct.**
6  Q.  Do you see the area that was sideswiped in any
7  of those photographs?
8  **A.  In the first sideswiping that you're referring**
9  **to, yes, I understand, yes.**
10  Q.  Can you show me which photograph that that
11  appears in?
12  **A.  It's in all of them.  If you see that, my**
13  **mirror, during the first sideswiping it knocked the**
14  **mirror in.**
15  Q.  Was there any damage to the body of the vehicle,
16  if you will, that you believe resulted from the first
17  sideswiping?
18       MR. KELLEY:           Objection.
19  BY MR. SCOTT:
20  Q.  If you know.
21  **A.  I don't know.**
22  Q.  Okay.  And then what about, you said, I think
23  you told me about three impacts in total, correct,
24  between you and the van?  And I correct about that, or
25  two?

Page 121

1  **A.  Which portion?**
2  Q.  Between --
3  **A.  After the spin-out?**
4  Q.  Let me ask you a better question.
5       How many times do you believe your vehicle and
6  the van had physical impact with each other?
7  **A.  I believe that Mr. Evans hit me four times.**
8  Q.  Four times.  Okay.  And you've told me about the
9  sideswiping, correct?  Was that the first time?
10  **A.  First.**
11  Q.  What about the second time, what part of his
12  vehicle impacted your vehicle?
13  **A.  Just before the spin-out when he once backed off**
14  **to the right and then came in hard and pushed me off**
15  **the left side of the interstate.**
16  Q.  Okay.  And would that have been -- I understand
17  you're talking about two points of contact but sort of
18  almost the same event; is that fair?
19  **A.  Subjective, but, yes.**
20  Q.  And what part of Mr. Evans' vehicle impacted
21  your vehicle in those two contacts?
22  **A.  It would be my passenger side and his driver's**
23  **side at some point.  I don't know exactly where.**
24  Q.  Okay.  All right.  Is that portion of your
25  vehicle depicted in any of these five photographs?

Page 122

1    A.    Yes.  This is 5the white SUV, the passenger side
2    photo.
3    Q.    And you're sort of indicating gesturing in the
4    area of the door; is that your recollection?
5    A.    I'm just making reference to this passenger
6    side.
7    Q.    Do you know if it was by the door or by the
8    front fender; do you recall?
9    A.    I don't recall.
10   Q.    Okay.
11   A.    I mean obviously the second two hits occurred
12   here at the right front fender and the right front
13   wheel.
14         The impacts that occurred while we were moving
15   forward before the spin-out, I don't know exactly where
16   those impacts occurred other than his driver's side, my
17   passenger side.
18   Q.    And the last impact would have been towards the
19   passenger side front tire; is that fair?
20   A.    That's correct.
21   Q.    And that's almost the position that we see
22   depicted in these five photographs; is that fair?
23   A.    That should be the position, yes.
24   Q.    After the shots are fired was there a point in
25   time when you became aware that there was more than one

Page 123

1    other person in the van with the driver?
2    A.    I was aware of Miss Pauley in the front
3    passenger seat.
4    Q.    Correct.
5    A.    But it wasn't until later that we found out
6    there were more occupants in the car.
7    Q.    And that's what I want to ask you about.
8         When did you become aware that there were more
9    occupants in the car?
10   A.    We had learned that there were two toddlers and
11   a teenager that were in the back of the van.  Exactly
12   at what point that occurred, you know, it was very soon
13   after the shots were fired.
14   Q.    Do you have, and I guess really what I want to
15   ask you about is what you recall as you sit here today
16   about when you first learned that there were children
17   in this vehicle.
18         What do you recall?  Do you remember who you saw
19   first, or did you see the toddlers?  Did you see the
20   teenager?
21   A.    I heard them first.  I heard them crying,
22   honestly.
23   Q.    And they were still inside the van, or were they
24   outside the van?  What do you recall?
25   A.    If I recall, the children were taken out of the

Page 124

1    van quickly.  I'm thinking that's when I was trying to
2    get radio traffic, radio communication to get an
3    ambulance coming.  I don't remember specifically the
4    children being taken out of the van.  I remember
5    hearing them, yeah.
6    Q.    You didn't personally take any of the children
7    out of the van, correct, that you recall?
8    A.    I don't recall that, no.  I did not do that.
9    Q.    Do you remember anything that was being said by
10   any of the children?
11   A.    At the time of the incident, no, but I do know
12   what was said, you know, after watching the video.
13   Q.    Okay.  So you had a chance to watch the video
14   and hear the audio so you certainly have a better
15   recollection having reviewed some of the materials,
16   okay.
17         Were you subjected to the same administrative
18   procedures we discussed earlier, almost at the
19   beginning of this deposition, having been involved in
20   this use of deadly force incident following this event?
21   A.    What are you referring to?
22   Q.    Well, we talked -- I'm sorry, that was pretty
23   convoluted.
24         Were you placed on administrative leave for any
25   period of time, or were any of the other officers

Page 125

1    placed on administrative leave to your knowledge?
2    A.    I believe -- I mean, I remember Officer Miller
3    being placed on administrative leave.  And specifically
4    for me, I was going on a regular weekend off.
5    Q.    So you had two days off or three days off
6    anyway?
7    A.    Just by -- just by nature of the schedule.  It
8    wasn't official.
9    Q.    So you were not subjected to any special
10   procedures, having been involved in this use of deadly
11   force incident; is that correct?
12   A.    I don't understand the question.
13   Q.    Yeah.  Nothing out of the ordinary happened with
14   regard to your schedule or your duties immediately
15   after this incident.
16   A.    No.  No.
17   Q.    Was there any review between yourself and any
18   other, I suppose, command staff within the Strongsville
19   Police Department concerning this pursuit and the
20   manner in which it was handled?
21   A.    There was an internal investigation done by the
22   Strongsville Police Department, but it wasn't done
23   initially.
24   Q.    And that would have been done sort of weeks
25   later or months later; do you recall?

Page 126

1   **A.    I recall that our administration waited until**
2   **after the grand jury findings before they started any**
3   **kind of internal administrative investigation.**
4   Q.    Okay.
5   **A.    That's my recollection.**
6   Q.    So it would have been a number of months after
7   March 7, 2017; is that correct?
8   **A.    I believe so, yeah. I wasn't directly involved**
9   **in that, but I believe that's what the --**
10  Q.    And other than participating in that internal
11  investigation, was there any other review of the manner
12  in which this pursuit was handled between yourself and
13  other command staff?
14  **A.    I didn't have any communication with anybody**
15  **about an internal investigation.**
16  Q.    No debriefing of any kind the next day?
17  **A.    Just with stress counselors, but not with the**
18  **administration.**
19  Q.    Do you recall when you first would have -- did
20  you ever speak to the chief of police about this event
21  following March 7, 2017?
22  **A.    I received a phone call from Chief Fender**
23  **several days after.**
24  Q.    And Chief Fender would have been the chief on
25  March 7, 2017, correct?

Page 127

1   **A.    That's right.**
2   Q.    And he had assumed his duties earlier in 2017,
3   correct?
4   **A.    Yes.**
5   Q.    Upon the retirement of Chief Kobak?
6   **A.    That's right.**
7   Q.    And so you received a phone call from Chief
8   Fender a couple days afterwards?
9   **A.    I did.**
10  Q.    Was that more of a how you're doing kind of
11  phone call as opposed to discussing the actual events?
12  **A.    Yes. We didn't discuss the events because it**
13  **was a BCI investigation.**
14  Q.    Did you ever have occasion then subsequent to
15  March 7, 2017 to sort of have a one-on-one with Chief
16  Fender to specifically discuss the events of this
17  pursuit?
18  **A.    No, I never have.**
19  Q.    And that's never happened to this day.
20  **A.    No.**
21  Q.    And would the same be true as regards to the
22  deputy chiefs of police that you mentioned, you've
23  never had a one-on-one conversation with them about
24  this?
25  **A.    No, BCI handled it. I don't recall having any**

Page 128

1   kind of conversation. They pretty much took a backseat
2   to all of this.
3   Q.    Okay. And I take it you've never had such
4   conversation with any higher ranking officer with the
5   City of Strongsville, other than this internal
6   investigation you told me about, correct?
7   **A.    I don't know if I'm answering your question**
8   **correctly, but the only dialogue that I had about an**
9   **internal investigation was when I was given a verbal**
10  **reprimand or something like that for not having my**
11  **microphone on. That's the only really conversation**
12  **I've had with the administration with this.**
13  Q.    And you had sort of told me that much earlier on
14  that you had turned your mic off in your office because
15  it kept beeping or whatever because it was out of range
16  with --
17  **A.    The car in the parking lot.**
18  Q.    -- the equipment in the car.
19  **A.    Yeah.**
20  Q.    And you were doing office work, correct?
21  **A.    Correct.**
22  Q.    And simply didn't have the opportunity or the
23  thought to turn it back on, correct?
24  **A.    Yeah.**
25  Q.    How did that come about that somebody then

Page 129

1   reprimanded you for not turning the mic on? When did
2   that occur?
3   **A.    It occurred at the end of their internal**
4   **investigation which would have started after the grand**
5   **jury findings. I don't know the exact date and I don't**
6   **know the exact time frame that they took to look into**
7   **all this.**
8   Q.    So one of the outcomes of the internal
9   investigation was to give you a verbal reprimand, a
10  written reprimand of some kind?
11  **A.    It's in our policy that we have to have our**
12  **microphones working, you know.**
13  Q.    I'm trying to understand the nature of the
14  reprimand. Was it just a verbal thing, or did they
15  send you a letter?
16  **A.    No, no letter.**
17  Q.    Just verbally.
18  **A.    It was verbal, yeah.**
19  Q.    So one of the outcomes of this internal
20  investigation was a verbal reprimand to you to make
21  sure that your microphone is turned on when you're in
22  -- or at appropriate times in your car, correct?
23  **A.    That's correct.**
24  Q.    And it's not always on, correct? I assume you
25  just turn it on when you're engaged in a call to duty;

1   is that fair?
2   **A.    Yeah, it turns on automatically if there's power**
3   **to it when the lights turn on, yes.**
4   Q.    Okay.  I see.
5   **A.    Or you can turn it on.**
6   Q.    Other than the verbal reprimand that you
7   received, are you aware of any other disciplinary
8   action that arose out of the internal investigation
9   conducted by the Strongsville Police Department?
10          MR. KELLEY:          Objection.
11          Go ahead.
12  **A.    I'm aware, yes.**
13  Q.    What are you aware of?
14  **A.    I recall that Officer Vlna shut his car off and**
15  **turned it back on and that he was reprimanded for that.**
16          **The squad car that Officer Vlna drives or was**
17  **driving was having some kind of electrical issues that**
18  **would mess with the motor.  So he turned the car off**
19  **and turned it back on while we were on the highway to**
20  **reset the computer that controls the motor.**
21          **I did know at the time that it actually wasn't—I**
22  **didn't give much thought to it.  But then afterwards I**
23  **think he was given a letter of reprimand for that, if**
24  **I'm not mistaken.**
25  Q.    So you were given a verbal reprimand, Officer

1   Vlna may have been given a written reprimand.
2   **A.    Yeah, he may have.  I'm not certain.**
3   Q.    Was there any other disciplinary action that
4   flowed out of the Strongsville internal investigation?
5   **A.    I'm not aware of any.  Not to say that there**
6   **wasn't, but I'm just not aware of it.  I don't know.**
7   Q.    To your knowledge was there any review of
8   Strongsville's policies as a result of this incident?
9   **A.    I am aware, yes.**
10  Q.    What are you aware of?
11  **A.    Our pursuit policy restricts the use of sport**
12  **utility vehicles in pursuits.  The policy itself is**
13  **antiquated because the sport utility vehicles that come**
14  **out of the factory now are pursuit rated.  So the**
15  **policy was not in line with the technology and it's**
16  **since been corrected.**
17  Q.    So would I be correct from all that that
18  technically the vehicle that you were operating was not
19  suitable for a pursuit under the then existing policy?
20  **A.    No.  The sport utility vehicles that sergeants**
21  **used to drive were not in line with the policy and not**
22  **allowed to be in pursuits.**
23          **The new sport utilities are allowed to be in**
24  **pursuits.  It's just the policy wasn't updated.**
25  Q.    And that's what I want to understand, was the

1   language of the prior policy a strict ban on using SUVs
2   in pursuits?
3   **A.    It was spelled out as a prohibited vehicle in a**
4   **pursuit, yes.**
5   Q.    I appreciate you're saying that the technology
6   of the SUV had changed such that they should have been
7   allowed, but under a strict reading of the policy at
8   the time they were not allowed; is that what you're
9   telling me?
10  **A.    If that's how -- again, if that's how it's**
11  **something that you want to interpret, yes.**
12  Q.    I don't want to interpret, I'm just asking if
13  that's the policy.
14          Did the policy say no SUVs in pursuits?
15  **A.    That's what the policy said.**
16  Q.    Okay.  And it's since been updated that the
17  vehicle you were operating would be eligible to
18  participate in a pursuit, correct?
19  **A.    Correct.**
20  Q.    Sergeant Kelley, are you aware of any expert
21  witnesses that have been retained on your behalf in
22  this matter?
23  **A.    No.**
24  Q.    Are you aware of any reports from any witnesses
25  that may have been retained on your behalf in this

1   matter?
2   **A.    I'm not aware of any.**
3   Q.    You mentioned in your response to the discovery
4   request that we previously marked as Plaintiff's
5   Exhibit 1 that Lieutenant O'Deens would have been your
6   immediate supervisor on March 6, March 7 of 2017; is
7   that fair?
8   **A.    That's correct.**
9   Q.    Was Lieutenant O'Deens actually at the station
10  and on duty during this pursuit?
11  **A.    No, he's at home.**
12  Q.    Okay.  But even when he's off duty he's
13  considered to be your immediate supervisor; is that
14  what you're telling us?
15  **A.    That's correct.**
16  Q.    Does the Strongsville Police Department require
17  officers to fill out a use of deadly force or less than
18  lethal force report for force used by officers in the
19  line of duty?
20  **A.    Yes.**
21  Q.    And are such reports filled out by just the
22  officer deploying such force or by all officers on
23  scene?
24          MR. KELLEY:          Off the record
25          for a second.

Page 134

1    I'm sorry, you have a question.
2    MR. SCOTT:        I'm just asking
3    who has to fill out the report.
4    MR. KELLEY:        Go ahead and
5    answer the question.
6  BY MR. SCOTT:
7  Q.   Is it just the officer using the force or
8  everybody who's on scene and witnesses force used?
9  A.   It's the officer who reports the force, but in
10  this particular case BCI investigated the use of force,
11  so there was no SP report made.
12    MR. SCOTT:        We can go
13    ahead and go off the record for a second.
14    (Thereupon, there was a discussion
15    off the record.)
16    MR. SCOTT:        Back on the
17    record.
18    We just took a short break and a
19    number of people have joined us, Mr.
20    Raskin has joined us as counsel,
21    co-counsel for the defendants.  Also
22    Amanda Pauley and her father.  Amanda of
23    course is one of the plaintiffs.
24    Her father is not a party to this
25    case, he is not a witness to this case,

Page 135

1    and we have stipulated that he is not
2    going to be a witness to this case at any
3    juncture for any purpose.
4    MR. KELLEY:        That's
5    correct.
6    MR. SCOTT:        And I
7    appreciate the accommodation to allow him
8    to sit in.
9        ---
10    (Thereupon, there was a lunch
11    recess.)
12        ---
13  BY MR. SCOTT:
14  Q.    Sergeant Kelley, we had a chance to take a
15  little break.  I wanted to get back to my questioning.
16  We were at the end of the pursuit and I had been asking
17  you about when you became aware that there were
18  children in the van.
19    I understand that you did not personally
20  interact directly with the children, correct, but you
21  became aware through voices or whatever that they were
22  present, correct?
23  A.   Immediately that was the case, yes.
24  Q.   Do you recall seeing the teenager, and I
25  appreciate you didn't know his name at the time, Devon

Page 136

1  Connard, and perhaps you've come to learn his name.
2  A.   Yes.
3  Q.   Did you see him outside the van at any time?
4  A.   I did.
5  Q.   Do you know if he was on scene in the area or
6  next to where Mr. Evans was?
7  A.   The first time that I saw Devon was he was -- he
8  was sitting in the middle of the interstate like
9  crisscross apple sauce with his legs crossed.  And he
10  was right next to where they were working on Mr. Evans.
11  So I just instinctively picked him up and got him away
12  from there.
13  Q.   So that was one direct interaction you had at
14  least with Devon was to remove him from the immediate
15  vicinity where Mr. Evans was being treated and place
16  him --
17  A.   I couldn't find a place to put him, so I just
18  had him sit on the side of the road where there was a
19  squad car that was blocking his line of sight to where
20  everything was happening.  There was no available cars.
21  Q.   All right.  Did you have any other direct
22  interaction with any of the children other than that
23  one time with Devon?
24  A.   Throughout the remainder of the incident, or
25  right immediately after?

Page 137

1  Q.   Throughout the remainder of the incident.
2  A.   I did.  I remember talking to the toddlers.
3  They were in the back of a squad car, I don't remember
4  which squad car, and there was a girl and a boy.  And
5  we were in the process of getting them back all
6  together as a family.
7    And I just remember the girl came out and I
8  remember coaxing the little boy, I think it's on video,
9  I'm like, come here, buddy.  And eventually they all
10  ended up in the same squad car and then came back here.
11  Q.   Let me ask you, when you indicated that you
12  positioned Devon off to the side of the roadway where
13  there was another car blocking his view, did you leave
14  him with anybody or was he just seated -- did you say,
15  stay here, or was he seated there by himself?
16  A.   Yeah, I think, you know, the road was closed so
17  I just had him sit down.
18  Q.   And did you --
19  A.   That's all I could do at the time.
20  Q.   Sure.  And did you leave him then to go off and
21  do other things?
22  A.   I had to, yes.
23  Q.   Was he handcuffed?
24  A.   He was handcuffed, yes.  I don't know who
25  handcuffed -- well, I didn't know at the time who

1   handcuffed him. I learned in the video that he was
2   handcuffed when he was taken out of the car by a, I
3   believe, Strongsville Officer.
4   Q.   And do you know which one?
5   A.   I don't remember. I think it was Plut, but I
6   don't remember.
7   Q.   Did he remain handcuffed as he was seated by the
8   side of the road out of the view of where Mr. Evans was
9   being treated?
10  A.   He was.
11  Q.   At any point in time was he unhandcuffed when he
12  was on scene?
13  A.   He was.
14  Q.   When was that?
15  A.   When I had -- it was a little bit chaotic at
16  that time, but then when things had settled down and we
17  made the decision to bring them back together as a
18  family, I went over to where I left him but discovered
19  that he had been since placed in the back of a
20  Brunswick Police car.
21  Q.   By somebody else?
22  A.   By somebody else, yeah.
23  Q.   Was he handcuffed in the back of the Brunswick
24  car?
25  A.   He was. He was, yeah.

1   Q.   Okay.
2   A.   So I had him come out of the car and he was --
3   and I said something like, come on, kid, let's go back
4   to your family or something like that. And he was
5   unhandcuffed and brought back with everybody else.
6   Q.   And I take it that the toddlers were never
7   restrained at any time, correct?
8   A.   No.
9   Q.   Mrs. Pauley or Amanda Pauley was handcuffed, is
10  that correct, initially?
11  A.   Yes, by me.
12  Q.   Did you remove Amanda from the van?
13  A.   I did.
14  Q.   Did anybody assist you in that, or did you do
15  that by yourself?
16  A.   It was just me.
17  Q.   And you handcuffed her and took her where?
18  A.   I took her to find a car to place her in, just
19  to secure her. All I could find was a trooper car and
20  I had her initially sit in the back of that car.
21  Q.   Did she remain handcuffed inside the State
22  Highway Patrol car?
23  A.   Yes.
24  Q.   And did she remain handcuffed until she was
25  brought back to the station, or was she unhandcuffed on

1   scene?
2   A.   No. When we brought the family back together on
3   scene in the same police car, I remember a trooper was
4   like escorting her and we were going to put her back
5   into the car with her kids. And the trooper asked
6   about handcuffed or unhandcuffed and I just made the
7   decision to unhandcuff her so she didn't have to be
8   seen in handcuffs by her kids.
9   Q.   I had asked you early on about whether or not
10  you had a personal cell phone with you. I think you
11  told me that you did, correct?
12  A.   Correct.
13  Q.   And that's typical, I mean, that would be your
14  practice or your habit, if you will, to have your
15  personal cell phone with you while you're on duty,
16  correct?
17  A.   Correct.
18  Q.   Did you make any use of your personal cell phone
19  while you were on scene?
20  A.   I called the other sergeant that was working.
21  Off the top of my head, that's what I recall.
22  Q.   And you called him with your personal cell phone
23  is what you're telling me, correct?
24  A.   Correct, yeah.
25  Q.   Did you make any other use of your personal cell

1   phone while you were on scene?
2   A.   I don't recall. And I don't know. I mean, if I
3   did it was for something that was going on.
4   Q.   Would have been related to now sort of dealing
5   with the incident scene.
6   A.   The issues, correct.
7   Q.   Do you recall making any use of your personal
8   cell phone later that evening whether it would have
9   been after you left the scene as you were traveling
10  back to the Strongsville Police Department or while you
11  were here at the Strongsville Police Department?
12  A.   I'm sure that I did because there was so much
13  going on. I just don't recall specifically using it.
14  Q.   Would it have been related to your official
15  duties, if you will, in managing the incident?
16  A.   That's right.
17  Q.   Or was it personal?
18  A.   I don't recall using -- I didn't even have the
19  time to use it for anything personal. It was for -- I
20  mean, I recall it was all very chaotic.
21  Q.   Fair to say any use of your personal cell phone
22  would have been work related.
23  A.   Correct.
24  Q.   At any time during the investigation by BCI, and
25  we know that the Bureau of Criminal Investigation was

Page 142

1  asked to come in and investigate this incident; is that
2  correct?
3  **A.  That's correct.**
4  Q.  At any time during -- and they were called right
5  away; is that fair?
6  **A.  That's correct.**
7  Q.  So they were called on March 7th what,
8  immediately after this happened or certainly shortly
9  after this incident happened; is that fair?
10  **A.  Yes, they came to the scene.**
11  Q.  And they came to the city that day, correct?
12  **A.  Within, you know, an hour I would say they were**
13  **there.**
14  Q.  At any time during the investigation by the
15  Bureau of Criminal Investigation did anybody ask for
16  your personal cell phone or any of your personal cell
17  phone records?
18  **A.  No.**
19  Q.  Do you know if any of the other officers on
20  scene had personal cell phones with them?
21  **A.  I don't know.  I'm assuming that they did, but I**
22  **don't know.**
23  Q.  And, again, to your knowledge did anybody ask,
24  anybody from BCI or any other investigative agency ever
25  ask for the officers' personal cell phones?

Page 143

1  **A.  No.**
2  Q.  In your statement to BCI, I want to go back to
3  shortly before the pursuit concluded, and we had talked
4  about the communications regarding one of the officers
5  observing Mr. Evans reaching around inside the van and
6  then saying he lit a cigarette, correct?
7  Do you recall in your interview with the BCI
8  using words to the effect that once you saw Mr. Evans
9  smoking a cigarette you thought he was messing with
10  you, or using words to that effect?
11  **A.  I remember using the word silly.**
12  Q.  And so you perceived or saw the act of Mr. Evans
13  smoking towards the end of this pursuit as sort of a
14  silly act, like he was just taking everybody along for
15  a ride or something; is that fair?
16  Or what did you mean by that?
17  **A.  No.  I meant that after all the events that had**
18  **occurred up to this point, you know, it was silly to**
19  **think that Mr. Evans was going to get away with this**
20  **and he was still not getting out.  That's what I meant.**
21  Q.  Silly for him to be so casual that he's smoking
22  a cigarette; is that what you mean?
23  How did that relate, I mean, you tied the two
24  together, this observation and this thought having to
25  do with the fact that here he is after all this, he's

Page 144

1  lighting up a cigarette and having a smoke.
2  **A.  Like I said, I mean, I interpreted that it was**
3  **just -- that's the word that came to mind.**
4  Q.  It was silly behavior.
5  **A.  It was very dangerous behavior.  And it was**
6  **silly to think that he was going to get away with this**
7  **after all that he had done.**
8  Q.  Having been involved in this incident and having
9  had the department conduct its own internal
10  investigation, and I think you told us before that the
11  result of that internal investigation as regards
12  yourself was simply a verbal reprimand to make sure
13  your microphone is on in the future, correct?
14  **A.  That's all I was told, yes.**
15  Q.  Was it your understanding that that
16  investigation looked at every aspect of this pursuit
17  and how it was handled?
18  **A.  I'd surmise that, yes.**
19  Q.  And that would include your performance and your
20  decisions as the officer in charge of this pursuit?
21  **A.  That's correct.**
22  Q.  At least in your mind as a sergeant with the
23  Strongsville Police Department, did that indicate to
24  you that everything else that you did that evening must
25  have been okay, if the only reprimand was for not

Page 145

1  having your microphone on.
2  MR. KELLEY:          Objection.
3  Go ahead.
4  **A.  Right, correct.**
5  Q.  And, I'm sorry, did you tell me you have never
6  been in a prior use of deadly force incident, or did
7  you indicate that you have?
8  **A.  Have not.**
9  Q.  Have you been involved in any other incidents as
10  a member of the Strongsville Police Department for
11  which there was a subsequent internal investigation?
12  **A.  Yes.**
13  Q.  What do you recall?
14  **A.  I believe the one that comes to mind immediately**
15  **is in your files about I was a patrol officer with a**
16  **canine, in the canine unit, and a person, a motorist**
17  **that I had stopped had accused me of racial profiling**
18  **as a reason for pulling him over.**
19  Q.  And so because of that citizen complaint there
20  was a review of that allegation?
21  **A.  That's correct.**
22  Q.  And I assume that review showed that the
23  allegation was unfounded or not true?
24  **A.  I'm assuming, yes.  I don't know the exact**
25  **terminology, whether it was exonerated, unfounded, you**

Page 146

1  know, unsubstantiated, but there was probable cause for
2  the stop.
3  Q.   And, again, you take the outcome and the
4  ultimate determination as sort of a tacit approval of
5  your actions in the way that you conducted yourself
6  during that particular stop.
7       MR. KELLEY:        Objection.
8       Go ahead.
9  A.   Yes.
10 Q.   Had there been any other citizen complaints
11 filed against you during your time with the
12 Strongsville Police Department?
13 A.   I don't recall. I don't recall. If there were,
14 I wasn't made aware of them or they were very minute,
15 but that's the only one I can recall.
16 Q.   What is the policy with respect to maintaining
17 citizen complaints? Is it limited to a period of time?
18 Are citizen complaints purged after a while?
19 A.   I learned because of this incident, actually,
20 that I don't know if it's our administrative function
21 or if it's a law, that it goes back six years we keep
22 our records. So that was the citizen complaint I got
23 in the last six years.
24 Q.   Let me just ask about you first, currently as a
25 sergeant are you a member of any union?

Page 147

1  A.   Yes.
2  Q.   What union are you part of?
3  A.   The Fraternal Order of Police Union.
4  Q.   Was that the same union you would have been part
5  of as a patrol officer?
6  A.   It's the same, but it's -- essentially the same
7  but because I have the rank of sergeant it's a
8  different --
9  Q.   Chapter.
10 A.   -- chapter, but it's essentially the same.
11 Q.   You were interviewed by the Bureau of Criminal
12 Investigation on March 7, 2017; am I correct about
13 that?
14 A.   That's correct.
15 Q.   Would that have been later in the day or as soon
16 as you got back to the police station?
17 A.   This incident occurred roughly 2:30 in the
18 morning and I think it was roughly 6:00 in the morning.
19 Q.   When BCI conducted their interview?
20 A.   That's right.
21 Q.   Did you have a chance to discuss the fact that
22 you were going to be interviewed with anybody prior to
23 the interview taking place?
24 A.   I spoke with Agent Moran who asked me if I
25 wanted to give an interview and I told him that I was

Page 148

1  comfortable to do it.
2  Q.   Did you discuss anything else with Agent Moran
3  prior to commencing the interview?
4  A.   No.
5  Q.   Did you meet with any officials from your union
6  prior to commencing the interview?
7  A.   A phone conversation with the union.
8  Q.   Did you discuss the specific events of the
9  pursuit in that phone conversation?
10 A.   I don't recall it was that in depth. It was
11 just a question of whether I should give a statement at
12 the time or not. And they indicated that I was okay.
13 Q.   And are those statements completely voluntary,
14 they're not Garrity statements or anything like that;
15 am I correct?
16 A.   I'm not sure I understand.
17 Q.   Are you familiar with a Garrity warning?
18 A.   I am, yeah.
19 Q.   Were you given a Garrity warning in this case?
20 A.   No.
21 Q.   So your chief was not commanding you to give a
22 statement. You gave a voluntary statement; is that
23 correct?
24 A.   That's correct.
25 Q.   My understanding is that if you're given Garrity

Page 149

1  it would be sort of insubordination, if you will, to
2  refuse, to continue to refuse to give a statement,
3  correct?
4  A.   That's correct. It was voluntary. I understand
5  your question.
6  Q.   I'm just about done, if you just give me one
7  second to go through this.
8       I do want to you ask about one of your
9  interrogatory responses and your testimony here today.
10      Interrogatory No. 13, I had asked about the
11 early warning system and training. I think your
12 response at that time was, "As a patrol officer I do
13 not believe I have received training in the
14 department's early warning system for monitoring police
15 officers;" do you see that?
16 A.   I see that, yes.
17 Q.   And I think what you told me earlier is that
18 subsequent to this event you have commenced inputting
19 information into the city's early warning system; is
20 that correct?
21 A.   That's correct.
22 Q.   Did you receive some sort of training after this
23 event on the early warning system and how to use it?
24 A.   Only in how to access the files and make entries
25 into the files.

Page 150

1  Q.   What about the nature of things that should be
2  noted?
3  **A.   It's discussed in our policy and, you know,**
4  **through policy discussions that some of the things that**
5  **a supervisor looks for, when it comes to dealing with**
6  **direct reports, are the police officers that directly**
7  **report to you, are they -- do they show signs that**
8  **they're experiencing family problems; are they**
9  **deficient in their duties as a police officer by not**
10  **delivering quality service; are they getting lots of**
11  **citizen complaints.**
12  **       I was instructed that these are the sort of**
13  **things, you know, that are taken into consideration in**
14  **dealing with the early warning system as a supervisor**
15  **interacting with subordinates.**
16  Q.   And so I just want to -- and I'm sorry, when did
17  that training come, did that come after this incident,
18  or when did you receive that training?
19  **A.   It was after this incident.**
20  Q.   And were you the only one that received the
21  training, or is that more department wide?  Do you know
22  how that training was administered?
23  **A.   You know, at the time of this incident on March**
24  **7th I had only been a sergeant for six weeks, so just**
25  **as a natural chronological, they just hadn't trained me**

Page 151

1  **on it yet, you know, it was just one of those things,**
2  **if that makes sense.**
3  Q.   I guess, and maybe I'm making this too
4  complicated, was this something that somebody just sat
5  down with you one-on-one and said, here's the computer,
6  here's how you get into the early warning system and
7  this is the sort of stuff you should be entering; is
8  that what happened?
9  Q.   It was more so, this is how you enter into it,
10  this is how you get into it, yeah.
11       The actual observations, you know, is something
12  that, yes, we're trained in it, but, yes, it's also
13  kind of common sense, you know.
14  Q.   Okay.  Do you remember who gave the training?
15  **A.   Lieutenant O'Deens.**
16  Q.   Is there any written material other than
17  possibly the policy itself?
18  **A.   No.**
19  Q.   So just the City of Strongsville's early warning
20  system policy would have been the only written material
21  that you would have been given.
22  **A.   That's all I'm aware of, yes.**
23  Q.   Was there any understanding on your part that
24  even activity that might be viewed as not necessarily
25  deficient but simply being involved in certain types of

Page 152

1  events, say, such as use of deadly force events, is
2  something that should be tracked through the early
3  warning system?
4  **A.   At the sergeant level, I don't think that I**
5  **would have anything to do with that.**
6  Q.   Is it your understanding that somebody at
7  another level would have something to do with that?
8  **A.   I would assume from an administrative**
9  **standpoint.  I don't know the parameters.  Officer**
10  **Miller was no billed in the grand jury.**
11  Q.   No, I understand that.
12       MR. SCOTT:        Sergeant
13       Kelley, I believe those are the only
14       questions I have for you.  Thank you for
15       the opportunity to speak with you today.
16        I believe Mr. Sidoti may have some
17       questions.
18                - - -
19  BY MR. SIDOTI:
20  Q.   Sergeant Kelley, my name is Marcus Sidoti, and
21  as you are probably aware from the pleadings that I
22  represent Adam Fried as the administrator for the
23  estate of Roy Evans.  Same rules apply for the
24  questioning.
25       I as you know have been here since the beginning

Page 153

1  so I'm going to do my best to not be redundant so we're
2  not here twice as long, okay?
3  **A.   Thank you.**
4  Q.   So please excuse me for bouncing around, but,
5  again, based on the questions you answered for
6  Mr. Scott and noting, as you can probably understand,
7  some of them may be duplicative, but I'm going to
8  bounce around trying to stay away from things you've
9  already answered, okay?
10  **A.   Okay.**
11  Q.   Are you married?
12  **A.   Yes.**
13  Q.   Children?
14  **A.   Yes.**
15  Q.   How long have you known Officer Miller?
16  **A.   Approximately 17 years.**
17  Q.   Do you and Officer Miller socialize outside of
18  the work environment?
19  **A.   No.**
20  Q.   Ever had a beer with Officer Miller?
21  **A.   I don't drink.**
22  Q.   Has Officer Miller ever been to your home?
23  **A.   Yes, he has.**
24  Q.   Do you engage in any sporting events, bowling,
25  softball, anything with Officer Miller socially outside

Page 154

1  of the work environment?
2  **A.  Not that I recall.**
3  Q.    Aside from OPOTA for your training as a police
4  officer, tell me about your education.  Where did you
5  go to high school?
6        MR. KELLEY:          Objection.
7        You didn't go to OPOTA?
8        THE WITNESS:          The
9        certification's through OPOTA.
10       MR. KELLEY:          Was it?  Okay,
11       I'm sorry.
12 **A.  High school?**
13 Q.    Yes, sir.
14 **A.  I went to St. Ignatius High School.**
15 Q.    Did you go to undergrad?
16 **A.  I did, at the University of Toledo.**
17 Q.    Master's Degree?
18 **A.  I have like two more courses left.**
19 Q.    Are you going to school currently?
20 **A.  Yes.**
21 Q.    Where?
22 **A.  Florida State University.  It's an online**
23 **master's program.**
24 Q.    When do you anticipate graduating with your
25 master's?

Page 155

1  **A.  In roughly two semesters I'm trying for.**
2  Q.    And what will your degree be in?
3  **A.  It's criminal justice studies with a**
4  **concentration in biosocial criminology.**
5  Q.    Do you have any other legal education background
6  but for the coursework for your master's so far?
7  **A.  No.**
8  Q.    Any military service?
9  **A.  No.**
10 Q.    Mr. Scott asked you some questions regarding
11 de-escalation and sometimes in regards to individuals
12 who might have psychiatric problems; do you recall
13 that?
14 **A.  I recall.**
15 Q.    Do you have any training identifying different
16 types of psychotic diagnoses, paranoid schizophrenia,
17 anything like that?  Have you had any formal training
18 in regards to that?
19 **A.  No.**
20 Q.    And just for clarification, you've been on the
21 force for how long now?
22 **A.  I'm in my 18th year.**
23 Q.    And at the time of the incident on March 7 of
24 2017 you'd been a sergeant then for six weeks, correct?
25 **A.  That's correct.**

Page 156

1  Q.    What type of testing or training prior to being
2  a sergeant does the Strongsville Police Department
3  require?
4  **A.  Promotions are done through civil service**
5  **testing, so there is a written exam.  And the written**
6  **exam covers three textbooks that they assign to us.**
7  **One is a police management book, one is a business**
8  **management book, and I believe there was another one on**
9  **ethics, something like that.**
10       **And then it also covers our policies and**
11 **procedures and codified ordinances.**
12 Q.    Did you pass that test the first time you took
13 it?
14 **A.  The first time I took it I got a 69 percent on**
15 **it.  And that was probably 2004 or '05, I think.**
16 Q.    So at that point you would have only been on the
17 force for a few years but you were eligible to take the
18 test to be a sergeant at that time?
19 **A.  Yeah, I just took the test.  I didn't study for**
20 **it.**
21 Q.    Okay.  So 2004, when was the next time after
22 2004 that you took the test?
23 **A.  I don't remember the exact year.  It was maybe**
24 **-- I don't remember the year.  I'm guessing somewhere**
25 **in the vicinity of 2011.**

Page 157

1  Q.    So several more years, somewhere between five
2  and seven years later you took the test a second time?
3  **A.  That's correct.**
4  Q.    And did you pass the test at that time?
5  **A.  I did.**
6  Q.    And what was your percentage; if you recall?
7  **A.  I don't recall my percentage.  I recall that at**
8  **the end I was ranked number 7.**
9  Q.    So explain to me, and I don't know, so if you
10 pass the test when you take it in 2011, and here we're
11 discussing that you're not a sergeant until 2017,
12 what's going on in that six-year window on why you
13 passed the test but you're not yet a sergeant?
14 **A.  It just goes off of openings, you know, so there**
15 **just was no -- there was no openings.  There were no**
16 **openings, I should say, and after two years the list**
17 **expires and they have to give a new test.**
18 Q.    Did you have to take the test again after 2011?
19 **A.  I did.**
20 Q.    And when did you take that test again?
21 **A.  2016, I believe it was.**
22 Q.    Is it fair to say that after you took that test
23 I'm assuming you passed; is that correct?
24 **A.  Yes.**
25 Q.    That was the last test you took before being a

Page 158

1  sergeant?
2  **A.    That's correct.**
3  Q.    Did the 2016 test contain anything regarding the
4  early warning system?  If you recall.
5  **A.    I don't recall.**
6  Q.    Did the 2016 test or any of the tests you took
7  for sergeant have any questions regarding identifying
8  issues with subordinates that you now know may be
9  considered for reports to the early warning system?
10 **A.    Yes.**
11 Q.    Tell me about those.
12 **A.    The promotional test is two parts.  One is a**
13 **written test and also there is an assessment center.**
14 **And in the assessment center it's an acting role**
15 **playing scenario, if you will, where you have to**
16 **counsel a problem employee.**
17 **      The test is concerned with playing off of the**
18 **actor.  There's a third-party actor hired.  You have to**
19 **try and identify what the problem with the employee is,**
20 **try and solve the work issues that are deficient and**
21 **try to come to the root of the problem.**
22 Q.    Do you recall what your actor's issues were that
23 you identified?
24 **A.    Yes.**
25 Q.    And what were they?

Page 159

1  **A.    Mine was, the scenario was that I had to counsel**
2  **a patrol officer who thought he knew everything and had**
3  **a quick answer for everything that I would say to him.**
4  **      So the root of the issue was that the person was**
5  **having some family problems at home, at least that's**
6  **what I surmised based on how the role play went out.**
7  **And that he was -- this person was struggling at home**
8  **and therefore when he would come to work he was acting**
9  **out.**
10 Q.    Along the lines of things you'd probably be
11 obligated to identify as one of their supervisors if
12 it's one of your patrol officers, correct?
13 **A.    I'm sorry, could you say that again?**
14 Q.    Let me rephrase that.
15       That portion of the test was attempting to
16 present you with issues that you may have had to have
17 dealt with as a supervisor for a patrol officer once
18 you were a sergeant.
19 **A.    That I may have to, yes.**
20 Q.    May have to, okay.
21       Mr. Scott asked you if uses of deadly force
22 would be something that would be taken into
23 consideration for any reporting to the early warning
24 system: do you recall that line of questioning a moment
25 ago?

Page 160

1  **A.    Yes.**
2  Q.    I believe you indicated that you were familiar
3  that perhaps there may be a supervisor, potentially --
4  was it Lieutenant O'Deens?
5  **A.    Correct, yeah.**
6  Q.    Potentially Lieutenant O'Deens.
7        Did Lieutenant O'Deens ever inform you when you
8  were involved with the training that uses of force,
9  deadly uses of force are specifically something that he
10 would address for that system?
11 **A.    No.**
12 Q.    Did he ever address with you that that's
13 something that you specifically don't address?
14 **A.    No.**
15 Q.    So when you respond in saying that you're not
16 sure in regards to deadly uses of force, if that's
17 something for the early warning system, you're just
18 saying that it's not your responsibility based on your
19 knowledge.
20 **A.    Based on my role in the agency, I don't see any**
21 **scenario where I would be tasked with something that**
22 **important.**
23 Q.    When Mr. Scott was asking you about the
24 investigation involving BCI, I believe one of your
25 responses was that the investigation for the incident

Page 161

1  on March 7th was BCI -- was being conducted by you and
2  BCI; do you recall that?
3  **A.    No.**
4  Q.    And I may have misheard this, that's why -- so
5  when you come back some four hours later and have a
6  conversation with I believe Agent Moran, you weren't
7  involved in the investigation itself.  You were just
8  informing him of the information you knew about the
9  incident.
10 **A.    That's correct.**
11 Q.    At any point were you involved in any of the
12 investigations, either internally or with BCI?
13 **A.    No.**
14 Q.    Have you had prior dealings with Agent Moran in
15 the past?
16 **A.    No, that was the first time.**
17 Q.    How about Agent Clar with BCI?
18 **A.    I don't know who that is.**
19 Q.    Did you ever speak with the Arvin Clar with
20 BCI?
21 **A.    I don't believe so.  If you describe him, I**
22 **might be able to identify him on the scene, but I don't**
23 **remember that name.**
24 Q.    Well, let me ask you this, do you recall
25 speaking with anybody else, aside from Agent Moran?

Page 162

1  **A.    I do.**
2  Q.    We've identified officers in regards to the
3  pursuit.  I would just like to have clarification for
4  the next few questions here.
5       You're involved, and we watched the portion of
6  the video, and you're operating the white SUV; is that
7  correct?
8  **A.    That's correct.**
9  Q.    And Officer Miller is in the vehicle behind the
10 van for a period of time.  We watched the portion of
11 the video in which he is perpendicular to the van and
12 then exits his vehicle, correct?
13 **A.    At the end of the pursuit?**
14 Q.    Yes.
15 **A.    Yes.**
16 Q.    No one else is in his vehicle to your knowledge?
17 **A.    Not a person.**
18 Q.    Does he have a dog in his car?
19 **A.    Yes.**
20 Q.    So the car that Officer Miller is driving at the
21 time of the pursuit, the dog is in the car to your
22 knowledge?
23 **A.    Yes.**
24 Q.    And then the officer that's in front of the
25 vehicle, that if you recall from the video, ends up

Page 163

1  turning around and then facing the opposite side of
2  Officer Miller; who is in that vehicle?
3  **A.    That is Officer Vlna.**
4  Q.    V?
5  **A.    L-N-A.**
6  Q.    L-N-A.
7       And the last officer would have been I'm
8  assuming near the rear of the vehicle when it comes to
9  a stop?  The rear of Officer Miller's vehicle.
10 **A.    Yes, that's Officer Plut, P-L-U-T.  And that has**
11 **the -- that depicts the best angle of the pursuit.**
12 Q.    So he would be positioned in the rear and driver
13 side, if you will, from the videos of Officer Miller's
14 car, is that a fair statement, at the end of the
15 pursuit?
16 **A.    That's a fair statement, yes.**
17 Q.    Mr. Scott asked you some questions regarding the
18 hierarchy of the police department; do you recall those
19 early on in his questioning?
20 **A.    I recall.**
21 Q.    I believe you refer to the hierarchy, if you
22 will, as paramilitary; do you recall that?
23 **A.    I remember quasi-military.**
24 Q.    Quasi-military.  Pseudo-military.
25 **A.    Right.**

Page 164

1  Q.    It's ran in a fashion similar to that of which
2  the military's ran, if you're familiar with it, right?
3  **A.    As far as the rank construction goes, yes.**
4  Q.    There we go, rank construction.
5       So individuals that are superior in rank have
6  control in regards to orders and the like to inferior
7  officers, if you will, correct?
8  **A.    Not exactly.**
9  Q.    Let me rephrase that.  Strike that.
10      It's a system of rank and certain ranks are
11 higher than others.
12 **A.    That's correct.**
13 Q.    Okay.  So in regards to that you would be, for
14 lack of better terms, the boss or the superior or the
15 supervisor of someone say as Officer Miller; is that a
16 fair statement?
17 **A.    That's correct.**
18 Q.    And then Lieutenant O'Deens would be a superior
19 to you?
20 **A.    That's correct.**
21 Q.    So if you were to give an order, hypothetically,
22 and Lieutenant O'Deens gave a different order, it would
23 in essence thwart your order, say if it was for Officer
24 Miller, and he'd have to abide by your superior; is
25 that a fair statement?

Page 165

1       MR. KELLEY:            Objection.
2       Go ahead.
3  **A.    We have a policy on this, as it deals with**
4  **conflicting orders.  I'm not sure if you're asking for**
5  **a very broad answer or you're asking very specific.**
6  Q.    Well, let me take all that back.
7       Let me ask you in regards to this
8  pseudo-military ranking system, if you will, tell me
9  what you understand that means.
10 **A.    Well, it just means exactly what, you know, your**
11 **summation is, that I am the patrol officer's**
12 **supervisor.**
13 Q.    You're a superior.  And in regards to the
14 incident that occurred on March 7 of 2017, was there
15 anybody involved that was your superior in the pursuit?
16 **A.    No.**
17 Q.    So it's a fair statement that during the date of
18 the incident, which is the subject matter of the
19 complaint, that you were the superior and supervising
20 officer for the pursuit.
21 **A.    Yes.**
22 Q.    Mr. Scott asked you questions regarding giving
23 orders and inferior officers following those orders
24 early on; do you recall that line of questioning?
25 **A.    I do.**

Page 166

```
1    Q.   I believe you indicated that you can't, and I
2    quote, can't always supervise, end quote, the officers
3    and their conduct in street patrol and things like
4    that; do you recall that?
5    A.   That's correct.
6    Q.   For example, you have patrol officers that are
7    out on the streets, you may be at the station and
8    they're effectuating a ticket for a stop sign
9    violation.
10   A.   That's correct.
11   Q.   You're not always there, are you?
12   A.   No.
13   Q.   And that's something that would not commonly be
14   called back to the station for you to give some sort of
15   order to that patrol officer to issue a ticket or not,
16   correct?
17   A.   Correct.
18   Q.   So when you say and you use the term discretion,
19   that would be something in the realm of discretion that
20   the patrol officers are able to use in their own
21   estimation; is that a fair statement?
22   A.   That is fair.
23   Q.   So when you talk about discretion, they may be
24   somewhere where you're not and they're authorized to
25   exercise their own discretion in effectuating traffic
```

Page 167

```
1    stops or a theft at the mall or anything like that
2    without your direct command being necessary; is that
3    fair?
4    A.   Yes.
5    Q.   Okay.  So in regards to the incident that took
6    place on March 7th, you were in fact involved, correct?
7    A.   That's correct.
8    Q.   And without going into the verbatim, there were
9    orders that were clearly given via dispatch and other
10   means in which you were ordering inferior officers to
11   do certain things in the pursuit of this vehicle; is
12   that correct?
13   A.   No.
14   Q.   Do you recall in your review of the videos and
15   the audio that there were orders that you were giving
16   in regards to the pursuit?
17   A.   I recall.
18   Q.   Okay.  Was there any other superior officer
19   involved that gave orders over you in regards to the
20   incident on March 7th of 2017?
21   A.   No.
22   Q.   So as we just discussed a moment ago in regard
23   to this discretion for traffic stops and the like, this
24   wasn't one of those situations because you were in fact
25   personally involved in this pursuit, correct?
```

Page 168

```
1                MR. KELLEY:           Objection.
2    A.   Again, that's incorrect.
3    Q.   How is that incorrect?
4    A.   The dialogue that was shared in the radio tapes,
5    the first set of dialogue was initiated by Officer
6    Miller when he gave a clarifying question in the form
7    of a statement, and it's in this radio tape.
8    Q.   Are we addressing the felony callout here?
9    A.   Yes.
10   Q.   Okay.
11   A.   "76 confirming if no one bails out, we're just
12   doing a felony callout and not charging up on the car,"
13   if I'm reading this right.
14              I responded with, "That's correct.  We will call
15   him out."
16              That dialogue dictated if Mr. Evans had pulled
17   his vehicle to a stop and gave up.
18   Q.   It doesn't say that, though, does it?
19   A.   It is inferred.
20   Q.   But it's not stated on dispatch, is it?
21   A.   Not on the radio tape, no.
22   Q.   Do you recall in the review of the dispatch
23   audio and the video, at any time does anyone bail from
24   that van prior to shots being fired?
25   A.   No.
```

Page 169

```
1    Q.   So we addressed this in regards to an order, so
2    bear with me for a moment, Officer Miller has now
3    addressed you in regards to what we are going to do in
4    regards to the current pursuit; is that a fair
5    statement?
6    A.   That is a fair statement.
7    Q.   He's inquiring to his involved superior officer,
8    is this what I'm doing in regards to this pursuit.
9    A.   Fair statement.
10   Q.   Fair statement.
11              And your answer is, "That's correct."
12   A.   That's correct.
13   Q.   Okay.  So is that anything else other than you
14   acquiescing what he's asking as a formal order, that's
15   what we're doing, that's correct.
16   A.   If Mr. Evans came to a stop and gave up.
17   Q.   But you didn't say that, though, let's just
18   address that.
19   A.   That's correct.
20   Q.   And I want to address this specifically because
21   your counsel is referring to I believe what's been
22   marked as Plaintiff's Exhibit 2.
23              So that is what I believe your counsel addressed
24   as, for lack better of terms, a transcript of the audio
25   dispatch that was communicated during the pursuit.
```

Page 170

1   **A.   Correct.**
2   Q.   Okay?  And he addressed the facts of if it is or
3   is not verbatim and that there's some boxes and some of
4   it may be slightly illegible, right?
5   **A.   Correct.**
6   Q.   Okay.  But the general discussion you and I are
7   having is that Officer Miller is saying are we only
8   doing a felony callout and not approaching the vehicle,
9   specifically not approaching it, and you're saying
10  that's correct.
11       Is there anything else that you're saying as
12  long as they didn't bail, none of that other audio is
13  either in that transcript or in the audio dispatch that
14  you had the opportunity to review prior to the
15  deposition; is that a fair statement?
16  **A.   It was inferred, but, yes, that's a fair**
17  **statement.**
18  Q.   So when you say infer, you're saying something
19  that was never specifically stated on audio and/or
20  video, but it was an inference that you're saying for
21  the record.
22  **A.   Right.**
23  Q.   Correct?
24  **A.   That's correct.**
25  Q.   Okay.  After that order and prior to shots being

Page 171

1   fired is it a fair statement that you gave no
2   subsequent order that changed that order?
3   **A.   That's incorrect.**
4   Q.   Do you recall giving any other different orders
5   after the time that Officer Miller asked you is this a
6   felony callout and prior to shots being fired?
7   **A.   Yes.**
8   Q.   What other orders did you give?
9   **A.   I gave the order to implement a boxing in**
10  **maneuver.**
11  Q.   Well, the boxing in maneuver, if we're going
12  chronologically, would be effectuated prior to the
13  stopping of the vehicle for then the officers to
14  effectuate the, quote, unquote, felony callout; is that
15  a fair statement?
16  **A.   No.  That's a change in dynamic.**
17  Q.   Would you agree that nothing in the audio or
18  video that you reviewed and that's included in the
19  record indicates you telling the officers, hey, we're
20  going to change things up, we're not doing a felony
21  callout.  Now instead we're going to do the moving PIT
22  maneuver -- strike that, the moving roadblock.
23  **A.   Can you restate that question one more time?**
24  Q.   You refer to the convoy of the four vehicles as
25  being a moving roadblock; is that a fair statement?

Page 172

1   **A.   Yes.**
2   Q.   Okay.  I believe you told Mr. Scott in his
3   questioning that you've attempted to do this now twice,
4   this is the second time right before the chase ends,
5   correct?
6   **A.   Right before the chase ends it would have been**
7   **the second attempt, yeah.**
8   Q.   Well, let me ask you this, at any time during
9   any of the audio, your recollection, or the video, do
10  you recall saying go up on the van?
11  **A.   No.**
12  Q.   So that's never captured anywhere, nor do you
13  ever give that order.
14  **A.   No.**
15  Q.   Sergeant Kelley, when you actually came in for
16  the depo today one of the first things we addressed was
17  a discussion you admitted you had with Officer Miller
18  regarding the vehicle pursuit policy; do you recall
19  that?
20  **A.   This morning, yes.**
21  Q.   And, again, trying to build off of what
22  Mr. Scott asked, there was some issue with the policy
23  as it relates to the SUV.
24  **A.   Correct.**
25  Q.   Let me take a step back for a moment.

Page 173

1        How many, if you know, how many cars are
2   designated as canine vehicles within your department?
3   **A.   Right now I'm aware of two.**
4   Q.   Now, do you have two designated canine officers
5   in your department?
6   **A.   Yes.**
7   Q.   And they're each assigned that specific car for
8   their dogs?
9   **A.   Yes, they take the cars home.**
10  Q.   They take the cars home, okay.
11       And what do you understand, are those cars
12  equipped any differently than the normal police
13  cruiser?
14  **A.   In what way?**
15  Q.   I'm asking you, I don't know.  Are you aware of
16  anything?
17  **A.   The back seat's removed and there's a dog kennel**
18  **placed in the back seat, but other than that,**
19  **mechanically it's the same as any police car.**
20  Q.   So that car, mechanically it's the same, it's
21  just altered in the interior for the transport of the
22  canine.
23  **A.   Correct.**
24  Q.   So those vehicles based on your description I'm
25  assuming are not capable of transporting prisoners or

Page 174

1    individuals that are arrested.
2  **A.    That's correct.**
3    Q.    So that car couldn't be by itself somewhere if
4  it involves the arrest of someone because that person
5  couldn't go in the vehicle.
6  **A.    That's not true.**
7    Q.    Could you arrest someone in the canine car?
8  **A.    As a canine officer operating by themselves they**
9  **can arrest somebody.**
10   Q.    Okay.
11 **A.    But then they would just call for another car.**
12   Q.    Okay. Well, that's where I'm going. I'm not
13 saying they can't arrest someone, effectuate the
14 arrest, but the difference you understand from a canine
15 vehicle to the regular cruiser is that the rear seat is
16 removed for the well-being and the transport of the
17 animal in those two units, correct?
18 **A.    Yes.**
19   Q.    So those are the only two vehicles in the
20 department for canine.
21 **A.    That I'm aware of.**
22   Q.    So Officer Miller, who's the other officer
23 involved with the other canine; if you know?
24 **A.    He doesn't have anything to do with this**
25 **specific case, obviously, but his name is Bryan Kadlec.**

Page 175

1    Q.    So you have two canine officers and two
2  vehicles --
3  **A.    Yes.**
4    Q.    -- assigned to those vehicles, and those dogs go
5  home with them at night, I'm assuming?
6  **A.    Yes.**
7    Q.    You and Mr. Scott addressed a portion of the
8  policy because at the time, and I'm going to refer to
9  it as the incident from March 7, 2017, at the time of
10 the incident you were operating an SUV, correct?
11 **A.    That's correct.**
12   Q.    Different than that of the everyday cruiser for
13 the department.
14 **A.    That's incorrect.**
15   Q.    Different enough that the policy in regards to
16 pursuits delineates between police cruisers and SUVs;
17 is that a fair statement?
18 **A.    That's incorrect, as I interpret it.**
19   Q.    Well, let's go by what the pursuit policy says,
20 okay?
21        When you came in today you addressed the fact
22 that you knew that you were driving an SUV, and I
23 believe in fact after this incident that the policy has
24 since been changed, correct?
25 **A.    That's correct.**

Page 176

1    Q.    So you're acquiescing the fact that you knew the
2  pursuit policy differentiated between SUVs and the,
3  quote, unquote, normal police cruiser.
4  **A.    That's incorrect.**
5    Q.    I'm not trying to trick you, sir.
6  **A.    I know.**
7    Q.    Okay.
8  **A.    It's a policy issue, it's not an SUV issue.**
9    Q.    Right. And I'm discussing specifically
10 regarding the policy. The policy at the time of the
11 incident differentiated in the policy for pursuits
12 between cruisers and an SUV or other specialty
13 vehicles, correct?
14 **A.    Yes.**
15   Q.    At the time of this incident, prior to the
16 change in the policy, you were driving an SUV.
17 **A.    Yes.**
18   Q.    And in fact you offered up the information, you
19 said, I was talking to Officer Miller to see if it was
20 within policy that I was involved in the chase and
21 operating an SUV and not a normal cruiser.
22 **A.    No, that's incorrect.**
23   Q.    You had a conversation with Officer Miller prior
24 to your deposition today, correct?
25 **A.    I did.**

Page 177

1    Q.    And that involved some discussion in regards to
2  following the policy of pursuits involving an SUV.
3  **A.    Correct.**
4    Q.    Okay. And now you even indicated in your
5  questioning with Mr. Scott that that policy has since
6  changed after the incident.
7  **A.    To keep up with technology, yes.**
8    Q.    Okay. Are you a car guy?
9  **A.    A little bit.**
10   Q.    Okay. Ever worked on a car?
11 **A.    Yes.**
12   Q.    More than changing tires and oil?
13 **A.    Yes.**
14   Q.    Okay. Rebuilt any old cars?
15 **A.    No.**
16   Q.    Okay. Were you involved in the implementation
17 of the old policy regarding pursuits and SUVs?
18 **A.    No.**
19   Q.    Were you involved in the altering of the policy
20 in regards to pursuits and SUVs?
21 **A.    No.**
22   Q.    So how do you know, what information do you have
23 that the policy was in fact changed after the incident?
24 **A.    Prior to purchasing the SUV that I was driving**
25 **that night, police sport utility vehicles were not**

Page 178

1   pursuit rated. The manufacturer who is Ford made SUVs
2   that were pursuit rated.
3           So the particular SUV that I was driving that
4   day was a pursuit rated vehicle; however, our policy
5   was outdated and didn't take into account that Ford
6   Motor Company SUVs are pursuit rated.
7   Q.    Would you agree with me that the policy that was
8   in place at the time of the incident, that there was no
9   language regarding pursuit rated or non pursuit rated
10  SUVs.
11  A.    That's correct.
12  Q.    So would you agree with me that the SUV being
13  involved in the pursuit at the time of the incident was
14  outside of policy.
15  A.    I'm sorry, repeat that.
16  Q.    Would you agree with me that the SUV being
17  involved in the pursuit at the time of the incident was
18  outside of policy at the time.
19          MR. KELLEY:                     Objection.
20          Go ahead.
21  A.    No, that's up to interpretation.
22  Q.    Fair enough.
23          Are you familiar with the pursuit policy?
24  A.    I am. Not verbatim, but I am.
25  Q.    Understood.

Page 179

1           What do you understand justifies a continued
2   pursuit?
3   A.    The needs of public safety to continue to pursue
4   that vehicle outweighs the needs to call the chase off.
5   Q.    That's what your understanding of the policy is?
6   A.    That is an overarching issue of the policy.
7   Q.    And I think Mr. Scott asked this, and just for
8   clarification, at the time pursuit is initiated, this
9   van is being stopped for a traffic violation, correct?
10  A.    Initially, yes.
11  Q.    Nothing else.
12  A.    Speeding.
13  Q.    That's it.
14          In your 17 years when you stopped someone with a
15  valid license, how many times have you actually
16  arrested them for speeding?
17  A.    I don't know that I ever have.
18  Q.    So in your 17 years, as we've identified the
19  reason for the stop is speeding, this is now a pursuit
20  that started for an offense in your almost 20 years
21  that you've never even arrested someone for, fair
22  statement?
23  A.    Have I ever arrested someone for speeding; is
24  that what you're asking?
25  Q.    No, I went back.

Page 180

1           You indicated that you can't recall ever
2   arresting someone for a speeding violation.
3   A.    I can't recall ever doing that.
4   Q.    So, again, at the time of the incident, the
5   pursuit begins in the incident, the only violation at
6   that time was speeding, right?
7   A.    Until he decided to fail to comply.
8   Q.    Right. And that's a separate incident.
9           But the pursuit isn't for -- let's just clarify.
10  Up until the vehicle's actually stopped and Mr. Evans
11  is already know, you have no idea who the occupants of
12  that van are; is that a fair statement?
13  A.    That's correct.
14  Q.    Mr. Scott asked you some questions on when the,
15  quote, unquote, pursuit started. The word pursuit
16  means something, correct?
17  A.    Yes.
18  Q.    It's different than effectuating a stop. Once
19  there's a pursuit, different things come into play; is
20  that a fair statement?
21  A.    Fair.
22  Q.    So at the time when you called into dispatch,
23  and maybe we listened to that audio and maybe we
24  didn't, you have to indicate that you're in pursuit of
25  a vehicle. That's part of your obligation, correct?

Page 181

1   A.    Yes.
2   Q.    So, again, at the time you called in that this
3   pursuit was now officially a pursuit and not just an
4   attempt to effectuate a traffic stop, aside from not
5   stopping, no other crime had been committed by the
6   operator of the van, except for the speed; is that
7   correct?
8   A.    That's incorrect.
9   Q.    What other violations of law had occurred
10  outside of the speed and the failure to comply at the
11  time the pursuit had been initiated?
12  A.    The initial probable cause for the stop was the
13  speed that I indicated. When I pulled out of the
14  crossover to go after Mr. Evans, he went from the high
15  speed lane all the way off to the exit ramp. That
16  constitutes a traffic violation.
17          Mr. Evans got to the top of the exit ramp and
18  made a left-hand turn onto State Route 82 without
19  stopping. That was another traffic violation.
20          And then when I -- I myself did the same thing
21  and reacquired a visual look at the van, I saw that
22  Mr. Evans had shut the headlights off.
23          So those chain of traffic violations in
24  conjunction with me getting up to the van with my
25  lights and sirens on, ascertaining the Pennsylvania

Page 182

1   tag, and him not stopping for my overhead lights,
2   that's a failure to comply.
3   Q.   So four traffic violations and then the failure
4   to comply.  Or so.
5   A.   That's fair.
6   Q.   Okay.  Based on your understanding of the policy
7   how many officers do you believe are supposed to or
8   allowed to be involved in a pursuit?
9   A.   Our policy dictates that ideally it's two.
10  Q.   And in this one we've already addressed the fact
11  that there were four, correct?
12  A.   That's correct.
13  Q.   And, again, not to go back, but to go through it
14  quickly, there are vehicle restrictions that was in the
15  policy at the time the incident occurred, correct?
16  A.   I don't understand.
17  Q.   Do you understand that at the time of the
18  incident there were policies regarding pursuits that
19  had restrictions on vehicles that were allowed to be
20  involved in the pursuit?
21  A.   Yes.
22  Q.   You're aware that there were policies in place
23  at the time of the incident that restricted certain
24  vehicles from being utilized in the pursuit of another
25  vehicle.

Page 183

1   A.   That's correct, yes.
2   Q.   And that included at the time SUVs, correct?
3   A.   That is correct.
4   Q.   And specialty vehicles that weren't specifically
5   addressed, would you include that to be a canine
6   vehicle?
7   A.   No.
8   Q.   So aside from an SUV and a canine, what else
9   would you identify as a, quote, unquote, specialty
10  vehicle within your department?
11  A.   I don't believe that a canine vehicle is a
12  specialty vehicle.
13  Q.   So we have SUVs that are utilized by the police
14  department, correct?
15  A.   That's incorrect.
16  Q.   You guys don't utilize SUVs in your department?
17  A.   We do.
18  Q.   Okay.  So that's correct.
19  A.   You're going to have to rephrase the question
20  because we're getting into semantics of this pursuit
21  rated, non pursuit rated sport utility vehicle.
22  Q.   I'm not talking about pursuit rated.  I'm
23  specifically talking about vehicles utilized by the
24  Strongsville Police Department, because I'm assuming,
25  do you have vans to transport multiple people?

Page 184

1   A.   Yes.
2   Q.   So I'm assuming that it's safe to say that those
3   vehicles cannot be utilized in a pursuit?
4   A.   That's correct.
5   Q.   Would you consider that to be a specialty
6   vehicle?
7   A.   Yes.
8   Q.   Okay.  And then you have the SUV that you were
9   driving.
10       Are there any other SUVs that are within the
11  department?
12  A.   We have two SUVs that are not pursuit rated.
13  That would be considered an SUV not allowed to pursue.
14  Q.   Aside from normal patrol vehicles, what other
15  types of vehicles does the Strongsville Police
16  Department utilize?
17  A.   Many.  Pickup trucks, like you said, prisoner
18  vans, we have motorcycles, we have a SWAT vehicle,
19  equipment vans.  Off the top of my head that's all I
20  can think of.
21  Q.   Okay.  Maybe Mr. Scott asked you this and I
22  apologize, do you have any specific training as it
23  relates to pursuits?
24  A.   Yes.
25  Q.   Aside from anything written or verbal, anything

Page 185

1   like on-the-field driving test, ever went somewhere to
2   practice pursuits?
3   A.   Yes.
4   Q.   And when was that?
5   A.   I don't exactly remember when, but it's on my
6   training sheet, if I could look at that.
7   Q.   I'll look at those, but so you've had some
8   training regarding pursuits?
9   A.   Yes.
10  Q.   Ever had any training regarding a PIT maneuver?
11  A.   No.
12  Q.   Ever heard of one?
13  A.   Yes.
14  Q.   During that training were you trained on how to
15  execute a moving roadblock?
16  A.   How do you mean?
17  Q.   Well, that's what we keep referring to in
18  regards to the two attempts in this particular
19  incident, correct?
20  A.   Correct.
21  Q.   So have you been trained in that at that time?
22  A.   We are trained that it is in our policy that we
23  can utilize it, yes.
24  Q.   But in regards to that hands-on training for the
25  pursuits, were you specifically trained on the moving

1  roadblock; if you recall?
2  **A.    We've never trained on surrounding a car and**
3  **slowing down, no.**
4  Q.    Okay.  Have you ever personally operated a
5  vehicle missing two tires?
6  **A.    I can't say that I have.**
7  Q.    Mr. Scott asked you regarding, I'm going to use
8  the word contact, there was contact between the van
9  being driven by Mr. Evans and the vehicle that you
10 occupied as well as that of Officer Miller, correct?
11 **A.    Correct, not in that order, but correct.**
12 Q.    And we've established that the first incidence
13 of contact between Officer Miller that you claim to
14 have viewed personally and the van being operated by
15 Mr. Evans occurred when Officer Miller was operating
16 his vehicle in the berm when I believe you identified
17 Mr. Evans as driving in the number 1 lane or the slow
18 lane, correct?
19 **A.    That's what I recall.**
20 Q.    So prior to that and the involvement of the
21 pursuit, no other contact had happened before that,
22 correct?
23 **A.    Before when Mr. Evans hit Officer Miller?**
24 Q.    Yes.  That's the first contact.
25 **A.    That is the first contact that was made between**

1  **any vehicles, yes.**
2  Q.    Okay.  And that contact occurred when Mr. Evans
3  was operating in the slow lane and Officer Miller was
4  driving in the berm of the road, not in a designated
5  lane for travel, correct?
6  **A.    I recall that, yes.**
7  Q.    Do you recall the year of the van Mr. Evans was
8  driving?
9  **A.    I don't know the year.  I know the year now**
10 **because somebody brought it up in conversation, but up**
11 **until today I didn't know the year.**
12 Q.    Like some early '80s; if you recall?
13 **A.    No, it was -- like I said, earlier in my**
14 **testimony when I was a kid we had an Econoline van, so**
15 **I knew what they were.  And I would not consider this**
16 **an '80s van.  I would consider it '90s.**
17 Q.    So '90s van.
18 **A.    Yeah.**
19 Q.    So let's take a step back.  I asked you a moment
20 ago if you're a car guy.  You said you're familiar with
21 cars.
22     Familiar enough to know the difference between a
23 pursuit and a non pursuit rated SUV, correct?
24     You said you knew the difference.
25 **A.    I knew that our new SUVs came pursuit rated.**

1  Q.    What do you understand that rating to mean?
2  **A.    It just means that it's mechanically inclined to**
3  **handle the rigors of high speed pursuit.**
4  Q.    Did you have an opportunity to view the van
5  being driven by Mr. Evans once it was in Strongsville
6  custody after the incident?
7  **A.    Yes.**
8  Q.    It was at your facility for a number of months,
9  correct?
10 **A.    Yes.**
11 Q.    And you personally were able to view the
12 condition of the van after the incident.
13 **A.    I saw the outside of it, but I personally tried**
14 **to avoid it.**
15 Q.    You talked about a couple other instances of
16 contact between Mr. Evans and your vehicle when you
17 were on the left side of him shortly before the chase
18 ended; do you recall that?
19 **A.    Yes.**
20 Q.    You identified at this point, we've already
21 established, the fact that the tack strips have been
22 deployed and they were successful from the audio of
23 dispatch; do you recall that?
24 **A.    I recall that radio traffic, yes.**
25 Q.    So in between contact number one with Officer

1  Miller in the berm and until the next time there's any
2  contact between Mr. Evans' van and any other vehicle,
3  he now is driving on two flat tires; is that a fair
4  statement?
5  **A.    Yes.**
6  Q.    And if you recall, and tell me if you don't, the
7  video shows a minimum of two semi trucks on the freeway
8  that Mr. Scott addressed, Mr. Evans doesn't have to
9  take, nor do they, evasive measures to not hit one
10 another; do you recall that?
11 **A.    I recall that, but that was prior to road**
12 **spiking.**
13 Q.    After the initial contact again with Officer
14 Miller, no other contact is made with any officers
15 until the tack strips are deployed and you received
16 notice that they were successfully implemented in his
17 tires; is that a fair statement?
18 **A.    Yes.**
19 Q.    And you already identified being able to see a
20 side view that Mr. Evans at the time was having
21 problems trying to control.  And you were indicating
22 that he's holding the wheel and it's shaking because
23 the tires are flat; do you recall that?
24 **A.    I recall that.**
25 Q.    Would you agree with me that it's probably

Page 190

1  difficult to control a van of that condition and year
2  with two flat tires at that rate of speed?
3         MR. KELLEY:        Objection.
4         You can answer.
5  **A.    From what I saw, Mr. Evans trying to negotiate**
6  **the steering wheel, I saw that he was having problems.**
7  Q.    Mr. Scott asked you a number of questions
8  regarding the manner in which Mr. Evans was operating
9  the vehicle that you used both in today's deposition
10 and through your reports as aggressive; do you recall
11 that?
12 **A.    I do.**
13 Q.    Mr. Scott asked you to specifically point out
14 what you meant by aggressive; do you recall that?
15 **A.    I recall that question, yeah.**
16 Q.    And but for changing lanes and his speed, I
17 don't recall you identifying anything else that
18 contributes to someone driving, quote, unquote,
19 aggressive.
20        Did you have anything else that you wanted to
21 add to that?
22 **A.    No, that's pretty aggressive.**
23 Q.    Changing lanes and speeding.
24 **A.    Fleeing from police vehicles, yes, that's**
25 **aggressive.**

Page 191

1  Q.    Okay.  But as Mr. Scott pointed out, when you
2  gave your report to BCI and he's lighting a cigarette,
3  you refer to it as being silly.
4  **A.    I did say that word, yes.  Silly in the respect**
5  **that --**
6         MR. KELLEY:        That's it.
7         You answered it.
8  BY MR. SIDOTI:
9  Q.    We went back and forth and I believe Mr. Scott
10 may have asked you this question a couple times, when
11 you were in your vehicle, Mr. Evans' van was at a
12 complete stop prior to shots being fired; would you
13 agree with that statement?
14 **A.    I believe that after I got rammed, the video**
15 **shows Mr. Evans' van stopped for a split second, if**
16 **that long.**
17 Q.    I know we want to address what we refer to as
18 the time frame and how long or how far away, but we had
19 an opportunity for the record that you were able to
20 watch the video from -- we referred to as video 3 of
21 Officer Vlna or Plut?  If you recall that video angle.
22 **A.    The best video angle?**
23 Q.    Yes.
24 **A.    That's Officer Plut.**
25 Q.    Okay.  So we were able to watch video 3 of

Page 192

1  Officer Plut that has the angle of clearly establishing
2  your vehicle, Officer Miller's vehicle, and the van
3  operated by Mr. Evans, correct?
4  **A.    That's correct.**
5  Q.    Okay.  So aside from time reference, would you
6  agree with me that the van was at a complete stop prior
7  to the shots being fired?
8  **A.    I believe that the van rammed my car which**
9  **caused it to stop.**
10 Q.    We looked at photographs of the passenger side
11 of your vehicle, correct?
12 **A.    That's correct.**
13 Q.    Mr. Scott asked you to point out the damage that
14 you thought occurred from that contact, and aside from
15 the rearview mirror you really couldn't point to
16 anything except for just the vicinity of the passenger
17 door; do you recall that?
18 **A.    Can you rephrase that question?**
19 Q.    Mr. Scott showed you some photographs of the
20 passenger side of the vehicle and asked you to address
21 some of the damages.  And I remember you specifically
22 pointing to the rearview mirror at first, the passenger
23 side rearview mirror; do you recall that?
24 **A.    I recall that.**
25 Q.    So you want to utilize ramming, I'm utilizing

Page 193

1  contact, but regardless, prior to the shots being fired
2  the van was at a complete stop; would you agree with
3  that statement?
4  **A.    No.**
5  Q.    And you may have been asked this specifically, I
6  don't recall how it was phrased, but did you personally
7  see anything with your own eyes that justified the use
8  of deadly force in this incident?
9  **A.    Yes.**
10 Q.    What did you see?
11 **A.    A Ford emblem coming at my head.**
12 Q.    Mr. Scott asked you the same question, if you
13 could see things, and I thought your response was there
14 was glare on the windshield and you couldn't see
15 anything.
16 **A.    I could not see inside the van.  But I did see**
17 **the hood, the grill, and the Ford emblem.  I did**
18 **delineate that.**
19 Q.    So that in your estimation is what justified the
20 use of deadly force?
21 **A.    That is a justification for deadly force, yes.**
22 Q.    And I believe you admitted in your testimony
23 earlier that you pulled your vehicle forward twice
24 prior to Mr. Evans' van striking the vehicle in the
25 front passenger quarter panel, correct?

Page 194

1   **A.    With lights and sirens on, yes.**
2   Q.    You pulled your vehicle in front of that car
3   when it was already spun out; is that true?
4   **A.    No.  It was still moving.**
5   Q.    But already spun out of control.
6   **A.    No.**
7   Q.    No?  He was in complete control of the vehicle?
8   **A.    Yes.**
9   Q.    When it did a 360 and was facing almost in the
10  same direction, your testimony is that you believe
11  Mr. Evans was still in control of the van at that time?
12  **A.    After the 360, yes, he was still moving.  The**
13  **pursuit had not ended.**
14  Q.    You indicated that you immediately exited your
15  vehicle, correct?
16          MR. KELLEY:          Objection.
17  **A.    No.  No, I did not.**
18  Q.    You indicated you didn't sustain any injuries,
19  correct?
20  **A.    That's correct.**
21  Q.    When you exited your vehicle did you draw your
22  weapon?
23  **A.    No.**
24  Q.    Did you know what had occurred other than
25  hearing shots being fired?

Page 195

1   **A.    I knew that Officer Miller had fired into the**
2   **van, yes.  I saw that occur.**
3          MR. SIDOTI:          I don't have
4          much more.
5          MR. RASKIN:          Go off the
6          record for just a second.
7              (Thereupon, there was a discussion
8          off the record.)
9   BY MR. SIDOTI:
10  Q.    Sergeant Kelley, I know we talked about some of
11  the policies regarding the pursuit, but the policy as
12  you may or may not know also addresses things like the
13  moving roadblock and tire deflation and all those
14  things within the Strongsville policy, correct?
15  **A.    Correct.**
16  Q.    Do you understand that that policy includes the
17  obligation of the officers to place themselves in a
18  position of safety in regards to the moving roadblock?
19  **A.    I don't remember that verbiage in the policy.**
20  Q.    Would you understand that your -- was your
21  understanding of the policy that the officers should
22  have themselves in a position of safety and not expose
23  themselves to excessive risk?
24          Do you think that would be within the policy
25  that you understand?

Page 196

1   **A.    I don't interpret that as being something in a**
2   **policy.**
3   Q.    So if it were in the policy that the officers
4   shall place themselves in a position of safety and not
5   expose themselves to excessive risk, would you have any
6   reason to believe that that wouldn't be in the policy?
7   **A.    I'm just not seeing it in that way.  A policy is**
8   **a guideline for us to follow.  It doesn't normally name**
9   **specifics.**
10  Q.    Well, do you think it's reasonable to understand
11  that the officers should put themselves in a safe place
12  in regards to any pursuit?
13  **A.    I believe that that's just natural, yes.**
14  Q.    So just dovetailing back to the question we were
15  addressing, you indicated that you said Mr. Evans --
16  the pursuit hadn't stopped, correct?
17  **A.    At which point?**
18  Q.    Prior to him coming in contact with your vehicle
19  before stopping.
20  **A.    Mr. Evans, when I moved forward Mr. Evans hit my**
21  **vehicle.  He then put his van in reverse.  I moved**
22  **forward.  He hit me again.**
23  Q.    So it's a fair statement to say that you
24  operated your vehicle directly in front of his path; is
25  that a fair statement?

Page 197

1   **A.    Yeah.**
2   Q.    Okay.  So if someone were driving through an
3   intersection in a pursuit, that you were perpendicular,
4   and you drove in front of the vehicle, and then that
5   vehicle struck you, do you think that that would
6   justify deadly force also?
7          MR. KELLEY:          Objection.
8   **A.    I don't see the correlation.**
9   Q.    Mr. Scott asked you about commands by Officer
10  Miller sometime during or after the discharge of his
11  two rounds; do you recall that questioning?
12  **A.    I do.**
13  Q.    You indicated that you heard Officer Miller say
14  something that you said it was, quote, consistent with
15  your training; do you recall that?
16  **A.    I do.**
17  Q.    And I'm interested to hear, your first statement
18  was you couldn't hear what he was saying because it's
19  inaudible.
20  **A.    Correct.**
21  Q.    So that means you can't understand what he's
22  saying; is that a fair statement?
23  **A.    That's a fair statement.**
24  Q.    I mean, if something's inaudible, you can't hear
25  what's being said.

Page 198

1  **A.    That's correct.**
2  Q.    So then how can you say that an inaudible
3  statement is somehow consistent with training, if you
4  have no idea what they're saying?
5  **A.    When I spoke with Mr. Scott I said I recognized**
6  **the flexion in his voice.**
7  Q.    What does that mean?  The tone?
8  **A.    Hands, show me your hands, the tone, yeah, the**
9  **syllables.**
10 Q.    The flexion and inaudible mean two different
11 things.  So you're saying if it's inaudible, let's just
12 address the record, you don't know what he's saying,
13 fair statement?
14 **A.    I don't know exactly what he said.**
15 Q.    Those were your words, not mine.  You used the
16 word inaudible; is that correct?
17 **A.    I may have said that, yeah.**
18 Q.    Okay.
19 **A.    Maybe that's the wrong word.  I heard noise.  I**
20 **didn't hear what the word was.**
21 Q.    Fair enough.  So you heard noise, not being able
22 to identify what was said, but then you try -- strike
23 that, then you claim that it's something that's
24 consistent with training.
25          Was that your statement?

Page 199

1  **A.    That sounds right, yes.**
2  Q.    Did you listen to the audio portion of the tape
3  immediately prior to, during, and after the shots are
4  fired?
5  **A.    Did I listen to the audiotapes during the**
6  **incident?**
7  Q.    Let me clarify that.
8          The video contains audio, correct?
9  **A.    That's correct.**
10 Q.    The video that we watched contains audio.
11 **A.    That's correct.**
12 Q.    I don't recall hearing anything verbal prior to
13 the shots being fired in that video, do you?
14 **A.    I recall hearing verbal commands.  I don't know**
15 **which camera angle picked it up.**
16 Q.    Do you know who was giving them or where they
17 were coming from?
18 **A.    I knew they were coming from Officer Miller,**
19 **yes.**
20 Q.    Last question, do you recall who transported
21 Miss Pauley and the children back to the station?
22 **A.    I believe it was Officer Jeff Steving,**
23 **S-T-E-V-I-N-G.  That's who I recall doing that.**
24 Q.    Is he a Strongsville officer?
25 **A.    Yes.**

Page 200

1          MR. SIDOTI:          Thank you,
2          sir.  Nothing further at this time.
3                    - - -
4  BY MR. SCOTT:
5  Q.    Sergeant Kelley, I just want to ask you a few
6  follow-up questions.
7          Did I understand you to say that prior to
8  engaging in the execution of the rolling roadblocks in
9  this pursuit on March 7th, 2017 you had not received
10 any training in the execution of a rolling roadblock?
11 **A.    Essentially a rolling roadblock is surrounding a**
12 **vehicle and slowing down.  There's not much more than**
13 **that.**
14 Q.    Had you been trained in that, had you performed
15 that in practice in some sort of training exercise
16 prior to --
17 **A.    No.**
18 Q.    -- March 7 of 2017?
19 **A.    No.**
20 Q.    Had you performed that maneuver as part of your
21 duties in any capacity prior to attempting it on March
22 7th of 2017?
23 **A.    No.**
24 Q.    To your knowledge did any of the other officers
25 involved in the pursuit on March 7, 2017, had any of

Page 201

1  them received training on the execution of a rolling
2  roadblock prior to March 7th of 2017?
3  **A.    I don't know.  I know it's not implemented by**
4  **the department.  Maybe it's trained in an individual**
5  **capacity.  I don't know, but I'm assuming no.**
6  Q.    And to your knowledge prior to their involvement
7  in this particular pursuit did any of the other
8  officers involved in the pursuit on March 7, 2017, had
9  they ever had to execute such a maneuver in the
10 performance of their duties with the Strongsville
11 Police Department?
12 **A.    I know that rolling roadblocks have been done**
13 **before by this agency, by officers in this agency.  I**
14 **don't know if it was done specifically, yeah.**
15 Q.    And when you say that you don't know how the
16 training -- one, you don't know if training is actually
17 given to any of the officers, certainly you did not
18 receive any such training.
19 **A.    I don't even know if they train at all because**
20 **it's just surrounding a car in traffic and slowing**
21 **down.**
22 Q.    And you believe if it is offered it might be
23 offered on some sort of individual basis, that is, that
24 an officer could ask to go to a particular training
25 program where it might be covered; is that what you're

Page 202

1  telling me?
2  **A.  Yeah, I'm just surmising.  I don't know.**
3  Q.    But certainly no uniformity of training that
4  you're aware of concerning the actual execution of a
5  rolling roadblock, correct?
6  **A.  That's correct.**
7  Q.    Is a felony callout stop the same as a high risk
8  stop, or are there differences?
9  **A.  I don't know that they're different.**
10  Q.    And let me be more specific.  We've been
11  provided a copy of a policy, and I'll give you the
12  number, it's 61.1.7 motorist stops in the course of
13  this case, and there is a Part B to that policy
14  captioned "High Risk Stops," okay?
15       Are you familiar with that policy?
16  **A.  I have read through it, yes.  I'm not -- like I**
17  **said, not verbatim, but I know what you're talking**
18  **about.**
19  Q.    What I'm trying to find out is, does that high
20  risk stop policy to your understanding subsume felony
21  callout stops?
22  **A.  I would say that they're one and the same.**
23  Q.    As I look at that policy it begins with,
24  "Special procedures shall be utilized when stopping and
25  approaching suspected or confirmed felony violators or

Page 203

1  other high risk stops."
2       Is that your understanding?
3  **A.  Yes, the key word being stops.**
4  Q.    Well, when stopping and approaching, correct?
5  **A.  Stopping --**
6  Q.    That's what it says.
7  **A.  Stopping and approaching.**
8  Q.    And Mr. Sidoti was asking you, and I can show
9  you, if you don't have a copy there in front of you, a
10  specific mandate within the policy for the officers to
11  place themselves in a position of maximum safety; are
12  you familiar with that?
13  **A.  Not verbatim, but if I could read it, I could**
14  **verify that.**
15  Q.    I'm going to show it to you on my laptop and
16  hopefully that won't time out on you.  If it does, let
17  me know.
18  **A.  This doesn't dictate a pursuit situation.  This**
19  **is a stop situation.**
20  Q.    So you view this as --
21  **A.  Not applicable.**
22  Q.    -- not applicable to the particular event that
23  we've been talking about?
24  **A.  That's correct.**
25  Q.    And you don't view the concept of trying to

Page 204

1  maintain maximum officer safety as applicable to this
2  particular situation; is that fair?
3  **A.  No, that's not fair.  Probably the most unfair**
4  **statement today.**
5  Q.    So do you think maintaining maximum officer
6  safety may be applicable to every situation?
7  **A.  Sure.**
8  Q.    Right?
9  **A.  Should be.**
10  Q.    Let me ask this, and I appreciate the closeness
11  in time, I really don't want to queue up this video
12  again, but we watched the video before.
13       You agree with me that the last contact between
14  Mr. Evans' van and your vehicle is completed before
15  shots are fired; is that fair?
16       We can watch it again.
17  **A.  My interpretation and what I was seeing and**
18  **feeling at that time was that I was hit once, the van**
19  **was placed in reverse, I was hit a second time even**
20  **harder, and then the shots were fired.  That's my**
21  **interpretation of it.**
22  Q.    So the second hit, I think the way that you just
23  described it, is completed before the shots are fired.
24  **A.  I don't believe that Mr. Evans' van ever stopped**
25  **motion.**

Page 205

1  Q.    I'm asking about the contact between Mr. Evans'
2  van and your cruiser.  That was completed before the
3  shots were fired.
4  **A.  I got shellacked, yeah.  I got hit hard and then**
5  **the shots were fired, yeah.**
6  Q.    Okay.  But the hitting was done before the shots
7  were fired.
8  **A.  Again, for me it was instantaneous.**
9  Q.    But the video shows what it shows and you
10  wouldn't disagree with the video, right?
11  **A.  The video shows me getting hit, yeah.**
12  Q.    And then it shows the shots being fired
13  subsequently.
14  **A.  Instantaneously.**
15  Q.    We can have somebody measure the time, but it's
16  certainly subsequent to the contact.
17       And you told me before that you could not see
18  inside the van through the windshield because of the
19  glare, correct?
20  **A.  That's correct.**
21  Q.    And you told me before you couldn't see what
22  Mr. Evans was doing, if anything, as the door on the
23  van opened; is that fair?
24  **A.  I could only see a glared windshield in front of**
25  **his van.**

Page 206

1    Q.    You could not see Mr. Evans' movements inside
2    the van.
3    A.    No, I could not.
4    Q.    At that point in time you did not see Mr. Evans
5    do anything that would have justified the use of deadly
6    force, did you?
7    A.    No, I believe that Mr. Evans rammed me really
8    hard.
9    Q.    I'm talking about a different point in time.
10   I'm talking about when the door opens, you say you
11   can't see inside the van, so you're not able to say
12   that Mr. Evans did anything that would have justified
13   the use of deadly force; is that true?
14   A.    I only saw a glared windshield.  That's all I
15   saw.
16   Q.    Okay.  So you did not see Mr. Evans do anything
17   that justified the use of deadly force, correct?
18   A.    I didn't see anything.
19   Q.    Do you recall anything -- do you know if the
20   engine was still running on the van after this last
21   impact?
22   A.    Yes.
23   Q.    What do you recall about that?
24   A.    I didn't initially recall it, but I do recall
25   reaching in and turning off the van.

Page 207

1    Q.    You turned off the van?
2    A.    I believe that the video shows that, yeah.  I
3    don't remember doing it, but I saw the van -- I saw the
4    video, yeah.
5    Q.    Okay.  And maybe I'm confused.  And I just want
6    to make sure that I -- like I said, I thought that
7    Officer Miller in his statement said that he turned off
8    the van, but you specifically recall turning off the
9    van?
10   A.    I think it's on video, yeah.  I think it's me,
11   yeah.  Like I said, I didn't initially remember it, but
12   I think I see myself on video doing it, yeah.
13   Q.    Do you know if the van was in gear?
14   A.    I believe that it was in -- not in park.
15   Q.    Possibly --
16   A.    Because reaching in, I think when I reached in I
17   think I just killed the engine.
18   Q.    Okay.
19   A.    I didn't have the, you know, again, I'm
20   surmising.
21   Q.    No, no.  I appreciate you trying to recall.
22   A.    I remember seeing on video it was just a reach
23   and shut off, I think.  There was no gear shift
24   obstructing the ignition.
25   Q.    Again, my understanding, and I could be

Page 208

1    mistaken, I'll go back and double-check, I thought that
2    somebody reported that the van was in reverse, was
3    found in reverse at the point in time that it was
4    turned off.
5    A.    Okay.
6    Q.    Does that sound right to you?
7    A.    Yeah, the video will tell everything.  I don't
8    remember doing it but I remember seeing myself doing it
9    on a subsequent video.
10   Q.    When you turned the van off was it moving, was
11   it in motion?
12   A.    No.
13   Q.    So it was running, correct, idling at least.
14   A.    I remember seeing -- I can't remember if it was
15   -- I can't remember if it was at the scene or on a
16   subsequent video, I remember seeing the windshield
17   wipers going.  I don't know why that vision sticks in
18   my head.
19   Q.    Okay.  All right.  You believe that the engine
20   was still running, though, correct?
21   A.    I have to watch the video.
22   Q.    And you believe that the van was not in park,
23   correct?
24   A.    I believe that it wasn't in park, yeah.
25   Q.    And it wasn't moving, was it?

Page 209

1    A.    Well, no, wasn't moving.
2    Q.    Okay.
3    A.    It was up against my squad car.
4    Q.    Well, if it was in -- was there anything behind
5    it, if it was in reverse, that would have prevented it
6    from moving backwards?
7          MR. KELLEY:          Objection.
8          Go ahead.
9    BY MR. SCOTT:
10   Q.    That you recall.
11   A.    I recall that there was a boat wake of shredded
12   rubber behind it, like, because he was flooring --
13   Mr. Evans was flooring the accelerator, but I don't
14   remember -- I just don't remember.  I'd have to watch
15   the video again.
16   Q.    Okay.
17   A.    For some reason I remember seeing myself turn it
18   off in the video.
19         MR. SCOTT:          Anything?
20         MR. SIDOTI:          No.
21         MR. SCOTT:          Sergeant
22         Kelley, thank you very much for giving me
23         the opportunity to speak with you.
24         MR. KELLEY:          You're going
25         to review this, okay?  It will be printed

Page 210

1        up at a later point. You'll get an
2        opportunity to read it over, all right?
3        THE WITNESS:      Okay.
4              - - -
5      (DEPOSITION CONCLUDED AT 2:33 P.M.)
6              - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 212

1   State of Ohio,   ) SS:    CERTIFICATE
2   County of Cuyahoga. )
3
       I, Janet M. Hoffmaster, a Registered Professional
4   Reporter and Notary Public within and for the State of
       Ohio, duly commissioned and qualified, do hereby
5   certify that the within-named witness, SERGEANT SHAMUS
       KELLEY, was by me first duly sworn to tell the truth,
6   the whole truth and nothing but the truth in the cause
       aforesaid: that the testimony then given by him was
7   reduced to stenotypy, and afterwards transcribed by me
       through the process of computer-aided transcription,
8   and that the foregoing is a true and correct transcript
       of the testimony so given by him as aforesaid.
9
10      I do further certify that this sworn statement was
       taken at the time and place in the foregoing caption
11   specified.
12
       I am not, nor is the court reporting firm with
13   which I am affiliated, under a contract as defined in
       Civil Rule 28(D).
14
15      I do further certify that I am not a relative,
       employee, or attorney of either party, or otherwise
16   interested in the event of this action.
17
       IN WITNESS WHEREOF, I have hereunto set my hand
18   and affixed my seal of office at Cleveland, Ohio, on
       this 30th day of July 2018.
19
20
21         _____
       Janet M. Hoffmaster, RPR and Notary Public
22   in and for the State of Ohio.
       My Commission expires October 8, 2022.
23
24
25

Page 211

1   I have read the foregoing transcript from page 1
2   through 212 and note the following corrections:
3   PAGE    LINE      REQUESTED CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18         _____
19         Sergeant Shamus Kelley
20     Subscribed and sworn to before me this ____ day
21   of _____ 2018
22
23         _____
24         Notary Public
25   My Commission expires: _____

**A**

**a.m** 1:18
**abide** 164:24
**ability** 5:22
**able** 6:21,25
  47:2 52:1,24
  54:11 55:4,16
  55:18,21 56:2
  59:4,5,12
  61:15 72:4
  74:20 77:25
  81:23 84:22
  89:6,7 91:24
  96:6,11 103:3
  110:21,23
  111:11 112:17
  112:19,20,24
  117:14 118:3
  161:22 166:20
  188:11 189:19
  191:19,25
  198:21 206:11
**absolutely** 78:18
**academy** 9:5,6,7
  9:13 25:5
  29:12
**accelerate** 96:24
**accelerating**
  50:1
**accelerator** 50:3
  209:13
**access** 17:6
  40:13 149:24
**accommodate**
  61:6
**accommodation**
  135:7
**account** 178:5
**accurate** 5:15
**accused** 145:17
**acquiescing**
  169:14 176:1
**act** 96:10 143:12
  143:14
**acting** 158:14
  159:8

**action** 61:5,11
  61:12 78:6
  130:8 131:3
  212:16
**actions** 54:5
  82:14 146:5
**activated** 47:1
**active** 15:8,9,13
**activity** 151:24
**actor** 158:18,18
**actor's** 158:22
**actual** 70:13
  110:7 127:11
  151:11 202:4
**Adam** 1:3 2:8
  4:11 116:25
  152:22
**add** 190:21
**additional** 14:18
  33:4
**address** 160:10
  160:12,13
  169:18,20
  191:17 192:20
  198:12
**addressed** 169:1
  169:3,23 170:2
  172:16 175:7
  175:21 182:10
  183:5 189:8
**addresses**
  195:12
**addressing**
  168:8 196:15
**administered**
  150:22
**administration**
  12:4 16:3
  126:1,18
  128:12
**administrative**
  13:8 14:1 15:1
  15:17,22 35:22
  40:6 124:17,24
  125:1,3 126:3
  146:20 152:8
**administrator**

**1**:3 2:8 4:11
  152:22
**admitted** 172:17
  193:22
**adopted** 27:10
  27:12
**adult** 39:11,12
**affairs** 14:22
**affiliated** 212:13
**affirmation**
  103:25
**affixed** 212:18
**afforded** 35:17
**aforesaid** 212:6
  212:8
**agencies** 14:6
**agency** 12:1
  14:15,16
  142:24 160:20
  201:13,13
**Agent** 7:2,4,9
  95:1 97:7,23
  112:6,19
  147:24 148:2
  161:6,14,17,25
**aggressive** 77:3
  77:5,9 79:13
  190:10,14,19
  190:22,25
**aggressively**
  79:6
**ago** 17:20 22:25
  31:10 159:25
  167:22 187:20
**agree** 85:6 87:20
  96:15 117:20
  171:17 178:7
  178:12,16
  189:25 191:13
  192:6 193:2
  204:13
**agreed** 99:6
**agrees** 63:4
**ahead** 8:1 11:2
  11:11 13:12
  14:9 15:16
  16:24 21:5,21

**30**:9 33:9 51:2
  52:24 55:24
  70:9 99:14
  113:24 115:22
  117:11 130:11
  134:4,13 145:3
  146:8 165:2
  178:20 209:8
**al** 1:4,7 4:12,13
**alarm** 43:18,21
  43:23
**alerted** 46:4
**allegation**
  145:20,23
**allegations** 5:2
**allow** 135:7
**allowed** 8:16
  131:22,23
  132:7,8 182:8
  182:19 184:13
**alongside** 86:6
  91:13 92:24
**altered** 173:21
**altering** 177:19
**Amanda** 2:2,23
  4:20 134:22,22
  139:9,12
**ambulance**
  110:15 124:3
**Amendment**
  74:10
**amount** 22:13
**and/or** 84:18
  170:19
**angle** 111:12
  163:11 191:21
  191:22 192:1
  199:15
**animal** 174:17
**answer** 5:21 6:1
  9:25 21:12
  22:9 23:8
  33:10 63:15
  103:15 105:21
  107:19 116:10
  134:5 159:3
  165:5 169:11

**190**:4
**answered** 153:5
  153:9 191:7
**answering** 14:2
  128:7
**answers** 5:4
**anticipate**
  154:24
**antiquated**
  131:13
**anybody** 30:2
  113:9 126:14
  137:14 139:14
  142:15,23,24
  147:22 161:25
  165:15
**anymore** 54:16
**anyway** 125:6
**apologize** 184:22
**apparently**
  102:1
**appear** 48:16
  57:2 61:10
  64:1 77:16
  96:4 102:4
**APPEARANC...**
  2:1
**appeared** 58:8
  91:17 93:19
  113:5
**appears** 23:19
  61:14 100:14
  114:14 117:23
  120:11
**apple** 136:9
**applicable** 13:20
  25:21 27:6,7
  203:21,22
  204:1,6
**apply** 152:23
**appreciate** 48:3
  71:13 88:1
  132:5 135:7,25
  204:10 207:21
**apprehend**
  21:25 34:14
**apprehended**

39:9
**approaching**
46:13 170:8,9
202:25 203:4,7
**appropriate**
129:22
**appropriateness**
15:20
**approval** 146:4
**approximate**
64:18
**approximately**
18:11 38:9
43:2 49:13
51:19 60:11
153:16
**area** 28:21 30:3
37:11 38:2
39:4 44:21
45:3 47:11
71:10 80:22
81:1 120:2,6
122:4 136:5
**arises** 21:15
**arose** 130:8
**arrest** 174:4,7,9
174:13,14
**arrested** 174:1
179:16,21,23
**arresting** 180:2
**Arvin** 161:19
**ascertain** 47:2
59:12
**ascertaining**
67:1,6 181:25
**aside** 13:23
118:8 154:3
161:25 181:4
183:8 184:14
184:25 192:5
192:14
**asked** 5:1 56:13
140:5,9 142:1
147:24 149:10
155:10 159:21
163:17 165:22
171:5 172:22

179:7 180:14
184:21 186:7
187:19 190:7
190:13 191:10
192:13,20
193:5,12 197:9
**asking** 21:18
26:9 34:5
63:13,14,14
68:14 110:20
114:21 132:12
134:2 135:16
160:23 165:4,5
169:14 173:15
179:24 203:8
205:1
**aspect** 144:16
**assertions** 5:4
**assess** 67:8 89:21
**assessing** 84:20
**assessment**
158:13,14
**assets** 67:8
**assign** 156:6
**assigned** 40:10
40:10 43:10
173:7 175:4
**assignments**
106:6
**assist** 64:9
139:14
**assistance** 56:13
**assume** 5:20
18:21 24:10
26:12 30:17
36:24 40:3
57:13 72:21
82:2 91:24
104:8 129:24
145:22 152:8
**assumed** 9:11
127:2
**assuming** 36:1
142:21 145:24
157:23 163:8
173:25 175:5
183:24 184:2

201:5
**assumption**
83:16
**attached** 23:12
43:20
**attempt** 68:6
75:3 78:25
89:2 95:7
172:7 181:4
**attempted** 28:23
36:21 37:8
69:3,6 74:25
75:1 85:16
172:3
**attempting**
38:16 71:16
159:15 200:21
**attempts** 185:18
**attention** 41:4
**attorney** 7:14
8:4 212:15
**audio** 44:2
124:14 167:15
168:23 169:24
170:12,13,19
171:17 172:9
180:23 188:22
199:2,8,10
**audiotapes**
199:5
**authority** 42:17
**authorized**
166:24
**autocratic** 19:21
**automatically**
130:2
**available** 6:25
49:3 72:23
136:20
**avenue** 74:7,13
**avoid** 78:6
188:14
**aware** 9:21 10:2
10:10,23 11:23
13:3,5 14:23
16:8,11 18:1
31:24 36:18

37:2,3 46:11
48:23 66:3
74:9 92:17,20
118:21,22
122:25 123:2,8
130:7,12,13
131:5,6,9,10
132:20,24
133:2 135:17
135:21 146:14
151:22 152:21
173:3,15
174:21 182:22
202:4

_____

**B**
**B** 202:13
**back** 15:13,21
23:12 25:13
40:23 44:1
53:3,4,5,6,11
53:14,17,18,21
54:2,7,20 56:1
60:10,18 63:18
65:17,22 66:12
66:13,19 67:24
69:11 70:3
72:10,18,18
73:1,7,15
82:12 88:23
94:8,11 95:23
95:25 100:2
103:17 104:20
104:21,22
106:10 123:11
128:23 130:15
130:19 134:16
135:15 137:3,5
137:10 138:17
138:19,23
139:3,5,20,25
140:2,4 141:10
143:2 146:21
147:16 161:5
165:6 166:14
172:25 173:17
173:18 179:25

182:13 187:19
191:9 196:14
199:21 208:1
**backed** 55:6
65:14 69:24
94:14,18,23
97:18,19
121:13
**background**
6:16 30:15
155:5
**backing** 98:1
**backseat** 65:16
128:1
**backwards**
209:6
**bail** 106:24
108:19 168:23
170:12
**bailing** 108:24
109:16
**bails** 100:24
101:14 108:22
168:11
**bald** 114:4
**ball** 72:12
**ban** 132:1
**BARBERIC**
1:21
**based** 153:5
159:6 160:18
160:20 173:24
182:6
**basic** 9:7 17:4,5
25:5 26:3
44:11
**basically** 7:10
8:9 26:20
42:18 50:2
67:19
**basis** 15:10
201:23
**battery** 43:24
**BCI** 14:13 102:2
127:13,25
134:10 141:24
142:24 143:2,7

161:1,2,12,17
161:20 191:2
**BCI's** 116:3
**beam** 47:1
**bear** 169:2
**becoming** 46:3
**beeping** 128:15
**beer** 153:20
**began** 30:15
42:8 44:6,7
64:8 68:18,19
**beginning** 38:10
124:19 152:25
**begins** 106:17
180:5 202:23
**begun** 41:10
**behalf** 2:2,8,14
5:5 116:25
132:21,25
**behavior** 27:1
113:16,19
144:4,5
**believe** 23:7 24:1
24:18 35:5
39:12 40:24
44:10 45:7
54:20 57:6
58:14 61:19
62:21,23 63:2
64:16 65:7
72:10 75:13,15
75:15 77:6,8
80:25 82:2
84:17 85:7
87:6 95:24
96:1 102:18,18
104:12 107:5
109:25 113:25
115:6 119:10
120:16 121:5,7
125:2 126:8,9
138:3 145:14
149:13 152:13
152:16 156:8
157:21 160:2
160:24 161:6
161:21 163:21

166:1 169:21
169:23 172:2
175:23 182:7
183:11 186:16
191:9,14 192:8
193:22 194:10
196:6,13
199:22 201:22
204:24 206:7
207:2,14
208:19,22,24
**berm** 75:16,22
76:2,6,10
186:16 187:4
189:1
**best** 5:21 153:1
163:11 191:22
**better** 13:21
73:16 103:4
105:20 106:1
121:4 124:14
164:14 169:24
**big** 60:22
**bigger** 87:18
**biggest** 84:20,24
**billed** 152:10
**binders** 25:4
**biosocial** 155:4
**bit** 9:3 28:18
49:25 65:14
67:12 76:6
79:7 94:23
110:7 111:18
138:15 177:9
**black** 93:14
**blank** 26:22,22
**blanket** 22:2
34:17 63:12
**block** 1:21 98:7
106:23 107:12
107:17,21
108:2,8 114:17
**blocked** 98:8,16
**blocking** 108:18
136:19 137:13
**boat** 209:11
**body** 26:15

120:15
**book** 156:7,8
**boss** 13:21
164:14
**bottom** 51:19
53:16,24 57:23
**bounce** 153:8
**bouncing** 84:23
96:13 153:4
**bowling** 153:24
**box** 60:23 89:1
104:7 106:14
**boxes** 102:4
170:3
**boxing** 67:17
69:3,7 171:9
171:11
**boy** 137:4,8
**brake** 61:6 78:2
**brakes** 61:9
**brand** 54:13,13
**break** 5:24 6:2
78:16 105:25
134:18 135:15
**breathing** 18:17
**brief** 78:20
**bright** 93:15
**bring** 138:17
**broad** 63:14
109:1,1 165:5
**broadcast** 101:9
109:9 114:10
**broadcasts**
103:21
**brought** 15:13
15:21 58:5,15
139:5,25 140:2
187:10
**Brunswick**
80:23 138:20
138:23
**Bryan** 174:25
**buddy** 137:9
**build** 172:21
**Building** 2:5
**bureau** 7:4 16:6
61:22 74:6

96:21 141:25
142:15 147:11
**bus** 110:25
**business** 156:7

**C**
**cabinet** 25:9
**calculus** 33:23
34:22 63:5
**call** 41:15 50:10
54:25 71:14
72:1,2 75:11
76:21 99:9
101:18,23
109:23,25
110:1,3,6,9
126:22 127:7
127:11 129:25
168:14 174:11
179:4
**called** 4:2 29:3
29:18 45:4
65:6 71:5,9
75:9 78:25
80:7,14 109:10
140:20,22
142:4,7 166:14
180:22 181:2
**calling** 101:13
**callout** 29:5,6,8
29:10,20 31:11
99:1,5 100:25
101:15 102:11
106:11 107:1
107:10,16
108:1,7,13,23
108:25 109:5,7
109:9,12 168:8
168:12 170:8
171:6,14,21
202:7,21
**calls** 12:9
**camera** 43:20
112:24 199:15
**canine** 8:15,18
67:5 145:16,16
173:2,4,22

174:7,8,14,20
174:23 175:1
183:5,8,11
**capable** 173:25
**capacity** 200:21
201:5
**caption** 212:10
**captioned** 3:7
100:7 202:14
**captured** 119:16
172:12
**captures** 117:16
**car** 8:18 28:22
28:24 29:1,17
43:21 44:4
50:3 54:12,13
54:23 55:1,6,8
55:13 59:20
60:7 67:20
69:13,15,18,24
73:19,21,22
77:12,17 90:16
91:7 97:11
98:9,12,14,25
101:1,15
104:17 110:10
110:13 111:4
117:5 119:21
123:6,9 128:17
128:18 129:22
130:14,16,18
136:19 137:3,4
137:10,13
138:2,20,24
139:2,18,19,20
139:22 140:3,5
162:18,20,21
163:14 168:12
173:7,19,20
174:3,7,11
177:8,10 186:2
187:20 192:8
194:2 201:20
209:3
**carry** 12:13,16
26:12
**cars** 29:17 44:23

56:5,6 65:6,7
65:11,12,18
70:14,17 88:22
117:4 136:20
173:1,9,10,11
177:14 187:21
**case** 1:5 4:13
20:5 38:21
40:6 134:10,25
134:25 135:2
135:23 148:19
174:25 202:13
**case-by-case**
15:10
**casual** 143:21
**catch** 50:3,15
51:4,20 54:11
**caught** 54:14
73:2
**cause** 33:4,13
66:9 79:19
146:1 181:12
212:6
**caused** 84:11,12
192:9
**causing** 78:1
**caveat** 8:11
34:25
**Caxton** 2:5
**cell** 12:13,16,20
12:22,24 13:5
93:10,12,15,19
94:4 140:10,15
140:18,22,25
141:8,21
142:16,16,20
142:25
**cellular** 93:1
**center** 76:12,18
158:13,14
**certain** 17:21
26:4 85:14
131:2 151:25
164:10 167:11
182:23
**certainly** 11:14
19:19 32:3

34:13 124:14
142:8 201:17
202:3 205:16
**CERTIFICATE**
212:1
**certificates**
23:13 24:24
**certification's**
154:9
**certified** 4:4
**certify** 212:5,10
212:15
**chain** 181:23
**chance** 124:13
135:14 147:21
**change** 16:16
171:16,20
176:16 211:3
**changed** 107:25
108:5 132:6
171:2 175:24
177:6,23
**changes** 47:15
79:13,15,19,25
81:13
**changing** 77:9
77:11,16,20
177:12 190:16
190:23
**channel** 71:23
**channels** 71:24
**chaotic** 138:15
141:20
**chapter** 147:9,10
**charge** 16:5,6
36:3 72:15
106:4 144:20
**charging** 22:6
100:25 101:15
109:7 168:12
**chase** 36:7 83:13
83:15 99:9
172:4,6 176:20
179:4 188:17
**check** 20:4 67:3
91:25
**checked** 58:16

59:17
**checking** 57:25
58:9,11 59:14
**chief** 8:17 16:4
18:3 126:20,22
126:24,24
127:5,7,15
148:21
**chiefs** 16:4
127:22
**children** 4:21
123:16,25
124:4,6,10
135:18,20
136:22 153:13
199:21
**chronological**
90:2 150:25
**chronologically**
171:12
**Chuck** 7:3,4
**church** 110:25
**cigarette** 113:10
113:13,17
114:2,6,11,19
143:6,9,22
144:1 191:2
**citizen** 145:19
146:10,17,18
146:22 150:11
**city** 1:6 2:14
4:12 9:12,22
16:8 27:9
40:23,25 44:5
45:2 128:5
142:11 151:19
**city's** 17:3
149:19
**civil** 1:13 4:21
12:4 156:4
212:13
**claim** 186:13
198:23
**claims** 118:15
**Clar** 161:17,19
**clarification**
8:18 155:20

162:3 179:8
**clarified** 99:2,8
**clarify** 88:10
108:13 180:9
199:7
**clarifying** 168:6
**clear** 5:19 70:5
70:11 72:13
98:13 100:18
101:25
**clearly** 61:9
63:23 70:18
95:10 105:17
116:8 167:9
192:1
**Cleveland** 1:22
2:6,12,18
28:10,21,23
30:17,21
212:18
**clocked** 47:9
48:24
**close** 11:25
36:14 48:4
50:8,17 51:7
54:9 55:3
91:22
**closed** 137:16
**closely** 118:12
**closeness** 204:10
**closer** 47:5 48:1
91:7
**closing** 54:17
**co-counsel**
134:21
**Coast** 24:1
**coaxing** 137:8
**codified** 156:11
**cognitive** 65:21
65:21 90:12
**cognizant** 20:18
26:5,20
**cold** 36:14
**collection** 119:4
**collided** 91:8
111:5 118:8
**colliding** 91:11

115:6
**collision** 70:11
118:10
**color** 119:5
**come** 12:3 64:9
82:1 90:25
114:23 115:4
115:10 128:25
131:13 136:1
137:9 139:2,3
142:1 150:17
150:17 158:21
159:8 161:5
180:19
**comes** 13:25,25
97:9 104:25
106:24 145:14
150:5 163:8
**comfortable**
148:1
**coming** 7:1,21
40:23 47:19
64:9 81:23
85:20 86:12
95:11,13,17
97:24,25 104:4
113:3 124:3
193:11 196:18
199:17,18
**command** 18:25
19:10,10 99:11
125:18 126:13
167:2
**commander**
18:3
**commanding**
148:21
**commands** 20:1
98:18 112:12
197:9 199:14
**commenced**
149:18
**commencing**
1:18 92:16
148:3,6
**Commission**
211:25 212:22

commissioned
212:4
committed
181:5
common 151:13
commonly
166:13
communicated
169:25
communication
31:2 36:25
102:17 104:10
107:22 108:2,9
110:6,14
114:25 124:2
126:14
communications
100:15 103:1
107:11 108:6
109:19 113:3
114:14 115:4
143:4
comp 118:15
Company 178:6
compared 27:24
complaint 4:23
5:3 145:19
146:22 165:19
complaints
146:10,17,18
150:11
complete 5:15
9:8 58:5,16
191:12 192:6
193:2 194:7
completed
204:14,23
205:2
completely
74:11 89:1
95:24,25 96:2
98:9,9 148:13
completing 9:13
completions
24:25
complicated
151:4

comply 180:7
181:10 182:2,4
computer 17:7,8
130:20 151:5
computer-aided
212:7
concentration
155:4
concept 18:25
22:12 203:25
concern 8:21
113:20
concerned
158:17
concerning
12:19 18:4
125:19 202:4
concerns 89:11
concluded 143:3
210:5
condition 32:1
79:24 80:2
81:10 188:12
190:1
conditions 32:10
44:15 45:18
62:10,14
conduct 144:9
166:3
conducted 130:9
146:5 147:19
161:1
confer 57:5
confirm 107:15
108:7
confirmation
102:15,16
107:10 108:1
109:6
confirmed
202:25
confirming
100:24 101:7
101:14 102:13
168:11
confirms 102:8
conflicting 165:4

confrontation
22:7
confused 207:5
conjunction
14:6 181:24
Connard 2:2
136:1
consider 31:21
33:20 184:5
187:15,16
considerable
87:4
consideration
32:3,8,13
150:13 159:23
considered 8:19
9:15 133:13
158:9 184:13
consistent
112:11 197:14
198:3,24
constitutes
181:16
construction
164:3,4
contact 39:13
69:14,17,22,25
70:13,16 73:18
77:1 94:20
95:5 120:4
121:17 186:8,8
186:13,21,24
186:25 187:2
188:16,25
189:2,13,14
192:14 193:1
196:18 204:13
205:1,16
contacting 71:19
contacts 121:21
contain 158:3
containing
108:24
contains 199:8
199:10
contingent 109:3
continue 33:24

52:25 82:16
87:4 97:15
149:2 179:3
continued 28:15
58:24 60:7
63:24,25 65:19
179:1
continues 57:8
62:5
continuing 33:6
56:15 105:22
contract 212:13
contrary 21:2,9
21:19
contributes
190:18
control 73:16
82:17 84:22
86:6,7 89:8,14
89:20 91:15
95:7 96:6,23
97:4 164:6
189:21 190:1
194:5,7,11
controlled 30:11
62:1 108:14
controls 130:20
conversation
103:10 105:9
109:16 127:23
128:1,4,11
148:7,9 161:6
176:23 187:10
conversations
109:13
conveyed 11:14
convoluted
124:23
convoy 171:24
copies 23:13
24:22,24
copy 24:19
202:11 203:9
core 67:6
corner 114:22
correct 4:23 5:5
6:9 7:6 8:25

14:20 19:15
20:2 23:9,11
24:3 25:12,20
30:4 31:4,19
31:20 32:8
33:1 34:8,11
34:12 35:11,12
35:15 37:16,19
38:24 41:3,13
41:14,17,21,23
41:24 42:20
43:11 45:8,10
45:11,14 47:10
48:10 50:7,18
50:23 51:8,12
51:14 52:21
53:19,20 54:4
54:8 56:4 59:3
60:12,14 61:1
61:2 62:8,11
63:7 66:2,8,21
66:22 67:23,23
67:25 68:4
71:3,4,20
72:16,17,20,25
73:3 74:8,21
75:10 76:3,4,5
77:18 79:3,4,8
80:4,18 81:4
85:10,17,18,22
86:8,17,22
88:16,17,20,21
88:24,25 89:4
89:10,23 90:1
90:6,7 92:2,4,8
92:14 94:21
95:8,9,11,14
95:18 97:1,3
98:3 99:11
100:8,9,16,17
100:19 101:10
101:17,21,22
102:3,7,10,11
102:13 103:12
104:1,2,4,5,18
104:22,23

105:2 106:8,12
106:21,24
107:2,12,13
110:2 114:2,9
114:11,15
115:1 116:1,9
117:18,19,21
117:22,24
118:11 119:21
119:22,24,25
120:5,23,24
121:9 122:20
123:4 124:7
125:11 126:7
126:25 127:3
128:6,20,21,23
129:22,23,24
131:17 132:18
132:19 133:8
133:15 135:5
135:20,22
139:7,10
140:11,12,16
140:17,23,24
141:6,23 142:2
142:3,6,11
143:6 144:13
144:21 145:4
145:21 147:12
147:14 148:15
148:23,24
149:3,4,20,21
155:24,25
157:3,23 158:2
159:12 160:5
161:10 162:7,8
162:12 164:7
164:12,17,20
166:5,10,16,17
167:6,7,12,25
168:14 169:11
169:12,15,19
170:1,5,10,23
170:24 172:5
172:24 173:23
174:2,17
175:10,11,24

175:25 176:13
176:24 177:3
178:11 179:9
180:13,16,25
181:7 182:11
182:12,15
183:1,2,3,14
183:18 184:4
185:19,20
186:10,11,11
186:18,22
187:5,23 188:9
192:3,4,11,12
193:25 194:15
194:19,20
195:14,15
196:16 197:20
198:1,16 199:8
199:9,11 202:5
202:6 203:4,24
205:19,20
206:17 208:13
208:20,23
212:8
**corrected** 131:16
**corrections** 6:17
   211:2
**corrective** 17:14
**correctly** 98:14
   101:3,18 128:8
**correlation**
   197:8
**counsel** 7:12
   99:24 119:9
   134:20 158:16
   159:1 169:21
   169:23
**counselors**
   126:17
**County** 6:18
   47:22 212:2
**couple** 59:25
   60:7,17 64:3
   65:6 68:21,23
   69:8 80:12,17
   127:8 188:15
   191:10

**course** 12:4
   18:19 24:18
   43:25 134:23
   202:12
**courses** 154:18
**coursework**
   155:6
**court** 1:1 4:15
   63:4 212:12
**cover** 51:23
**covered** 69:6
   201:25
**covers** 156:6,10
**crash** 40:22
**crashed** 36:9
   37:11 38:25
   39:3,7
**crime** 34:10,15
   35:4 181:5
**criminal** 7:4
   61:22 74:6
   96:22 141:25
   142:15 147:11
   155:3
**criminology**
   155:4
**crisis** 20:14
   23:20 25:25
   26:7 27:3
**crisscross** 136:9
**cross** 58:10 59:1
**cross-examina...**
   1:12 3:3 4:6
**cross-over** 64:12
**cross-traffic**
   58:12,13
**crossed** 136:9
**crossover** 45:4
   181:14
**crouch** 111:18
**cruiser** 61:3 68:1
   173:13 174:15
   175:12 176:3
   176:21 205:2
**cruisers** 66:23
   68:11,19 80:6
   175:16 176:12

**crying** 123:21
**current** 169:4
**currently** 146:24
   154:19
**Curtiss** 10:8
**custody** 29:4
   30:11 188:6
**Cuyahoga** 6:18
   212:2

───────────

**D**

**Dale** 4:12
**damage** 120:15
   192:13
**damages** 192:21
**danger** 20:23
   21:1,8,16,18
   33:14 35:5
   63:21 84:19,25
   85:8 89:14
**dangerous** 63:3
   97:14 144:5
**dark** 47:5 93:3
**darkness** 93:16
**dashboard**
   43:20
**date** 1:19 40:8
   40:10,12,15
   129:5 165:17
**David** 2:23
**day** 1:18 20:15
   26:13 41:20,23
   42:4,7,12
   126:16 127:19
   142:11 147:15
   178:4 211:20
   212:18
**days** 15:5,5,7
   125:5,5 126:23
   127:8
**de-escalation**
   20:9 21:2,9,19
   21:23 22:18
   23:16,20 25:20
   155:11
**dead** 39:6
**deadly** 9:18,21

10:2,16,20
13:10,14,16,24
14:4,10,12,25
15:20 16:21
115:20 118:4
124:20 125:10
133:17 145:6
152:1 159:21
160:9,16 193:8
193:20,21
197:6 206:5,13
206:17
**deal** 20:14,17
**dealing** 25:24
   92:3 141:4
   150:5,14
**dealings** 161:14
**deals** 165:3
**dealt** 159:17
**debriefing**
   126:16
**debris** 81:23
**Deceased** 2:9
**decided** 67:15
   87:13 109:19
   180:7
**decipher** 8:15
**decision** 33:3,5
   87:12 90:17
   138:17 140:7
**decisions** 21:13
   21:16 144:20
**decline** 16:17
**decrease** 45:8
**Defendant** 1:12
   4:2 23:9
**defendants** 1:7
   2:14 5:5
   134:21
**defendants'**
   117:2
**deficiencies**
   16:18
**deficient** 17:13
   150:9 151:25
   158:20
**defined** 212:13

definitely 15:9
66:15 69:10
103:8 106:20
107:24
definition 50:13
definitive 103:15
107:19
deflate 72:23
deflated 83:14
83:18 86:13,21
96:2
deflation 195:13
degree 154:17
155:2
delineate 193:18
delineates
175:16
delivering
150:10
department 1:17
6:9,12 7:16
10:17 12:16
14:17 16:9
18:5 19:20
24:5 39:21
125:19,22
130:9 133:16
141:10,11
144:9,23
145:10 146:12
150:21 156:2
163:18 173:2,5
174:20 175:13
183:10,14,16
183:24 184:11
184:16 201:4
201:11
department's
149:14
depending 21:6
22:5,10 26:24
33:2 34:18
85:13
depicted 33:16
121:25 122:22
depicts 163:11
deploy 72:23

deployed 38:20
80:18,25
188:22 189:15
deploying
133:22
depo 172:16
deposed 4:4
deposition 1:9
1:11 4:9 6:21
7:23 8:2 23:3
99:20 119:1
124:19 170:15
176:24 190:9
210:5
depth 148:10
deputy 8:17 16:4
18:3 127:22
describe 61:22
161:21
described 79:24
80:5 81:11
204:23
description
173:24
designated
173:2,4 187:4
desk 43:18,22,22
44:3
detective 16:6
determination
15:19 146:4
determinations
34:20
determine 31:24
determined
66:14
determining
31:21 63:6
Devon 2:2
135:25 136:7
136:14,23
137:12
diagnoses
155:16
dialogue 72:12
98:20 107:6
109:17 128:8

168:4,5,16
dictate 74:10
99:15 203:18
dictated 168:16
dictates 182:9
difference 35:1,6
35:8 174:14
187:22,24
differences
202:8
different 20:3
71:24 73:5
80:20 82:9
83:11 147:8
155:15 164:22
171:4 175:12
175:15 180:18
180:19 198:10
202:9 206:9
differentiated
176:2,11
differently
173:12
difficult 190:1
direct 18:8
136:13,21
150:6 167:2
Directed 23:9
direction 52:19
58:9 106:5
194:10
directive 72:9
directly 37:9
56:21 57:16
71:25 126:8
135:20 150:6
196:24
disabled 82:7
disagree 55:13
205:10
discharge
197:10
disciplinary
130:7 131:3
discovered 65:2
138:18
discovery 4:9

117:3 119:9
133:3
discretion 19:17
19:23 20:6
21:15 166:18
166:19,23,25
167:23
discuss 15:14
127:12,16
147:21 148:2,8
discussed 124:18
150:3 167:22
discussing 11:7
127:11 157:11
176:9
discussion 8:14
40:18 50:20
74:5 134:14
170:6 172:17
177:1 195:7
discussions
150:4
dispatch 72:4,22
167:9 168:20
168:22 169:25
170:13 180:22
188:23
dispatchers 72:2
disposal 67:9
dispute 114:13
disputing 101:23
disseminated
10:22 11:21,24
12:6
disseminating
11:22
distance 27:23
46:18 54:17
69:5 80:10
87:4
distinct 109:13
distinctly 93:15
District 1:1,1
4:14,15
division 1:2 16:5
document 16:19
100:3,23

101:25 102:2
105:17,20
106:1
documents 6:21
25:1,1 67:22
118:24
dog 67:5 162:18
162:21 173:17
dogs 173:8 175:4
doing 10:25
41:19 43:22
44:3 47:3
54:15 70:24
72:9 91:10
94:3 97:17
100:25 101:14
106:11 107:1
107:10 115:13
127:10 128:20
168:12 169:8
169:15 170:8
171:20 180:3
199:23 205:22
207:3,12 208:8
208:8
door 106:23
107:12,17,22
108:3,8,10,10
108:19 110:22
111:1,6,8,13
112:9 115:11
115:23 122:4,7
192:17 205:22
206:10
doors 98:10
108:12
double-check
208:1
doubt 86:24
dove 111:1,7
dovetailing
196:14
downtown 6:17
downward
57:22
draw 111:14,15
111:19 194:21

**drew** 112:18
**drink** 153:21
**drive** 131:21
**driven** 30:17
  31:2 186:9
  188:5
**driver** 30:23
  61:9 84:25
  89:13,18,19
  92:18,22
  104:11,24
  105:1 106:23
  107:12,22
  108:10,19
  111:1,8 123:1
  163:12
**driver's** 68:1
  76:19 82:23
  83:8 88:4,10
  88:11 91:2,6
  92:25 94:12
  107:17 108:2,8
  110:5 111:4
  121:22 122:16
**drives** 130:16
**driving** 32:1
  46:4 54:12,13
  77:3,17 78:12
  79:6,13 87:16
  92:13 113:13
  130:17 162:20
  175:22 176:16
  177:24 178:3
  184:9 185:1
  186:17 187:4,8
  189:3 190:18
  197:2
**drop** 47:18
  67:24
**drove** 37:12
  197:4
**duly** 4:3 212:4,5
**duplicative**
  153:7
**duration** 27:22
**duress** 26:16
**duties** 9:11 14:1

14:1 35:18,22
  36:1 43:6,13
  44:3 125:14
  127:2 141:15
  150:9 200:21
  201:10
**duty** 12:13,17,20
  13:6 15:13,21
  42:11,19,20,22
  43:5,7,15
  129:25 133:10
  133:12,19
  140:15
**dynamic** 20:13
  171:16

———————
**E**
**E** 2:5
**earlier** 36:1
  40:21 42:4
  91:19 124:18
  127:2 128:13
  149:17 187:13
  193:23
**early** 7:9 16:10
  16:12,22 17:3
  17:9,23 18:4
  27:9 36:15
  41:8 45:19
  140:9 149:11
  149:14,19,23
  150:14 151:6
  151:19 152:2
  158:4,9 159:23
  160:17 163:19
  165:24 187:12
**east** 97:10
**east/west** 58:21
**EASTERN** 1:2
**Econoline** 47:7
  187:14
**education** 154:4
  155:5
**effect** 72:6 102:9
  143:8,10
**effectuate**
  171:14 174:13

181:4
**effectuated**
  171:12
**effectuating**
  166:8,25
  180:18
**effort** 22:14
**eight** 17:20
  41:22 42:13
**either** 32:17
  52:18,19 58:9
  65:3 68:20
  79:20 88:23
  113:4 161:12
  170:13 212:15
**elapsed** 107:14
  109:18
**electrical** 130:17
**eligible** 132:17
  156:17
**else's** 11:16
**email** 1:24 2:7
  2:13,19,20
**emails** 12:9
**emblem** 97:24
  193:11,17
**employee** 158:16
  158:19 212:15
**employment**
  42:4,5
**empty** 52:8
**encountered**
  82:3
**encounters** 80:3
  80:8 81:16
**ended** 28:6
  30:14 36:8
  41:11 69:10
  75:7 137:10
  188:18 194:13
**ends** 162:25
  172:4,6
**enforcement**
  6:15 9:4
**engage** 153:24
**engaged** 129:25
**engaging** 27:1

200:8
**engine** 206:20
  207:17 208:19
**enhance** 11:16
**enhances** 29:24
**enter** 151:9
**entering** 151:7
**entire** 100:3
**entirety** 92:10
**entrance** 53:2
  60:1,2,4
**entries** 17:8,11
  149:24
**entry** 17:7,18,23
  18:4 62:16
**environment**
  30:12 153:18
  154:1
**equate** 34:13
**equates** 34:15
**equipment**
  66:17 128:18
  184:19
**equipped** 173:12
**escalate** 20:21
**escalated** 73:9
  73:14
**escalating** 20:18
  22:7
**escape** 74:7,14
**escorting** 140:4
**ESQ** 2:4,10,16
  2:16
**essence** 164:23
**essentially** 73:4
  147:6,10
  200:11
**establish** 110:14
**established**
  186:12 188:21
**establishing**
  192:1
**estate** 2:9 4:11
  152:23
**estimation**
  166:21 193:19
**et** 1:4,7 4:12,13

**ethics** 156:9
**Evans** 2:3,3,9
  4:12 46:4,7
  57:20,25 58:5
  58:9,15 59:16
  64:1 69:12,23
  70:10,23 71:3
  73:7 76:22
  77:2,2,25 78:7
  79:6,24 80:8
  81:12,12,16
  82:12 87:16
  89:7,18,24
  90:13 91:8,10
  91:14 92:7,11
  94:13,19,24
  95:3,6 96:5,16
  96:23 97:17
  99:8 107:7
  108:15,20
  109:14,19
  110:19 112:17
  113:4,9,12,17
  113:22 115:15
  115:23 121:7
  136:6,10,15
  138:8 143:5,8
  143:12,19
  152:23 168:16
  169:16 180:10
  181:14,17,22
  186:9,15,17,23
  187:2,7 188:5
  188:16 189:8
  189:20 190:5,8
  192:3 194:11
  196:15,20,20
  205:22 206:4,7
  206:12,16
  209:13
**Evans'** 58:3 59:8
  78:12 94:22
  111:4 115:13
  121:20 189:2
  191:11,15
  193:24 204:14
  204:24 205:1

206:1
**evasive** 54:5
61:5,11,12
78:2,6,11
79:16,21 189:9
**evening** 42:8
43:14 46:9
141:8 144:24
**event** 41:8 43:12
81:10 93:23
108:11,14
110:7,18
121:18 124:20
126:20 149:18
149:23 203:22
212:16
**events** 8:6 17:22
90:2 127:11,12
127:16 143:17
148:8 152:1,1
153:24
**eventually** 29:1
39:10 137:9
**everybody** 10:23
11:16 13:15
15:7 19:19
24:8,11 29:23
68:9 69:11
73:1 85:2
87:17 116:22
134:8 139:5
143:14
**everyday** 175:12
**evidence** 13:4
**evidentiary**
12:25
**exact** 60:17
64:25 72:12
81:7 98:24
99:2 129:5,6
145:24 156:23
**exactly** 48:5
55:14 67:18
68:8,22 71:12
112:14 121:23
122:15 123:11
164:8 165:10

185:5 198:14
**exam** 35:14
156:5,6
**examination** 4:2
**example** 166:6
**exception** 44:17
**excessive** 195:23
196:5
**excuse** 59:22
153:4
**execute** 94:10
185:15 201:9
**executed** 88:18
**execution** 200:8
200:10 201:1
202:4
**exercise** 166:25
200:15
**Exhibit** 23:2,7
99:18,19 100:6
118:25 119:14
133:5 169:22
**EXHIBITS** 3:8
**existed** 62:14
**existing** 131:19
**exit** 48:20,25
49:3,7,15,20
49:24 51:10
57:9,10,11,21
57:22 64:17,17
80:23 81:2
181:15,17
**exited** 39:5
57:11 194:14
194:21
**exits** 57:14
162:12
**exonerated**
145:25
**expect** 19:10,25
**experiencing**
150:8
**expert** 132:20
**expires** 157:17
211:25 212:22
**explain** 157:9
**expose** 195:22

196:5
**exposed** 98:11
**expressions**
26:15,15,18
**extraordinary**
39:25 78:3,9
**eyes** 52:1 193:7

_____

**F**

**F** 2:4
**facial** 26:14,18
**facility** 188:8
**facing** 45:15
97:9 163:1
194:9
**fact** 40:25 59:16
70:19,20 74:20
82:15 84:21
93:18 143:25
147:21 167:6
167:24 175:21
175:23 176:1
176:18 177:23
182:10 188:21
**factors** 31:21,24
33:4
**factory** 131:14
**facts** 170:2
**fail** 180:7
**failure** 181:10
182:2,3
**fair** 5:22,23
10:18,19 11:17
13:6,7 19:12
19:13 20:4
21:3 22:1,3,7
22:11 32:5,6
32:13,14,18
41:20 48:4,5
53:25 57:17
63:8 70:7,24
73:23 74:2
78:4 82:7,8
89:9 90:9
92:11 97:5
111:23 112:1
121:18 122:19

122:22 130:1
133:7 141:21
142:5,9 143:15
157:22 163:14
163:16 164:16
164:25 165:17
166:21,22
167:3 169:4,6
169:9,10
170:15,16
171:1,15,25
175:17 178:22
179:21 180:12
180:20,21
182:5 189:3,17
196:23,25
197:22,23
198:13,21
204:2,3,15
205:23
**fairly** 62:11
102:17
**familiar** 4:23
29:13 31:18
38:8 100:10
148:17 160:2
164:2 178:23
187:20,22
202:15 203:12
**family** 137:6
138:18 139:4
140:2 150:8
159:5
**far** 24:11,13
39:2 47:16
49:6 80:9
155:6 164:3
191:18
**fashion** 164:1
**fast** 75:14
**faster** 46:20 77:7
**father** 134:22,24
**fault** 88:7
**FAX** 1:23
**feasible** 20:8
**Federal** 1:13
**feel** 32:15 33:14

62:17
**feeling** 204:18
**feet** 55:8 59:25
60:1 111:7
**felony** 29:6,8,10
29:16,20 31:11
99:1,4,9
100:25 101:14
102:11 106:11
107:1,3,10,16
108:1,7,13,23
108:25 109:6,9
109:12,14
168:8,12 170:8
171:6,14,20
202:7,20,25
**felt** 32:20,21
33:6,24 96:22
**female** 93:9,11
**fender** 122:8,12
126:22,24
127:8,16
**field** 12:1 26:13
**Fields** 10:8
**fifth** 106:13
**figure** 102:24
**file** 25:9 40:1,6
119:10
**filed** 4:22 5:4
146:11
**files** 145:15
149:24,25
**fill** 133:17 134:3
**filled** 133:21
**find** 33:12 72:21
91:25 105:25
136:17 139:18
139:19 202:19
**findings** 126:2
129:5
**fine** 92:6
**fire** 24:2 112:10
**fired** 99:12
109:8,24 110:1
110:6 114:15
115:1,5,24
116:1,9 117:17

117:18,21,24
118:11 122:24
123:13 168:24
171:1,6 191:12
192:7 193:1
194:25 195:1
199:4,13
204:15,20,23
205:3,5,7,12
**firing** 111:20
**firm** 2:4 212:12
**first** 4:3 6:6
17:17 20:4
23:8 45:2 46:8
55:19 57:20
69:3,7,22
74:24 75:1,6,7
78:25 84:8
86:12 92:20
95:5 100:6,12
100:22 107:9
120:4,8,13,16
121:9,10
123:16,19,21
126:19 136:7
146:24 156:12
156:14 161:16
168:5 172:16
186:12,24,25
192:22 197:17
212:5
**five** 42:12 43:3
117:3 119:5,14
121:25 122:22
157:1
**flat** 52:24 82:19
82:22 83:13
189:3,23 190:2
**flated** 83:14
**fled** 36:10 37:9
**flee** 84:23
**fleeing** 66:5
190:24
**flexion** 198:6,10
**floor** 50:3
**flooring** 209:12
209:13

**Florida** 154:22
**flowed** 131:4
**folder** 40:7
**follow** 20:1 48:9
54:6 196:8
**follow-up** 39:19
200:6
**followed** 19:11
56:15
**following** 18:21
37:18 38:16
124:20 126:21
165:23 177:2
211:2
**follows** 4:5
**foot** 36:10
**force** 9:18,21
10:2,16,20
11:8,17 13:10
13:14,16,24
14:4,10,12,25
15:20 16:21
21:24 22:5,13
27:13,14 74:19
89:2 115:20
118:4 124:20
125:11 133:17
133:18,18,22
134:7,8,9,10
145:6 152:1
155:21 156:17
159:21 160:8,9
160:16 193:8
193:20,21
197:6 206:6,13
206:17
**Ford** 47:7 97:24
178:1,5 193:11
193:17
**foregoing** 211:1
212:8,10
**forget** 22:20
**forgot** 44:1
91:19 113:2
**form** 22:20
168:6
**formal** 15:19

17:2 35:24
155:17 169:14
**format** 100:12
**forth** 1:19 191:9
**forward** 22:7
94:22 97:12,20
97:21,21 98:2
98:4,7 111:18
122:15 193:23
196:20,22
**found** 110:24
123:5 208:3
**four** 9:10 25:4
43:3 65:8,10
66:1 74:17
88:19,22 121:7
121:8 161:5
171:24 182:3
182:11
**Fourth** 74:9
**frame** 7:19
83:12 85:13
107:7 116:4,4
129:6 191:18
**Franklin's** 2:17
**frankly** 11:24
**frantic** 112:25
**Fraternal** 147:3
**freeway** 189:7
**Fried** 1:3 2:8
4:11 116:25
152:22
**friend** 2:2
**front** 36:9 39:8
66:24 73:21
88:23 90:21
91:1 94:7,12
95:24 96:1
97:11,16,25
98:2,4,11,12
98:12 111:5
112:20,21
114:23 115:5
122:8,12,12,19
123:2 162:24
193:25 194:2
196:24 197:4

203:9 205:24
**full** 6:4
**function** 146:20
**further** 66:24
71:17 80:21
81:2,5 200:2
212:10,15
**future** 144:13

**G**

**gap** 50:8 51:7
**Garrity** 148:14
148:17,19,25
**gathering** 13:4
**Gaughan** 1:6
4:17
**gear** 207:13,23
**general** 22:12
25:10 170:6
**geographical**
103:3
**gesturing** 122:3
**getting** 55:24
77:9 85:25
90:18 94:8
114:16 137:5
143:20 150:10
181:24 183:20
205:11
**girl** 137:4,7
**give** 5:10 43:21
68:5 99:12
116:13 129:9
130:22 147:25
148:11,21
149:2,6 157:17
164:21 166:14
171:8 172:13
202:11
**given** 24:17 31:5
62:14 108:15
128:9 130:23
130:25 131:1
148:19,25
151:21 167:9
201:17 212:6,8
**giving** 106:5

108:9,21
109:17,20
165:22 167:15
171:4 199:16
209:22
**glare** 112:22
113:1 193:14
205:19
**glared** 118:6
205:24 206:14
**Glover** 37:24
38:5
**go** 7:25 9:5 11:2
11:11 13:13
14:9 15:16
16:24 19:14
21:5,21 24:8
24:14 26:12
30:9 33:9
40:16 43:15
45:9 48:13,19
51:2,10,24
66:23 70:9
75:21 86:7
87:8 99:14
106:10,13
113:24 115:22
116:19 117:11
130:11 134:4
134:12,13
137:20 139:3
143:2 145:3
146:8 149:7
154:5,7,15
164:4 165:2
172:10 174:5
175:4,19
178:20 181:14
182:13,13
195:5 201:24
208:1 209:8
**goes** 34:21 57:22
146:21 157:14
164:3
**going** 5:9,20
15:2 18:18,19
28:13 33:14

34:3,18 36:15
43:19,23 44:3
44:4,5 45:13
47:17 48:24
50:5,6,16,25
53:19 54:18
57:13,21 58:12
59:14 60:6,15
60:23 67:13,17
71:10 75:25
77:7 86:7,25
87:17 88:14,22
89:1 90:8,21
90:23 92:24,25
94:3 97:11
98:18 99:1
102:11,24
106:6,23
107:11,17,21
108:2,8,23
109:6 116:25
125:4 135:2
140:4 141:3,13
143:19 144:6
147:22 153:1,7
154:19 157:12
167:8 169:3
171:11,20,21
174:12 175:8
183:19 186:7
203:15 208:17
209:24
**Gosh** 105:3
**gotten** 54:20
56:1 63:18
**GPS** 94:2,2
**graduating**
154:24
**grand** 126:2
129:4 152:10
**GRAY'S** 1:21
**great** 116:17
**greater** 47:17
**grill** 193:17
**ground** 51:23
**guess** 17:19
33:12 59:19

73:23 123:14
151:3
**guessing** 55:7
156:24
**guesstimating**
48:2
**guideline** 196:8
**gun** 83:24
111:14,15,16
111:19,20
**guy** 90:23
114:23 177:8
187:20
**guys** 116:12
183:16

———————

**H**
**habit** 140:14
**hair** 114:5
**halfway** 52:14
**hand** 99:23
119:4 212:17
**handcuffed**
137:23,24,25
138:1,2,7,23
139:9,17,21,24
140:6
**handcuffs** 29:19
140:8
**handing** 23:6
**handle** 67:14
98:18 188:3
**handled** 125:20
126:12 127:25
144:17
**handout** 24:17
**handouts** 25:7
**hands** 115:13
198:8,8
**hands-on** 185:24
**happened** 13:22
18:9,15,16
81:18 87:11
94:9 112:2,7
116:2,5,11
125:13 127:19
142:8,9 151:8

186:21
**happening**
136:20
**happens** 18:20
52:22 59:23
71:14 81:17
90:11 97:8
**hard** 97:22
121:14 205:4
206:8
**harder** 94:25
204:20
**harm** 32:23 33:7
33:25
**head** 5:11 10:13
22:20 38:3
45:10 53:14
65:5 70:3
97:11 140:21
184:19 193:11
208:18
**headed** 70:6
**heading** 45:12
46:14 64:8
69:4
**headlights** 46:13
46:19,21,23
47:3 54:16
67:16 181:22
**health** 25:25
26:6,7 27:3,5
**hear** 113:7
124:14 197:17
197:18,24
198:20
**heard** 83:19,20
109:23 112:10
112:15 115:24
123:21,21
185:12 197:13
198:19,21
**hearing** 124:5
194:25 199:12
199:14
**Heights** 57:10
**held** 24:18 93:2
**help** 23:1,16

35:17 103:14
**hereinafter** 4:4
**hereunto** 212:17
**hey** 171:19
**hierarchy**
163:18,21
**high** 36:22 37:1
37:9 38:12
46:15,19 48:20
154:5,12,14
181:14 188:3
202:7,14,19
203:1
**higher** 29:21
128:4 164:11
**highest** 19:7,24
**highlighted**
100:4
**highway** 9:6
31:12 38:23
44:23 47:6
48:25 49:4
71:19 72:5,22
130:19 139:22
**hired** 6:13
158:18
**hit** 69:13 75:17
94:23,25 97:17
97:21 103:25
110:4 112:9
115:23 121:7
186:23 189:9
196:20,22
204:18,19,22
205:4,11
**hits** 94:13
122:11
**hitting** 115:25
205:6
**Hoffmaster** 1:14
1:21 212:3,21
**hoffmastercou...**
1:24
**hold** 59:17 93:17
**holding** 93:10
94:5,6 189:22
**home** 133:11

153:22 159:5,7
173:9,10 175:5
**honestly** 123:22
**Honorable** 4:16
**hood** 193:17
**hopefully** 203:16
**hour** 47:3,9,17
50:21 54:16,19
62:6 81:21
82:11 90:8
142:12
**hours** 7:9 41:9
161:5
**house** 10:7
**huh-uh** 5:12
**hundred** 54:15
54:18 59:25
**Huron** 2:5
**hurt** 20:20
**hypothetically**
164:21

———————

**I**
**I-271** 81:8
**I-71** 36:9 37:12
**ice** 97:2
**idea** 30:5,6 34:2
107:14 180:11
198:4
**ideally** 182:9
**identification**
23:4 99:21
119:2
**identified** 93:9
117:1 158:23
162:2 179:18
186:16 188:20
189:19
**identify** 103:4
118:23 158:19
159:11 161:22
183:9 198:22
**identifying**
155:15 158:7
190:17
**idling** 208:13
**Ignatius** 154:14

**ignition** 207:24
**illegible** 170:4
**illuminated**
    93:12 94:4
**image** 53:23
    70:3 97:23
**imagine** 21:7
**immediate** 39:1
    39:6 81:18
    102:17,18
    133:6,13
    136:14
**immediately**
    13:24 15:5,6
    36:22 68:5
    73:9 86:7 89:5
    91:10 97:17
    98:3 125:14
    135:23 136:25
    142:8 145:14
    194:14 199:3
**impact** 116:8
    121:6 122:18
    206:21
**impacted** 121:12
    121:20
**impacts** 120:23
    122:14,16
**implement** 87:13
    90:22 171:9
**implementation**
    177:16
**implemented**
    189:16 201:3
**important**
    160:22
**impression**
    58:11
**improve** 17:15
**improvements**
    18:18
**in-house** 9:14
**inaudible** 112:10
    112:15 114:5
    197:19,24
    198:2,10,11,16
**incidence** 186:12

**incident** 7:10,17
    9:17,23 10:4,7
    10:9,20 13:10
    13:15,24 15:6
    15:14 23:22
    30:14 34:19
    35:20 44:6,7
    113:6 119:11
    124:11,20
    125:11,15
    131:8 136:24
    137:1 141:5,15
    142:1,9 144:8
    145:6 146:19
    147:17 150:17
    150:19,23
    155:23 160:25
    161:9 165:14
    165:18 167:5
    167:20 175:9
    175:10,23
    176:11,15
    177:6,23 178:8
    178:13,17
    180:4,5,8
    182:15,18,23
    185:19 188:6
    188:12 193:8
    199:6
**incidents** 9:19
    9:22 10:2,16
    14:4 15:1
    16:21 17:12
    145:9
**inclined** 188:2
**include** 144:19
    183:5
**included** 171:18
    183:2
**includes** 195:16
**including** 65:3,8
    65:9 66:1
    88:20
**incorrect** 168:2
    168:3 171:3
    175:14,18
    176:4,22 181:8

183:15
**increase** 79:12
**increasingly**
    81:19
**INDEX** 3:1
**indicate** 26:6,16
    96:22 119:8
    144:23 145:7
    180:24
**indicated** 79:1
    137:11 148:12
    160:2 166:1
    177:4 180:1
    181:13 194:14
    194:18 196:15
    197:13
**indicates** 117:3
    171:19
**indicating**
    105:19 122:3
    189:21
**indication** 26:25
    108:20 114:1
**individual** 29:15
    106:6 201:4,23
**Individually** 2:2
**individuals**
    25:25 155:11
    164:5 174:1
**infer** 170:18
**inference** 170:20
**inferior** 164:6
    165:23 167:10
**inferred** 168:19
    170:16
**inflection** 112:15
**inform** 160:7
**information**
    10:22 11:5,15
    11:20,22,24
    30:15,25
    149:19 161:8
    176:18 177:22
**informing** 161:8
**inherently** 63:3
**initial** 66:9
    69:18 99:4

**instructing**
    24:17
**instructs** 20:17
**insubordination**
    149:1
**intended** 21:23
**intent** 74:17,18
**intentional**
    73:20 96:10,20
**interact** 135:20
**interacting**
    150:15
**interaction**
    136:13,22
**interested** 100:1
    100:2 197:17
    212:16
**interfering**
    61:15
**interior** 173:21
**internal** 14:15
    14:18,21
    125:21 126:3
    126:10,15
    128:5,9 129:3
    129:8,19 130:8
    131:4 144:9,11
    145:11
**internally** 14:5
    161:12
**interpret** 109:2
    132:11,12
**interpretation**
    73:23 82:9,10
    116:4 178:21
    204:17,21
**interpreted**
    96:10 97:13
    144:2
**Interrogatories**
    23:8
**interrogatory**
    149:9,10
**intersection**
    59:25 197:3
**interstate** 44:5

**initially** 55:3
    64:3,24 65:1
    70:15 81:25
    86:5 91:21
    113:20 120:3
    125:23 139:10
    139:20 179:10
    206:24 207:11
**initiate** 50:16
**initiated** 28:20
    29:11 36:7,20
    37:4 46:8
    168:5 179:8
    181:11
**initiating** 49:17
    68:10
**injured** 40:22,24
**injuries** 118:13
    194:18
**injury** 32:16
    118:19
**inputting** 149:18
**inquiring** 169:7
**inside** 55:16,18
    55:22 56:2
    70:23 91:9,12
    110:13 112:17
    115:9,14 118:2
    118:9 123:23
    139:21 143:5
    193:16 205:18
    206:1,11
**instances** 188:15
**instant** 112:7
    116:2
**instantaneous**
    205:8
**Instantaneously**
    205:14
**instantly** 112:7
**instinctively**
    136:11
**Institute** 24:1
**instructed** 17:15
    23:25 88:14
    150:12

**181:12 189:13**

44:25 45:1,3
53:4,4,15
55:19 71:17
95:4 121:15
136:8
**interview** 143:7
147:19,23,25
148:3,6
**interviewed**
147:11,22
**interviews** 74:5
**investigate**
142:1
**investigated**
14:5,5,6,7,13
134:10
**investigation**
14:15,19 39:20
39:24 40:2
61:22 74:6
96:22 116:3
125:21 126:3
126:11,15
127:13 128:6,9
129:4,9,20
130:8 131:4
141:24,25
142:14,15
144:10,11,16
145:11 147:12
160:24,25
161:7
**investigation's**
15:2
**investigations**
7:5 161:12
**investigative**
119:10 142:24
**involved** 7:16
8:13 9:18 10:6
10:8,10 13:10
13:14 14:25
15:4,11,25
16:2 19:8 22:1
27:17,19 31:12
32:21 34:6
36:2,5,17,19

36:25 37:9,21
37:23 38:6
56:10 66:2
71:23 79:21
85:2 88:20
90:18 118:19
124:19 125:10
126:8 144:8
145:9 151:25
160:8 161:7,11
162:5 165:15
167:6,19,25
169:7 174:23
176:20 177:1
177:16,19
178:13,17
182:8,20
200:25 201:8
**involvement**
16:20 186:20
201:6
**involves** 174:4
**involving** 9:22
10:16,21 17:12
160:24 177:2
**issue** 66:15
98:20,25 159:4
166:15 172:22
176:8,8 179:6
**issued** 72:8
**issues** 12:2 19:10
26:6 31:25
74:10 130:17
141:6 158:8,20
158:22 159:16
**issuing** 72:8
98:18
**item** 100:22,22
101:17 102:20
103:19 104:3,6
104:7 106:14
106:14 107:9
114:8,17

_____
**J**
_____
**jail** 40:23,25
**James** 2:15

**Janet** 1:14 212:3
212:21
**Jason** 2:14 8:5
**Jeff** 199:22
**job** 6:19 20:13
**jockey** 69:12
**join** 64:6
**joined** 27:14
28:14,25 56:5
56:6 64:15,23
65:1 68:24,25
134:19,20
**Jordan** 2:10
**Joseph** 2:4 4:19
**Jr** 2:3,9
**jscott@ohiow...**
2:7
**Judge** 1:6 4:16
**July** 1:9 212:18
**jumped** 53:11
**juncture** 65:25
135:3
**June** 9:9
**jury** 126:2 129:5
152:10
**justice** 155:3
**justification**
193:21
**justified** 115:19
118:4 193:7,19
206:5,12,17
**justifies** 179:1
**justify** 197:6
**juvenile** 29:3
39:11

_____
**K**
_____
**K** 2:16
**K-E-L-L-E-Y**
6:7
**Kadlec** 174:25
**keep** 24:15,22,24
33:14 52:1
58:12 59:14
146:21 177:7
185:17
**keeping** 25:10

**Kelley** 1:9,11
2:15,16 3:14
4:1,10,19,20
6:6 7:18,22,25
9:24 11:1,10
13:11 14:8
15:15 16:23
19:16 20:24
21:4,11,20
22:8 23:3,6,9
30:8 33:8
40:16 41:6
51:1 55:9,12
69:20 70:8
74:22 78:15,23
82:24 85:5
95:19 99:13,20
99:23 101:24
105:15 113:23
115:21 117:8
117:14 119:1,4
119:13 120:18
130:10 132:20
133:24 134:4
135:4,14 145:2
146:7 152:13
152:20 154:6
154:10 165:1
168:1 172:15
178:19 190:3
191:6 194:16
195:10 197:7
200:5 209:7,22
209:24 211:19
212:5
**kennel** 173:17
**kept** 27:20
128:15
**key** 203:3
**kid** 47:8 139:3
187:14
**kids** 140:5,8
**killed** 207:17
**kind** 11:18 14:22
35:14 40:6
44:19 51:21
56:23 60:22

65:16,17 75:16
82:12,13 84:12
93:2 102:5
126:3,16
127:10 128:1
129:10 130:17
151:13
**knew** 52:25 65:1
65:5 82:6
159:2 161:8
175:22 176:1
187:15,24,25
195:1 199:18
**knocked** 120:13
**know** 5:12,25
7:13 11:4,5,12
11:13 12:1,21
13:21 15:17,23
16:25 17:21
18:6,10 19:21
20:17 22:19
24:12,13 25:6
27:9,12,15
29:15 33:10
36:11 38:9,11
38:12 39:11,13
39:23 40:11,12
40:14,21 44:18
45:6 46:22
47:14,16,18,23
48:5 49:13
50:12,19 52:23
60:22 64:14,25
65:20,22 66:14
67:5 68:18
69:5,8 71:8,12
71:22 73:8
74:9 80:11
81:7,7 84:12
85:7 88:9,9
89:17,19 90:23
91:9,20 92:3,7
92:11,12,13
93:4,4,15 94:3
98:24 101:16
103:5,6 104:10
104:14 105:7

105:10 107:8
107:20,21
109:4,4 110:12
110:18 112:13
112:14,22
116:3,3 117:8
118:5,8,20
120:20,21
121:23 122:7
122:15 123:12
124:11,12
128:7 129:5,6
129:12 130:21
131:6 135:25
136:5 137:16
137:24,25
138:4 141:2,25
142:12,19,21
142:22 143:18
145:24 146:1
146:20 150:3
150:13,21,23
151:1,11,13
152:9,25 157:9
157:14 158:8
161:18 165:10
173:1,15
174:23 176:6
177:22 179:17
187:9,9,11,22
191:17 194:24
195:10,12
198:12,14
199:14,16
201:3,3,5,12
201:14,15,16
201:19 202:2,9
202:17 203:17
206:19 207:13
207:19 208:17
**knowledge** 11:16
12:15 14:14
18:8 39:19
113:7 118:18
125:1 131:7
142:23 160:19
162:16,22

200:24 201:6
**known** 153:15
**Kobak** 2:15
127:5

---

## L

**L-N-A** 163:5,6
**L.P.A** 2:17
**labeled** 40:4
100:23
**lack** 13:21
164:14 169:24
**lane** 46:15,15,17
46:20 48:16,20
56:16,20,23
57:1,2,3,7 64:2
64:2 75:12,13
75:14,14,14,14
75:15 76:1,1,2
76:7,9,12,18
76:22 77:8,10
77:12 79:12,14
79:19,25 81:12
181:15 186:17
186:18 187:3,5
**lanes** 52:9 53:17
53:18 59:1
68:8 75:14
77:10,11,16,20
84:16 97:10
190:16,23
**language** 26:15
132:1 178:9
**lap** 44:4 45:2
**laptop** 117:11
203:15
**large** 25:4 87:16
**lasted** 38:9
**law** 2:4 6:15 9:3
110:16 146:21
181:9
**lawsuit** 12:5
**leader** 19:6,7,23
**leadership** 19:21
**learn** 43:25
136:1
**learned** 123:10

123:16 138:1
146:19
**leave** 15:1,14,22
74:7,13 124:24
125:1,3 137:13
137:20
**left** 39:6 51:25
52:4,8,16 53:1
57:25 58:2,3
58:18,25 59:13
68:13 70:4
75:25 76:13
86:1 87:14,14
87:18,21 88:1
88:10 91:8
94:23,25 95:3
95:16 96:5,19
121:15 138:18
141:9 154:18
188:17
**left-hand** 58:19
59:24 181:18
**left-side** 82:12
**leg** 61:23 64:7,15
65:2,20
**legal** 155:5
**legs** 136:9
**length** 55:13
**lengths** 27:22
54:23 55:1,6,8
60:8
**let's** 13:15 55:25
63:16 65:10
72:10 74:24
139:3 169:17
175:19 180:9
187:19 198:11
**lethal** 22:5
133:18
**letter** 129:15,16
130:23
**level** 29:21 152:4
152:7
**license** 55:4,5,5
56:1 179:15
**lieutenant** 10:5
16:4,6 18:3

133:5,9 151:15
160:4,6,7
164:18,22
**life** 16:17 63:9
**light** 44:17 45:21
45:21 51:24
52:4,8 62:11
62:13 67:16
77:22 78:1
93:12
**lighting** 113:17
114:2,5,11
144:1 191:2
**lights** 50:2 52:11
56:23 66:14
130:3 181:25
182:1 194:1
**liked** 89:16
**limit** 21:24 22:13
47:11,14 48:24
**limitation** 13:5
**limited** 146:17
**line** 46:17 47:22
70:5,11 111:9
111:11 131:15
131:21 133:19
136:19 159:24
165:24 211:3
**lines** 159:10
**list** 157:16
**listed** 100:22
**listen** 199:2,5
**listened** 7:8
61:21 180:23
**lit** 113:10 143:6
**litigation** 4:21
22:23
**little** 9:3 28:18
42:5 51:22
65:14 67:6
76:6 79:7,25
94:23 110:7
111:18 135:15
137:8 138:15
177:9
**living** 18:17
**LLC** 2:4

**LLP** 2:10
**location** 46:14
**lock** 47:2
**Lodi** 28:6,15
29:1 30:14
31:8,16
**logical** 27:2
**logistics** 13:23
14:2 68:16
**long** 6:11 38:9
60:15 68:18
69:9 100:19
107:8,8 153:2
153:15 155:21
170:12 191:16
191:18
**longer** 96:24
**longest** 27:25
28:2
**look** 22:12,20
26:11,22 40:11
60:9 61:8 78:8
99:25 100:3,18
100:21,21
103:17,19
104:6 109:21
111:5 119:6
129:6 181:21
185:6,7 202:23
**looked** 8:25 9:1
94:5,6 144:16
192:10
**looking** 26:19
75:24 82:13
87:23,24
116:10,23
**looks** 110:13
150:5
**loses** 86:6,7
**losing** 89:12
**lost** 11:18 50:13
52:4 96:23
**lot** 10:11 57:6
109:3 128:17
**lots** 150:10
**lunch** 135:10

**M**

**M** 1:14 2:16
    212:3,21
**M-hm** 92:5
**Madison** 28:21
    30:16
**maintain** 31:22
    32:4 34:22
    48:16 57:2
    60:7 63:6 64:1
    82:17 89:8,13
    89:20 91:15
    95:7 96:6,16
    204:1
**maintaining**
    32:15,22 54:24
    55:2 146:16
    204:5
**making** 17:17
    18:3 46:6
    58:25 71:17
    82:14 101:9
    122:5 141:7
    151:3
**male** 93:11
    114:4
**mall** 167:1
**management**
    156:7,8
**managing**
    141:15
**mandate** 203:10
**mandated** 24:11
    24:12,13
**maneuver** 48:22
    60:20 67:17
    70:10 71:2
    77:25 171:10
    171:11,22
    185:10 200:20
    201:9
**maneuvered**
    79:2
**maneuvers** 78:2
    78:12,12 79:16
    79:22

**manila** 40:7
**manner** 125:20
    126:11 190:8
**mannerism** 93:3
**mannerisms**
    26:5,8
**manufacturer**
    178:1
**marathon** 78:19
**March** 6:13 7:17
    8:6,22 9:9,17
    9:23 10:3
    17:22 18:1,10
    23:20 27:16,24
    27:25 35:9,20
    36:3,12 41:4,6
    41:7,10,11
    78:24 119:16
    126:7,21,25
    127:15 133:6,6
    142:7 147:12
    150:23 155:23
    161:1 165:14
    167:6,20 175:9
    200:9,18,21,25
    201:2,8
**Marcus** 2:10
    116:24 152:20
**marcus@jord...**
    2:13
**mark** 10:5 99:17
**marked** 3:8 23:4
    23:6 99:21
    119:2 133:4
    169:22
**marker** 45:5
    47:23 48:4
    49:13,16 57:12
    60:11 64:19
    68:19 71:8
    80:19,22 81:5
    81:7,9 102:21
    104:4
**markers** 45:8
**marking** 119:20
**marred** 101:21
**married** 153:11

**master's** 154:17
    154:23,25
    155:6
**match** 51:6
**material** 151:16
    151:20
**materials** 6:24
    24:15,22 25:3
    25:11,16
    124:15
**matter** 4:10
    132:22 133:1
    165:18
**maximum**
    203:11 204:1,5
**Mazanec** 1:17
**mean** 7:13 19:2
    32:20 43:15
    50:22 53:6
    63:17 68:7
    76:25 77:4
    78:19 88:4
    93:20,21 101:6
    102:4,10,13
    105:19 122:11
    125:2 140:13
    141:2,20
    143:16,22,23
    144:2 185:16
    188:1 197:24
    198:7,10
**meaning** 83:23
**means** 5:12 19:3
    101:16 104:14
    108:19 165:9
    165:10 167:10
    180:16 188:2
    197:21
**meant** 73:25
    92:15 143:17
    143:20 190:14
**measure** 205:15
**measures** 17:14
    20:19 189:9
**mechanically**
    173:19,20
    188:2

**median** 64:12
**medical** 41:1
**Medina/Cuya...**
    47:21
**meet** 7:14 8:3
    148:5
**megaphone** 29:4
    29:5,18
**member** 6:11
    18:5 145:10
    146:25
**members** 7:15
    10:17 12:15
    19:11
**memory** 24:2
**mental** 16:17
    25:25 26:6,7
    26:17 27:3,5
    67:3 70:3
    97:23
**mentioned** 120:2
    127:22 133:3
**mentioning**
    13:13
**merge** 60:18
**merged** 53:18,21
    54:2
**merging** 53:17
**mess** 130:18
**messing** 143:9
**metal** 50:15
**mic** 128:14
    129:1
**microphone**
    43:18,19,24
    110:11 128:11
    129:21 144:13
    145:1
**microphones**
    129:12
**middle** 45:3
    46:17 75:14
    76:1 136:8
**Middleburg**
    57:10
**mild** 44:16
**mile** 45:5,8

**median** 64:12
47:23,25 48:4
    49:13,16,17
    57:12 60:11
    64:19 68:19,21
    69:8 71:8
    80:19,22 81:5
    81:7,9 102:20
    104:4
**miles** 47:3,9,17
    50:21 54:15,18
    62:6 64:4
    68:23 69:8
    80:13,17 81:14
    81:15,21 82:11
    87:9 90:8
**military** 41:19
    155:8
**military's** 164:2
**Miller** 2:15,22
    8:5 36:21,25
    37:7,8,21 38:4
    38:14 65:16
    67:4 73:10,11
    73:13 75:16,19
    77:2 91:4
    98:23 99:5
    101:11,12
    110:19,21
    111:7,10,13,14
    111:17 112:10
    112:11,18
    115:10,24
    125:2 152:10
    153:15,17,20
    153:22,25
    162:9,20 163:2
    164:15,24
    168:6 169:2
    170:7 171:5
    172:17 174:22
    176:19,23
    186:10,13,15
    186:23 187:3
    189:1,14 195:1
    197:10,13
    199:18 207:7
**Miller's** 8:18,22

10:10 69:13,15
69:18,24 73:19
75:18 76:10
102:14,17
163:9,13 192:2
**millisecond**
117:25
**mind** 13:25
67:11,11 79:5
79:11 86:24
87:7 107:7
108:6 115:12
144:3,22
145:14
**mind's** 28:13
**mine** 159:1
198:15
**minimum** 42:12
189:7
**minute** 99:25
107:18 119:6
146:14
**minutes** 60:17
113:18 116:13
117:6 118:23
**mirror** 56:24
58:3 59:13
120:13,14
192:15,22,23
**misheard** 161:4
**missing** 186:5
**mistake** 18:13
**mistaken** 130:24
208:1
**mistakes** 18:19
**misting** 44:19
**moment** 59:10
62:15 84:21
110:16 115:12
159:24 167:22
169:2 172:25
187:19
**moments** 69:22
117:16
**monitor** 66:20
**monitoring**
37:14 44:24

45:25 47:12
149:14
**months** 6:19
9:10 17:20
125:25 126:6
188:8
**Moran** 7:3,4,9
95:1 97:7,24
112:6,19
147:24 148:2
161:6,14,25
**morning** 5:8 7:9
41:9,22 44:8,8
44:10 45:19
147:18,18
172:20
**motion** 48:20
97:13 103:9
113:22 204:25
208:11
**motor** 28:5
130:18,20
178:6
**motorcycles**
184:18
**motorist** 79:15
145:16 202:12
**motorists** 32:7
62:22 63:1,10
63:21 78:5
90:19
**move** 86:6,10
91:6,7
**moved** 96:4
97:20,20,21
196:20,21
**movement** 70:22
71:1
**movements**
206:1
**moving** 46:1,20
67:11 94:22
112:4 122:14
171:21,22,25
185:15,25
194:4,12
195:13,18

208:10,25
209:1,6
**muddy** 88:8
**multiple** 183:25
**Murphy's**
110:16

## N

**name** 4:19 6:5,6
6:6,7 10:5 40:8
40:13,14 43:1
135:25 136:1
152:20 161:23
174:25 196:8
**names** 64:25
**natural** 150:25
196:13
**nature** 8:21 15:2
34:23 125:7
129:13 150:1
**near** 163:8
**necessarily** 85:3
151:24
**necessary** 21:24
22:13 167:2
**need** 18:18
21:14 34:14
105:9 117:9
**needed** 17:14
**needlessly** 20:23
20:25 21:8,19
**needs** 63:20
179:3,4
**negotiate** 190:5
**Nettles** 43:1,4
**network** 17:7,9
**never** 37:9,17
78:5 127:18,19
127:23 128:3
139:6 145:5
170:19 172:12
179:21 186:2
**new** 35:24 54:13
54:13 131:23
157:17 187:25
**night** 41:16,22
42:14,19,23

44:15 175:5
177:25
**nobody's** 11:14
**nod** 5:11
**noise** 198:19,21
**non** 178:9
183:21 187:23
**normal** 26:21,23
113:16,19
173:12 176:3
176:21 184:14
**normally** 196:8
**north** 24:1 36:23
37:1 46:14
47:19 51:11
53:3,5,6,7,8
55:23 56:1,8
56:16 57:8
59:21 64:8,16
81:8 104:22
**north/south**
58:22,23
**northbound**
39:5 45:16
46:9 50:21
53:10,11,19
54:2,7 59:2
91:21
**northern** 1:1
4:15 104:17
**nose** 98:12
**Notary** 1:15
211:24 212:4
212:21
**note** 211:2
**noted** 150:2
**notice** 1:16
189:16
**noticeable** 16:16
**noting** 153:6
**number** 5:2,9
24:4 31:24
34:7 40:8,9
45:9 46:15,19
60:17 65:5
87:8 101:13
104:7,16 114:8

114:17 126:6
134:19 157:8
186:17 188:8
188:25 190:7
202:12
**numbered**
100:21
**numbers** 45:13
101:5

## O

**o'clock** 41:22
42:1,2 44:7
**O'Deens** 133:5,9
151:15 160:4,6
160:7 164:18
164:22
**Objection** 7:18
9:24 11:1,10
13:11 14:8
15:15 16:23
19:16 20:24
21:4,11,20
22:8 30:8 33:8
51:1 55:9 70:8
74:22 82:24
85:5 95:19
99:13 113:23
115:21 120:18
130:10 145:2
146:7 154:6
165:1 168:1
178:19 190:3
194:16 197:7
209:7
**OBJECTIONS**
3:13
**obligated** 159:11
**obligation**
180:25 195:17
**obscure** 102:5
**observation** 58:8
143:24
**observations**
151:11
**observed** 83:2
84:8 86:12,20

115:19
**observing** 143:5
**obstruct** 74:10
**obstructing**
207:24
**obviously** 5:8
12:2 13:20
31:18 43:25
44:1 60:25
67:4 89:18
92:23 108:13
119:19 122:11
174:25
**occasion** 127:14
**occupant** 92:18
92:21
**occupants** 29:2
29:3 32:13
85:1 92:17
123:6,9 180:11
**occupied** 84:15
186:10
**occur** 129:2
195:2
**occurred** 7:10
10:11 28:17
40:12 41:8
70:12 73:10
94:24 103:10
110:4,7 112:25
115:7 118:9,10
122:11,14,16
123:12 129:3
130:21 143:18
147:17 165:14
181:9 182:15
186:15 187:2
192:14 194:24
**occurring** 8:23
95:2,21 103:1
113:15
**occurs** 116:9
**October** 212:22
**offense** 34:7,23
66:3 179:20
**offered** 176:18
201:22,23

**office** 128:14,20
212:18
**officer** 2:22 6:17
8:18,22 9:12
9:15 10:5,6,8,8
10:10,10,21
13:14 15:12,21
16:16 17:24
18:2 19:7,24
20:13,25 21:8
21:15 24:14
28:23 29:21,24
30:17,18,21
32:3 36:20,25
37:7,7,20,24
37:24,25 38:4
38:5,14 65:15
65:15,15 67:1
67:2,4,5 69:13
69:15,17,23
72:15 73:10,11
73:12,19 75:16
75:18,19 76:10
77:2 90:20,25
91:3,4 94:12
98:23 99:5,6
101:11,12
102:14,17
104:15,16,17
106:4,6 110:19
110:21 111:7,9
111:13,14,17
112:9,11,18
113:21 114:21
115:10,24
118:18 125:2
128:4 130:14
130:16,25
133:22 134:7,9
138:3 144:20
145:15 147:5
149:12 150:9
152:9 153:15
153:17,20,22
153:25 154:4
159:2,17 162:9
162:20,24

163:2,3,7,9,10
163:13 164:15
164:23 165:20
166:15 167:18
168:5 169:2,7
170:7 171:5
172:17 174:8
174:22,22
176:19,23
186:10,13,15
186:23 187:3
188:25 189:13
191:21,24
192:1,2 195:1
197:9,13
199:18,22,24
201:24 204:1,5
207:7
**officer's** 165:11
**officers** 9:23
12:12 13:9,13
14:25 17:12
19:17,23 20:5
20:22 21:13
24:4 29:13
31:3 32:17,23
33:7,15 34:1
37:20 38:4
42:10,13,16
43:6 64:6,8,23
64:25 66:1
68:24,25 69:6
79:21 80:1
81:11 84:18
85:4,9,22
86:16 88:15,20
89:15 94:9
113:4 124:25
133:17,18,22
142:19 143:4
149:15 150:6
159:12 162:2
164:7 165:23
166:2,6,20
167:10 171:13
171:19 173:4
175:1 182:7

189:14 195:17
195:21 196:3
196:11 200:24
201:8,13,17
203:10
**officers'** 142:25
**official** 125:8
141:14
**officially** 181:3
**officials** 148:5
**offset** 70:4
**oh** 2:6,12,18
78:17 104:15
114:1,18
**Ohio** 1:1,16,18
1:22 4:15 9:6
38:23 45:12
57:9 64:16,17
71:19 72:5,22
212:1,4,18,22
**oil** 177:12
**okay** 5:7,13,14
6:2 7:25 8:10
10:15 12:12
13:2 14:21
18:14,24 20:7
22:17 26:8
28:7,12 31:6
31:13 35:23
36:24 45:5
47:4 48:9 49:6
50:10 51:10
52:6 53:8,13
56:15,25 57:19
61:13 64:5,11
65:24 66:7
71:5,11,13
74:3 75:3
76:25 77:23
78:14 81:16
82:10,21 83:11
83:16 85:9,24
87:19,23 88:11
89:5,17 90:11
90:24 91:14
92:20 93:24
96:15 99:4,23

100:14 101:17
102:23 103:18
104:13,15
105:12 106:10
109:7 112:8,17
114:25 115:25
118:7 119:7,12
120:22 121:8
121:16,24
122:10 124:13
124:16 126:4
128:3 130:4
132:16 133:12
139:1 144:25
148:12 151:14
153:2,9,10
154:10 156:21
159:20 164:13
167:5,18
168:10 169:13
170:2,6,25
172:2 173:10
174:10,12
175:20 176:7
177:4,8,10,14
177:16 182:6
183:18 184:8
184:21 186:4
187:2 191:1,25
192:5 197:2
198:18 202:14
205:6 206:16
207:5,18 208:5
208:19 209:2
209:16,25
210:3
**old** 110:25
177:14,17
**on-the-field**
185:1
**on-the-job** 35:19
35:21
**once** 50:17 55:4
98:19 106:24
116:5 121:13
143:8 159:17
180:18 188:5

204:18
oncoming 59:20
one's 109:7
one-on-one
 127:15,23
 151:5
online 154:22
open 110:21
 111:6,8,13
 115:10,23
opened 205:23
opening 112:9
openings 157:14
 157:15,16
opens 206:10
operate 19:4
operated 43:24
 186:4,14 192:3
 196:24
operating 19:12
 46:7 76:11
 119:16 131:18
 132:17 162:6
 174:8 175:10
 176:21 186:15
 187:3 190:8
operator 181:6
OPOTA 154:3,7
 154:9
opportunities
 22:13
opportunity
 7:14 8:3 19:18
 22:4 128:22
 152:15 170:14
 188:4 191:19
 209:23 210:2
opposed 5:11
 22:6 29:21
 70:23 71:2
 127:11
opposite 163:1
option 32:19,25
orchestrated
 72:2
order 67:19 68:5
 90:2 147:3

164:21,22,23
166:15 169:1
169:14 170:25
171:2,2,9
172:13 186:11
ordered 89:22
 90:4
ordering 167:10
orders 164:6
 165:4,23,23
 167:9,15,19
 171:4,8
ordinances
 156:11
ordinary 125:13
organization
 18:17 19:3
organizational
 19:4
originally 27:10
outcome 39:20
 39:23 146:3
outcomes 129:8
 129:19
outdated 178:5
outside 14:6
 30:21 123:24
 136:3 153:17
 153:25 178:14
 178:18 181:10
 188:13
outweighs 179:4
overall 45:18
overarching
 179:6
overhead 182:1
oversee 65:23
owns 91:25

———————
P
P-L-U-T 163:10
P.M 210:5
PA 99:10
pack 43:18,19
 43:24
page 100:3,21
 103:17 106:10

106:13 107:9
114:8 211:1,3
pages 3:2 100:19
 100:20
paint 111:3
pair 46:13,18
panel 193:25
parameters
 152:9
paramilitary
 163:22
paranoid 155:16
parent 2:2
park 207:14
 208:22,24
parked 45:1,3
parking 10:11
 128:17
part 22:22 33:23
 50:11 63:5
 74:5,12 75:20
 97:13 100:1
 107:1,3 108:22
 108:24 113:25
 119:10 121:11
 121:20 147:2,4
 151:23 180:25
 200:20 202:13
partially 98:8
participate
 132:18
participating
 126:10
participation
 75:20
particular 28:9
 36:7,20 37:21
 42:14,23 49:2
 50:11 62:15
 84:7 100:1
 110:16 134:10
 146:6 178:3
 185:18 201:7
 201:24 203:22
 204:2
parts 158:12
party 134:24

212:15
pass 57:9 61:15
 90:16 156:12
 157:4,10
passed 47:6
 48:17 61:3
 91:1 157:13,23
passenger 68:2
 83:3,5,10 84:4
 84:9 85:20
 87:14,15,21
 91:5 93:1,9
 95:25 96:1,1
 98:10 105:1
 108:10 111:6
 121:22 122:1,5
 122:17,19
 123:3 192:10
 192:16,20,22
 193:25
passing 35:13
 46:23 61:7
 75:14,25 76:7
 93:25 102:20
path 98:10,14
 196:24
Patricia 1:6 4:16
patrol 9:6,12
 16:5 17:12
 31:12 38:23
 42:13 43:6
 44:12 71:20
 72:5,22 139:22
 145:15 147:5
 149:12 159:2
 159:12,17
 165:11 166:3,6
 166:15,20
 184:14
patrolling 44:21
 44:22,23
Pauley 2:2,23,23
 93:4 112:24
 123:2 134:22
 139:9,9 199:21
paused 110:13
PD 100:7

peace 110:25
 111:6
peacefully 22:14
Pearl 49:6 57:10
 57:14,22 58:10
 58:21,22 59:22
 62:17 63:19
 64:17 68:21,23
pedal 50:14
pending 4:14 6:2
Pennsylvania
 55:5 91:23
 181:25
people 12:6,8
 15:10 19:14,25
 20:14 83:19,20
 90:18 134:19
 183:25
perceived
 143:12
percent 156:14
percentage
 157:6,7
perform 19:20
 75:9 88:15
performance
 17:16 144:19
 201:10
performed
 200:14,20
performing
 29:10 74:4,12
 102:25
period 15:14
 35:24 76:22
 80:11 124:25
 146:17 162:10
perpendicular
 162:11 197:3
person 13:20
 19:5,6 26:6
 29:18 30:11
 93:1,7,10,18
 93:19 94:1,6
 123:1 145:16
 159:4,7 162:17
 174:4

**personal** 12:13
   12:16,20,22,24
   12:25 13:5
   16:17 140:10
   140:15,18,22
   140:25 141:7
   141:17,19,21
   142:16,16,20
   142:25
**personally**
   115:11,19
   124:6 135:19
   167:25 186:4
   186:14 188:11
   188:13 193:6
**perspective**
   95:20,21
**phone** 12:9,13
   12:17 93:2,3
   93:10,13,15,19
   94:4,6 126:22
   127:7,11
   140:10,15,18
   140:22 141:1,8
   141:21 142:16
   142:17 148:7,9
**phones** 12:20,22
   12:24 13:1,6
   142:20,25
**photo** 122:2
**photograph**
   120:10
**photographs**
   6:22 12:25
   119:5,8,14
   120:1,7 121:25
   122:22 192:10
   192:19
**photos** 12:25
   119:17
**phrase** 62:2
**phrased** 193:6
**physical** 26:17
   118:19 121:6
**physically** 37:17
**picked** 76:24
   136:11 199:15

**Pickup** 184:17
**picture** 70:11
   79:11 111:3
**PIT** 171:21
   185:10
**place** 13:17 21:8
   23:24,25 75:8
   114:17 136:15
   136:17 139:18
   147:23 167:6
   178:8 182:22
   195:17 196:4
   196:11 203:11
   212:10
**placed** 15:1
   16:21 29:19
   124:24 125:1,3
   138:19 173:18
   204:19
**placing** 20:22,25
   21:18
**Plaintiff's** 1:4 2:8
**Plaintiff's** 3:8
   23:2,7 99:18
   99:19 100:6
   118:25 119:14
   133:4 169:22
**plaintiffs** 1:13
   2:2 4:3 134:23
**Plaintiffs'** 23:8
**plate** 55:4,5,5
   56:1 91:22,23
   91:25
**platoon** 43:9
**play** 16:14 90:25
   117:11 159:6
   180:19
**played** 117:12
**playing** 117:10
   158:15,17
**pleadings**
   152:21
**please** 4:7 5:10
   5:19,25 6:4
   25:13 33:21
   78:18 99:25
   100:3 119:5

153:4
**plural** 106:21
**plus** 65:3
**Plut** 65:15 67:2
   91:3 104:15,16
   104:17 138:5
   163:10 191:21
   191:24 192:1
**point** 9:16 25:10
   30:20 47:14,15
   51:16 52:12,13
   54:10,15,25
   55:25 56:3,7
   56:13 57:4,8
   58:1 60:16
   63:17,19 64:1
   64:5,12 65:1
   66:2 69:20,25
   70:16,25 71:6
   75:2 76:15
   77:1,14,19
   79:6 80:3
   81:13 84:7,11
   84:17 86:24
   87:2,8 89:17
   89:19 91:12
   92:8 96:18
   98:23 102:23
   102:24 105:8
   107:5 111:16
   111:22,25
   112:4 115:9,18
   118:2,5 120:2
   121:23 122:24
   123:12 138:11
   143:18 156:16
   161:11 188:20
   190:13 192:13
   192:15 196:17
   206:4,9 208:3
   210:1
**pointed** 111:20
   191:1
**pointing** 192:22
**points** 85:15
   121:17
**police** 1:17 6:9

6:12 7:15 8:8
   9:7,22 10:17
   10:21 12:16
   14:17 16:9
   18:5 19:17,20
   20:13 21:13
   24:5 25:5
   29:11,12,17
   30:17,18,21
   31:3 32:1
   39:21 42:10
   43:21 56:6
   64:6,23 65:12
   65:18 66:1
   68:1 77:12,17
   79:20 85:21
   88:19 118:3
   119:20 125:19
   125:22 126:20
   127:22 130:9
   133:16 138:20
   140:3 141:10
   141:11 144:23
   145:10 146:12
   147:3,16
   149:14 150:6,9
   154:3 156:2,7
   163:18 173:12
   173:19 175:16
   176:3 177:25
   183:13,24
   184:15 190:24
   201:11
**policies** 12:19,21
   16:15 74:15
   131:8 156:10
   182:18,22
   195:11
**policy** 8:7,9,10
   8:12 11:8
   12:23 17:3
   18:22 31:19
   129:11 131:11
   131:12,15,19
   131:21,24
   132:1,7,13,14
   132:15 146:16

150:3,4 151:17
   151:20 165:3
   172:18,22
   175:8,15,19,23
   176:2,8,10,10
   176:11,16,20
   177:2,5,17,19
   177:23 178:4,7
   178:14,18,23
   179:5,6 182:6
   182:9,15
   185:22 195:11
   195:14,16,19
   195:21,24
   196:2,3,6,7
   202:11,13,15
   202:20,23
   203:10
**Polytechnic** 24:1
**portion** 44:2
   50:21 119:15
   121:1,24
   159:15 162:5
   162:10 175:7
   199:2
**position** 15:18
   19:18 56:22
   58:2 68:11
   69:12 73:15
   75:2 76:16,18
   84:19 85:22,25
   87:14,18 88:11
   88:23 89:6
   91:4,5 94:11
   94:22 111:18
   116:22 122:21
   122:23 195:18
   195:22 196:4
   203:11
**positioned** 65:11
   65:12 70:2
   137:12 163:12
**positioning**
   75:18,19 89:11
**positive** 103:22
**possible** 22:15
**possibly** 48:23

66:5 87:4
151:17 207:15
**posted** 47:11
**potential** 85:7
**potentially**
20:21 25:21
27:6,8 160:3,6
**power** 130:2
**powerful** 110:11
**practice** 140:14
185:2 200:15
**preparation**
7:23 8:2
**prepared** 7:11
102:2
**preparing** 6:20
**present** 2:22
37:17 135:22
159:16
**presented** 32:22
33:6,24 62:18
62:21 89:14
**presents** 32:16
63:20
**pretty** 34:17
44:16,17 63:12
63:13,13,14
124:22 128:1
190:22
**prevented** 209:5
**previously** 10:12
133:4
**printed** 100:15
209:25
**printouts** 100:10
**prior** 6:16,25
7:20 17:22
18:1,10 28:16
30:14 36:3,5
46:3,4 50:19
68:10 85:19
89:5 92:16
95:5 98:17
99:12 113:2
114:15,16
116:9 117:17
132:1 145:6

147:22 148:3,6
156:1 161:14
168:24 170:14
170:25 171:6
171:12 176:15
176:23 177:24
186:20 189:11
191:12 192:6
193:1,24
196:18 199:3
199:12 200:7
200:16,21
201:2,6
**prisoner** 184:17
**prisoners** 173:25
**privilege** 4:20
**probable** 66:9
146:1 181:12
**probably** 17:20
36:15 48:1
55:6 84:5 91:3
105:20 107:19
152:21 153:6
156:15 159:10
189:25 204:3
**problem** 105:23
158:16,19,21
**problems** 105:18
110:15 150:8
155:12 159:5
189:21 190:6
**procedure** 1:14
16:14
**procedures** 13:9
124:18 125:10
156:11 202:24
**proceed** 5:8
**proceeded** 31:7
58:16 62:15
94:9
**proceeding** 53:8
78:24
**proceeds** 59:21
59:22
**process** 35:21
91:5 102:25
137:5 212:7

**processed** 84:21
**produced** 119:9
**Professional**
1:15 212:3
**profile** 58:3
59:13 82:13
**profiling** 145:17
**program** 154:23
201:25
**prohibited** 132:3
**promotional**
158:12
**Promotions**
156:4
**proper** 99:7
**protect** 21:14
**protection** 29:21
**protocol** 9:14
29:9
**protocols** 13:8
13:17
**provide** 29:20
**provided** 202:11
**provisions** 71:17
**proximity** 46:25
**pseudo-military**
163:24 165:8
**psychiatric**
155:12
**psychotic** 155:16
**public** 1:15 2:11
21:14 32:2
63:3 179:3
211:24 212:4
212:21
**pull** 48:9 97:11
98:9
**pulled** 29:1
48:19 49:3
97:16 98:4,11
108:15 168:16
181:13 193:23
194:2
**pulling** 98:2,7
145:18
**pulls** 98:2,14
**purchasing**

177:24
**purged** 146:18
**purpose** 10:25
11:15,22 135:3
**purposes** 11:7
**pursuant** 1:16
**pursue** 34:2 50:1
50:2 179:3
184:13
**pursued** 28:24
29:1
**pursuing** 28:19
50:14
**pursuit** 8:9,10
8:11,13,16,19
8:23 27:16,23
27:24,25 28:1
28:2,5,9,16,16
28:20,25 29:15
31:7,14,16,19
31:22,23 32:4
32:16,18,21,22
32:24 33:5,24
34:6,23 36:10
36:12,19,20
37:1,10,21
38:9 39:15,20
40:12,22 44:2
49:17 50:11,12
50:22 54:24,25
55:2 56:6,7,11
57:8 60:10,15
61:23 62:5,15
62:18,21,25
63:6,11,16,20
63:24 64:6,7
64:15,23 65:1
65:17,19 66:20
72:14,16 75:4
78:5,24 79:11
80:2 81:4
84:12 85:11,13
86:25 87:8
90:5 91:20
92:10 93:8
97:12 98:23
100:16 103:10

104:18 106:4,7
108:6 113:18
117:17 118:13
118:19 125:19
126:12 127:17
131:11,14,19
132:4,18
133:10 135:16
143:3,13
144:16,20
148:9 162:3,13
162:21 163:11
163:15 165:15
165:20 167:11
167:16,25
169:4,8,25
172:18 175:19
176:2 178:1,2
178:4,6,9,9,13
178:17,23
179:2,8,19
180:5,9,15,15
180:19,24
181:3,3,11
182:8,20,24
183:20,21,22
184:3,12
186:21 187:23
187:23,25
188:3 194:13
195:11 196:12
196:16 197:3
200:9,25 201:7
201:8 203:18
**pursuits** 8:8
27:17,22 36:2
36:5 63:2
131:12,22,24
132:2,14
175:16 176:11
177:2,17,20
182:18 184:23
185:2,8,25
**pushed** 121:14
**pushes** 95:3
**put** 21:16 72:5
97:18 136:17

140:4 196:11
196:21

**Q**

qualified 212:4
quality 150:10
quarter 193:25
quasi-military
19:4 163:23,24
question 5:20
6:1 10:13 14:2
21:22 33:10
63:12,14 80:15
83:22 84:2
109:1,2 121:4
125:12 128:7
134:1,5 148:11
149:5 168:6
171:23 183:19
190:15 191:10
192:18 193:12
196:14 199:20
questioning
135:15 152:24
159:24 163:19
165:24 172:3
177:5 197:11
questions 5:2,9
5:11,21 105:21
152:14,17
153:5 155:10
158:7 162:4
163:17 165:22
180:14 190:7
200:6
queue 105:8
116:12 117:1
204:11
queued 117:5
quick 159:3
quickly 54:12,14
54:21 69:11
124:1 182:14
quite 11:24
20:14 21:22
49:25 67:12
88:6

quote 73:17
166:2,2 171:14
176:3 180:15
183:9 190:18
197:14

**R**

racial 145:17
radar 47:1,1,2
radio 36:24
37:15 67:18
71:23,24,25
72:4 73:11
83:23 84:6
91:25 98:24
99:15 100:7,15
101:22 102:8
103:21 105:6
108:9 110:5,14
110:15 113:25
114:3 115:8
124:2,2 168:4
168:7,21
188:24
radioed 56:10
rain 44:17,18,19
44:20
rammed 73:12
191:14 192:8
206:7
ramming 73:18
192:25
ramp 48:21
49:20,24 51:10
51:20,21,21,25
52:3,7,14 53:2
53:2,14,16,16
53:24 54:6
57:21,22,23
60:1,2,3,4
181:15,17
ran 164:1,2
range 43:20
128:15
rank 19:6 147:7
164:3,4,5,10
ranked 157:8

ranking 19:7,24
128:4 165:8
ranks 10:23 16:7
19:5 164:10
Raskin 2:16,17
134:20 195:5
rate 36:22 38:12
190:2
rated 8:20
131:14 178:1,2
178:4,6,9,9
183:21,21,22
184:12 187:23
187:25
rating 188:1
reach 207:22
reached 28:14
207:16
reaching 113:5
113:22 114:3,4
114:5,10 143:5
206:25 207:16
reacquired
181:21
read 55:4 101:3
101:18 202:16
203:13 210:2
211:1
reading 74:15
106:18 132:7
168:13
really 63:9 75:1
97:22 123:14
128:11 192:15
204:11 206:7
realm 166:19
rear 84:5 163:8
163:9,12
174:15
rearview 192:15
192:22,23
reason 5:25
16:16 33:18,22
34:10 38:16,19
66:7 110:6,12
145:18 179:19
196:6 209:17

reasonable
196:10
reasons 34:7
Rebuilt 177:14
recall 17:17
23:16 26:2,4
26:10 28:3,4,4
30:19 31:9,10
31:14 36:7,10
38:3,5,7,11
39:4,16,18,25
42:6 43:14
44:14,16 45:21
46:6 49:21
53:23 54:1
56:16,18 57:4
60:6,21,21,23
61:8 62:10,12
62:13 64:22
68:7,7,8,13,15
68:22 69:1,2
69:23,24 71:15
71:16 75:21
77:8,22 78:10
79:18 84:10
96:2 98:15,17
99:15 105:10
105:14 107:18
113:3,11,14
115:3,7 116:2
122:8,9 123:15
123:18,24,25
124:7,8 125:25
126:1,19
127:25 130:14
135:24 140:21
141:2,7,13,18
141:20 143:7
145:13 146:13
146:13,15
148:10 154:2
155:12,14
157:6,7,7
158:4,5,22
159:24 161:2
161:24 162:25
163:18,20,22

165:24 166:4
167:14,17
168:22 171:4
172:10,18
180:1,3 186:1
186:19 187:6,7
187:12 188:18
188:23,24
189:6,10,11,23
189:24 190:10
190:14,15,17
191:21 192:17
192:23,24
193:6 197:11
197:15 199:12
199:14,20,23
206:19,23,24
206:24 207:8
207:21 209:10
209:11
receive 20:16
22:18 24:25
149:22 150:18
201:18
received 17:2
18:24 20:9
24:23 25:4,7
25:11,24 26:3
35:19 126:22
127:7 130:7
149:13 150:20
189:15 200:9
201:1
receiving 35:21
reception 110:16
recess 78:21
135:11
recognized 47:7
198:5
recollect 62:8
80:21,22 83:22
recollection 54:9
61:18 62:7
80:9,20 112:4
112:6 122:4
124:15 126:5
172:9

**record** 4:8 5:16
6:5 40:17,19
101:25 105:16
133:24 134:13
134:15,17
170:21 171:19
191:19 195:6,8
198:12
**recording**
114:19
**records** 142:17
146:22
**red** 51:24 52:4,8
**reduced** 212:7
**redundant** 153:1
**reentered** 55:22
56:7,8
**refer** 76:2
163:21 171:24
175:8 191:3,17
**reference** 83:12
122:5 192:5
**referred** 16:9
29:6 67:21
191:20
**referring** 28:16
30:13 46:2
62:4 120:8
124:21 169:21
185:17
**reflect** 4:8
**refuse** 149:2,2
**regard** 125:14
167:22
**regarding** 17:9
17:24 143:4
155:10 158:3,7
163:17 165:22
172:18 176:10
177:17 178:9
182:18 185:8
185:10 186:7
190:8 195:11
**regardless** 193:1
**regards** 8:8
127:21 144:11
155:11,18

160:16 162:2
164:6,13 165:7
165:13 167:5
167:16,19
169:1,3,4,8
175:15 177:1
177:20 185:18
185:24 195:18
196:12
**register** 34:3
**Registered** 1:15
212:3
**regular** 37:12
125:4 174:15
**relate** 143:23
**related** 141:4,14
141:22
**relates** 8:12
35:22 172:23
184:23
**relation** 36:11
103:2
**relative** 5:2
65:12 70:2
88:1 100:15
212:15
**relatively** 36:14
57:6 76:20
85:23 86:18
94:21
**relayed** 72:21
**remain** 76:22
138:7 139:21
139:24
**remainder**
136:24 137:1
**remained** 65:7
65:10
**remember** 10:14
10:15 22:24
25:18 30:13
31:6,9,11
36:14 37:24,25
37:25 38:18,18
38:22 40:23
42:14 43:16,17
43:17,22 44:3

44:4,18,18
46:10,16 56:22
57:1,5 59:12
62:2,3,9 65:4
65:14,16,21
67:1,3,6,18
72:12 73:6
74:15 75:12
76:24 77:9
78:3,8,9,13
81:8,9,20
82:20,22 83:3
83:6,13 84:1,6
84:11,20 85:25
90:14,15,20
91:3 93:23,25
95:2 96:12,14
98:20,22 99:2
99:16 103:9,13
103:16 105:3,4
105:5 106:8
109:13,22
110:10,23
111:1 113:9
123:18 124:3,4
124:9 125:2
137:2,3,7,8
138:5,6 140:3
143:11 151:14
156:23,24
161:23 163:23
185:5 192:21
195:19 207:3
207:11,22
208:8,8,14,14
208:15,16
209:14,14,17
**remove** 136:14
139:12
**removed** 173:17
174:16
**repeat** 178:15
**rephrase** 5:19
159:14 164:9
183:19 192:18
**report** 14:22,22
41:25 133:18

134:3,11 150:7
191:2
**reported** 28:22
208:2
**Reporter** 1:15
212:4
**reporting** 159:23
212:12
**reports** 132:24
133:21 134:9
150:6 158:9
190:10
**reposition** 117:9
**represent** 152:22
**representing**
4:20
**reprimand**
128:10 129:9
129:10,14,20
130:6,23,25
131:1 144:12
144:25
**reprimanded**
129:1 130:15
**request** 133:4
**REQUESTED**
211:3
**require** 41:1
133:16 156:3
**requires** 19:21
**reset** 130:20
**resolve** 22:4,14
**respect** 146:16
191:4
**respond** 160:15
**responded**
168:14
**response** 5:10
117:2 133:3
149:12 193:13
**responses** 149:9
160:25
**responsibility**
160:18
**restate** 171:23
**restrained** 139:7
**restricted**

182:23
**restrictions**
182:14,19
**restricts** 131:11
**result** 39:1,24
40:22 79:15
131:8 144:11
**resulted** 120:16
**retained** 132:21
132:25
**retired** 10:5
**retirement** 127:5
**reverse** 97:18
196:21 204:19
208:2,3 209:5
**review** 6:21,25
8:6 15:12,14
25:16 125:17
126:11 131:7
145:20,22
167:14 168:22
170:14 209:25
**reviewed** 7:2
22:19,22,24
25:18 124:15
171:18
**rewinding**
113:14
**ride** 143:15
**rig** 61:4
**right** 5:16 6:4
10:4 14:3 15:6
18:9,9 19:8
34:7 39:7
48:14 53:1,4
53:11 54:3,24
55:16 58:1
59:5,8 60:13
65:9,9 69:13
70:21 73:19
75:25 78:16
82:18 83:7
84:3 85:12,14
86:8 88:6
89:20 93:6
94:14,18 97:25
98:12,15 102:9

103:23 104:3
104:11,15,19
104:24 106:11
106:17 107:18
111:5 112:13
113:22 114:19
114:22,22
115:3 116:6,19
121:14,24
122:12,12
127:1,6 136:10
136:21,25
141:16 142:4
145:4 147:20
163:25 164:2
168:13 170:4
170:22 172:4,6
173:3 176:9
180:6,8 199:1
204:8 205:10
208:6,19 210:2
**rigors** 188:3
**rigs** 48:14,18
**risk** 32:16,22
33:7,25 62:18
62:22 63:21
84:19,20,24
195:23 196:5
202:7,14,20
203:1
**road** 1:17 2:5,18
38:1 39:1,4
44:23 47:16
49:6,8,9,11,14
49:18 51:11
52:10,15,19
53:22 55:23
57:10,14,23
58:10,21,21,22
62:17 63:19,22
64:17 71:16
74:10 77:14,21
79:2 80:15,18
80:25 84:10
90:15 103:23
136:18 137:16
138:8 187:4

189:11
**roadblock** 67:22
68:6,10 71:5,9
71:15 74:4,13
74:21 75:4,9
75:11,21 76:21
79:1 80:7,14
85:17 87:13
88:15 89:22
90:5,13,15,18
90:22 92:16,24
94:8,10 96:25
102:25 103:2
109:10,11
114:17 171:22
171:25 185:15
186:1 195:13
195:18 200:10
200:11 201:2
202:5
**roadblocks**
200:8 201:12
**roads** 38:8
**roadway** 75:24
137:12
**roadways** 32:8
**role** 37:14 66:20
158:14 159:6
160:20
**rolling** 67:22
68:6,10 71:5,9
71:14 72:12
74:4,13,21
75:4,9,11,20
76:21 79:1
80:7 85:17
87:13 88:15
89:22 90:4,12
90:15,15,17,22
92:16,23 94:8
94:10 96:25
102:25 103:2
109:10,11
114:17 200:8
200:10,11
201:1,12 202:5
**Ronald** 43:1

**room** 19:14
**root** 158:21
159:4
**roughly** 147:17
147:18 155:1
**rounds** 197:11
**route** 51:13
52:25 81:1,2
104:4 181:18
**Row** 2:17
**Roy** 2:3,9 4:12
46:4 92:7,11
152:23
**Royalton** 1:17
49:8,9,11,14
49:18 51:11
52:9,15,19
55:23 59:21
**RPR** 212:21
**rubber** 81:23
85:20 209:12
**Rule** 212:13
**rules** 1:13 4:3
152:23
**run** 28:23
108:20
**running** 30:23
34:15 35:4
108:11 206:20
208:13,20
**runs** 41:19
**rushing** 29:22
**Ryder** 2:17

─────────────
**S**
**S** 51:22
**S-H-A-M-U-S**
6:7
**S-T-E-V-I-N-G**
199:23
**safe** 62:13 64:21
184:2 196:11
**safely** 59:5 61:15
**safety** 21:14
29:23,24,25
30:2 32:2,3,7
32:12 63:3

66:15 179:3
195:18,22
196:4 203:11
204:1,6
**sat** 46:9 151:4
**sauce** 136:9
**saved** 25:2,3
**saw** 45:25 46:13
46:21,21,23
47:25 48:13,19
48:19 50:14
52:8 53:16
58:2 61:19
70:10,18 71:1
78:5 81:25
82:1,15 89:24
91:22 93:1,1,7
93:9,14,15
94:3 95:2,6,15
97:24 110:18
110:19 111:13
111:13,17,17
111:19,20
112:23,25
113:21 118:5
123:18 136:7
143:8,12
181:21 188:13
190:5,6 195:2
206:14,15
207:3,3
**saying** 7:22 18:7
22:22 34:14
70:20 83:22
84:1 99:3
101:12,13
105:3,4,4,10
105:14,19
106:8 112:11
113:9 132:5
143:6 160:15
160:18 170:7,9
170:11,18,20
172:10 174:13
197:18,22
198:4,11,12
**says** 98:24

100:24 101:22
102:20 103:21
104:11 106:14
107:9 114:4,19
114:20,21
175:19 203:6
**scenario** 158:15
159:1 160:21
**scenarios** 67:13
**scene** 13:16,23
14:2 15:8
34:10 37:13
133:23 134:8
136:5 138:12
140:1,3,19
141:1,5,9
142:10,20
161:22 208:15
**schedule** 23:14
125:7,14
**schizophrenia**
155:16
**school** 154:5,12
154:14,19
**Scott** 2:4,4 3:4
4:7,18,19 7:20
7:24 11:3 23:5
40:20 41:7,12
55:10,14 69:21
78:17,22 83:1
99:17,22 102:6
105:24 106:2
116:16,20
117:7,13 119:3
120:19 134:2,6
134:12,16
135:6,13
152:12 153:6
155:10 159:21
160:23 163:17
165:22 172:2
172:22 175:7
177:5 179:7
180:14 184:21
186:7 189:8
190:7,13 191:1
191:9 192:13

| | | | | |
|---|---|---|---|---|
| 192:19 193:12 | 96:6,11,12 | 59:19 | **Shamus** 1:9,11 | **show** 61:9 65:17 |
| 197:9 198:5 | 100:4 101:1,2 | **semantics** | 2:15 4:1,10 6:6 | 120:10 150:7 |
| 200:4 209:9,19 | 102:21,22 | 183:20 | 23:3,9 99:20 | 198:8 203:8,15 |
| 209:21 | 103:19,20 | **semesters** 155:1 | 119:1 211:19 | **showed** 116:3 |
| **screen** 93:15 | 104:9 106:13 | **semi** 189:7 | 212:5 | 145:22 192:19 |
| **seal** 212:18 | 106:15,19 | **send** 129:15 | **share** 43:5,13 | **shows** 55:15 |
| **seat** 93:1 110:5 | 110:21,23 | **sense** 53:12 | **shared** 11:7 | 114:12 189:7 |
| 111:4 123:3 | 111:6,7,12,14 | 151:2,13 | 168:4 | 191:15 205:9,9 |
| 173:18 174:15 | 111:15,16,19 | **sentence** 107:6 | **sharing** 11:6,15 | 205:11,12 |
| **seat's** 173:17 | 112:17,19,20 | **separate** 117:3 | **sheet** 185:6 | 207:2 |
| **seated** 110:5 | 112:21,24 | 180:8 | **shellacked** 205:4 | **shredded** 84:5,9 |
| 111:4 137:14 | 113:8,12 | **sergeant** 1:9,11 | **Sheriff** 6:18 | 86:21 96:3 |
| 137:15 138:7 | 115:10,11,12 | 2:15 4:1,9,19 | **shift** 41:10,16,16 | 209:11 |
| **second** 40:17 | 115:14,15,17 | 6:8 17:1,19 | 41:18,25 42:8 | **shredding** 83:21 |
| 55:20 90:4 | 115:18 116:6 | 18:2,11 19:18 | 42:11 207:23 | **shut** 43:23 |
| 92:16 94:8 | 116:22 117:8 | 19:24 23:3,6 | **shining** 56:24 | 130:14 181:22 |
| 96:7,9 98:6 | 117:14 118:3 | 35:10,13,17 | **shoot** 110:19 | 207:23 |
| 102:25 103:2 | 119:20 120:1,6 | 36:3,6 42:16 | 111:13 | **sic** 4:20 18:10 |
| 109:16 110:4 | 120:12 122:21 | 42:19,22 43:2 | **shooter** 15:9 | 27:25 35:20 |
| 112:2 114:16 | 123:19,19 | 43:2,4,5,13 | **shooters** 15:8 | 83:14 |
| 117:25 121:11 | 130:4 136:3 | 78:23 99:20,23 | **shooting** 10:6,11 | **side** 39:7 58:3 |
| 122:11 133:25 | 149:15,16 | 106:3 117:7,14 | 116:19 | 59:13 68:1,1,2 |
| 134:13 149:7 | 160:20 176:19 | 119:1,4,13 | **shootings** 14:10 | 68:12,14,20 |
| 157:2 172:4,7 | 189:19 193:7 | 132:20 135:14 | 14:12 | 70:6,7 73:21 |
| 191:15 195:6 | 193:10,13,14 | 140:20 144:22 | **shoots** 47:1 | 73:21,22,25 |
| 204:19,22 | 193:16,16 | 146:25 147:7 | **short** 80:11 | 74:1 76:13,19 |
| **secondary** 42:3 | 197:8 205:17 | 150:24 152:4 | 114:4 134:18 | 77:13 82:13,23 |
| 42:5 | 205:21,24 | 152:12,20 | **shortly** 64:7 | 83:4,5,8,10 |
| **seconds** 117:6 | 206:1,4,11,16 | 155:24 156:2 | 142:8 143:3 | 84:4 85:21 |
| **secure** 139:19 | 206:18 207:12 | 156:18 157:11 | 188:17 | 86:1 87:14,15 |
| **sedans** 87:17 | **seeing** 46:16 | 157:13 158:1,7 | **shot** 51:22 52:24 | 87:18,21 88:4 |
| **see** 16:15 45:4 | 60:21 82:22 | 159:18 172:15 | 83:23,23 86:22 | 88:10,10,12,23 |
| 45:24 51:10,18 | 83:3,6,13 | 195:10 200:5 | 106:19 180:11 | 89:7 91:2,5,6 |
| 51:20,24 52:6 | 90:16 96:2,12 | 209:21 211:19 | **shots** 99:12 | 92:25 94:13,13 |
| 52:20,24 53:13 | 96:14 110:24 | 212:5 | 109:8,23 110:1 | 95:3 119:21 |
| 54:5 55:16,18 | 111:2 112:9 | **sergeants** 35:25 | 110:6 114:15 | 121:15,22,23 |
| 55:21 56:2 | 135:24 196:7 | 131:20 | 114:25 115:5 | 122:1,6,16,17 |
| 57:20 58:10 | 204:17 207:22 | **serves** 24:2 | 116:1,9 117:17 | 122:19 136:18 |
| 62:24 69:14,17 | 208:8,14,16 | **service** 150:10 | 117:18,21,24 | 137:12 138:8 |
| 70:12,13,16,20 | 209:17 | 155:8 156:4 | 118:11 122:24 | 163:1,13 |
| 70:22,23,25 | **seen** 9:1 49:1 | **set** 1:19 16:14 | 123:18 168:24 | 188:17 189:20 |
| 72:4 81:23 | 84:4 89:13 | 23:8 47:3 | 170:25 171:6 | 192:10,20,23 |
| 82:12,14 83:9 | 95:22,23 96:15 | 71:16 168:5 | 191:12 192:7 | **side-to-side** |
| 83:9,14 85:20 | 98:1 100:10 | 212:17 | 193:1 194:25 | 73:18 |
| 86:1,1 89:6,7 | 116:6 140:8 | **settled** 138:16 | 199:3,13 | **side-view** 56:24 |
| 91:9,10,12,22 | **segment** 80:5 | **seven** 6:18 157:2 | 204:15,20,23 | 58:3 59:13 |
| 92:25 95:11,12 | **self-preservati...** | **shaking** 189:22 | 205:3,5,6,12 | **sides** 74:17 |

sideswipe 73:24
sideswiped
  69:13,23 120:3
  120:6
sideswiping
  69:19 70:1
  73:10,20 120:8
  120:13,17
  121:9
Sidoti 2:10,10
  3:5 116:14,18
  116:24,24
  152:16,19,20
  191:8 195:3,9
  200:1 203:8
  209:20
sight 52:4 70:5
  70:11 111:9
  136:19
sign 57:24 58:6
  59:7,11,17
  166:8
significance
  59:17 93:17
significant 93:22
  93:22
significantly
  108:5
signs 150:7
silhouette 93:14
silly 143:11,14
  143:18,21
  144:4,6 191:3
  191:4
similar 28:9
  164:1
simple 31:25
simply 43:10
  128:22 144:12
  151:25
single 20:5
sir 4:24 5:7,24
  6:15 7:24
  14:11 47:20
  76:14 80:16,24
  90:3 114:12,21
  115:2 154:13

176:5 200:2
sirens 50:2 52:11
  181:25 194:1
sit 24:20 78:10
  93:21 123:15
  135:8 136:18
  137:17 139:20
sitting 45:19
  136:8
situated 75:16
situation 20:19
  20:20,22 21:6
  21:7,25 22:5
  22:10,14 25:22
  26:24 27:7
  29:14 33:2,17
  34:18 67:14
  89:21 97:14
  108:14 109:4
  203:18,19
  204:2,6
situations 26:23
  167:24
six 18:11 35:11
  36:1,13 65:3,3
  65:5 100:18,20
  146:21,23
  150:24 155:24
six-year 157:12
skelley@mrrla...
  2:19
slightly 170:4
slow 59:7 67:20
  74:19 75:13,14
  75:15 76:2,9
  76:22 77:8,10
  77:11 89:2,2
  186:17 187:3
slowed 81:19,19
  84:14 90:5
slowing 74:19
  81:22 82:3
  83:17 186:3
  200:12 201:20
smoke 144:1
smoking 143:9
  143:13,21

snowy 36:15
socialize 153:17
socially 153:25
softball 153:25
solely 43:12
Solon 2:18
solve 158:20
somebody 18:21
  20:17 27:1
  34:9,11,15,16
  35:5 37:6
  48:23 68:17
  72:9 93:8,11
  103:21 113:20
  128:25 138:21
  138:22 151:4
  152:6 174:9
  187:10 205:15
  208:2
somebody's
  26:16
something's
  197:24
somewhat 75:22
  76:19 83:7,17
  85:10 93:12
soon 49:2 123:12
  147:15
sorry 18:13 38:8
  78:18 83:11
  87:22 88:5
  92:5 94:16
  101:19 108:4
  124:22 134:1
  145:5 150:16
  154:11 159:13
  178:15
sort 11:8 14:21
  15:12 28:18
  30:6 31:1
  35:16 44:11
  62:18,22 66:19
  67:8 69:5
  76:17 79:16,21
  91:24 100:14
  113:22 119:23
  121:17 122:3

125:24 127:15
  128:13 141:4
  143:13 146:4
  149:1,22
  150:12 151:7
  166:14 200:15
  201:23
sorts 17:11 25:3
  26:8
sound 208:6
sounds 102:7,7
  106:25 199:11
south 28:24
  45:10 46:14
  53:6 58:25
  60:2 64:7 65:2
  69:1,4 80:21
  81:2,6
southbound
  59:21,22 60:5
  60:11,19 61:23
  62:5,5,15,17
  63:18 64:15
  65:20 66:24
  70:6 72:14
  75:25 78:24
  97:10 104:3
southern 45:12
SP 134:11
SPD 117:4
speak 8:5 64:10
  66:17 71:25
  126:20 152:15
  161:19 209:23
speaker 93:3
  94:5
speaking 14:10
  28:9 74:23
  76:20 85:14,23
  86:19 161:25
special 13:8 42:7
  125:9 202:24
specialty 8:12,15
  8:19 176:12
  183:4,9,12
  184:5
specific 26:9,11

26:18 44:21
  63:15 148:8
  165:5 173:7
  174:25 184:22
  202:10 203:10
specifically 8:11
  12:23 13:13
  14:13 18:6,7
  25:6 43:17
  44:24 93:23
  100:2 109:3
  110:23 111:1
  124:3 125:3
  127:16 141:13
  160:9,13
  169:20 170:9
  170:19 176:9
  183:4,23
  185:25 190:13
  192:21 193:5
  201:14 207:8
specifics 31:5
  33:11,13 196:9
specified 212:11
spectacular
  84:13
sped 77:6 79:7
  79:25
speed 31:7 36:22
  37:1,9,12
  38:12,15 46:15
  46:19 47:11,14
  47:17 48:20,24
  50:1,25 51:6
  54:22 62:25
  66:10 79:12
  90:5 181:6,10
  181:13,15
  188:3 190:2,16
speeding 66:4
  179:12,16,19
  179:23 180:2,6
  190:23
speeds 50:10,20
  62:6
spelled 6:7 132:3
spike 72:11

81:16 82:4
83:20 103:11
**spiked** 38:1 39:1
39:2,4 77:15
80:15 81:13,23
84:9 85:20
**spikes** 71:16
80:18 81:1
103:24 104:1
**spiking** 189:12
**spin-out** 121:3
121:13 122:15
**spinning** 98:17
115:7
**spins** 95:17 97:8
97:9
**split** 191:15
**spoke** 8:7,17
147:24 198:5
**sport** 87:15
119:23 131:11
131:13,20,23
177:25 183:21
**sporting** 153:24
**spot** 37:5,6
**spotted** 37:7
**spun** 96:5,8
103:7,8 107:23
194:3,5
**squad** 44:4
54:13 97:11
130:16 136:19
137:3,4,10
209:3
**Square** 2:11
**SS** 212:1
**St** 154:14
**staff** 125:18
126:13
**stamp** 102:16
**stamped** 103:5
**stand** 111:17
**standpoint**
13:19 103:3
152:9
**stands** 42:7
**stare** 26:22

**start** 13:15
**started** 28:5,10
28:11 69:12
75:7 77:6 91:6
91:7 126:2
129:4 179:20
180:15
**starting** 42:2
90:25
**state** 1:16 6:4
9:6 24:13 38:1
38:23 52:25
71:19 72:22
112:25 139:21
154:22 181:18
212:1,4,22
**stated** 168:20
170:19
**statement** 7:2,7
7:8 22:2 34:17
61:21 63:8
82:8 85:6 95:1
96:21 102:14
143:2 148:11
148:22,22
149:2 163:14
163:16 164:16
164:25 165:17
166:21 168:7
169:5,6,9,10
170:15,17
171:1,15,25
175:17 179:22
180:12,20
189:4,17
191:13 193:3
196:23,25
197:17,22,23
198:3,13,25
204:4 207:7
212:10
**statements**
50:19 148:13
148:14
**States** 1:1 4:14
**station** 24:2
133:9 139:25

147:16 166:7
166:14 199:21
**status** 16:17
**stay** 94:20
137:15 153:8
**stayed** 58:1 77:8
94:21
**steering** 70:24
71:2 82:15
84:23 86:2
89:8,25 90:14
95:6 96:13
190:6
**stems** 29:14
**stenotypy** 212:7
**step** 172:25
187:19
**Stepanovich**
10:6
**STEVEN** 2:16
**Steving** 199:22
**sticks** 208:17
**stipulated** 135:1
**stolen** 28:22
**stop** 29:6,10,14
29:20 31:15
33:19,23 34:2
34:11,16,16,24
35:2,2,3 36:21
37:8 38:15,16
38:20 46:8
48:11 50:17
57:24 58:5,6
58:16 59:7,7
59:11,16 65:24
72:6,23 73:2
74:16 80:3,8
82:14 83:18
87:19 89:23
97:9,12 98:19
99:1,5,9
106:24 107:2,3
107:10,16
108:1,7,23,25
109:7,9,12,15
113:3 115:10
117:25 146:2,6

163:9 166:8
168:17 169:16
179:19 180:18
181:4,12
191:12 192:6,9
193:2 202:7,8
202:20 203:19
**stopped** 28:11
29:2,17 30:5
57:25 59:9,11
59:16 90:23
98:19 99:8
108:15 109:14
111:21,24,25
114:24 116:1
117:20,23
145:17 179:9
179:14 180:10
191:15 196:16
204:24
**stopping** 33:22
59:15 66:3,8
107:7 171:13
181:5,19 182:1
196:19 202:24
203:4,5,7
**stops** 29:8 46:5,6
98:25 167:1,23
202:12,14,21
203:1,3
**stored** 40:5
**straddle** 58:2
**straddling** 56:23
**straight** 51:22
52:23
**strategies** 67:13
**street** 1:22 39:7
166:3
**streets** 166:7
**stress** 26:16,17
126:17
**stretch** 47:6
68:21,23
**strict** 132:1,7
**strike** 164:9
171:22 198:22
**striking** 193:24

**strip** 83:20
**strips** 31:15
38:20 72:6,11
72:23 73:2
80:3,8 81:16
82:4 83:18
103:11 188:21
189:15
**Strongsville** 1:6
1:17,18 2:14
4:13 6:8,12
7:15 8:8 9:12
9:22 10:16,17
10:21 12:16
14:17 15:21
16:9 18:5 24:2
24:5 27:9 28:5
28:11,15,25
31:8 36:8
37:25 39:14,21
42:10 56:6
64:5,23 65:12
66:1 67:25
68:11 77:12,17
79:20 84:18
85:4,21 88:19
100:7 105:17
119:20 125:18
125:22 128:5
130:9 131:4
133:16 138:3
141:10,11
144:23 145:10
146:12 156:2
183:24 184:15
188:5 195:14
199:24 201:10
**Strongsville's**
31:18 131:8
151:19
**struck** 59:20
73:8 96:7,9,19
97:6 98:3,5
197:5
**structure** 19:5
**struggling** 82:15
86:2 89:8,13

89:19,24 90:13
91:14 95:6
96:5,16 159:7
**studies** 155:3
**study** 156:19
**stuff** 151:7
**subject** 13:9
165:18
**subjected**
124:17 125:9
**subjective** 35:7
63:13 121:19
**subordinates**
150:15 158:8
**Subscribed**
211:20
**subsequent**
127:14 145:11
149:18 171:2
205:16 208:9
208:16
**subsequently**
36:19 38:25
86:10 205:13
**subsume** 202:20
**successful** 83:20
188:22
**successfully**
189:16
**suggest** 41:1
**suggested** 77:4
79:5
**suggestion** 27:2
**suitable** 131:19
**Suite** 1:22 2:5,11
**summation**
165:11
**superior** 164:5
164:14,18,24
165:13,15,19
167:18 169:7
**supervise** 17:13
19:19 43:12
166:2
**supervising** 18:2
72:15 99:6
165:19

**supervision**
17:24
**supervisor** 32:20
65:22 67:3
133:6,13 150:5
150:14 159:17
160:3 164:15
165:12
**supervisors**
159:11
**supervisory**
13:19 35:18
42:17 43:5
66:20
**suppose** 105:8
125:18
**supposed** 104:8
182:7
**supreme** 63:4
**sure** 12:11,18
18:9,14,15
21:22 25:14
27:8 32:9 33:3
39:22 50:5
63:8 87:10,20
88:2 94:17
102:8 103:15
129:21 137:20
141:12 144:12
148:16 160:16
165:4 204:7
207:6
**surmise** 71:10
144:18
**surmised** 53:3
159:6
**surmising** 202:2
207:20
**surround** 67:20
68:16 74:16,18
**surrounding**
186:2 200:11
201:20
**suspect** 21:25
29:24 32:12
34:24 35:3,4
39:9,14 40:13

40:21 74:7,13
108:24
**suspected**
202:25
**suspects** 36:10
**sustain** 118:13
118:19 194:18
**SUV** 91:2
119:23 122:1
132:6 162:6
172:23 175:10
175:22 176:8
176:12,16,21
177:2,24 178:3
178:12,16
183:8 184:8,13
187:23
**SUVs** 132:1,14
175:16 176:2
177:17,20
178:1,6,10
183:2,13,16
184:10,12
187:25
**SWAT** 184:18
**swerve** 61:6 78:1
**swerves** 95:16
**swerving** 96:19
**sworn** 4:4 9:15
211:20 212:5
212:10
**syllables** 198:9
**system** 16:10,13
16:22 17:3,9
17:23 18:4
27:10 99:10
149:11,14,19
149:23 150:14
151:6,20 152:3
158:4,9 159:24
160:10,17
164:10 165:8

**T**

**tacit** 146:4
**tack** 188:21
189:15

**tactic** 109:9
**tactics** 11:8
21:23 22:6,18
30:10 74:3
**tag** 182:1
**take** 5:24 12:24
23:24 30:11
35:13 49:23
54:6 61:5,11
66:19 76:10
78:2,6,11,15
79:16,19,21
87:14,17 88:11
88:22 99:25
105:25 108:11
111:8 118:23
119:6 124:6
128:3 135:14
139:6 146:3
156:17 157:10
157:18,20
165:6 172:25
173:9,10 178:5
187:19 189:9
**taken** 1:12,14
4:10 29:4
76:16 91:4
123:25 124:4
138:2 150:13
159:22 212:10
**takes** 61:11
**talk** 55:25 62:16
63:16 65:10
74:24 166:23
**talked** 7:13 8:9
124:22 143:3
188:15 195:10
**talking** 12:7
36:13 69:19
78:23 83:11
94:1 102:1
104:12 121:17
137:2 176:19
183:22,23
202:17 203:23
206:9,10
**tape** 168:7,21

199:2
**tapes** 99:15
168:4
**task** 19:20
**tasked** 160:21
**taught** 26:4,11
26:20
**team** 67:6
**technically**
131:18
**technology**
131:15 132:5
177:7
**teenager** 123:11
123:20 135:24
**tell** 5:19 6:24
28:18 29:8
46:11,18 72:18
73:1 145:5
154:4 158:11
165:8 189:6
208:7 212:5
**telling** 41:2 49:4
55:21 67:10
90:20 93:13
108:18 132:9
133:14 140:23
171:19 202:1
**ten** 42:1,2
**tendered** 117:2
**term** 13:21
61:24 73:24
88:1 166:18
**Terminal** 2:11
**terminate** 32:17
32:24 33:5
63:10,20 86:25
**terminated**
72:15 106:7
**terminates** 81:5
**terminology**
87:20 145:25
**terms** 27:22 74:3
80:9 164:14
169:24
**test** 156:12,18,19
156:22 157:2,4

157:10,13,17
157:18,20,22
157:25 158:3,6
158:12,13,17
159:15 185:1
**testimony** 149:9
187:14 193:22
194:10 212:6,8
**testing** 156:1,5
**tests** 158:6
**textbooks** 156:6
**texting** 12:9
**thank** 5:7 23:18
25:15 118:7
152:14 153:3
200:1 209:22
**theft** 167:1
**thing** 11:9 19:15
92:15 129:14
181:20
**things** 16:20
20:21 26:9,11
26:14 33:19
34:14,21 73:9
76:24 107:15
114:10 137:21
138:16 150:1,4
150:13 151:1
153:8 159:10
166:3 167:11
171:20 172:16
180:19 193:13
195:12,14
198:11
**think** 15:10
22:16 23:12
24:19 27:19
28:8 48:2,3,6
49:15 62:4,25
63:3,17,19,23
67:21 72:11
73:12 74:4
75:23 79:7,14
80:12 86:22
87:3 91:21
93:13 95:5
98:13 99:5,25

103:14 105:22
116:12 120:22
130:23 137:8
137:16 138:5
140:10 143:19
144:6,10
147:18 149:11
149:17 152:4
156:15 179:7
184:20 195:24
196:10 197:5
204:5,22
207:10,10,12
207:16,17,23
**thinking** 67:12
124:1
**third** 41:16,18
42:11
**third-party**
158:18
**thought** 30:10
63:9 65:21
84:24 87:7
90:12 94:1
97:10 99:4
128:23 130:22
143:9,24 159:2
192:14 193:13
207:6 208:1
**threatened**
30:23
**threatening**
63:10
**three** 4:21 15:5,5
15:7 66:23
75:13 82:19,20
120:23 125:5
156:6
**three-day** 15:13
**THURSDAY**
1:9
**thwart** 164:23
**ticket** 48:25
166:8,15
**tied** 143:23
**time** 5:18,24
7:19 13:16

17:17 19:12,19
24:6,9 25:17
25:17,18 27:12
27:23 32:15
34:19 35:20
38:13 41:20
42:2 43:7
46:22 52:2
55:19,20,25
56:3 59:10,18
62:20 63:19
67:12,15 72:14
74:24 75:1,6,7
76:23 79:23
80:10,11,14,15
81:13 82:2
84:8 87:12
93:25 94:25
96:7,9 97:13
98:6 102:15
103:5,7 107:14
107:15,16
109:8,18
110:12 111:22
111:25 112:4
112:25 113:6
113:12 115:8
115:16,17
116:11 120:3
121:9,11
122:25 124:11
124:25 129:6
130:21 132:8
135:25 136:3,7
136:23 137:19
137:25 138:11
138:16 139:7
141:19,24
142:4,14
146:11,17
148:12 149:12
150:23 155:23
156:12,14,18
156:21 157:2,4
161:16 162:10
162:21 168:23
171:5,23 172:4

172:8 175:8,9
176:10,15
178:8,13,17,18
179:8 180:4,6
180:22 181:2
181:11 182:15
182:17,23
183:2 185:21
189:1,20
191:18 192:5
194:11 200:2
203:16 204:11
204:18,19
205:15 206:4,9
208:3 212:10
**times** 75:3 86:9
98:6 121:5,7,8
129:22 179:15
191:10
**tire** 84:5,9 85:21
86:12,21 95:13
95:23,25 96:1
106:21 122:19
195:13
**tires** 72:24 82:1
82:19,22 83:10
83:14,14,17,21
83:23 86:22
87:5 89:12
95:11,17 96:17
96:24 104:25
177:12 186:5
189:3,17,23
190:2
**today** 4:8 5:1 7:1
7:11,21 24:20
93:21 123:15
149:9 152:15
172:16 175:21
176:24 187:11
204:4
**today's** 6:20
190:9
**TODD** 2:16
**toddlers** 123:10
123:19 137:2
139:6

**told** 48:3 69:11
79:14 97:6,23
112:6,19
120:23 121:8
128:6,13
140:11 144:10
144:14 147:25
149:17 172:2
205:17,21
**Toledo** 154:16
**tone** 198:7,8
**top** 10:13 22:19
38:3 51:21,24
52:3,7 53:2,14
53:15 140:21
181:17 184:19
**topic** 23:20
**total** 65:25 88:19
120:23
**totally** 48:22
**touched** 73:25
**Tower** 2:11
**town** 37:3,4
**track** 27:20 94:2
**tracked** 152:2
**tractor** 60:22
**tractor-trailer**
48:14,18 60:23
61:4
**tractor-trailers**
46:16,20,24
**traffic** 29:14
34:7,16 35:2
44:12,22,23
45:16,18,21,25
45:25 46:5,6,8
47:16 48:25
49:20,22 50:16
51:15 52:9,18
52:19 53:21
54:1 57:6 58:9
58:16 59:2,2
59:14,17 60:4
60:19 62:10,12
66:4,16 67:16
67:19 74:18
77:21,22 78:1

78:1,5,11,11
79:2 84:6,10
84:13 100:7
101:22 102:8
113:25 114:3
115:8 124:2
166:25 167:23
179:9 181:4,16
181:19,23
182:3 188:24
201:20
**train** 201:19
**trained** 112:12
150:25 151:12
185:14,21,22
185:25 186:2
200:14 201:4
**training** 9:4,14
11:8,16,22
12:2 17:2,5
18:24 20:10,16
21:3,10,19
22:17 23:13,14
23:17,19,24
24:6,8,12,15
24:22,23,25
25:1,3,7,11,16
25:21,24 26:3
27:5 29:9,11
35:16,19,21,24
74:12 149:11
149:13,22
150:17,18,21
150:22 151:14
154:3 155:15
155:17 156:1
160:8 184:22
185:6,8,10,14
185:24 197:15
198:3,24
200:10,15
201:1,16,16,18
201:24 202:3
**transcribed**
212:7
**transcript**
169:24 170:13

211:1 212:8
**transcription**
105:18 212:7
**translation**
50:13
**transmission**
105:6
**transport** 173:21
174:16 183:25
**transported**
199:20
**transporting**
173:25
**traskin@mrrl...**
2:20
**travel** 48:17 52:9
56:16,20 57:3
59:25 61:16
64:2 75:12
187:5
**traveling** 38:12
46:16 54:21
69:1 141:9
**treated** 136:15
138:9
**treatment** 41:2
**trick** 176:5
**tried** 188:13
**trooper** 38:1
139:19 140:3,5
**truck** 60:22,23
61:4,5,11
**trucks** 184:17
189:7
**true** 127:21
145:23 174:6
194:3 206:13
212:8
**truth** 212:5,6,6
**try** 5:10,19
20:19 48:24
50:8 67:17,19
72:23 91:25
92:25 105:25
158:19,20,21
198:22
**trying** 5:21

11:20 31:9
33:12 34:9,16
34:24 35:1,2
50:1,15 51:4
51:20 55:11
67:8 79:11
82:16,17 83:9
84:23 88:7,7
94:2 96:24
102:23 110:14
124:1 129:13
153:8 155:1
172:21 176:5
189:21 190:5
202:19 203:25
207:21
**turn** 44:1 58:18
58:19,25 59:24
64:11 104:25
128:23 129:25
130:3,5 181:18
209:17
**turned** 52:4,8,13
66:14 94:24
128:14 129:21
130:15,18,19
207:1,7 208:4
208:10
**turning** 41:4
52:16 129:1
163:1 206:25
207:8
**Turnpike** 57:9
64:16,17
**turns** 47:21 62:5
130:2
**twice** 75:5 98:4,5
115:24 153:2
172:3 193:23
**two** 10:15 16:4
29:2 34:13
38:4,5 44:7
46:16 47:25
48:1,13,17
55:6,8 59:1
70:6,14,17
82:20,21,22

83:2,3,13
107:11,15
108:6 109:13
109:18 114:9
114:18 120:25
121:17,21
122:11 123:10
125:5 143:23
154:18 155:1
157:16 158:12
173:3,4 174:17
174:19 175:1,1
182:9 184:12
185:18 186:5
189:3,7 190:2
197:11 198:10
**two-and-a-half**
48:1
**type** 29:6 40:7
156:1
**typed** 5:13 7:6
14:22 100:14
**types** 21:16
151:25 155:16
184:15
**typical** 45:22,23
140:13
**typically** 45:4
**typing** 101:21

_____

**U**

**uh-huh** 5:12
**ultimate** 39:20
146:4
**ultimately** 81:4
81:19 96:23
**undergrad**
154:15
**understand** 5:5
5:6 11:20
19:22 20:12
21:22 41:9,15
50:22 55:11
58:4 61:25
73:17 86:3,10
94:17 100:13
101:5 120:9

121:16 125:12
129:13 131:25
135:19 148:16
149:4 152:11
153:6 165:9
173:11 174:14
179:1 182:16
182:17 188:1
195:16,20,25
196:10 197:21
200:7
**understanding**
16:12 30:20
38:14 39:3
41:18 114:9
144:15 148:25
151:23 152:6
179:5 182:6
195:21 202:20
203:2 207:25
**Understood**
61:17 178:25
**unfair** 204:3
**unfamiliar** 48:22
**unfold** 110:18
**unfounded**
145:23,25
**unhandcuff**
140:7
**unhandcuffed**
138:11 139:5
139:25 140:6
**uniformity**
202:3
**union** 146:25
147:2,3,4
148:5,7
**unit** 19:11
145:16
**United** 1:1 4:14
**units** 174:17
**unity** 18:25
**universal** 29:12
**University**
154:16,22
**unlit** 47:5
**unquote** 73:17

171:14 176:3
180:15 183:9
190:18
**unreasonable**
32:16,22 33:6
33:25 62:18,22
63:1,21 84:19
**unsubstantiated**
146:1
**updated** 131:24
132:16
**upright** 111:18
**use** 9:18,21 10:2
10:15,20 11:7
11:17 12:19,22
12:24 13:5,10
13:14 14:4,25
15:20 16:20
21:24 31:15
61:23 90:22
110:10,10
115:19 118:4
124:20 125:10
131:11 133:17
134:10 140:18
140:25 141:7
141:19,21
145:6 149:23
152:1 166:18
166:20 186:7
193:7,20 206:5
206:13,17
**uses** 159:21
160:8,9,16
**utilities** 131:23
**utility** 87:15
119:23 131:12
131:13,20
177:25 183:21
**utilize** 183:16
184:16 185:23
192:25
**utilized** 182:24
183:13,23
184:3 202:24
**utilizing** 192:25

---
**V**
---
**v** 1:5 163:4
**valid** 179:15
**value** 45:9
**van** 46:4,7,12,21
46:22,25 47:5
47:6,7,25 48:9
48:11,13,16,19
49:2,18,21,23
51:4,7,10,15
51:18,20,20
52:1,6,24
53:16,18,24
54:2,6,10,11
54:16,18,21
55:16,18,22,22
56:2,15,20
57:2,14,17
58:5,15 59:8
60:8,18,25
61:3,6,14
65:13 66:9,12
68:2,3,3,8,12
68:20 69:14,18
70:2,22,23
71:1 72:24
73:19 75:12
76:13,19 79:1
80:3,6 81:22
81:24 82:1,3,6
82:17,19 83:7
83:8,16 84:8
84:22 85:10,19
85:22 86:1,13
87:3,15,16,23
87:24 88:12,24
89:2,7,12,23
91:10,12 92:13
92:18,21 93:18
94:22 95:11,14
95:16,17 96:4
96:4,6,23
97:12,17,18
98:1,3,4,7,8,11
98:12,16,17,19
103:7,8 107:23

110:22,24,24
111:4,25 112:4
112:18,20
113:1,3,13
115:14 117:23
118:9 120:2,4
120:24 121:6
123:1,11,23,24
124:1,4,7
135:18 136:3
139:12 143:5
162:10,11
168:24 172:10
179:9 180:12
181:6,21,24
186:8,14 187:7
187:14,16,17
188:4,12 189:2
190:1 191:11
191:15 192:2,6
192:8 193:2,16
193:24 194:11
195:2 196:21
204:14,18,24
205:2,18,23,25
206:2,11,20,25
207:1,3,8,9,13
208:2,10,22
**van's** 51:6 76:9
98:10,14
**vans** 183:25
184:18,19
**vantage** 113:8
115:9,18 118:2
118:5
**vehicle** 8:15,16
8:19,22 27:17
28:5,19 29:22
30:5,16,22,22
30:23 31:2,22
32:1,4,12
33:19,23 34:2
34:24 35:2,3
36:8,21 37:5,6
37:7,8,8,11,18
38:1,11,15,17
38:25 39:3,5

39:14 61:5,14
63:2 66:4,8
69:25 73:8,25
74:1,7,13,16
74:19,20 75:18
75:19,21 76:11
87:6,16 89:9
89:20 91:15
92:1 94:20,21
95:8,10 96:17
96:17 97:4,8,9
98:2 108:24
109:7 110:8
111:21 115:9
115:25 116:8
117:20 118:3
119:15,20,23
120:4,15 121:5
121:12,12,20
121:21,25
123:17 131:18
132:3,17 162:9
162:12,16,25
163:2,8,9
167:11 168:17
170:8 171:13
172:18 174:5
174:15 178:4
179:4 180:25
182:14,25
183:6,10,11,12
183:21 184:6
184:18 186:5,9
186:16 188:16
189:2 190:9
191:11 192:2,2
192:11,20
193:23,24
194:2,7,15,21
196:18,21,24
197:4,5 200:12
204:14
**vehicle's** 180:10
**vehicles** 8:12
39:14 59:10
70:6 75:8
131:12,13,20

171:24 173:2
173:24 174:19
175:2,4 176:13
177:25 182:19
182:24 183:4
183:23 184:3
184:14,15
187:1 190:24
**verbal** 5:10 7:8
128:9 129:9,14
129:18,20
130:6,25
144:12 184:25
199:12,14
**verbally** 129:17
**verbatim** 167:8
170:3 178:24
202:17 203:13
**verbiage** 195:19
**verify** 203:14
**version** 7:7
100:15
**versus** 4:12
**vicinity** 81:21
136:15 156:25
192:16
**video** 55:15
56:18 57:5
60:9 61:9,10
65:17 68:9
70:18,21 78:9
81:25 90:16,21
95:2,22,23
96:15 98:1
103:4 109:21
110:12 112:23
112:24 116:6
117:5,10,12,14
124:12,13
137:8 138:1
162:6,11,25
168:23 170:20
171:18 172:9
189:7 191:14
191:20,20,21
191:22,25
199:8,10,13

204:11,12
205:9,10,11
207:2,4,10,12
207:22 208:7,9
208:16,21
209:15,18
**videos** 6:22 8:25
9:1 117:3
163:13 167:14
**view** 82:12
137:13 138:8
188:4,11
189:20 203:20
203:25
**viewed** 151:24
186:14
**violation** 66:16
66:17 166:9
179:9 180:2,5
181:16,19
**violations** 66:4
181:9,23 182:3
**violators** 202:25
**violent** 34:10,15
35:4
**vision** 208:17
**visual** 53:23
181:21
**Vlna** 65:15 67:2
90:20,25 94:12
114:21 130:14
130:16 131:1
163:3 191:21
**voice** 112:16
198:6
**voices** 135:21
**voluntary**
148:13,22
149:4

———————
**W**
**wait** 30:6
**waited** 126:1
**wake** 209:11
**Walmart** 10:11
**want** 5:15,24
7:13 9:3 12:24

22:16 50:13
59:19 64:22
69:4 87:19
88:2 94:16
109:2 116:15
118:23 119:4
123:7,14
131:25 132:11
132:12 143:2
149:8 150:16
169:20 191:17
192:25 200:5
204:11 207:5
**wanted** 20:3
29:16 38:15
40:11 55:3
73:7,15 91:22
119:13 135:15
147:25 190:20
**wanting** 33:18
33:22 34:11
**wants** 92:1
**warning** 16:10
16:12,22 17:3
17:9,23 18:4
27:10 148:17
148:19 149:11
149:14,19,23
150:14 151:6
151:19 152:3
158:4,9 159:23
160:17
**warrants** 92:1
**wasn't** 50:12
59:15 113:7
123:5 125:8,22
126:8 131:6,24
146:14 167:24
208:24,25
209:1
**watch** 56:18
68:9 95:10
124:13 191:20
191:25 204:16
208:21 209:14
**watched** 61:10
70:21 103:4

117:25 162:5
162:10 199:10
204:12
**watching** 45:15
111:22 112:1
124:12
**waters** 88:8
**way** 5:8 32:2
50:20 54:1
72:3 86:25
88:18 97:14
99:7 146:5
173:14 181:15
196:7 204:22
**ways** 40:14
**we'll** 5:8,25
85:16 101:18
101:23 114:23
116:12,21
**we're** 4:8 14:13
32:1 36:13
41:19 54:15
55:25 63:18
69:1 71:24
74:23 75:24
77:14 83:22
84:2 88:14
90:23 98:25
100:24,25
101:14,15
102:1,11 104:3
106:10 107:9
108:23 109:6
112:12 116:23
117:10 151:12
153:1 157:10
168:11 169:15
171:11,19,20
171:21 183:20
**we've** 5:1 63:18
162:2 179:18
182:10 186:2
186:12 188:20
202:10 203:23
**weapon** 112:18
194:22
**weapons** 115:15

115:17
**weather** 32:10
44:14
**weekend** 125:4
**weeks** 18:11
35:11 36:1,13
125:24 150:24
155:24
**well-being**
174:16
**went** 9:6 22:17
24:5 44:11,25
45:2 49:23
52:3,7 60:25
69:7 70:1
94:23 114:10
138:18 154:14
159:6 179:25
181:14 185:1
191:9
**weren't** 31:4
85:12 161:6
183:4
**West** 1:22 28:20
30:16 36:9
37:11 38:2
39:5,5
**wheel** 70:24 71:2
82:15 84:23
86:2 89:8,25
90:14 94:25
95:7 96:13
122:13 189:22
190:6
**wheels** 106:19
**WHEREOF**
212:17
**white** 91:2 114:4
119:19,19
122:1 162:6
**wide** 150:21
**wife** 89:16
**William** 2:22
**window** 111:6
157:12
**windshield**
44:20 112:20

112:21 113:1
118:6 193:14
205:18,24
206:14 208:16
**Winters** 2:4
**wipers** 208:17
**within-named**
212:5
**witness** 134:25
135:2 154:8
210:3 212:5,17
**witnesses** 132:21
132:24 134:8
**woman** 93:5
**word** 143:11
144:3 180:15
186:8 191:4
198:16,19,20
203:3
**word-of-mouth**
12:8
**wording** 86:22
**words** 73:12
90:22 98:25
99:2 102:5,5,9
143:8,10
198:15
**work** 16:19 42:5
43:15,23
128:20 141:22
153:18 154:1
158:20 159:8
**worked** 42:3
177:10
**working** 11:25
41:15 42:15
43:11 129:12
136:10 140:20
**works** 43:7,8
**wouldn't** 16:25
32:24 63:10
89:16 104:14
106:4 196:6
205:10
**written** 129:10
131:1 151:16
151:20 156:5,5

158:13 184:25
**wrong** 102:3
198:19

**X**

**Y**

**yard** 36:9
**yards** 39:8
**Yasmyn** 2:2
**yeah** 7:6 22:16
31:4 33:22
38:7 40:9
41:24 44:20
48:5,8 49:10
55:12 59:12
60:9 61:19
62:23 64:21
66:17,18 69:16
85:19 86:4
93:14,20 94:21
98:8 101:21,23
102:6,9,13
103:4 105:24
106:12 107:13
108:9 110:2
111:17 113:14
113:14 115:7
116:7,20,20
118:12 124:5
125:13 126:8
128:19,24
129:18 130:2
131:2 137:16
138:22,25
140:24 148:18
151:10 156:19
160:5 172:7
187:18 190:15
197:1 198:8,17
201:14 202:2
205:4,5,11
207:2,4,10,11
207:12 208:7
208:24
**year** 6:14 9:8
23:22 28:4

155:22 156:23
156:24 187:7,9
187:9,11 190:1
**year-and-a-half**
9:2 17:20
**years** 22:25 25:7
31:10 43:3
146:21,23
153:16 156:17
157:1,2,16
179:14,18,20
**yell** 112:12
**yelling** 115:24
**young** 39:12

**Z**

**zero** 50:5 52:9

**0**

**05** 156:15
**08:00** 41:20

**1**

**1** 3:9 23:2,7
46:15,19 133:5
186:17 211:1
**1-888-595-1970**
1:24
**1:18-CV-00139**
1:5
**1:18-CV-139**
4:13
**10** 27:21 31:10
**10:00** 41:22
**100** 2:17 50:21
**107** 103:19
**11** 100:22 104:7
**11(2)** 3:14
**110** 104:3
**113** 3:15
**114** 104:6
**115** 3:15 104:8
**118** 3:10
**12** 106:14
114:17 117:4,4
**120** 3:15 101:17
101:19

**121** 102:20
**127** 114:8
**13** 3:14 117:6
149:10
**130** 3:15
**130th** 38:2 39:5
**1360** 1:22
**14** 3:14
**145** 3:15
**146** 3:15
**15** 3:14
**152** 3:5
**154** 3:16
**16** 3:14
**165** 3:16
**168** 3:16
**17** 27:25 35:20
101:1,16
104:11,14,15
104:16,24
153:16 179:14
179:18
**178** 3:16
**18688** 1:17
**18th** 6:14 155:22
**19** 1:9 3:14
**190** 3:16
**1900** 2:11
**194** 3:16
**197** 3:16
**1st** 23:20

**2**

**2** 3:9 99:18,19
100:6 169:22
**2:30** 44:8,10
147:17
**2:33** 210:5
**2:35** 44:10
**20** 3:14 55:8
113:17 179:20
**2001** 6:13 9:9,10
18:10
**2004** 156:15,21
156:22
**2011** 156:25
157:10,18

**2016** 23:21
157:21 158:3,6
**2017** 7:17 8:6,22
9:17,23 10:3
17:22 18:1,12
18:13 27:16,24
35:9 36:3,16
41:5 78:24
119:16 126:7
126:21,25
127:2,15 133:6
147:12 155:24
157:11 165:14
167:20 175:9
200:9,18,22,25
201:2,8
**2018** 1:9 211:21
212:18
**2022** 212:22
**209** 3:16
**21(3)** 3:14
**212** 211:2
**216** 1:23,23 2:12
**22** 3:14
**22:00** 41:19
**220** 3:4 81:5
**222** 104:4
**222.2** 102:20
**224** 80:19,22
81:3
**228** 47:24 48:7
**229** 47:24
**22nd** 9:9
**23** 3:9
**230** 45:7 48:4,4
**231** 49:15,15
**232** 64:19 71:10
**233** 64:19
**234** 57:12 60:11
**248-7906** 2:19
**27** 117:4,4
**28(D)** 212:13
**2nd** 6:13 23:20

**3**

**3** 3:10 81:2
103:17 117:4

**2016** 23:21
118:25 119:15
191:20,25
**30** 3:14 90:8,10
117:6
**303** 80:23
**30th** 212:18
**33** 3:14
**34305** 2:18
**35** 81:21 82:11
90:10
**357-3350** 2:12
**360** 194:9,12

**4**

**4** 3:4 100:3,21
106:10,13
107:9 114:8
**40** 81:20
**440** 1:22 2:6,19
**44113** 1:22 2:12
**44115** 2:6
**44139** 2:18
**490** 2:5
**498-9100** 2:6

**5**

**50** 81:20
**500** 60:1
**51** 3:14
**55** 2:11 3:15
**5th** 9:9
**5the** 122:1

**6**

**6** 36:3 41:4,7
133:6
**6:00** 147:18
**60** 47:13,18,21
**61.1.7** 202:12
**621-2550** 1:23
**621-3377** 1:23
**65th** 36:9 37:12
39:6
**69** 156:14
**6th** 35:9 41:10

**7**

**7** 3:14 7:17 8:6
8:22 9:23 10:3
17:22 18:1,10
27:16,24 36:12
41:6 78:24
119:16 126:7
126:21,25
127:15 133:6
147:12 155:23
157:8 165:14
175:9 200:18
200:25 201:8
**70** 3:15 47:15,17
47:21
**70s** 62:9
**71** 28:24 36:23
37:1 38:2 39:5
44:22 45:19
46:9,14 47:15
53:3,5,17,19
54:2,7 55:22
56:1,8,16 57:8
60:2,5,10,18
62:16 63:18
69:1 72:14
78:25
**72** 114:20
**74** 3:15
**76** 100:24 101:7
101:7 168:11
**7th** 9:17 41:11
142:7 150:24
161:1 167:6,20
200:9,22 201:2

**8**

**8** 212:22
**80** 47:3,9 62:6
**80s** 187:12,16
**80th** 28:20 30:16
**812** 2:5
**82** 3:15 49:8
51:13 52:25
53:11 66:12,13
66:13,13 69:2
69:2,4 181:18
**85** 3:15 62:6

**9**

**9** 3:14 117:4,5
**9:06** 1:18
**90** 50:20
**90s** 187:16,17
**95** 3:15
**99** 3:9,15
**9TH** 1:22

Page 212

```
 1   State of Ohio,          ) SS:          CERTIFICATE
 2   County of Cuyahoga.     )

 3
           I, Janet M. Hoffmaster, a Registered Professional
 4   Reporter and Notary Public within and for the State of
     Ohio, duly commissioned and qualified, do hereby
 5   certify that the within-named witness, SERGEANT SHAMUS
     KELLEY, was by me first duly sworn to tell the truth,
 6   the whole truth and nothing but the truth in the cause
     aforesaid; that the testimony then given by him was
 7   reduced to stenotypy, and afterwards transcribed by me
     through the process of computer-aided transcription,
 8   and that the foregoing is a true and correct transcript
     of the testimony so given by him as aforesaid.
 9
10         I do further certify that this sworn statement was
     taken at the time and place in the foregoing caption
11   specified.

12
           I am not, nor is the court reporting firm with
13   which I am affiliated, under a contract as defined in
     Civil Rule 28(D).
14
15         I do further certify that I am not a relative,
     employee, or attorney of either party, or otherwise
16   interested in the event of this action.

17
           IN WITNESS WHEREOF, I have hereunto set my hand
18   and affixed my seal of office at Cleveland, Ohio, on
     this 30th day of July 2018.
19
20
21   _____
     Janet M. Hoffmaster, RPR and Notary Public
22   in and for the State of Ohio.
     My Commission expires October 8, 2022.
23
24
25
```

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**

Page 211

1  I have read the foregoing transcript from page 1

2  through 212 and note the following corrections:

3  PAGE          LINE                    REQUESTED CHANGE

4  58            7                 AFTER REVIEWING THE VIDEO FROM

5                                  THE DASHCAM OF SPD CAR #3,

6                                  IT IS EVIDENT THAT MR. EVANS

7                                  NEVER STOPPED AT THE SAID

8                                  STOP SIGN.

9  59            12                BASED OFF DASHCAM FOOTAGE FROM

10                                 SPD CAR #3, I INCORRECTLY

11                                 RECOLLECTED MR. EVANS STOPPING

12                                 HIS VAN AT THE SAID STOP

13                                 SIGN. MR. EVANS IN FACT

14                                 NEVER STOPPED HIS VAN AT

15                                 THE INTERSECTION.

16

17

18

19                    Sergeant Shamus Kelley

20  Subscribed and sworn to before me this 6th day

21  of _September_ 2018

22

23

24                    Notary Public

                      CHRISTINA J. McKNIGHT
                      Notary Public
                      In and for the State of Ohio
                      My Commission Expires
                      March 28, 2023

25  My Commission expires: _____

**Hoffmaster & Barberic, Inc.**
**(216) 621-2550**