Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4
 5   ADAM FRIED, Administrator ) CASE NO. 1:18-cv-00139
 6   for the Estate of Roy      )
     Evans, Jr., Deceased       )
 7        and                   ) JUDGE GAUGHAN
 8   AMANDA PAULEY,             )
 9   Individually and as        ) VIDEOTAPED DEPOSITION OF
10   Parent and Next Friend     ) AMANDA PAULEY
     for D.C., Y.E., and R.E.   )
11        Plaintiffs,           )
12        versus                )
13                              )
     CITY OF STRONGSVILLE,      )
14   OHIO                       )
15        and                   )
16   JASON MILLER               )
17        and                   )
18   SGT. KELLEY                )
19        and                   )
20   JAMES KOBAK                )
21        Defendants.           )
22
23        - - - - - - -
24
25
```

---

**Page 2**

```
 1        Videotaped Deposition of AMANDA PAULEY, a
 2   Plaintiff herein, called by the Defendants for
 3   Cross-Examination pursuant to the Ohio Rules of Civil
 4   Procedure, taken before me, the undersigned, Susan M.
 5   Petro, a Stenographic Reporter and Notary Public in and
 6   for the State of Ohio, at the offices of Jordan &
 7   Sidoti, LLP, The Terminal Tower, 50 Public Square,
 8   Suite 1900, Cleveland, Ohio, on Wednesday,
 9   July 18, 2018, at 9:20 a.m.
10
```

---

**Page 3**

```
 1   APPEARANCES:
 2
 3   On Behalf of the Plaintiff, Adam Fried,
     Administrator for the Estate of Roy Evans, Jr.,
 4   Deceased:
 5        Marcus S. Sidoti, Esq.
          Jordan & Sidoti, LLP
 6        The Terminal Tower
          50 Public Square, Suite 1900
 7        Cleveland, Ohio 44113
          216.357.3350
 8        marcus@jordansidoti.com
 9   On Behalf of the Plaintiffs, Amanda Pauley
     Individually and as Parent and Next Friend for
10   D.C., Y.E., and R.E.:
11        Joseph F. Scott, Esq.
          Scott & Winters
12        The Caxton Building
          812 Huron Road, Suite 490
13        Cleveland, Ohio 44115
          216.650.5318
14        jscott@ohiowagelawyers.com
15   On Behalf of the Defendants:
16        Todd M. Raskin, Esq.
          Mazanec, Raskin & Ryder Co., L.P.A.
17        100 Franklin's Row
          34305 Solon Road
18        Solon, Ohio 44139
          440.424.0023
19        traskin@mrrlaw.com
20
21   ALSO PRESENT:
22
23        David Tackla, Videographer
24        David Pauley
25        - - - - - - -
```

---

**Page 4**

```
 1              I N D E X
 2
 3   EXAMINATION BY                    PAGE
 4   Mr. Raskin                   5
                                204
 5
 6   Mr. Sidoti               197
 7
 8   PLAINTIFF'S EXHIBITS MARKED
 9   None
10
11   DEFENDANTS' EXHIBITS MARKED            PAGE
12   A, Copies of Photos             82
13   A-1, Copies of Photo Containing Van    84
14   B, Amended Complaint            156
15   C, Report of Special Agent Charles Moran    173
16        - - - - - - -
```

Page 5

1    THE VIDEOGRAPHER:  We're on the record.
2  Today's date is July 18, 2018; the time
3  is now 9:20:59.  This is the beginning of
4  Tape No. 1.
5    Can you please raise your right hand to
6  be sworn in by the court reporter.
7  WHEREUPON,
8    AMANDA PAULEY,
9  after being first duly sworn, as hereinafter
10  certified, testified as follows:
11    CROSS-EXAMINATION
12  BY MR. RASKIN:
13  Q.  Ms. Pauley, good morning.
14  A.  Good morning.
15  Q.  My name is Todd Raskin.  We're meeting for the
16  first time.  I represent the City of Strongsville
17  and Officers -- Officer Miller, Sergeant Kelley,
18  and former Chief Kobak in the defense of a lawsuit
19  which was filed by Adam Fried as the Administrator
20  of the Estate of Roy Evans Jr. and yourself both
21  individually and as parent and next friend of
22  three children.
23  A.  Two children.
24  Q.  Let me first begin by saying please accept my
25  condolences.  I'm sorry that I have to meet you

Page 6

1  under these circumstances.
2    In the room, in addition to the court
3  reporter and videographer and two of your lawyers,
4  is your dad; is that correct?
5  A.  Yes.
6  Q.  Okay.  And you've asked to have your dad present
7  as -- as support for you --
8  A.  Yes.
9  Q.  -- today, correct?
10  A.  Yes.
11    MR. RASKIN:  All right.  And, Counsel, on
12  behalf of the Defendants, I agreed that
13  Mr. Pauley could be present so long as we
14  have a stipulation that he will be -- he will
15  not be participating in or testifying in this
16  case in any manner, be it for motion practice
17  or at trial.  Is that --
18    MR. SCOTT:  That is -- that is correct.
19  And we so stipulate Mr. Pauley will not be a
20  witness in any capacity at any stage of this
21  litigation.
22    MR. RASKIN:  Thank you very much.
23  And, Mr. Pauley, we met.
24    MR. PAULEY:  Yes.
25    MR. RASKIN:  You're not mic'd up.  But we

Page 7

1  met just before we started as well.
2    MR. PAULEY:  Yes.
3  BY MR. RASKIN:
4  Q.  Okay.  So you have very able counsel representing
5  you and I'm sure that they've discussed with you
6  what this process entails.  But -- but at the risk
7  of repeating what you've already heard, I'd like
8  to share with you just a couple of observations,
9  okay?
10  A.  Yes.
11  Q.  So -- so the first thing to remember is you must
12  always give verbal responses to questions because
13  the court reporter can't interpret what you mean
14  if you nod your head or shake your head, okay?
15  A.  Yes.
16  Q.  Secondly, this is a question and answer session,
17  it's not a conversation.  Do you understand?
18  A.  Yes.
19  Q.  Okay.  Which means we can't interrupt one another
20  because, once again, the court reporter can't take
21  down what we're both saying at the same time.
22  Fair enough?
23  A.  Yes.
24  Q.  Okay.  If you need to take a break at any time,
25  just tell me and we'll -- and we'll take a break.

Page 8

1    If I give you a document, which I will,
2  an exhibit that I'll mark, I'll ask you to read it
3  or read a portion of it, and you take as much time
4  as you need, and then you just tell me when you're
5  ready for me to ask you questions, okay?
6  A.  Yes.
7  Q.  All right.  At any time you need to consult with
8  your lawyers, just tell me that you need to take a
9  break, even if I've asked you a question -- you
10  are welcome to consult with your lawyers at any
11  time -- we'll go off the record and you can step
12  out of the room, or we will, so that you can talk
13  to your counsel, okay?
14  A.  Yes.
15  Q.  All right.  So with -- with those kinds of
16  conversations complete, let me ask you for some
17  basic information.  We'll start out easy.
18  Hopefully, the day will go easy, right?
19  A.  Yes.
20  Q.  Do you have any time constraints today?
21  A.  No.
22  Q.  Okay.  Are you taking any medication that causes
23  you any difficulty in understanding the questions
24  that I'm asking or the answers that you're giving?
25  A.  No.

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 9

1  Q.  Have you taken any medication at all today?
2  A.  No.
3  Q.  Do you regularly take some prescriptions?
4  A.  Yes.
5  Q.  What do you regularly take?
6  A.  I take ███████████ every evening.
7  Q.  That's to help you ████?
8  A.  Yes.
9  Q.  It's my understanding that you had been taking and
10     maybe still do take an ██████ medication.
11  A.  No.  I was taking ████ for ██████
12  Q.  Okay.  And do you no longer take ██████
13  A.  I no longer take it.
14  Q.  How long were you taking it?
15  A.  A year.
16  Q.  So you know what that means, but I don't.  What --
17     what's the year that you're thinking of?  What
18     month --
19  A.  I'm sorry.
20  Q.  -- to what month?
21         That's okay.
22  A.  March of 2017 to approximately March of 2018.
23  Q.  You're kind of soft-spoken.
24  A.  I'm sorry.
25  Q.  I'm kind of old, and there's kind of noise in this

Page 10

1     room, so can you try --
2  A.  Speak louder.
3  Q.  -- and keep your voice up?
4  A.  Yes.
5  Q.  Thank you.  I'll remind you.  Because if I can't
6     hear you, then I can't ask the next question and
7     we'll never get this deposition over, right?
8  A.  Right.
9  Q.  Right.
10         And my guess is the first thing you want
11     to do is finish, right?
12  A.  Yes.
13  Q.  Okay.  That's what I figured.
14         So tell me, who prescribed the ██████
15  A.  Dr. Carbone.
16  Q.  And what type of doctor is Dr. Carbone?
17  A.  He's my PCP, primary care physician.
18  Q.  Where does he practice?
19  A.  Avon.
20  Q.  Is there a name of his practice?
21  A.  No, I don't -- well, I'm not sure.  It might be
22     Westshore, but I -- I'm not exactly sure.
23  Q.  Okay.
24  A.  You can google his name, though, and it gives you
25     everything.

Page 11

1  Q.  Okay.  Did -- did the ██████ that you were
2     taking -- did the prescription ever increase or
3     decrease, or were you on the same dosage for a
4     year?
5  A.  It increased.
6  Q.  Do you know what your dosage was?
7  A.  I went up to ████████████.
8  Q.  Do you know what you started at?
9  A.  ████
10  Q.  And if I understand you correctly, by the end of
11     March of this year, you had stopped taking ████
12     entirely.
13  A.  Yes.
14  Q.  Is that because whatever symptoms you were
15     experiencing that you needed ██████ for had
16     subsided?
17  A.  No.  My doctor switched my ████████ to
18     another ████████  They seemed to make me
19     tired and nauseous, so I personally -- it was my
20     decision to quit.
21  Q.  Was the ████████████ -- ████████████ that he
22     switched you -- switched you to ████████
23  A.  Yes.
24  Q.  And when -- when were you switched to ████████
25  A.  I can't give you an exact date.  I don't recall.

Page 12

1  Q.  What's your best memory?
2  A.  Maybe January of 2018.
3  Q.  So then you weren't taking ██████ the whole --
4  A.  Not the whole year, no -- I don't know.  I -- I
5     don't know.  If you pull up the records, I'm sure
6     the pharmaceutical will show when I switched to
7     ████████
8  Q.  Why did you switch from ████████
9  A.  Nausea.  It made me actually nauseous and sleepy
10     throughout the day.
11  Q.  So the side effects?
12  A.  Yes, the side effects.
13  Q.  And why did you stop taking the ████████?
14  A.  Same side effects.
15  Q.  And that's spelled ████████████
16  A.  Yes.
17  Q.  So by March of 2018, you -- and since that time,
18     you haven't taken any medication for ██████ or
19     ████████ correct?
20  A.  Correct.
21  Q.  Are you treating with any mental health or
22     behavioral health specialist?
23  A.  Yes.
24  Q.  Who?
25  A.  I just started speaking with Alison Flowers.

Page 13

1  Q.  And Alison Flowers is -- what is her field of
2      expertise?
3  A.  I believe she's a psychologist.
4  Q.  How many times have you seen --
5  A.  I've seen her twice so far.
6  Q.  Okay.  So that's --
7  A.  Two times.
8  Q.  When was the first time you saw her?
9  A.  About maybe a month ago.
10 Q.  What's the frequency of your visits?
11 A.  Every two weeks.
12 Q.  You go every two weeks and see her for how long
13     each time?
14 A.  Until she says I don't have to.
15 Q.  No, no, no.  I'm sorry.
16 A.  Oh, how -- how long the sessions are?
17 Q.  Yes.
18 A.  Approximately 30 minutes.
19 Q.  So you would have seen Alison Flowers for the
20     first time sometime in June?
21 A.  Yes, I seen her --
22 Q.  June of 2018?
23 A.  Yes.  And then I seen her for the second time
24     yesterday.
25 Q.  Has Alison Flowers given you a diagnosis?

Page 14

1  A.  She hasn't -- she's given me paperwork on
2      ██████████████.  We mainly work
3      on -- she's trying to help me manage my ████
4      with meditation and breathing.
5  Q.  Has Alison Flowers diagnosed you as suffering from
6      ████?
7  A.  There's nothing that -- me and her haven't spoken
8      about it, but she printed me paperwork on it, so
9      that would be something you would have to ask her.
10 Q.  How did you come to begin consulting with Alison
11     Flowers?
12 A.  About a year ago Dr. Carbone kept suggesting I
13     speak with her, that's somebody that he works
14     with.  In my last appointment with him, they
15     continued to up the ████  And my lack of
16     concentration, he's -- told me that he thinks that
17     it would be a really good idea for me to speak
18     with somebody, so this time he made my first
19     appointment for me.
20 Q.  Your family doctor?
21 A.  Yes.
22 Q.  And how much does each visit cost you?
23 A.  Nothing.  My -- my insurance covers it.
24 Q.  By whom are you insured?
25 A.  CareSource.

Page 15

1  Q.  So there's no out-of-pocket expense to you at all?
2  A.  Correct.
3  Q.  Are you treating with any other physicians or
4      behavioral health practitioners for any condition
5      which you attribute to the events of March of
6      2017?
7  A.  No.
8  Q.  Are you employed?
9  A.  Yes.
10 Q.  Where do you work?
11 A.  Five Star Adult Home.
12 Q.  I'm sorry?
13 A.  Five Star Adult Home.  It's an alternative living
14     to a nursing home.
15 Q.  Where is Five Star Adult Home located?
16 A.  Avon Lake.
17 Q.  How long have you worked there?
18 A.  Approximately five years.
19 Q.  And what do you do?
20 A.  I'm a caregiver.
21 Q.  So tell me -- a caregiver can be anything from an
22     RN to an LPN to a medical assistant.  What --
23     what --
24 A.  I take a role of an STNA.
25 Q.  So you're state certified?

Page 16

1  A.  I'm not state certified, but we do everything an
2      STNA would do without the state certification.
3  Q.  Okay.  So are you --
4  A.  I do have my medical assistant license, but that
5      is not what I do in that facility.  I -- our
6      titles are caregivers.
7  Q.  So you're a nursing assistant without the state
8      certification?
9  A.  Correct.
10 Q.  Is that the job you filled all five years?
11 A.  Yes.
12 Q.  And you have a medical assistant certificate?
13 A.  Correct.
14 Q.  Okay.  And when did you get --
15 A.  2013.
16 Q.  You got to let me ask my question first.
17 A.  Sorry.
18 Q.  So you got a medical assistant certificate in
19     2013.  Where did you study for your certification?
20 A.  Ohio Business College.
21 Q.  And did you successfully pass the test?
22 A.  Yes.
23 Q.  And that's a one-year course of study, plus or
24     minus?
25 A.  Yes.

Deposition of Amanda Pauley      Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 17

1   **Q. Any other formal education beyond your medical**
2     **assistant certification?**
3   A. No.
4   **Q. Are you a high school graduate?**
5   A. Yes.
6   **Q. Where did you go to high school and when did you**
7     **graduate?**
8   A. Brookside High in 1999.
9   **Q. And in what community is Brookside?**
10   A. Sheffield Lake.
11   **Q. So in March of 2017, you were employed at Five**
12     **Star?**
13   A. Yes.
14   **Q. Did you miss any time from work --**
15   A. Yes.
16   **Q. -- following the incident?**
17   A. Yes. In March of 2017, I was employed at Five
18     Star. I had put my two weeks in and got employed
19     at a foot doctor. I worked there for one day, the
20     day that Roy passed away, that Monday I worked.
21     And then I -- after everything that happened, I
22     chose to go back to Five Star, so --
23   **Q. So how soon after the March 2017 incident did you**
24     **return to work at Five Star?**
25   A. About a month.

Page 18

1   **Q. Did Five Star accept your resignation the day**
2     **before?**
3   A. Yes, she was -- well, I -- I gave her a two-week
4     prior notice, yes. She accepted it, she was very
5     happy.
6   **Q. So how much were you making at Five Star in March**
7     **of 2017?**
8   A. Ten seventy-five.
9   **Q. And were you working 40 hours a week?**
10   A. Thirty-five.
11   **Q. Was there any interruption in your benefits in the**
12     **month that you didn't work?**
13   A. I don't understand the question.
14   **Q. Was there any interruption in your medical**
15     **coverage or anything like that?**
16   A. No.
17   **Q. What is your marital status?**
18   A. Single.
19   **Q. Have you ever been married?**
20   A. No.
21   **Q. Do you have children?**
22   A. Yes.
23   **Q. How many?**
24   A. Three.
25   **Q. What are their names and ages, please?**

Page 19

1   A. D█████ C██████, ███████████; Y██████ E█████, she's
2     and R██ E█████, ███████.
3   **Q. And is the father -- or was the father of**
4     **J█████ R██ --**
5   A. Y█████.
6   **Q. Oh, Y██████. I'm sorry. Forgive me. I apologize.**
7     **Strike that. I'll re-ask the question.**
8        **Was the father of Y███████ and R██**
9     **E███████.?**
10   A. Yeah. His name was R██ E█████. -- I'm sorry --
11     and then my son is R██ E█████.
12   **Q. Okay. Now you've confused me.**
13   A. There's █████ He should have been a third, so --
14   **Q. Okay.**
15   A. Yes.
16   **Q. So the decedent --**
17   A. Is R██ E█████, yes.
18   **Q. -- is the father -- okay. You have to let me ask**
19     **my questions, please.**
20        **The decedent is the father of Y██████ and**
21     **R██?**
22   A. Yes.
23   **Q. Your two children -- two of your three children?**
24   A. Yes.
25   **Q. Have all three of your children always lived with**

Page 20

1     **you?**
2   A. Yes.
3   **Q. It's my understanding that D████ had some**
4     **involvement with Bellefaire.**
5   A. Yes.
6   **Q. Okay. Why was D████ being seen at Bellefaire?**
7   A. I had contacted Bellefaire prior to this incident
8     because D████ had some ████████████ and I
9     thought it would be good for him to speak with
10     somebody.
11   **Q. Is this the Bellefaire in Cleveland Heights?**
12   A. No.
13   **Q. Where is --**
14   A. Elyria.
15   **Q. And what is the nature of the services that**
16     **Bellefaire in Elyria provides?**
17   A. Well, he was seeing a psychologist.
18   **Q. What was the name of the psychologist?**
19   A. Oh, my goodness. He's seen two, and I'm drawing a
20     complete blank all of a sudden.
21        THE WITNESS: Do you remember?
22   **Q. No, no. He can't answer.**
23   A. Oh, he can't?
24   **Q. Nobody can help you.**
25   A. I'm sorry.

Page 21

1  Q.  But if -- but if you know --
2  A.  I -- I can't recall right now.
3  Q.  If you don't know the answer to one of my
4      questions, just tell me you don't remember or you
5      can't recall, that's okay.  I don't want you to
6      guess.  Nobody wants you to guess.
7               Okay.  So do I understand that D███ was
8      seeing a psychologist at Bellefaire in Elyria
9      prior to the incident in March of 2017?
10 A.  Correct.
11 Q.  Why?
12 A.  He was very ██████.
13 Q.  Were you ever provided with a diagnosis?
14 A.  Yes.
15 Q.  What?
16 A.  ████████████████████████████.
17 Q.  And that was prior to March of 2017?
18 A.  Yes.
19 Q.  And was he seeing a psychologist regularly prior
20     to --
21 A.  Yes.
22 Q.  -- March of 2017?
23 A.  Yes.
24 Q.  With what frequency?  How often?
25 A.  Probably about twice a week.

Page 22

1  Q.  For how long prior to March of 2017 was that going
2      on?
3  A.  I -- my best guess would be a few months, three
4      months.
5  Q.  Has D███ continued to see a psychologist at
6      Bellefaire subsequent to the incident in March of
7      2017?
8  A.  He does not currently see one.
9  Q.  When did he last receive any counseling or
10     treatment at Bellefaire?
11 A.  I can't give you a direct answer, but to my best
12     guess would be maybe June of 2017.
13 Q.  And was the counseling discontinued because he was
14     discharged and all of his symptoms resolved, or
15     did he just decide to stop going?
16 A.  He was discharged.  He didn't want to speak with
17     anybody else currently.  He did start seeing
18     Dr. Carbone and he got some medication, which
19     seemed to help.  But he doesn't speak to anybody
20     currently.
21 Q.  Okay.  But my question was a little bit different
22     than that.
23               Was he discharged because he was -- his
24     ████████████ had resolved?
25 A.  No.

Page 23

1  Q.  Okay.  So he -- he stopped going?
2  A.  No, he was discharged.  He was discharged.
3  Q.  Why was he discharged?
4  A.  He was -- he started seeing -- he started seeing
5      Bellefaire and he got his self in trouble so,
6      through the courts, they switched his counsel from
7      the woman to the man, he really connected with the
8      man.  So when his court issues were wrapped up,
9      they wanted -- they didn't want to discharge him
10     so fast because he wanted to continue to see this
11     counselor because he needed it.  So the courts let
12     him stay on until they said we can no longer.  So
13     without the court order, he couldn't see this in
14     particular counselor.
15 Q.  What was the name of that counselor?
16 A.  I can't recall.
17 Q.  All right.  What was -- what difficulty did he
18     become involved with that caused him to be
19     involved with the courts?
20               MR. SCOTT:  Objection.
21               You can answer.
22               You're asking about juvenile records.
23               MR. RASKIN:  I understand.
24 BY MR. RASKIN:
25 Q.  You can answer.

Page 24

1  A.  He got -- got in a fight with his girlfriend and
2      he got arrested.
3  Q.  For?
4  A.  Well, for domestic violence and -- I don't know
5      the technical term.  He broke her tablet, so
6      breaking his -- girlfriend's tablet, and it
7      went to court.
8  Q.  And he went to juvenile court in Elyria?
9  A.  Correct.
10 Q.  How old is D███ now?
11 A.  Devin is ███.
12 Q.  Was that D███ only involvement with the
13     judicial system?
14 A.  Yes.
15 Q.  And have you described for me all of the
16     counseling that D███ has had as a -- a young
17     person?
18 A.  I -- actually, I was thinking about it --
19               THE WITNESS:  Which I meant to call you
20     on this one.
21 A.  He did see -- after my mother and his grandpa
22     passed away, he went to Psych & Psych because they
23     passed away so fast and --
24 Q.  When was that?
25 A.  -- in Elyria.  That was around 2013.  He went

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 25

1 there for a couple months.
2 Q. So when his maternal grandparents --
3 A. Yes.
4 Q. Has D███ lived with -- I might have asked you
5 this question.  If I did, I apologize.
6 But have all three of the kids lived with
7 you throughout their entire lifetime?
8 A. Yes.
9 Q. With regard to your medical conditions, have you
10 been diagnosed with suffering from any medical
11 conditions by any physicians?
12 A. No.
13 Q. According to the CareSource records that we
14 received, it looks like their records reflect that
15 you have a diagnosis of ████████████████,
16 ████████████████████, ████████████████,
17 ████████████████, and ████████████████, and
18 ████████████.
19 MR. SCOTT:  Objection.
20 Go ahead and answer.
21 THE WITNESS:  Excuse me?
22 MR. SCOTT:  You can go ahead and answer.
23 I'm sorry.
24 A. Well, then, nobody ever told me any of that.
25

Page 26

1 BY MR. RASKIN:
2 Q. So all that comes as a shock to you?
3 A. That all comes as a shock to me, yes.
4 Q. Okay.  Well, then, I would suggest that you reach
5 out to CareSource because that's what their
6 records that we just got show.
7 A. Yes, that's --
8 Q. So -- but to be clear then, it's your testimony
9 that you didn't -- that you don't suffer from any
10 of those conditions so far as you know?
11 A. As far as I know, no.
12 Q. Are you a smoker?
13 A. No.
14 Q. Have you ever been?
15 A. No.
16 Q. Well, they got that right apparently.
17 Okay.  Have you been diagnosed as
18 suffering from ████████████?
19 A. Yes.
20 Q. Are you taking medication to treat the pain and
21 inflammation associated with ████████?
22 A. No.
23 Q. Have you ever?
24 A. Yes.
25 Q. They got that right.

Page 27

1 Okay.  In any event, would it be your
2 testimony that whatever medical conditions you
3 have have not been affected by the events of March
4 of 2017?
5 A. Correct.
6 Q. Have you been hospitalized at any time within the
7 last 10 years overnight other than for childbirth?
8 A. Yes.
9 Q. Why?
10 A. I was very ████████ when I was pregnant with Roy
11 and I was ████████ and I was put in a ████████
12 hospital for ████████ at the time.
13 Q. Okay.  So R██ is three, so when would that have
14 occurred?
15 A. 2014.
16 Q. And was that while you were carrying R██ or after
17 you delivered?
18 A. While I was carrying him.
19 Q. Did you actually attempt suicide?
20 MR. SCOTT:  Objection.
21 You can answer.
22 A. I had took too much ████████ and I woke up in
23 the ICU.  It wasn't an attempt.  It wasn't an
24 attempt, but I did take too much.  I had worked
25 12 hours and -- I don't know.  My -- my mental

Page 28

1 stability wasn't very strong at that time.
2 BY MR. RASKIN:
3 Q. So you ████████ by taking too much ████████?
4 A. Yes.
5 Q. How many ████████ tablets did you take?
6 A. I don't know the exact number.
7 Q. And where were you hospitalized?
8 A. University Hospital in Cleveland.
9 Q. At Hanna Pavilion?
10 A. I -- I don't know.  Down -- downtown campus,
11 somewhere down here, and then they transferred me
12 to a place I don't even know the name of.
13 Q. How long were you -- well, strike that.  Were you
14 an inpatient?
15 A. Yes.
16 Q. For how long?
17 A. A week.
18 Q. Were you an inpatient voluntarily or
19 involuntarily?
20 A. Involuntarily.
21 Q. Who caused you to be admitted?
22 A. I'm assuming the -- the hospital.  I don't know.
23 Q. So you don't know who filled out the paperwork --
24 A. No.
25 Q. -- requesting that you be committed?

Deposition of Amanda Pauley                          Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 29

1   A.  I -- my -- my thoughts would be the hospital,
2       University Hospital.
3   Q.  I'm not asking you to guess.  Do you know?
4   A.  I do not know.
5   Q.  Do you know the name of the psychiatrist or
6       psychologist with whom you treated at UH?
7   A.  No.
8   Q.  Were you given instructions for follow-up care?
9   A.  They gave me ▮▮▮▮, and I followed up with my
10      OB/GYN and took ▮▮▮▮▮▮▮▮▮ for a month or two
11      and stopped.
12  Q.  Was that the only hospitalization you've had in
13      the last 10 years?
14  A.  Yes.
15  Q.  Have you described for me all of the behavioral
16      health care that you've received in the last
17      10 years?
18  A.  Yes.
19  Q.  So you didn't have any ongoing counseling with any
20      behavioral health --
21  A.  No.
22  Q.  -- professional --
23  A.  No.
24  Q.  -- after getting released from UH?
25  A.  No.

Page 30

1           MR. RASKIN:  Counsel, so we'll need to
2       get an authorization for --
3           MR. SCOTT:  Yes.
4           MR. RASKIN:  -- University Hospital as
5       well, please.
6           MR. SCOTT:  We'll get you an additional
7       one.  I think we sent three.
8   BY MR. RASKIN:
9   Q.  Did you inform Dr. Flowers of your prior
10      commitment to University Hospital?
11  A.  No.
12  Q.  Prior to working at Five Star, what type of work
13      did you do?
14  A.  I was an entertainer.
15  Q.  I'm sorry?
16  A.  I was a dancer.
17          MR. RASKIN:  Is there any way you can
18      turn this off?
19          MR. SIDOTI:  It'd be a hundred degrees in
20      here.
21  BY MR. RASKIN:
22  Q.  Where did you work as a dancer?
23  A.  Christie's Cabaret.
24  Q.  Which one?
25  A.  Downtown.

Page 31

1   Q.  And how long did you work at Christie's?
2   A.  Ten years.
3   Q.  And I should have asked you this question, and I
4       apologize, what's your date of birth?
5   A.  ▮▮▮▮▮▮▮.
6   Q.  Any other employment other than at Christie's and
7       at Five Star?
8   A.  Yes.  Roy -- Roy opened up a carpet shop on
9       Route 113 called the Remnant Barn.  I helped him
10      do everything there.
11  Q.  How long did you work there?
12  A.  A year.
13  Q.  Okay.  What year was that year?
14  A.  I want to say 2010 -- 2009, 2010.
15  Q.  And then did that business -- was that business
16      not successful?
17  A.  It was overwhelming, so he gave it to his parents.
18      It was -- it was too much for two people to
19      handle.
20  Q.  And so that's when your employment ended --
21  A.  There.
22  Q.  -- or did you continue working there?
23  A.  No.  No, I did not continue working there.
24  Q.  Did you go back to Christie's?
25  A.  Yes.

Page 32

1   Q.  Can you tell me basically what years you worked at
2       Christie's?  I'm just trying to fill in all of
3       your --
4   A.  No, that's fine.
5   Q.  -- employment history.
6   A.  2 -- probably around 2001 until 2011, 2012.
7   Q.  And then you went to Five Star?
8   A.  Yeah.  Yes, I went to Five Star in 2013.  I
9       also -- I always helped Roy on his jobs.  It
10      was -- I was almost his assistant from 2007 to --
11      that's nothing that I would claim on my taxes, it
12      was just that's what we did.
13  Q.  Have you ever been charged with and convicted of a
14      crime of dishonesty?
15  A.  Yes.
16          MR. SCOTT:  Objection.
17          THE WITNESS:  I'm sorry.
18          MR. SCOTT:  That's all right.
19  BY MR. RASKIN:
20  Q.  Can you tell me all of the crimes of dishonesty
21      which you have been convicted of within the last
22      10 years, please?
23  A.  None.
24  Q.  How about prior to that time?
25          MR. SCOTT:  Objection.

Page 33

1   You can answer.
2   A.  I was convicted of a misdemeanor fraud.
3   BY MR. RASKIN:
4   Q.  When?
5   A.  2007 or 2008.  I can't be sure of the exact
6       conviction date.
7   Q.  Okay.  And in what court were you convicted?
8   A.  Lorain Municipal Court.
9   Q.  Any other convictions?
10  A.  No.  Well, driving under suspension.  I do have
11      driving under suspension, I don't know if that's
12      what you meant.
13  Q.  It's not a crime of dishonesty, but thank you.
14  A.  Oh.
15  Q.  I saw that in the police reports, I was going to
16      ask you about that, but so -- so specifically in
17      response to the question of whether or not you've
18      been convicted of any crimes of dishonesty, the
19      only crime of dishonesty you've been convicted of
20      was in 2007 or '08 in Lorain Municipal Court, a
21      misdemeanor fraud offense; is that correct?
22  A.  Correct.
23  Q.  You did lose your driver's license; is that right?
24  A.  Yes.
25  Q.  Okay.  On the date of the incident which is the

Page 34

1       subject matter of your complaint in March of 2017,
2       you didn't have a valid driver's license, did you?
3   A.  I believe I did.  I carry an SR-22/Bond and it was
4       due, but I don't believe -- I believe I had a
5       license at that time.
6   Q.  Okay.  I saw in the police reports that you told
7       one of the --
8   A.  I didn't think I had one.
9   Q.  You got to let me ask my question before you
10      answer.  Remember, it's not a conversation,
11      questions and answers.  Okay.  And I apologize, I
12      didn't mean to interrupt you, but the record won't
13      make any sense.
14          All right.  So as I recall, you told a
15      Strongsville police officer after the shooting
16      that both you and Roy did not have valid driver's
17      licenses, you both had had your licenses
18      suspended.  Is that what you told the Strongsville
19      police?
20  A.  Yes.
21  Q.  But you're now telling me you believe that your
22      financial responsibility bond had not yet expired
23      on the date of -- of the shooting?  Yes?
24  A.  Yes.
25  Q.  Okay.  You have to --

Page 35

1   A.  Yes.
2   Q.  -- answer verbally.
3           Okay.  And what leads you to believe that
4       what you told the Strongsville police officers was
5       incorrect?
6   A.  Because I -- I paid it and I -- I believe -- back
7       then, everything was jumbled.  But when I did pay
8       my SR-22, I believe the girl said that it was
9       still instated, like there was a grace period or
10      something like that.
11  Q.  Oh, so it may have expired, but -- but you had a
12      certain window to --
13  A.  Yes.
14  Q.  -- go forward --
15  A.  To -- to pay.  I -- I was under the impression
16      that if you did not pay it by that date it
17      expired.
18  Q.  Right.
19  A.  I thought it expired, I paid it the prior day.
20  Q.  I see.
21  A.  Yes.
22  Q.  So you paid it on, what, March 16?
23  A.  I -- I can't be sure.
24  Q.  I'm sorry.  You paid it on March 6, you think?
25  A.  No, I would have paid it on, like, March 8,

Page 36

1       March 9.
2   Q.  So after the shooting?
3   A.  Prior to him passing away, yes.
4   Q.  Okay.  Let's -- let's -- let's make sure that we
5       have an understanding of the dates.  My
6       understanding is the incident which is the subject
7       matter of your lawsuit occurred on March 7.
8   A.  Yes.
9   Q.  And -- and so you think you paid it on March 8th
10      or 9th?
11  A.  Yes.
12  Q.  After Roy --
13  A.  Yes.
14  Q.  -- passed?
15  A.  Yes.
16  Q.  You're aware that he actually passed on the 7th,
17      right?
18  A.  Yes.
19  Q.  That was a yes?
20  A.  Yes.
21  Q.  Again, I'm sorry if I ask you questions that are
22      painful to you.  If you need to take a break,
23      please do so, just tell us and we will, okay?
24      Because it ain't any fun on for any of us, least
25      of all you, I understand that and I'm trying to be

Deposition of Amanda Pauley | Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 37

1 sensitive to that, okay?
2      Have you now described for me all of the
3   medical care and hospital care that you have
4   personally received in the last 10 years --
5 A. Yes.
6 Q. -- whether it's for behavioral health or physical
7   health?
8 A. Yes.
9 Q. What about D▓▓▓? Has D▓▓▓ received any medical
10   care or behavioral health care in the last
11   10 years that you haven't told me about?
12 A. No.
13 Q. He hasn't been hospitalized overnight for any
14   reason?
15 A. No.
16 Q. No behavioral health, psychological problems which
17   caused him to be committed?
18 A. No.
19 Q. Is D▓▓ -- where does he go to school?
20 A. Gerson, the Eleanor Gerson School.
21 Q. Is that G-e-r-s-o-n?
22 A. Yes.
23 Q. And you have to forgive me, but I'm not familiar
24   with that school. Is that a public school?
25 A. It's a school for kids that have like -- I guess,

Page 38

1   like, ▓▓▓▓▓. It's -- it's a school for kids
2   that need more one-on-one. You have to have an
3   IEP.
4 Q. So you have to have an individual educational
5   plan?
6 A. Yes.
7 Q. That's --
8 A. To attend there. I'm sorry.
9 Q. That's all right.
10      So you have to -- so did one of the
11   public schools he was attending prepare an IEP for
12   D▓▓▓?
13 A. Yes.
14 Q. And what school was that?
15 A. Avon.
16 Q. Avon High School?
17 A. Middle School.
18 Q. And was it a counselor or a psychologist or a
19   nurse at Avon Middle School who prepared the IEP?
20 A. I do not know who prepared it.
21 Q. For how many years has D▓▓▓ been at the Eleanor
22   Gerson School?
23 A. Two.
24 Q. Where is that located?
25 A. West 117th -- no, I'm sorry. 107th and Detroit

Page 39

1   Road in Cleveland.
2 Q. Is it a public school operated by the Cleveland
3   Public Schools, or is it a private school, if you
4   know?
5 A. I'm not -- I'm not sure.
6 Q. Is D▓▓ in the grade that he should be in
7   chronologically?
8 A. No.
9 Q. Okay. So what grade is D▓▓ in?
10 A. D▓▓ is in ▓▓▓. He was held back in
11   kindergarten.
12 Q. You say he's in ▓▓▓. So we're in the
13   summertime, so did he just complete the ▓▓▓
14   grade, or is he going into ▓▓▓ grade?
15 A. He's going -- he's going into the ▓▓▓ grade.
16 Q. Okay. So he just completed the ▓▓▓ grade?
17 A. No, I'm sorry. He didn't complete the ▓▓▓
18   grade. He -- he failed last year. So he was held
19   back in kindergarten and he did not complete the
20   ▓▓▓ grade, so he'll be attending ▓▓▓ grade
21   again this year.
22 Q. If I mispronounce "Y▓▓▓," you feel free to
23   correct me every time I do that because sometimes
24   I just draw blanks at these things, so forgive me.
25      Y▓▓▓▓ would be in the -- would have

Page 40

1   completed the ▓▓▓ grade?
2 A. Yes.
3 Q. And she's going into ▓▓▓ grade?
4 A. Yes.
5 Q. Where does she go to school?
6 A. Open Door Christian Academy.
7 Q. And where is that located?
8 A. Elyria.
9 Q. And R▓▓, of course, is too young to be -- is he in
10   ▓▓?
11 A. No.
12 Q. So who takes care of R▓▓ while you work?
13 A. Kiddie College. I think -- I believe this year
14   he'll be going into, like, their ▓▓▓▓▓ room.
15 Q. Have you described for me all of the medical care
16   and/or hospitalizations that either -- and
17   behavioral health care that either Y▓▓▓ and R▓▓
18   have experienced?
19 A. Yes.
20 Q. Has Y▓▓▓ had any mental health care at all?
21 A. No.
22 Q. What about R▓▓?
23 A. No.
24 Q. Has Y▓▓▓ been evaluated by a mental health
25   professional or behavioral health professional?

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 41

1  A.  No.
2  Q.  Same answer for R██?
3  A.  Correct, no.
4  Q.  Have either of them, other than when they were
5      born, been hospitalized overnight?
6  A.  No -- oh, I take that back.  Y██████ had █████
7      when she was younger.  So yes, Y██████.
8  Q.  Where was she hospitalized?
9  A.  Now I can't think of the name of it.  It's the one
10     in Westlake.  St. John West Shore.
11 Q.  In what year?
12 A.  ████.
13 Q.  When she was a baby?
14 A.  She was a baby.
15 Q.  Was that just one night?
16 A.  No, she --
17 Q.  For how long?
18 A.  She was hospitalized a couple times there for two
19     or three nights.
20 Q.  Due to ███████a, same condition?
21 A.  Uh-huh.
22 Q.  Who is Y██████ and R██ pediatrician?
23 A.  Dr. Mona Patel.
24 Q.  And where does Dr. Patel practice?
25 A.  North Ridgeville.

Page 42

1  Q.  Does Dr. Patel practice in a -- within a group
2      name, or is it just her practice, if you know?
3  A.  I believe it's Westshore Primary Care.
4  Q.  You told me you were single.  Have you ever been
5      married?
6  A.  No.
7  Q.  If I asked you that question, I apologize.
8          I'm going to ask you some questions
9      concerning Roy Evans Jr.  How long were you and
10     Roy a couple?
11 A.  We met when we were -- when I was 16.  We split
12     up.  I guess he -- we were together for 10 years.
13 Q.  Okay.
14 A.  So we got back -- in 2007 until 2018.
15 Q.  Okay.  So --
16 A.  Or, I'm sorry, 2017.
17 Q.  Let me see if I -- if I understand your
18     testimony.  So you met when you were 16, that
19     would have been 1997?
20 A.  '98.  '98 to '99 we dated.
21 Q.  And then you reconnected in what year?
22 A.  2007.
23 Q.  And did you remain together until he passed?
24 A.  Yes.
25 Q.  So 2007 to 2017?

Page 43

1  A.  Correct.
2  Q.  And did you live together for that 10 years?
3  A.  Yes.
4  Q.  Yes?
5  A.  Yes.
6  Q.  Where did you live?
7  A.  When I -- I moved in with him, he had -- he had a
8      small trailer, then we lived on Middle Avenue in
9      Elyria, then we had a house for several years on
10     Phillips Court.
11 Q.  In Elyria?
12 A.  In Elyria.  And then Avon when he passed away.
13 Q.  The same location in Avon where you presently
14     live?
15 A.  I live in Elyria now.
16 Q.  You live in Elyria?
17 A.  I moved.  Yes.  After he passed, I moved last
18     September.
19 Q.  Okay.  So the address I have is -- is 812 Huron
20     Road East, Suite 490, which I suspect is the
21     address of this office.  So can you tell me what
22     your present home address is, please?
23 A.  370 Concord.
24 Q.  370.
25 A.  Concord.

Page 44

1  Q.  Concord?
2  A.  Elyria.
3  Q.  And you've lived there for how long?
4  A.  Almost a year.  Since last September.
5  Q.  So nine months, plus or minus?
6  A.  Yes.
7  Q.  And who lives there with you?
8  A.  Y██████, R██, and D████.
9  Q.  And prior to 370 Concord, where did you live?
10 A.  1606 Cypress West.
11 Q.  And that was Avon?
12 A.  Yes.
13 Q.  And at that point, it was the five of you?
14 A.  Excuse me?
15 Q.  When you lived there, did you live there with
16     Y██████, R██, D████, Roy, and yourself?
17 A.  Yes, when Roy came home from prison.  He was only
18     out a few months, yes.
19 Q.  Okay.  I'm going to ask you about that in a
20     minute.
21 A.  Can I use -- can I use the restroom?
22 Q.  Of course.  Don't forget to take your mic off.
23         THE VIDEOGRAPHER:  We're going to go off
24     the record.  The time is now 10:13:19.  Off
25     of the record.

Page 45

1    (Recess was taken.)
2    (Whereupon, Mr. Pauley exited the
3    conference room.)
4    THE VIDEOGRAPHER: We're back on the
5    record. This is the beginning of Tape No. 2.
6    The time is now 10:22:48. On the record.
7    BY MR. RASKIN:
8    Q. Okay. So we've just taken a short break.
9    By the way, may I call you Amanda?
10   A. Yes.
11   Q. Thank you.
12   Your dad isn't here.
13   MR. RASKIN: Is it okay if we resume?
14   MR. SCOTT: Yes, it is. He'll rejoin us
15   in a few minutes.
16   MR. RASKIN: Okay. All right. Fine. I
17   just didn't want to be insensitive.
18   BY MR. RASKIN:
19   Q. Okay. So I'd like to ask you some questions --
20   some of the same questions actually that you've
21   just been answering only this time with respect to
22   Roy, okay?
23   So you said you were 16 when you met Roy.
24   How old was he at the time?
25   A. Eighteen. I believe --

Page 46

1    Q. Did you go to school together?
2    A. No.
3    Q. Okay. Are you aware of his background? In other
4    words, where he was born, raised, went to school,
5    that kind of thing.
6    A. Yes.
7    Q. Tell me where was he born, raised and went to
8    school.
9    A. He was -- he was born in Lorain.
10   (Whereupon, Mr. Pauley entered the
11   conference room.)
12   A. He was raised in Lorain. I believe he moved to
13   Medina while he was younger for a short period of
14   time, then he went to Southview and Admiral King,
15   just the Lorain -- the local Lorain schools.
16   Q. Okay. So he -- did he graduate from Admiral King?
17   A. He did not graduate.
18   Q. Okay. What was the highest grade in high school
19   that Roy completed?
20   A. I'm not sure.
21   Q. But you know that he didn't graduate?
22   A. I know he did not graduate.
23   Q. Did Roy have any formal education after leaving
24   high school?
25   A. He got his GED.

Page 47

1    Q. In what year?
2    A. Before we reunited in 2007, so I can't be sure of
3    the year.
4    Q. When you met Roy initially in '97 or '98, what was
5    he doing?
6    A. Carpet.
7    Q. He was a carpet installer?
8    A. He was a carpet assistant. He would prep the jobs
9    for a man named Ron Baumhardt, I believe he had
10   passed away. They were employed through Dewey's
11   Carpet and Furniture.
12   Q. Throughout Roy's adult life, when he wasn't in
13   prison, is that how he earned a living?
14   A. Yes.
15   Q. And was he an independent contractor?
16   A. Yes.
17   Q. So he would get hired by whom to do the
18   installation?
19   A. He would get hired by personal people and he would
20   also be hired through -- like one of the places he
21   worked mainly was through Scarvelli Flooring in
22   Avon. He worked -- he worked with Ted's Flooring
23   in Lorain. He's worked through Budget Carpet &
24   Tile before they shut down in Elyria. And then he
25   did his own, he advertised as JR Carpet

Page 48

1    Installers, and he would do his own work, too.
2    Q. And during the years that -- after you and Roy
3    reconnected and began living together, which I
4    think you said was the 10-year period from 2007 to
5    2017, other than when he was in prison, how much
6    did he earn in a year?
7    A. I can't be sure.
8    Q. On average, what's your best estimate?
9    A. I would -- I mean, I would say -- I don't know.
10   Twenty -- it would depend if -- I'll say 25,000,
11   that -- that'll be my estimate. I know that they
12   would get 1099s, I believe they're called --
13   Q. Yes.
14   A. -- through, like, the carpet stores.
15   Q. Right.
16   A. So I mean, that -- like, I know when he was
17   working for Scarvelli, I'm pretty sure he made
18   probably a little more.
19   Q. Was he an employee of Scarvelli?
20   A. They're not considered employees. They're
21   independent contractors, but Scarvelli would get
22   them work.
23   Q. Right.
24   A. Yes.
25   Q. Okay. So -- so he would get 1099s?

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 49

1   A.  Yes.
2   Q.  And -- and your best estimate is that on
3       average -- some years might be higher, some years
4       might be lower -- but on average, Roy would have
5       earned $25,000 per year each year during the 10
6       years that you lived together between 2010 and
7       2017; is that correct?
8   A.  Yes.
9   Q.  Did you and Roy file joint tax returns or were --
10      were they individual returns?
11  A.  Individual.
12  Q.  Following his death -- strike that.  Do you have
13      access to -- to the copies of his tax returns in
14      the years preceding his death?
15  A.  I do not.
16  Q.  Who does?
17  A.  I don't believe he filed taxes all the time.  I --
18      I know that he did at times, but I don't believe
19      he filed too many taxes.
20  Q.  So in spite of get --
21  A.  Yes, in -- I'm sorry.
22  Q.  No, that's okay.
23          So in spite of receiving 1099s, Roy
24      didn't file taxes?  He didn't file income tax
25      returns?

Page 50

1   A.  Not all the time.
2   Q.  Can you tell me -- in the 10-year period that the
3       two of you lived together, can you remember any
4       year in which Roy filed a federal tax return?
5   A.  He filed through H&R Block a few times.
6   Q.  So a few times -- again, in your mind, you know
7       what -- what you mean by that, help me to
8       understand.  Is that once or twice or four or five
9       times?
10  A.  I would say about twice.
11  Q.  Twice.  So twice in 10 years he had H&R Block
12      complete tax returns for him?
13  A.  Yes.
14  Q.  Was the IRS pursuing Roy at the time of his death?
15  A.  I do not know.
16  Q.  Would that likewise -- would your answer be the
17      same regarding Roy filing Ohio tax returns and any
18      city tax returns that Avon might require or any
19      other city in which he lived?
20  A.  To my guess, I don't -- the only time I know that
21      he filed tax returns is when I took him to H&R
22      Block with me.  Now, I know that his parents would
23      always file taxes.  I don't know if he would go
24      with them.  I'm not -- like, I'm not real clear on
25      when he did and what he did.  And what he did with

Page 51

1       those forms, I don't know.
2   Q.  Okay.  But you -- do you have a specific
3       recollection of taking him with you to H&R
4       Block --
5   A.  Yes.
6   Q.  -- a couple of times?
7   A.  Yes.
8   Q.  And then that --
9   A.  Yes, that -- that's how I know that he filed those
10      years.
11  Q.  Well, actually, you really don't know that he
12      filed those years, do you, as opposed to going
13      with you to H&R Block?
14  A.  No.  I remember she seen the lady I seen, so I know
15      for a fact that he filed -- I cannot -- I want to
16      say -- I'll say I know for a fact he filed at
17      least once, I think it was twice, and I only can
18      say that because it was through my lady.  Any
19      other time, like, I would go by myself and file my
20      taxes, so --
21  Q.  When you say go by yourself and file your taxes,
22      by that do you mean that you would have H&R Block
23      file them for you?
24  A.  Yes.
25  Q.  Okay.  And so when you say that you know that he

Page 52

1       filed once and maybe twice in the 10 years that
2       you all lived together, that's because he -- you
3       know he asked H&R Block to file tax returns for
4       him when he accompanied you?
5   A.  Correct.
6   Q.  Okay.  I just want to make sure I understand your
7       testimony.
8           Had Roy been married at any time?
9   A.  Yes.
10  Q.  To whom and when?
11  A.  Her name was Jessica, and I believe he got married
12      November of '99.
13  Q.  Do you know Jessica's last name?
14  A.  Evans.  I don't know if she changed it or not,
15      but that's --
16  Q.  Okay.  But she took his name when they married as
17      far as you know?
18  A.  She took his -- yes.
19  Q.  And you say they were married in 1999?
20  A.  Yes.
21  Q.  Okay.  And were they divorced?
22  A.  They were.
23  Q.  And when did they divorce?  Do you know?
24  A.  They did not formally divorce until 2009.
25  Q.  But, clearly, he was living separate and apart

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 53

1   from her because he was living with you?
2   A.  Yeah, yeah.  They had been done -- they never even
3       spoke.  They had actually -- I don't even believe
4       she lived in the state.  She had contacted his
5       mother and then, you know, they went and filed for
6       the divorce and just got it done with.
7   Q.  So do you know where Jessica Evans resides?
8   A.  I have no idea.  The last I heard was Michigan.
9   Q.  Do you know where in Michigan?
10  A.  Absolutely not.
11  Q.  And her contact was through Roy's mother?
12  A.  Yes.  She always had the same phone number.
13  Q.  And did Roy and Jessica have children?
14  A.  No.
15  Q.  Did Roy have any children other than Y█████ and
16      R██?
17  A.  Yes.
18  Q.  Okay.  What are the names and ages of those
19      children, please?
20  A.  D█████, with a "D" -- not ███████, D█████ -- D█████
21      T█████, his birthday was █████████████4; and
22      J█████ E█████, his birthday is ███████████████.
23  Q.  And do you know the identity of D█████ T█████
24      mother?
25  A.  Do I what?

Page 54

1   Q.  The identity of D█████ T█████ mother?
2   A.  Yes.
3   Q.  What is her name?
4   A.  Jennifer Taylor.
5   Q.  And where does Jennifer live?
6   A.  Erie Street in Elyria.
7   Q.  And J█████ E█████, what is the identity of his
8       mother?
9   A.  Crystal Tummel.
10  Q.  And could you spell her last name?
11  A.  T-u-m-m-e-l.
12  Q.  And where does -- do you know where Crystal
13      resides?
14  A.  I do not.
15  Q.  Do you know if she -- do you know what town she
16      lives in?
17  A.  I do not.  The last I heard -- Roy's mother would
18      know.  She had moved from -- she was living in
19      Columbus when Roy passed.  She moved up here and
20      was staying with family in Lorain until she got
21      her own place.  Now, whether or not she got her
22      own place, I'm not 100 percent sure.  So she is in
23      Lorain County right now, though.
24  Q.  She is in Lorain County?
25  A.  She is in Lorain County right now, but I couldn't

Page 55

1   give you an address.
2   Q.  Okay.  Can you give me a city?  Is she in Lorain?
3       Elyria?
4   A.  Lorain -- Lorain or Elyria would be my guess.
5       She -- she was with her mother.
6   Q.  Do -- do you know both of these women?
7   A.  Yes.
8   Q.  Are you acquainted with them apart from the fact
9       that they are the mother of Roy's other children?
10  A.  Me and Jennifer are friends.
11  Q.  Okay.  So Roy had an affair with Crystal while he
12      was living with you?
13  A.  Correct.
14  Q.  Did Roy see either D█████ or J█████ regularly?
15  A.  He seen D█████ all the time.  He didn't see J█████.
16  Q.  And when you say he saw D█████ all the time, again
17      you know what that means in your brain, but I
18      don't.
19  A.  I'm sorry.  He seen -- he seen D█████ on a daily
20      basis.
21  Q.  On a daily basis?
22  A.  On a daily basis.
23  Q.  How would he -- did D█████ live with you all?
24  A.  D█████ did not live with us.  He resided with his
25      mother, but we would pick D█████ up all the time,

Page 56

1   his mother would pick him up and, you know, bring
2   him to our house.  He stayed every weekend with
3   us.  In the summer, he would -- stayed every
4   summer with us.
5   Q.  And, of course, that was probably easier because
6       you and Jennifer are friends.
7   A.  Yes, yes.
8   Q.  Was there a child support order that Roy had to
9       support D█████ and J█████?
10  A.  Yes.
11  Q.  And what court entered those orders?
12  A.  Lorain County.
13  Q.  And was Roy current in paying his child support --
14  A.  No.
15  Q.  -- according to the court order?
16  A.  No.
17  Q.  Did he pay any child support?
18  A.  I mean, he would pay -- I mean, I'm assuming he
19      paid at some point, so sometimes.
20  Q.  I don't want you to ask --
21  A.  I don't know.
22  Q.  I'm sorry.  Forgive me, that was my fault.  I
23      apologize.  I don't want you to assume.
24          If you're aware that Roy paid child
25      support, please tell me that.  And if you don't

Page 57

1     know, you can tell me you don't know.
2 A. I don't know.
3 Q. And so I'm clear, Roy didn't marry either Jennifer
4     or Crystal --
5 A. Correct.
6 Q. -- is that correct?
7 A. Yes.
8 Q. Roy was, in fact, convicted of crimes of
9     dishonesty, wasn't he?
10 A. Of dishonesty?
11 Q. Yes.
12 A. I'm not aware of that.
13 Q. Okay. What caused him to go to prison?
14 A. Felonious assault.
15 Q. So at least in your mind felonious assault
16     wouldn't be a crime of dishonesty?
17 A. No, that would be a crime of fighting.
18 Q. And let me be more -- a little broader in my
19     question, and -- but let me first ask you -- and
20     I'm not asking you to be a lawyer now, but I just
21     need to understand what your thought process is.
22     So when you hear a question which asks whether or
23     not a person has been convicted of a crime of
24     dishonesty, what definition do you use for that
25     terminology in your brain?

Page 58

1 A. I would just assume lying, stealing, theft. To
2     me, that would be dishonest.
3 Q. Okay. All right. So you're aware that Roy had
4     criminal convictions, correct?
5 A. Yes.
6 Q. How many convictions did he have?
7 A. I don't know.
8 Q. Okay. All right. You know of some of them
9     though, right?
10 A. Yes.
11 Q. Why don't you tell me about each criminal
12     conviction for Roy that you are aware of.
13 A. In 2014, he went to prison for felonious assault.
14     And when me and him reunited in 2007, he had just
15     gotten out of prison for felonious assault.
16 Q. And was he sentenced in both of those instances by
17     the court in Lorain County?
18 A. Yes.
19 Q. So they were Lorain County convictions?
20 A. Yes.
21 Q. Are you aware of any convictions for crimes that
22     Roy committed in any county other than Lorain
23     County?
24 A. No.
25 Q. Are you aware of any other crimes that Roy was

Page 59

1     convicted of apart from the 2007 felonious assault
2     and the 2014 felonious assault?
3 A. No.
4 Q. How long was he in prison for the 2014 felonious
5     assault?
6 A. Two years.
7 Q. And was he at Lorain Correctional?
8 A. No, he was at Mansfield.
9 Q. And what about the 2007 felonious assault? How
10     long was he in prison?
11 A. I can't be sure.
12 Q. Okay.
13 A. I didn't speak to him prior to it, so I can't be
14     sure.
15 Q. Okay. Do you know where he was incarcerated then?
16 A. From my understanding, Richland and Lebanon.
17 Q. And your understanding is based on what Roy told
18     you?
19 A. Yes, yes.
20 Q. Okay. And so other than his incarceration in
21     Mansfield, Richland, and Lebanon, any other
22     incarcerations that you're aware of?
23 A. Lots of traffic stops. You know, he would go to
24     jail for not paying his child support, stuff like
25     that. But no, he -- those are the only prison

Page 60

1     convictions that I know of.
2 Q. So from time to time, he would be arrested because
3     of his child support arrearages?
4 A. Uh-huh.
5 Q. Was he arrested for DUS?
6 A. I know he's gotten plenty of DUSs, but I can't
7     recall if he was actually arrested for those.
8 Q. Any other criminal activity beyond unpaid child
9     support and DUS and the two felonious assaults
10     you've told me about?
11 A. He had gotten a child endangerment in Avon. He
12     ran inside Scarvelli Floors and got a paycheck and
13     my daughter was sleeping in the car and, I guess,
14     he couldn't run in the store -- or run and get his
15     paycheck.
16 Q. Was that -- you say that happened in Avon, did
17     that -- was that Avon Municipal Court or was that
18     a child endangerment charge by the Avon Police?
19 A. I can't be sure.
20 Q. Okay. Do you know when that was?
21 A. Probably like 2013.
22 Q. And which of your children did that involve?
23 A. Y██████.
24 Q. Did Y█████ suffer any injuries as a result?
25 A. No, she was sleeping.

Page 61

1  Q.  He just left her in the car and that's why?
2  A.  Yes.  She was sleeping, so he went and got his
3      paycheck.
4  Q.  By the time this is over, I'm going to remember
5      how to spell her name.
6          Do you know the facts of either of the
7      felonious assaults?  Do you know what happened?
8  A.  Yes.
9  Q.  Okay.  Tell me about the 2014 felonious assault.
10     What was involved in that, please?
11 A.  He was -- it was New Year's Eve.  I had dropped
12     our friend off at a house.  I was pregnant, I fell
13     asleep.  He went to go pick the friend up from the
14     house not aware that a fight had broke out prior
15     to him getting there.  So when he arrived and went
16     to go to the door to get the friend, he was
17     attacked and he was choked to the point of passing
18     out.  And he had a switchblade on him, and he
19     stabbed the man.
20 Q.  And what about the 2007 felonious assault?
21 A.  I can't be sure.
22 Q.  Can't be sure of that?
23 A.  No.
24 Q.  Well, what did Roy tell you happened?
25 A.  That there was a whole bunch of guys that tried to

Page 62

1      jump him and he got in a car because, obviously,
2      they outnumbered him.  And when he drove -- like,
3      they tried to block the roadway, so when he -- he
4      drove straight, he went up into one of the guys.
5  Q.  So it was felonious assault with the use of a
6      vehicle?
7  A.  I can't be sure.
8  Q.  Right.  As he described it to you --
9  A.  Yes, yes, that's how he described it.
10 Q.  -- he used the car --
11 A.  Yes.
12 Q.  -- to assault a pedestrian?
13 A.  Yes.
14 Q.  Did you talk to Roy about these events, the --
15     stabbing and the use of the car to assault a
16     pedestrian?  I mean, did he tell you what he was
17     thinking, why he did what he did?
18 A.  Not the prior case.  Like I said, we wasn't
19     together when that happened.  In the 2007, yes.
20     He said that he was scared for his life.  He said,
21     "I was attacked.  I wasn't prepared.  I had no
22     idea going into this place that there was even any
23     fighting going on," and he was attacked.
24 Q.  And that's when he used the knife?
25 A.  And he reacted.

Page 63

1  Q.  Roy knew that -- that using a car to assault a
2      pedestrian was -- was wrong, didn't he?
3          MR. SCOTT:  Objection.
4          You can answer.
5  A.  I -- I mean, I -- I can't answer what Roy knew and
6      what he felt back then because we wasn't --
7  BY MR. RASKIN:
8  Q.  I'm asking what -- I apologize.  That's a fair
9      response to my question because it was a bad
10     question.
11         Did Roy ever tell you that -- that he
12     knew that using a car to assault a pedestrian
13     was -- was wrong?
14 A.  No, but we didn't really talk too much about how
15     the case came about.  He was -- when we got
16     together, he was on parole.  I mean, he just
17     mentioned -- there wasn't lengthy conversations on
18     why or the events or what happened leading up to
19     it.
20 Q.  Was Roy's parole ever violated?
21 A.  Yes.
22 Q.  Who was Roy's parole officer?
23 A.  I don't know her name.  Not -- I'm sorry.  Let me
24     rephrase that.  His parole was violated in the
25     earlier case, not in the later case.

Page 64

1  Q.  Okay.  So since getting out of prison in -- so
2      that would have been -- he would have gotten out
3      of prison in 2016?
4  A.  September 28, 2016.
5  Q.  And he -- was he still on parole at the time of
6      his passing?
7  A.  Yes.
8  Q.  And you don't know the name of his parole officer?
9  A.  I cannot recall.  I'm sorry.
10 Q.  That's okay.
11         And it's your testimony that since his
12     release from prison in September of 2016 he was
13     not violated?
14 A.  No.
15 Q.  He maintained the conditions of his parole?
16 A.  Correct.
17 Q.  In the 10 years preceding his death that you know
18     about when he wasn't in prison, was Roy ever
19     hospitalized overnight?
20 A.  Yes.
21 Q.  How many times?
22 A.  A few times.
23 Q.  Do you recall the events which led up to each
24     hospitalization?
25 A.  Yes.

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 65

1  Q.  Okay.
2  A.  Two of the hospitalizations was due to his ███████
3  ███████, he has -- he had severe ███████████.
4  Q.  Okay.  So let's -- so that I can follow along
5      chronologically -- because you're younger than me
6      and my brain cells don't work quite that fast.  So
7      let's start with -- if you would please, with the
8      hospitalization most recent in time prior to his
9      death.  When was that and where was it?
10 A.  January 1, 2016.
11 Q.  Okay.
12 A.  He was hospitalized -- he wound up with an
13     ████████████████ and it was making his body
14     go █████, and he was in the hospital for about
15     five days.
16 Q.  So he had ██████?
17 A.  Yes.
18 Q.  Okay.  And where was he hospitalized?
19 A.  Elyria.
20 Q.  Elyria Memorial?
21 A.  Yes.
22 Q.  And you say it was about five days?
23 A.  Yes.
24 Q.  Okay.  And -- so no hospitalizations closer in
25     time to his death than January of 2015 --

Page 66

1  A.  Correct.
2  Q.  -- correct?
3      All right.  When is the next most recent
4      hospitalization?
5  A.  2014.
6  Q.  Do you know what month?
7  A.  I would say September or October of 2014.
8  Q.  Okay.  Why?
9  A.  His ████████████████.
10 Q.  Did Roy have ███████████████████████
11     ██████████ because of the ████████████████?
12 A.  He did -- he did not have surgery.  He was
13     hospitalized for about a week, but no, he did not
14     have surgery, and he was put on a lot of
15     medication.
16 Q.  Okay.  Was that also at Elyria?
17 A.  Yes.
18 Q.  Okay.  And how about the next most recent
19     occasion?
20 A.  He was hospitalized at Lorain Community Hospital
21     for a ██████ condition.
22 Q.  Lorain Community Hospital, I'm not familiar with
23     that one.  Is that in the City of Lorain?
24 A.  Yes.
25 Q.  Is that the old St. Joe's?

Page 67

1  A.  No, no, it's not.  It's over more -- more down
2      like close to Kolbe Road.
3  Q.  Is it the Health Partners?
4  A.  It might be on Kolbe Road.
5      Yeah, Mercy Health Partners.  It used to
6      be Lorain Community.
7  Q.  I represent the city, so I know most of the
8      hospitals, which is why --
9  A.  That's all right.
10 Q.  But I must have started after it became Mercy.
11 A.  Mercy.
12 Q.  St. Joe's is on Broadway?
13 A.  Yes.
14 Q.  Okay.  All right.  And -- and that was for a
15     ███████████████, you said?
16 A.  Yes.
17 Q.  And when was that, please?
18 A.  That would have been December of -- December of
19     2013, I want to say.
20 Q.  And what was the ███████████████████ which
21     caused him to be hospitalized?
22 A.  I'm not exactly sure.  He was very ████████
23     couldn't sleep.  He -- he went to The Nord Center
24     because --
25 Q.  He was treating at The Nord Center?

Page 68

1  A.  He went to The Nord Center.  I -- I -- I told him,
2      you know, the ████████ and the ████████,
3      it's not normal.  I got him to go down there like
4      for an emergency thing.  And when they spoke to
5      him, they were concerned and they pink-slipped him
6      and he went to Mercy for like three -- three days
7      or five days and then he came home.
8  Q.  So did he also then go to The Nord Center in
9      December of 2013?
10 A.  He went there a couple of times, I believe, like
11     just to speak with somebody, I think.  I can't be
12     sure of The Nord Center.  I do remember his
13     hospitalization, though.
14 Q.  Well, at least one time you know he went to The
15     Nord Center and then --
16 A.  They hospitalized him.
17 Q.  -- you say "pink" -- "pink-slipped," you mean he
18     was involuntarily committed?
19 A.  He was involuntarily committed, yes.
20 Q.  And -- and one followed immediately after the
21     next, right?  He went to The Nord Center, he was
22     assessed, involuntarily committed, and sent to
23     Mercy Health --
24 A.  Correct.
25 Q.  -- Center?

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 69

1  A.  Correct.
2  Q.  So that would have also been in December of 2013?
3  A.  Yes.
4  Q.  Any other hospitalizations?
5  A.  Yes, one prior to that.  Mercy Hospital for his
6     ███████.
7  Q.  In what year?
8  A.  2007 or 2008.
9  Q.  Was Roy treating with a ████████████
10    professional?
11 A.  Not when he came home, no.
12 Q.  Was Roy prescribed any -- any ████████
13    medication?
14 A.  Yes.
15 Q.  Okay.  Who was -- who was the prescriber?
16 A.  Prior to him going to prison, I believe it was
17    The Nord Center.
18 Q.  Okay.
19 A.  When he came home from prison, he came with some
20    medication in a prescription from -- I don't know.
21 Q.  The State doctor?
22 A.  From the State, yes.
23 Q.  And what was he taking?
24 A.  ████████.
25 Q.  Do you know the dosage?

Page 70

1  A.  I can't be sure.
2  Q.  So he is released, I think you told me on
3     September --
4  A.  September 28.
5  Q.  -- 28, 2016?
6  A.  Yes.
7  Q.  So is he taking ████████ at least since 2014?
8  A.  Yes.
9  Q.  Before that?
10 A.  He started it prior to being incarcerated and he
11    continued to take the -- the medication for the
12    two years he was incarcerated.
13 Q.  Okay.  And then he comes out and he comes out with
14    some medication remaining on his script, correct?
15 A.  Yes.
16 Q.  On September 28, 2016.  And does he finish that
17    prescription?
18 A.  I can't be sure if he finished that prescription
19    or refilled one.  I know that I destroyed medicine
20    personally after he passed, like I flushed them.
21    I don't know if he filled another prescription.
22 Q.  Okay.  I asked a bad question.  I apologize.  Let
23    me withdraw that.
24       When he came out of prison, he had
25    ████████ pills left?

Page 71

1  A.  Yes.
2  Q.  Did he take all of those pills?
3  A.  That's what I mean, I don't know if he finished
4     that prescription and filled another one or those
5     were still --
6  Q.  Do you know who -- do you know who the prescribing
7     doctor would have been --
8  A.  The State gave him the --
9  Q.  -- once he got out?
10 A.  -- prescription.
11 Q.  The State gave him the prescription.
12       Okay.  As best as you can recall, when
13    was the last time prior to his death that Roy was
14    regularly taking ████████?
15 A.  He took it, I would say, up until about --
16    sometime in February I think he quit.
17 Q.  Did he stop taking the ████████ because a
18    physician or a ████████████████ professional told
19    him he didn't need it anymore?
20 A.  No.
21 Q.  He just stopped?
22 A.  He just stopped.
23 Q.  Do you understand what type of condition -- strike
24    that.  Do you understand the -- strike that.  Are
25    you aware of the symptoms that the ████████ was

Page 72

1  intended to control?
2  A.  I would assume his ████████.
3  Q.  ████████████?
4  A.  He had -- he was almost like hyper, like not able
5     to concentrate.  And I -- I can only say this
6     because I know Roy from how he was acting until
7     when he wouldn't take his medication, how he would
8     act.
9  Q.  Okay.  So that's probably a better --
10 A.  In my opinion.
11 Q.  So -- okay.  So I'm -- I'm not really looking for
12    your opinion, but what I am looking for is your
13    observations, okay?  And you just gave me a better
14    question to ask.  I apologize for that.  Thank you
15    actually.
16       So can you describe for me how Roy would
17    act when he was taking the ████████ as opposed to
18    after he stopped taking it?
19 A.  He -- when he was taking it when he was
20    incarcerated, because that's when they started, he
21    just seemed like he had his thought patterns more
22    together -- like he knew he wanted to come home,
23    he knew he wanted to work -- to where, when I
24    started observing in February, him being restless,
25    not -- very restless, like not having his thought

Page 73

1  pattern as --
2  Q.  So he didn't have clear thinking?
3  A.  Correct.  And he wouldn't be able to sleep.
4  Q.  And while he was taking it, he slept fine?
5  A.  Yes.
6  Q.  I mean, that's a hard job, I would think he'd come
7      home tired.
8  A.  You would think.
9  Q.  Is that true?
10 A.  I mean, he would come home tired from work, yes.
11     Yes.
12 Q.  How about ████████?  Did he experience any
13     ████████ when he went off the meds?
14 A.  He -- he did, this was my experience in the past.
15     Whether or not he was having ████a after he
16     left prison, I can't say yes or no because I -- I
17     didn't observe the ████████.  But whether or not
18     he felt it or not, I -- I can't be sure.
19 Q.  But you observed it when he was off the meds in
20     the past?
21 A.  Before he got put on the meds in the past, yes.
22 Q.  And when you say you observed ████████, tell me
23     what you actually saw or heard, please.
24 A.  Him thinking people are out to get him, and he --
25     he would think people were out to get him, look --

Page 74

1  like we'd be sitting on the front porch just
2  drinking coffee and "That car drove by five
3  times," and I wouldn't see it, or, you know,
4  "Don't let that person see me."  Just -- he would
5  be very paranoid.
6  Q.  Any other signs or symptoms that you observed in
7      Roy when he was off his medication, not taking
8      Risperdal?
9  A.  No.
10 Q.  Was he prescribed any mood-altering medication
11     other than ████████?
12 A.  I don't believe so.
13 Q.  In any event, you didn't see him take any of it?
14 A.  I've never seen him bring a prescription home, and
15     I've never seen him take another one besides the
16     ████████.
17 Q.  Have you now described for me all of the -- well,
18     strike that.  Other than treating at The Nord
19     Center and his involuntary commitment, any other
20     ████████ or ████████ treatment that
21     Roy had that you're aware of in the 10 years
22     preceding his death?
23 A.  No.
24 Q.  And the only -- the only place he treated for his
25     ████████ issues was either The Nord Center or

Page 75

1  Mercy Health Partners when he was committed; is
2  that correct?
3  A.  Yes.
4  Q.  Okay.  Do you need a break, or are you okay to
5      keep going?
6  A.  We can keep going.
7  Q.  Let's talk about then the events of March 7, 2017,
8      if we can.  Now, this happened in the early
9      morning hours of March 7, right?
10 A.  Yes.
11 Q.  Okay.  So tell me what you and Roy did during the
12     24 hours that ended at midnight March 2016.
13 A.  Got up that morning and we drank coffee and I left
14     to work.  I returned home from work around maybe
15     5:30, so we wasn't together.  In the meantime,
16     while I'm at work, Roy had told me he had this
17     carpet job to do, this carpet job to do, and he
18     had -- he was just messaging about work and having
19     to do this and having to go there.  But, you know,
20     like -- it wasn't like he was following a pattern,
21     I guess.  So when I came home, I changed my
22     clothes.  Roy was not home, he had my kids --
23     well, he had Y████ -- Y████ and R█ with him.  I
24     don't -- I can't remember if he had D████.  And he
25     came home and he said, "Will you help me do this

Page 76

1  carpet job?"  I agreed because he needed help and
2  he was becoming unorganized again.
3  Q.  Because he was off his meds?
4  A.  That would be my guess.
5  Q.  Well, based on your observations.
6  A.  My observation that -- that is why I believed he
7      was becoming unorganized and --
8  Q.  And tell me what you mean when you say
9      "unorganized."
10 A.  He -- he couldn't keep track of everything that he
11     had to do.  Like it wouldn't be like step one
12     first, step two, step three.  It was all this just
13     jumbled on a paper and "I just have to get all of
14     it done."
15 Q.  So his thought process wasn't clear?
16 A.  Correct.
17         So we -- we left.
18 Q.  So -- now, let me just ask you about that.  So
19     what time -- I mean, it struck me as a little
20     unusual, maybe I just don't understand the
21     business.  But what time did you leave to do the
22     carpet install?  I think it was in Akron.
23 A.  No, it was in Brunswick.
24 Q.  In Brunswick?
25 A.  It was in Brunswick.

Deposition of Amanda Pauley                          Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 77

1  Q.  Okay.  For some reason, I thought it was somewhere
2      in Akron.
3          And who gave him that job?  What --
4  A.  The personal person.
5  Q.  Oh, so it was somebody who responded to an ad or
6      something?
7  A.  Yes.
8  Q.  And what were the names?
9  A.  I can't recall.
10 Q.  Okay.  All right.  But the -- but someone, a
11     couple, somebody --
12 A.  It was -- it was an older couple in Brunswick had
13     responded.  And the reason it was so late was they
14     needed the job done and they couldn't get it done
15     in the daytime hours the next day because they had
16     some appointments, but they wanted it done.
17 Q.  Okay.  So what time did -- did you all arrive in
18     Brunswick?
19 A.  Late.  I mean, I understand -- I -- I thought it
20     was a little later.  Probably around maybe 8:30,
21     9:00, maybe a little later.  I can't give you a
22     definite time.
23 Q.  So somewhere between 8:30 and 9:30?
24 A.  Yeah.  Yes.
25 Q.  And why did you take the kids?

Page 78

1  A.  Because they always -- well, prior to Roy --
2      because my kids always did carpet with him, they
3      always helped.  Y████ was a little bit younger
4      when he went to prison, but D████ and D████
5      always helped him.  And he was -- he was taking
6      D████ because he was actually going to start to
7      teach D████ the trade of how to do it.  And then
8      Y████, she just -- she always wanted to go and,
9      obviously, they would have to go with me if I'm
10     going.
11 Q.  Was that a school night, by the way?
12 A.  Yes.
13 Q.  So how long did the carpet job take?
14 A.  Longer than expected.  A few hours.  We were there
15     a few hours.
16 Q.  So what is your best estimate of the time that the
17     job was completed and you left?
18 A.  We left after two in the morning.
19 Q.  I'm sorry?
20 A.  After two in the morning, I believe we left.
21 Q.  Let me digress for just a minute.  It's my
22     understanding, but please correct me if I'm wrong,
23     that approximately -- that within 30 days or so of
24     March 7 Roy had been stopped and cited for driving
25     under suspension; is that right?

Page 79

1  A.  From what I -- I understand, he was pulled over
2      the same -- March 6 in the morning.  I wasn't with
3      him, I was at work, but I believe there was a
4      ticket or something.  He got a driving under
5      suspension by a lady cop in Lorain.
6  Q.  Okay.  So are you aware that he actually went to
7      municipal court in -- in Avon, to mayor's court?
8  A.  I do know what you're talking about, you just
9      reminded me.  Yes, I am aware of that, too.
10 Q.  Okay.  And when was that?
11 A.  I can't give you a date.
12 Q.  If -- if I told you that it was in -- within a
13     month or so --
14 A.  I would agree.
15 Q.  -- of his death, does that help to refresh your
16     memory even though you can't remember the specific
17     date?
18 A.  Yes.  Yes, I agree.
19 Q.  So within a month or so of Roy's death he was
20     cited for driving under suspension?
21 A.  Yes.
22 Q.  In Avon?
23 A.  Yes.
24 Q.  And he went to court?
25 A.  Yes.

Page 80

1  Q.  And he wasn't put in jail, was he?
2  A.  No.
3  Q.  He was actually -- had to pay a fine, right?
4  A.  Well, I'm assuming you have to pay a fine.  I do
5      know he went to court, but I was at work and --
6  Q.  Well, what you do know is he didn't go to jail.
7  A.  He did not go to jail.
8  Q.  Whatever the resolution was, he was free to leave
9      after he appeared in --
10 A.  Yes.
11 Q.  -- in municipal court in Avon?
12 A.  Yes.
13 Q.  For the driving under suspension offense --
14 A.  Correct.
15 Q.  -- right?
16         And then you're saying the day before
17     March 7, he was cited yet again for driving under
18     suspension by Lorain PD?
19 A.  Yes.
20 Q.  Did that citation -- if you know, did -- did Roy
21     report his driving under suspension citation to
22     his parole officer?
23 A.  I do not know.
24 Q.  In any event, you do know that Roy never went to
25     jail for the driving under suspension conviction

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 81

1  in Avon, don't you?
2  A.  Right.
3  Q.  Did he tell you he was surprised by that?
4  A.  No.
5  Q.  It didn't surprise him at all that he -- that he
6      didn't go to jail?
7          MR. SCOTT:  Objection.
8          You can answer if you know.
9  A.  He never said anything to me, so --
10 BY MR. RASKIN:
11 Q.  And then on March 6, he was cited by LPD for
12     driving under suspension?
13 A.  Yes.
14 Q.  And I assume that court date was some point in the
15     future after he passed?
16 A.  Yes.
17 Q.  All right.  So you leave Brunswick at 2:00 a.m.
18     and are -- with -- with Roy and the kids in the
19     car?
20 A.  Yes.
21 Q.  By the way, were there any rear seats in --
22 A.  No.
23 Q.  Okay.  And it really wasn't a car, it was a
24     conversion van, wasn't it?
25 A.  Yes.

Page 82

1  Q.  It was a burgundy or red conversion van?
2  A.  Yes.
3  Q.  Yes?
4  A.  Yes.
5  Q.  I'm going to mark a stack of color copies that I'm
6      going to ask you to take a look at, please.  And
7      what I'm going to ask you to do is identify for me
8      if you see the conversion van that you were in on
9      March 7, 2017.
10         MR. RASKIN:  And I'm going to mark these,
11     Counsel, as Exhibit A, and we can -- we can
12     count them if you'd like.
13         (Whereupon, Defendants' Exhibit A was
14     marked for identification.)
15 BY MR. RASKIN:
16 Q.  And what I'll ask you to do is just remove for me
17     any -- any copies of photos of the conversion van,
18     if you could do that, please, assuming I can get
19     the clip back on the stack.  This is why David
20     doesn't let me do technical things.
21         MR. RASKIN:  So here's -- I got it for
22     you.  I have one for both of you.
23         MR. SCOTT:  Thank you.
24 BY MR. RASKIN:
25 Q.  So showing you what we've marked for

Page 83

1  identification purposes as Exhibit A -- you see
2  the blue sticker?
3  A.  Yes.
4  Q.  Yes?
5      So can you identify for me -- just pull
6      out --
7  A.  Okay.
8  Q.  -- any -- any xerographic reproductions of the
9      conversion van in which you were driving with Roy
10     and the kids on March 7, 2017.  They may be
11     towards the back.  There -- there is no particular
12     order to this exhibit.
13         MR. SCOTT:  Can we go off the record for
14     just a second?
15         MR. RASKIN:  Uh-huh.
16         MR. SCOTT:  It's a --
17         THE VIDEOGRAPHER:  Off the record.  The
18     time is now 11:16:23.  Off the record.
19         (Discussion off the record.)
20         THE VIDEOGRAPHER:  We're back on the
21     record.  The time is 11:17:23.  On the
22     record.
23 BY MR. RASKIN:
24 Q.  Have you been able to find any photos of the van?
25 A.  I have not.

Page 84

1  Q.  Okay.  Keep looking.
2      And so for any photo you see with the van
3      in it, even if it's got other vehicles or other
4      people, just -- just pull it out of this stack if
5      you would, please.
6      Okay.  Do you have them all?
7  A.  Yes.
8  Q.  Okay.  I counted 34 photos -- or copies of photos
9      in which the red van that you and Roy and the
10     children were riding in is shown.  Can you count
11     the number of -- of pages you have there just to
12     make sure that you and I have the same number,
13     please?
14 A.  Thirty-seven.
15 Q.  You have 37?
16 A.  Wait.  Is that wrong?
17 Q.  I have 34, but okay.  Let's -- let's do this.
18     Let's just mark those as --
19 A.  Do you want me to recount them?
20 Q.  That's all right.  It's not necessary.
21     Let's just mark that stack as A-1,
22     please.  I'll do it.  No problem.
23         (Whereupon, Defendants' Exhibit A-1 was
24     marked for identification.)
25 Q.  Okay.  So showing you what I've marked for

Page 85

1  identification as Exhibit A-1, would you agree
2  with me that the color photos that make up
3  Exhibit A-1 all have a -- an image of the red or
4  maroon van that you were riding in with Roy and
5  the children on March 7, 2017?
6  A.  Yes.
7  Q.  Okay.  Were you present on the scene at the time
8     these photos were taken, or did you see somebody
9     taking the photos?
10  A.  I don't believe so.
11  Q.  Okay.  Would you agree with me -- well, first of
12     all, are you comfortable that you had an
13     opportunity to look at each photo to confirm that
14     it contained the red van in it or the maroon van,
15     is that --
16  A.  Maroon.
17  Q.  Maroon van?
18  A.  Yes.
19  Q.  Okay.  The van has a Pennsylvania license plate.
20     Can you tell me why it had a Pennsylvania license
21     plate?
22  A.  Because he had just purchased the van from a man
23     in Lorain, and I believe the van was registered to
24     the man's mother.  And he told Roy basically, you
25     know, just switch it over and, when you switch it

Page 86

1  over, dispose of the plates, I'm assuming.
2  Q.  Well, was the van -- did Roy get title to the van?
3  A.  He got it that day.
4  Q.  He got the van that day?
5  A.  No, no, no.  He received the title that day.  He
6     switched the title into his name for the van
7     probably sometime that afternoon of March 6.
8  Q.  I see.
9        THE VIDEOGRAPHER:  Two minutes of tape.
10  BY MR. RASKIN:
11  Q.  And in looking at the -- at the copies of the --
12     of the photos that make up Exhibit A-1, do you
13     find any photo that is the least bit inaccurate
14     based upon your recollection?
15  A.  I don't understand what you mean by "inaccurate."
16  Q.  That -- that doesn't show what it is supposed to
17     show.
18  A.  No.
19  Q.  Okay.  These -- these are all accurate photographs
20     of the condition --
21  A.  Yes.
22  Q.  -- of the maroon van on March 7, 2017 and its
23     position in relation to the various Strongsville
24     police units, correct?
25  A.  Yes.

Page 87

1  Q.  Okay.  Thank you.
2        How long had you been -- well, strike
3     that.  What was your intended destination after
4     leaving Brunswick?
5  A.  To go home.
6  Q.  Okay.  And so in order to go home, what was the
7     route that Roy was taking?
8  A.  I don't know.
9  Q.  Okay.  Was Roy the only person who drove on
10     March 7, 2017?
11  A.  Yes.
12  Q.  But you just weren't paying attention to what
13     roads he was on?
14  A.  Correct.
15  Q.  However he got from the residence in Brunswick to
16     Interstate 71, we can agree that he was driving on
17     I-71 in a northbound direction when he was -- when
18     he first became aware that a Strongsville police
19     officer was following him, correct?
20  A.  I wasn't aware it was northbound, but I was aware
21     we were on 71, yes.
22  Q.  Well, wouldn't you have had to have been driving
23     northbound from Brunswick on 71 in order to get to
24     your residence in Avon?
25  A.  I would assume, but I -- I -- I can't tell you

Page 88

1  whether or not we was or not, whether or not he
2  made a wrong turn.  I -- we was on 71, but I -- I
3  can't sit here and tell you I know we were
4  northbound because I paid no attention.
5  Q.  Okay.
6        THE VIDEOGRAPHER:  We are going off the
7     record.  This is the end of Tape No. 2.  The
8     time is now 11:28:01.  Off of the record.
9        (Recess was taken.)
10        (Whereupon, Mr. Pauley exited the
11     conference room.)
12        THE VIDEOGRAPHER:  We're back on the
13     record.  This is the beginning of Tape No. 3.
14     The time is now 11:35:36.  On the record.
15  BY MR. RASKIN:
16  Q.  Okay.  Are you ready to resume?
17  A.  Yes.
18  Q.  All right.  So if I told you that, according to
19     the Strongsville Police Department records, Roy
20     was driving the van northbound when he was
21     initially observed operating at a speed of
22     approximately 80 miles per hour, 20 miles over the
23     speed limit, would you have any facts or memory to
24     share with me that would be different than that?
25  A.  No.

Deposition of Amanda Pauley | Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 89

1  Q.  Okay.  Now, do you -- do you recall first becoming
2     aware that a Strongsville police officer in a
3     Strongs -- in a marked Strongsville police vehicle
4     was approaching the van as it was driving
5     northbound on Interstate 71?
6  A.  I remember when it did, but I couldn't tell you if
7     it was Strongsville or not.
8  Q.  Okay.
9  A.  I didn't pay attention.  I was --
10 Q.  Okay.  But -- but you're aware that it was a
11    police vehicle?
12 A.  Yes.
13 Q.  Okay.  And when you first saw the police vehicle,
14    had it activated lights, sirens, or an overhead
15    light bar at all?
16 A.  No.
17 Q.  Okay.  How did you become aware?
18 A.  I -- I believe it was just -- the cruiser was just
19    sitting there as we passed.
20 Q.  Okay.
21 A.  Roy may have said something like, you know, "Crap,
22    there's the cops" or -- I -- I don't completely
23    recall, but I remember knowing -- being aware of
24    it, but --
25 Q.  And -- and Roy didn't do anything to -- to pull

Page 90

1     over, did he?
2  A.  No.
3  Q.  Did you tell him to pull over?
4  A.  Yes.
5  Q.  How many times did you tell Roy throughout the
6     entire pursuit to stop and pull over?
7  A.  I can't give you a number, but a lot.
8  Q.  So again, in -- in your mind, you know what "a
9     lot" means.
10 A.  Consistently.
11 Q.  I'm sorry?
12 A.  Consistently.
13 Q.  Consistently throughout the entire pursuit you
14    were telling Roy, "Stop.  Pull over" --
15        (Whereupon, Mr. Pauley entered the
16        conference room.)
17 A.  Yes.
18 Q.  -- or words to that effect --
19 A.  Yes.
20 Q.  -- is that correct?
21        Do you recall a point in time when Roy
22    exited Interstate 71, drove up the exit ramp and
23    then turned off his headlights?
24 A.  I -- I remember him pulling off the exit ramp.  I
25    wasn't aware that he turned his lights off,

Page 91

1     though.
2  Q.  Okay.  If I told you that the records of the
3     Strongsville Police Department reflect that that
4     is what happened, that -- that Roy actually exited
5     Interstate 71 at State Route 82, ran a red light,
6     turned left and got back onto Interstate 71
7     heading southbound -- I'm sorry, heading
8     northbound with no lights on, would that refresh
9     your recollection?
10 A.  I remember him exiting the highway, but I still
11    wouldn't remember whether he turned his lights
12    off.
13 Q.  Do you remember if he -- if he ran a red light?
14 A.  I don't remember that either.
15 Q.  Okay.  Do you remember if he got back on the
16    highway going in the opposite direction?
17 A.  Yes.  Yes, I do.  I couldn't have told you whether
18    it was opposite or the same way, but I do remember
19    exiting and I remember entering.
20 Q.  Okay.  But -- but your testimony is that -- that
21    you were not aware that at the time that he made
22    the maneuvers that I've just described he actually
23    turned his headlights off?
24 A.  Correct, I was not aware.
25 Q.  Okay.  Do you recall the weather conditions that

Page 92

1     night or early morning?
2  A.  It was raining.
3  Q.  So you would agree with me, wouldn't you, that
4     driving on the highway at high rates of speed in
5     the rain with no lights on was dangerous to you
6     and the kids and to Roy?
7  A.  Yes.
8  Q.  And you would agree with me that driving on the
9     highway at high rates of speed with no lights on
10    is also dangerous to any other motorist who
11    happened to be on the road because they wouldn't
12    be able to see you, right?
13 A.  Yes.  Yes.
14 Q.  So Roy's conduct represented a danger to you and
15    everyone in his vehicle as well as to everyone
16    else who was on the roadway at the same time,
17    didn't it?
18 A.  Yes.
19 Q.  Now, if I'm correct, based upon your earlier
20    questions, the license plate that was on this van
21    that you were driving was not registered to Roy,
22    was it?
23 A.  No, it wasn't.
24 Q.  So if the police department called in that license
25    plate number, it would not -- there's no record

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 93

1   that you're aware of that would enable the
2   officers to know that the vehicle belonged to Roy
3   Evans Jr., was there?
4   A.   Correct.
5   Q.   At some point after Roy re-entered the highway,
6   Interstate 71, did you become aware of the speeds
7   at which he was driving?
8   A.   No.
9   Q.   If I told you that, according to the records of
10  the Strongsville Police Department, he was driving
11  northbound at between 100 and 110 miles per hour,
12  would you have any facts to share with me that
13  would contradict that conclusion?
14  A.   His gauge didn't go that high, the thing that says
15  the speed.
16  Q.   But I'm not -- I'm not asking you what he his
17  gauge showed.  I'm saying the records of the
18  Strongsville Police Department indicate that he
19  was driving at speeds between 100 and 110 miles
20  per hour.  Do you have any facts to share with me
21  that that's wrong?
22  A.   No.
23  Q.   Okay.  Fair enough.
24       Now, there came a time when other police
25  cars joined in the pursuit; isn't that right?

Page 94

1   A.   Yes.
2   Q.   And you could see those, couldn't you?
3   A.   Yes.
4   Q.   As a matter of fact, you could see a police car
5   next to the driver's side, right?
6   A.   Yes.
7   Q.   To Roy -- to Roy.  You could also see a police car
8   next to you --
9   A.   Yes.
10  Q.   -- right?
11       And at one point in time, you could also
12  see a police car ahead of you --
13  A.   Yes.
14  Q.   -- right?
15       And the police cars were going slower and
16  slower in an effort to get Roy to stop, weren't
17  they?
18  A.   I can't answer that, I don't know what their
19  speeds were.
20  Q.   Okay.  You don't know if they were -- trying to
21  slow down?
22  A.   Correct, I -- I don't know if they were trying to
23  slow down.
24  Q.   Or if all four vehicles were just operating at the
25  same speed, you just didn't pay attention to that?

Page 95

1   A.   I -- I was aware one was in front at one time.  I
2   was aware that they were on the sides.  I wasn't
3   aware if they were slowing down or going faster.
4   It was --
5   Q.   Okay.  Fair enough.
6        Are you aware about the number of times
7   that Roy rammed a police car with the vehicle that
8   you were riding in?
9        MR. SCOTT:  Objection.
10       You can answer.
11  A.   I recall, my memory, there was a cop car to his
12  driver's side.
13  BY MR. RASKIN:
14  Q.   A police car?
15  A.   Yes.  And there was a police car to the right
16  side, the passenger's side.  I recall that -- that
17  police car coming over and hitting us, making
18  contact with our car.
19  Q.   Did you see the police officer in the -- in the
20  car that was on the passenger's side, your side --
21  A.   Yes.
22  Q.   -- actually cause his vehicle to move towards the
23  vehicle you were driving in, or do you just recall
24  the impact?
25  A.   I recall the impact of him coming in contact with

Page 96

1   us.
2   Q.   Right.  So you --
3   A.   And then afterwards, I recall our van -- Roy
4   coming in contact with the same -- with the same
5   car.
6   Q.   On --
7   A.   On the passenger's side.
8   Q.   -- the passenger's side?
9   A.   Yes.
10  Q.   If I told you that, according to the records of
11  the Strongsville Police Department, it was Roy who
12  actually drove the van that you were riding in
13  into the side of the police car on the passenger's
14  side of your vehicle, would you have any facts to
15  share with me that that impact happened
16  differently?
17  A.   I can't give you any facts.  I can tell you what I
18  remember, and I can tell you that that cop car
19  came in contact with us first and then, yes, Roy
20  came in contact with him.  I do remember that
21  because it scared me.
22  Q.   Right.
23       And I'm not saying first or second.  My
24  question is:  Do you know whether Roy maneuvered
25  the steering wheel so that the van came in contact

Deposition of Amanda Pauley | Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 97

1     **with the police car or the police officer**
2     **maneuvered his steering wheel so that his vehicle**
3     **came in contact with the van?**
4 A.   I can't say I seen either one of those, no.
5 **Q.   All right. And so if the records of the**
6     **Strongsville Police Department reflect that it was**
7     **Roy who maneuvered the van into the police car**
8     **that was on the passenger's side of -- of the van,**
9     **you wouldn't have any facts to dispute that --**
10        MR. SCOTT: Objection.
11 BY MR. RASKIN:
12 **Q.   -- would you?**
13        MR. SCOTT: You can answer.
14 A.   I mean, I wouldn't have any facts, but I'm not --
15 BY MR. RASKIN:
16 **Q.   Thank you.**
17     **All right. And the next impact occurred**
18     **on Roy's side of the van, didn't it?**
19 A.   I don't recall that.
20 **Q.   Okay. Are you aware that Roy actually drove the**
21     **van into a police car which was on the left side**
22     **of the van?**
23 A.   No, I wasn't aware of that.
24 **Q.   Okay. If I told you that the records of the**
25     **Strongsville Police Department reflect that that's**

Page 98

1     **what happened, that Roy actually maneuvered the**
2     **van so that it hit the officer which was on the**
3     **driver's side of the van in which you were riding,**
4     **you wouldn't have any facts to dispute that**
5     **either, would you?**
6        MR. SCOTT: Objection.
7        You can answer.
8 A.   I would not.
9 BY MR. RASKIN:
10 **Q.   Thank you.**
11     **If I told you that there were, according**
12     **to the records of the Strongsville Police**
13     **Department, four separate impacts between the van**
14     **that you were driving in and various Strongsville**
15     **police cars, you wouldn't have any facts to**
16     **dispute that either, would you?**
17        MR. SCOTT: Objection.
18        You can answer.
19 A.   That there was impacts?
20 BY MR. RASKIN:
21 **Q.   Yes.**
22 A.   I'm sorry, I didn't --
23 **Q.   I'll try it again. That's okay.**
24     **If I told you that, according to the**
25     **Strongsville Police Department records, there were**

Page 99

1     **four separate impacts between the van that you**
2     **were driving and -- strike that. You weren't**
3     **driving. Forgive me.**
4     **If I told you according, to the records**
5     **of the Strongsville Police Department, there were**
6     **four separate impacts between the van in which you**
7     **were a passenger and Roy was driving and various**
8     **Strongsville police vehicles, you would not have**
9     **any facts to dispute that, would you?**
10        MR. SCOTT: Objection.
11        You can answer.
12 A.   No, I -- I remember a couple of times, so --
13 BY MR. RASKIN:
14 **Q.   Do you remember four?**
15 A.   Yes.
16 **Q.   Okay. Good.**
17     **All right. And do you remember that**
18     **three of those impacts resulted from Roy ramming**
19     **the Strongsville police vehicle that was on his**
20     **side of the van, on the driver's side of the van?**
21        MR. SCOTT: Objection.
22        You can answer.
23 A.   I don't -- I don't recall any impacts on the
24     driver's side, I don't recall it. I recall two
25     impacts in the back of our car. I don't know if

Page 100

1     maybe -- I don't know, I don't know what happened,
2     but I remember being hit twice in the back and I
3     remember the two on the passenger's side. I do
4     not recall any on the driver's side.
5 BY MR. RASKIN:
6 **Q.   And when you say being hit in the back, you didn't**
7     **actually see those impacts, right?**
8 A.   No, I felt them.
9 **Q.   You felt them?**
10 A.   I felt them.
11 **Q.   So you felt them coming from what you thought was**
12     **the back of the van?**
13 A.   Coming from it, yes, correct.
14 **Q.   Okay. You would agree with me it could have been**
15     **coming from Roy's side of the van notwithstanding**
16     **your belief that it came from the back?**
17        MR. SCOTT: Objection.
18        You can answer.
19 A.   No, I believe it came from the back. I mean,
20     there could be facts -- and I may be wrong, I'm
21     not saying that.
22 BY MR. RASKIN:
23 **Q.   Okay.**
24 A.   But from my recollection, I believe they came from
25     the back.

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 101

1       THE WITNESS:  Is this mine or yours?  I'm
2    sorry.  Is this my water?
3  BY MR. RASKIN:
4  Q.  Okay.  Now, there -- and if I understand your
5      testimony, throughout the entire pursuit you were
6      saying repeatedly to Roy, "Stop.  Stop.  Stop,"
7      right?
8  A.  Yes.
9  Q.  What's he saying to you?
10  A.  Nothing.
11  Q.  So does -- does it seem to you like he's not
12      hearing you or responding to you?
13  A.  He wasn't responding to me.
14  Q.  Okay.  Do you know why?
15  A.  No.
16  Q.  Was that normal for him?
17  A.  No.
18  Q.  So as this was all going down, was this just
19      almost surreal to you?
20  A.  Yes.
21  Q.  During the entire pursuit, did you -- do you need
22      to take a break?
23  A.  No.
24  Q.  Are you sure?
25          During the entire pursuit, at any time

Page 102

1      did you use your cell phone?
2  A.  No.  I did use my son's cell phone.
3  Q.  Your son's cell phone?
4  A.  Yes.
5  Q.  And that -- that's D██████?
6  A.  D█████ cell phone.
7  Q.  Why didn't you use yours?
8  A.  It was dead.
9  Q.  It was dead?
10  A.  Yes.
11  Q.  All right.  What's D█████ cell phone number?
12  A.  I have no idea.  He never activated the phone
13      after that.  I -- I -- I don't know.  It was in my
14      phone, but BCI destroyed my phone, so I couldn't
15      tell you what his phone number was at the time.
16  Q.  Do you know who his provider was?
17  A.  Metro PCS.
18  Q.  Who did you call?
19  A.  Jodi Evans.
20  Q.  Who is Jodi Evans?
21  A.  Roy's mother.  His mother.
22  Q.  Do you know her cell phone number?
23  A.  ██████████.
24  Q.  Tell me about your conversation with Jodi Evans
25      during the pursuit --

Page 103

1  A.  It was very short.
2  Q.  -- please.
3  A.  I told her that the police were chasing us and Roy
4      won't pull over.  He usually would listen to me
5      and his mother, so I thought maybe she could talk
6      some sense into him.
7  Q.  Did you give him the phone?
8  A.  Yes.
9  Q.  Did he talk to his mother?
10  A.  For a second.
11  Q.  What did he say?
12  A.  "They're chasing us."
13  Q.  And --
14  A.  "They're trying to cut us off" or -- I -- I can't
15      be sure of the exact statement, but, you know, I
16      don't know what she said because it was on the
17      phone.  I'm sure she asked him, "What are you
18      doing?"
19  Q.  Well, I was going to ask you, did you have the
20      speaker on?
21  A.  No.
22  Q.  Okay.  So could you hear --
23  A.  I could only hear him.
24  Q.  So you could not hear what Jodi Evans said to her
25      son?

Page 104

1  A.  Correct.
2  Q.  All you could hear is what Roy said to his mother?
3  A.  Yes.
4  Q.  And tell me everything you remember Roy saying to
5      his mother.
6  A.  Something along the lines of "They're chasing us,
7      they're" -- it was very split second.  He -- I
8      don't know if the phone -- the phone may have died
9      or he hung up on her, I can't be sure because
10      D█████ phone was getting ready to die when I used
11      it.
12  Q.  Did you make any calls to anyone else other than
13      Jodi Evans?
14  A.  No, we didn't have a phone afterwards.  I know for
15      a fact it died afterwards, it wouldn't turn on.
16      So I don't know if he hung up the phone on her or
17      if it died on her.
18  Q.  Okay.
19  A.  I can't be sure.
20  Q.  Fair enough.
21          Do you recall a point in time when the
22      tires of the van in which you were riding went
23      flat?
24  A.  I wasn't aware at the time that's what -- I was
25      aware we got a flat.  I wasn't aware -- I know now

Page 105

1   that it was tire strips, like I -- I can remember
2   hearing "thud, thud, thud," you know, noise.
3 Q.  Sure.
4       But -- but at the time you were aware
5   that a -- a tire went flat --
6 A.  I --
7 Q.  -- or not?
8 A.  I -- I was aware that something went flat.  I
9   couldn't tell you if it was one, two, or all four.
10 Q.  Okay.  And that was during the pursuit?
11 A.  Yes.
12 Q.  Okay.  And -- and you became aware that that's
13   what caused Roy to have to stop, right?  He
14   actually spun around?
15 A.  He didn't spin around.  We were hit and the car
16   almost flipped, and that's what brought us to a
17   stop.
18 Q.  Oh, not the flat tires?
19 A.  I mean, I'm sure it was kind of a combination of
20   everything, would be my guess.  I can't tell you.
21 Q.  Okay.  Fair enough.
22       All right.  Where is it that you
23   believe -- well, strike that.  On what part of the
24   van in which you were riding do you believe was
25   hit immediately prior to the van coming to a stop?

Page 106

1 A.  Just the back, the back.
2 Q.  So you think the rear of the van was hit by
3   another vehicle?
4 A.  It was hit twice.
5 Q.  It was hit twice?
6 A.  It was hit twice.  And it seemed like he was going
7   to lose control at that point.
8 Q.  So after the van was hit twice, is that when it
9   spun around?
10 A.  Yes.
11 Q.  Okay.  And then it came to a stop?
12 A.  Yes.
13 Q.  May I see Exhibit A-1?
14       Thank you.
15       And could I trouble you for that?
16 A.  I'm sorry.
17 Q.  Thank you very much.
18       No, that's all right.  That's fine?
19       You now know that the tires were flat --
20 A.  Yes.
21 Q.  -- right?
22 A.  Yes.
23 Q.  Okay.  And you saw photos of that in Exhibit A-1,
24   right?
25 A.  Yes.

Page 107

1 Q.  After the van came to a stop, did it move again at
2   any time?
3 A.  Yes.  I thought --
4 Q.  In what direction did it move?  Forward or
5   backwards?
6 A.  Forward.
7 Q.  Okay.  And did you feel it ram into a Strongsville
8   Police Department SUV --
9       MR. SCOTT:  Objection.
10       You can answer.
11 BY MR. RASKIN:
12 Q.  -- immediately --
13       MR. RASKIN:  At least let me get my
14   question out --
15       MR. SCOTT:  Sorry.
16       MR. RASKIN:  -- before you object, if you
17   don't mind.
18 BY MR. RASKIN:
19 Q.  Strike that.
20       Did you feel the van move forward and ram
21   into a Strongsville Police Department SUV after it
22   had stopped?
23       MR. SCOTT:  Objection.
24       You can answer.
25 A.  I don't know.  I don't recall it ramming into

Page 108

1   anything.  I -- I can't be sure.  I -- I can't be
2   sure.
3 BY MR. RASKIN:
4 Q.  If I told you that the records of the Strongsville
5   Police Department reflect that after the van came
6   to a -- to a stop Roy actually rammed the white
7   Strongsville SUV again, would you have any facts
8   to share with me that are different than that?
9       MR. SCOTT:  Objection.
10       You can answer.
11 A.  I don't have -- I guess I don't have any facts,
12   no.
13 BY MR. RASKIN:
14 Q.  Let me show you -- I've taken some of the
15   pictures -- the copies out of A-1 which show the
16   relationship of the van to the Strongsville -- the
17   white Strongsville police SUV.  Would you take a
18   look at these, please.  You may want to show them
19   to your counsel because he doesn't know which ones
20   I've pulled, please.
21       THE WITNESS:  Can my dad look at the
22   pictures, too?
23       MR. SCOTT:  Oh, sure, sure.
24       THE WITNESS:  I had asked him before.

Deposition of Amanda Pauley        Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 109

BY MR. RASKIN:

Q. Would you agree with me that each of those color copies accurately represents the location of the van that you were riding in that Roy Evans was driving and the Strongsville Police SUV after the stop and after Roy rammed it?

A. I would agree that the vehicles made contact. I would not agree to say that Roy rammed a vehicle, whether it rolled or made a connection.

Q. Right.

A. I -- I would agree to that. But to say that it was rammed, I would assume I would feel an impact and I never felt an impact from that.

Q. Well, you knew that -- that Roy's van after stopping again came in contact with a Strongsville Police Department SUV, correct?

A. Correct.

Q. Okay. All right. Fair enough. And that contact occurred before the driver's side door was open, didn't it?

A. Yes.

Q. There were no -- there were only the front seats in -- in the van; is that right?

A. Correct.

Q. So throughout this entire pursuit, none of the

Page 110

kids were belted?

A. Correct.

Q. Were you belted?

A. No.

Q. Was Roy belted?

A. No.

Q. Okay. After the van impacted the Strongsville SUV following the initial stop, do you recall where Roy's feet were?

A. I mean, I could assume, but I -- I assume they were --

Q. I'm not asking you to assume.

A. I can't -- I can't --

Q. I'm asking you do you know where his feet were.

A. No.

Q. Do you know -- you don't know if his feet were on the brake or on the accelerator --

A. I do not.

Q. -- or one foot on each or both foot -- feet on neither of those, do you?

A. Correct, I do not know.

Q. Do you have any recollection of hearing the engine of the van? In other words, do you remember if you heard it at all?

A. I don't remember.

Page 111

Q. Okay.

A. I don't recall that.

Q. Okay. So you're not prepared to testify that you have any facts from which to conclude that Roy wasn't actually revving the engine of the van at the time the driver's side door was open, do you?

A. No.

Q. And you have no facts to share with me that Roy's foot was not on the accelerator causing the engine to rev at the time the driver's side door to the van was open, do you?

A. No.

Q. Now, after the van in which you were driving stopped and then hit the SUV, is that when Roy grabbed your hand?

A. I don't -- I don't -- I don't recall if it was before or after.

Q. In reading your statement, I believe you said that you fist bumped, you said --

A. I didn't say anything. I -- I told him he was going to jail.

Q. I thought you said, "You're going to jail." And he said, "I love you"?

A. I told him I loved him.

Q. Oh, you told him you loved him?

Page 112

A. I told him.

Q. All right. So --

A. He said something along the lines of, "We got this."

Q. "We got this." Do you have any idea what "We got this" meant?

A. Absolutely not.

Q. Okay. So --

A. I just assumed -- I can make speculation. It came to an end or, you know, it's okay, I don't know.

Q. Okay. But let's talk about what we do know, okay? So what we do know is that -- that kind of the timeline is the vehicle that you're in, the van, spins, comes to a stop, impacts with the Strongsville police cruiser that we see in the photos there, the white cruiser, and then does the door open or do you -- the driver's side door open, or do you have the exchange that you just described first, or do you know?

A. We had the exchange first.

Q. Okay.

A. Prior to the door opening.

Q. Okay. So that -- so before Officer Miller opens the driver's side door, you fist bump? Yes?

A. Yes.

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 113

1  Q.  Roy says something like, "We got this," correct?
2  A.  Yes.
3  Q.  You say, "I love you, and you know you're going to
4       jail"?
5  A.  Yes.
6  Q.  Or words to that effect --
7  A.  Yes.
8  Q.  -- right?
9            After the fist bump, is Roy holding your
10      hand?
11 A.  No.
12 Q.  No.
13           When the -- when the driver's side door
14      first opens, do you know where Roy's hands were?
15 A.  No.
16 Q.  Did you ever see -- strike that.  After the van
17      stops and the van then impacts again with the
18      Strongsville SUV, did you ever see Roy's hands --
19      and after your first bump, of course, did you ever
20      see Roy's hands on either the steering wheel of
21      the van or the gearshift selector?
22 A.  I -- I -- I remember seeing his hand and I
23      remember a cigarette in his mouth.  I remember his
24      hands in front of him, whether they were touching
25      the gearshift or the -- I can't -- I can't

Page 114

1       remember.  It happened so fast.
2  Q.  Okay.  I understand.  And I'm just asking you for
3       your best recollection.
4            So at some point after the impact with
5       the SUV and after your fist bump and -- and the
6       exchange that you've just described, you remember
7       Roy's hands --
8  A.  I remember his hands --
9  Q.  -- on the steering wheel or shift selector, you're
10      not sure?
11 A.  I -- I remember seeing them up and he had a
12      cigarette hanging out his mouth.  But the
13      cigarette was not in his hand, it was in his
14      mouth.
15 Q.  Right.
16           And do you remember seeing both of his
17      hands or just one of them?
18 A.  I can't be sure.
19 Q.  Okay.  And since you can't be sure, you can't tell
20      me if you saw his left hand or his right hand?
21      You just don't know?  And this is immediately
22      prior to the door opening.
23 A.  I want to say I remember a cigarette and I
24      remember his hand on the steering wheel.  Whether
25      it was the left or the right, I can't tell you.

Page 115

1  Q.  Okay.  So -- but -- and again, I know this is hard
2       and I apologize, I don't mean to cause you any
3       more pain than you've already suffered, but I
4       just -- I can't jump inside your head.
5  A.  No, I know.
6  Q.  So I have to ask you these questions.
7  A.  That's okay.
8  Q.  So please forgive me.
9            So with respect to what you are certain
10      you remember as opposed to what you might think
11      happened, right, you remember one of his hands on
12      the steering wheel and you remember the cigarette
13      hanging out of his mouth after the exchange you've
14      described and after the fish bump -- fist bump --
15 A.  Yes.
16 Q.  -- correct?
17           And you don't know where his other hand
18      was, do you?
19 A.  No, I can't be sure.
20 Q.  Okay.  Now the door comes open, correct?
21 A.  Correct.
22 Q.  Do you remember the police officer -- I'll tell
23      you his name was Officer Miller.  You -- you know
24      his name is Officer Miller, right?
25 A.  I know that now, I didn't know that --

Page 116

1  Q.  Sure.  Of course not, but -- but -- so if I refer
2       to him as Officer Miller, you know who I'm talking
3       about?
4  A.  Yes.
5  Q.  Okay.  So do you remember Officer Miller yelling
6       "Hands, let me see your hands"?
7  A.  No, he never had a sentence.  I remember noise,
8       maybe he yelled "Hands."  He fired his gun
9       immediately.  There was never even time for a full
10      sentence of "Let me see your hands."
11 Q.  If I told you that, according to the reports of
12      the Ohio State Highway Patrol Troopers, they
13      reported that they heard Officer Miller say,
14      "Hands, let me see your hands" --
15 A.  I would tell you that I heard that after Roy was
16      shot.  I will tell you I did hear that --
17 Q.  But he did --
18 A.  -- but I didn't hear that statement -- no, I don't
19      think, I know -- until after Roy was shot.
20 Q.  Okay.  Did -- do -- do you recall hearing "Hands"?
21 A.  I can't recall even a full word.  I heard "H --
22      bam, bam."
23 Q.  Okay.
24 A.  That's what I heard.
25 Q.  When the door opened -- when Officer Miller opened

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 117

1  the door, do you have a memory of what movements,
2  if any, Roy made before the first shot was fired?
3  A.  There was no time for movements.
4  Q.  I'm asking --
5  A.  No, no.
6  Q.  You have no memory at all?
7  A.  No.
8  Q.  Okay.  If I told you that Officer Miller in his
9      report indicated that Roy reached down between the
10     seats, you don't have any memory that contradicts
11     that, do you?
12 A.  I will tell you --
13         MR. SCOTT:  Objection.
14         You can answer.
15 A.  I will tell you Roy couldn't reach between the
16     seats because there was several carpet rolls in
17     between the seats.
18 BY MR. RASKIN:
19 Q.  I understand.
20 A.  That there's no way that he could get his hand in
21     between the seats.
22 Q.  Well, he could reach down and touch the carpet
23     roll, right?
24 A.  Yeah, but they were kind of propped like that.  So
25     I mean --

Page 118

1  Q.  But "like that" doesn't --
2  A.  Like -- I'm --
3  Q.  -- help us.
4  A.  I'm sorry.
5  Q.  No, no.  That's okay.
6  A.  I'm sorry.
7  Q.  Because you have a vision --
8  A.  I'm sorry.
9  Q.  -- in your mind, but --
10 A.  They're angled this way because the -- the van
11     has -- is it called a dash or a console or
12     whatever -- it goes like this on the inside.
13 Q.  Okay.
14 A.  The carpet rolls were in, so, of course, then
15     they're -- I believe it was like that.
16 Q.  Okay.  Well --
17 A.  Oh, my God.
18 Q.  Okay.  Well, we don't --
19 A.  I'm sorry.
20 Q.  -- have to guess because --
21 A.  I -- I know there was several carpet rolls --
22 Q.  Sure.
23 A.  -- and -- and that's why my seat belt --
24 Q.  Okay.
25 A.  And I can assume his seat belt wasn't on.  Like

Page 119

1  there was several carpet rolls in between us.
2  Q.  Okay.  So let's look at Exhibit A again, and I
3      think we'll see a couple of photographs -- or
4      xerographic reproductions.  Okay.  Look at A,
5      don't look at the --
6  A.  I'm sorry.
7  Q.  That's all right.  Take your time.
8         There's Exhibit A, right?
9  A.  Okay.  What am I looking for?
10 Q.  And I think you'll find some photographs of the
11     interior of the van, at least a couple.  Did you
12     find them?
13 A.  No, I was hoping he would have.
14 Q.  Oh, okay.
15 A.  It would be in the police vehicles or it would be
16     in --
17 Q.  In the big -- in the big one.
18 A.  It would be in the big one.
19         Thank you.
20         Yes, the carpet rolls.
21 Q.  Okay.  So these are the carpet rolls.  We can --
22 A.  Yes.
23 Q.  Right?
24 A.  These are the carpet rolls.  Those are the tubings
25     from the job that he had did.

Page 120

1  Q.  Right.  That's fine.  It's all carpeting?
2  A.  Yes.
3  Q.  Okay.  I don't mean to be -- to a guy who's not in
4      the carpet installing business, it's all
5      carpeting, right?
6         Okay.  So we can agree that there --
7      there's nothing in these photos that shows how far
8      the carpet rolls extended into the front area of
9      the van, is there?
10 A.  Well, a standard carpet roll is at least 12 foot,
11     so we can --
12 Q.  Listen -- listen to my question.  We can agree
13     that there's -- take a look in -- in Exhibit A.
14     All right?
15 A.  Why can't we just look at these ones?  I have them
16     pulled out.
17 Q.  Because those don't have any pictures of the
18     inside of the van.
19 A.  I was trying to look at the front of the van --
20 Q.  Oh, go ahead.  That's fine.
21 A.  -- is what I was trying to do.
22 Q.  Sure.
23 A.  I can't see.
24 Q.  That's all right.
25         And actually, look at every picture that

Deposition of Amanda Pauley      Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 121

1   you want.  I'm not trying to restrict you.  I'm
2   just trying to move the process along a little
3   bit, but that's all right.  So --
4   A.  It's just -- it's just that I -- I can't -- I just
5     know that they were seated in the front.  My
6     memory -- I mean --
7   Q.  The fact is you don't have any memory of what
8     Roy's body did once the driver's side door opened
9     and before he was shot, do you?
10      MR. SCOTT:  Objection.
11      You can answer.
12   A.  I mean, I think we both looked at the door, that's
13     the only body --
14   BY MR. RASKIN:
15   Q.  I'm not asking you what you think.  I'm asking you
16     specifically -- this is a specific question:  Do
17     you or do you not have a memory of what Roy's
18     body --
19   A.  No.
20   Q.  -- did just prior to him being shot?
21   A.  No.
22   Q.  So -- and I asked that poorly, and I apologize.
23     What -- what I really meant to ask, and should
24     have been more specific about, was you don't have
25     any memory, do you, of any of Roy's movements

Page 122

1   between the time the driver's side door opened and
2   he was shot, do you?
3   A.  I --
4      MR. SCOTT:  Objection.
5      You can answer.
6   A.  I do not recall him -- him moving, that's what
7     I'll say.  I don't recall him moving, so no.
8   BY MR. RASKIN:
9   Q.  Thank you.
10     And if I understand your testimony, you
11     may have heard the word "Hands," you're not sure,
12     but you're fairly confident that "Hands" -- the
13     statement "Hands, let me see your hands" did not
14     get made before Roy was shot?
15      MR. SCOTT:  Objection.
16      You can answer.
17   A.  Right.
18   BY MR. RASKIN:
19   Q.  Now, in terms of -- strike that.  After the first
20     shot and before the second shot, did you see any
21     movement of any part of Roy's body at all?
22   A.  He died after the first shot, the life went out of
23     him, he didn't move at all.  Like he --
24   Q.  Okay.  Again, you need to focus on my question,
25     please.

Page 123

1     After the first shot and before the
2     second shot, were you looking at Roy in order to
3     enable you to see whether or not there was any
4     movement --
5   A.  Yes.
6   Q.  -- of any part of his body?
7   A.  Yes.
8   Q.  Was there?
9   A.  Not that I recall.
10   Q.  There could have been, you just don't remember?
11   A.  No, I'm pretty sure there wasn't.  There -- there
12     was no movement.  No, there was no movement.
13   Q.  The reason I'm asking you this question -- it's
14     not a trick --
15   A.  No, I know.  I know.  No, no, no, I know.  It's
16     just I remember --
17   Q.  Let me just see if I can explain to you, so you
18     said neither of you were belted --
19   A.  Correct.
20   Q.  -- right?
21     And according to your statement, when the
22     door opened, you threw your hands up in the air.
23   A.  My hands were probably up prior to that, but yeah.
24   Q.  Okay.  And you were looking at the police officer.
25   A.  I was looking at the door when --

Page 124

1   Q.  And you were looking at Jason Miller --
2   A.  -- it first --
3   Q.  Right, correct.
4   A.  I mean, yes, I was looking at the door.
5   Q.  Because you saw him shoot, right?  Did you see him
6     shoot?
7   A.  Yes.
8   Q.  Right.
9     So you're not looking at Roy, you're
10     looking at the officer who has now surprised you
11     by opening the door, yelling something, and then
12     shooting, right?  So you're not looking at Roy,
13     are you --
14   A.  When we're --
15   Q.  -- until after the shot?
16   A.  Correct.
17   Q.  All right.  And -- and that first shot shocked the
18     heck out of you, didn't it?  You weren't expecting
19     that at all, were you?
20   A.  No.
21   Q.  Okay.  So would it be fair to say that you were in
22     a state of shock when that happened?  It was
23     surreal, I think you described it as.  Yes?
24   A.  Yes.
25   Q.  So it's really not clear, any of these things --

Page 125

1  these events from the time the door opens to the
2  time the shots are fired?
3  A.  No, I'm clear.
4  Q.  You're clear?
5  A.  I am clear.  When he was shot, he went -- he
6  didn't fall on me because of the carpet.  He went
7  my way.
8  Q.  Okay.  He fell towards the passenger's side --
9  A.  Yes.
10  Q.  -- of the -- of the van?
11  A.  Yes.
12  Q.  Okay.
13  A.  And I think at that point I was -- maneuvered
14  toward him.  At this point --
15  Q.  Was that before the first shot or the second shot?
16  A.  After the first.
17  Q.  Okay.
18  A.  I mean, the shots startled me, scared me, shocked
19  me, and I -- I mean, it was -- it was so
20  instantaneously.
21  Q.  You don't know what his hands did or --
22  A.  He wasn't moving.
23  Q.  -- any part of his body other than he fell towards
24  you?
25  A.  No, I was looking at him.

Page 126

1  Q.  Right.
2  A.  At this point, I'm looking at him, he's not
3  moving.
4  Q.  Correct.
5       Do you --
6  A.  He's --
7  Q.  -- know what his hands or any other part of his
8  body were doing between the first and the second
9  shot?
10  A.  Yeah, they were doing nothing.
11  Q.  You're --
12  A.  He -- he had no movement.
13  Q.  He just fell towards you?  Well, he had some
14  movement because he fell towards you, you said.
15  A.  He fell toward me --
16  Q.  Right.
17  A.  -- because he got killed.
18  Q.  Well, you don't know if the first shot killed him
19  or the second shot killed him, do you?
20  A.  Can I say 100 percent that I -- I can prove it,
21  no.  Can I say being with somebody from 10 years
22  and watching the life go out of them, yes.
23  Q.  But that's not a medical opinion.  I mean,
24  you're -- you're a --
25  A.  I'm not a --

Page 127

1  Q.  -- nursing assistant.
2  A.  I'm no medical --
3  Q.  You know you can't make that assessment.
4  A.  No.
5  Q.  Okay.  All right.  But certainly, emotionally,
6  that's how you felt, I understand that, I
7  appreciate that.  And I'm not trying to minimize
8  that, I'm just trying to -- to understand.
9       Okay.  Where were the kids when the shots
10  were fired between the time the door was opened
11  and the time the shots were fired?
12  A.  In the back.
13  Q.  Okay.  Did you -- I'm sure after all of these
14  events occurred, you talked to the kids about what
15  happened, right?
16  A.  Yes.
17  Q.  Okay.  Did any of the -- well, let's just -- let's
18  just kind of go through the list if we can.
19  Did -- did J████ tell you that she saw --
20  A.  Y████
21  Q.  -- anything?
22       Sorry.
23  A.  If you ever meet her, she'll -- she'll get you for
24  that one.
25  Q.  You know something, my first name's Todd and it

Page 128

1  used to aggravate the heck out of me when people
2  spelled it with one "d," so I'm with her, right,
3  so I'm -- I'm with her.  But I promise you, by the
4  time this is -- we're all done.
5       All right.  Okay.  So it's J████?
6  A.  Y████
7  Q.  Y████.
8  A.  With a "Y."
9  Q.  Because I'm looking at it and it's spelled the way
10  you can read it.
11       Okay.  So -- so did Y████ tell you she
12  saw anything?
13  A.  Yes.
14  Q.  Yes.
15       Okay.  Tell me what -- before I ask you
16  that, have you now described for me everything
17  that you saw from the time the van stops, the door
18  opens, the shots are fired?
19  A.  Yes.
20  Q.  You -- you haven't left out anything because I
21  haven't -- because I've asked bad questions or I
22  haven't asked comprehensive enough questions; is
23  that right?
24  A.  No.
25  Q.  Okay.  So Y████ is now ████?

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 129

1  A.  Yes.
2  Q.  Which means that she's ██ --
3  A.  She was ██.
4  Q.  ██ at the time.
5  A.  She turned ██ the day after she buried her dad.
6  Q.  Okay.  So where was Y██████ in the -- in the -- I
7     know she was behind the front seats --
8  A.  Yes.
9  Q.  -- but do you know specifically where she was
10    physically in the van from the time the door
11    opened until the time the shots were fired?
12 A.  Did I physically see her, no.
13 Q.  Okay.  Did she tell you where she was?
14 A.  D████ was -- D████ was holding them.
15 Q.  Okay.  So D████ was holding both Y█████ and R██?
16 A.  Yes.
17 Q.  Okay.  I'm assuming you didn't see that, so D████,
18    Y██████, and/or R██ must have told you that?
19 A.  Yes.
20 Q.  Okay.  So we have a photo -- or a copy of a photo
21    of the interior of the van, right?  We were just
22    looking at it, right?  We saw the --
23 A.  Yes.
24 Q.  -- carpet rolls and carpet remnants.
25 A.  The photo of remnants.

Page 130

1  Q.  Okay.  All right.  So can you find that -- it
2     probably isn't in that stack.  It's probably in --
3        MR. SCOTT:  This one here.
4        MR. RASKIN:  Yes, that's fine.
5  BY MR. RASKIN:
6  Q.  So -- here, let's -- let's just -- because this is
7     the -- this is the -- this is the labeled exhibit.
8        MR. SCOTT:  Use that one.
9  BY MR. RASKIN:
10 Q.  So what I'm going to do is I'm going to put these
11    photos back into A-1 because these are all
12    photos -- or copies of photos of the van, right?
13 A.  Yes.
14 Q.  Yes?
15 A.  Yes.
16 Q.  Okay.  You have to answer verbally.
17       Now, within A-1, can you pick out -- and
18    I'll help you, I'm happy to help -- the photos of
19    the interior of the van which shows the carpet
20    rolls and remnants?  And I think that there are
21    two of those, right?
22 A.  Yes.
23 Q.  Two photos, correct?
24 A.  Yes.
25 Q.  Okay.  So let's take these temporarily out of A-1,

Page 131

1     and I'm going to show you both of those photos.
2        Now, from looking at those colored
3     photos -- or color copies of photos, can you
4     pinpoint for me where D████, R██ and Y██████ were
5     located at the time the shots were fired?
6  A.  No.
7  Q.  Okay.  Did D████, R██, or Y██████ tell you where
8     they were located in the rear of the van at the
9     time the shots were fired?
10 A.  I believe behind the driver's seat.
11 Q.  How far behind the driver's seat?
12 A.  I don't know.  But, I mean, obviously, during the
13    chase, it became a wreck.  The van was actually
14    organized when we got in.  I recall Y██████ saying
15    that she could see through the cracks of the door,
16    the side door was open.  So I don't exactly know,
17    but I know there was more beside -- behind
18    ████████ seat than my seat.
19 Q.  So Y██████ said she could see through the crack of
20    the --
21 A.  The side doors.
22 Q.  Right.
23 A.  And she was --
24 Q.  Not -- not -- not the front driver's side door?
25 A.  Not the front, but the sides.

Page 132

1  Q.  Okay.  So did any -- did any of the three kids
2     describe for you what they saw?
3  A.  Yes.
4  Q.  Okay.  Did -- did they all or -- well, first of
5     all, was R██ too young?
6  A.  R██ too young to comprehend what happened --
7  Q.  Okay.
8  A.  -- to understand.  R██ understands that he -- he
9     seen his dad get shot because when he plays cops
10    and robbers he says, "Freeze.  You're under
11    arrest.  You're going to go to heaven."
12 Q.  So what did the kids tell you they observed?
13 A.  Y██████ said that after they took me out of the
14    car --
15 Q.  Keep --
16 A.  They took me out of the car and then I was placed
17    in a police car away from them.  Y██████ and R██
18    were still in the van and they had took D████ out.
19    She said she climbed into the front seat and she
20    could see red stuff.  She said she looked down at
21    her daddy and she said there was blood.
22 Q.  Is her --
23 A.  And she thought --
24 Q.  Is R██ out of the car -- he's out of the van at
25    this point, is that right, or no?

Page 133

1  A.  Huh-uh, no, he's still in the van.
2  Q.  Okay.  All right.  So she climbed into his lap
3      or --
4  A.  Into the driver's seat.  Y▮▮▮▮ climbed -- they
5      took -- they took R▮▮▮. -- they took ▮▮▮▮ out
6      of the car and that's when she climbed into the
7      driver's seat.
8  Q.  Okay.  That's what I --
9  A.  I'm sorry.  I should have been more clear.
10 Q.  Well, R▮▮▮. and ▮▮▮▮▮, but we don't really
11     have a ▮▮▮▮▮▮
12 A.  Well, I always called Roy Jr. that got shot -- I
13     always referred to him as Junior.
14 Q.  Okay.
15 A.  I never called him Roy.
16 Q.  All right.
17 A.  And I call my son R▮▮.
18 Q.  Okay.  So -- but from my -- so that I can keep
19     them straight, right, so -- so they had taken Roy
20     Evans out of the car before J▮▮▮▮ -- Y▮▮▮▮
21     climbed in the front seat?
22 A.  Yes.
23 Q.  Okay.  My question is a little different than
24     that.  My question is, at this point, did Y▮▮▮▮
25     or D▮▮▮ tell you if they saw any of the events

Page 134

1      beginning with when the driver's side door opened
2      and concluding with when Roy was shot.
3  A.  I mean, D▮▮▮ said when they first shot he thought
4      that they tased him.  I mean, they didn't give me
5      any description of what they seen.  They both,
6      when they spoke to me, seemed to have an
7      understanding and they both knew that Roy was
8      shot.
9  Q.  Right.  But I'm asking you if they told you what
10     they saw, if they saw anything, prior to the
11     shooting.
12 A.  Y▮▮▮▮ said Officer Miller took the cigarette out
13     of her dad's mouth and threw it in the back.  That
14     cigarette he was smoking actually burnt her coat.
15 Q.  Again, I'm talking about the period of time
16     between when the door opens --
17 A.  She doesn't say, "Oh, I seen the cop pull the gun
18     out and shoot," no.
19 Q.  Please let me ask my question so that -- so that
20     we're communicating with one another.
21            Did either Y▮▮▮▮ or D▮▮▮ describe
22     seeing anything between the time the driver's side
23     door of the van opens and the shots are fired?
24 A.  No.
25 Q.  Did you ask them if they saw anything?

Page 135

1  A.  No, I never asked them to go into detail.
2  Q.  So we can put these interior shots back into A-1,
3      please.
4            At the time Roy was shot, was he holding
5      your hand?
6  A.  No.
7  Q.  Okay.  At some point after you fist bumped, did he
8      reach over to hold your hand?
9  A.  I don't believe so.
10 Q.  Do you recall making a statement saying that?  Not
11     after the first bump, but that he reached over
12     and -- and grabbed your hand?
13 A.  He probably grabbed my hand.  I don't recall.
14 Q.  Okay.  Do you recall being interviewed by a
15     special agent from the Ohio Bureau of Criminal
16     Investigation?
17 A.  Yes.
18 Q.  Do you remember it was a gentleman by the name of
19     Charles Moran?
20 A.  Yes.
21 Q.  Do you remember telling Agent Moran that Roy "knew
22     he was going to jail.  He knew he was going to
23     jail.  For running.  He's on parole so...felonious
24     assault.  So this is now his second time for
25     getting pulled over for driving without a license,

Page 136

1      you know, he's just going to go, you know?"  Do
2      you remember telling that to --
3  A.  I remember talk --
4  Q.  -- Special Agent Moran?
5  A.  I remember talking to them.  I -- those were my
6      speculations.  Was it that he verbalized that, no.
7  Q.  That's what you told Special Agent Moran?
8  A.  I didn't say that he verbalized it.  I said that
9      he didn't speak in the car, but I -- but when --
10     when they came shortly after they -- they were --
11     actually had a thing on my door when I arrived.
12     He never spoke in the vehicle, those were my
13     speculations.  I mean, of course he had to have
14     known.  I mean any person in their right mind --
15     any person in this room could agree that he was
16     going to go to prison, I mean, after running and
17     being on parole.  Was Roy expressing "I'm going to
18     run because I'm going to go to jail," no, that's
19     not what happened.
20 Q.  My question was much simpler than that.  Did you
21     tell Special Agent Moran --
22 A.  Yes.
23 Q.  -- quote, He knew he was going to jail.  He knew
24     he was going to jail.  For running.  He's on
25     parole so...felonious assault.  So this is now his

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 137

1  second time for getting pulled over for driving
2  without a license so he's, he's just going to go,
3  you know?  Is -- do you recall using those words
4  in your interview with Special Agent Moran?
5  A.  I mean, it's in the report, so I -- I know it's
6     there.  Do I recall what I said to him, no, I was
7     in a --
8  Q.  You don't deny saying it?
9  A.  No.  No, I -- I don't deny it.
10 Q.  You don't have any reason to believe --
11 A.  No.
12 Q.  --that Special Agent Moran --
13 A.  No.
14 Q.  -- attributed any statements to you that --
15 A.  No.
16 Q.  -- you didn't make, do you?
17 A.  No.
18 Q.  Okay.  All right.  Fair enough.
19        Do you recall that during part of the
20     interview Special Agent Moran asked you what
21     happened when the van came to a stop?
22 A.  I don't really recall very much of anything that
23     happened after.
24 Q.  So let me -- and I appreciate that.
25 A.  I -- I don't believe that he put anything in my

Page 138

1     mouth, so you can read.
2  Q.  Okay.  So -- and that's what I'm going to do,
3     so --
4  A.  Yes.
5  Q.  -- just to make sure we're on the same page.
6        So the second page of his report --
7     forgive me.  That's not -- okay.  So the second --
8     the third page of his report says, "Special Agent
9     Moran asked Pauley what happened when the van came
10    to a stop."  Quote, Pauley responded, "He looked
11    at me and I said, 'I love you.  You're going to
12    jail.'  And he said put his fist out and bumped my
13    fist.  Told my son he loved him and went like
14    this.  The cop opened the door and said, 'Bam!
15    Bam!' Shot him point blank in the chest two times
16    in front of my children.  There were no guns.
17    There were no weapons."  Do you remember that
18    exchange with Special Agent Moran at all?
19 A.  Yes.
20 Q.  Okay.  So my question to you is, what did you mean
21    when you said "Told my son he loved him and went
22    like this"?  What is "went like this"?
23 A.  I don't recall.
24 Q.  You don't remember?
25 A.  I don't recall.

Page 139

1  Q.  Okay.  All right.
2  A.  I'm assuming it -- it was an expression, but I
3     don't recall.
4  Q.  You don't recall.
5        Do you recall during an interview
6     describing Roy as a ███████████████?
7  A.  Yes.
8  Q.  And that's true, isn't it?
9  A.  ███████ -- ███████ -- ███████ -- -- it's
10    not ███████.  It's ███████████████.
11 Q.  You think that's his diagnosis, ███████████████
12    ███████?
13 A.  Yeah, same -- yeah, I mean --
14 Q.  You used the phrase "███████████████" when
15    you were interviewed?
16 A.  And he is ███████, yes.
17 Q.  But -- but --
18 A.  Yes, I -- I recall that.
19 Q.  But you think that --
20 A.  I mean, I'm --
21 Q.  -- a more complete diagnosis might be
22    ███████████████?  I'll get The Nord
23    records --
24 A.  Yes.
25 Q.  -- so don't worry about that.

Page 140

1        But you -- that's how you described
2     him --
3  A.  Yes.
4  Q.  -- to the police officer?
5        Do you recall at any time saying that
6     Roy -- that after the car had stopped but before
7     the shots were fired Roy reached over and grabbed
8     your hand?
9  A.  I don't recall.
10 Q.  Okay.  You wouldn't say that you didn't say that,
11    you just don't remember saying that?
12 A.  Correct, correct.
13 Q.  All right.  Fair enough.
14        Do you recall how long the pursuit lasted
15    from start to finish?
16 A.  Ten, fifteen minutes.
17 Q.  Okay.  If I told you that the records reflect that
18    it was almost 20 minutes that he was fleeing from
19    the police, do you have any reason to doubt that?
20 A.  No.
21 Q.  Do you recall being asked by Special Agent Moran
22    whether or not the children could see out of the
23    windows of the van and your response was that they
24    were below the window levels of the van?
25 A.  I don't recall saying it.  I will -- the only one

Page 141

1  that I would say may not be below would be D█████,
2  he's a very tall boy.
3  Q.  But my question is, do you recall telling Special
4     Agent Moran --
5  A.  No.
6  Q.  -- that the kids were below window level of the
7     van?
8  A.  I mean, I don't -- I don't recall the whole
9     conversation, but I have no reason to believe that
10    he would lie.
11 Q.  Fair enough.  Okay.
12        THE VIDEOGRAPHER:  Two minutes of tape.
13        MR. RASKIN:  Dave, why don't you kill the
14    tape now.
15        THE VIDEOGRAPHER:  We're going to go off
16    the record.  This will be the end of Tape
17    No. 3.  The time is now 12:38:02.  Off of the
18    record.
19        (Recess was taken.)
20        THE VIDEOGRAPHER:  We're back on the
21    record.  This is the beginning of Tape No. 4.
22    The time is now 12:51:13.  On the record.
23 BY MR. RASKIN:
24 Q.  You ready --
25 A.  Yes.

Page 142

1  Q.  -- to start up?
2        Okay.  You doing all right?
3  A.  Yes.
4  Q.  So once the van came to a stop, do you have any
5     memory of where Officer Miller's police cruiser
6     was located?
7  A.  No.
8  Q.  You're not able to say where it was in relation to
9     the van, are you?
10 A.  No.
11 Q.  Okay.  Did you actually see Officer Miller get out
12    of his cruiser and walk over to the van?
13 A.  No.
14 Q.  Okay.  So the first time you saw Officer Miller
15    after the van stopped was when he opened the
16    driver's side door; is that correct?
17 A.  Yes.
18 Q.  You're not able to place him at any point in the
19    roadway or at any point in relation to the van
20    until he opens the driver's side door, are you?
21 A.  Correct.
22 Q.  So the photos -- or the color copies of photos
23    that make up Exhibit A and A-1 and show where
24    Officer Miller's cruiser is located -- for
25    instance, you can see in the first --

Page 143

1  A.  This one?
2  Q.  -- photo it's immediately next to the van that you
3     were driving in, isn't it?
4  A.  Yes.
5  Q.  Yes?
6  A.  Yes.
7  Q.  You have to take your hands away from your mouth,
8     I'm sorry.
9        And -- and you have no reason to believe
10    that that's not an accurate reflection of where
11    the vehicles came to a stop, correct?
12 A.  Correct.
13 Q.  And just so that I'm clear, at no point do you
14    recall telling any of the investigating officers,
15    either Strongsville or the special agents from the
16    Bureau of Criminal Investigation, that Mr. Evans
17    grabbed your hand immediately before he was shot;
18    is that correct?
19 A.  Correct.
20 Q.  And you don't remember that, is that also correct?
21 A.  Yeah, I don't remember.
22 Q.  It could have happened, you just don't recall?
23 A.  Correct.
24 Q.  Now, at some point, you were -- you and the kids
25    were transported to the Strongsville police

Page 144

1  station, right?
2  A.  Yes.
3  Q.  Okay.  Take --
4  A.  Sorry.
5  Q.  That's okay.  It's common.
6        Before I ask you what happened there,
7     have you now described for me as best as you can
8     recall, even if I've asked bad questions,
9     everything that happened from the time the pursuit
10    started until the time it concluded?
11 A.  Yes.
12 Q.  You haven't left anything out because I haven't
13    been smart enough to ask the right question?
14 A.  No.
15 Q.  That's very kind of you.
16        Okay.  So -- and there's nothing you want
17    to add to or -- or take away from your testimony
18    thus far, correct?
19 A.  Correct.
20 Q.  So when you get to the Strongsville police
21    station, at some point you ask to make a telephone
22    call; is that right?
23 A.  Yes.
24 Q.  And -- and your request is granted, right?
25 A.  Yes.

Deposition of Amanda Pauley | Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 145

1  Q.  What -- what do they do?  Where do you make -- you
2      make a series of telephone calls, don't you?
3  A.  Yes.  I called three people that night, my -- my
4      father --
5  Q.  Okay.
6  A.  -- Roy's mother and father, and my friend Amy.
7  Q.  So your dad's sitting right here --
8  A.  Yes.
9  Q.  -- right?
10         And Roy's parents?
11 A.  Yes.
12 Q.  And that's --
13 A.  Jodi and --
14 Q.  Jodi?
15 A.  Yes.
16 Q.  -- and --
17 A.  Roy.
18 Q.  Roy.  Is his nickname Senior?
19 A.  Yes.
20 Q.  I would have guessed.
21         And your friend Amy?
22 A.  Yes.
23 Q.  And what's Amy's last name?
24 A.  Sharpless.
25 Q.  Spell it for me, please.

Page 146

1  A.  S-h-a-r-p-l-e-s-s.
2  Q.  One more time, please?
3  A.  S-h-a-r-p-l-e-s-s.
4  Q.  And it's pronounced "Sharpleff"?
5  A.  Sharpless.
6  Q.  S-h-a-r-p-l-e --
7  A.  s-s.
8  Q.  s-s.  I'm sorry.
9          Where does Amy live?
10 A.  Elyria.
11 Q.  Where?
12 A.  904 Case Avenue.
13 Q.  One more time.
14 A.  904 Case Avenue.
15 Q.  Case Avenue.
16         Tell me about your conversation with your
17      father.  What do you tell him?
18 A.  I mean, I don't remember everything.  I mean, I'm
19      sure I told him to come pick me up, that was
20      probably my first thing, and that they shot Roy
21      and that we were in a police chase.
22 Q.  Where -- where were you physically when you made
23      these calls to your dad --
24 A.  They --
25 Q.  -- to Roy's parents and to Amy?

Page 147

1  A.  The officers that took me back to Strongsville
2      police station -- when we walk into the police
3      station, there's like glass to the side -- and I'm
4      assuming that's where the officers have desks and
5      stuff because there was lots of desks -- and they
6      let me sit in there and we made phone calls.  And
7      then they finally put us in a room, but, you
8      know -- more of a private room, but I did not make
9      phone calls from that room.
10 Q.  Okay.  So you -- all of the phone calls that you
11      made were in the -- when you walk in the
12      Strongsville police station, on your right -- and
13      you come in through the front doors --
14 A.  Yes.
15 Q.  -- right?
16         On your right, you see a big glass --
17 A.  Yes.
18 Q.  -- several -- what looks like several big windows,
19      doesn't it?
20 A.  Yes.
21 Q.  Right.
22         And behind those windows there's an
23      officer who, if you were going to go --
24 A.  No, there was nobody.
25 Q.  No, no.  Listen to my question.  Behind those

Page 148

1      windows, there's a desk where an officer would sit
2      if you needed to get directed to see somebody
3      else.  You remember there's like a -- a little --
4      a phone handset you pick up to talk to that
5      person -- the person on the other side of the
6      window?
7  A.  No, I didn't go through -- no, we just went
8      through doors.  I -- I -- I don't recall --
9  Q.  Okay.  That's fine.
10 A.  -- a desk or anything like that.
11 Q.  As you were talking, for instance, to your dad --
12 A.  Yes.
13 Q.  -- did you hear faint beeps from time to time?
14 A.  I did not pay attention.  With everything going
15      on, you know, I did not pay attention.
16 Q.  You yourself have been arrested before, right?
17      We --
18 A.  Yes.
19 Q.  -- we -- we confirmed that.  And -- and you knew
20      then, just as you know now, that -- that
21      telephones in police departments are recorded?
22         MR. SCOTT:  Objection.
23 A.  No, I was not aware that my phone calls were
24      recorded.  No, I was not.
25

Deposition of Amanda Pauley                                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 149

1  BY MR. RASKIN:
2  Q.  You were not?
3  A.  I was not aware of it, nor at the time -- I mean,
4      I guess if you think -- if I were to think about
5      it now, okay, I'm in a police station, yes,
6      they're recorded, but given the incidents and the
7      fact that they took my cell phone -- when they
8      gave me a phone to call, no, I had no assumption
9      that they were recording phone calls where I'm
10     telling people that he passed away, no.
11 Q.  Okay.  Tell me what -- so have you described
12     everything you can recall that you said to your
13     dad when you called him?
14 A.  That they shot him, we were on a police chase,
15     probably "Come pick me up, I'm in Strongsville."
16 Q.  Anything else that you remember?
17 A.  That I told my dad, not that I recall, no.
18 Q.  Okay.  And you called Jodi and Roy Sr.?
19 A.  Yes, I called them several times that night.
20 Q.  Okay.  And can you tell me what you recall of
21     those conversations?
22 A.  I believe the first conversation I told her they
23     shot him.  I wasn't aware that he was -- it wasn't
24     confirmed that he was alive or dead yet.  But
25     prior to that, I talked to her in the van, you

Page 150

1      know, so she knew we were on a police chase.  I
2      think I told her that Roy hit a police car and
3      that he was running and that he didn't stop.
4  Q.  Anything else that you --
5  A.  And that they shot him.
6  Q.  Okay.  Anything else that you can recall?
7  A.  No.
8  Q.  Do you recall what, if anything -- well, first of
9      all, were they both on the line -- on the phone at
10     the same time?
11 A.  They're always on the line at the same time.
12 Q.  Okay.  I guess that saves one from having to tell
13     the other one what was said, right?
14         Do you recall what, if anything, either
15     Jodi or Roy Sr. said to you?
16 A.  Probably just a lot of crying.
17 Q.  Okay.  Again, I'm not asking you to guess.  I'm
18     asking do you remember what --
19 A.  No.
20 Q.  -- either of them said to you.
21 A.  No.
22 Q.  No.
23         Now, you said you spoke with them several
24     times.
25 A.  Yes.

Page 151

1  Q.  One time we know you spoke with Jodi during the
2      pursuit?
3  A.  Yes.
4  Q.  Was there more than one phone call that you made
5      to them from the police station?
6  A.  Yes.
7  Q.  Okay.
8  A.  It took a long time, it felt like, that night for
9      anybody to come, so, yeah, I used the phone, I
10     was --
11 Q.  Okay.  Do you remember any parts of the
12     conversation that you had with Roy's parents, any
13     of the conversations?  You've told me about what
14     happened in the van.
15 A.  Well, I -- my conversations with them is me
16     explaining to them what happened.
17 Q.  Right.
18         And how about their responses to you?
19 A.  I don't recall.
20 Q.  Okay.  Do you remember speaking with a
21     Strongsville police officer named Steving,
22     S-t-e-v-i-n-g?
23 A.  No.
24 Q.  Officer Steving?
25 A.  No.

Page 152

1  Q.  If I told you his report reflects that he spoke
2      with you and you were actually in his patrol
3      vehicle at the scene, would you recall being in a
4      Strongsville police officer's patrol vehicle at
5      the scene?
6  A.  I don't recall.  I was in two police -- two
7      separate police vehicles at the scene.
8  Q.  But you don't remember the names of either
9      officer?
10 A.  Correct.
11 Q.  If I told you Officer Steving identified himself
12     as having you in his patrol car, you wouldn't have
13     any reason to dispute that, would you?
14 A.  I would assume that would be the person that drove
15     me to the police station because one of the cars
16     there was no cop, they just put me in there.
17 Q.  Well --
18 A.  And there was no officer in there, I should say,
19     with me.
20 Q.  So I can help with you that.  His report indicates
21     that Officer Steving was advised by the sergeant
22     to take the passengers of the suspect's vehicle
23     back to the police station.
24 A.  So then yes, I -- I would say yes.
25 Q.  So you remember being in -- transported back?

Deposition of Amanda Pauley                     Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 153

1   A.   Yes.
2   Q.   He says, in his report, that during the -- the
3        drive back to the police station from the scene
4        you stated that Mr. Evans was a ▇▇▇▇▇▇
5        ▇▇▇▇▇▇ and he had not taken his meds for
6        two to three weeks.  Do you remember saying that
7        to the police officer who was driving you back to
8        Strongsville?
9   A.   No, I don't remember saying it, but that's
10       about -- I mean, I would assume that that's about
11       the time he stopped taking his meds, so yes.
12  Q.   So you wouldn't deny saying it?
13  A.   I would not deny it.
14  Q.   Okay.  And his report goes on to say that you
15       reported that, quote, She told him to stop as he
16       was speeding and passing the officer, he refused
17       to because he didn't have a driver's license.  Do
18       you remember telling Officer Steving that?
19  A.   No.
20  Q.   But, again, you wouldn't dispute that you --
21  A.   I -- I wouldn't dispute any of it, no.
22  Q.   Do you remember telling Officer Steving, quote,
23       He's very ▇▇▇▇▇▇ because he is not on his
24       medication, end quote?
25  A.   I don't recall.

Page 154

1   Q.   But, again, you wouldn't dispute saying that?
2   A.   I wouldn't dispute it, but, no, I don't recall.
3   Q.   Okay.  And here's why I asked you the question
4        about the hand-holding, according to Officer
5        Steving's report, he says that he reported that he
6        overheard a phone conversation of the female, you,
7        at the police station where she stated, quote, He
8        was smoking a cigarette and holding her hand and
9        stated we did it, unquote.  Officer Steving also
10       stated that the female then stated on the phone
11       call, quote, The officer opened the door and shot
12       my boyfriend, end quote.  Do you remember saying
13       any of those things?
14  A.   I don't remember saying any of those things and I
15       would almost dispute it because why would I say to
16       Roy's parents or my father that they shot my
17       boyfriend.  They obviously know who my boyfriend
18       is.
19  Q.   So you --
20  A.   So I mean, I --
21  Q.   Do you dispute --
22  A.   I just --
23  Q.   -- that this is what Officer Steving overheard?
24  A.   Yeah.
25  Q.   Okay.  Because you remember not saying it?

Page 155

1   A.   Because it doesn't make -- that -- that section
2        saying he was holding my hand and I told them that
3        they shot my boyfriend, I would dispute saying
4        that because I would never refer to Roy as my
5        boyfriend.  Where there was Junior, there
6        was Mandy.  Where I was, he was.  I would never
7        have to express that to a single person I knew, so
8        I'll dispute that.
9   Q.   So you deny that?
10  A.   Yes.
11  Q.   All right.  How about the statement "He was
12       smoking a cigarette and holding her hand and
13       stated 'We did it'"?
14  A.   Yeah, I'll deny that, too.  I don't recall any of
15       that.
16  Q.   So do you not --
17  A.   Was he -- no, he was smoking a cigarette.
18  Q.   So -- and he also said "We did it," right?  You
19       didn't understand what that meant, but that's what
20       he said.  I mean, you testified to that earlier,
21       right?
22  A.   Yes.
23  Q.   Okay.  And the fact is --
24  A.   "We did it" or "We" -- something along that line.
25       I honestly can't even remember.

Page 156

1   Q.   And the fact of the matter is this is kind of a
2        blur at this point, isn't it?
3   A.   I mean, the whole thing's not a blur.  I mean, I
4        guess, part -- some parts --
5   Q.   You remember?
6   A.   -- stay in your mind and other parts don't.
7   Q.   And you don't even know to whom you were speaking
8        on the phone with when Officer Steving is
9        describing what he hears you say?
10  A.   No, I -- I do not.
11  Q.   Right.
12            And it's true you don't have a specific
13       recollection of not saying, quote, He was smoking
14       a cigarette and holding her hand and stated "We
15       did it," unquote.  You just don't think you would
16       have said that?
17  A.   Correct.
18            MR. RASKIN:  What are we on?  B?
19            THE NOTARY:  Yes.
20            (Whereupon, Defendants' Exhibit B was
21       marked for identification.)
22  BY MR. RASKIN:
23  Q.   Showing you what I've marked for identification
24       purposes as Exhibit B.
25            MR. SCOTT:  Thank you.

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 157

BY MR. RASKIN:

Q.  And I will tell you this is a copy of the Amended
Complaint, that's -- that's legalese, but it's a
copy of the lawsuit that was filed on behalf of
Adam Fried as the Administrator, yourself
individually and as parent and next friend of your
three kids.  You recognize their initials, right?

A.  Yes.

Q.  Yes?

A.  Yes.

Q.  So -- and this is called an Amended Complaint
which means this is the second lawsuit that was
filed, that's not -- not that there was another
case, but there was an initial lawsuit filed and
then a second one, which is why this is referred
to as an Amended Complaint.  Do you see that in
the little caption there?
       Let me ask you:  Have you seen this
before?

A.  Yes.

       THE WITNESS:  This is the one that you
gave me?

BY MR. RASKIN:

Q.  Wait.  You can't ask your lawyer.

A.  I can't ask questions?

Page 158

Q.  You can't ask your lawyer a question that --
you -- you can say, "Hey, I need to talk to my
lawyer" and excuse yourself and do that, but you
can't ask him to help you answer the question.

A.  Can I talk to my lawyer?

Q.  Sure.  But when you do that, take the microphone
off.

       THE VIDEOGRAPHER:  We're going to go off
the record.  The time is 1:09:20.  Off of the
record.

       (Discussion off the record.)

       THE VIDEOGRAPHER:  We're back on the
record.  The time is 1:09:44.  On the record.

BY MR. RASKIN:

Q.  Okay.  So I'm going to ask you some questions
about certain paragraphs in this lawsuit, and what
I'm going to ask you to do is read -- you know,
I'll say, "Would you please read paragraph No. 7
and tell me when you're done," and then I'll ask
you a question about it, by way of example.
That's not the -- the paragraph I'm going --

A.  Yeah.

Q.  -- to point you to, but -- so you know how we're
going to do this, right?

A.  Yes.

Page 159

Q.  Okay.  Fair enough.
       All I have to do is get to my notes.
       All right.  Would you read paragraph
No. 16 to yourself and tell me when you're done,
that's on page 4.  Page numbers are at the bottom.
       Are you done?

A.  Yes.

Q.  Okay.  It's just one sentence.  That's an easy
one, right?

A.  Yes.

Q.  Okay.  That's not true, is it?

A.  Some of the time he was.

Q.  Okay.  But when -- when he was engaged with the
police, he wasn't operating the vehicle at the
speed limit.  He was speeding, wasn't he?

A.  At times.

Q.  Well, remember --

A.  Yes, at -- at times -- at times he did speed, but
then there was plenty of times that he lit a
cigarette and slowed down.

Q.  Sure.

A.  Yes.

Q.  But when he was -- initially came in contact with
the police cruiser -- remember I asked you earlier
today and I read to you from a report that said he

Page 160

was driving at 80 miles per hour, the speed limit
was 60 miles per hour, and you agreed that was
correct.

A.  Uh-huh.

Q.  Right?

A.  Yes.

Q.  So when -- when Roy first came into contact with
the Strongsville Police Department -- even if you
didn't know it was Strongsville, you knew it was a
police officer.

A.  Yes.

Q.  -- he was driving at 20 miles over the speed
limit?

A.  Approximately.  I --

Q.  Okay.

A.  I don't know.

Q.  Fair enough.  Fair enough.
       Read paragraph 18 to yourself and tell me
when you're done.

A.  I'm done.

Q.  I believe you earlier testified that you didn't
know when or even that Roy had turned off his
headlights; is that right?

A.  Correct.

Q.  Okay.  So this statement in paragraph 18 that "A

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 161

1    **Strongsville police officer noticed that the van's**
2    **headlights were not on and began to pursue the**
3    **vehicle," there's no possible way you can say**
4    **that's true, is there?**
5        MR. SCOTT:  Objection.
6        You can answer.
7    A.  Can I say if a Strongsville police officer noticed
8        that a van's headlights were not on?  I mean, I
9        can't say.  You guys told me.
10   BY MR. RASKIN:
11   Q.  **But there's -- take your hand away from your**
12   **mouth, please.**
13       **There's no way you can say that that's a**
14   **true statement, is there?**
15       MR. SCOTT:  Same objection.
16       You can answer.
17   A.  I can't say it, no.
18   BY MR. RASKIN:
19   Q.  **Okay.  Fair enough.**
20       **Take a look at paragraph No. 22, please,**
21   **on the next page.  Read that and tell me when**
22   **you're done.**
23   A.  I'm done.
24   Q.  **This paragraph says that "The pursuing**
25   **Strongsville officers could see inside Evans'**

Page 162

1    **van."  There's no way that you know what the**
2    **officers could see or couldn't see, is there?**
3        MR. SCOTT:  Objection.
4        You can answer.
5    A.  I don't know what they seen.  I do know that
6        several people have told me that they watched the
7        video and that they noticed D███, that they
8        personally noticed.  Can I tell you what somebody
9        seen or thought, no, I -- I can't answer anybody's
10       questions.
11   BY MR. RASKIN:
12   Q.  **So this -- so this claim in numbered paragraph 22**
13   **you can't possibly say is correct?**
14       MR. SCOTT:  Objection.
15       You can answer.
16   A.  I can't say it's incorrect either.
17   BY MR. RASKIN:
18   Q.  **Right.**
19       **You can't say it one way or another?**
20   A.  Correct.
21   Q.  **And that's likewise true that you can't say --**
22   **can't say that it's true that the officers could**
23   **see there were other occupants in the van apart**
24   **from yourself?**
25   A.  They definitely knew I was in the van.

Page 163

1    Q.  **Correct.**
2        **But you can't testify that any of the**
3    **officers were ever able to see that there were**
4    **kids in the van, can you?**
5        MR. SCOTT:  Objection.
6    BY MR. RASKIN:
7    Q.  **Until after it stopped and it was all over.**
8    A.  I can't testify if they noticed D███ or not.  I
9        mean, he's 5 foot 11, so it's hard for me to think
10       that they wouldn't have noticed him.  I mean, he's
11       a tall -- I mean, but those are my thoughts.
12   Q.  **Right.**
13   A.  So can I --
14   Q.  **But I'm asking you about --**
15   A.  Sorry.
16   Q.  **-- facts.  You cannot testify that any of the**
17   **Strongsville officers during the pursuit could see**
18   **inside the van?**
19   A.  I can't testify what anybody seen.
20   Q.  **Okay.  Fair enough.**
21       **All right.  Likewise, you can't testify**
22   **that the Strongsville police officers could see**
23   **that Evans lit a cigarette, can you?**
24       MR. SCOTT:  Objection.
25       You can answer.

Page 164

1    A.  Oh, no, there's audio where they -- he says he lit
2        a -- lit a cigarette, so I can say that they --
3        they knew.  Can I say that if I wouldn't have
4        heard the audio where somebody calls in "He's
5        lighting a cigarette," then, no, I couldn't tell
6        you whether or not they knew, but I know that they
7        knew from the audio.
8    BY MR. RASKIN:
9    Q.  **Okay.  Take a look at page 6, paragraph 29,**
10   **please.**
11   A.  I read it.
12   Q.  **Okay.  Do you know what any of this means?**
13   A.  Yes.
14   Q.  **You do?**
15       **Okay.  Did -- did you hear or see**
16   **anything which led you to conclude that you know**
17   **what the Strongsville supervisor ordered his**
18   **officers to do or not do once the van that you**
19   **were riding in came to a stop?**
20   A.  Did I -- did I hear it on scene, no.
21   Q.  **Did you hear it at some other point?**
22   A.  Yes.
23   Q.  **When and how?**
24   A.  I heard it on -- I don't know what they're called.
25       It's -- I heard audio, and that's exactly what

Deposition of Amanda Pauley                                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 165

1   they said.
2   Q.  What did -- where was the -- what is the source of
3       the audio?  Where did you hear it and -- and what
4       is the audio that you heard?
5   A.  I heard -- I -- I don't know what it would be
6       called, where the police are speaking to each
7       other over a CB.
8   Q.  And how did you get access to that audio?
9   A.  A newscaster sent it to me.
10  Q.  A newscaster sent it?
11  A.  Correct.
12  Q.  Do you know that that audio -- whether or not that
13      audio was altered in any way?
14  A.  Do I know, no.
15  Q.  Did the newscaster use that audio -- well, first
16      of all, who is the newscaster?
17  A.  Jessica Dill.
18  Q.  I'm sorry?
19  A.  Jessica Dill.
20  Q.  Jessica Dill?
21  A.  Yes.
22  Q.  And forgive me, I must not watch that local
23      station.  Who --
24  A.  Fox 8.
25  Q.  Fox 8.

Page 166

1       And so did Jessica Dill reach out to you
2       for an interview?
3   A.  She somehow was acquainted with Roy's parents,
4       they're -- they're not friends or anything, but
5       something had happened over by where they lived.
6       And, yes, when I arrived at Roy -- Roy's parents'
7       house, she was there.
8   Q.  On March --
9   A.  7th.
10  Q.  -- 7?
11  A.  Yes.
12  Q.  So you were interviewed by Jessica Dill on
13      March 7?
14  A.  Yes.
15  Q.  And did she play for you what she told you was an
16      audio of some of the --
17  A.  No.  I'm sorry.  I'm --
18  Q.  That's okay.  That's all right.
19      Did she play for you what she told you
20      was an audio of -- of some communications between
21      the Strongsville police officers?
22  A.  No, she emailed it to me.
23  Q.  She what?
24  A.  She emailed it to me.
25  Q.  She emailed.

Page 167

1       What did she email?
2   A.  All the audio.
3   Q.  What -- I mean --
4   A.  All -- all the audios from -- from the -- I'm
5       sorry, I don't know the proper names.
6   Q.  That's okay.
7   A.  The --
8   Q.  Audio communications, let's call it that.
9   A.  All the audio communications.
10  Q.  How did she email it to you?  Did she -- did she
11      email it as an attachment to a file?
12  A.  I can't be sure.  I mean, I have the email, but I
13      can't be sure of how she sent it.
14  Q.  You saved the email?
15  A.  Absolutely.
16  Q.  And you saved the attachment with the audio?
17  A.  Yes.
18  Q.  And you listened to it?
19  A.  Yes.
20  Q.  But not on March 7, on some other date --
21  A.  Right, correct.
22  Q.  -- after March 7?
23  A.  Yes.
24  Q.  Numbered paragraph 34, it says "Miller fired
25      repeatedly.  He paused briefly between each shot."

Page 168

1       That's not true, is it?
2   A.  Yes, he shot twice.  He didn't shoot once --
3   Q.  I mean, he didn't shoot repeatedly.  He shot
4       twice, right?
5           MR. SCOTT:  Objection.
6           You can answer.
7   A.  I mean, that would repeat after the first shot,
8       so --
9   BY MR. RASKIN:
10  Q.  What you mean to say is he shot him twice.  Isn't
11      that a truthful statement?
12  A.  Yes, he shot him twice.
13  Q.  Okay.
14  A.  He paused in between each shot.
15  Q.  How much time went by when you say "He paused in
16      between each shot"?  I thought I understood your
17      earlier testimony to be that the shots were almost
18      instantaneous, now are you telling me there was a
19      pause -- a perceptible pause between the first
20      shot and the second shot?
21  A.  I can't tell you how long, it was a second.
22  Q.  The fact is you don't know, do you?
23  A.  I mean, I remember what I heard, but, I mean, I --
24      I don't know how to explain it to you guys.  I
25      mean, it was -- it was -- it wasn't like "Boom,

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 169

1    boom." It was "Boom. Boom."
2    Q.   Okay.
3    A.   He shot, he fell, I seen, he shot again.
4    Q.   Okay. So you just said "Boom. Boom," and that's
5         what you think is an accurate reflection of the
6         time between the first shot and the second shot,
7         is that right, as you recall it now?
8    A.   Yes.
9    Q.   Fair enough.
10        And to be clear, how much -- so that
11        sounded to me like a second or two.
12   A.   Yeah.
13   Q.   Okay. Is that what you meant it to be, a second
14        or two between the first shot and the second shot?
15   A.   Yes.
16   Q.   Do you know where Sergeant Kelley was when either
17        of the two shots were fired?
18   A.   No.
19   Q.   You're not able to say that Sergeant Kelley was in
20        a position to intervene and prevent the second
21        shot from being fired, are you?
22   A.   No. Well, it depends. Was Sergeant Kelley the
23        person that was standing outside? There was two
24        officers out my van door.
25   Q.   On what side of the van?

Page 170

1    A.   On the driver's side.
2    Q.   Okay.
3    A.   There was two people -- there was two cops.
4    Q.   Two police officers?
5    A.   I couldn't tell you the -- I mean, I know the one
6         is Miller. I still can't tell you who the second
7         one is.
8    Q.   They were two police officers, right?
9    A.   Yes.
10   Q.   Okay. And so -- so but you can't identify the
11        second police officer as being Sergeant Kelley,
12        can you?
13   A.   No. I could not identify any of the police
14        officers at that time, no.
15   Q.   Well, did you see a police officer standing
16        outside of the driver's side of the van with
17        sergeant stripes on his uniform, forget about
18        whether you knew his name or not?
19   A.   I couldn't tell you what -- if he had stripes, I'm
20        sorry.
21   Q.   That's okay.
22   A.   I'm not that observant. I'm -- I -- I can't say.
23   Q.   That's fine.
24        Now, have you had an opportunity to look
25        at any of the training records of the training

Page 171

1    that either Sergeant Kelley or Officer Miller
2    received?
3    A.   No.
4    Q.   Okay. You're not prepared to testify what that
5         training consisted of and whether or not it was
6         adequate, are you?
7    A.   No, I -- I couldn't tell you.
8    Q.   Okay. Thank you.
9         MR. RASKIN: Let's go off the record.
10        I'm about 10 minutes from having to take
11        that call, if you don't mind.
12        THE VIDEOGRAPHER: We're going to go off
13        the record. The time is 1:23:11. Off the
14        record.
15        (Recess was taken.)
16        THE VIDEOGRAPHER: We're back on the
17        record. The time is now 2:31:17. On the
18        record.
19        MR. RASKIN: I apologize for the delay.
20        The -- the conference call took longer than I
21        expected, so please forgive me if this holds
22        you over a little bit longer than you were
23        hoping.
24   BY MR. RASKIN:
25   Q.   Okay. So let me ask you some questions about the

Page 172

1    answers to interrogatories. You remember you were
2    served with a series of written questions that --
3    A.   Yes.
4    Q.   -- I asked you to answer.
5         You -- you can close that lawsuit, I
6         think we're done with that.
7         Okay. We've covered that.
8         Do you have any report -- are you aware
9         that your lawyers have hired expert witnesses to
10        testify on your behalf in this case?
11   A.   Yes.
12   Q.   Are you aware of any of the opinions that those
13        experts have? And if so, I don't want you to
14        share with me any information you got from your
15        lawyers. But if you've seen reports that they've
16        written, I'm interested in knowing what you've
17        seen.
18   A.   No, not yet.
19   Q.   Okay. Have you seen the report of -- of the
20        Bureau of Criminal Identification?
21   A.   Yes.
22   Q.   Okay.
23        MR. RASKIN: What is this? C?
24        THE NOTARY: C.
25        MR. RASKIN: Yes?

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 173

1    THE NOTARY:  Yes.
2    (Whereupon, Defendants' Exhibit C was
3    marked for identification.)
4  BY MR. RASKIN:
5  Q.  Let me show you what I've marked for
6      identifications purposes as Defendant's Exhibit C.
7              MR. SCOTT:  Thank you.
8              MR. RASKIN:  You're welcome.
9  BY MR. RASKIN:
10 Q.  Now, tell me, can you identify Exhibit C as the
11     report that you've seen?  Take whatever time you
12     need to review it.
13 A.  Yes.
14 Q.  When you read this report, did you contact the
15     author of the report, Special Agent Moran, and
16     tell him that any of the information contained in
17     the report was inaccurate or incorrect?
18 A.  No.
19 Q.  Thank you.
20     When you were living with Roy, how did
21     you share expenses?
22 A.  We didn't really have a way.  We just --
23 Q.  In other words, did you -- did you take your
24     earnings -- well, first of all, did you have a
25     joint bank account?

Page 174

1  A.  No.
2  Q.  Okay.  So, for instance, how did you decide who
3      paid the rent, who paid the utilities, who paid
4      all of -- who purchased food?  How did you do
5      that?
6  A.  It was just -- it was never really like a
7      question.  I mean, we usually would just keep our
8      money upstairs in the dresser drawer.  We didn't
9      have bank accounts, neither one of us did.  And, I
10     mean, we just -- we just lived.  I mean, it was
11     never really a discussion.  It wasn't who paid
12     what or where, we were -- we were one, we were a
13     unit.
14 Q.  Well, I guess what I'm interested in -- in trying
15     to understand is how much financial support did
16     Roy provide for you and the children?  Of the
17     $25,000 per year that he earned, how much of that
18     was attributable to -- how much of that went to
19     your support?
20 A.  I mean, he -- he -- it was -- I can't break it
21     down.  It was complete support.  If it would have
22     been up to Roy, I would have never even worked.  I
23     would have just been a stay-at-home mother.  Roy
24     took care of us.  I mean, he took -- did for his
25     kids.  He did -- he -- that's just the man he was.

Page 175

1  Q.  Well, how much --
2  A.  I can't give you an amount because I can't tell
3      you.  I mean, were there times maybe when his
4      carpet was slow and my income had to pay the rent,
5      of course.  Then were there times -- especially
6      when I danced, he -- he did not want me to dance,
7      so there -- I mean, we'd go two, three months and
8      I wouldn't work and he would fully support.
9  Q.  But in the five years preceding his death, you --
10     you worked as a nursing assistant --
11 A.  Yes.
12 Q.  -- and you were earning approximately $11 an hour
13     working about 35 hours a week.  So in round
14     numbers --
15 A.  Prior to him going to prison, he paid for
16     everything.  When he -- when he came home from
17     prison -- the day after he came home from prison,
18     he got employed at A1 Welding and he worked there
19     for a few months.  And, I mean, he -- he provided.
20     It was never a breakdown.
21 Q.  So what -- what did you do with the money that you
22     earned?  Did that also contribute to the
23     household?
24 A.  Yeah.
25 Q.  Okay.  So you were earning gross 350, 360 a week?

Page 176

1  A.  Probably less than that.
2  Q.  You said ten seventy-five an hour --
3  A.  Yes.
4  Q.  -- times 35 hours.
5  A.  Yes.  Or whatever it is, yes.
6  Q.  Okay.  All right.  And so you would --
7  A.  I mean, yes, I -- I would pay bills, yes.
8  Q.  So you would contribute your take-home pay --
9  A.  Absolutely.
10 Q.  -- towards the household?
11 A.  Yes.
12 Q.  And Roy, who wasn't paying taxes most years, would
13     contribute approximately 2,000 a month towards the
14     household?
15 A.  I can't tell you approximately anything.  All I
16     can tell you is that we paid the bills together.
17     We never split anything 50/50.  If we were at a
18     store and I wanted to go shopping and he had
19     money, he took me shopping.  If my children wanted
20     something, their father bought it for them.  I
21     mean, he split expenses as a normal father would
22     as my father did with my mother, I'm sure as Joe
23     did, and I'm sure as you did.
24 Q.  Okay.  As a result of the events which are the
25     subject matter of your lawsuit, is there anything

Deposition of Amanda Pauley                          Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 177

1  that you personally -- any activities, anything at
2  all that you personally were able to do before
3  March of 2017 that you're no longer able to do
4  now?
5  A.  I don't understand.  What do you mean by
6  "activities"?
7  Q.  Anything at all.  In other words, as a result
8  of -- of the shooting on March 7, 2017, is there
9  anything that you feel that you are no longer able
10  to do emotionally, physically that you were able
11  to do before the shooting?
12  A.  I mean, I have a hard time answering that
13  question.  You're not talking about -- I mean, of
14  course, emotionally, there's lots of things I
15  don't want to do because that's something me and
16  Roy may have done together.  I mean, yeah, that --
17  there are a lot of things in that aspect.
18  Q.  Such as?
19  A.  Camping, Roy loved to camp, Roy loved to fish.  I
20  mean, he took the kids consistently.  They have
21  yet to go since their father passed.  I mean,
22  there's certain things, you know, that they're
23  memories that are hard to deal with.
24  Q.  Have you begun dating again?
25  A.  Yes.

Page 178

1  Q.  Are you involved in a relationship?
2  A.  I'm dating someone, if that's what you're asking,
3  yes.
4  Q.  How long have you been --
5  A.  I mean --
6  Q.  First of all, what's the person's name?
7  A.  His name is Jose.
8  Q.  Does Jose have a last name?
9  A.  Cortez.
10  Q.  Cortez, C-o-r-t-e-z?
11  A.  Yes.
12  Q.  And how long has -- have you been dating Jose?
13  A.  A month or two.
14  Q.  But you maintain separate residences?
15  A.  Yes.
16  Q.  And where does he reside?
17  A.  He resides in Elyria.  I can't think of his
18  address, I just know the house.  Sorry.  Oberlin
19  Avenue in Elyria.
20  Q.  Tell me the kinds of activities Roy engaged in
21  other than camping and fishing with the kids,
22  please.
23  A.  Everyday activities of going to the park or we
24  would go to the beach a lot.  He did everything
25  with the kids.  He was a great father.

Page 179

1  Q.  Right.
2        But help me to understand -- when you say
3  "everything," again, you know what you mean by
4  that, I don't know what you mean by that.
5  A.  I mean, typical day-to-day living.  Playing with
6  them, teaching them, you know, games.  I mean,
7  watching movies with them.
8  Q.  On average --
9  A.  Going to amusement parks with them.  He enjoyed
10  taking the kids to carnivals.
11  Q.  On average, how many hours a week did he spend
12  interacting with the kids?
13  A.  All the time.
14  Q.  How about the kids that didn't live with you?
15  A.  D█████, all the time.
16  Q.  So D█████ -- was D█████ essentially a member of
17  your family --
18  A.  Absolutely.
19  Q.  -- even though --
20  A.  Absolutely.
21  Q.  -- he didn't live there?
22  A.  Absolutely.
23  Q.  So why didn't he pay child support if he was so
24  devoted to D█████?
25  A.  He supported him 100 percent, that's why his

Page 180

1  mother never pushed the issue.  I mean, if he
2  needed school clothes, Roy bought the school
3  clothes.  If he needed shoes, Roy bought -- bought
4  the shoes.  If he needed -- anything for
5  Jennifer's house, he always, always supported.
6  And it wasn't -- with that, it wasn't just "I'm
7  going to pick you up from your mother's and drop
8  you off," we were friends, she was part of our
9  family.  We did holidays together.  I mean --
10  Q.  "She" being the mother?
11  A.  Yes.  Me and her still communicate.  Her other
12  children came to my house.  I would watch her
13  children, she would watch my children.  Like, you
14  know, it was very intertwined.
15  Q.  Did Roy leave a will?
16  A.  No.
17  Q.  Did he -- did he have any assets that were
18  bequeathed to his children?
19  A.  No.
20  Q.  Did Roy have any type of retirement or pension
21  plan?
22  A.  I don't believe so.
23  Q.  Okay.  I think you said he had no bank accounts;
24  is that right?
25  A.  No, he didn't.

Page 181

1  Q.  Did Roy provide any support for his parents?
2  A.  I mean, if they needed something and they asked
3      him, of course he would.
4  Q.  I didn't ask what he would do, I asked if you know
5      what he did do.
6          Did he provide any financial support for
7      his parents that you're aware of?
8  A.  I mean, has he ever given them money, yes.  Can I
9      tell you for what or where or when, no.
10  Q.  So you know he's provided some money to his
11      parents over the years but can't say how much --
12  A.  Correct.
13  Q.  -- or when?
14          Did Roy provide any physical care for his
15      parents?
16  A.  No.
17  Q.  Parents in pretty good health?
18  A.  His mother is not.
19  Q.  Did he provide any care for his mother?
20  A.  No.
21  Q.  When Roy was -- when Roy was shot for the first
22      time, did you observe any level of consciousness
23      at all?
24  A.  No.
25  Q.  Okay.

Page 182

1  A.  He lost all consciousness at that time.
2  Q.  From the first shot?
3  A.  From the first shot, he lost consciousness.
4  Q.  I think I asked you this question, but I just want
5      to make sure:  You don't have any facts or
6      information at all concerning the extent and level
7      of training received by either Sergeant Kelley or
8      Officer Miller, do you?
9  A.  I do not believe so.
10  Q.  If you would take a look at the other photos in
11      Exhibit A that -- that we --
12  A.  This one?
13  Q.  -- haven't separated out.  These photos right here
14      in Exhibit A.
15  A.  I probably should put my glasses on, huh?
16  Q.  That's fine.
17          You'll see that there are various photos
18      of damage to the Strongsville Police Department
19      police vehicles that were involved in the incident
20      on March 6, 2017, correct?
21  A.  Yes.
22  Q.  Do you have any facts to share with me that those
23      photos are not accurate in any way?
24  A.  No.
25  Q.  You would agree with me that -- that the vehicles

Page 183

1      that the photos depict reflect the vehicles that
2      you recall being at the scene or represent the
3      vehicles you recall being at the scene?
4  A.  Yeah, they would represent them.
5  Q.  And you wouldn't have any facts to share with me
6      that the damage that's shown in those photos
7      didn't occur as a result of the impact with the
8      van that you were riding in on March 6, 2017,
9      correct?
10  A.  Correct.
11  Q.  March 7, 2017.
12          Did you ever talk to Sergeant Kelley
13      about what happened?
14  A.  No.
15  Q.  What about Patrolman Miller?  Did you ever talk to
16      Patrolman Miller about what happened?
17  A.  No.
18  Q.  Tell me what your interaction with the -- with
19      anybody from Strongsville Police Department was
20      following the incident of -- of March 7, 2017.
21  A.  The car ride from the scene to Strongsville Police
22      Department.
23  Q.  That was Officer Steving, right?
24  A.  That -- that would be my only interaction.
25  Q.  Okay.  How about once you got to the police

Page 184

1      station?  Were you interviewed by anybody
2      affiliated with Strongsville Police?
3  A.  No.  No, I was not interviewed.  That -- that room
4      I'm talking about that had all the phones in it,
5      there were no police officers in there.  There was
6      a victim's advocate person that came with another
7      officer, I don't know if it was an officer on
8      scene or not, and told me Roy passed away later
9      on.
10  Q.  Did you have any other interaction with the
11      victim's advocate apart from being told that
12      Ray -- Roy had passed away?
13  A.  They brought an indictment on Miller to my house
14      in Avon and they were actually putting it on my
15      door when I pulled up from work.
16  Q.  You're aware that --
17  A.  It was a victim's advocate lady because I remember
18      her saying that.
19  Q.  Yeah.  You're aware that Officer Miller was -- was
20      presented to the grand jury?
21  A.  Yes, I'm aware.
22  Q.  And you're aware that the grand jury did not
23      choose to indict him?
24          MR. SCOTT:  Objection.
25          You can answer if you know.

Page 185

1  A.  I'm aware.
2  BY MR. RASKIN:
3  Q.  Okay.  So when you say they brought an indictment
4      to your house of Officer Miller --
5  A.  Well, I'm sorry.
6  Q.  No, no, that's okay.  I just want to make sure
7      that the record is clear.
8          You're aware Officer Miller was never
9      indicted for any conduct whatsoever relating to
10     the events of March 7, 2017, aren't you?
11 A.  Yes.
12         MR. SCOTT:  Objection.
13         You can answer.
14 BY MR. RASKIN:
15 Q.  And for that matter, you're aware that no one else
16     was either, correct?
17 A.  Correct.
18         MR. SCOTT:  Objection.
19 BY MR. RASKIN:
20 Q.  Are you aware that -- that Sergeant Kelley gave a
21     statement to the Bureau of Criminal
22     Investigation --
23 A.  Yes.
24 Q.  -- concerning the events?
25 A.  Yes.

Page 186

1  Q.  Did you -- did you read that statement at some
2      point?
3  A.  I -- I didn't read the entire statements.  I've
4      had a difficult time going over the BCI reports.
5      I have glanced through them.  So if you bring
6      something up, I may or may not know it.
7  Q.  Sure.
8          Do you recall Sergeant Kelley saying
9      specifically that Roy intentionally drove into
10     him, he's never experienced anything like that and
11     he was very scared?
12         MR. SCOTT:  Objection.
13         You can answer.
14 A.  Yes.
15 BY MR. RASKIN:
16 Q.  And you have no reason to disbelieve the
17     truthfulness of what Sergeant Kelley said, do you?
18         MR. SCOTT:  Objection.
19         You can answer.
20 A.  I mean, from the videos, he kind of pulls in front
21     of it.  So do I believe that he was hit and Roy
22     rammed his vehicle and he wasn't scared for his
23     life, no, I don't believe it, but I'm not -- just
24     my opinion.
25

Page 187

1  BY MR. RASKIN:
2  Q.  You -- you don't dispute the fact that that's what
3      Sergeant Kelley said in describing --
4  A.  I do not dispute it.
5  Q.  -- his feelings, do you?
6  A.  Correct.
7  Q.  Do you recall when the four police vehicles
8      surrounded the van that Roy slowed down or did he
9      maintain the same speed even though he was
10     surrounded by police vehicles?
11 A.  I don't recall.
12 Q.  You can't say one way or another?
13 A.  I can't say one way or the other.
14 Q.  Do you remember Roy maneuvering the van so that he
15     got away from those four vehicles, police
16     vehicles?
17 A.  I don't recall.
18 Q.  Well, if -- if he hadn't gotten away from the four
19     police vehicles that surrounded him, he would have
20     stopped then and there, right?
21 A.  Well, then, he got away.
22 Q.  Right, and that's my point.
23         So you do remember that after Roy was
24     surrounded by the four police vehicles, he still
25     got away from them and the pursuit continued,

Page 188

1      correct?
2  A.  Correct.
3  Q.  Did you see how close Officer Miller's vehicle
4      came to the guardrail after Roy rammed his
5      vehicle?
6          MR. SCOTT:  Objection.
7          You can answer.
8  A.  No.
9  BY MR. RASKIN:
10 Q.  Did you tell the investigating -- Special Agent
11     Moran that you understood why the officer --
12     officers would have approached the van after it
13     finally came to a stop with their guns drawn?
14         MR. SCOTT:  Objection.
15         You can answer.
16 A.  I -- I don't recall what I told Agent Moran.
17 BY MR. RASKIN:
18 Q.  Okay.  If I told you that that's what's reflected
19     in the report --
20 A.  I -- I --
21 Q.  -- you wouldn't deny that?
22 A.  I wouldn't deny that.  I mean, I understand that
23     he ran, of course they're going to have a reason
24     for wanting to know why he ran.
25 Q.  Do you recall telling Special Agent Moran that you

Deposition of Amanda Pauley      Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 189

1   thought that Officer Miller should have used his
2   taser instead of his gun?
3 A.   I don't recall, but I do believe that.
4 Q.   And what's the basis of that belief other than,
5   presumably, Roy would still be alive?
6 A.   My basis is he is not the judge, jury, and
7   executioner. He didn't have a decision to -- to
8   kill the man because he ran. That's -- that's
9   my -- my opinion.
10 Q.   You think --
11 A.   He should have gotten him out of the car and
12   arrested him. And then the if's, why's, where's,
13   when's, why he ran, this and that, only he could
14   have answered, but he never gave him that option
15   to answer because he killed him.
16 Q.   Is it your belief that Officer Miller shot Roy
17   Evans because he fled from the police officers?
18 A.   Is that my opinion? Is that what you're asking?
19 Q.   I said is that your belief.
20 A.   That's my opinion, yes.
21 Q.   And you can't think of any other reason why Roy --
22   why deadly force was used?
23 A.   I can't, no.
24 Q.   Would you agree with me that Roy's driving placed
25   all of the officers who were pursuing him at risk

Page 190

1   of serious bodily harm --
2         MR. SCOTT: Objection.
3 BY MR. RASKIN:
4 Q.   -- including Roy and everybody else in your van?
5         MR. SCOTT: Objection.
6         You can answer.
7 A.   Yes.
8 BY MR. RASKIN:
9 Q.   And that risk could have even included death,
10   right?
11         MR. SCOTT: Objection.
12         You can answer.
13 A.   Yes.
14 BY MR. RASKIN:
15 Q.   And that risk of serious bodily harm or death was
16   as a result of Roy's refusal to stop and his
17   driving?
18 A.   I believe that Roy should have stopped, I've never
19   argued that. In my opinion, he should have
20   stopped. In my opinion, yes, he put me and the
21   children in danger, but that does not give them
22   the right to shoot. And I've seen -- just my
23   opinion, I'm sorry.
24 Q.   In fact, not only did Roy put you and the children
25   in danger as passengers in the van, he also put in

Page 191

1   danger every police officer that was pursuing
2   him --
3 A.   Uh-huh.
4 Q.   -- right?
5         MR. SCOTT: Objection.
6         You can answer.
7 A.   Yes.
8 BY MR. RASKIN:
9 Q.   Would you agree with me that if it was not
10   possible to utilize a taser then the use of deadly
11   force was justified?
12         MR. SCOTT: Objection.
13 A.   No.
14 BY MR. RASKIN:
15 Q.   So you don't think --
16 A.   Not at all.
17 Q.   -- the use of deadly force was justified?
18 A.   There is no justification --
19 Q.   Wait a minute. Listen -- you got to let me get --
20   get my question out.
21 A.   I'm sorry.
22 Q.   No, that's okay. You don't have to apologize.
23         So it's your belief that the use of
24   deadly force wasn't justified even if there was no
25   other alternative including the use of a taser; is

Page 192

1   that correct?
2         MR. SCOTT: Objection.
3         You can answer.
4 A.   He could have got him out of the car, there was no
5   weapons. So my belief is that, no, there wasn't.
6   At that point, they could have grabbed him, they
7   could have arrested him, they could have tased
8   him. He had no weapon. There was no knives,
9   there was no guns, so no. Miller never gave the
10   opportunity for him to give his self up.
11 BY MR. RASKIN:
12 Q.   Do you know whether or not Officer Miller actually
13   performed CPR on Roy?
14 A.   I believe in the BCI report it said that they did,
15   but I --
16 Q.   You didn't see it?
17 A.   I -- no, I seen CPR be rendered to him, yes, I
18   did.
19 Q.   No, no.
20 A.   But I --
21 Q.   Did you see Officer Miller --
22 A.   I can't tell you if I seen him because I -- I
23   wasn't familiar with who they were on the scene.
24 Q.   Can you describe Officer Miller to me physically?
25 A.   I couldn't give you details, no.

Page 193

1   **Q. Can you describe Sergeant Kelley to me physically?**
2   A.   No.
3   **Q. So if either one of them walked into this room now**
4      **and they weren't wearing Strongsville Police**
5      **Department uniforms, you wouldn't necessarily be**
6      **able to recognize either one?**
7   A.   I've seen -- I've seen pictures of Officer Miller,
8      so I may be able to recognize him, but I don't
9      believe I've ever seen a picture of Kelley.
10   **Q. When D███ was at the Strongsville Police**
11      **Department, were you aware that he placed a call**
12      **to his father?**
13   A.   Yes.
14   **Q. Did you discuss that with D███ at all?**
15   A.   No.
16   **Q. Did -- did D███ tell you what he said to his**
17      **father or what his father to him?**
18   A.   No.
19   **Q. Are you aware of whether or not D███ asked his**
20      **father to come get him?**
21   A.   I believe he probably did.
22   **Q. And his father didn't?**
23   A.   My father was on the way. I mean, I knew D███
24      was really distraught. Me and him didn't have
25      discussions of what he spoke with to his father.

Page 194

1      But his father was there when we were on our way
2      home, his father was coming to my house, yes.
3   **Q. So D███s father came to your house and met you**
4      **there?**
5   A.   He didn't meet us there. He -- actually, we got
6      off at the Elyria exit, I believe, me and my
7      father did, and D███ had talked to his dad. He
8      may have even talked to him in the car. I'm
9      sorry, I -- I don't remember, but we seen him at
10      the Shell gas station and --
11   **Q. You can't --**
12   A.   No, I'm sorry. Yeah, he wanted -- his father
13      picked him up at the gas -- at the Shell gas
14      station and he left with his father and I went to
15      Jodi and Roy's.
16   **Q. You said to me that D███ had to repeat the -- has**
17      **to repeat the ████████ --**
18   A.   Yes.
19   **Q. -- is that right?**
20      **Did -- did you get any explanation for**
21      **why he had to repeat the ████████?**
22   A.   Because D███ didn't like to go to school, he --
23      he would be absent a lot.
24      His counselor's name is Terry, it just
25      came to me when you -- when you asked that --

Page 195

1   Q.   Terry?
2   A.   Terry, Terry. Because Terry came out that -- that
3      morning and took D███ to his school because the
4      Gerson School has counselors and stuff on -- on
5      hand, and they -- they were a big support system
6      for D███.
7   **Q. And how about the other two kids? Have they**
8      **continued to perform in school as they did prior**
9      **to this incident?**
10   A.   Y███ been an honor roll student since she
11      started.
12   **Q. And, of course, little R██ isn't --**
13   A.   R██, he doesn't go to school yet.
14   **Q. He's just got to live up to his sister, huh?**
15   A.   He just has to.
16      MR. RASKIN: I believe that I'm done.
17      You have the right to -- well, here's
18      what's going to happen, I'm concluding your
19      deposition at this point. However,
20      gentlemen, I am going to reserve the right to
21      call Amanda back because we have not gotten
22      any of her medical or psychologic --
23      psychological records, nor have we gotten any
24      medical or psychological records for the
25      children. I'm not saying I'm doing that, but

Page 196

1      I'm going to -- but I may ask the court for
2      permission to do that once we get the records
3      which we need to get. And I can have an
4      off-the-record discussion with you when we're
5      done and talk about some more releases that
6      I'd like to have signed.
7      MR. SCOTT: Right, right, right.
8      MR. RASKIN: But -- so at this point,
9      we're going to adjourn your deposition. And
10      the court reporter here is going -- you've
11      seen her working on this little machine, and
12      she's going to type up all of the questions I
13      asked, answers you gave, objections that were
14      made into typewritten form, and you'll have
15      the right, if you chose, to read that
16      transcript, not for the purposes of changing
17      your answers but for the purposes of ensuring
18      that all of the questions asked, answers
19      given, objections made were properly
20      recorded. You have to tell us what you want
21      to do. Consult with your lawyers and then
22      just say verbally, "Yes, I want to read" or,
23      "No, I don't want to read," please.
24      MR. SIDOTI: Todd, if I may. I know that
25      you referenced a couple times that I -- "your

Page 197

1   lawyers," I -- just so you understand, I
2   represent Mr. Fried in regards to the estate.
3   Mr. Scott is counsel for Ms. Pauley and her
4   children.
5        THE VIDEOGRAPHER:  We have one minute of
6   tape.  Do you want to change tapes?
7        MR. RASKIN:  Yeah.
8        THE VIDEOGRAPHER:  We're going to go off
9   the record.  This will be the end of Tape
10  No. 4.  The time is now 3:02:57.  Off the
11  record.
12       (Discussion off the record.)
13       THE VIDEOGRAPHER:  We're back on the
14  record.  This is the beginning of Tape No. 5.
15  The time is now 3:03:32.  On the record.
16       - - -
17  BY MR. SIDOTI:
18  Q.  Ms. Pauley, my name is Marcus Sidoti.  I represent
19      Adam Fried as the Administrator for the Estate of
20      Roy Evans.  I just have a few follow-up questions.
21          The same rules apply.  I'll ask a
22      question.  If you have any questions to ask me,
23      but I'll ask and you can respond.
24          I'm going to work back in time if you
25      give me a moment.

Page 198

1        If you still have Defense Exhibit B in
2    front of you, which was the Amended Complaint.
3    Did you --
4   A.  Yes, I have it.
5   Q.  Put that in front of you for just a moment.
6        Just a couple clarifications.
7        Mr. Raskin asked you questions going
8    through that.  We've already addressed the fact
9    that the date of the occurrence was March of 2017,
10   correct?
11  A.  Yes.
12  Q.  Okay.  And you'll note from the top of Defense
13      Exhibit B this is a document that indicates to be
14      filed on January 18 of 2018.  Do you see that
15      there?
16  A.  Yes.
17  Q.  So Mr. Raskin asked you about five paragraphs,
18      specifically one was paragraph 16 on page 4.
19      Would you look at that for a moment?
20          So you were asked -- and this statement
21      indicates that "Evans," referring to Roy, "was
22      operating the van within the speed limit."  Do you
23      see that paragraph?
24  A.  Yes.
25  Q.  You indicated in your response that sometimes he

Page 199

1    was, in fact, operating the vehicle within the
2    speed limit to the incident that
3    occurred in March of 2017; is that correct?
4   A.  Yes.
5   Q.  Okay.  Two below that, paragraph 18 indicates that
6       "A Strongsville police officer noticed the van's
7       headlights were not on."  From the date of the
8       incident and up until this was filed by your
9       lawyer, with his authority, did you come to learn
10      or were you ever provided information that that
11      was your understanding, that at some point the
12      headlights were not on on the vehicle?
13  A.  Yes.
14  Q.  Again, on page 5, paragraph 22 indicates that the
15      officers could see inside the van.  Although not
16      knowing what the officers could see at the time of
17      the incident, from that date and up until the date
18      of this filing, were you ever informed or did you
19      have some information that led you to believe that
20      the Strongsville officers involved, some or all,
21      could actually see inside of the van during the
22      pursuit?
23  A.  Yes.
24  Q.  Okay.  You indicated that you received some emails
25      from the media and the like that included what's

Page 200

1    been referred to as audio communications.  I'll
2    refer to them as dispatch, perhaps communications
3    between officers and maybe the police station.
4        Were you able -- from the time of the
5    incident up until the time this document was
6    filed, did you have time to hear audio that's
7    consistent with dispatch or communications between
8    officers?
9   A.  Yes.
10  Q.  At all times pertinent, there was no gun nor no
11      weapons in the vehicle; is that correct?
12  A.  Correct.
13  Q.  Moving along to paragraph 29 on page 6 of Defense
14      Exhibit B, you were asked to review that, that
15      indicates, quoting only a portion, felony call out
16      procedures rather than rushing the van.
17          Between the date of the incident and
18      prior to the filing of this, did you personally
19      hear information through those communications
20      that -- what I'm referring to as a dispatch --
21      that officers were ordered to call the individuals
22      out of the van and specifically not approach it?
23  A.  Yes.
24  Q.  You've heard those yourself?
25  A.  Yes.

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 201

1  Q. And lastly, in Defense Exhibit B, paragraph 34 --
2     just to be clear, we're really not in dispute,
3     based on your understanding, that there were two
4     shots fired, correct?
5  A. Correct.
6  Q. But you addressed a pause, there was one -- and
7     this refers to repeatedly -- there was one and
8     then some time that you're not completely clear of
9     and then a second shot was fired, correct?
10 A. Yes.
11 Q. Okay. Just for clarification in regards to the
12    phone calls that you made at the Strongsville
13    Police Department, do you recall who specifically
14    you spoke with when you asked to use a phone to
15    make phone calls?
16 A. I believe -- I can't be sure. There was -- I
17    believe it was the officer -- the officer that
18    drove me in, I asked if I could use the phone.
19 Q. You weren't at liberty to use any phone you
20    wanted, you asked to use a phone and that officer
21    designated a particular phone for you to use; is
22    that correct?
23 A. Correct.
24 Q. At no time pertinent of any of the calls that you
25    made were you ever informed that those were

Page 202

1     recorded phone calls?
2  A. No.
3  Q. Lastly, there was a series of questions regarding
4     the placement of Roy's hands in the vehicle and
5     some questions regarding like a fist bump and some
6     communication. Do you recall that line of
7     questioning?
8  A. Yes.
9  Q. I believe your testimony was prior -- your
10    testimony was prior to Officer Miller opening the
11    door you and Roy exchanged some words along the
12    lines of "We got this" and did a fist bump. Do
13    you recall that?
14 A. Yes.
15 Q. There were some questions regarding where Roy's
16    hands were located at the time that the door was
17    opened. Do you recall those questions?
18 A. Yes.
19 Q. And I believe at the time the door was opened, you
20    referred to the hands being -- plural -- being up
21    and you weren't sure if they were actually on the
22    steering wheel or on the gearshift. Do you recall
23    that?
24 A. Yes.
25 Q. Do you recall, as you sit here today, the location

Page 203

1     of the gearshift in the vehicle?
2  A. Yes.
3  Q. It's on the right-hand side of the steering wheel
4     if I were sitting in the driver's seat of the
5     vehicle?
6  A. Correct.
7  Q. Ma'am, to your recollection, at all times
8     pertinent from the time that Officer Miller opened
9     the door up until the first shot was discharged,
10    is it your testimony that Roy's hands were, is it
11    fair to say, above his heart?
12 A. Yes.
13 Q. And at that time, prior to, during, and after the
14    first shot was fired, they were above his heart
15    and either on the steering wheel or near the
16    gearshift but definitely above where both hands
17    would be --
18 A. Yes, but I can't tell you exactly, but they were
19    above.
20 Q. And it was your testimony that Roy, in your
21    estimation, went unconscious after the first shot
22    was fired?
23 A. Yes.
24    MR. SIDOTI: I have nothing further.
25    MR. RASKIN: I just have a couple of

Page 204

1     follow-up questions if -- if I could, please.
2           - - -
3        RECROSS-EXAMINATION
4  BY MR. RASKIN:
5  Q. We have taken a series of breaks throughout the
6     day, and I hope you had enough opportunity to
7     catch a breather when you took those breaks.
8  A. Yes. Thank you.
9  Q. So -- you're welcome. So I know on the last break
10    you were downstairs with your dad at Starbucks.
11    During the other breaks, did you meet with both
12    Mr. Scott and Mr. Sidoti?
13 A. No, I met with Mr. Scott.
14 Q. Okay. Mr. Sidoti didn't meet with you --
15 A. No.
16 Q. -- and discuss any of the questions --
17 A. No.
18 Q. -- or answers?
19 A. No.
20    MR. RASKIN: Thank you. I have no
21    further questions.
22    THE VIDEOGRAPHER: We're going to go off
23    the record. This will be the end of this
24    tape, the end of the deposition. The time is
25    now 3:12:26. Off of the record.

Deposition of Amanda Pauley      Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

Page 205

1       MR. SCOTT:  We'll read it if it's
2  ordered.  I guess you're not done yet
3  necessarily.
4       MR. RASKIN:  Yeah, but I'll order this.
5       MR. SCOTT:  Okay.  So we'll read it.
6       - - - - - - -
7  (Signature was not waived by the Witness.)
8       - - - - - - -
9  (The deposition was adjourned at 3:12 p.m.)
10       - - - - - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 207

1         C E R T I F I C A T E
2
3  STATE OF OHIO, )
               SS:
4  SUMMIT COUNTY. )
5      I, Susan M. Petro, a Stenographic Reporter and
Notary Public within and for the State of Ohio, do
6  hereby certify that the within-named Witness, AMANDA
PAULEY, was by me first duly sworn to testify the
7  truth, the whole truth and nothing but the truth in the
cause aforesaid; that the testimony so given by her was
8  by me reduced to Stenotypy in the presence of said
witness; afterwards prepared and produced by means of
9  Computer-Aided Transcription, and that the foregoing is
a true and correct transcription of the testimony so
10  given by her as aforesaid.
11      I do further certify that this deposition was
taken at the time and place in the foregoing caption
12  specified, and was adjourned.
13      I do further certify that I am not a relative,
employee of or attorney for any party or counsel, or
14  otherwise financially interested in this action.
15      I do further certify that I am not, nor is the
court reporting firm with which I am affiliated, under
16  a contract as defined in Civil Rule 28(D).
17
18      IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my seal of office at Akron, Ohio, this 30th
19  day of July, 2018.
20
21       _____
     Susan M. Petro, Notary Public
22       My commission expires May 7, 2022
23
24
25

Page 206

1     W I T N E S S  C E R T I F I C A T E
2
3      I, AMANDA PAULEY, do hereby certify that I have
4  read my deposition taken on July 18, 2018, in the case
5  of Adam Fried, Administrator for the Estate of Roy
6  Evans, Jr., Deceased and Amanda Pauley v City of
7  Strongsville, Jason Miller, Sgt. Kelley, and James
8  Kobak, consisting of two hundred and seven pages, and
9  that said deposition is a true and correct
10  transcription of my testimony with changes as noted on
11  the errata sheet.
12
13      _____
14      AMANDA PAULEY
15  Dated this _____ day of _____, 2018.
16
17
18      Sworn to and subscribed before me this _____
19
20  day of _____, 2018.
21
22
23      _____
    Notary Public
24
25  My commission expires _____.
   SP

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

## WORD INDEX

**< $ >**
**$11** 175:12
**$25,000** 49:5 174:17

**< 0 >**
**08** 33:20

**< 1 >**
**1** 5:4 65:10
**1:09:20** 158:9
**1:09:44** 158:13
**1:18-cv-00139** 1:3
**1:23:11** 171:13
**10** 27:7 29:13, 17 32:22
37:4, 11 42:12 43:2 49:5
50:11 52:1 64:17 74:21
126:21 171:10
**100** 3:17 11:7 54:22
93:11, 19 126:20 179:25
**107th** 38:25
**1099s** 48:12, 25 49:23
**10-year** 48:4 50:2
**11** 163:9
**110** 93:11, 19
**113** 31:9
**117th** 38:25
**12** 27:25 120:10
**12.5** 9:6
**156** 4:14
**16** 24:11 35:22 42:11, 18
45:23 159:4 198:18
**1606** 44:10
**17** 53:22
**173** 4:15
**18** 2:9 5:2 160:18, 25
198:14 199:5 206:4
**1900** 2:8 3:6
**197** 4:4
**1997** 42:19
**1999** 17:8 52:19

**< 2 >**
**2** 32:6 45:5 88:7
**2,000** 176:13
**2:00** 81:17
**2:31:17** 171:17
**20** 88:22 140:18 160:12
**2001** 32:6
**2004** 53:21
**2007** 32:10 33:5, 20
42:14, 22, 25 47:2 48:4
58:14 59:1, 9 61:20
62:19 69:8
**2008** 33:5 69:8
**2009** 31:14 52:24
**2010** 31:14, 14 41:12 49:6
**2011** 32:6 53:22
**2012** 32:6

**2013** 16:15, 19 24:25
32:8 60:21 67:19 68:9
69:2
**2014** 27:15 58:13 59:2, 4
61:9 66:5, 7 70:7
**2015** 65:25
**2016** 64:3, 4, 12 65:10
70:5, 16 75:12
**2017** 9:22 15:6 17:11, 17,
23 18:7 21:9, 17, 22 22:1,
7, 12 27:4 34:1 42:16, 25
48:5 49:7 75:7 82:9
83:10 85:5 86:22 87:10
177:3, 8 182:20 183:8, 11,
20 185:10 198:9 199:3
**2018** 2:9 5:2 9:22 12:2,
17 13:22 42:14 198:14
206:4, 15, 20 207:18
**2022** 207:21
**204** 4:4
**216.357.3350** 3:7
**216.650.3318** 3:13
**22** 161:20 162:12 199:14
**24** 75:12
**25,000** 48:10
**28** 64:4 70:4, 5, 16 207:16
**29** 164:9 200:13

**< 3 >**
**3** 88:13 141:17
**3:02:57** 197:10
**3:03:32** 197:15
**3:12** 205:9
**3:12:26** 204:25
**30** 13:18 78:23
**30th** 207:18
**31** 53:21
**34** 84:8, 17 167:24 201:1
**34305** 3:18
**35** 175:13 176:4
**350** 175:25
**360** 175:25
**37** 84:15
**370** 43:23, 24 44:9

**< 4 >**
**4** 141:21 159:5 197:10
198:18
**40** 18:9
**440.424.0023** 3:19
**440-320-5459** 102:23
**44113** 3:6
**44115** 3:13
**44139** 3:18
**490** 3:12 43:20

**< 5 >**
**5** 4:4 163:9 197:14
199:14

**5:30** 75:15
**50** 2:7 3:6 176:17, 17

**< 6 >**
**6** 35:24 79:2 81:11 86:7
164:9 182:20 183:8
200:13
**60** 160:2

**< 7 >**
**7** 36:7 75:7, 9 78:24
80:17 82:9 83:10 85:5
86:22 87:10 158:18
166:10, 13 167:20, 22
177:8 183:11, 20 185:10
207:21
**71** 87:16, 21, 23 88:2
89:5 90:22 91:5, 6 93:6
**7-18-81** 31:5
**7th** 36:16 166:9

**< 8 >**
**8** 35:25 165:24, 25
**8:30** 77:20, 23
**80** 88:22 160:1
**812** 3:12 43:19
**82** 4:12 91:5
**84** 4:13
**8th** 36:9

**< 9 >**
**9** 36:1
**9:00** 77:21
**9:20** 2:9
**9:20:59** 5:3
**9:30** 77:23
**904** 146:12, 14
**97** 47:4
**98** 42:20, 20 47:4
**99** 42:20
**9th** 36:10

**< A >**
**a.m** 2:9 81:17
**A1** 175:18
**A-1** 4:13 84:21, 23 85:1,
3 86:12 106:13, 23
108:15 130:11, 17, 25
135:2 142:23
**able** 4:4 72:4 73:3
83:24 92:12 142:8, 18
163:3 169:19 177:2, 3, 9,
10 193:6, 8 200:4
**absent** 194:23
**Absolutely** 53:10 112:7
167:15 176:9 179:18, 20,
22
**Academy** 40:6
**accelerator** 110:17 111:9

**accept** 5:24 18:1
**accepted** 18:4
**access** 49:13 165:8
**accompanied** 52:4
**account** 173:25
**accounts** 174:9 180:23
**accurate** 86:19 143:10
169:5 182:23
**accurately** 109:3
**acquainted** 55:8 166:3
**act** 72:8, 17
**acting** 72:6
**action** 207:14
**activated** 89:14 102:12
**activities** 177:1, 6 178:20,
23
**activity** 60:8
**ad** 77:5
**ADAM** 1:3 3:1 5:19
157:5 197:19 206:5
**add** 144:17
**addition** 6:2
**additional** 30:6
**address** 43:19, 21, 22 55:1
178:18
**addressed** 198:8 201:6
**adequate** 171:6
**adjourn** 196:9
**adjourned** 205:9 207:12
**Administrator** 1:3 3:3
5:19 157:5 197:19 206:5
**Admiral** 46:14, 16
**admitted** 28:21
**Adult** 15:11, 13, 15 47:12
**advertised** 47:25
**advised** 152:21
**advocate** 184:6, 11, 17
**affair** 55:11
**affiliated** 184:2 207:15
**affixed** 207:18
**aforesaid** 207:7, 10
**afternoon** 86:7
**Agent** 4:15 135:15, 21
136:4, 7, 21 137:4, 12, 20
138:8, 18 140:21 141:4
173:15 188:10, 16, 25
**agents** 143:15
**ages** 18:25 53:18
**aggravate** 128:1
**ago** 13:9 14:12
**agree** 79:14, 18 85:1, 11
87:16 92:3, 8 100:14
109:2, 7, 8, 11 120:6, 12
136:15 182:25 189:24
191:9
**agreed** 6:12 76:1 160:2
**ahead** 25:20, 23 94:12
120:20
**ain't** 36:24

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

**air** 123:22
**Akron** 76:22 77:2 207:18
**Alison** 12:25 13:1, 19, 25
14:5, 10
**alive** 149:24 189:5
**altered** 165:13
**alternative** 15:13 191:25
**AMANDA** 1:8, 10 2:1
3:9 5:8 45:9 195:21
206:3, 6, 13 207:6
**■■■■■** 9:6 14:15
**Amended** 4:14 157:2, 11,
16 198:2
**amount** 175:2
**amusement** 179:9
**Amy** 145:6, 21 146:9, 25
**Amy's** 145:23
**angled** 118:10
**answer** 7:16 20:22 21:3
22:11 23:21, 25 25:20, 22
27:21 33:1 34:10 35:2
41:2 50:16 63:4, 5 81:8
94:18 95:10 97:13 98:7,
18 99:11, 21 100:18
107:10, 24 108:10 117:14
121:11 122:5, 16 130:16
158:4 161:6, 16 162:4, 9,
15 163:25 168:6 172:4
184:25 185:13 186:13, 19
188:7, 15 189:15 190:6,
12 191:6 192:3
**answered** 189:14
**answering** 45:21 177:12
**answers** 8:24 34:11
172:1 196:13, 17, 18
204:18
**■■■■■** 9:10
**■■■■■** 11:17, 18,
21
**■■■■■** 29:10
**■■■■■** 12:19 14:3
**anybody** 22:17, 19 151:9
163:19 183:19 184:1
**anybody's** 162:9
**anymore** 71:19
**apart** 52:25 55:8 59:1
162:23 184:11
**apologize** 19:6 25:5 31:4
34:11 42:7 56:23 63:8
70:22 72:14 115:2
121:22 171:19 191:22
**apparently** 26:16
**APPEARANCES** 3:1
**appeared** 80:9
**apply** 197:21
**appointment** 14:14, 19
**appointments** 77:16
**appreciate** 127:7 137:24
**approach** 200:22

**approached** 188:12
**approaching** 89:4
**approximately** 9:22 13:18
15:18 78:23 88:22
160:14 175:12 176:13, 15
**area** 120:8
**argued** 190:19
**arrearages** 60:3
**arrest** 132:11
**arrested** 24:2 60:2, 5, 7
148:16 189:12 192:7
**arrive** 77:17
**arrived** 61:15 136:11
166:6
**■■■■■** 25:15
**■■■■■** 26:18, 21
**asked** 6:6 8:9 25:4 31:3
42:7 52:3 70:22 103:17
108:24 121:22 128:21, 22
135:1 137:20 138:9
140:21 144:8 154:3
159:24 172:4 181:2, 4
182:4 193:19 194:25
196:13, 18 198:7, 17, 20
200:14 201:14, 18, 20
**asking** 8:24 23:22 29:3
57:20 63:8 93:16 110:12,
14 114:2 117:4 121:15,
15 123:13 134:9 150:17,
18 163:14 178:2 189:18
**asks** 57:22
**asleep** 61:13
**aspect** 177:17
**assault** 57:14, 15 58:13,
15 59:1, 2, 5, 9 61:9, 20
62:5, 12, 15 63:1, 12
135:24 136:25
**assaults** 60:9 61:7
**assessed** 68:22
**assessment** 127:3
**assets** 180:17
**assistant** 15:22 16:4, 7, 12,
18 17:2 32:10 47:8
127:1 175:10
**associated** 26:21
**assume** 56:23 58:1 72:2
81:14 87:25 109:12
110:10, 10, 12 118:25
152:14 153:10
**assumed** 112:9
**assuming** 28:22 56:18
80:4 82:18 86:1 129:17
139:2 147:4
**assumption** 149:8
**attachment** 167:11, 16
**attacked** 61:17 62:21, 23
**attempt** 27:19, 23, 24
**attend** 38:8
**attending** 38:11 39:20

**attention** 87:12 88:4
89:9 94:25 148:14, 15
**attorney** 207:13
**attributable** 174:18
**attribute** 15:5
**attributed** 137:14
**audio** 164:1, 4, 7, 25
165:3, 4, 8, 12, 13, 15
166:16, 20 167:2, 8, 9, 16
200:1, 6
**audios** 167:4
**author** 173:15
**authority** 199:9
**authorization** 30:2
**Avenue** 43:8 146:12, 14,
15 178:19
**average** 48:8 49:3, 4
179:8, 11
**Avon** 10:19 15:16 38:15,
16, 19 43:12, 13 44:11
47:22 50:18 60:11, 16, 17,
18 79:7, 22 80:11 81:1
87:24 184:14
**aware** 36:16 46:3 56:24
57:12 58:3, 12, 21, 25
59:22 61:14 71:25 74:21
79:6, 9 87:18, 20, 20 89:2,
10, 17, 23 90:25 91:21, 24
93:1, 6 95:1, 2, 3, 6 97:20,
23 104:24, 25, 25 105:4, 8,
12 148:23 149:3, 23
172:8, 12 181:7 184:16,
19, 21, 22 185:1, 8, 15, 20
193:11, 19

**< B >**
**baby** 41:13, 14
**back** 17:22 31:24 35:6
39:10, 19 41:6 42:14
45:4 63:6 82:19 83:11,
20 88:12 91:6, 15 99:25
100:2, 6, 12, 16, 19, 25
106:1, 1 127:12 130:11
134:13 135:2 141:20
147:1 152:23, 25 153:3, 7
158:12 171:16 195:21
197:13, 24
**background** 46:3
**backwards** 107:5
**bad** 63:9 70:22 128:21
144:8
**bam** 116:22, 22 138:14, 15
**bank** 173:25 174:9
180:23
**bar** 89:15
**Barn** 31:9
**based** 59:17 76:5 86:14
92:19 201:3
**basic** 8:17
**basically** 32:1 85:24

**basis** 55:20, 21, 22 189:4,
6
**Baumhardt** 47:9
**BCI** 102:14 186:4 192:14
**beach** 178:24
**becoming** 76:2, 7 89:1
**beeps** 148:13
**began** 48:3 161:2
**beginning** 5:3 45:5 88:13
134:1 141:21 197:14
**begun** 177:24
**Behalf** 3:1, 9, 14 6:12
157:4 172:10
**behavioral** 12:22 15:4
29:15, 20 37:6, 10, 16
40:17, 25 69:9 71:18
74:20
**belief** 100:16 189:4, 16,
19 191:23 192:5
**believe** 13:3 34:3, 4, 21
35:3, 6, 8 40:13 42:3
45:25 46:12 47:9 48:12
49:17, 18 52:11 53:3
68:10 69:16 74:12 78:20
79:3 85:10, 23 89:18
100:19, 24 105:23, 24
111:18 118:15 131:10
135:9 137:10, 25 141:9
143:9 149:22 160:21
180:22 182:9 186:21, 23
189:3 190:18 192:14
193:9, 21 194:6 195:16
199:19 201:16, 17 202:9,
19
**believed** 76:6
**Bellefaire** 20:4, 6, 7, 11, 16
21:8 22:6, 10 23:5
**belonged** 93:2
**belt** 118:23, 25
**belted** 110:1, 3, 5 123:18
**benefits** 18:11
**bequeathed** 180:18
**best** 12:1 22:3, 11 48:8
49:2 71:12 78:16 114:3
144:7
**better** 72:9, 13
**beyond** 17:1 60:8
**big** 119:17, 17, 18 147:16,
18 195:5
**bills** 176:7, 16
**birth** 31:4
**birthday** 53:21, 22
**bit** 22:21 78:3 86:13
121:3 171:22
**blank** 20:20 138:15
**blanks** 39:24
**Block** 50:5, 11, 22 51:4,
13, 22 52:3 62:3
**blood** 132:21

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

**blue** 83:2
**blur** 156:2, 3
**bodily** 190:1, 15
**body** 65:13 121:8, 13, 18
122:21 123:6 125:23
126:8
**Bond** 34:3, 22
**Boom** 168:25 169:1, 1, 1, 4
**Boom,** 169:4
**born** 41:5 46:4, 7, 9
**bottom** 159:5
**bought** 176:20 180:2, 3, 3
**bowel** 25:18
**boy** 141:2
**boyfriend** 154:12, 17, 17
155:3, 5
**brain** 55:17 57:25 65:6
**brake** 110:17
**break** 7:24, 25 8:9 36:22
45:8 75:4 101:22 174:20
204:9
**breakdown** 175:20
**breaking** 24:6
**breaks** 204:5, 7, 11
**breather** 204:7
**breathing** 14:4
**briefly** 167:25
**bring** 56:1 74:14 186:5
**broader** 57:18
**Broadway** 67:12
**broke** 24:5 61:14
**Brookside** 17:8, 9
**brought** 105:16 184:13
185:3
**Brunswick** 76:23, 24, 25
77:12, 18 81:17 87:4, 15,
23
**Budget** 47:23
**Building** 3:12
**bump** 112:24 113:9, 19
114:5 115:14, 14 135:11
202:5, 12
**bumped** 111:19 135:7
138:12
**bunch** 61:25
**Bureau** 135:15 143:16
172:20 185:21
**burgundy** 82:1
**buried** 129:5
**burnt** 134:14
**Business** 16:20 31:15, 15
76:21 120:4

**< C >**
**Cabaret** 30:23
**call** 24:19 45:9 102:18
133:17 144:22 149:8
151:4 154:11 167:8
171:11, 20 193:11 195:21
200:15, 21

**called** 2:2 31:9 48:12
92:24 118:11 133:12, 15
145:3 149:13, 18, 19
157:11 164:24 165:6
**calls** 104:12 145:2
146:23 147:6, 9, 10
148:23 149:9 164:4
201:12, 15, 24 202:1
**camp** 177:19
**Camping** 177:19 178:21
**campus** 28:10
**capacity** 6:20
**caption** 157:17 207:11
**car** 60:13 61:1 62:1, 10,
15 63:1, 12 74:2 81:19,
23 94:4, 7, 12 95:7, 11, 14,
15, 17, 18, 20 96:5, 13, 18
97:1, 7, 21 99:25 105:15
132:14, 16, 17, 24 133:6,
20 136:9 140:6 150:2
152:12 183:21 189:11
192:4 194:8
**Carbone** 10:15, 16 14:12
22:18
**care** 10:17 29:8, 16 37:3,
3, 10, 10 40:12, 15, 17, 20
42:3 174:24 181:14, 19
**caregiver** 15:20, 21
**caregivers** 16:6
**CareSource** 14:25 25:13
26:5
**carnivals** 179:10
**carpet** 31:8 47:6, 7, 8, 11,
23, 25 48:14 75:17, 17
76:1, 22 78:2, 13 117:16,
22 118:14, 21 119:1, 20,
21, 24 120:4, 8, 10 125:6
129:24, 24 130:19 175:4
**carpeting** 120:1, 5
**carry** 34:3
**carrying** 27:16, 18
**cars** 93:25 94:15 98:15
152:15
**CASE** 1:3 6:16 62:18
63:15, 25, 25 146:12, 14,
15 157:14 172:10 206:4
**catch** 204:7
**cause** 95:22 115:2 207:7
**caused** 23:18 28:21
37:17 57:13 67:21
105:13
**causes** 8:22
**causing** 111:9
**Caxton** 3:12
**CB** 165:7
**cell** 102:1, 2, 3, 6, 11, 22
149:7
**cells** 65:6

**Center** 67:23, 25 68:1, 8,
12, 15, 21, 25 69:17 74:19,
25
**certain** 35:12 115:9
158:16 177:22
**certainly** 127:5
**certificate** 16:12, 18
**certification** 16:2, 8, 19
17:2
**certified** 5:10 15:25 16:1
**certify** 206:3 207:6, 11, 13,
15
**change** 197:6
**changed** 52:14 75:21
**changes** 206:10
**changing** 196:16
**charge** 60:18
**charged** 32:13
**Charles** 4:15 135:19
**chase** 131:13 146:21
149:14 150:1
**chasing** 103:3, 12 104:6
**chest** 138:15
**Chief** 5:18
**child** 56:8, 13, 17, 24
59:24 60:3, 8, 11, 18
179:23
**childbirth** 27:7
**children** 5:22, 23 18:21
19:23, 23, 25 53:13, 15, 19
55:9 60:22 84:10 85:5
138:16 140:22 174:16
176:19 180:12, 13, 13, 18
190:21, 24 195:25 197:4
**choked** 61:17
**choose** 184:23
**chose** 17:22 196:15
**Christian** 40:6
**Christie's** 30:23 31:1, 6,
24 32:2
**chronic** 25:16
**chronologically** 39:7 65:5
**cigarette** 113:23 114:12,
13, 23 115:12 134:12, 14
154:8 155:12, 17 156:14
159:20 163:23 164:2
**cigarette,** 164:5
**circumstances** 6:1
**citation** 80:20, 21
**cited** 78:24 79:20 80:17
81:11
**CITY** 1:13 5:16 50:18,
19 55:2 66:23 67:7
206:6
**Civil** 2:3 207:16
**claim** 32:11 162:12
**clarification** 201:11
**clarifications** 198:6
**clear** 26:8 50:24 57:3
73:2 76:15 124:25 125:3,

4, 5 133:9 143:13 169:10
185:7 201:2, 8
**clearly** 52:25
**Cleveland** 2:8 3:6, 13
20:11 28:8 39:1, 2
**climbed** 132:19 133:2, 4,
6, 21
**clip** 82:19
**close** 67:2 172:5 188:3
**closer** 65:24
**clothes** 75:22 180:2, 3
**coat** 134:14
**coffee** 74:2 75:13
**College** 16:20 40:13
**color** 82:5 85:2 109:2
131:3 142:22
**colored** 131:2
**Columbus** 54:19
**combination** 105:19
**come** 14:10 72:22 73:6,
10 146:19 147:13 149:15
151:9 193:20 199:9
**comes** 26:2, 3 70:13, 13
112:14 115:20
**comfortable** 85:12
**coming** 95:17, 25 96:4
100:11, 13, 15 105:25
194:2
**commission** 206:23 207:21
**commitment** 30:10 74:19
**committed** 28:25 37:17
58:22 68:18, 19, 22 75:1
**common** 144:5
**communicate** 180:11
**communicating** 134:20
**communication** 202:6
**communications** 166:20
167:8, 9 200:1, 2, 7, 19
**community** 17:9 66:20,
22 67:6
**community-acquired** 25:16
**Complaint** 4:14 34:1
157:3, 11, 16 198:2
**complete** 8:16 20:20
39:13, 17, 19 50:12
139:21 174:21
**completed** 39:16 40:1
46:19 78:17
**completely** 89:22 201:8
**comprehend** 132:6
**comprehensive** 128:22
**Computer-Aided** 207:9
**concentrate** 72:5
**concentration** 14:16
**concerned** 68:5
**concerning** 42:9 182:6
185:24
**conclude** 111:4 164:16
**concluded** 144:10

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

concluding 134:2 195:18
conclusion 93:13
Concord 43:23, 25 44:1, 9
condition 15:4 41:20
  66:21 67:15, 20 71:23
  86:20
conditions 25:9, 11 26:10
  27:2 64:15 91:25
condolences 5:25
conduct 92:14 185:9
conference 45:3 46:11
  88:11 90:16 171:20
confident 122:12
confirm 85:13
confirmed 148:19 149:24
confused 19:12
C█████████ 19:1
connected 23:7
connection 109:9
consciousness 181:22
  182:1, 3
considered 48:20
consisted 171:5
consistent 200:7
Consistently 90:10, 12, 13
  177:20
consisting 206:8
console 118:11
constraints 8:20
consult 8:7, 10 196:21
consulting 14:10
contact 53:11 95:18, 25
  96:4, 19, 20, 25 97:3
  109:7, 15, 19 159:23
  160:7 173:14
contacted 20:7 53:4
contained 85:14 173:16
Containing 4:13
continue 23:10 31:22, 23
continued 14:15 22:5
  70:11 187:25 195:8
contract 207:16
contractor 47:15
contractors 48:21
contradict 93:13
contradicts 117:10
contribute 175:22 176:8,
  13
control 72:1 106:7
conversation 7:17 34:10
  102:24 141:9 146:16
  149:22 151:12 154:6
conversations 8:16 63:17
  149:21 151:13, 15
conversion 81:24 82:1, 8,
  17 83:9
convicted 32:13, 21 33:2,
  7, 18, 19 57:8, 23 59:1
conviction 33:6 58:12
  80:25

convictions 33:9 58:4, 6,
  19, 21 60:1
cop 79:5 95:11 96:18
  134:17 138:14 152:16
Copies 4:12, 13 49:13
  82:5, 17 84:8 86:11
  108:15 109:3 130:12
  131:3 142:22
cops 89:22 132:9 170:3
copy 129:20 157:2, 4
  █████████████ 25:15
correct 6:4, 9, 18 12:19,
  20 15:2 16:9, 13 21:10
  24:9 27:5 33:21, 22
  39:23 41:3 43:1 49:7
  52:5 55:13 57:5, 6 58:4
  64:16 66:1, 2 68:24 69:1
  70:14 73:3 75:2 76:16
  78:22 80:14 86:24 87:14,
  19 90:20 91:24 92:19
  93:4 94:22 100:13 104:1
  109:16, 17, 24 110:2, 21
  113:1 115:16, 20, 21
  123:19 124:3, 16 126:4
  130:23 140:12, 12 142:16,
  21 143:11, 12, 18, 19, 20,
  23 144:18, 19 152:10
  156:17 160:3, 24 162:13,
  20 163:1 165:11 167:21
  181:12 182:20 183:9, 10
  185:16, 17 187:6 188:1, 2
  192:1 198:10 199:3
  200:11, 12 201:4, 5, 9, 22,
  23 203:6 206:9 207:9
Correctional 59:7
correctly 11:10
Cortez 178:9, 10
C-o-r-t-e-z 178:10
cost 14:22
Counsel 6:11 7:4 8:13
  23:6 30:1 82:11 108:19
  197:3 207:13
counseling 22:9, 13 24:16
  29:19
counselor 23:11, 14, 15
  38:18
counselors 195:4
counselor's 194:24
count 82:12 84:10
counted 84:8
County 54:23, 24, 25
  56:12 58:17, 19, 22, 23
  207:4
couple 7:8 25:1 41:18
  42:10 51:6 68:10 77:11,
  12 99:12 119:3, 11
  196:25 198:6 203:25
course 16:23 40:9 44:22
  56:5 113:19 116:1
  118:14 136:13 175:5

177:14 181:3 188:23
  195:12
COURT 1:1 5:6 6:2
  7:13, 20 23:8, 13 24:7, 8
  33:7, 8, 20 43:10 56:11,
  15 58:17 60:17 79:7, 7,
  24 80:5, 11 81:14 196:1,
  10 207:15
courts 23:6, 11, 19
coverage 18:15
covered 172:7
covers 14:23
CPR 192:13, 17
crack 131:19
cracks 131:15
Crap 89:21
crime 32:14 33:13, 19
  57:16, 17, 23
crimes 32:20 33:18 57:8
  58:21, 25
criminal 58:4, 11 60:8
  135:15 143:16 172:20
  185:21
███████ 65:2, 3 66:9, 11
  69:6
Cross-Examination 2:3
  5:11
cruiser 89:18 112:15, 16
  142:5, 12, 24 159:24
crying 150:16
Crystal 54:9, 12 55:11
  57:4
current 56:13
currently 22:8, 17, 20
cut 103:14
Cypress 44:10

< D >
d, 128:2
D.C 1:10 3:10
dad 6:4, 6 45:12 108:21
  129:5 132:9 146:23
  148:11 149:13, 17 194:7
  204:10
daddy 132:21
dad's 134:13 145:7
daily 55:19, 21, 22
damage 182:18 183:6
dance 175:6
danced 175:6
dancer 30:16, 22
danger 92:14 190:21, 25
  191:1
dangerous 92:5, 10
dash 118:11
date 5:2 11:25 31:4
  33:6, 25 34:23 35:16
  79:11, 17 81:14 167:20
  198:9 199:7, 17, 17 200:17

dated 42:20 206:15
dates 36:5
D█████████ 53:20, 20, 20, 23
  54:1 55:14, 15, 16, 19, 23,
  24, 25 56:9 78:4 179:15,
  16, 16, 24
dating 177:24 178:2, 11
daughter 60:13
Dave 141:13
David 3:19, 19 82:19
day 8:18 12:10 17:19, 20
  18:1 35:19 77:15 80:16
  86:3, 4, 5 129:5 175:17
  204:6 206:15, 20 207:18
days 65:15, 22 68:6, 7
  78:23
daytime 77:15
day-to-day 179:5
dead 102:8, 9 149:24
deadly 189:22 191:10, 17,
  24
deal 177:23
death 49:12, 14 50:14
  64:17 65:9, 25 71:13
  74:22 79:15, 19 175:9
  190:9, 15
Deceased 1:6 3:3 206:6
decedent 19:16, 20
December 53:21 67:18,
  18 68:9 69:2
decide 22:15 174:2
decision 11:20 189:7
decrease 11:3
defective 139:9
Defendants 1:21 2:2
  3:14 4:11 6:12 82:13
  84:23 156:20 173:2
Defendant's 173:6
defense 5:18 198:1, 12
  200:13 201:1
defined 207:16
definite 77:22
definitely 162:25 203:16
definition 57:24
degrees 30:19
delay 171:19
delivered 27:17
deny 137:8, 9 153:12, 13
  155:9, 14 188:21, 22
Department 88:19 91:3
  92:24 93:10, 18 96:11
  97:6, 25 98:13, 25 99:5
  107:8, 21 108:5 109:16
  160:8 182:18 183:19, 22
  193:5, 11 201:13
departments 148:21
depend 48:10
depends 169:22
depict 183:1

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

**DEPOSITION** 1:9 2:1
10:7 195:19 196:9
204:24 205:9 206:4, 9
207:11
▇▇▇▇▇▇▇ 11:21
▇▇▇▇ 21:12 27:10
▇▇▇▇ 9:11 12:18
27:12 38:1
▇▇▇▇▇ 20:8 21:16, 16
22:24
**describe** 72:16 132:2
134:21 192:24 193:1
**described** 24:15 29:15
37:2 40:15 62:8, 9 74:17
91:22 112:19 114:6
115:14 124:23 128:16
140:1 144:7 149:11
**describing** 139:6 156:9
187:3
**description** 134:5
**designated** 201:17
**desk** 148:1, 10
**desks** 147:4, 5
**destination** 87:3
**destroyed** 70:19 102:14
**detail** 135:1
**details** 192:25
**Detroit** 38:25
**D**▇▇ 19:1 20:3, 6, 8
21:7 22:5 24:10, 11, 16
25:4 37:9, 9, 19 38:12, 21
39:6, 9, 10 44:8, 16 75:24
78:4, 6, 7 129:14, 14, 15,
17 131:4, 7 132:18
133:25 134:3, 21 141:1
162:7 163:8 193:10, 14,
16, 19, 23 194:7, 16, 22
195:3, 6
**D**▇▇ 24:12 102:5, 6, 11
104:10 194:3
**devoted** 179:24
**Dewey's** 47:10
▇▇▇▇▇ 25:17
**diagnosed** 14:5 25:10
26:17
**diagnosis** 13:25 21:13
25:15 139:11, 21
**die** 104:10
**died** 104:8, 15, 17 122:22
**different** 22:21 88:24
108:8 133:23
**differently** 96:16
**difficult** 186:4
**difficulty** 8:23 23:17
**digress** 78:21
**Dill** 165:17, 19, 20 166:1,
12
**direct** 22:11
**directed** 148:2

**direction** 87:17 91:16
107:4
**disbelieve** 186:16
**discharge** 23:9
**discharged** 22:14, 16, 23
23:2, 2, 3 203:9
**discontinued** 22:13
**discuss** 193:14 204:16
**discussed** 7:5
**Discussion** 83:19 158:11
174:11 196:4 197:12
**discussions** 193:25
**disease** 25:15, 17, 18 65:3,
3 66:9, 11 69:6
**dishonest** 58:2
**dishonesty** 32:14, 20
33:13, 18, 19 57:9, 10, 16,
24
**disorder** 21:16 22:24
139:10, 12, 22
**dispatch** 200:2, 7, 20
**dispose** 86:1
**dispute** 97:9 98:4, 16
99:9 152:13 153:20, 21
154:1, 2, 15, 21 155:3, 8
187:2, 4 201:2
**distraught** 193:24
**DISTRICT** 1:1, 2
**DIVISION** 1:3
**divorce** 52:23, 24 53:6
**divorced** 52:21
**doctor** 10:16 11:17
14:20 17:19 69:21 71:7
**document** 8:1 198:13
200:5
**doing** 47:5 103:18 126:8,
10 142:22 195:25
**domestic** 24:4
**done,** 158:19
**Door** 40:6 61:16 109:20
111:6, 10 112:17, 17, 22,
24 113:13 114:22 115:20
116:25 117:1 121:8, 12
122:1 123:22, 25 124:4,
11 125:1 127:10 128:17
129:10 131:15, 16, 24
134:1, 16, 23 136:11
138:14 142:16, 20 154:11
169:24 184:15 202:11, 16,
19 203:9
**doors** 131:21 147:13
148:8
**dosage** 11:3, 6 69:25
**doubt** 140:19
**downstairs** 204:10
**downtown** 28:10 30:25
**Dr** 10:15, 16 14:12 22:18
30:9 41:23, 24 42:1
**drank** 75:13

**draw** 39:24
**drawer** 174:8
**drawing** 20:19
**drawn** 188:13
**dresser** 174:8
**drinking** 74:2
**drive** 153:3
**driver's** 33:23 34:2, 16
94:5 95:12 98:3 99:20,
24 100:4 109:20 111:6,
10 112:17, 24 113:13
121:8 122:1 131:10, 11,
24 133:4, 7 134:1, 22
142:16, 20 153:17 170:1,
16 203:4
**driving** 33:10, 11 78:24
79:4, 20 80:13, 17, 21, 25
81:12 83:9 87:16, 22
88:20 89:4 92:4, 8, 21
93:7, 10, 19 95:23 98:14
99:2, 3, 7 109:5 111:13
135:25 137:1 143:3
153:7 160:1, 12 189:24
190:17
**drop** 180:7
**dropped** 61:11
**drove** 62:2, 4 74:2 87:9
90:22 96:12 97:20
152:14 186:9 201:18
**due** 34:4 41:20 65:2
**duly** 5:9 207:6
**DUS** 60:5, 9
**DUSs** 60:6

**< E >**
**earlier** 63:25 92:19
155:20 159:24 160:21
168:17
**early** 75:8 92:1
**earn** 48:6
**earned** 47:13 49:5
174:17 175:22
**earning** 175:12, 25
**earnings** 173:24
**easier** 56:5
**East** 43:20
**EASTERN** 1:3
**easy** 8:17, 18 159:8
**education** 17:1 46:23
**educational** 38:4
**effect** 90:18 113:6
**effects** 12:11, 12, 14
**effort** 94:16
**eight** 19:2 128:25
**Eighteen** 45:25
**either** 40:16, 17 41:4
55:14 57:3 61:6 74:25
91:14 97:4 98:5, 16
113:20 134:21 143:15
150:14, 20 152:8 162:16

169:16 171:1 182:7
185:16 193:3, 6 203:15
**Eleanor** 37:20 38:21
**Elyria** 20:14, 16 21:8
24:8, 25 40:8 43:9, 11, 12,
15, 16 44:2 47:24 54:6
55:3, 4 65:19, 20 66:16
146:10 178:17, 19 194:6
**email** 167:1, 10, 11, 12, 14
**emailed** 166:22, 24, 25
**emails** 199:24
**emergency** 68:4
**emotionally** 127:5 177:10,
14
**employed** 15:8 17:11, 17,
18 47:10 175:18
**employee** 48:19 207:13
**employees** 48:20
**employment** 31:6, 20 32:5
**enable** 93:1 123:3
**endangerment** 60:11, 18
**ended** 31:20 75:12
**engaged** 159:13 178:20
**engine** 110:22 111:5, 9
**enjoyed** 179:9
**ensuring** 196:17
**entails** 7:6
**entered** 46:10 56:11
90:15
**entering** 91:19
**entertainer** 30:14
**entire** 25:7 90:6, 13
101:5, 21, 25 109:25 186:3
**entirely** 11:12
**Erie** 54:6
**errata** 206:11
**especially** 175:5
**Esq** 3:3, 11, 14
**essentially** 179:16
**Estate** 1:6 3:3 5:20
197:2, 19 206:5
**estimate** 48:8, 11 49:2
78:16
**estimation** 203:21
**evaluated** 40:24
**Evans** 1:6 3:3 5:20 19:1,
2, 9, 10, 11, 17 42:9 52:14
53:7, 22 54:7 93:3
102:19, 20, 24 103:24
104:13 109:4 133:20
143:16 153:4 161:25
163:23 189:17 197:20
206:6
**Evans,** 198:21
**Eve** 61:11
**evening** 9:6
**event** 27:1 74:13 80:24
**events** 15:5 27:3 62:14
63:18 64:23 75:7 125:1

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

127:*14*  133:*25*  176:*24*
185:*10, 24*
**everybody**  190:*4*
**Everyday**  178:*23*
**everything,**  179:*3*
**exact**  11:*25*  28:6  33:5
103:*15*
**exactly**  10:*22*  67:*22*
131:*16*  164:*25*  203:*18*
**EXAMINATION**  4:*3*
**example**  158:*20*
**exchange**  112:*18, 20*
114:*6*  115:*13*  138:*18*
**exchanged**  202:*11*
**Excuse**  25:*21*  44:*14*  158:*3*
**executioner**  189:*7*
**exhibit**  8:*2*  82:*11, 13*
83:*1, 12*  84:*23*  85:*1, 3*
86:*12*  106:*13, 23*  119:*2, 8*
120:*13*  130:*7*  142:*23*
156:*20, 24*  173:*2, 6, 10*
182:*11, 14*  198:*1, 13*
200:*14*  201:*1*
**EXHIBITS**  4:*8, 11*
**exit**  90:*22, 24*  194:*6*
**exited**  45:*2*  88:*10*  90:*22*
91:*4*
**exiting**  91:*10, 19*
**expected**  78:*14*  171:*21*
**expecting**  124:*18*
**expense**  15:*1*
**expenses**  173:*21*  176:*21*
**experience**  73:*12, 14*
**experienced**  40:*18*  186:*10*
**experiencing**  11:*15*
**expert**  172:*9*
**expertise**  13:*2*
**experts**  172:*13*
**expired**  34:*22*  35:*11, 17, 19*
**expires**  206:*23*  207:*21*
**explain**  123:*17*  168:*24*
**explaining**  151:*16*
**explanation**  194:*20*
**express**  155:*7*
**expressing**  136:*17*
**expression**  139:*2*
**extended**  120:*8*
**extent**  182:*6*

**< F >**
**facility**  16:*5*
**fact**  51:*15, 16*  55:*8*  57:*8*
94:*4*  104:*15*  121:*7*  149:*7*
155:*23*  156:*1*  168:*22*
187:*2*  190:*24*  198:*8*
199:*1*
**facts**  61:*6*  88:*23*  93:*12, 20*  96:*14, 17*  97:*9, 14*
98:*4, 15*  99:*9*  100:*20*

108:*7, 11*  111:*4, 8*  163:*16*
182:*5, 22*  183:*5*
**failed**  39:*18*
**faint**  148:*13*
**Fair**  7:*22*  63:*8*  93:*23*
95:*5*  104:*20*  105:*21*
109:*18*  124:*21*  137:*18*
140:*13*  141:*11*  159:*1*
160:*17, 17*  161:*19*  163:*20*
169:*9*  203:*11*
**fairly**  122:*12*
**fall**  125:*6*
**familiar**  37:*23*  66:*22*
192:*23*
**family**  14:*20*  54:*20*
179:*17*  180:*9*
**far**  13:*5*  26:*10, 11*  52:*17*
120:*7*  131:*11*  144:*18*
**fast**  23:*10*  24:*23*  65:*6*
114:*1*
**faster**  95:*3*
**father**  19:*3, 3, 8, 18, 20*
145:*4, 6*  146:*17*  154:*16*
176:*20, 21, 22*  177:*21*
178:*25*  193:*12, 17, 17, 20, 22, 23, 25*  194:*1, 2, 3, 7, 12, 14*
**fault**  56:*22*
**February**  71:*16*  72:*24*
**federal**  50:*4*
**feel**  39:*22*  107:*7, 20*
109:*12*  177:*9*
**feelings**  187:*5*
**feet**  110:*9, 14, 16, 19*
**fell**  61:*12*  125:*8, 23*
126:*13, 14, 15*  169:*3*
**Felonious**  57:*14, 15*  58:*13, 15*  59:*1, 2, 4, 9*  60:*9*  61:*7, 9, 20*  62:*5*
**felony**  200:*15*
**felt**  63:*6*  73:*18*  100:*8, 9, 10, 11*  109:*13*  127:*6*  151:*8*
**female**  154:*6, 10*
**field**  13:*1*
**fifteen**  140:*16*
**Fifty**  11:*9*
**fight**  24:*1*  61:*14*
**fighting**  57:*17*  62:*23*
**figured**  10:*13*
**file**  49:*9, 24, 24*  50:*23*
51:*19, 21, 23*  52:*3*  167:*11*
**filed**  5:*19*  49:*17, 19*  50:*4, 5, 21*  51:*9, 12, 15, 16*  52:*1*
53:*5*  157:*4, 13, 14*  198:*14*
199:*8*  200:*6*
**filing**  50:*17*  199:*18*
200:*18*
**fill**  32:*2*
**filled**  16:*10*  28:*23*  70:*21*

71:*4*
**finally**  147:*7*  188:*13*
**financial**  34:*22*  174:*15*
181:*6*
**financially**  207:*14*
**find**  83:*24*  86:*13*  119:*10, 12*  130:*1*
**fine**  32:*4*  45:*16*  73:*4*
80:*3, 4*  106:*18*  120:*1, 20*
130:*4*  148:*9*  170:*23*
182:*16*
**finish**  10:*11*  70:*16*  140:*15*
**finished**  70:*18*  71:*3*
**fired**  116:*8*  117:*2*  125:*2*
127:*10, 11*  128:*18*  129:*11*
131:*5, 9*  134:*23*  140:*7*
167:*24*  169:*17, 21*  201:*4, 9*  203:*14, 22*
**firm**  207:*15*
**first**  5:*9, 16, 24*  7:*11*
10:*10*  13:*8, 20*  14:*18*
16:*16*  57:*19*  76:*12*  85:*11*
87:*18*  89:*1, 13*  96:*19, 23*
112:*19, 20*  113:*14, 19*
117:*2*  122:*19, 22*  123:*1*
124:*2, 17*  125:*15, 16*
126:*8, 18*  127:*25*  132:*4*
134:*3*  135:*11*  142:*14, 25*
146:*20*  149:*22*  150:*8*
160:*7*  165:*15*  168:*7, 19*
169:*6, 14*  173:*24*  178:*6*
181:*21*  182:*2, 3*  203:*9, 14, 21*  207:*6*
**fish**  115:*14*  177:*19*
**fishing**  178:*21*
**fist**  111:*19*  112:*24*  113:*9*
114:*5*  115:*14*  135:*7*
138:*12, 13*  202:*5, 12*
**Five**  15:*11, 13, 15, 18*
16:*10*  17:*11, 17, 22, 24*
18:*1, 6*  30:*12*  31:*7*  32:*7, 8*  44:*13*  50:*8*  65:*15, 22*
68:*7*  74:*2*  175:*7*  198:*17*
**flat**  104:*23, 25*  105:*5, 8, 18*  106:*19*
**fled**  189:*17*
**fleeing**  140:*18*
**flipped**  105:*16*
**Flooring**  47:*21, 22*
**Floors**  60:*12*
**Flowers**  12:*25*  13:*1, 19, 25*  14:*5, 11*  30:*9*
**flushed**  70:*20*
**focus**  122:*24*
**follow**  65:*4*
**followed**  29:*9*  68:*20*
**following**  17:*16*  49:*12*
75:*20*  87:*19*  110:*8*
183:*20*
**follows**  5:*10*

**follow-up**  29:*8*  197:*20*
204:*1*
**food**  174:*4*
**foot**  17:*19*  110:*19, 19*
111:*9*  120:*10*  163:*9*
**force**  189:*22*  191:*11, 17, 24*
**foregoing**  207:*9, 11*
**forget**  44:*22*  170:*17*
**Forgive**  19:*6*  37:*23*
39:*24*  56:*22*  99:*3*  115:*8*
138:*7*  165:*22*  171:*21*
**form**  196:*14*
**formal**  17:*1*  46:*23*
**formally**  52:*24*
**former**  5:*18*
**forms**  51:*1*
**forward**  35:*14*  107:*4, 6, 20*
**four**  50:*8*  94:*24*  98:*13*
99:*1, 6, 14*  105:*9*  187:*7, 15, 18, 24*
**Fox**  165:*24, 25*
**Franklin's**  3:*17*
**fraud**  33:*2, 21*
**free**  39:*22*  80:*8*
**Freeze**  132:*10*
**frequency**  13:*10*  21:*24*
**FRIED**  1:*3*  3:*1*  5:*19*
157:*5*  197:*2, 19*  206:*5*
**Friend**  1:*9*  3:*9*  5:*21*
61:*12, 13, 16*  145:*6, 21*
157:*6*
**friends**  55:*10*  56:*6*  166:*4*
180:*8*
**front**  74:*1*  95:*1*  109:*22*
113:*24*  120:*8, 19*  121:*5*
129:*7*  131:*24, 25*  132:*19*
133:*21*  138:*16*  147:*13*
186:*20*  198:*2, 5*
**full**  116:*9, 21*
**fully**  175:*8*
**fun**  36:*24*
**Furniture**  47:*11*
**further**  203:*24*  204:*21*
207:*11, 13, 15*
**future**  81:*15*

**< G >**
**games**  179:*6*
**gas**  194:*10, 13, 13*
**gauge**  93:*14, 17*
**GAUGHAN**  1:*7*
**gearshift**  113:*21, 25*
202:*22*  203:*1, 16*
**GED**  46:*25*
**gentleman**  135:*18*
**gentlemen**  195:*20*
**Gerson**  37:*20, 20*  38:*22*
195:*4*
**G-e-r-s-o-n**  37:*21*

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

**getting** 29:24 61:15 64:1
104:10 135:25 137:1
**girl** 35:8
**girlfriend** 24:1
**girlfriend's** 24:6
**give** 7:12 8:1 11:25
22:11 55:1, 2 77:21
79:11 90:7 96:17 103:7
134:4 175:12 190:21
192:10, 25 197:25
**given** 13:25 14:1 29:8
149:6 181:8 196:19
207:7, 10
**gives** 10:24
**giving** 8:24
**glanced** 186:5
**glass** 147:3, 16
**glasses** 182:15
**go** 8:11, 18 13:12 17:6,
22 25:20, 22 31:24 35:14
37:19 40:5 44:23 46:1
50:23 51:19, 21 57:13
59:23 61:13, 16 65:14
68:3, 8 75:19 78:8, 9
80:6, 7 81:6 83:13 87:5,
6 93:14 120:20 126:22
127:18 132:11 135:1
136:1, 16, 18 137:2
141:15 147:23 148:7
158:8 171:9, 12 175:7
176:18 177:21 178:24
194:22 195:13 197:8
204:22
**God** 118:17
**goes** 118:12 153:14
**going** 22:1, 15 23:1
33:15 39:14, 15, 15 40:3,
14 42:8 44:19, 23 51:12
61:4 62:22, 23 69:16
75:5, 6 78:6, 10 82:5, 6, 7,
10 88:6 91:16 94:15
95:3 101:18 103:19
106:6 111:21, 22 113:3
130:10, 10 131:1 132:11
135:22, 22 136:1, 16, 17,
18, 23, 24 137:2 138:2, 11
141:15 147:23 148:14
158:8, 15, 17, 21, 24
171:12 175:15 178:23
179:9 180:7 186:4
188:23 195:18, 20 196:1,
9, 10, 12 197:8, 24 198:7
204:22
**good** 5:13, 14 14:17 20:9
99:16 181:17
**goodness** 20:19
**google** 10:24
**gotten** 58:15 60:6, 11
64:2 187:18 189:11
195:21, 23

**grabbed** 111:15 135:12,
13 140:7 143:17 192:6
**grace** 35:9
**grade** 39:6, 9, 14, 14, 15,
16, 18, 20, 20 40:1, 3
46:18 194:17, 21
**graduate** 17:4, 7 46:16,
17, 21, 22
**grand** 184:20, 22
**grandpa** 24:21
**grandparents** 25:2
**granted** 144:24
**great** 178:25
**gross** 175:25
**group** 42:1
**guardrail** 188:4
**guess** 10:10 21:6, 6 22:3,
12 29:3 37:25 42:12
50:20 55:4 60:13 75:21
76:4 105:20 108:11
118:20 149:4 150:12, 17
156:4 174:14 205:2
**guessed** 145:20
**gun** 116:8 134:17 189:2
200:10
**guns** 138:16 188:13 192:9
**guy** 120:3
**guys** 61:25 62:4 161:9
168:24
**GYN** 29:10

**< H >**
**hand** 5:5 111:15 113:10,
22 114:13, 20, 20, 24
115:17 117:20 135:5, 8,
12, 13 140:8 143:17
154:8 155:2, 12 156:14
161:11 195:5 207:16
**hand-holding** 154:4
**handle** 31:19
**hands** 113:14, 18, 20, 24
114:7, 8, 17 115:11 116:6,
6, 8, 10, 14, 14, 20 122:12,
13, 13 123:22, 23 125:21
126:7 143:7 202:4, 16, 20
203:10, 16
**Hands,** 122:11
**handset** 148:4
**hanging** 114:12 115:13
**Hanna** 28:9
**happen** 195:18
**happened** 17:21 60:16
61:7, 24 62:19 63:18
75:8 91:4 92:11 96:15
98:1 100:1 114:1 115:11
124:22 127:15 132:6
136:19 137:21, 23 138:9
143:22 144:6, 9 151:14,
16 166:5 183:13, 16
**happy** 18:5 130:18

**hard** 73:6 115:1 163:9
177:12, 23
**harm** 190:1, 15
**head** 7:14, 14 115:4
**heading** 91:7, 7
**headlights** 160:23 91:23
160:23 161:2, 8 199:7, 12
**health** 12:21, 22 15:4
29:16, 20 37:6, 7, 10, 16
40:17, 20, 24, 25 67:3, 5,
15, 20 68:23 69:9 71:18
74:20, 20, 25 75:1 181:17
**hear** 10:6 57:22 103:22,
23, 24 104:2 116:16, 18
148:13 164:15, 20, 21
165:3 200:6, 19
**heard** 7:7 53:8 54:17
73:23 110:24 116:13, 15,
21, 24 122:11 164:4, 24,
25 165:4, 5 168:23 200:24
**hearing** 101:12 105:2
110:22 116:20
**hears** 156:9
**heart** 203:11, 14
**heaven** 132:11
**heck** 124:18 128:1
**he'd** 73:6
**Heights** 20:11
**held** 39:10, 18
**he'll** 39:20 40:14 45:14
**help** 9:7 14:3 20:24
22:19 50:7 75:25 76:1
79:15 118:3 130:18, 18
152:20 158:4 179:2
**helped** 31:9 32:9 78:3, 5
**hereinafter** 5:9
**hereunto** 207:16
**Hey** 158:2
**high** 17:4, 6, 8 38:16
46:18, 24 92:4, 9 93:14
**higher** 49:3
**highest** 46:18
**highway** 91:10, 16 92:4, 9
93:5 116:12
**hired** 47:17, 19, 20 172:9
**history** 32:5
**hit** 98:2 100:2, 6 105:15,
25 106:2, 4, 5, 6, 8 111:14
150:2 186:21
**hitting** 95:17
**hold** 135:8
**holding** 113:9 129:14, 15
135:4 154:8 155:2, 12
156:14
**holds** 171:21
**holidays** 180:9
**Home** 15:11, 13, 14, 15
43:22 44:17 68:7 69:11,
19 72:22 73:7, 10 74:14

**honestly** 155:25
**honor** 195:10
**hope** 204:6
**Hopefully** 8:18
**hoping** 119:13 171:23
**hospital** 27:12 28:8, 22
29:1, 2 30:4, 10 37:3
65:14 66:20, 22 69:5
**hospitalization** 29:12
64:24 65:8 66:4 68:13
**hospitalizations** 40:16
65:2, 24 69:4
**hospitalized** 27:6 28:7
37:13 41:5, 8, 18 64:19
65:12, 18 66:13, 20 67:21
68:16
**hospitals** 67:8
**hour** 88:22 93:11, 20
160:1, 2 175:12 176:2
**hours** 18:9 27:25 75:9,
12 77:15 78:14, 15
175:13 176:4 179:11
**house** 43:9 56:2 61:12,
14 166:7 178:18 180:5,
12 184:13 185:4 194:2, 3
**household** 175:23 176:10,
14
**huh** 182:15 195:14
**Huh-uh** 133:1
**hundred** 30:19 206:8
**hung** 104:9, 16
**Huron** 3:12 43:19
**hyper** 72:4

**< I >**
**I-71** 87:17
**ICU** 27:23
**idea** 14:17 53:8 62:22
102:12 112:5
**identification** 82:14 83:1
84:24 85:1 156:21, 23
172:20 173:3
**identifications** 173:6
**identified** 152:11
**identify** 82:7 83:5
170:10, 13 173:10
**identity** 53:23 54:1, 7
**IEP** 38:3, 11, 19
**if's** 189:12
**III** 133:10, 11
**image** 85:3
**immediately** 68:20 105:25
107:12 114:21 116:9
143:2, 17
**impact** 95:24, 25 96:15
97:17 109:12, 13 114:4
183:7
**impacted** 110:7

Case: 1:18-cv-00139-PAG  Doc #: 36  Filed:  12/14/18  60 of 71.  PageID #: 381

Deposition of Amanda Pauley                                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

**impacts** 98:13, 19  99:1, 6, 18, 23, 25  100:7  112:14  113:17
**impression** 35:15
**inaccurate** 86:13, 15  173:17
**incarcerated** 59:15  70:10, 12  72:20
**incarceration** 59:20
**incarcerations** 59:22
**incident** 17:16, 23  20:7  21:9  22:6  33:25  36:6  182:19  183:20  195:9  199:2, 8, 17  200:5, 17
**incidents** 149:6
**included** 190:9  199:25
**including** 190:4  191:25
**income** 49:24  175:4
**incorrect** 35:5  162:16  173:17
**increase** 11:2
**increased** 11:5
**independent** 47:15  48:21
**indicate** 93:18
**indicated** 117:9  198:25  199:24
**indicates** 152:20  198:13, 21  199:5, 14  200:15
**indict** 184:23
**indicted** 185:9
**indictment** 184:13  185:3
**individual** 38:4  49:10, 11
**Individually** 1:9  3:9  5:21  157:6
**individuals** 200:21
**infection** 65:13
**inflammation** 26:21
**inform** 30:9
**information** 8:17  172:14  173:16  182:6  199:10, 19  200:19
**informed** 199:18  201:25
**initial** 110:8  157:14
**initially** 47:4  88:21  159:23
**initials** 157:7
**injuries** 60:24
**inpatient** 28:14, 18
**insensitive** 45:17
**inside** 60:12  115:4  118:12  120:18  161:25  163:18  199:15, 21
**install** 76:22
**installation** 47:18
**installer** 47:7
**Installers** 48:1
**installing** 120:4
**instance** 142:25  148:11  174:2

**instances** 58:16
**instantaneous** 168:18
**instantaneously** 125:20
**instated** 35:9
**instructions** 29:8
**insurance** 14:23
**insured** 14:24
**intended** 72:1  87:3
**intentionally** 186:9
**interacting** 179:12
**interaction** 183:18, 24  184:10
**interested** 172:16  174:14  207:14
**interior** 119:11  129:21  130:19  135:2
**interpret** 7:13
**interrogatories** 172:1
**interrupt** 7:19  34:12
**interruption** 18:11, 14
**Interstate** 87:16  89:5  90:22  91:5, 6  93:6
**intertwined** 180:14
**intervene** 169:20
**interview** 137:4, 20  139:5  166:2
**interviewed** 135:14  139:15  166:12  184:1, 3
**intestine** 66:11
**investigating** 143:14  188:10
**Investigation** 135:14  143:16  185:22
**involuntarily** 28:19, 20  68:18, 19, 22
**involuntary** 74:19
**involve** 60:22
**involved** 23:18, 19  61:10  178:1  182:19  199:20
**involvement** 20:4  24:12
**irritable** 25:18
**IRS** 50:14
**issue** 180:1
**issues** 20:8  23:8  74:25
**it'** 155:13
**it,** 155:18  156:15
**It'd** 30:19
**its** 86:22

**< J >**
**jail** 59:24  80:1, 6, 7, 25  81:6  111:21, 22  113:4  135:22, 23  136:23, 24  138:12
**jail,** 136:18
**JAMES** 1:20  206:7
**January** 12:2  65:10, 25  198:14
**J▮▮▮▮** 19:4  127:19

128:5  133:20
**JASON** 1:16  124:1  206:7
**Jennifer** 54:4, 5  55:10  56:6  57:3
**Jennifer's** 180:5
**Jessica** 52:11  53:7, 13  165:17, 19, 20  166:1, 12
**Jessica's** 52:13
**job** 16:10  73:6  75:17, 17  76:1  77:3, 14  78:13, 17  119:25
**jobs** 32:9  47:8
**Jodi** 102:19, 20, 24  103:24  104:13  145:13, 14  149:18  150:15  151:1  194:15
**Joe** 176:22
**Joe's** 66:25  67:12
**John** 41:10
**joined** 93:25
**joint** 49:9  173:25
**Jordan** 2:6  3:5
**Jose** 178:7, 8, 12
**Joseph** 3:11
**Josh** 55:15  56:9
**Joshua** 53:22  54:7  55:14
**Jr** 1:6  3:3  5:20  19:10, 11, 11, 17  42:9  47:25  93:3  133:5, 10, 12  206:6
**jscott@ohiowagelawyers.com** 3:14
**JUDGE** 1:7  189:6
**judicial** 24:13
**July** 2:9  5:2  206:4  207:18
**jumbled** 35:7  76:13
**jump** 62:1  115:4
**June** 13:20, 22  22:12
**Junior** 133:5, 13  155:5
**Junior's** 131:18
**jury** 184:20, 22  189:6
**justification** 191:18
**justified** 191:11, 17, 24
**juvenile** 23:22  24:8

**< K >**
**keep** 10:3  75:5, 6  76:10  84:1  132:15  133:18  174:7
**KELLEY** 1:18  5:17  169:16, 19, 22  170:11  171:1  182:7  183:12  185:20  186:8, 17  187:3  193:1, 9  206:7
**kept** 14:12
**Kiddie** 40:13
**kids** 25:6  37:25  38:1  75:22  77:25  78:2  81:18  83:10  92:6  110:1  127:9, 14  132:1, 12  141:6

143:24  157:7  163:4  174:25  177:20  178:21, 25  179:10, 12, 14  195:7
**kill** 141:13  189:8
**killed** 126:17, 18, 19  189:15
**kind** 9:23, 25, 25  46:5  105:19  112:12  117:24  127:18  144:15  156:1  186:20
▮▮▮▮▮▮▮ 39:11, 19
**kinds** 8:15  178:20
**King** 46:14, 16
**knew** 63:1, 5, 12  72:22, 23  109:14  134:7  135:21, 22  136:23, 23  148:19  150:1  155:7  160:9  162:25  164:3, 6, 7  170:18  193:23
**knife** 62:24
**knives** 192:8
**know** 9:16  11:6, 8  12:4, 5  21:1, 3  24:4  26:10, 11  27:25  28:6, 10, 12, 22, 23  29:3, 4, 5  33:11  38:20  39:4  42:2  46:21, 22  48:9, 11, 16  49:18  50:6, 15, 20, 22, 23  51:1, 9, 11, 14, 16, 25  52:3, 13, 14, 17, 23  53:5, 7, 9, 23  54:12, 15, 15, 18  55:6, 17  56:1, 21  57:1, 1, 2  58:7, 8  59:15, 23  60:1, 6, 20  61:6, 7  63:23  64:8, 17  66:6  67:7  68:2, 14  69:20, 25  70:19, 24  71:3, 6, 6  72:6  74:3  75:19  79:8  80:5, 6, 20, 23, 24  81:8  85:25  87:8  88:3  89:21  90:8  93:2  94:18, 20, 22  96:24  99:25  100:1, 1  101:14  102:13, 16, 22  103:15, 16  104:8, 14, 16, 25  105:2  106:19  107:25  108:19  110:14, 16, 16, 21  112:10, 10, 11, 12, 19  113:3, 14  114:21  115:1, 5, 17, 23, 25, 25  116:2, 19  118:21  121:5  123:15, 15, 15  125:21  126:7, 18  127:3, 25  129:7, 9  131:12, 16, 17  136:1, 1  137:3, 5  147:8  148:15, 20  150:1  151:1  154:17  156:7  158:17, 23  160:6, 19, 22  162:1, 5, 5  164:6, 12, 16, 24  165:5, 12, 14  167:5  168:22, 24  169:16  170:5  177:22  178:18  179:3, 4, 6  180:14  181:4, 10  184:7, 25  186:6  188:24  192:12  196:24  204:9

Case: 1:18-cv-00139-PAG  Doc #: 36  Filed: 12/14/18  61 of 71.  PageID #: 382

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

**knowing** 89:*23* 172:*16* 199:*16*

**known** 136:*14*

**KOBAK** 1:*20* 5:*18* 206:*8*

**Kolbe** 67:*2, 4*

**< L >**

**L.P.A** 3:*17*

**labeled** 130:*7*

**lack** 14:*15*

**lady** 51:*14, 18* 79:*5* 184:*17*

**Lake** 15:*16* 17:*10*

**lap** 133:*2*

**lasted** 140:*14*

**lastly** 201:*1* 202:*3*

**late** 77:*13, 19*

**lawsuit** 5:*18* 36:*7* 157:*4, 12, 14* 158:*16* 172:*5* 176:*25*

**lawyer** 57:*20* 157:*24* 158:*1, 3, 5* 199:*9*

**lawyers** 6:*3* 8:*8, 10* 172:*9, 15* 196:*21*

**lawyers,** 197:*1*

**leading** 63:*18*

**leads** 35:*3*

**learn** 199:*9*

**leave** 76:*21* 80:*8* 81:*17* 180:*15*

**leaving** 46:*23* 87:*4*

**Lebanon** 59:*16, 21*

**led** 64:*23* 164:*16* 199:*19*

**left** 61:*1* 70:*25* 73:*16* 75:*13* 76:*17* 78:*17, 18, 20* 91:*6* 97:*21* 114:*20, 25* 128:*20* 144:*12* 194:*14*

**legalese** 157:*3*

**lengthy** 63:*17*

**level** 141:*6* 181:*22* 182:*6*

**levels** 140:*24*

**liberty** 201:*19*

**license** 16:*4* 33:*23* 34:*2, 5* 85:*19, 20* 92:*20, 24* 135:*25* 137:*2* 153:*17*

**licenses** 34:*17, 17*

**lie** 141:*10*

**life** 47:*12* 62:*20* 122:*22* 126:*22* 186:*23*

**lifetime** 25:*7*

**light** 89:*15* 91:*5, 13*

**lighting** 164:*5*

**lights** 89:*14* 90:*25* 91:*8, 11* 92:*5, 9*

**likewise** 50:*16* 162:*21* 163:*21*

**limit** 88:*23* 159:*15* 160:*1, 13* 198:*22* 199:*2*

**line** 150:*9, 11* 155:*24*

202:*6*

**lines** 104:*6* 112:*3* 202:*12*

**list** 127:*18*

**listen** 103:*4* 120:*12, 12* 147:*25* 191:*19*

**listened** 167:*18*

**lit** 159:*19* 163:*23* 164:*1, 2*

**litigation** 6:*21*

**little** 22:*21* 48:*18* 57:*18* 76:*19* 77:*20, 21* 78:*3* 121:*2* 133:*23* 148:*3* 157:*17* 171:*22* 195:*12* 196:*11*

**live** 43:*2, 6, 14, 15, 16* 44:*9, 15* 54:*5* 55:*23, 24* 146:*9* 179:*14, 21* 195:*14*

**lived** 19:*25* 25:*4, 6* 43:*8* 44:*3, 15* 49:*6* 50:*3, 19* 52:*2* 53:*4* 166:*5* 174:*10*

**lives** 44:*7* 54:*16*

**living** 15:*13* 47:*13* 48:*3* 52:*25* 53:*1* 54:*18* 55:*12* 173:*20* 179:*5*

**LLP** 2:*7* 3:*5*

**local** 46:*15* 165:*22*

**located** 15:*15* 38:*24* 40:*7* 131:*5, 8* 142:*6, 24* 202:*16*

**location** 43:*13* 109:*3* 202:*25*

**long** 6:*13* 9:*14* 13:*12, 16* 15:*17* 22:*1* 28:*13, 16* 31:*1, 11* 41:*17* 42:*9* 44:*3* 59:*4, 10* 78:*13* 87:*2* 140:*14* 151:*8* 168:*21* 178:*4, 12*

**longer** 9:*12, 13* 23:*12* 78:*14* 171:*20, 22* 177:*3, 9*

**look** 73:*25* 82:*6* 85:*13* 108:*18, 21* 119:*2, 4, 5* 120:*13, 15, 19, 25* 161:*20* 164:*9* 170:*24* 182:*10* 198:*19*

**looked** 121:*12* 132:*20* 138:*10*

**looking** 72:*11, 12* 84:*1* 86:*11* 119:*9* 123:*2, 24, 25* 124:*1, 4, 9, 10, 12* 125:*25* 126:*2* 128:*9* 129:*22* 131:*2*

**looks** 25:*14* 147:*18*

**Lorain** 33:*8, 20* 46:*9, 12, 15, 15* 47:*23* 54:*20, 23, 24, 25* 55:*2, 4, 4* 56:*12* 58:*17, 19, 22* 59:*7* 66:*20, 22, 23* 67:*6* 79:*5* 80:*18* 85:*23*

**lose** 33:*23* 106:*7*

**lost** 182:*1, 3*

**lot** 66:*14* 90:*7, 9* 150:*16* 177:*17* 178:*24* 194:*23*

**Lots** 59:*23* 147:*5* 177:*14*

**louder** 10:*2*

**love** 111:*23* 113:*3* 138:*11*

**loved** 111:*24, 25* 138:*13, 21* 177:*19, 19*

**lower** 49:*4*

**LPD** 81:*11*

**LPN** 15:*22*

**lying** 58:*1*

**< M >**

**Ma'am** 203:*7*

**machine** 196:*11*

**maintain** 178:*14* 187:*9*

**maintained** 64:*15*

**major** 21:*16, 16* 22:*24*

**making** 18:*6* 65:*13* 95:*17* 135:*10*

**man** 23:*7, 8* 47:*9* 61:*19* 85:*22* 174:*25* 189:*8*

**manage** 14:*3*

**Mandy** 155:*6*

**maneuvered** 96:*24* 97:*2, 7* 98:*1* 125:*13*

**maneuvering** 187:*14*

**maneuvers** 91:*22*

**manner** 6:*16*

**man's** 85:*24*

**Mansfield** 59:*8, 21*

**March** 9:*22, 22* 11:*11* 12:*17* 15:*5* 17:*11, 17, 23* 18:*6* 21:*9, 17, 22* 22:*1, 6* 27:*3* 34:*1* 35:*22, 24, 25* 36:*1, 7, 9* 75:*7, 9, 12* 78:*24* 79:*2* 80:*17* 81:*11* 82:*9* 83:*10* 85:*5* 86:*7, 22* 87:*10* 166:*8, 13* 167:*20, 22* 177:*3, 8* 182:*20* 183:*8, 11, 20* 185:*10* 198:*9* 199:*3*

**Marcus** 3:*3* 197:*18*

**marcus@jordansidoti.com** 3:*7*

**marital** 18:*17*

**mark** 8:*2* 82:*5, 10* 84:*18, 21*

**MARKED** 4:*8, 11* 82:*14, 25* 84:*24, 25* 89:*3* 156:*21, 23* 173:*3, 5*

**maroon** 85:*4, 14, 16, 17* 86:*22*

**married** 18:*19* 42:*5* 52:*8, 11, 16, 19*

**marry** 57:*3*

**maternal** 25:*2*

**matter** 34:*1* 36:*7* 94:*4* 156:*1* 176:*25* 185:*15*

**mayor's** 79:*7*

**Mazanec** 3:*17*

**mean** 7:*13* 34:*12* 48:*9, 16* 50:*7* 51:*22* 56:*18, 18*

62:*16* 63:*5, 16* 68:*17* 71:*3* 73:*6, 10* 76:*8, 19* 77:*19* 86:*15* 97:*14* 100:*19* 105:*19* 110:*10* 115:*2* 117:*25* 120:*3* 121:*6, 12* 124:*4* 125:*18, 19* 126:*23* 131:*12* 134:*3, 4* 136:*13, 14, 16* 137:*5* 138:*20* 139:*13, 20* 141:*8* 146:*18, 18* 149:*3* 153:*10* 154:*20* 155:*20* 156:*3, 3* 161:*8* 163:*9, 10, 11* 167:*3, 12* 168:*3, 7, 10, 23, 23, 25* 170:*5* 174:*7, 10, 10, 20, 24* 175:*3, 7, 19* 176:*7, 21* 177:*5, 12, 13, 16, 20, 21* 178:*5* 179:*3, 4, 5, 6* 180:*1, 9* 181:*2, 8* 186:*20* 188:*22* 193:*23*

**means** 7:*19* 9:*16* 55:*17* 90:*9* 129:*2* 157:*12* 164:*12* 207:*8*

**meant** 24:*19* 33:*12* 112:*6* 121:*23* 155:*19* 169:*13*

**media** 199:*25*

**medical** 15:*22* 16:*4, 12, 18* 17:*1* 18:*14* 25:*9, 10* 27:*2* 37:*3, 9* 40:*15* 126:*23* 127:*2* 195:*22, 24*

**medication** 8:*22* 9:*1, 10* 12:*18* 22:*18* 26:*20* 66:*15* 69:*13, 20* 70:*11, 14* 72:*7* 74:*7, 10* 153:*24*

**medicine** 70:*19*

**Medina** 46:*13*

**meditation** 14:*4*

**meds** 73:*13, 19, 21* 76:*3* 153:*5, 11*

**meet** 5:*25* 127:*23* 194:*5* 204:*11, 14*

**meeting** 5:*15*
██████ 25:*17*

**member** 179:*16*

**Memorial** 65:*20*

**memories** 177:*23*

**memory** 12:*1* 79:*16* 88:*23* 95:*11* 117:*1, 6, 10* 121:*6, 7, 17, 25* 143:*2*

**mental** 12:*21* 27:*11, 25* 40:*20, 24* 66:*21* 67:*15, 20* 74:*20, 25*

**mentioned** 63:*17*

**Mercy** 67:*5, 10, 11* 68:*6, 23* 69:*5* 75:*1*

**messaging** 75:*18*

**met** 6:*23* 7:*1* 42:*11, 18* 45:*23* 47:*4* 194:*3* 204:*13*

**Metro** 102:*17*

**mic** 44:*22*

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

**mic'd** 6:25
**Michigan** 53:8, 9
**microphone** 158:6
**Middle** 38:17, 19  43:8
**midnight** 75:12
**miles** 88:22, 22  93:11, 19
160:1, 2, 12
**MILLER** 1:16  5:17
112:23  115:23, 24  116:2,
5, 13, 25  117:8  124:1
134:12  142:11, 14  167:24
170:6  171:1  182:8
183:15, 16  184:13, 19
185:4, 8  189:1, 16  192:9,
12, 21, 24  193:7  202:10
203:8  206:7
**Miller's** 142:5, 24  188:3
**milligrams** 11:7
**mind** 50:6  57:15  90:8
107:17  118:9  136:14
156:6  171:11
**mine** 101:1
**minimize** 127:7
**minus** 16:24  44:5
**minute** 44:20  78:21
191:19  197:5
**minutes** 13:18  45:15
86:9  140:16, 18  141:12
171:10
**misdemeanor** 33:2, 21
**mispronounce** 39:22
**moment** 197:25  198:5, 19
**Mona** 41:23
**Monday** 17:20
**money** 174:8  175:21
176:19  181:8, 10
**month** 9:18, 20  13:9
17:25  18:12  29:10  66:6
79:13, 19  176:13  178:13
**months** 22:3, 4  25:1  44:5,
18  175:7, 19
█████████████ 69:12
74:10
**Moran** 4:15  135:19, 21
136:4, 7, 21  137:4, 12, 20
138:9, 18  140:21  141:4
173:15  188:11, 16, 25
**morning** 5:13, 14  75:9, 13
78:18, 20  79:2  92:1
195:3
**mother** 24:21  53:5, 11, 24
54:1, 8, 17  55:5, 9, 25
56:1  85:24  102:21, 21
103:5, 9  104:2, 5  145:6
174:23  176:22  180:1, 10
181:18, 19
**mother's** 180:7
**motion** 6:16
**motorist** 92:10

**mouth** 65:13  113:23
114:12, 14  115:13  134:13
138:1  143:7  161:12
**move** 95:22  107:1, 4, 20
121:2  122:23
**moved** 43:7, 17, 17  46:12
54:18, 19
**movement** 122:21  123:4,
12, 12  126:12, 14
**movements** 117:1, 3
121:25
**movies** 179:7
**moving** 122:6, 7  125:22
126:3  200:13
**Municipal** 33:8, 20  60:17
79:7  80:11

< N >
**name** 5:15  10:20, 24
19:10  20:18  23:15  28:12
29:5  41:9  42:2  52:11, 13,
16  54:3, 10  61:5  63:23
64:8  86:6  115:23, 24
135:18  145:23  170:18
178:6, 7, 8  194:24  197:18
**named** 47:9  151:21
**names** 18:25  53:18  77:8
152:8  167:5
**name's** 127:25
**N██████** 53:20
**nature** 20:15
**Nausea** 12:9
**nauseous** 11:19  12:9
**near** 203:15
**necessarily** 193:5  205:3
**necessary** 84:20
**need** 7:24  8:4, 7, 8  30:1
36:22  38:2  57:21  71:19
75:4  101:21  122:24
158:2  173:12  196:3
**needed** 11:15  23:11  76:1
77:14  148:2  180:2, 3, 4
181:2
**neither** 110:20  123:18
174:9
**never** 10:7  53:2  74:14,
15  80:24  81:9  102:12
109:13  116:7, 9  133:15
135:1  136:12  155:4, 6
174:6, 11, 22  175:20
176:17  180:1  185:8
186:10  189:14  190:18
192:9
**New** 61:11
**newscaster** 165:9, 10, 15,
16
**nickname** 145:18
**night** 41:15  78:11  92:1
145:3  149:19  151:8

**nights** 41:19
**nine** 44:5
**ninth** 39:16
**nod** 7:14
**noise** 9:25  105:2  116:7
**Nord** 67:23, 25  68:1, 8, 12,
15, 21  69:17  74:18, 25
139:22
**normal** 68:3  101:16
176:21
**North** 41:25
**northbound** 87:17, 20, 23
88:4, 20  89:5  91:8  93:11
**NORTHERN** 1:2
**Notary** 2:5  156:19
172:24  173:1  206:23
207:5, 21
**note** 198:12
**noted** 206:10
**notes** 159:2
**notice** 18:4
**noticed** 161:1, 7  162:7, 8
163:8, 10  199:6
**notwithstanding** 100:15
**November** 52:12  53:22
**number** 28:6  53:12
84:11, 12  90:7  92:25
95:6  102:11, 15, 22
**numbered** 162:12  167:24
**numbers** 159:5  175:14
**nurse** 38:19
**nursing** 15:14  16:7
127:1  175:10

< O >
**OB** 29:10
**Oberlin** 178:18
**object** 107:16
**Objection** 23:20  25:19
27:20  32:16, 25  63:3
81:7  95:9  97:10  98:6, 17
99:10, 21  100:17  107:9,
23  108:9  117:13  121:10
122:4, 15  148:22  161:5,
15  162:3, 14  163:5, 24
168:5  184:24  185:12, 18
186:12, 18  188:6, 14
190:2, 5, 11  191:5, 12
192:2
**objections** 196:13, 19
**observant** 170:22
**observation** 76:6
**observations** 7:8  72:13
76:5
**observe** 73:17  181:22
**observed** 73:19, 22  74:6
88:21  132:12
**observing** 72:24
**obstructive** 25:16

**obviously** 62:1  78:9
131:12  154:17
**occasion** 66:19
**occupants** 162:23
**occur** 183:7
**occurred** 27:14  36:7
97:17  109:19  127:14
199:3
**occurrence** 198:9
**October** 66:7
**of'99** 52:12
**off,** 180:8
**offense** 33:21  80:13
**office** 43:21  207:18
**Officer** 5:17  34:15  63:22
64:8  80:22  87:19  89:2
95:19  97:1  98:2  112:23
115:22, 23, 24  116:2, 5, 13,
25  117:8  123:24  124:10
134:12  140:4  142:5, 11,
14, 24  147:23  148:1
151:21, 24  152:9, 11, 18,
24  153:7, 16, 18, 22  154:4,
9, 11, 23  156:8  160:10
161:1, 7  170:11, 15  171:1
182:8  183:23  184:7, 7, 19
185:4, 8  188:3, 11  189:1,
16  191:1  192:12, 21, 24
193:7  199:6  201:17, 17,
20  202:10  203:8
**Officers** 5:17  35:4  93:2
143:14  147:1, 4  161:25
162:2, 22  163:3, 17, 22
164:18  166:21  169:24
170:4, 8, 14  184:5  188:12
189:17, 25  199:15, 16, 20
200:3, 8, 21
**officer's** 152:4
**offices** 2:6
**off-the-record** 196:4
**Oh** 13:16  19:6  20:19, 23
33:14  35:11  41:6  77:5
105:18  108:23  111:25
118:17  119:14  120:20
134:17  164:1
**OHIO** 1:2, 14  2:3, 6, 8
3:6, 13, 18  16:20  50:17
116:12  135:15  207:3, 5, 18
**Okay** 6:6  7:4, 9, 14, 19,
24  8:5, 13, 22  9:12, 21
10:13, 23  11:1  13:6  16:3,
14  19:12, 14, 18  20:6
21:5, 7  22:21  23:1  26:4,
17  27:1, 13  31:13  33:7,
25  34:6, 11, 25  35:3  36:4,
23  37:1  39:19, 21  43:1,
15, 17  43:19  44:19  45:8,
13, 16, 19, 22  46:3, 16, 18
48:25  49:22  51:2, 25
52:6, 16, 21  53:18  55:2,

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

*11* 57:13 58:3, *8* 59:12, 15, 20 60:20 61:9 64:1, 10 65:1, 4, 11, 18, 24 66:8, 16, 18 67:14 69:15, 18 70:13, 22 71:12 72:9, 11, 13 75:4, 4, 11 77:1, 10, 17 79:6, 10 81:23 83:7 84:1, 6, 8, 17, 25 85:7, 11, 19 86:19 87:1, 6, 9 88:5, 16 89:1, 8, 10, 13, 17, 20 91:2, 15, 20, 25 93:23 94:20 95:5 97:20, 24 98:23 99:16 100:14, 23 101:4, 14 103:22 104:18 105:10, 12, 21 106:11, 23 107:7 109:18 110:7 111:1, 3, 18 112:8, 10, 11, 11, 21, 23 114:2, 19 115:1, 7, 20 116:5, 20, 23 117:8 118:5, 13, 16, 18, 24 119:2, 4, 9, 14, 21 120:3, 6 122:24 123:24 124:21 125:8, 12, 17 127:5, 9, 13, 17 128:5, 11, 15, 25 129:6, 13, 15, 17, 20 130:1, 16, 25 131:7 132:1, 4, 7 133:2, 8, 14, 18, 23 135:7, 14 137:18 138:2, 7, 20 139:1 140:10, 17 141:11 142:2, 11, 14 144:3, 5, 16 145:5 147:10 148:9 149:5, 11, 18, 20 150:6, 12, 17 151:7, 11, 20 153:14 154:3, 25 155:23 158:15 159:1, 8, 11, 13 160:15, 25 161:19 163:20 164:9, 12, 15 166:18 167:6 168:13 169:2, 4, 13 170:2, 10, 21 171:4, 8, 25 172:7, 19, 22 174:2 175:25 176:6, 24 180:23 181:25 183:25 185:3, 6 188:18 191:22 198:12 199:5, 24 201:11 204:14 205:5
**old** 9:25 24:10 45:24 66:25
**older** 77:12
**on,** 62:23
**once** 7:20 50:8 51:17 52:1 71:9 121:8 142:4 164:18 168:2 183:25 196:2
**one-on-one** 38:2
**ones** 108:19 120:15
**one-year** 16:23
**ongoing** 29:19
**Open** 40:6 109:20 111:6, 11 112:17, 18 115:20 131:16

**opened** 31:8 116:25, 25 121:8 122:1 123:22 127:10 129:11 134:1 138:14 142:15 154:11 202:17, 19 203:8
**opening** 112:22 114:22 124:11 202:10
**opens** 112:23 113:14 125:1 128:18 134:16, 23 142:20
**operated** 39:2
**operating** 88:21 94:24 159:14 198:22 199:1
**opinion** 72:10, 12 126:23 186:24 189:9, 18, 20 190:19, 20, 23
**opinions** 172:12
**opportunity** 85:13 170:24 192:10 204:6
**opposed** 51:12 72:17 115:10
**opposite** 91:16, 18
**option** 189:14
**order** 23:13 56:8, 15 83:12 87:6, 23 123:2 205:4
**ordered** 164:17 200:21 205:2
**orders** 56:11
**organized** 131:14
**outnumbered** 62:2
**out-of-pocket** 15:1
**outside** 169:23 170:16
████████████ 28:3
**overhead** 89:14
**overheard** 154:6, 23
**overnight** 27:7 37:13 41:5 64:19
**overwhelming** 31:17

**< P >**
**p.m** 205:9
**PAGE** 4:3, 11 138:5, 6, 8 159:5, 5 161:21 164:9 198:18 199:14 200:13
**pages** 84:11 206:8
**paid** 35:6, 19, 22, 24, 25 36:9 56:19, 24 88:4 174:3, 3, 3, 11 175:15 176:16
**pain** 26:20 115:3
**painful** 36:22
**paper** 76:13
**paperwork** 14:1, 8 28:23
**paragraph** 158:18, 21 159:3 160:18, 25 161:20, 24 162:12 164:9 167:24 198:18, 23 199:5, 14 200:13 201:1
**paragraphs** 158:16 198:17

████████████ 73:12, 13, 15, 17, 22
████████ 67:22 74:5 139:6, 14, 16 153:4, 23
**Parent** 1:9 3:9 5:21 157:6
**parents** 31:17 50:22 145:10 146:25 151:12 154:16 166:3, 6 181:1, 7, 11, 15, 17
**park** 178:23
**parks** 179:9
**parole** 63:16, 20, 22, 24 64:5, 8, 15 80:22 135:23 136:17, 25
**part** 66:10 105:23 122:21 123:6 125:23 126:7 137:19 156:4 180:8
**participating** 6:15
**particular** 23:14 83:11 201:21
**Partners** 67:3, 5 75:1
**parts** 151:11 156:4, 6
**party** 207:13
**pass** 16:21
**passed** 17:20 24:22, 23 36:14, 16 42:23 43:12, 17 47:10 54:19 70:20 81:15 89:19 149:10 177:21 184:8, 12
**passenger** 99:7
**passengers** 152:22 190:25
**passenger's** 95:16, 20 96:7, 8, 13 97:8 100:3 125:8
**passing** 36:3 61:17 64:6 153:16
**Patel** 41:23, 24 42:1
**Patrol** 116:12 152:2, 4, 12
**Patrolman** 183:15, 16
**pattern** 73:1 75:20
**patterns** 72:21
**PAULEY** 1:8, 10 2:1 3:9, 19 5:8, 13 6:13, 19, 23, 24 7:2 45:2 46:10 88:10 90:15 138:9, 10 197:3, 18 206:3, 6, 13 207:6
**pause** 168:19, 19 201:6
**paused** 167:25 168:14, 15
**Pavilion** 28:9
**pay** 35:7, 15, 16 56:17, 18 80:3, 4 89:9 94:25 148:14, 15 175:4 176:7, 8 179:23
**paycheck** 60:12, 15 61:3
**paying** 56:13 59:24 87:12 176:12
**PCP** 10:17

**PCS** 102:17
**PD** 80:18
**pedestrian** 62:12, 16 63:2, 12
**pediatrician** 41:22
**Pennsylvania** 85:19, 20
**pension** 180:20
**people** 31:18 47:19 73:24, 25 84:4 128:1 145:3 149:10 162:6 170:3
**percent** 54:22 126:20 179:25
**perceptible** 168:19
**perform** 195:8
**performed** 192:13
**period** 35:9 46:13 48:4 50:2 134:15
**permission** 196:2
**person** 24:17 57:23 74:4 77:4 87:9 136:14, 15 148:5, 5 152:14 155:7 169:23 184:6
**personal** 47:19 77:4
**personally** 11:19 37:4 70:20 162:8 177:1, 2 200:18
**person's** 178:6
**pertinent** 200:10 201:24 203:8
**Petro** 2:5 207:5, 21
**pharmaceutical** 12:6
**Phillips** 43:10
**phone** 53:12 102:1, 2, 3, 6, 11, 12, 14, 14, 15, 22 103:7, 17 104:8, 8, 10, 14, 16 147:6, 9, 10 148:4, 23 149:7, 8, 9 150:9 151:4, 9 154:6, 10 156:8 201:12, 14, 15, 18, 19, 20, 21 202:1
**phones** 184:4
**Photo** 4:13 84:2 85:13 86:13 129:20, 20, 25 143:2
**photographs** 86:19 119:3, 10
**Photos** 4:12 82:17 83:24 84:8, 8 85:2, 8, 9 86:12 106:23 112:16 120:7 130:11, 12, 12, 18, 23 131:1, 3, 3 142:22, 22 182:10, 13, 17, 23 183:1, 6
**phrase** 139:14
**physical** 37:6 181:14
**physically** 129:10, 12 146:22 177:10 192:24 193:1
**physician** 10:17 71:18
**physicians** 15:3 25:11

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

**pick** 55:25 56:1 61:13 130:17 146:19 148:4 149:15 180:7
**picked** 194:13
**picture** 120:25 193:9
**pictures** 108:15, 22 120:17 193:7
**pills** 70:25 71:2
**pink** 68:17
**pink-slipped** 68:5
**pink-slipped,** 68:17
**pinpoint** 131:4
**place** 28:12 54:21, 22 62:22 74:24 142:18 207:11
**placed** 132:16 189:24 193:11
**placement** 202:4
**places** 47:20
**Plaintiff** 2:2 3:1
**Plaintiffs** 1:11 3:9
**PLAINTIFF'S** 4:8
**plan** 38:5 180:21
**plate** 85:19, 21 92:20, 25
**plates** 86:1
**play** 166:15, 19
**Playing** 179:5
**plays** 132:9
**please** 5:5, 24 18:25 19:19 30:5 32:22 36:23 43:22 53:19 56:25 61:10 65:7 67:17 73:23 78:2 82:6, 18 84:5, 13, 22 103:2 108:18, 20 115:8 122:25 134:19 135:3 145:25 146:2 158:18 161:12, 20 164:10 171:21 178:22 196:23 204:1
**plenty** 60:6 159:19
**plural** 202:20
**plus** 16:23 44:5
**PM** 27:22 28:3, 5
▇▇▇▇▇▇ 25:16 41:6, 20
**point** 44:13 56:19 61:17 81:14 90:21 93:5 94:11 104:21 106:7 114:4 125:13, 14 126:2 132:25 133:24 135:7 138:15 142:18, 19 143:13, 24 144:21 156:2 158:23 164:21 186:2 187:22 192:6 195:19 196:8 199:11
**police** 33:15 34:6, 15, 19 35:4 60:18 86:24 87:18 88:19 89:2, 3, 11, 13 91:3 92:24 93:10, 18, 24 94:4, 7, 12, 15 95:7, 14, 15, 17, 19 96:11, 13 97:1, 1, 6, 7, 21, 25 98:12, 15, 25 99:5,

8, 19 103:3 107:8, 21 108:5, 17 109:5, 16 112:15 115:22 119:15 123:24 132:17 140:4, 19 142:5 143:25 144:20 146:21 147:2, 2, 12 148:21 149:5, 14 150:1, 2 151:5, 21 152:4, 6, 7, 15, 23 153:3, 7 154:7 159:14, 24 160:8, 10 161:1, 7 163:22 165:6 166:21 170:4, 8, 11, 13, 15 182:18, 19 183:19, 21, 25 184:2, 5 187:7, 10, 15, 19, 24 189:17 191:1 193:4, 10 199:6 200:3 201:13
**poorly** 121:22
**porch** 74:1
**portion** 8:3 200:15
**position** 86:23 169:20
**possible** 161:3 191:10
**possibly** 162:13
▇▇▇▇▇▇ 14:2
**practice** 6:16 10:18, 20 41:24 42:1, 2
**practitioners** 15:4
**preceding** 49:14 64:17 74:22 175:9
**pregnant** 27:10 61:12
**prep** 47:8
**prepare** 38:11
**prepared** 38:19, 20 62:21 111:3 171:4 207:8
**preschool** 40:10, 14
**prescribed** 10:14 69:12 74:10
**prescriber** 69:15
**prescribing** 71:6
**prescription** 11:2 69:20 70:17, 18, 21 71:4, 10, 11 74:14
**prescriptions** 9:3
**presence** 207:8
**PRESENT** 3:19 6:6, 13 43:22 85:7
**presented** 184:20
**presently** 43:13
**presumably** 189:5
**pretty** 48:17 123:11 181:17
**prevent** 169:20
**primary** 10:17 42:3
**printed** 14:8
**prior** 18:4 20:7 21:9, 17, 19 22:1 30:9, 12 32:24 35:19 36:3 44:9 59:13 61:14 62:18 65:8 69:5, 16 70:10 71:13 78:1 105:25 112:22 114:22 121:20 123:23 134:10

149:25 175:15 195:8 200:18 202:9, 10 203:13
**prison** 44:17 47:13 48:5 57:13 58:13, 15 59:4, 10, 25 64:1, 3, 12, 18 69:16, 19 70:24 73:16 78:4 136:16 175:15, 17, 17
**private** 39:3 147:8
**Probably** 21:25 32:6 48:18 56:5 60:21 72:9 77:20 86:7 123:23 130:2, 2 135:13 146:20 149:15 150:16 176:1 182:15 193:21
**problem** 84:22
**problems** 37:16
**Procedure** 2:4
**procedures** 200:16
**process** 7:6 57:21 76:15 121:2
**produced** 207:8
**professional** 29:22 40:25, 25 69:10 71:18
**promise** 128:3
**pronounced** 146:4
**proper** 167:5
**properly** 196:19
**propped** 117:24
**prove** 126:20
**provide** 174:16 181:1, 6, 14, 19
**provided** 21:13 175:19 181:10 199:10
**provider** 102:16
**provides** 20:16
**Psych** 24:22, 22
**psychiatrist** 29:5
**psychologic** 195:22
**psychological** 37:16 195:23, 24
**psychologist** 13:3 20:17, 18 21:8, 19 22:5 29:6 38:18
▇▇▇▇▇▇ 14:6
**Public** 2:5, 7 3:6 37:24 38:11 39:2, 3 206:23 207:5, 21
**pull** 12:5 83:5 84:4 89:25 90:3, 6, 14 103:4 134:17
**pulled** 79:1 108:20 120:16 135:25 137:1 184:15
**pulling** 90:24
**pulls** 186:20
▇▇▇▇▇▇ 25:17
**purchased** 85:22 174:4
**purposes** 83:1 156:24 173:6 196:16, 17

**pursuant** 2:3
**pursue** 161:2
**pursuing** 50:14 161:24 189:25 191:1
**pursuit** 90:6, 13 93:25 101:5, 21, 25 102:25 105:10 109:25 140:14 144:9 151:2 163:17 187:25 199:22
**pushed** 180:1
**put** 17:18 27:11 66:14 73:21 80:1 130:10 135:2 137:25 138:12 147:7 152:16 182:15 190:20, 24, 25 198:5
**putting** 184:14

< Q >
**question** 7:16 8:9 10:6 16:16 18:13 19:7 22:21 25:5 31:3 33:17 34:9 42:7 57:19, 22 63:9, 10 70:22 72:14 96:24 107:14 120:12 121:16 122:24 123:13 133:23, 24 134:19 136:20 138:20 141:3 144:13 147:25 154:3 158:1, 4, 20 174:7 177:13 182:4 191:20 197:22
**questioning** 202:7
**questions** 7:12 8:5, 23 19:19 21:4 34:11 36:21 42:8 45:19, 20 92:20 115:6 128:21, 22 144:8 157:25 158:15 162:10 171:25 172:2 196:12, 18 197:20, 22 198:7 202:3, 5, 15, 17 204:1, 16, 21
**quit** 11:20 71:16
**quite** 65:6
**quote** 136:23 138:10 153:15, 22, 24 154:7, 11, 12 156:13
**quoting** 200:15

< R >
**R.E** 1:10 3:10
**racing** 68:2 72:2, 3
**rain** 92:5
**raining** 92:2
**raise** 5:5
**raised** 46:4, 7, 12
**ram** 107:7, 20
**rammed** 95:7 108:6 109:6, 8, 12 186:22 188:4
**ramming** 99:18 107:25
**ramp** 90:22, 24
**ran** 60:12 91:5, 13 188:23, 24 189:8, 13

Case: 1:18-cv-00139-PAG  Doc #: 36  Filed: 12/14/18  65 of 71.  PageID #: 386

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

**Raskin** 3:*14*, *17* 4:*4* 5:*12*, 15 6:*11*, 22, 25 7:*3* 23:*23*, 24 26:*1* 28:*2* 30:*1*, 4, 8, 17, 21 32:*19* 33:*3* 45:*7*, 13, 16, 18 63:*7* 81:*10* 82:*10*, 15, 21, 24 83:*15*, 23 86:*10* 88:*15* 95:*13* 97:*11*, 15 98:*9*, 20 99:*13* 100:*5*, 22 101:*3* 107:*11*, 13, 16, 18 108:*3*, 13 109:*1* 117:*18* 121:*14* 122:*8*, 18 130:*4*, 5, 9 141:*13*, 23 149:*1* 156:*18*, 22 157:*1*, 23 158:*14* 161:*10*, 18 162:*11*, 17 163:*6* 164:*8* 168:*9* 171:*9*, 19, 24 172:*23*, 25 173:*4*, 8, 9 185:*2*, 14, 19 186:*15* 187:*1* 188:*9*, 17 190:*3*, 8, 14 191:*8*, 14 192:*11* 195:*16* 196:*8* 197:*7* 198:*7*, 17 203:*25* 204:*4*, 20 205:*4*

**rates** 92:*4*, 9

**Ray** 184:*12*

**reach** 26:*4* 117:*15*, 22 135:*8* 166:*1*

**reached** 117:*9* 135:*11* 140:*7*

**reacted** 62:*25*

**read** 8:*2*, 3 128:*10* 138:*1* 158:*17*, 18 159:*3*, 25 160:*18* 161:*21* 164:*11* 173:*14* 186:*1*, 3 196:*15*, 22 205:*1*, 5 206:*4*

**read,** 196:*23*

**reading** 111:*18*

**ready** 8:*5* 88:*16* 104:*10* 141:*24*

**real** 50:*24*

**really** 14:*17* 23:*7* 51:*11* 63:*14* 72:*11* 81:*23* 121:*23* 124:*25* 133:*10* 137:*22* 173:*22* 174:*6*, 11 193:*24* 201:*2*

**rear** 81:*21* 106:*2* 131:*8*

**re-ask** 19:*7*

**reason** 37:*14* 77:*1*, 13 123:*13* 137:*10* 140:*19* 141:*9* 143:*9* 152:*13* 186:*16* 188:*23* 189:*21*

**recall** 11:*25* 21:*2*, 5 23:*16* 34:*14* 60:*7* 64:*9*, 23 71:*12* 77:*9* 89:*1*, 23 90:*21* 91:*25* 95:*11*, 16, 23, 25 96:*3* 97:*19* 99:*23*, 24, 24 100:*4* 104:*21* 107:*25* 110:*8* 111:*2*, 16 116:*20*, 21 122:*6*, 7 123:*9* 131:*14* 135:*10*, 13, 14 137:*3*, 6, 19,

22 138:*23*, 25 139:*3*, 4, 5, 18 140:*5*, 9, 14, 21, 25 141:*3*, 8 143:*14*, 22 144:*8* 148:*8* 149:*12*, 17, 20 150:*6*, 8, 14 151:*19* 152:*3*, 6 153:*25* 154:*2* 155:*14* 169:*7* 183:*2*, 3 186:*8* 187:*7*, 11, 17 188:*16*, 25 189:*3* 201:*13* 202:*6*, 13, 17, 22, 25

**receive** 22:*9*

**received** 25:*14* 29:*16* 37:*4*, 9 86:*5* 171:*2* 182:*7* 199:*24*

**receiving** 49:*23*

**Recess** 45:*1* 88:*9* 141:*19* 171:*15*

**recognize** 157:*7* 193:*6*, 8

**recollection** 51:*3* 86:*14* 91:*9* 100:*24* 110:*22* 114:*3* 156:*13* 203:*7*

**reconnected** 42:*21* 48:*3*

**record** 5:*1* 8:*11* 34:*12* 44:*24*, 25 45:*5*, 6 83:*13*, 17, 18, 19, 21, 22 88:*7*, 8, 13, 14 92:*25* 141:*16*, 18, 21, 22 158:*9*, 10, 11, 13, 13 171:*9*, 13, 14, 17, 18 185:*7* 197:*9*, 11, 12, 14, 15 204:*23*, 25

**recorded** 148:*21*, 24 149:*6* 196:*20* 202:*1*

**recording** 149:*9*

**records** 12:*5* 23:*22* 25:*13*, 14 26:*6* 88:*19* 91:*2* 93:*9*, 17 96:*10* 97:*5*, 24 98:*12*, 25 99:*4* 108:*4* 139:*23* 140:*17* 170:*25* 195:*23*, 24 196:*2*

**recount** 84:*19*

**RECROSS-EXAMINATIO N** 204:*3*

**red** 82:*1* 84:*9* 85:*3*, 14 91:*5*, 13 132:*20*

**reduced** 207:*8*

**re-entered** 93:*5*

**refer** 116:*1* 155:*4* 200:*2*

**referenced** 196:*25*

**referred** 133:*13* 157:*15* 200:*1* 202:*20*

**referring** 198:*21* 200:*20*

**refers** 201:*7*

**refilled** 70:*19*

**reflect** 25:*14* 91:*3* 97:*6*, 25 108:*5* 140:*17* 183:*1*

**reflected** 188:*18*

**reflection** 143:*10* 169:*5*

**reflects** 152:*1*

**refresh** 79:*15* 91:*8*

**refusal** 190:*16*

**refused** 153:*16*

**regard** 25:*9*

**regarding** 50:*17* 202:*3*, 5, 15

**regards** 197:*2* 199:*2* 201:*11*

**registered** 85:*23* 92:*21*

**regularly** 9:*3*, 5 21:*19* 55:*14* 71:*14*

**rejoin** 45:*14*

**relating** 185:*9*

**relation** 86:*23* 142:*8*, 19

**relationship** 108:*16* 178:*1*

**relative** 207:*13*

**release** 64:*12*

**released** 29:*24* 70:*2*

**releases** 196:*5*

**remain** 42:*23*

**remaining** 70:*14*

**remember** 7:*11* 20:*21* 21:*4* 34:*10* 50:*3* 51:*14* 61:*4* 68:*12* 75:*24* 79:*16* 89:*6*, 23 90:*24* 91:*10*, 11, 13, 14, 15, 18, 19 96:*18*, 20 99:*12*, 14, 17 100:*2*, 3 104:*4* 105:*1* 110:*23*, 25 113:*22*, 23, 23 114:*1*, 6, 8, 11, 16, 23, 24 115:*10*, 11, 12, 22 116:*5*, 7 123:*10*, 16 135:*18*, 21 136:*2*, 3, 5 138:*17*, 24 140:*11* 143:*20*, 21 146:*18* 148:*3* 149:*16* 150:*18* 151:*11*, 20 152:*8*, 25 153:*6*, 9, 18, 22 154:*12*, 14, 25 155:*25* 156:*5* 159:*17*, 24 168:*23* 172:*1* 184:*17* 187:*14*, 23 194:*9*

**remind** 10:*5*

**reminded** 79:*9*

**Remnant** 31:*9*

**remnants** 129:*24*, 25 130:*20*

**remove** 66:*10* 82:*16*

**rendered** 192:*17*

**rent** 174:*3* 175:*4*

**repeat** 168:*7* 194:*16*, 17, 21

**repeatedly** 101:*6* 167:*25* 168:*3* 201:*7*

**repeating** 7:*7*

**rephrase** 63:*24*

**Report** 4:*15* 80:*21* 117:*9* 137:*5* 138:*6*, 8 152:*1*, 20 153:*2*, 14 154:*5* 159:*25* 172:*8*, 19 173:*11*, 14, 15, 17 188:*19* 192:*14*

**reported** 116:*13* 153:*15* 154:*5*

**Reporter** 2:*5* 5:*6* 6:*3* 7:*13*, 20 196:*10* 207:*5*

**reporting** 207:*15*

**reports** 33:*15* 34:*6* 116:*11* 172:*15* 186:*4*

**represent** 5:*16* 67:*7* 183:*2*, 4 197:*2*, 18

**represented** 92:*14*

**representing** 7:*4*

**represents** 109:*3*

**reproductions** 83:*8* 119:*4*

**request** 144:*24*

**requesting** 28:*25*

**require** 50:*18*

**reserve** 195:*20*

**reside** 178:*16*

**resided** 55:*24*

**residence** 87:*15*, 24

**residences** 178:*14*

**resides** 53:*7* 54:*13* 178:*17*

**resignation** 18:*1*

**resolution** 80:*8*

**resolved** 22:*14*, 24

**respect** 45:*21* 115:*9*

**respond** 197:*23*

**responded** 77:*5*, 13 138:*10*

**responding** 101:*12*, 13

**response** 33:*17* 63:*9* 140:*23* 198:*25*

**responses** 7:*12* 151:*18*

**responsibility** 34:*22*

**restless** 72:*24*, 25

**restrict** 121:*1*

**restroom** 44:*21*

**result** 60:*24* 176:*24* 177:*7* 183:*7* 190:*16*

**resulted** 99:*18*

**resume** 45:*13* 88:*16*

**retirement** 180:*20*

**return** 17:*24* 50:*4*

**returned** 75:*14*

**returns** 49:*9*, 10, 13, 25 50:*12*, 17, 18, 21 52:*3*

**reunited** 47:*2* 58:*14*

**rev** 111:*10*

**review** 173:*12* 200:*14*

**revving** 111:*5*

**Richland** 59:*16*, 21

**ride** 183:*21*

**Ridgeville** 41:*25*

**riding** 84:*10* 85:*4* 95:*8* 96:*12* 98:*3* 104:*22* 105:*24* 109:*4* 164:*19* 183:*8*

**right** 5:*5* 6:*11* 8:*7*, 15, 18 10:*7*, 8, 9, 11 21:*2* 23:*17* 26:*16*, 25 32:*18* 33:*3* 34:*14* 35:*18* 36:*17* 38:*9* 45:*16* 48:*15*, 23 54:*23*, 25 58:*3*, 8, 9 62:*8* 66:*3* 67:*9*,

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

*14 68:21 75:9 77:10
78:25 80:3, 15 81:2, 17
84:20 88:18 92:12 93:25
94:5, 10, 14 95:15 96:2,
22 97:5, 17 99:17 100:7
101:7 102:11 105:13, 22
106:18, 21, 24 109:10, 18,
23 112:2 113:8 114:15,
20, 25 115:11, 24 117:23
119:7, 8, 23 120:1, 5, 14,
24 121:3 122:17 123:20
124:3, 5, 8, 12, 17 126:1,
16 127:5, 15 128:2, 5, 23
129:21, 22 130:1, 12, 21
131:22 132:25 133:2, 16,
19 134:9 136:14 137:18
139:1 140:13 142:2
144:1, 13, 22, 24 145:7, 9
147:12, 15, 16, 21 148:16
150:13 151:17 155:11, 18,
21 156:11 157:7 158:24
159:3, 9 160:5, 23 162:18
163:12, 21 166:18 167:21
168:4 169:7 170:8 176:6
179:1 180:24 182:13
183:23 187:20, 22 190:10,
22 191:4 194:19 195:17,
20 196:7, 7, 7, 15*
**right-hand** 203:3
**risk** 7:6 189:25 190:9, 15
▮▮▮▮▮▮69:24 70:7, 25
*71:14, 17, 25 72:17 74:8,
11, 16*
**RN** 15:22
**Road** 3:12, 18 39:1
*43:20 67:2, 4 92:11*
**roads** 87:13
**roadway** 62:3 92:16
*142:19*
**robbers** 132:10
**role** 15:24
**roll** 117:23 120:10 195:10
**rolled** 109:9
**rolls** 117:16 118:14, 21
*119:1, 20, 21, 24 120:8
129:24 130:20*
**Ron** 47:9
**room** 6:2 8:12 10:1
*40:14 45:3 46:11 88:11
90:16 136:15 147:7, 8, 9
184:3 193:3*
**round** 175:13
**Route** 31:9 87:7 91:5
**Row** 3:17
**Roy** 1:6 3:3 5:20 17:20
*19:2, 4, 8, 8, 10, 11, 17, 21
27:10, 13, 16 31:8, 8 32:9
34:16 36:12 40:9, 12, 17,
22 41:2 42:9, 10 44:8, 16,
16, 17 45:22, 23 46:19, 23*

*47:4 48:2 49:4, 9, 23
50:4, 14, 17 52:8 53:13,
15, 16 54:19 55:11, 14
56:8, 13, 24 57:3, 8 58:3,
12, 22, 25 59:17 61:24
62:14 63:1, 5, 11 64:18
66:10 69:9, 12 71:13
72:6, 16 74:7, 21 75:11,
16, 22, 23 78:1, 24 80:20,
24 81:18 83:9 84:9 85:4,
24 86:2 87:7, 9 88:19
89:21, 25 90:5, 14, 21
91:4 92:6, 21 93:2, 5
94:7, 7, 16 95:7 96:3, 11,
19, 24 97:7, 20 98:1 99:7,
18 101:6 103:3 104:2, 4
105:13 108:6 109:4, 6, 8
110:5 111:4, 14 113:1, 9
116:15, 19 117:2, 9, 15
122:14 123:2 124:9, 12
129:15, 18 131:4, 7 132:5,
8, 17, 24 133:5, 10, 10, 11,
12, 15, 17, 19 134:2, 7
135:4, 21 136:17 139:6
140:6, 7 145:17, 18
146:20 149:18 150:2, 15
155:4 160:7, 22 166:6
173:20 174:16, 22, 23
176:12 177:16, 19, 19
178:20 180:2, 3, 15, 20
181:1, 14, 21, 21 184:8, 12
186:9, 21 187:8, 14, 23
188:4 189:5, 16, 21 190:4,
18, 24 192:13 195:12, 13
197:20 198:21 202:11
203:20 206:5*
**Roy's** 41:22 47:12 53:11
*54:17 55:9 63:20, 22
79:19 92:14 97:18
100:15 102:21 109:14
110:9 111:8 113:14, 18,
20 114:7 121:8, 17, 25
122:21 132:6 145:6, 10
146:25 151:12 154:16
166:3, 6 189:24 190:16
194:15 202:4, 15 203:10*
**Rule** 207:16
**Rules** 2:3 197:21
**run** 60:14, 14 136:18
**running** 135:23 136:16,
24 150:3
**rushing** 200:16
**Ryder** 3:17

**< S >**
**saved** 167:14, 16
**saves** 150:12
**saw** 13:8 33:15 34:6
*55:16 73:23 89:13
106:23 114:20 124:5*

*127:19 128:12, 17 129:22
132:2 133:25 134:10, 10,
25 142:14*
**saying** 5:24 7:21 80:16
*93:17 96:23 100:21
101:6, 9 104:4 131:14
135:10 137:8 140:5, 11,
25 153:6, 9, 12 154:1, 12,
14, 25 155:2, 3 156:13
184:18 186:8 195:25*
**says** 13:14 93:14 113:1
*132:10 138:8 153:2
154:5 161:24 164:1
167:24*
**scared** 62:20 96:21
*125:18 186:11, 22*
**Scarvelli** 47:21 48:17, 19,
*21 60:12*
**scene** 85:7 152:3, 5, 7
*153:3 164:20 183:2, 3, 21
184:8 192:23*
▮▮▮▮▮▮▮ 139:9
▮▮▮▮▮▮▮▮▮ 139:11, 22
▮▮▮▮▮▮▮ 139:9, 9
▮▮▮▮▮▮▮▮ 139:10
▮▮▮▮▮▮▮▮ 139:6, 10,
*14 153:5*
**school** 17:4, 6 37:19, 20,
*24, 24, 25 38:1, 14, 16, 17,
19, 22 39:2, 3 40:5 46:1,
4, 8, 18, 24 78:11 180:2, 2
194:22 195:3, 4, 8, 13*
**schools** 38:11 39:3 46:15
**Scott** 3:11, 11 6:18 23:20
*25:19, 22 27:20 30:3, 6
32:16, 18, 25 45:14 63:3
81:7 82:23 83:13, 16
95:9 97:10, 13 98:6, 17
99:10, 21 100:17 107:9,
15, 23 108:9, 23 117:13
121:10 122:4, 15 130:3, 8
148:22 156:25 161:5, 15
162:3, 14 163:5, 24 168:5
173:7 184:24 185:12, 18
186:12, 18 188:6, 14
190:2, 5, 11 191:5, 12
192:2 196:7 197:3
204:12, 13 205:1, 5*
**script** 70:14
**seal** 207:16
**seat** 118:23, 25 131:10, 11,
*18, 18 132:19 133:4, 7, 21
203:4*
**seated** 121:5
**seats** 81:21 109:22
*117:10, 16, 17, 21 129:7*
**second** 13:23 40:1 83:14
*96:23 103:10 104:7
120:22 123:2 125:15
126:8, 19 135:24 137:1*

*138:6, 7 157:12, 15
168:20, 21 169:6, 11, 13,
14, 20 170:6, 11 201:9*
**Secondly** 7:16
**section** 155:1
**see** 13:12 22:5, 8 23:10,
*13 24:21 35:20 42:17
55:14, 15 74:3, 4, 13 82:8
83:1 84:2 85:8 86:8
92:12 94:2, 4, 7, 12 95:19
100:7 106:13 112:15
113:16, 18, 20 116:6, 10,
14 119:3 120:23 122:13,
20 123:3, 17 124:5
129:12, 17 131:15, 19
132:20 140:22 142:11, 25
147:16 148:2 157:16
161:25 162:2, 2, 23 163:3,
17, 22 164:15 170:15
182:17 188:3 192:16, 21
198:14, 23 199:15, 16, 21*
**seeing** 20:17 21:8, 19
*22:17 23:4, 4 113:22
114:11, 16 134:22*
**seen** 13:4, 5, 19, 21, 23
*20:6, 19 51:14, 14 55:15,
19, 19 74:14, 15 97:4
132:9 134:5, 17 157:18
162:5, 9 163:19 169:3
172:15, 17, 19 173:11
190:22 192:17, 22 193:7,
7, 9 194:9 196:11*
**selector** 113:21 114:9
**self** 23:5 192:10
**Senior** 145:18
**sense** 34:13 103:6
**sensitive** 37:1
**sent** 30:7 68:22 165:9, 10
*167:13*
**sentence** 116:7, 10 159:8
**sentenced** 58:16
**separate** 52:25 98:13
*99:1, 6 152:7 178:14*
**separated** 182:13
▮▮▮▮▮ 65:16
**September** 43:18 44:4
*64:4, 12 66:7 70:3, 4, 16*
▮▮▮▮ 65:14
**Sergeant** 5:17 152:21
*169:16, 19, 22 170:11, 17
171:1 182:7 183:12
185:20 186:8, 17 187:3
193:1*
**series** 145:2 172:2 202:3
*204:5*
**serious** 190:1, 15
**served** 172:2
**services** 20:15
**session** 7:16

Deposition of Amanda Pauley                                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

sessions 13:16
set 207:16
seven 129:5 206:8
seventy-five 18:8 176:2
severe 65:3
SGT 1:18 206:7
shake 7:14
share 7:8 88:24 93:12, 20 96:15 108:8 111:8 172:14 173:21 182:22 183:5
S-h-a-r-p-l-e 146:6
Sharpleff 146:4
Sharpless 145:24 146:5
S-h-a-r-p-l-e-s-s 146:1, 3
sheet 206:11
Sheffield 17:10
Shell 194:10, 13
she'll 127:23, 23
shift 114:9
shock 26:2, 3 124:22
shocked 124:17 125:18
shoes 180:3, 4
shoot 124:5, 6 168:2, 3 190:22
shoot, 134:18
shooting 34:15, 23 36:2 124:12 134:11 177:8, 11
shop 31:8
shopping 176:18, 19
Shore 41:10
short 45:8 46:13 103:1
shortly 136:10
shot 116:16, 19 117:2 121:9, 20 122:2, 14, 20, 20, 22 123:1, 2 124:15, 17 125:5, 15, 15 126:9, 18, 19 132:9 133:12 134:2, 3, 8 135:4 138:15 143:17 146:20 149:14, 23 150:5 154:11, 16 155:3 167:25 168:2, 3, 7, 10, 12, 14, 16, 20, 20 169:3, 3, 6, 6, 14, 14, 21 181:21 182:2, 3 189:16 201:9 203:9, 14, 21
shots 125:2, 18 127:9, 11 128:18 129:11 131:5, 9 134:23 135:2 140:7 168:17 169:17 201:4
show 12:6 26:6 86:16, 17 108:14, 15, 18 131:1 142:23 173:5
showed 93:17
showing 82:25 84:25 156:23
shown 84:10 183:6
shows 120:7 130:19
shut 47:24
side 12:11, 12, 14 94:5 95:12, 16, 16, 20, 20 96:7,

8, 13, 14 97:8, 18, 21 98:3 99:20, 20, 24 100:3, 4, 15 109:20 111:6, 10 112:17, 24 113:13 121:8 122:1 125:8 131:16, 21, 24 134:1, 22 142:16, 20 147:3 148:5 169:25 170:1, 16 203:3
sides 95:2 131:25
Sidoti 2:7 3:3, 5 4:4 30:19 196:24 197:17, 18 203:24 204:12, 14
Signature 205:7
signed 196:6
signs 74:6
simpler 136:20
Single 18:18 42:4 155:7
sirens 89:14
sister 195:14
sit 88:3 147:6 148:1 202:25
sitting 74:1 89:19 145:7 203:4
six 129:2, 3, 4
sixteen 19:1
sleep 9:7 67:23 73:3
sleeping 60:13, 25 61:2 68:2
sleepy 12:9
slept 73:4
slow 94:21, 23 175:4
slowed 159:20 187:8
slower 94:15, 16
slowing 95:3
small 43:8
smart 144:13
smoker 26:12
smoking 134:14 154:8 155:12, 17 156:13
sofelonious 135:23 136:25
soft-spoken 9:23
Solon 3:18, 18
somebody 14:13, 18 20:10 68:11 77:5, 11 85:8 126:21 148:2 162:8 164:4
son 19:11 103:25 133:17 138:13, 21
son's 102:2, 3
soon 17:23
sorry 5:25 9:19, 24 13:15 15:12 16:17 19:6, 10 20:25 25:23 30:15 32:17 35:24 36:21 38:8, 25 39:17 42:16 49:21 55:19 56:22 63:23 64:9 78:19 90:11 91:7 98:22 101:2 106:16 107:15 118:4, 6, 8, 19 119:6 127:22 133:9 143:8

144:4 146:8 163:15 165:18 166:17 167:5 170:20 178:18 185:5 190:23 191:21 194:9, 12
sounded 169:11
source 165:2
southbound 91:7
Southview 46:14
SP 206:23
Speak 10:2 14:13, 17 20:9 22:16, 19 59:13 68:11 136:9
speaker 103:20
speaking 12:25 151:20 156:7 165:6
Special 4:15 135:15 136:4, 7, 21 137:4, 12, 20 138:8, 18 140:21 141:3 143:15 173:15 188:10, 25
specialist 12:22
specific 51:2 79:16 121:16, 24 156:12
specifically 33:16 121:16 129:9 186:9 198:18 200:22 201:13
specified 207:12
speculation 112:9
speculations 136:6, 13
speed 88:21, 23 92:4, 9 93:15 94:25 159:15, 18 160:1, 12 187:9 198:22 199:2
speeding 153:16 159:15
speeds 93:6, 19 94:19
spell 54:10 61:5 145:25
spelled 12:15 128:2, 9
spend 179:11
spin 105:15
spins 112:14
spite 49:20, 23
split 42:11 104:7 176:17, 21
spoke 53:3 68:4 134:6 136:12 150:23 151:1 152:1 193:25 201:14
spoken 14:7
spun 105:14 106:9
Square 2:7 3:6
Sr 150:15
Sr. 19:9 149:18
SR-22 34:3 35:8
SS 207:3
s-s 146:7, 8
St 41:10 66:25 67:12
stabbed 61:19
stabbing 62:15
stability 28:1
stack 82:5, 19 84:4, 21 130:2

stage 6:20
standard 120:10
standing 169:23 170:15
Star 15:11, 13, 15 17:12, 18, 22, 24 18:1, 6 30:12 31:7 32:7, 8
Starbucks 204:10
start 8:17 22:17 65:7 78:6 140:15 142:1
started 7:1 11:8 12:25 23:4, 4 67:10 70:10 72:20, 24 144:10 195:11
startled 125:18
State 2:6 15:25 16:1, 2, 7 53:4 69:21, 22 71:8, 11 91:5 116:12 124:22 207:3, 5
stated 153:4 154:7, 9, 10, 10 155:13 156:14
statement 103:15 111:18 116:18 122:13 123:21 135:10 155:11 160:25 161:14 168:1 185:21 186:1 198:20
statements 137:14 186:3
STATES 1:1
station 144:1, 21 147:2, 3, 12 149:5 151:5 152:15, 23 153:3 154:7 165:23 184:1 194:10, 14 200:3
status 18:17
stay 23:12 156:6
stay-at-home 174:23
stayed 56:2, 3
staying 54:20
stealing 58:1
steering 96:25 97:2 113:20 114:9, 24 115:12 202:22 203:3, 15
Stenographic 2:5 207:5
Stenotypy 207:8
step 8:11 76:11, 12, 12
Steving 151:21, 24 152:11, 21 153:18, 22 154:9, 23 156:8 183:23
S-t-e-v-i-n-g 151:22
Steving's 154:5
sticker 83:2
stipulate 6:19
stipulation 6:14
STNA 15:24 16:2
stop 12:13 22:15 71:17 90:6, 14 94:16 101:6, 6 105:13, 17, 25 106:11 107:1 108:6 109:6 110:8 112:14 137:23 138:10 142:4 143:11 150:3 153:15 164:19 188:13 190:16
Stop, 101:6

Case: 1:18-cv-00139-PAG  Doc #: 36  Filed: 12/14/18  68 of 71.  PageID #: 389

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

**stopped** 11:*11* 23:*1*
29:*11* 71:*21, 22* 72:*18*
78:*24* 107:*22* 111:*14*
140:*6* 142:*15* 153:*11*
163:*7* 187:*20* 190:*18, 20*
**stopping** 109:*15*
**stops** 59:*23* 113:*17*
128:*17*
**store** 60:*14* 176:*18*
**stores** 48:*14*
**straight** 62:*4* 133:*19*
**Street** 54:*6*
**stress** 14:*2*
**Strike** 19:*7* 28:*13* 49:*12*
71:*23, 24* 74:*18* 87:*2*
99:*2* 105:*23* 107:*19*
113:*16* 122:*19*
**stripes** 170:*17, 19*
**strips** 105:*1*
**strong** 28:*1*
**Strongs** 89:*3*
**STRONGSVILLE** 1:*13*
5:*16* 34:*15, 18* 35:*4*
86:*23* 87:*18* 88:*19* 89:*2,
3, 7* 91:*3* 93:*10, 18* 96:*11*
97:*6, 25* 98:*12, 14, 25*
99:*5, 8, 19* 107:*7, 21*
108:*4, 7, 16, 17* 109:*5, 15*
110:*7* 112:*15* 113:*18*
143:*15, 25* 144:*20* 147:*1,
12* 149:*15* 151:*21* 152:*4*
153:*8* 160:*8, 9* 161:*1, 7,
25* 163:*17, 22* 164:*17*
166:*21* 182:*18* 183:*19, 21*
184:*2* 193:*4, 10* 199:*6, 20*
201:*12* 206:*7*
**struck** 76:*19*
**student** 195:*10*
**study** 16:*19, 23*
**stuff** 59:*24* 132:*20* 147:*5*
195:*4*
**subject** 34:*1* 36:*6* 176:*25*
**subscribed** 206:*15*
**subsequent** 22:*6*
**subsided** 11:*16*
**successful** 31:*16*
**successfully** 16:*21*
**sudden** 20:*20*
**suffer** 26:*9* 60:*24*
**suffered** 115:*3*
**suffering** 14:*5* 25:*10*
26:*18*
**suggest** 26:*4*
**suggesting** 14:*12*
▮▮▮▮▮ 27:*11*
▮▮▮▮ 27:*19*
**Suite** 2:*8* 3:*6, 12* 43:*20*
**summer** 56:*3, 4*
**summertime** 39:*13*

**SUMMIT** 207:*4*
**supervisor** 164:*17*
**support** 6:*7* 56:*8, 9, 13,
17, 25* 59:*24* 60:*3, 9*
174:*15, 19, 21* 175:*8*
179:*23* 181:*1, 6* 195:*5*
**supported** 179:*25* 180:*5*
**supposed** 86:*16*
**sure** 7:*5* 10:*21, 22* 12:*5*
33:*5* 35:*23* 36:*4* 39:*5*
46:*20* 47:*2* 48:*7, 17* 52:*6*
54:*22* 59:*11, 14* 60:*19*
61:*21, 22* 62:*7* 67:*22*
68:*12* 70:*1, 18* 73:*18*
84:*12* 101:*24* 103:*15, 17*
104:*9, 19* 105:*3, 19* 108:*1,
2, 23, 23* 114:*10, 18, 19*
115:*19* 116:*1* 118:*22*
120:*22* 122:*11* 123:*11*
127:*13* 138:*5* 146:*19*
158:*6* 159:*21* 167:*12, 13*
176:*22, 23* 182:*5* 185:*6*
186:*7* 201:*16* 202:*21*
▮▮▮▮▮▮ 66:*10, 12, 14*
**surprise** 81:*5*
**surprised** 81:*3* 124:*10*
**surreal** 101:*19* 124:*23*
**surrounded** 187:*8, 10, 19,
24*
**Susan** 2:*4* 207:*5, 21*
**suspect** 43:*20*
**suspect's** 152:*22*
**suspended** 34:*18*
**suspension** 33:*10, 11*
78:*25* 79:*5, 20* 80:*13, 18,
21, 25* 81:*12*
**SUV** 107:*8, 21* 108:*7, 17*
109:*5, 16* 110:*7* 111:*14*
113:*18* 114:*5*
**switch** 12:*8* 85:*25, 25*
**switchblade** 61:*18*
**switched** 11:*17, 22, 22, 24*
12:*6* 23:*6* 86:*6*
**sworn** 5:*6, 9* 206:*15*
207:*6*
**symptoms** 11:*14* 22:*14*
71:*25* 74:*6*
▮▮▮▮▮▮▮ 14:*2*
**system** 24:*13* 195:*5*

**< T >**
**tablet** 24:*5, 6*
**tablets** 28:*5*
**Tackla** 3:*19*
**take** 7:*20, 24, 25* 8:*3, 8*
9:*3, 5, 6, 10, 12, 13* 15:*24*
27:*24* 28:*5* 36:*22* 41:*6*
44:*22* 70:*11* 71:*2* 72:*7*
74:*13, 15* 77:*25* 78:*13*
82:*6* 101:*22* 108:*17*

119:*7* 120:*13* 130:*25*
143:*7* 144:*3, 17* 152:*22*
158:*6* 161:*11, 20* 164:*9*
171:*10* 173:*11, 23* 182:*10*
**take-home** 176:*8*
**taken** 2:*4* 9:*1* 12:*18*
45:*1, 8* 85:*8* 88:*9* 108:*14*
133:*19* 141:*19* 153:*5*
171:*15* 204:*5* 206:*4*
207:*11*
**takes** 40:*12*
**talk** 8:*12* 62:*14* 63:*14*
75:*7* 103:*5, 9* 112:*11*
136:*3* 148:*4* 158:*2, 5*
183:*12, 15* 196:*5*
**talked** 127:*14* 149:*25*
194:*7, 8*
**talking** 79:*8* 116:*2*
134:*15* 136:*5* 148:*11*
177:*13* 184:*4*
**tall** 141:*2* 163:*11*
**Tape** 5:*4* 45:*5* 86:*9* 88:*7,
13* 141:*12, 14, 16, 21*
197:*6, 9, 14* 204:*24*
**tapes** 197:*6*
**tased** 134:*4* 192:*7*
**taser** 189:*2* 191:*10, 25*
**tax** 49:*9, 13, 24* 50:*4, 12,
17, 18, 21* 52:*3*
**taxes** 32:*11* 49:*17, 19, 24*
50:*23* 51:*20, 21* 176:*12*
**Taylor** 53:*21* 54:*4*
**Taylor's** 53:*23* 54:*1*
**teach** 78:*7*
**teaching** 179:*6*
**technical** 24:*5* 82:*20*
**Ted's** 47:*22*
**telephone** 144:*21* 145:*2*
**telephones** 148:*21*
**tell** 7:*25* 8:*4, 8* 10:*14*
15:*21* 21:*4* 32:*1, 20*
36:*23* 43:*21* 46:*7* 50:*2*
56:*25* 57:*1* 58:*11* 61:*9,
24* 62:*16* 63:*11* 73:*22*
75:*11* 76:*8* 81:*3* 85:*20*
87:*25* 88:*3* 89:*6* 90:*3, 5*
96:*17, 18* 102:*15, 24*
104:*4* 105:*9, 24* 114:*19,
25* 115:*22* 116:*15, 16*
117:*12, 15* 127:*19* 128:*11,
15* 129:*13* 131:*7* 132:*12*
133:*25* 136:*21* 146:*16, 17*
149:*11, 20* 150:*12* 157:*2*
158:*19* 159:*4* 160:*18*
161:*21* 162:*8* 164:*5*
168:*21* 170:*5, 6, 19* 171:*7*
173:*10, 16* 175:*2* 176:*15,
16* 178:*20* 181:*9* 183:*18*
188:*10* 192:*22* 193:*16*
196:*20* 203:*18*

**telling** 34:*21* 90:*14*
135:*21* 136:*2* 141:*3*
143:*14* 149:*10* 153:*18, 22*
168:*18* 188:*25*
**temporarily** 130:*25*
**Ten** 18:*8* 31:*2* 140:*16*
176:*2*
**tenth** 39:*10, 12, 13, 14, 15,
17, 20, 20* 194:*17, 21*
**term** 24:*5*
**Terminal** 2:*7* 3:*5*
**terminology** 57:*25*
**terms** 122:*19*
**Terry** 194:*24* 195:*1, 2, 2, 2*
**test** 16:*21*
**testified** 5:*10* 155:*20*
160:*21*
**testify** 111:*3* 163:*2, 8, 16,
19, 21* 171:*4* 172:*10* 207:*6*
**testifying** 6:*15*
**testimony** 26:*8* 27:*2*
42:*18* 52:*7* 64:*11* 91:*20*
101:*5* 122:*10* 144:*17*
168:*17* 202:*9, 10* 203:*10,
20* 206:*10* 207:*7, 9*
**Thank** 6:*22* 10:*5* 33:*13*
45:*11* 72:*14* 82:*23* 87:*1*
97:*16* 98:*10* 106:*14, 17*
119:*19* 122:*9* 156:*25*
171:*8* 173:*7, 19* 204:*8, 20*
**theft** 58:*1*
**thing** 7:*11* 10:*10* 46:*5*
68:*4* 93:*14* 136:*11*
146:*20*
**things** 39:*24* 82:*20*
124:*25* 154:*13, 14* 177:*14,
17, 22*
**thing's** 156:*3*
**think** 30:*7* 34:*8* 35:*24*
36:*9* 40:*13* 41:*9* 48:*4*
51:*17* 68:*11* 70:*2* 71:*16*
73:*6, 8, 25* 76:*22* 106:*2*
115:*10* 116:*19* 119:*3, 10*
121:*12, 15* 124:*23* 125:*13*
130:*20* 139:*11, 19* 149:*4,
4* 150:*2* 156:*15* 163:*9*
169:*5* 172:*6* 178:*17*
180:*23* 182:*4* 189:*10, 21*
191:*15*
**thinking** 9:*17* 24:*18*
62:*17* 73:*2, 24*
**thinks** 14:*16*
**third** 19:*13* 40:*3* 138:*8*
**Thirty-five** 18:*10*
**Thirty-seven** 84:*14*
**this,** 113:*1*
**thought** 20:*9* 35:*19*
57:*21* 68:*2* 72:*21, 25*
76:*15* 77:*1, 19* 100:*11*
103:*5* 107:*3* 111:*22*

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

132:*23*  134:*3*  162:*9*
168:*16*  189:*1*
**thoughts**  29:*1*  72:*2, 3*
163:*11*
**three**  5:*22*  18:*24*  19:*2, 13,*
*23, 25*  23:*2*  25:*6*  27:*13*
30:*7*  41:*19*  68:*6, 6*  76:*12*
99:*18*  132:*1*  145:*3*  153:*6*
157:*7*  175:*7*
**threw**  123:*22*  134:*13*
**thud**  105:*2, 2*
**thud,**  105:*2*
**ticket**  79:*4*
**Tile**  47:*24*
**time**  5:*2, 16*  7:*21, 24*  8:*3,*
*7, 11, 20*  12:*17*  13:*8, 13,*
*20, 23*  14:*18*  17:*14*  27:*6,*
*12*  28:*1*  32:*24*  34:*5*
39:*23*  44:*24*  45:*6, 21, 24*
46:*14*  49:*17*  50:*1, 14, 20*
51:*19*  52:*8*  55:*15, 16, 25*
60:*2, 2*  61:*4*  64:*5*  65:*8,*
*25*  68:*14*  71:*13*  76:*19, 21*
77:*17, 22*  78:*16*  83:*18, 21*
85:*7*  88:*8, 14*  90:*21*
91:*21*  92:*16*  93:*24*  94:*11*
95:*1*  101:*25*  102:*15*
104:*21, 24*  105:*4*  107:*2*
111:*6, 10*  116:*9*  117:*3*
119:*7*  122:*1*  125:*1, 2*
127:*10, 11*  128:*4, 17*
129:*4, 10, 11*  131:*5, 9*
134:*15, 22*  135:*4, 24*
137:*1*  140:*5*  141:*17, 22*
142:*14*  144:*9, 10*  146:*2,*
*13*  148:*13, 13*  149:*3*
150:*10, 11*  151:*1, 8*
153:*11*  158:*9, 13*  159:*12*
168:*15*  169:*6*  170:*14*
171:*13, 17*  173:*11*  177:*12*
179:*13, 15*  181:*22*  182:*1*
186:*4*  197:*10, 15, 24*
199:*16*  200:*4, 5, 6*  201:*8,*
*24*  202:*16, 19*  203:*8, 13*
204:*24*  207:*11*
**timeline**  112:*13*
**times**  13:*4, 7*  41:*18*
49:*18*  50:*5, 6, 9*  51:*6*
64:*21, 22*  68:*10*  90:*5*
95:*6*  99:*12*  138:*15*
149:*19*  150:*24*  159:*16, 18,*
*18, 19*  175:*3, 5*  176:*4*
196:*25*  200:*10*  203:*7*
**times,**  74:*3*
**tire**  105:*1, 5*
**tired**  11:*19*  73:*7, 10*
**tires**  104:*22*  105:*18*
106:*19*
**title**  86:*2, 5, 6*
**titles**  16:*6*

**today**  6:*9*  8:*20*  9:*1*
159:*25*  202:*25*
**Today's**  5:*2*
**Todd**  3:*14*  5:*15*  127:*25*
196:*24*
**told**  14:*16*  25:*24*  34:*6, 14,*
*18*  35:*4*  37:*11*  42:*4*
59:*17*  60:*10*  68:*1*  70:*2*
71:*18*  75:*16*  79:*12*  85:*24*
88:*18*  91:*2, 17*  93:*9*
96:*10*  97:*24*  98:*11, 24*
99:*4*  103:*3*  108:*4*  111:*20,*
*24, 25*  112:*1*  116:*11*
117:*8*  129:*18*  134:*9*
136:*7*  138:*13, 21*  140:*17*
146:*19*  149:*17, 22*  150:*2*
151:*13*  152:*1, 11*  153:*15*
155:*2*  161:*9*  162:*6*
166:*15, 19*  184:*8, 11*
188:*16, 18*
**top**  198:*12*
**touch**  117:*22*
**touching**  113:*24*
**Tower**  2:*7*  3:*5*
**town**  54:*15*
**track**  76:*10*
**trade**  78:*7*
**traffic**  59:*23*
**trailer**  43:*8*
**training**  170:*25, 25*  171:*5*
182:*7*
**transcript**  196:*16*
**transcription**  206:*10*
207:*9, 9*
**transferred**  28:*11*
**transported**  143:*25*
152:*25*
**traskin@mrrlaw.com**  3:*19*
**treat**  26:*20*
**treated**  29:*6*  74:*24*
**treating**  12:*21*  15:*3*
67:*25*  69:*9*  74:*18*
**treatment**  22:*10*  74:*20*
**trial**  6:*17*
**trick**  123:*14*
**tried**  61:*25*  62:*3*
▇▇▇▇▇  11:*22, 24*  12:*7,*
*13*
▇▇▇▇▇  12:*15*
**Troopers**  116:*12*
**trouble**  23:*5*  106:*15*
**true**  73:*9*  139:*8*  156:*12*
159:*11*  161:*4, 14*  162:*21,*
*22*  168:*1*  206:*9*  207:*9*
**truth**  207:*7, 7, 7*
**truthful**  168:*11*
**truthfulness**  186:*17*
**try**  10:*1*  98:*23*
**trying**  14:*3*  32:*2*  36:*25*
94:*20, 22*  103:*14*  120:*19,*

*21*  121:*1, 2*  127:*7, 8*
174:*14*
**tubings**  119:*24*
**Tummel**  54:*9*
**T-u-m-m-e-l**  54:*11*
**turn**  30:*18*  88:*2*  104:*15*
**turned**  90:*23, 25*  91:*6, 11,*
*23*  129:*5*  160:*22*
**Twenty**  48:*10*
**twice**  13:*5*  21:*25*  50:*8, 10,*
*11, 11*  51:*17*  52:*1*  100:*2*
106:*4, 5, 6, 8*  168:*2, 4, 10,*
*12*
**Two**  5:*23*  6:*3*  13:*7, 11,*
*12*  17:*18*  19:*23, 23*  20:*19*
29:*10*  31:*18*  38:*23*  41:*18*
50:*3*  59:*6*  60:*9*  65:*2*
70:*12*  76:*12*  78:*18, 20*
86:*9*  99:*24*  100:*3*  105:*9*
130:*21, 23*  138:*15*  141:*12*
152:*6, 13*  153:*6*  169:*11, 14,*
*17, 23*  170:*3, 3, 4, 8*  175:*7*
178:*13*  195:*7*  199:*5*
201:*3*  206:*8*
**two-week**  18:*3*
▇▇▇▇▇  27:*22*  28:*3, 5*
**type**  10:*16*  30:*12*  71:*23*
180:*20*  196:*12*
**typewritten**  196:*14*
**typical**  179:*5*

**< U >**
**UH**  29:*6, 24*
**Uh-huh**  41:*21*  60:*4*
83:*15*  160:*4*  191:*3*
**unconscious**  203:*21*
**undersigned**  2:*4*
**understand**  7:*17*  11:*10*
18:*13*  21:*7*  23:*23*  36:*25*
42:*17*  50:*8*  52:*6*  57:*21*
71:*23, 24*  76:*20*  77:*19*
79:*1*  86:*15*  101:*4*  114:*2*
117:*19*  122:*10*  127:*6, 8*
132:*8*  155:*19*  174:*15*
177:*5*  179:*2*  188:*22*
197:*1*
**understanding**  8:*23*  9:*9*
20:*3*  36:*5, 6*  59:*16, 17*
78:*22*  134:*7*  199:*11*
201:*3*
**understands**  132:*8*
**understood**  168:*16*  188:*11*
**uniform**  170:*17*
**uniforms**  193:*5*
**unit**  174:*13*
**UNITED**  1:*1*
**units**  86:*24*
**University**  28:*8*  29:*2*
30:*4, 10*

**unorganized**  76:*2, 7, 9*
**unpaid**  60:*8*
**unquote**  154:*9*  156:*15*
**unusual**  76:*20*
**upstairs**  174:*8*
**use**  44:*21, 21*  57:*24*  62:*5,*
*15*  102:*1, 2, 7*  130:*8*
165:*15*  191:*10, 17, 23, 25*
201:*14, 18, 19, 20, 21*
**usually**  103:*4*  174:*7*
**utilities**  174:*3*
**utilize**  191:*10*

**< V >**
**valid**  34:*2, 16*
**Van**  4:*13*  81:*24*  82:*1, 8,*
*17*  83:*9, 24*  84:*2, 9*  85:*4,*
*14, 14, 17, 19, 22, 23*  86:*2,*
*2, 4, 6, 22*  88:*20*  89:*4*
92:*20*  96:*3, 12, 25*  97:*3, 7,*
*8, 18, 21, 22*  98:*2, 3, 13*
99:*1, 6, 20, 20*  100:*12, 15*
104:*22*  105:*24, 25*  106:*2,*
*8*  107:*1, 20*  108:*5, 16*
109:*4, 14, 23*  110:*7, 23*
111:*5, 11, 13*  112:*13*
113:*16, 17, 21*  118:*10*
119:*11*  120:*9, 18, 19*
125:*10*  128:*17*  129:*10, 21*
130:*12, 19*  131:*8, 13*
132:*18, 24*  133:*1*  134:*23*
137:*21*  138:*9*  140:*23, 24*
141:*7*  142:*4, 9, 12, 15, 19*
143:*2*  149:*25*  151:*14*
162:*1, 23, 25*  163:*4, 18*
164:*18*  169:*24, 25*  170:*16*
183:*8*  187:*8, 14*  188:*12*
190:*4, 25*  198:*22*  199:*15,*
*21*  200:*16, 22*
**van's**  161:*1, 8*  199:*6*
**various**  86:*23*  98:*14*  99:*7*
182:*17*
**vehicle**  62:*6*  89:*3, 11, 13*
92:*15*  93:*2*  95:*7, 22, 23*
96:*14*  97:*2*  99:*19*  106:*3*
109:*8*  112:*13*  136:*12*
152:*3, 4, 22*  159:*14*
186:*22*  188:*3, 5*  199:*1, 12*
200:*11*  202:*4*  203:*1, 5*
**vehicle,**  161:*3*
**vehicles**  84:*3*  94:*24*  99:*8*
109:*7*  119:*15*  143:*11*
152:*7*  182:*19, 25*  183:*1, 3*
187:*7, 10, 15, 16, 19, 24*
**verbal**  7:*12*
**verbalized**  136:*6, 8*
**verbally**  35:*2*  130:*16*
196:*22*
**versus**  1:*12*

Deposition of Amanda Pauley

Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

**victim's** 184:*6, 11, 17*
**video** 162:*7*
**Videographer** 3:*19* 5:*1*
 6:*3* 44:*23* 45:*4* 83:*17, 20*
 86:*9* 88:*6, 12* 141:*12, 15,*
 *20* 158:*8, 12* 171:*12, 16*
 197:*5, 8, 13* 204:22
**videos** 186:*20*
**VIDEOTAPED** 1:*9* 2:*1*
**violated** 63:*20, 24* 64:*13*
**violence** 24:*4*
**vision** 118:*7*
**visit** 14:22
**visits** 13:*10*
**voice** 10:*3*
**voluntarily** 28:*18*

**< W >**
**Wait** 84:*16* 157:24
 191:*19*
**waived** 205:*7*
**walk** 142:*12* 147:2, *11*
**walked** 193:*3*
**want** 10:*10* 21:5 22:*16*
 23:*9* 31:*14* 45:*17* 51:*15*
 52:6 56:*20, 23* 67:*19*
 84:*19* 108:*18* 114:*23*
 121:*1* 144:*16* 172:*13*
 175:6 177:*15* 182:*4*
 185:6 196:*20, 22, 23* 197:6
**wanted** 23:9, *10* 72:*22, 23*
 77:*16* 78:8 176:*18, 19*
 194:*12* 201:*20*
**wanting** 188:*24*
**wants** 21:6
**watch** 165:22 180:*12, 13*
**watched** 162:6
**watching** 126:22 179:7
**water** 101:*2*
**way** 30:*17* 45:9 78:*11*
 81:*21* 91:*18* 117:*20*
 118:*10* 125:7 128:9
 158:*20* 161:*3, 13* 162:*1,*
 *19* 165:*13* 173:22 182:*23*
 187:*12, 13* 193:*23* 194:*1*
**weapon** 192:*8*
**weapons** 138:*17* 192:5
 200:*11*
**wearing** 193:*4*
**weather** 91:*25*
**Wednesday** 2:8
**week** 18:*9* 21:25 28:*17*
 66:*13* 175:*13, 25* 179:*11*
**weekend** 56:*2*
**weeks** 13:*11, 12* 17:*18*
 153:6
**welcome** 8:*10* 173:8
 204:*9*
**Welding** 175:*18*

**well** 7:*1* 10:21 18:*3*
 20:*17* 24:*4* 25:*24* 26:*4,*
 *16* 28:*13* 30:5 33:*10*
 51:*11* 61:*24* 68:*14* 74:*17*
 75:*23* 76:5 78:*1* 80:*4, 6*
 85:*11* 86:*2* 87:*2, 22*
 92:*15* 103:*19* 105:23
 109:*14* 117:22 118:*16, 18*
 120:*10* 126:*13, 18* 127:*17*
 132:*4* 133:*10, 12* 150:*8*
 151:*15* 152:*17* 159:*17*
 165:*15* 169:22 170:*15*
 173:*24* 174:*14* 175:*1*
 185:*5* 187:*18, 21* 195:*17*
**went** 11:*7* 24:*7, 8, 22, 25*
 32:*7, 8* 46:*4, 7, 14* 53:5
 58:*13* 61:*2, 13, 15* 62:*4*
 67:*23* 68:*1, 6, 10, 14, 21*
 73:*13* 78:*4* 79:*6, 24* 80:*5,*
 *24* 104:22 105:*5, 8*
 122:22 125:*5, 6* 138:*13,*
 *21, 22* 148:*7* 168:*15*
 174:*18* 194:*14* 203:*21*
**We're** 5:*1, 15* 7:*21* 39:*12*
 44:*23* 45:*4* 83:*20* 88:*12*
 124:*14* 128:*4* 134:*20*
 138:*5* 141:*15, 20* 158:*8,*
 *12, 23* 171:*12, 16* 172:6
 196:*4, 9* 197:*8, 13* 201:*2*
 204:22
**West** 38:*25* 41:*10* 44:*10*
**Westlake** 41:*10*
**Westshore** 10:22 42:*3*
**we've** 45:*8* 82:*25* 172:*7*
 198:*8*
**whatsoever** 185:*9*
**wheel** 96:*25* 97:*2* 113:*20*
 114:*9, 24* 115:*12* 202:22
 203:*3, 15*
**when's** 189:*13*
**WHEREOF** 207:*16*
**white** 108:*6, 17* 112:*16*
**why's** 189:*12*
**window** 35:*12* 140:*24*
 141:6 148:6
**windows** 140:*23* 147:*18,*
 *22* 148:*1*
**Winters** 3:*11*
**withdraw** 70:*23*
**within-named** 207:6
**witness** 6:*20* 20:21 24:*19*
 25:*21* 32:*17* 101:*1*
 108:*21, 24* 157:*21* 205:*7*
 207:6, *8, 16*
**witnesses** 172:*9*
**woke** 27:22
**woman** 23:*7*
**women** 55:6
**word** 116:*21* 122:*11*

**words** 46:*4* 90:*18* 110:*23*
 113:*6* 137:*3* 173:*23*
 177:*7* 202:*11*
**work** 14:2 15:*10* 17:*14,*
 *24* 18:*12* 30:*12, 22* 31:*1,*
 *11* 40:*12* 48:*1, 22* 65:6
 72:*23* 73:*10* 75:*14, 14, 16,*
 *18* 79:*3* 80:5 175:*8*
 184:*15* 197:24
**worked** 15:*17* 17:*19, 20*
 27:*24* 32:*1* 47:*21, 22, 22,*
 *23* 174:22 175:*10, 13*
**working** 18:*9* 30:*12*
 31:*22, 23* 48:*17* 175:*13*
 196:*11*
**works** 14:*13*
**worry** 139:*25*
**wound** 65:*12*
**wrapped** 23:*8*
**wreck** 131:*13*
**written** 172:*2, 16*
**wrong** 63:*2, 13* 78:22
 84:*16* 88:*2* 93:*21* 100:*20*

**< X >**
**xerographic** 83:*8* 119:*4*
**XR** 9:6

**< Y >**
**Y.E** 1:*10* 3:*10*
**Y**▮ 19:*1, 5, 6, 8, 20*
 39:*25* 40:*17, 20, 24* 41:*6,*
 *7, 22* 44:*8, 16* 53:*15*
 60:*23, 24* 75:*23, 23* 78:*3,*
 *8* 127:20 128:*6, 7, 11, 25*
 129:*6, 15, 18* 131:*4, 7, 14,*
 *19* 132:*13, 17* 133:*4, 20,*
 *24* 134:*12, 21*
**Y**▮ 39:22
**Y**▮ 195:*10*
**Yeah** 19:*10* 32:8 53:*2, 2*
 67:5 77:24 117:24
 123:23 126:*10* 139:*13, 13*
 143:*21* 151:9 154:*24*
 155:*14* 158:22 169:*12*
 175:*24* 177:*16* 183:*4*
 184:*19* 194:*12* 197:*7*
 205:*4*
**year** 9:*15, 17* 11:*4, 11*
 12:*4* 14:*12* 31:*12, 13, 13*
 39:*18, 21* 40:*13* 41:*11*
 42:*21* 44:*4* 47:*1, 3* 48:6
 49:*5, 5* 50:*4* 69:*7* 174:*17*
**years** 15:*18* 16:*10* 27:7
 29:*13, 17* 31:2 32:*1, 22*
 37:*4, 11* 38:*21* 42:*12*
 43:*2, 9* 48:2 49:*3, 3, 6, 14*
 50:*11* 51:*10, 12* 52:*1*
 59:6 64:*17* 70:*12* 74:*21*

 126:*21* 175:9 176:*12*
 181:*11*
**Year's** 61:*11*
**yelled** 116:8
**yelling** 116:5 124:*11*
**yesterday** 13:24
**young** 24:*16* 40:9 132:*5,*
 *6*
**younger** 41:7 46:*13* 65:*5*
 78:*3*

**< Z >**
▮▮▮ 9:*11, 12* 10:*14*
 11:*1, 11, 15* 12:*3, 8* 29:9

Deposition of Amanda Pauley                    Adam Fried, Administrator Estate of Roy Evans, vs. City of Strongsville,

1                              C E R T I F I C A T E

2

3        STATE OF OHIO,  )
                         )  SS:
4        SUMMIT COUNTY.  )

5            I, Susan M. Petro, a Stenographic Reporter and
         Notary Public within and for the State of Ohio, do
6        hereby certify that the within-named Witness, AMANDA
         PAULEY, was by me first duly sworn to testify the
7        truth, the whole truth and nothing but the truth in the
         cause aforesaid; that the testimony so given by her was
8        by me reduced to Stenotypy in the presence of said
         witness; afterwards prepared and produced by means of
9        Computer-Aided Transcription, and that the foregoing is
         a true and correct transcription of the testimony so
10       given by her as aforesaid.

11           I do further certify that this deposition was
         taken at the time and place in the foregoing caption
12       specified, and was adjourned.

13           I do further certify that I am not a relative,
         employee of or attorney for any party or counsel, or
14       otherwise financially interested in this action.

15           I do further certify that I am not, nor is the
         court reporting firm with which I am affiliated, under
16       a contract as defined in Civil Rule 28(D).

17

18           IN WITNESS WHEREOF, I have hereunto set my hand
         and affixed my seal of office at Akron, Ohio, this 30th
         day of July, 2018.
19

20

21       _____
         Susan M. Petro, Notary Public
         My commission expires May 7, 2022
22

23

24

25

Tackla Court Reporting, LLC              PH:  216.241.3918                      Page: 207